ORAL ARGUMENT NOT YET SCHEDULED

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

**Case No. 13-1060**

POM WONDERFUL, LLC, ET AL

*Petitioner,*

v.

FEDERAL TRADE COMMISSION,

*Respondent.*

ON APPEAL FROM THE FEDERAL TRADE COMMISSION
CASE NO. 9344

## JOINT APPENDIX
## VOLUME II of III

Thomas C. Goldstein
Eric Citron
GOLDSTEIN & RUSSELL, P.C.
5225 Wisconsin Ave. N.W.
Suite 404
Washington, D.C. 20015
Telephone: (202) 362-0636
Facsimile: (866) 574-2033
tg@goldsteinrussell.com

Kristina Diaz
Johnny Traboulsi
Brooke Hammond
ROLL LAW GROUP P.C.
11444 West Olympic Blvd
10th Floor
Los Angeles, CA 90064
Telephone: (310) 966-8400

Erik S. Jaffe
ERIK S. JAFFE, P.C.
5104 34th Street, NW
Washington, DC 20008
(202) 237-8165
jaffe@esjpc.com

*Counsel for Petitioner*

Bertram Fields
GREENBERG, GLUSKER
FIELDS CLAMAN &
MACHTINGER LLP
1900 Avenue of the Stars
21st Floor
Los Angeles, CA 90067

John Graubert
Megan L. Rodgers
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC 20004
(202) 662-5938

Jonathan E. Nuechterlein
Joel Marcus
Jessica Rich
Imad D. Abyad
FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., N.W.
Washington, DC 20580
(202) 326-2375

*Counsel for Respondent*

March 12, 2014

# JOINT APPENDIX TABLE OF CONTENTS

**Document Description**                                    **Page**

## Volume I
## JA-0001 - 577

Case Timeline, POM Wonderful LLC and Roll Global LLC,
FTC Docket No. 9344 .................................................................. JA-0001

Administrative Complaint with Exhibits
(FTC Sept. 24, 2010)..................................................................... JA-0015

Order of Chief Administrative Law Judge D. Michael Chappell
(FTC May 17, 2012)....................................................................... JA-0065

Initial Decision by Chief Administrative Law Judge D. Michael
Chappell (FTC May 17, 2012) ....................................................... JA-0070

Appendix to Initial Decision by Chief Administrative Law Judge D.
Michael Chappell (FTC May 17, 2012) ......................................... JA-0415

Answering Brief of Respondents (FTC Jul. 18, 2012) .................. JA-0524

**Document Description (cont.)**                                          **Page**

## Volume II
## JA-0578 - 956

Final Order of Commission (FTC Jan. 10, 2013)......................... JA-0578

Opinion of the Commission (FTC Jan. 10, 2013)......................... JA-0584

Claims Appendix A to Opinion of Commission
(FTC Jan. 10, 2013) .................................................................... JA-0638

Figures Appendix B to Opinion of Commission
(FTC Jan. 10, 2013) .................................................................... JA-0652

Summary Table of Commission Findings
Regarding POM Exhibits (FTC Jan. 10, 2013)............................ JA-0765

Concurring Statement of Commissioner Ohlhausen
(FTC Jan. 10, 2013) .................................................................... JA-0768

Concurring Statement of Commissioner Rosch
(FTC Jan. 10, 2013) .................................................................... JA-0775

Letter from Donald S. Clark to Jonathan W. Emord, Denying Petition
for Rulemaking (Nov. 30, 2000) .................................................. JA-0778

Fed. Trade Comm'n Bureau of Consumer Protection, Dietary
Supplements: An Advertising Guide for Industry (2001) ........... JA-0791

Exhibit CX0016 POM Wonderful Advertisement "Drink and be healthy"
(Oct. 12, 2003) ............................................................................ JA-0823

Exhibit CX0029 POM Wonderful Advertisement "Studies Show that 10
out of 10 People Don't Want to Die"
(Nov. 11, 2004).............................................................................. JA-0825

## Document Description (cont.)          Page

Exhibit CX0034 POM Wonderful Advertisement "Amaze your cardiologist." (Feb. 1, 2005) ........................................................... JA-0828

Exhibit CX0036 POM Wonderful Advertisement "Cheat death." (Mar. 10, 2005) ...................................................................... JA-0830

Office of Dietary Supplements, National Institutes of Health, Dietary Supplement Fact Sheet: Vitamin C (Jun. 6, 2005) ....................... JA-0832

Office of Dietary Supplements, National Institutes of Health, Dietary Supplement Fact Sheet: Vitamin E (Jun. 6, 2005) ....................... JA-0845

Exhibit PX0178, Eastham, James A., *Prostate-Specific Antigen Doubling Time as a Prognostic Marker in Prostate Cancer*, Natural Clinical Practice, Vol 2 No. 10 (Oct. 2005) .................................. .JA-0856

Exhibit CX0065 POM Wonderful, POMx Press Release (Jun. 10, 2006). ............................................................... JA-0866

Exhibit CX0122 POM Wonderful Advertisement "Science, not fiction." (May 1, 2007) ................................................................ JA-0870

Exhibit CX0120 POM Wonderful Advertisement "One small pill for mankind." (May 28, 2007) .......................................................... JA-0872

Exhibit CX0128 Email from P. Holmgren to POM Wonderful Re: Press Release with Attachment (Jun. 27, 2007) .................................... JA-0874

Exhibit CX0169 POM Wonderful Advertisement "The power of POM, in one little pill." (Jan. 6, 2008) .......................................... JA-0878

Exhibit CX0180 POM Wonderful Advertisement "The antioxidant superpill." (Feb. 3, 2008) .............................................. JA-0880

Exhibit CX0260 POM Wonderful Advertisement "Drink to prostate health." (Dec. 1, 2008) .................................................. JA-0882

**Document Description (cont.)**                                    **Page**

Exhibit PX0014, Davidson, Michael H. et al, *Effects of Consumption of Pomegranate Juice on Carotid Intima-Media Thickness in Men and Women at Moderate Risk for Coronary Heart Disease*, Amer. Journal of Cardiology (2009) ........................................................................ JA-0884

Exhibit CX0274 POM Wonderful Advertisement "I'm off to save PROSTATES!" (Feb. 1, 2009)......................................................... JA-0891

Exhibit CX0279 POM Wonderful Advertisement "Science, not fiction." (Mar. 1, 2009) ................................................................. JA-0893

Exhibit CX0280 POM Wonderful Advertisement "Live Long Enough to Watch Your 401(k) Recover." (Mar. 21, 2009) .............................. JA-0895

Exhibit CX0314 Email from A. Hernandez to C. Nelson Re: Need some images, with attachment (Jun. 2, 2009) ...................................... JA-0899

Exhibit CX0379 POM Wonderful Advertisement "Lucky I Have Super Health Powers!" (Jul. 21, 2009) .................................................... JA-0909

Exhibit CX0372 POM Wonderful Advertisement "Lucky I Have Super Health Powers!" (Sept. 2, 2009) ................................................... JA-0913

Exhibit CX0380 POM Wonderful Advertisement "Lucky I Have Super Health Powers!" (Sept. 10, 2009) ................................................. JA-0917

Exhibit CX0331 POM Wonderful Advertisement "Healthy. ~~Wealthy~~. And Wise." (Sept. 27, 2009)........................................................... JA-0924

David C. Vladeck, Remarks at the Council for Responsible Nutrition Annual Symposium for the Dietary Supplement Industry: Priorities for Dietary Supplement Advertising Enforcement (Oct. 22, 2009)................................................................. JA-0930

Mary K. Engle, The FTC's Advertising Priorities (Oct. 22, 2009) ............................................................... JA-0942

**Document Description (cont.)**                       **Page**

## Volume III
### JA-0957 – 1315

Exhibit CX0328 POM Wonderful Advertisement "Your New Health Care Plan." (Nov. 8, 2009) ............................................................. JA-0957

Exhibit CX0337 POM Wonderful Advertisement "The First Bottle You Should Open in 2010." (Jan. 3, 2010) ........................................... JA-0959

Exhibit CX0342 POM Wonderful Advertisement "Take Out A Life Insurance Supplement." (Feb. 22, 2010) ...................................... JA-0961

Exhibit CX0344 Letter from FDA to M. Tupper Re: Inspections and Compliance (Feb. 23, 2010) ............................................................ JA-0963

Exhibit CX0348 POM Wonderful Advertisement "24 Scientific Studies Now in One Easy-To-Swallow Pill." (Apr. 1, 2010) ....................... JA-0967

Exhibit CX0350 POM Wonderful Advertisement "24 Scientific Studies Now in One Easy-To-Swallow Pill." (Apr. 26, 2010) .................... JA-0970

Exhibit CX0351 POM Wonderful Advertisement "The Only Antioxidant Supplement Rated X." (May 1, 2010) ........................................... JA-0972

Exhibit CX0353 POM Wonderful Advertisement "Take Out A Life Insurance Supplement." (Jun. 14, 2010) ..................................... JA-0974

Exhibit CX0355 POM Wonderful Advertisement "The Only Antioxidant Supplement Rated X." (Jul. 1, 2010) ........................................... JA-0976

The Organic Center, Elevating Antioxidant Intakes (Aug. 2010) ...................................................................................... JA-0978

Exhibit CX1336, Deposition Transcript Excerpt of Michael H. Davidson (Dec. 3, 2010) ................................................................... JA-0980

## Document Description (cont.)                                    Page

Exhibit CX1341, Deposition Transcript Excerpt of Allan Pantuck
(Dec. 15, 2010) ................................................................................ JA-0994

Exhibit CX1352, Deposition Transcript Excerpt of David Heber
(Jan. 28, 2011) ................................................................................. JA-1003

Exhibit CX1287, Expert Report of James A. Eastham
(Mar. 3, 2011) .................................................................................. JA-1013

Exhibit CX1291, Expert Report of Frank M. Sacks
(Mar. 3, 2011) .................................................................................. JA-1039

Exhibit CX1289, Expert Report of Arnold Melman
(Mar. 4, 2011) .................................................................................. JA-1078

Exhibit CX1293, Expert Report of Meir Jonathan Stampfer
(Mar. 4, 2011) .................................................................................. JA-1096

Exhibit PX0206, Expert Report of Denis R. Miller
(Mar. 18, 2011) ................................................................................ JA-1126

Exhibit PX0025, Expert Report of Dean Ornish
(Mar. 4, 2011) .................................................................................. JA-1146

Exhibit PX0149, Expert Report of Arthur Burnett ...................... JA-1173

Exhibit PX0192, Expert Report of David Heber
(Mar. 18, 2011) ................................................................................ JA-1180

Exhibit PX0362, Deposition Transcript Excerpt of Meir Jonathan
Stampfer (Apr. 6, 2011) ................................................................. JA-1187

Exhibit PX0361, Deposition Transcript Excerpt of Frank Sacks
(Apr. 12, 2011) ................................................................................ JA-1193

**Document Description (cont.)**                                    **Page**

Hearing Transcript Excerpts *In The Matter Of POM Wonderful, et al*
(May 24 - Oct. 12, 2011) ............................................................. JA-1206

Statement of Commissioner Ohlhausen Dissenting In Part, *In the Matter of GeneLink, Inc. and foru International Corporation,* FTC File No. 112 3095 (Jan. 7, 2014) ......................................................... JA-1295

Memorial Sloan-Kettering Cancer Center, Integrative Medicine: Pomegranate Information, available at http://www.mskcc.org/cancercare/herb/pomegranate (last visited Mar. 10, 2014). ................................................... JA-1298

Academy of Nutrition & Dietetics, *What Are Antioxidants?*, available at http://www.eatright.org/public/content.aspx?id=6792 (last visited Mar. 10, 2014) .......................................................... JA-1304

The University of Chicago Medicine, Profile of Michael H. Davidson, MD, available at http://www.uchospitals.edu/physicians/michael-davidson.html (last visited Mar. 10, 2014). ................................. JA-1306

Stanford Medicine Cancer Institute, *Nutrition to Reduce Cancer Risk*, available at http://cancer.stanford.edu/information/nutritionAndCancer/reduceRisk/ (last visited Mar. 10, 2014) .......................................................... JA-1308

Medicare Prostate Cancer Screening Information, available at http://www.medicare.gov/coverage/prostate-cancer-screenings.html (last visited Mar. 10, 2014) .......................................................... JA-1313

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

COMMISSIONERS:                   **Jon Leibowitz, Chairman**
                                 **J. Thomas Rosch**
                                 **Edith Ramirez**
                                 **Julie Brill**
                                 **Maureen K. Ohlhausen**

———————————————————————
                                          )
**In the Matter of**                       )
                                          )
**POM WONDERFUL LLC and**                  )
**ROLL GLOBAL LLC,**                       )      **Docket No. 9344**
  **as successor in interest to Roll International**   )
  **Corporation, companies, and**           )
                                          )
**STEWART A. RESNICK,**                    )
**LYNDA RAE RESNICK, and**                 )
**MATTHEW TUPPER, individually and as**    )
  **officers of the companies,**             )
                                          )
           **Respondents.**            )
———————————————————————)

**FINAL ORDER**

**DEFINITIONS**

For purposes of this Order, the following definitions shall apply:

1.      Unless otherwise specified, "Individual Respondents" means Stewart A. Resnick, Lynda Rae Resnick, and Matthew Tupper, individually and as officers of POM Wonderful LLC ("POM Wonderful") and Roll Global LLC ("Roll").

2.      Unless otherwise specified, "Respondents" means POM Wonderful and Roll, their successors and assigns; the Individual Respondents; and each of the above's officers, agents, representatives, and employees.

3.      "Commerce" means as defined in Section 4 of the Federal Trade Commission Act, 15 U.S.C. § 44.

4.      "Covered Product" means any food, drug, or dietary supplement, including, but not limited to the POM Products.

1

5.      "Food" and "drug" means as defined in Section 15 of the Federal Trade Commission Act, 15 U.S.C. § 55.

6.      "Endorsement" means as defined in 16 C.F.R. § 255.0(b).

7.      "POM Product" means any food, drug, or dietary supplement containing pomegranate or its components, including, but not limited to, POM Wonderful 100% Pomegranate Juice and pomegranate juice blends, POMx Pills, POMx Liquid, POMx Tea, POMx Iced Coffee, POMx Bars, and POMx Shots.

8.      The term "including" in this Order means "without limitation."

9.      The terms "and" and "or" in this Order shall be construed conjunctively or disjunctively as necessary, to make the applicable phrase or sentence inclusive rather than exclusive.

## I.

**IT IS ORDERED** that Respondents, directly or through any corporation, partnership, subsidiary, division, trade name, or other device, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product, in or affecting commerce, shall not make any representation in any manner, expressly or by implication, including through the use of a product name, endorsement, depiction, illustration, trademark, or trade name, that such product is effective in the diagnosis, cure, mitigation, treatment, or prevention of any disease, including, but not limited to, any representation that the product will treat, prevent or reduce the risk of heart disease, including by decreasing arterial plaque, lowering blood pressure, or improving blood flow to the heart; treat, prevent or reduce the risk of prostate cancer; or treat, prevent or reduce the risk of erectile dysfunction; unless the representation is non-misleading and, at the time of making such representation, Respondents possess and rely upon competent and reliable scientific evidence that, when considered in light of the entire body of relevant and reliable scientific evidence, is sufficient to substantiate that the representation is true.  For purposes of this Part I, competent and reliable scientific evidence shall consist of at least two randomized and controlled human clinical trials (RCTs) of the Covered Product that are randomized, well controlled, based on valid end points, and conducted by persons qualified by training and experience to conduct such studies.  Such studies shall also yield statistically significant results, and shall be double-blinded unless Respondents can demonstrate that blinding cannot be effectively implemented given the nature of the intervention.

## II.

**IT IS FURTHER ORDERED** that Respondents, directly or through any corporation, partnership, subsidiary, division, trade name, or other device, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product, in or affecting commerce, shall not misrepresent, in any manner, expressly or by implication, including through the use of a product name, endorsement, depiction, or

2

illustration, trademark, or trade name, the existence, contents, validity, results, conclusions, or interpretations of any test, study, or research.

### III.

**IT IS FURTHER ORDERED** that Respondents, directly or through any corporation, partnership, subsidiary, division, trade name, or other device, in connection with the manufacturing, labeling, advertising, promotion, offering for sale, sale, or distribution of any Covered Product, in or affecting commerce, shall not make any representation, in any manner, expressly or by implication, including through the use of a product name, endorsement, depiction, illustration, trademark, or trade name, about the health benefits, performance, or efficacy of any Covered Product, unless the representation is non-misleading, and, at the time of making such representation, Respondents possess and rely upon competent and reliable scientific evidence that is sufficient in quality and quantity based on standards generally accepted in the relevant scientific fields, when considered in light of the entire body of relevant and reliable scientific evidence, to substantiate that the representation is true. For purposes of this Part III, competent and reliable scientific evidence means tests, analyses, research, or studies that have been conducted and evaluated in an objective manner by qualified persons and are generally accepted in the profession to yield accurate and reliable results.

### IV.

**IT IS FURTHER ORDERED** that:

A.   Nothing in Parts I through III of the Order shall prohibit Respondents from making any representation for any product that is specifically permitted in labeling for such product by regulations promulgated by the Food and Drug Administration pursuant to the Nutrition Labeling and Education Act of 1990; and

B.   Nothing in Parts I through III of the Order shall prohibit Respondents from making any representation for any drug that is permitted in the labeling for such drug under any tentative final or final standard promulgated by the Food and Drug Administration, or under any new drug application approved by the Food and Drug Administration.

### V.

**IT IS FURTHER ORDERED** that POM Wonderful, Roll, and their successors and assigns, and Individual Respondents shall, for five (5) years after the last date of dissemination of any representation covered by this Order, maintain and upon request make available to the Commission for inspection and copying:

A.   All advertisements, labeling, packaging, and promotional materials containing the representation;

B.   All materials that were relied upon in disseminating the representation;

C.     All tests, reports, studies, surveys, demonstrations, or other evidence in their possession or control that contradict, qualify, or call into question the representation, or the basis relied upon for the representation, including complaints and other communications with consumers or with governmental or consumer protection organizations; and

D.     All acknowledgments of receipt of this Order, obtained pursuant to Part VI.

## VI.

**IT IS FURTHER ORDERED** that POM Wonderful, Roll, and their successors and assigns, and Individual Respondents shall deliver a copy of this Order to all of their current and future principals, officers, directors, and managers, and to all of their current and future employees, agents, and representatives having managerial responsibilities with respect to the subject matter of this Order, and shall secure from each such person a signed and dated statement acknowledging receipt of the Order. POM Wonderful, Roll, and their successors and assigns, and Individual Respondents shall deliver this Order to such current personnel within thirty (30) days after the effective date of this Order, and to such future personnel within thirty (30) days after the person assumes such position or responsibilities.

## VII.

**IT IS FURTHER ORDERED** that POM Wonderful, Roll, and their successors and assigns, shall notify the Commission at least thirty (30) days prior to any change in the corporations or any business entity that POM Wonderful, Roll, and their successors and assigns, and Individual Respondents directly or indirectly control, or have an ownership interest in, that may affect compliance obligations arising under this Order, including but not limited to formation of a new business entity; a dissolution, assignment, sale, merger, or other action that would result in the emergence of a successor entity; the creation or dissolution of a subsidiary, parent, or affiliate that engages in any acts or practices subject to this Order; the proposed filing of a bankruptcy petition; or a change in the business or corporate name or address.  Provided, however, that, with respect to any proposed change about which POM Wonderful, Roll, and their successors and assigns, and Individual Respondents learn less than thirty (30) days prior to the date such action is to take place, POM Wonderful, Roll, and their successors and assigns, and Individual Respondents shall notify the Commission as soon as is practicable after obtaining such knowledge. Unless otherwise directed by a representative of the Commission, all notices required by this Part shall be sent by overnight courier to the Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580, with the subject line FTC v. POM Wonderful. *Provided, however*, that, in lieu of overnight courier, notices may be sent by first class mail, but only if electronic versions of such notices are contemporaneously sent to the Commission at DEbrief@ftc.gov.

4

## VIII.

**IT IS FURTHER ORDERED** that each Individual Respondent, for a period of ten (10) years after the date of issuance of this Order, shall notify the Commission of the discontinuance of his current business or employment, or of his affiliation with any new business or employment.  The notice shall include the Individual Respondent's new business address and telephone number and a description of the nature of the business or employment and his or her duties and responsibilities.  Unless otherwise directed by a representative of the Commission, all notices required by this Part shall be sent by overnight courier to the Associate Director for Enforcement, Bureau of Consumer Protection, Federal Trade Commission, 600 Pennsylvania Avenue NW, Washington, DC 20580, with the subject line FTC v. POM Wonderful. Provided, however, that, in lieu of overnight courier, notices may be sent by first-class mail, but only if electronic versions of such notices are contemporaneously sent to the Commission at DEbrief@ftc.gov.

## IX.

**IT IS FURTHER ORDERED** that POM Wonderful, Roll, and their successors and assigns, and Individual Respondents within sixty (60) days after the effective date of this Order, shall each file with the Commission a true and accurate report, in writing, setting forth in detail the manner and form of their compliance with this Order.  Within ten (10) days of receipt of written notice from a representative of the Commission, they shall submit additional true and accurate written reports.

## X.

This Order will terminate on January 10, 2033, or twenty (20) years from the most recent date that the United States or the Commission files a complaint (with or without an accompanying consent decree) in federal court alleging any violation of the Order, whichever comes later; provided, however, that the filing of such a complaint will not affect the duration of:

A.     Any Part in this Order that terminates in less than twenty (20) years;

B.     This Order's application to any proposed respondent that is not named as a defendant in such complaint; and

C.     This Order if such complaint is filed after the Order has terminated pursuant to this Part.

*Provided, further*, that if such complaint is dismissed or a federal court rules that Respondents did not violate any provision of the Order, and the dismissal or ruling is either not appealed or upheld on appeal, then the Order will terminate according to this Part as though the complaint had never been filed, except that the Order will not terminate between the date such complaint is filed and the later of the deadline for appealing such dismissal or ruling and the date such dismissal or ruling is upheld on appeal.

By the Commission.


Donald S. Clark
Secretary


ISSUED:  January 10, 2013
SEAL:

6

**UNITED STATES OF AMERICA**
**BEFORE THE FEDERAL TRADE COMMISSION**

**COMMISSIONERS:**          **Jon Leibowitz, Chairman**
                           **J. Thomas Rosch**
                           **Edith Ramirez**
                           **Julie Brill**
                           **Maureen K. Ohlhausen**

---

|  |  |
|---|---|
| **In the Matter of** ) | |
| ) | |
| **POM WONDERFUL LLC and** ) | |
| **ROLL GLOBAL LLC,** ) | **Docket No. 9344** |
|   **as successor in interest to Roll International** ) | |
|   **Corporation, companies, and** ) | **January 10, 2013** |
| ) | |
| **STEWART A. RESNICK,** ) | |
| **LYNDA RAE RESNICK, and** ) | |
| **MATTHEW TUPPER, individually and as** ) | |
|   **officers of the companies,** ) | |
| ) | |
|             **Respondents.** ) | |

---

## OPINION OF THE COMMISSION

### By OHLHAUSEN, Commissioner:

### I.      Introduction

Respondents POM Wonderful LLC ("POM Wonderful" or "POM"), Roll Global LLC ("Roll Global"), Stewart A. Resnick, Lynda Rae Resnick, and Matthew Tupper (collectively, "Respondents") appeal from Administrative Law Judge ("ALJ")[1] D. Michael Chappell's Initial Decision and Order holding them liable for violating Sections 5(a) and 12 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. §§ 45 and 52, by making false or misleading claims in multiple media fora to promote their pomegranate juice products, specifically POM Wonderful Juice, POMx Pills, and POMx Liquid (collectively, "Challenged POM Products").  Complaint Counsel cross-appeal the ALJ's finding that some of the challenged advertisements did not make the representations alleged in the Complaint, his holding concerning the level of scientific support needed to make the alleged claims, and the injunctive relief outlined in the ALJ's Order. We conclude that the Respondents have violated Section 5(a) and Section 12 of the FTC Act, based on both the findings of the ALJ and on additional challenged advertisements, and we issue a Final Order which differs in some respects from the Order attached to the Initial Decision.

Respondents have marketed the Challenged POM Products using a variety of means since they began selling and marketing POM Wonderful Juice in 2002.  Between 2002 and 2010, sales for all Challenged POM Products totaled close to $250 million.

On September 24, 2010, the Commission issued an administrative complaint alleging that Respondents engaged in deceptive acts and practices and disseminated false advertising in violation of Sections 5(a) and 12 of the FTC Act in promoting the Challenged POM Products. The Complaint alleged that Respondents disseminated advertising and promotional materials representing that consumption of certain doses of Challenged POM Products treats, prevents or reduces the risk of heart disease, prostate cancer, or erectile dysfunction ("ED"), without having a reasonable basis to substantiate these claims.  The Complaint also alleged that Respondents disseminated advertising and promotional materials representing that clinical studies, research, and/or trials prove that consumption of the Challenged POM Products in certain doses treats, prevents or reduces the risk of heart disease, prostate cancer, or ED, when in fact clinical studies, research, or trials do not so prove.

---

[1] For purposes of this opinion, we use the following abbreviations in referencing the record:
    ALJ:  Administrative Law Judge D. Michael Chappell
    Tr.:  Transcript of trial testimony before the ALJ
    Dep.:  Transcript of deposition
    ID:  Initial Decision
    IDF:  Initial Decision Findings of Fact
    CCA:  Complaint Counsel's Appeal Brief
    RA:  Respondents' Appeal Brief
    RAns:  Respondents' Answering Brief
    RR:  Respondents' Reply Brief
    CX:  Complaint Counsel Exhibit
    PX:  Respondent Exhibit

At trial, Complaint Counsel challenged a total of 43 items, including print advertisements, newsletters, separate "web captures" of Respondents' websites, Internet banner advertisements, press releases, and media interviews. Respondents denied that such materials make the claims alleged and argued that the claims that were made in their advertising and promotional materials were substantiated adequately by scientific research. Some of POM's ads and marketing materials stated that the Challenged POM Products were supported by over $30 million in medical research.

In his Initial Decision, the ALJ found that 19 of the 43 challenged advertisements and promotional materials contained implied claims that the Challenged POM Products treat, prevent or reduce the risk of heart disease, prostate cancer, or ED, and that in 14 of these ads, there were implied claims that the effects on disease were clinically proven; that those claims were false or misleading; and that the claims were material to consumers' purchasing decisions. ID at 5-6. In his opinion, the ALJ determined that in the case of a safe food that is not advertised as a substitute for medical treatment, competent and reliable scientific evidence includes clinical studies though not necessarily double-blind, randomized, placebo-controlled clinical trials. *Id.* at 328. The ALJ attached to the Initial Decision an order that would, if issued by the Commission, prohibit the Respondents from making representations that any food, drug, or dietary supplement, including but not limited to the Challenged POM Products, is effective in diagnosing, curing, treating, mitigating, or preventing any disease unless such representations are not misleading and are based on competent and reliable scientific evidence. *Id.* at 332. The order would also prohibit Respondents from misrepresenting the results of any test, study or research in connection with the advertisement or sale of any food, drug, or dietary supplement, including but not limited to the Challenged POM Products. *Id.* In addition, the order would prohibit Respondents from making any representation about the health benefits, performance, or efficacy of any food, drug, or dietary supplement, including but not limited to the Challenged POM Products, unless the representation is non-misleading and based on Respondents' reliance on competent and reliable scientific evidence. *Id.* The order would define "competent and reliable scientific evidence" as "tests, analyses, research, or studies, conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results." *Id.* at 331.

Respondents' principal claims on appeal are that the ALJ erred in (1) finding that any of the challenged advertising and promotional materials contain implied efficacy or establishment claims (*i.e.*, those asserting that the efficacy claims are established scientifically) that the Challenged POM Products treat, prevent or reduce the risk of heart disease, prostate cancer, or ED; (2) holding that substantiation for such claims required clinical studies; and (3) finding the foregoing claims to be material. Respondents also allege that the relief ordered is impermissibly broad and runs afoul of the First and Fifth Amendments.

Complaint Counsel's principal claims on cross-appeal are (1) the ALJ should have found that all of the challenged advertisements and promotional materials (including four media interviews) made efficacy claims; (2) all but four of these materials also included establishment claims; (3) the ALJ incorrectly applied a substantiation standard requiring only clinical studies, rather than the higher standard of well-designed, well-conducted, double-blind, randomized

2

controlled clinical trials (referred to in this opinion as "RCTs"); and (4) in his order, the ALJ should have required pre-approval by the Food and Drug Administration ("FDA") of any future disease claims made by Respondents with respect to the Challenged POM Products.

Based on our consideration of the entire record in this case and the arguments of counsel, we deny Respondents' appeal and grant in part, and deny in part, Complaint Counsel's cross-appeal. We find Respondents liable on the basis of a larger number of advertisements containing false and misleading claims than the ALJ found. The basis of Respondents' liability under the FTC Act is their lack of sufficiently reliable evidence — namely, RCTs (as described more fully below in this opinion) — to substantiate the claims that we found. Complaint Counsel's experts testified that two RCTs are necessary to substantiate the heart disease claims at issue, while the prostate cancer and ED claims can be substantiated with at least one RCT. *See* CX1291 at 15 (Sacks Expert Report) (for heart disease "most scientists and researchers . . . believe that at least two-well designed studies . . . showing strong results are needed to constitute reliable evidence"); CX1287 at 6 (Eastham Expert Report) (stating "qualified experts in the field of urology, including the prevention and treatment of prostate cancer, . . . would require that Respondents' claims be supported by at least one well-conducted, randomized, double-blind, placebo-controlled clinical trial with an appropriate endpoint"); and CX1289 at 4 (Melman Expert Report) ("[t]o constitute competent and reliable scientific evidence, experts in the field of erectile dysfunction would require at least one clinical trial, involving several investigatory sites, that is well-designed, randomized, placebo-controlled, and double-blinded"). The Commission need not, and does not, reach the question of the number of RCTs needed to substantiate the claims made because, as discussed below, Respondents failed to proffer even one RCT that supports the challenged claims that we found they made.[2] The Final Order we issue today differs from that proposed by the ALJ and contains fencing-in relief by providing that any disease-related establishment or efficacy claims made about the Challenged POM Products or in connection with Respondents' sale of any food, drug, or dietary supplement must be supported by at least two RCTs.[3] However, we do not reach the question of liability based on the four challenged media interviews, and today's Final Order does not include a provision requiring FDA pre-approval of any future claims made by Respondents.

## II.     Factual Background and Proceedings Below

Respondent POM Wonderful is a limited liability company wholly owned by the Stewart and Lynda Resnick Revocable Trust dated December 27, 1988. IDF 1, 3. In 2002, POM Wonderful launched the first of the Challenged POM Products, POM Wonderful Juice, and currently sells all of the Challenged POM Products. IDF 5, 6. Respondent Roll Global is a separate corporation wholly owned by the same trust; Roll Global owns a number of companies, including POM Wonderful LLC, FIJI Water, Suterra, Paramount Farms, Paramount Citrus, Teleflora, Neptune Shipping, Paramount Farming, and Justin Winery. IDF 7, 9, 11. Roll

---

[2] The Commission applies the same rationale throughout this opinion when it refers to a requirement of "RCTs" for Respondents' liability under the FTC Act.

[3] As explained more fully in Section X.B, Commissioner Ohlhausen supports an order provision requiring at least one RCT, viewed in light of the relevant scientific evidence, for disease-related efficacy and establishment claims made about the Challenged POM Products or in connection with the sale of any food, drug, or dietary supplement by the Respondents.

3

International Corporation reorganized at the end of 2010 and is currently known as Roll Global. IDF 8.  Roll Global uses an in-house advertising agency for POM and its other affiliated companies.  IDF 14.

The individual Respondents in this case include Stewart Resnick, Lynda Resnick, and Matthew Tupper.  Stewart Resnick is the Chairman and CEO of POM Wonderful, and Chairman and President of Roll Global.  IDF 19-21.[4]  His responsibilities include setting the marketing, advertising, and medical research budgets for POM Wonderful.  IDF 23.  Although he leaves most of the marketing decisions about POM Wonderful to his wife, Lynda Resnick, he considers himself responsible for whether advertising should or should not be published and has been involved at a high level with POM's advertising and marketing campaigns.  IDF 25-26.  Lynda Resnick is Vice Chairman of Roll Global and sole owner of POM Wonderful along with Stewart Resnick.  IDF 15, 28.  Mrs. Resnick was still the chief marketing executive at POM as of 2011, working with POM's marketing department and internal advertising agency to implement creative concepts for POM's campaigns.  IDF 31, 33.  Mrs. Resnick has the "final say" with respect to POM's marketing and advertising content and concepts.  IDF 34.  Matthew Tupper joined POM in 2003 as Chief Operating Officer and became President of POM Wonderful in 2005 before retiring from POM at the end of 2011.  IDF 37-38, 40.  Mr. Tupper was responsible for the day-to-day affairs of POM, including managing the operations of the marketing team.  IDF 44.  The head of POM's Marketing Department reported to Mr. Tupper, and one of Mr. Tupper's responsibilities was to serve as a liaison between the marketing staff and the researchers who performed the medical studies sponsored by POM.  IDF 50, 52.

The Challenged POM Products are POM Juice, POMx Liquid, and POMx Pills.  POM Juice is a 100% juice product produced by pressing whole pomegranates, filtering and/or enzyme-treating the juice, concentrating the juice, reconstituting it with water, pasteurizing it, and bottling it.  IDF 58-60.  A single serving of POM Juice is eight ounces, and it is sold in grocery stores for a price of approximately $3 for an eight-ounce bottle.  IDF 64-65, 97.  POM Juice contains a variety of polyphenols (including ellagitannins and gallotannins, anthocyanins, and ellagic acid).  IDF 62-63.  POMx Liquid "is the product of the pressed whole fruit after most of the juice is extracted and the polyphenols are concentrated by filtering and concentrating using juice processing."  IDF 67 (quoting CX0096, *in camera*, at 0014).  A single serving is one teaspoon daily.  IDF 69.  POMx Pills are made through a process by which POMx Liquid is extracted.  IDF 70.  POMx Pills do not contain anthocyanins, nor do they contain the calories or sugar found in POM Juice.  IDF 73, 75.  A single serving is one pill daily.  IDF 76.  POMx Pills and POMx Liquid are available for sale via the Respondents' website or through a telephone call center; POMx Pills are also available through some retail outlets.  IDF 68, 72.  If purchased from the POM website, the cost of a  bottle containing 30 POMx Pills or a five ounce bottle of POMx Liquid (containing extract) was $29.95, excluding shipping.  IDF 101-102.

POM Wonderful has engaged in a number of advertising campaigns to promote the Challenged POM Products, including print advertisements in magazines, freestanding inserts in newspapers, billboards, posters in bus shelters, posters in health clubs and doctors' offices, advertising on prescription drug bags, Internet websites, online banner advertisements, medical

---

[4] Another Respondent, Mark Dreher, Ph.D., agreed to an administrative consent order to resolve the claims against him.  *See* http://www.ftc.gov/os/caselist/0823122/100927pomagree.pdf.

outreach, radio and television ads, and press releases. IDF 171. POM Wonderful considers health-conscious, educated, affluent consumers to be its target audience. IDF 172, 176, 178, 181.

The POM Juice print advertisements at issue were disseminated in a wide variety of publications, including but not limited to the *Chicago Tribune*, *Prevention*, *Details*, *Rolling Stone*, *Health*, *InStyle*, *Town and Country*, *Men's Health*, and *Men's Fitness*. IDF 169. The POMx Pills print advertisements challenged by Complaint Counsel were disseminated in publications including but not limited to *Fortune*, *The New York Times*, *Discover*, *Men's Health*, *Popular Science*, *Time*, and *Playboy*. IDF 170. Some of POM's challenged advertisements are creative in nature, depicting the POM Wonderful Juice bottle in a number of unusual ways (for example, as an intravenous bag; covered by medical equipment such as a blood pressure cuff or EKG sensors; anthropomorphized lying on a therapist's couch or in a bikini top; and as a superhero) and accompanied by headlines such as "[a]maze your cardiologist" and "[l]ucky I have super HEALTH POWERS." *See* CX0033; CX0034; CX0103; CX0109; CX0192; CX0274; CX0372. Many of the challenged advertisements include statements touting the Challenged POM Products' effects on heart disease, prostate cancer, and/or ED, sometimes by quoting from or citing to various scientific studies.

At trial, Complaint Counsel challenged 43 promotional materials that Respondents disseminated. The Complaint alleges that POM's materials claim that drinking POM Juice, taking POMx Pills, or taking POMx Liquid daily (1) prevents or reduces the risk of heart disease, including by decreasing arterial plaque, lowering blood pressure, and/or improving blood flow to the heart (Compl. ¶ 12.A); (2) treats heart disease, including by decreasing arterial plaque, lowering blood pressure, and/or improving blood flow to the heart (Compl. ¶ 12.B); (3) prevents or reduces the risk of prostate cancer, including by prolonging prostate-specific antigen doubling time ("PSADT") (Compl. ¶ 14.A); (4) treats prostate cancer, including by prolonging PSADT (Compl. ¶ 14.B); (5) prevents or reduces the risk of ED (Compl. ¶ 16.A); and (6) treats ED (Compl. ¶ 16.B). In sum, the Complaint alleges that Respondents made six different claims regarding the efficacy of the Challenged POM Products.

The Complaint also alleges that Respondents have represented that "clinical studies, research, and/or trials prove that" drinking POM Juice or taking POMx Pills or Liquid treats heart disease, prostate cancer, and erectile dysfunction or prevents or reduces the risk of each of these diseases. Compl. ¶¶ 12, 14, 16. Thus, in addition to the claim that the Challenged POM Products treat, prevent or reduce the risk of disease, the Complaint alleges that some of the ads convey that there is clinical proof of the efficacy of the Challenged POM Products, *i.e.*, that they make "establishment" claims.

Following an administrative trial that began on May 24, 2011, and concluded on November 4, 2011, the ALJ filed a 335-page Initial Decision, with 1,431 findings of fact and a 108-page appendix on May 17, 2012. The ALJ found that 19 of the 43 challenged advertisements and promotional materials contained implied claims that the Challenged POM Products treat, prevent or reduce the risk of heart disease, prostate cancer, or ED, and that 14 of these ads also contained implied claims that these effects on disease were clinically proven. ID at 211-34. The ALJ also found that the claims at issue are material to consumers. *Id.* at 290-96.

5

The ALJ further determined that the appropriate level of substantiation for such claims is competent and reliable scientific evidence, which for claims that a food or food-derived product treats, prevents or reduces the risk of disease must include adequate clinical studies, though not necessarily RCTs. *Id*. at 234-50. The ALJ determined that Respondents did not have such evidence to substantiate their claims, rendering them false or misleading under Sections 5(a) and 12 of the FTC Act. *Id.* at 250-290. According to the ALJ's cease and desist order against the corporate and individual Respondents pursuant to Section 5(b) of the FTC Act, Respondents would be prohibited from engaging in deceptive advertising practices with respect to any food, drug, or dietary supplement that may be advertised by Respondents in the future. *Id.* at 309-25. The ALJ did not require that Respondents seek FDA pre-approval for any future disease claims with respect to the Challenged Products. *See id.* at 314-23.

## III.    Legal Standard

The Commission reviews the record *de novo* by considering "such parts of the record as are cited or as may be necessary to resolve the issues presented and . . . exercis[ing] all the powers which [the Commission] could have exercised if it had made the initial decision." 16 C.F.R. § 3.54. In this case, the Commission adopts the ALJ's findings of fact to the extent those findings are not inconsistent with this opinion.

An advertisement is deceptive if it contains a representation or omission of fact that is likely to mislead a consumer acting reasonably under the circumstances, and that representation or omission is material to a consumer's purchasing decision.[5] *FTC Policy Statement on Deception*, 103 F.T.C. 174, 175 (1984) (appended to *Cliffdale Assocs., Inc.*, 103 F.T.C. 110 (1984)) ("*Deception Statement*"); *see also, e.g.*, *In re Novartis Corp.*, 127 F.T.C. 580, 679 (1999), *aff'd*, 223 F.3d 783 (D.C. Cir. 2000); *In re Stouffer Foods Corp.*, 118 F.T.C. 746, 798 (1994); *In re Kraft, Inc.*, 114 F.T.C. 40, 120 (1991), *aff'd*, 970 F.2d 311 (7th Cir. 1992). In addition, the Commission long has held that making objective claims without a reasonable basis constitutes a deceptive practice in violation of Section 5. *FTC Policy Statement Regarding Advertising Substantiation*, 104 F.T.C. 839 (1984) (appended to *Thompson Med. Co.*, 104 F.T.C. 648 (1984)) ("*Substantiation Statement*"); *see, e.g.*, *In re Auto. Breakthrough Scis., Inc.*, 126 F.T.C. 229, 293 & 293 n.20 (1998); *In re Jay Norris, Inc.*, 91 F.T.C. 751, 854 (1978), *aff'd as modified*, 598 F.2d 1244 (2d Cir. 1979). Consequently, the determination of whether Respondents disseminated false advertisements in violation of the FTC Act requires a three-part inquiry: (1) whether Respondents disseminated advertisements conveying the claims alleged in the Complaint; (2) whether those claims were false or misleading; and (3) whether those claims are material to prospective consumers. *Kraft, Inc. v. FTC*, 970 F.2d 311, 314 (7th Cir. 1992); *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994); *FTC v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285, 297 (D. Mass. 2008), *aff'd*, 684 F.3d 1 (1st Cir. 2010).

---

[5] The Complaint alleges that Respondents violated both Sections 5 and 12 of the FTC Act. Section 5 prohibits "deceptive" acts or practices in or affecting commerce, 15 U.S.C. § 45(a), while Section 12 specifically addresses the dissemination of any "false advertisement," *i.e.*, one that is "misleading in a material respect," 15 U.S.C. § 55(a)(1), for food, drugs, devices, services, or cosmetics. The deception standard is the same under both provisions. *Deception Statement*, 103 F.T.C. at 182.

IV.     **Respondents Disseminated Advertising or Promotional Material Making Disease Treatment, Prevention and Risk Reduction Claims**

The Commission's approach to ad interpretation is well established, and the general framework is not disputed on appeal. The Commission "will deem an advertisement to convey a claim if consumers, acting reasonably under the circumstances, would interpret the advertisement to contain that message." *In re Thompson Med. Co.*, 104 F.T.C. 648, 788 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986); *Deception Statement*, 103 F.T.C. at 176. A reasonable interpretation is one that would be shared by at least a significant minority of reasonable consumers. *Kraft, Inc.*, 114 F.T.C. at 122; *In re Telebrands Corp.*, 140 F.T.C. 278, 291 (2005) ("[a]n ad is misleading if at least a significant minority of reasonable consumers are likely to take away the misleading claim"), *aff'd*, 457 F.3d 354 (4th Cir. 2006); *Deception Statement*, 103 F.T.C. at 177 n.20 (citing *In re Kirchner*, 63 F.T.C. 1282 (1963) (explaining a reasonable interpretation is one that would be shared by more than an insignificant and unrepresentative segment of the class of persons to whom the represented is addressed)). Where an ad conveys more than one meaning, only one of which is misleading, a seller is liable for the misleading interpretation even if non-misleading interpretations are possible. *See, e.g.*, *In re Bristol-Myers Co.*, 102 F.T.C. 21, 320 (1983), *aff'd*, 738 F.2d 554 (2d Cir. 1984); *Nat'l Comm'n on Egg Nutrition v. FTC*, 570 F.2d 157, 161 n.4 (7th Cir. 1977). The primary evidence of the representations that an advertisement conveys to reasonable consumers is the advertisement itself. *Deception Statement*, 103 F.T.C. at 176; *see also Novartis Corp.*, 127 F.T.C. at 680; *Stouffer Foods Corp.*, 118 F.T.C. at 798; *Kraft, Inc.*, 114 F.T.C. at 121. In determining what claims may reasonably be attributed to an advertisement, the Commission examines the entire advertisement and assesses the overall "net impression" it conveys. *Deception Statement*, 103 F.T.C. at 178; *see also Novartis Corp.*, 127 F.T.C. at 679; *Kraft, Inc.*, 114 F.T.C. at 122; *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 958 (N.D. Ill. 2006) ("the Court looks to the overall, net impression made by the advertisement to determine whether the net impression is such that the ads would be likely to mislead reasonable consumers"), *aff'd*, 512 F.3d 858 (7th Cir. 2008).

The Complaint alleges that Respondents' advertisements claim that consuming the Challenged POM Products daily treats, prevents or reduces the risk of heart disease, prostate cancer, or ED. These claims that the Challenged POM Products are effective without expressly or impliedly representing a particular level of support are "efficacy claims." The Complaint also alleges that Respondents have represented that "clinical studies, research, and/or trials prove that" drinking POM Juice or taking POMx Pills or Liquid treats the diseases or prevents or reduces the risk of each of the diseases. A claim that there is a certain type or level of support is considered an "establishment claim." *Thompson Med. Co.*, 791 F.2d at 194; *see also Bristol-Myers Co.*, 102 F.T.C. at 321 (noting that a claim of clinical proof can be express or implied). While "[t]here is no conceptual or practical reason to single out such claims . . . for special treatment . . . the express or implied claim that an advertiser possesses a particular level of substantiation" is an additional representation, which we also evaluate to ensure that it is not misleading. *Thompson Med. Co.*, 104 F.T.C. at 821-22 n.59.

It is well established that the Commission has the common sense and expertise to determine "what claims, including implied ones, are conveyed in a challenged advertisement, so long as those claims are reasonably clear." *Kraft, Inc.*, 970 F.2d at 319; *accord FTC v. Colgate-*

7

*Palmolive Co.*, 380 U.S. 374, 391-92 (1965); *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1189-90 n.12 (N.D. Ga. 2008) (holding that facial analysis is a sufficient basis to find an alleged claim was made if it is "clear and conspicuous" or "apparent" on the face of the ad), *aff'd*, 356 Fed. Appx. 358, (11th Cir. 2009) (unpublished opinion); *Daniel Chapter One*, 2009 WL 5160000 at *14-15 (F.T.C. 2009), *aff'd*, 405 Fed. Appx. 505 (D.C. Cir. 2010) (unpublished opinion), *available at* 2011-1 Trade Cas. (CCH) ¶77,443 (D.C. Cir. 2010).

Claims may be either express or implied.  The Commission reviews implied claims as if they are on a continuum: at one end claims are virtually synonymous with express claims; at the other end are claims that use language that few consumers would interpret as making a particular representation.  *Novartis Corp.*, 127 F.T.C. at 680.  To determine whether a particular implied claim has been made, the Commission starts with a facial analysis of the advertisement.  A facial analysis of an ad considers "an evaluation of such factors as the entire document, the juxtaposition of various phrases in the document, the nature of the claim, and the nature of the transaction."  *Deception Statement*, 103 F.T.C. at 176.  "If, after examining the interaction of all the different elements in the ad, the Commission can conclude with confidence that an advertisement can reasonably be read to contain a particular claim, a facial analysis is sufficient basis to conclude that the advertisement conveys the claim."  *Stouffer Foods Corp.*, 118 F.T.C. at 798; *accord Novartis Corp.*, 127 F.T.C. at 680; *Kraft, Inc.*, 114 F.T.C. at 121.  Nonetheless, "the Commission may not inject novel meanings into ads . . . ; ads must be judged by the impression they make on reasonable members of the public."  *Bristol-Myers Co.*, 102 F.T.C. at 320.

Extrinsic evidence is unnecessary to establish the impression that consumers would take away from an ad if the claims are reasonably clear from the face of the advertisement.  *Kraft Inc.*, 970 F.2d at 319 (holding that "the Commission may rely on its own reasoned analysis to determine what claims, including implied ones, are conveyed in a challenged ad, so long as those claims are reasonably clear from the face of the advertisement."); *accord Nat'l Urological Grp.*, 645 F. Supp. 2d at 1189-90 n.12 (holding that facial analysis is a sufficient basis to find an alleged claim was made if claims are "clear and conspicuous" or "apparent" on the face of the advertisement); *FTC v. QT, Inc.*, 448 F. Supp. 2d  at 958 (quoting *FTC v. Febre*, No. 94 C 3625, 1996 WL 396117, at *4 (N.D. Ill. July 3, 1996), *aff'd*, 128 F.3d 530 (7th Cir. 1997)); *Kraft, Inc.*, 970 F.2d at 320) ("'There is no authority for defendants' contention that implied claims cannot be found to be deceptive absent extrinsic evidence.  The courts and the FTC have consistently recognized that implied claims fall along a continuum from those which are so conspicuous as to be virtually synonymous with express claims to those which are barely discernible.  It is only at the latter end of the continuum that extrinsic evidence is necessary.'  Where implied claims are conspicuous and 'reasonably clear from the face of the advertisements,' extrinsic evidence is not required.") (citations omitted); *Stouffer Foods Corp.*, 118 F.T.C. at 798 ("If after examining the interaction of all the different elements in the ad, the Commission can conclude with confidence that an ad can reasonably be read to contain a particular claim, a facial analysis is sufficient basis to conclude that the ad conveys the claim."); *see also Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 652-53 (1985) ("When the possibility of deception is as self-evident as it is in this case, we need not require the State to 'conduct a survey of the  . . . public before it [may] determine that the [advertisement] had a tendency to mislead.'") (quoting FTC v. Colgate-Palmolive Co., 380 U.S. at 391-92).

8

Yet, if extrinsic evidence has been introduced, that evidence "must be considered by the Commission in reaching its conclusion" about the meaning of the advertisement. *Bristol-Myers Co.*, 102 F.T.C. at 319; *see also Thompson Med. Co.*, 104 F.T.C. at 794 (finding that the Commission was "obliged to consider" extrinsic evidence offered by the parties). In this case, extrinsic evidence includes expert testimony by Dr. Ronald Butters and Dr. David Stewart, a survey of consumer responses to billboard headlines, and evidence regarding the intent of Respondents to convey particular messages in their advertising.

We find that in the context of POM Wonderful's challenged advertisements, reasonable consumers would read claims to "prevent" or "reduce the risk of" heart disease, prostate cancer, or ED as conveying the claim that consuming the Challenged POM Products substantially reduces the likelihood that the consumer will contract the disease or condition, not that the products would absolutely prevent the onset of these conditions. Because the development of heart disease, cancer, or ED may be influenced by many factors, in the context of the particular advertisements challenged in this matter, most reasonable consumers would not interpret the language, imagery, and other elements of the advertisements to convey claims that consuming the Challenged POM Products would eliminate all possibility that the consumer might develop these diseases at some later time. This interpretation of the implied claims in Respondents' advertisements does not affect our conclusion that Respondents disseminated advertisements or promotional materials that contained the claims alleged in the Complaint, which was phrased in the disjunctive (prevent or reduce risk) rather than the conjunctive (prevent and reduce risk).[6]

A.    Facial Analysis

In the Initial Decision, Judge Chappell found claims alleged by Complaint Counsel were conveyed in 19 advertisements or promotional materials. He found that 11 of these ads conveyed efficacy claims that the Challenged POM Products treat, prevent or reduce the risk of heart disease. IDF 580, 583. He found that eight ads conveyed efficacy claims that the Challenged POM Products treat, prevent or reduce the risk of prostate cancer, IDF 581, and four ads conveyed efficacy claims that the Challenged POM Products treat, prevent or reduce the risk of ED. IDF 582.[7] In 15 of the 19 advertisements, the ALJ found that the advertisements contained establishment claims that clinical studies supported the heart disease, prostate cancer, and ED efficacy claims. IDF 580, 581, 582. In our review of the ads, the Commission finds that 36[8] ads convey the claims alleged by Complaint Counsel.[9] The attached Claims Appendix provides an analysis of each of the challenged ads in this case. We evaluate treatment claims separately from claims that the Challenged POM Products prevent or reduce the risk of disease

---

[6] To the extent this interpretation affects the substantiation that the Respondents must possess to support their claims, we incorporate this interpretation in our analysis. *See* discussion *infra* Section V.A.

[7] The ALJ found some of the ads to make claims relating to more than one disease.

[8] The Commission finds three of the 39 exhibits we reviewed on appeal contain none of the disease claims alleged in the Complaint and seven of those 39 exhibits contain only some of the asserted claims. As explained below, *see* discussion *infra*, the Commission did not reach the question of whether the four media interviews conveyed the challenged claims.

[9] For most of the challenged advertisements, Commissioner Ohlhausen agrees with the majority of the Commission about the claims conveyed. As explained in her Concurring Statement, for some advertisements, however, Commissioner Ohlhausen either did not find certain claims were made or believes extrinsic evidence is necessary to determine whether consumers would take away such claims.

(which, as explained above, are viewed as equivalent in the context of this matter). We also explain in the Claims Appendix the basis for our findings that Respondents made establishment claims. The Claims Appendix describes the facial analysis of each ad.

Although we find that more ads contain claims alleged by Complaint Counsel than the ALJ did, we agree with Judge Chappell's approach to the facial analysis regarding the juxtaposition of elements in the ads to find that Respondents represented that the Challenged POM Products treat heart disease and that the Challenged POM Products prevent or reduce the risk of heart disease. As Judge Chappell explained,

> Respondents made these claims indirectly and obliquely, typically presenting, through words and images, a logical syllogism that: free radicals cause or contribute to heart disease; the POM Products contain antioxidants that neutralize free radicals; and, therefore, the POM Products are effective for heart disease. IDF 294-295, 301-303, 348, 374, 394-396, 398, 407, 414, 444, 452-453, 460-462.

ID at 225. We also adopt the ALJ's reasoning regarding the basis for finding establishment claims in the ads that contain heart disease claims and incorporate his findings.

> Against this background, many of the advertisements further state or represent that the POM Products have been shown in one or more clinical, medical, or scientific studies [sic], to reduce plaque, lower blood pressure, and/or improve blood flow to the heart, in a context where it is readily inferable that the referenced study results involve heart disease risk factors and, therefore, constitute clinical support for the effectiveness claim. IDF 295, 301, 303, 349, 373, 376, 379, 395-397, 400, 407, 414, 420.

ID at 225-26.

We similarly adopt and incorporate the ALJ's approach to the facial analysis of Respondents' ads regarding the presence of prostate cancer claims.

> These advertisements typically communicate the claim by juxtaposing statements and representations that prostate cancer is a leading cause of death in men; antioxidants, such as those provided by the POM Products, may help prevent cancer; that PSA is an indicator of prostate cancer; that PSA doubling time is an indicator of prostate cancer progression; and that the POM Products have been shown in clinical testing to slow PSA doubling time. IDF 310-318, 332, 334-336, 352-353, 371, 381, 389-392, 398, 400-405, 409, 429.

ID at 228. The ALJ further explained that he found the establishment claims because the ads "connect both POM-provided antioxidants, and the study results, to effectiveness for prostate cancer." *Id.*

We likewise adopt and incorporate the ALJ's reasoning for the facial analysis for the ads containing ED claims.

10

> Respondents disseminated print advertisements that stated and represented, for example, that (1) the superior antioxidants in the POM Products protect against free radicals, which can damage the body; (2) powerful antioxidants enhance the actions of nitric oxide in vascular endothelial cells, showing potential for management of "ED"; and (3) a preliminary study on "erectile function" showed that men who consumed POM Juice reported "a 50% greater likelihood of improved erections," as compared to a placebo. IDF 323-324. . . . Presenting a study on "erectile function" showing "improved erections" is reasonably read to imply effectiveness for erectile dysfunction, particularly when juxtaposed to an express reference to management of "ED." IDF 323-325.

ID at 229-230.

Respondents argue that this chain of reasoning to determine whether a significant minority of reasonable consumers would interpret the ads as containing the alleged claims is improper because the approach requires leaps in logic or the addition of missing elements in a chain of deduction. Respondents further argue that a facial analysis cannot provide those missing elements, but instead such analysis is strictly constrained by what actually appears in ad. We disagree. When conducting a facial analysis of an advertisement, the advertisement must be viewed as a whole "without emphasizing isolated words or phrases apart from their context[.]" *Removatron Int'l Corp. v. FTC*, 884 F.2d 1489, 1496 (1st Cir. 1989) (quoting *Am. Home Prods. Corp. v. FTC*, 695 F.2d 681, 687 (3d Cir. 1982)); *FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 674 (2d Cir. 1963) (explaining "[t]he entire mosaic should be viewed rather than each tile separately"). Respondents' ads drew a logical connection between the antioxidant claims and the specific disease treatment or prevention claims through the associated explanatory text, the specific findings of the study results, and references to diseases or medical conditions. Ultimately, we assess the net impression of each ad, and we find that for many of Respondents' ads, the net impression is more than any individual element of the ad.

The ALJ did not individually analyze those exhibits for which he did not find the claims alleged by Complaint Counsel. Instead, he summarized generally a variety of factors explaining why he did not find such claims, including that the "advertisements . . . do not mention heart disease, prostate cancer, or erectile dysfunction; use vague, non-specific, substantially qualified, and/or otherwise non-definitive language; use language and/or images that, in the context of the advertisement, are inconsistent with the alleged claim; and/or do not draw a connection for the reader, such as through associated explanatory text, between health benefits, or study results, and effectiveness for heart disease, prostate cancer, or erectile dysfunction." ID at 222.

Based on a facial analysis of the ads, as well as a consideration of the relevant extrinsic evidence, we find that Respondents conveyed the efficacy claims alleged in the Complaint in more ads than the ALJ did. [10]

For example, we overrule the ALJ's with regard to Figure 7 ("Cheat Death" print ad) because we find that this ad conveyed to at least a significant minority of reasonable consumers

---

[10] *See* Summary Table of Commission Findings Regarding POM Exhibits, appended to this opinion.

that drinking eight ounces of POM Juice daily prevents heart disease.  We make this finding based on the net impression of the advertisement, including the statements that drinking eight ounces of POM Juice a day "can help prevent . . . heart disease," and "[t]he sooner you drink it, the longer you will enjoy it," as well as imagery of the POM Juice bottle with a noose around the neck of the bottle.

We also overrule some of the ALJ's findings with regard to Figure 11 ("Decompress" print ad) because we find that this ad conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily prevents or reduces the risk of heart disease.  The ad containing medical imagery depicts the POM Juice bottle wrapped in a blood pressure cuff.  Moreover, express language in the ad establishes a link between POM Juice, which "helps guard . . . against free radicals [that] . . . contribute to disease," and the $20 million of "scientific research from leading universities, which has uncovered encouraging results in prostate and cardiovascular health."  The ad also states that POM Juice will help "[k]eep your ticker ticking."  In combination, these elements communicate the message that POM Juice prevents or reduces the risk of heart disease, and that those efficacy claims are scientifically established.

In addition, we reverse the findings of the ALJ with regard to Figure 22 ("Drink to Prostate Health" print ad).  Based on the overall net impression, we find that this ad conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily treats prostate cancer and that this claim is scientifically established.  Factors contributing to this net impression include the language "Drink to prostate health" and express language equating POM Juice to "good medicine."  Furthermore, the ad describes "[a] recently published preliminary medical study [that] followed 46 men previously treated for prostate cancer" which found that "[a]fter drinking 8 ounces of POM Wonderful 100% Pomegranate Juice daily for at least two years, these men experienced significantly longer PSA doubling times."

Regarding the establishment claims, we agree with the ALJ that "[t]he majority of the Challenged Advertisements that have been found herein to have made the claims alleged in the Complaint [also] represented that clinical studies supported the claimed effectiveness of the POM Products."  ID at 225.  Not "every reference to a test [or study] necessarily gives rise to an establishment claim.  The key, of course, is the overall impression created by the ad."  *Bristol-Myers Co.*, 102 F.T.C. at 321 n.7.  An establishment claim may be made by such words and phrases as "established" or "medically proven," but an establishment claim may also be made "through the use of visual aids (such as scientific texts or white-coated technicians) which clearly suggest that the claim is based upon a foundation of scientific evidence."  *Id.* at 321 (citing *Am. Home Prods.*, 98 F.T.C. 136, 375 (1981), *aff'd*, 695 F.2d 681 (3d Cir. 1982)).

For four ads, Figures 4-7, the ALJ found that the ads conveyed heart disease efficacy claims but not establishment claims.  *See* IDF 583.  As recognized by Judge Chappell, Complaint Counsel did not allege establishment claims for two of the ads, Figures 5 and 7.  For Figures 4 and 6, the ALJ explained that he did not find establishment claims when the ads "either do not reference any clinical testing or refer to clinical testing in such a way and in such context, that it cannot be concluded with confidence that a significant minority of reasonable consumers would take away the message that the efficacy claim is 'clinically proven.'"  ID at 227.  The ALJ found

12

that these ads represented that the Challenged POM Products treat, prevent or reduce the risk of heart disease, but he explained that "the only reference to any scientific support is in very small print, at an asterisk at the bottom of the page, which states 'Aviram, M. Clinical Nutrition, 2004. Based on a clinical pilot study.'" He concluded that "this small print, single reference to a study, particularly in the context of a qualified assertion that POM Juice 'can' reduce plaque, is insufficient to conclude with confidence" that reasonable consumers would interpret the ads "to be claiming that POM Juice is clinically proven to be effective for heart disease." *Id.* at 227-28 (citing IDF 446-447, 466-467).

The Commission disagrees.[11] We find that specificity of the representation in the text of the ad that drinking "eight ounces a day can reduce plaque by up to 30%!" – which is in the same size font as the rest of the ad text – would lead at least a significant minority of reasonable consumers to interpret the ad to convey that there is clinical proof of the heart disease claims. The specific percentage reduction of plaque in someone's arteries cannot be ascertained by any means other than by scientific measurement, and the statement therefore implies that the claim of plaque reduction is scientifically established. The claim of scientific proof is bolstered by the asterisk that directs the reader to the quoted citation for the "clinical pilot study," which the Commission acknowledges is in small print.

Respondents argue that none of their ads make establishment claims asserting "clinical proof" because any references to studies in the ads are only accurate descriptions of specific study findings rather than broad establishment claims. Respondents claim that it is improper to treat reports of particular study results about PSADT or reduced plaque in arteries as claimed clinical proof of treatment or prevention of prostate cancer or heart disease. We disagree. As we explain in the Claims Appendix, these ads drew a logical connection between the study results and effectiveness for the particular diseases. Reasonable consumers are unlikely to differentiate the precise medical differences after reading a headline proclaiming "Prostate Cancer Affects 1 Out of Every 6 Men," *see* Figure 17; a statement that "Prostate cancer is the most commonly diagnosed cancer in men in the United States," *see* Figures 21 and 27; or the headline "Amaze your cardiologist." *See* Figure 6.

Respondents also argue that the ads cannot reasonably be interpreted as making establishment claims asserting "clinical proof" because the ads simply report study results in a qualified manner with words such as "preliminary," "promising," "encouraging," or "hopeful." It is well established that if the disclosure of information is necessary to prevent a representation from being deceptive, the disclosure must be clear. *See, e.g.*, *Pantron I Corp.*, 33 F.3d at 1088; *Thompson Med. Co.*, 104 F.T.C. at 789 n.9, 842-43. Respondents' use of one or two adjectives does not alter the net impression that clinical studies prove their claims. This is especially true when the chosen adjectives – promising, encouraging, or hopeful – provide a positive spin on the studies rather than a substantive disclaimer.[12] As the ALJ explained, in the context of the

---

[11] Commissioner Ohlhausen would uphold the ALJ's findings for CX0031 and CX0034 (Figures 4 and 6). *See* Commissioner Ohlhausen's Concurring Statement.

[12] Our analysis here is consistent with the Commission's experience in other situations where it has found the use of qualifiers to be inadequate to sufficiently modify an otherwise false or misleading claim to render it non-deceptive. *See, e.g.*, Guides Concerning Use of Endorsements and Testimonials in Advertising, 16 C.F.R. § 255.2 (ads with endorsements will likely be interpreted as conveying that the endorser's experience is representative of what consumers will generally achieve, even when they include disclaimers such as "Results not typical" and "These

13

particular ads, "the foregoing language fails to materially alter the overall net impression that such advertisements were claiming clinical proof." *See, e.g.*, IDF 300-301, 312, 333, 342, 349-350, 354; *see also* IDF 519 (noting that Dr. Stewart had opined that "the typical consumer would likely have little understanding of what 'initial' or 'pilot' means, particularly in the context of [a study] being referred to as having been published in a major journal").[13]

Moreover, we note that in many instances, ads describing study results using such qualifying language include other elements that also contribute to the net impression that the claims at issue are clinically proven, such as the use of medical imagery (including the caduceus, a well-recognized symbol of the medical profession), or statements relating to the overall amount of money spent on "medical" research, ranging from $20 million to over $30 million, depending on the relevant time period. When an ad represents that tens of millions of dollars have been spent on medical research, it tends to reinforce the impression that the research supporting product claims is established and not merely preliminary.

Whether an ad conveys the implied claims alleged by Complaint Counsel is a question of fact. *See, e.g.*, *Removatron Int'l*, 884 F.2d at 1496, *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1189. As we explain here, and in more detail in the Claims Appendix, based on our weighing of all of the evidence, the Commission finds that the net impression conveyed to at least a significant minority of reasonable consumers was that there is clinical proof for the disease treatment, prevention or risk reduction claims at issue. In this case, extrinsic evidence is not required because the establishment claims are in fact apparent from the overall, common-sense, net impression of the words and images of the advertisements themselves.

B.     Extrinsic Evidence

Even though only a facial analysis is necessary to determine whether Respondents had indeed made the claims alleged by Complaint Counsel, both Complaint Counsel and Respondents provided extrinsic evidence in support of their arguments regarding claim interpretation. Specifically, Respondents offered the expert report and testimony of Dr. Ronald R. Butters, who was qualified as an expert in linguistics, as to the meaning of Respondents' advertisements. IDF 262, 264. In rebuttal, Complaint Counsel offered the expert report and testimony of rebuttal witness Dr. David Stewart, who is accepted as an expert in advertising, marketing, consumer behavior, and survey methodology, to review Dr. Butters' report and counter his conclusions. IDF 287-89. Complaint Counsel also relied on the Bovitz Survey, a 2009 study of billboard headlines commissioned by Respondents to compare the impact of two

---

testimonials are based on the experiences of a few people and you are not likely to have similar results"); FTC Staff Report, *Effects of Bristol Windows Advertisement with an "Up To" Savings Claim on Consumer Take-Away and Beliefs* (May 2012), *available at* http://www.ftc.gov/opa/2012/06/uptoclaims.shtm (when marketers use the phrase "up to" in their ads, such as making a claim that consumers will save "up to 47%" in energy costs by purchasing replacement windows, the qualifier does not affect consumers' overall takeaway that the percentage savings depicted is typical of what they can expect to achieve).

[13] In Commissioner Ohlhausen's view, the use of qualified terms such as "preliminary studies," or "initial studies" in the main text of an ad is significantly different than including a disclosure like "results not typical" in small print at the bottom of an ad. In her opinion, for some of the exhibits, the qualifying language regarding studies warrants extrinsic evidence before finding implied establishment claims. *See* Commissioner Ohlhausen's Concurring Statement.

14

advertising campaigns related to a number of the advertisements challenged by Complaint Counsel. ID at 222. Except where noted here and in the accompanying Claims Appendix, we agree with the ALJ's conclusions with respect to the extrinsic evidence provided in this case.

Extrinsic evidence can include results from methodologically sound surveys about the ads in question, the common usage of language, accepted principles from market research concerning consumers' response in general to ads, and the opinions of expert witnesses on how an advertisement might reasonably be interpreted. *See Kraft Inc.*, 114 F.T.C. at 121 (explaining extrinsic evidence includes "reliable results from methodologically sound consumer surveys"); *Thompson Med. Co.*, 104 F.T.C. at 790.

1. Dr. Butters' Expert Report and Dr. Stewart's Analysis

Dr. Butters examined the challenged ads and offered his opinion that none of them conveyed that scientific research proves that the use of the Challenged POM Products successfully treats, prevents or reduces the risk of heart disease, prostate cancer, or ED. IDF 264, 480-83; PX0158 (Butters Expert Report at 0003). He concluded that, at most, the ads would convey that pomegranate juice is a health beverage and that preliminary research suggests there may be health benefits. IDF 486; PX0158 (Butters Expert Report at 0043.) Additionally, Dr. Butters opined that what people might infer with respect to a food product may differ from what they might infer with respect to a drug regarding treatment claims. IDF 491-92; Butters, Tr. 2817-18. During trial, Dr. Butters testified and proffered his opinion on the interpretation of many of the challenged ads. *See* IDF 496-511. Dr. Stewart provided a useful analysis of Dr. Butters' expert report, but Dr. Stewart did not conduct his own facial analysis of the challenged ads, and because he could not opine on what the ads meant, his analysis has inherent limitations. IDF 513. He explained that Dr. Butters' linguistic approach to ad interpretation fails to take into account the characteristics of the viewer and how consumers use information. Stewart, Tr. 3170-73.

We agree with the ALJ's conclusion that, notwithstanding Dr. Butters' opinion to the contrary, the use of qualified language such as "may" or "can" with respect to the effects of the Challenged POM Products on disease does not modify the messages being conveyed.[14] In fact, we agree that such qualifiers may create the inference of a stronger claim by garnering reader trust and that their meaning can depend on context. ID at 233; IDF 527, 589. We also agree with the ALJ's conclusion that notwithstanding Dr. Butters' opinion to the contrary, the use of humor, parody, and hyperbole in an advertisement does not block communication of a serious message. ID at 233; IDF 487-89. Indeed, it may be the humor that grabs the reader's eye but the serious message that holds the reader's interest. The Commission agrees with the ALJ's conclusion based on Dr. Stewart's testimony that qualifying language with respect to cited studies (such as "preliminary," "promising," "encouraging," or "hopeful") "fails to materially alter the overall net impression that such advertisements were claiming clinical proof." ID at 232; IDF 519. In sum, we find Dr. Butters' linguistic analysis of the advertisements in question to be of limited value in our overall assessment of the net impression of the ads at issue.

---

[14] Commissioner Ohlhausen believes that the qualifying language in some of the exhibits requires extrinsic evidence before finding implied claims. *See* Commissioner Ohlhausen's Concurring Statement.

15

2.   Bovitz Survey

In 2009, POM engaged the Bovitz Research Group to design a consumer survey to evaluate the relative effectiveness of the then-running "Super Hero" advertising campaign compared to POM's earlier "Dressed Bottle" campaign.  The survey exposed survey respondents to POM's billboard advertising, which included taglines related to antioxidants but contained no additional text.  Four of the billboard advertisements share headlines and imagery that appear in certain challenged ads in this case.  IDF 544, 546, 547, 550, 552.  We note at the outset that Complaint Counsel offered the Bovitz Survey as supporting extrinsic evidence only in the context of the testimony of its rebuttal witness, Dr. Stewart.  Stewart, Tr. 3205-21; 3241-42.

In determining whether a consumer survey is methodologically sound, we consider whether the survey "draws valid samples from the appropriate population, asks appropriate questions in ways that minimize bias, and analyzes the results correctly."  *Thompson Med. Co.*, 104 F.T.C. at 790.  The Commission does not require methodological perfection before it will rely on a copy test or other type of consumer survey, but looks to whether such evidence is reasonably reliable and probative.  *See Stouffer Foods Corp.*, 118 F.T.C. at 807; *Bristol-Myers Co.*, 85 F.T.C. at 743-44, 744 n.14.  Flaws in the methodology may affect the weight that is given to the results of the survey.  *See Stouffer Foods Corp.*, 118 F.T.C. at 807-08.

We agree with the ALJ's conclusion that the Bovitz study is not particularly persuasive.  The ALJ concluded that the Bovitz Survey's conclusions on consumers' interpretations of billboard messages are entitled to little weight for assessing whether the print advertisements at issue in this case conveyed the alleged claims.  ID at 223.  The ALJ reasoned that even when the billboard headlines appeared in the challenged print ads, the billboard images did not include the additional text contained in the print ads, such as references to scientific studies, that might modify the message.  *Id.*

3.   Respondents' Intent

Finally, the ALJ rejected Complaint Counsel's argument that Respondents' intent to make disease claims in their advertisements should be considered in this matter as extrinsic evidence that the claims were made.  *See* ID at 216 ("This Initial Decision need not, and does not, determine whether or not Respondents intended to make the disease claims alleged in the Complaint because the evidence is sufficient to conclude that Respondents disseminated advertisements containing the alleged claims, without regard to Respondents' alleged intent.").  It is true that a showing of intent to make a particular claim is not required to find liability for violating Section 5.  *See, e.g.*, *Chrysler Corp. v. FTC*, 561 F.2d 357, 363, 363 n.5 (D.C. Cir. 1977); *Novartis Corp.*, 127 F.T.C. at 683; *Kraft, Inc.*, 114 F.T.C. at 121.  But it is also well established that a showing that an advertiser intended to make particular claims can help demonstrate that the alleged claim was in fact conveyed to consumers.  *See Telebrands Corp.*, 140 F.T.C. at 304 (concluding that "ample evidence that respondents intended to convey the challenged claims" provided further support for the conclusion that advertisements made the alleged claims); *Novartis Corp.*, 127 F.T.C. at 683 ("evidence of intent to make a claim may support a finding that the claims were indeed made"); *Thompson Med. Co.*, 104 F.T.C. at 791.

16

**JA-0600**

Here, we only consider whether Respondents intended to make the disease claims challenged by Complaint Counsel in their advertisements; whether Respondents intended to make claims about general health benefits in their advertisements is not relevant to our analysis.

We find that the record includes evidence of Respondents' intent to make claims in their advertisements about the Challenged POM Products' effects on heart disease, prostate cancer, and ED. For example, Mr. Resnick testified that POM communicates to consumers the company's "belief that pomegranate juice is beneficial in treating some causes of impotence, for the purpose of promoting sales of its product." IDF 1316 (citing CX1372 at 45 (S. Resnick, Tropicana Dep.)). Separate creative briefs for POMx Pills, dated September 1 and 5, 2006, respectively, stated that their "main creative focus is prostate cancer," and that other versions of the creative brief "should definitely focus on the other benefits of POM – antioxidant, anti-aging, heart health, etc." IDF 1327, 1328. Although we rely principally on a facial analysis of the challenged ads in determining their net impression, evidence of Respondents' intent to convey claims about disease treatment and prevention supports our reading of Respondents' ads.

## V.    Respondents' Disease Claims Are False or Deceptive

Having determined that a significant number of the advertisements at issue on their face convey the claims challenged by Complaint Counsel, we turn next to whether such claims are false or likely to mislead consumers. There are two analytical routes by which Complaint Counsel can prove that Respondents' ads are deceptive or misleading, and both arise in this case.

The first is to demonstrate that the claims in the ads are false. *See Thompson Med. Co.*, 104 F.T.C. at 818-19. In this case, the claims that Complaint Counsel alleges are false are Respondents' establishment claims. These claims may be deemed false where Respondents represent expressly or implicitly that there is clinical proof that the Challenged POM Products treat, prevent or reduce the risk of heart disease, prostate cancer, or ED but Respondents lacked such proof at the time the representations were made. If Respondents do not have such clinical proof, Respondents' establishment claims are false. *See, e.g.*, *Removatron Int'l Corp.*, 111 F.T.C. 206, 297-99 (1988) ("If an advertisement represents that a particular claim has been scientifically established, the advertiser must possess a level of proof sufficient to satisfy the relevant scientific community of the claim's truth."), *aff'd*, 884 F.2d 1489 (1st Cir. 1989); *Sterling Drug*, 102 F.T.C. 395, 762 (1983) ("when an advertiser represents in its ads that there is a particular level of support for a claim, the absence of that support makes the claim false").

The second approach is through the "reasonable basis" theory, which Complaint Counsel asserts with regard to the efficacy claims in Respondents' ads. This theory rests on the principle that an objective claim about a product's performance or efficacy carries with it an express or implied representation that the advertiser had a reasonable basis of support for the claim. *Thompson Med. Co.*, 104 F.T.C. at 813 n.37. "Consumers find these representations of support to be important in evaluating the reliability of the product claims. Therefore, injury is likely if the advertiser lacks support for the claims." *Id.* For that reason, "[t]he reasonable basis doctrine requires that firms have substantiation before disseminating a claim." *Substantiation Statement*, 104 F.T.C. at 840. To determine what constitutes a reasonable basis, the Commission considers the "*Pfizer* factors," which are factors relevant to the benefits and costs of developing

17

substantiation for the claim. *See In re Pfizer Inc.*, 81 F.T.C. 23 (1972); *Substantiation Statement*, 104 F.T.C. at 840 (the "determination of what constitutes a reasonable basis depends . . . on a number of relevant factors relevant to the benefits and costs of substantiating a particular claim …[including,] the type of claim, the product, the consequences of a false claim, the benefits of a truthful claim, the cost of developing substantiation for the claim, and the amount of substantiation experts in the field believe is reasonable").

In the Initial Decision, the ALJ recognized that both the falsity of the establishment claims and the lack of a reasonable basis for Respondents' efficacy claims involved questions of the level of substantiation that Respondents needed to possess. He further recognized that the experts who testified in this case explained that they would find the establishment and efficacy claims to be properly supported with the same level of evidence. *See* ID at 243. Thus, the ALJ consolidated his analysis of the establishment and efficacy claims and appears to have applied the *Pfizer* factors to both types of claims when he evaluated the expert testimony. *See id.* at 243-44. To the extent that the ALJ's approach may be interpreted as applying the *Pfizer* factors to determine the level of substantiation necessary to support the establishment claims, we do not adopt the analysis. *Removatron Int'l Corp.*, 111 F.T.C. at 297 ("[I]f the ad . . . implies a particular level of substantiation to reasonable consumers, application of the *Pfizer* factors is not required."); *Thompson Med. Co.*, 104 F.T.C. at 821-22 n.59; *Bristol-Myers*, 102 F.T.C. at 321, 331.

The ALJ also failed to differentiate the opinions and testimony of the expert witnesses regarding the particular claims that they were addressing. The ALJ correctly recognized that the level of evidence "required to support a claim depends on the claim being made." IDF 688 (citing Stampfer, Tr. 830-31; Miller, Tr. 2195, 2210). *See also* PX0206 at 11 (Miller Expert Report) ("whether clinical science is necessary to substantiate a particular claim would vary according to the strengths of the basic science and the particular claim"). Yet, the ALJ appears to have relied on expert testimony about the level of substantiation necessary for broad, generalized health and nutritional benefits when he determined the level of substantiation needed to address the specific disease treatment, prevention and risk reduction claims at issue in this case. Our review of the record leads us to conclude that, to the extent the ALJ did so, his conclusions are not properly supported.

Throughout this case, Respondents have argued that their scientific studies of the Challenged POM Products support claims about broad health benefits, which may contribute to a reduced risk of disease.[15] Thus, within the category of claims related to disease risk reduction, Respondents would include general dietary recommendations and qualified claims regarding any health benefits of food, which they contend are equivalent to the representations made in their ads.

---

[15] *See, e.g.*, RAns at 5 ("[T]he gist of these ads – their 'net effect' – is to convey the idea that POM's Products are natural foods high in health-enhancing antioxidants, much like other healthy foods, such as broccoli and blueberries, which may improve one's odds of staying in good health but are not medicine to prevent or treat disease."); RA at 26 ("What, then, do the statements in POM's advertisements mean? The plain reading of these messages is that the high antioxidant content of POM juice is likely a good thing, because it can help promote healthy functioning of various natural processes in the body.").

The starting point for Respondents' experts was the position that Respondents put forward on ad interpretation, namely that the challenged ads convey only that the Challenged POM Products generally promote good health. As a result, Respondents' experts provided opinions regarding the level of science needed to substantiate claims about general health benefits, testifying that lower levels of substantiation — for instance, the totality of the evidence, including basic science and pilot studies — are sufficient. *See* PX0025 at 5 (Ornish Expert Report) ("Taken as a whole, the scientific evidence from basic science studies, animal research, and clinical trials in humans indicates that pomegranate juice in its various forms . . . is likely to be beneficial in maintaining cardiovascular health and is likely to help reduce the risk of cardiovascular disease."); PX0192 at 9, 11 (Heber Expert Report) ("It is not appropriate to require the use of double-blind placebo-controlled studies for evaluating the health benefits of foods that have been consumed for their health benefits for thousands of years" and "the body of research on pomegranate juice and extract, revealing how they act in the body, provides support for potential health benefits for heart disease, and prostate cancer."); PX0149 at 6-7 (Burnett Expert Report) ("[T]he basic scientific and clinical evidence is sufficient to support the use of pomegranate juice as a potential benefit for vascular blood flow and the vascular health of the penis. . . . It is also my opinion that further such studies as double blinded, placebo-based tests are not required before permitting this information to be given to the public."); PX0189 at 3 (Goldstein Expert Report) ("[P]hysicians who treat patients concerned with erectile health would not hold pomegranate juice to the standards of safety and efficacy traditionally required by the FDA for approval of a pharmaceutical (including performance of large, double-blind, placebo-controlled pivotal clinical trials) before recommending pomegranate juice to their patients. The available body of scientific literature – including in vitro, in vivo, and preliminary clinical trials – strongly suggests that consuming pomegranate juice promotes erectile health.").

Yet, on cross-examination these experts revealed that even they distinguish the type of evidence that would be necessary to substantiate disease treatment, prevention or risk reduction claims, which are precisely the type of the representations we conclude are made in Respondents' ads. *See, e.g.*, IDF 684 ("Dr. Burnett testified that the standard of substantiation is different for a product that is directly associated as a treatment for erectile dysfunction and for a product that claims to have helpful benefits for or improves one's erectile function."); PX0192 at 40-41 (Heber Expert Report) ("To the extent [Complaint Counsel's expert] Dr. Stampfer claims that pomegranate juice and extract have not been proven absolutely effective to treat, prevent, or reduce the risk of heart disease and prostate cancer, I agree. But . . . [i]n my expert opinion, there is credible scientific evidence that pomegranate juice and pomegranate extracts have significant health benefits for human cardiovascular systems . . . [and] the following effects on prostate biology relevant to reducing the risk of prostate cancer . . ."). Likewise, as the ALJ recognized, claims regarding general health benefits for heart, prostate, or erectile function are not the equivalent of claims to treat, prevent or reduce the risk of heart disease, prostate cancer, and erectile dysfunction. *See* ID at 282, 288, 289.[16]

---

[16] This key distinction between general health benefit claims and disease treatment, prevention or risk reduction claims is the basis for Commissioner Ohlhausen's Concurring Statement regarding what claims were made in a number of Respondents' advertisements. *See* Commissioner Ohlhausen's Concurring Statement Regarding Exhibit Claims.

19

Similarly, Complaint Counsel's experts, who testified that RCTs would be necessary to support Respondents' disease treatment and prevention claims, have explained that less rigorous evidence may be sufficient to support some claims regarding health or nutritional benefits of food. *See* IDF 637 (Dr. Stampfer has made public health recommendations regarding diet that were not supported by RCTs), 644-45 (Dr. Sacks testified that RCTs are not necessary to test the benefit of food categories that are included in a diet already tested in an RCT for the same benefit).

In fact, the testimony of experts called by both Complaint Counsel and Respondents was consistent on this issue. They acknowledged the differences in the level of substantiation that would be necessary for general nutritional and health benefit claims compared to the level of substantiation necessary for the specific disease treatment and prevention claims at issue in this case. *See* IDF 631 (citing Stampfer, Tr. 830-31) (explaining if the claim does not imply a causal link, then evidence short of RCTs may support that claim), 649 (explaining even if a product is safe and might create a benefit, like a fruit juice, Dr. Eastham would still require an RCT to justify claims that Respondents are charged with making) (citing Eastham, Tr. 1325-31), 684 ("Dr. Burnett testified that the standard of substantiation is different for a product that is directly associated as a treatment for erectile dysfunction and for a product that claims to have helpful benefits for or improves one's erectile function."); Heber, Tr. 2145-47 (explaining that his prior testimony was that the totality of evidence showed that the Challenged POM Products likely reduced the risk in a "probabilistic sense" rather than "actual"; he did not previously testify that the Challenged POM Products treat prostate cancer, but rather they "help to treat" prostate cancer because he would not opine that the Challenged POM Products should substitute for conventional treatment); PX0206 at 11 (Miller Expert Report) ("an unqualified claim that the product has been shown to slow the progression of PSA doubling times should actually be supported by clinical evidence" whereas a "qualified claim that POM products may be effective … is reasonable" if additional conditions are met, including there is "no suggestion" that pomegranate alone can "absolutely prevent the disease").

Although there is substantial expert testimony regarding the level of support required for generalized nutritional and health benefit claims, such evidence does not address the issue before us. We need not determine the level of substantiation required to support all health claims, and we therefore decline to make such a finding. We consider only the claims that, as found by the Commission, Respondents made in this case — that the Challenged POM Products treat, prevent or reduce the risk of heart disease, prostate cancer, and ED, and that such claims are scientifically established. The expert evidence was clear that RCTs are necessary for adequate substantiation of these representations.

Accordingly, we reject the ALJ's conclusion that "RCTs are not required to convey information about a food or nutrient supplement where . . . the safety of the product is known; the product creates no material risk of harm; and the product is not being advocated as an alternative to following medical advice." *See* ID at 243. Other than to endorse the Commission's prior statements that health claims in food advertising be supported by

"competent and reliable scientific evidence,"[17] we do not reach the issue regarding the level of substantiation for other unspecified health claims involving food products.  We simply reject the ALJ's findings and conclusions regarding any health benefits not specifically challenged in the Complaint.

Just as we limit our findings to the specific disease treatment and prevention claims that are before us, we also reject the ALJ's determination that the level of substantiation needed to support representations that a product treats, prevents or reduces the risk of disease varies according to whether the advertiser offers the product as a replacement for traditional medical care.  *See* ID at 243.  Again, we address only the level of substantiation needed to support the claims that are at issue in this case and do not address hypothetical claims.

A.      Claims That Are False

We turn next with more specificity to Respondents' claims that are alleged to be false.  According to the Complaint, and as we found above, Respondents have represented that "clinical studies, research, and/or trials prove" that the Challenged POM Products treat, prevent or reduce the risk of heart disease, prostate cancer, and ED.  Compl. ¶¶ 12, 14, 16.  When "ads contain express or implied statements regarding the amount of support the advertiser has for the product claim . . . , the advertiser must possess the amount and type of substantiation the ad actually communicates to consumers."[18]  *Substantiation Statement*, 104 F.T.C. at 839.  Moreover, "[i]f an advertisement represents that a particular claim has been scientifically established, the advertiser must possess a level of proof sufficient to satisfy the relevant scientific community of the claim's truth."  *See Thompson Med. Co.*, 104 F.T.C. at 821-22 n.59; *Removatron Int'l Corp.*, 111 F.T.C. at 297.

Because Complaint Counsel bears the burden of showing that these claims are false, *Thompson Med. Co.*, 104 F.T.C. at 818-19, Complaint Counsel must demonstrate that Respondents did not have the amount and type of substantiation they claimed to have had.  *See Sterling Drug*, 102 F.T.C. at 762; *Thompson Med. Co.*, 791 F.2d at 194.  To meet this burden, Complaint Counsel must establish the standards that clinical studies, research, or trials must meet to pass muster in the view of the relevant scientific and medical communities as support for the claims Respondents were making, and then show that the studies Respondents possessed did not meet those standards.  If Respondents do not possess the level of clinical studies, research, or

---

[17] "'[C]ompetent and reliable scientific evidence' has been more specifically defined in Commission orders addressing health claims for food products to mean:  tests, analysis, research, studies or other evidence based on the expertise of professionals in the relevant area, that have been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results."  *FTC Enforcement Policy Statement on Food Advertising*, (1994), *available at* http://www.ftc.gov/bcp/policystmt/ad-food.shtm (citing *Gracewood Fruit Co*., 116 F.T.C. 1262, 1272 (1993); *Pompeian, Inc.*, 115 F.T.C. 933, 942 (1992)) ("*Food Advertising Statement*").

[18] As noted above, for these establishment claims, unlike efficacy claims, we need not perform an evaluation of the various factors set out in *Pfizer* to establish the appropriate level of substantiation because the ads themselves make express or implied substantiation claims.  We simply hold Respondents to the level of substantiation that the ads claim.  "We treat such claims like any other representations contained in the ad.  We verify that it is reasonable to interpret the ad as making them, that the claims were material, and that they are false.  If so, they are deceptive under Section 5(a) of the FTC Act."  *Thompson Med. Co.*, 104 F.T.C. at 821-22 n.59.

21

trials demanded by those scientific and medical communities, then Respondents' claims of clinical proof are false.  *See*, *e.g.*, *Sterling Drug*, 102 F.T.C. at 762 ("[W]hen an advertiser represents in its ads that there is a particular level of support for a claim, the absence of that support makes the claim false.").

Based on our review of the entire record, we conclude that a higher level of substantiation is necessary to support Respondents' establishment claims than what the ALJ found.  The ALJ found that experts in the relevant fields would require "competent and reliable evidence [that] must include clinical studies although not necessarily RCTs" to support Respondents' claims.  *See* ID at 253.  We disagree.  The Commission finds that experts in the relevant fields would require RCTs (*i.e.*, properly randomized and controlled human clinical trials described in more detail below) to establish a causal relationship between a food and the treatment, prevention, or reduction of risk of the serious diseases at issue in this case.

To determine the standards that the relevant scientific and medical communities would demand, we review the testimony of expert witnesses qualified in the fields of heart disease, prostate cancer, and ED.  The Commission finds that the preponderance of the credible expert testimony establishes that the level of substantiation experts in the field would consider necessary to support Respondents' establishment claims – that clinical studies, research, or trials prove that the Challenged POM Products treat and prevent or reduce the risk of heart disease, prostate cancer, or ED – is RCTs.  *Cf. Thompson Med. Co.*, 104 F.T.C. at 821 (finding the standard generally adhered to by the medical scientific community for testing the efficacy of a drug is well-controlled clinical tests (or RCTs)).  Here, Respondents' advertisements on their face convey the net impression that clinical studies or trials show that a causal relation has been established between consumption of the Challenged POM Products and its efficacy to treat, prevent or reduce the risk of the serious diseases in question.  The record testimony in this case indicates that experts in the fields of heart disease, prostate cancer, and ED would find that causation has been shown only if RCTs have been conducted and the appropriate data demonstrates that each study's hypothesis has been fully supported.  *See* CX1293 at 8, 9 (Stampfer Expert Report) (observational studies "typically cannot confirm causality" and "best evidence of a causal relationship between a nutrient or drug . . . and a disease outcome in humans is a randomized, double blind, placebo-controlled, clinical trial"); IDF 639 (stating Dr. Sacks testified that most scientists in the fields of nutrition, epidemiology and the prevention of disease believe RCTs "are needed to constitute reliable evidence that an intervention causes a result"); IDF 687 (explaining Dr. Goldstein testified that "RCTs are considered the criterion standard for determining causality"); *accord* Federal Judicial Center, *Reference Manual on Scientific Evidence* 218 (3d ed. 2011) ("[r]andomized controlled experiments are ideally suited for demonstrating causation").  That is, we find that RCTs are required to substantiate Respondents' disease claims because it is necessary to isolate the effect of consuming the Challenged POM Products on the incidence of the disease, and the expert testimony revealed that only RCTs can isolate that effect.

As discussed previously, our conclusion differs from that of the ALJ in that the ALJ relied on expert testimony describing the level of substantiation that would support general claims of "health benefits" associated with the consumption of the Challenged POM Products, rather than focusing on the expert testimony about the level of substantiation needed to support

the specific disease treatment and prevention claims that are conveyed by Respondents' ads. *See* ID at 222. The ALJ recognized that "claims of efficacy can be made only when a causal relationship with human disease is established by competent and reliable scientific evidence." *Id.* at 247. Yet, the ALJ nonetheless relied on expert testimony addressing health benefit claims that do not assert a causal relationship to conclude that clinical evidence that is less than RCTs would support Respondents' claims. *See id.* at 247 (relying on IDF 631 (explaining public health recommendations that are not based on causation could be supported by evidence other than RCTs)). We find that the ALJ's conclusion that clinical evidence that is less than RCTs would substantiate Respondents' disease treatment, prevention, and risk reduction claims is not supported by the record.

Based on the expert testimony, we also find that the RCTs necessary to substantiate the serious disease claims made by Respondents share several essential attributes. First, to show the efficacy of the Challenged POM Products to treat, prevent or reduce the risk of disease, experts in the field would require the studies or trials to show causation, which would require the trial to be well-controlled. *See, e.g.*, CX1293 at 8-10 (Stampfer Expert Report); CX1291 at 11 (Sacks Expert Report); *cf.* Burnett, Tr. 2260-62 (discussing well-controlled studies to be validated by FDA). "A controlled study is one that includes a group of patients receiving the purported treatment . . . and a control group . . . . A control group provides a standard by which results observed in the treatment group can be evaluated. A control group allows investigators to distinguish between real effects from the intervention, and other changes, including those due to the mere act of being treated ('placebo effect'), the passage of time, change in seasons, other environmental changes, and equipment changes." IDF 611 (citations omitted).

Second, subjects should be randomly assigned to the test and control groups. Randomization "increases the likelihood that the treatment and control groups are similar in relevant characteristics, so that any difference in the outcome between the two groups can be attributed to the treatment . . . [and] also prevents the investigator from . . . introduc[ing] bias into the study." IDF 612.

Third, for clinical studies or trials to prove that the Challenged POM Products treat, prevent or reduce the risk of heart disease, prostate cancer, or ED, the studies need to examine variables that are known to be predictive of or measure the incidence of the disease. That is, the studies or trials need to examine disease endpoints or validated surrogate markers that "have been shown to be so closely linked to a direct endpoint that a change in the surrogate marker is confidently predictive of a change in the disease." IDF 621. Validated measures or assessment tools are those that have been established as reliable through rigorous assessments. IDF 621. Study results affecting variables that are not confidently predictive of a change in the incidence of disease do not prove that the Challenged POM Products treat, prevent or reduce the risk of the particular diseases.

Fourth, the testimony indicates that the scientific and medical communities would require that results of the trial be statistically significant to demonstrate that clinical studies prove that the tested product treats or prevents disease. IDF 616 (citing CX1291 at 12-13 (Sacks Expert Report); Burnett, Tr. 2269) ("If the results of the treatment group are *statistically significant* from those of the control group at the end of the trial, it can be concluded that the tested product

23

is effective.") (emphasis added), 618 (citing CX1291 at 12 (Sacks Expert Report); Eastham, Tr. 1273; Ornish, Tr. 2368; Melman, Tr. 1102-03) (explaining statistical significance means that differences are not due to chance or other causes). Moreover, the population from which the groups draw must be appropriate for the purposes of the study. *See* CX1287 at 12, 15 (Eastham Expert Report) (explaining that in a prostate cancer prevention trial the appropriate population would involve healthy men having no sign of prostate cancer, whereas in a prostate cancer treatment trial, the appropriate sample population would depend on the stage of the disease targeted by the study).

Fifth, the clinical trials should be double-blinded when feasible. Blinding refers to steps taken to ensure that neither the study participants nor the researchers conducting the outcome measurements are aware of whether a patient is in the active group or the control group. IDF 614. Double blinding, which is the blinding of both the subjects and investigators, is optimal to prevent bias arising from actions of the subjects or investigators. IDF 615. The expert testimony revealed in some instances that it may not be possible to conduct blinded clinical trials of food products. In that regard, the experts in the field might demand different well-controlled human clinical trials of foods than they would expect in other areas. The expert testimony in this case indicated that, for clinical tests involving food, participants in the study may be able to determine the products that they are consuming.[19] *See* IDF 641; Sacks, Tr. 1435-36 (describing controlled study testing low sodium diet in which subjects were able to taste the saltiness of the diet); Ornish, Tr. 2328-29, 2356; Goldstein, Tr. 2600-01. In such cases, there may be some flexibility in the double-blind requirement when determining whether a well-controlled human clinical trial satisfies the standard that experts in the field would consider support for particular claims for food. Although we note that Respondents submitted several studies with pomegranate juice that were described as double blind RCTs,[20] and we recognize that double-blinding would lend more credence to a clinical trial, we acknowledge that blinding of subjects may not always be feasible for the reasons stated above. We note, however, that clinical trials involving products such as the POMx pills should not face these types of blinding challenges.

Respondents argue that they should not be required to meet "an impossibly high and legally untenable standard of dispositive proof through the clinical studies" that their products treat, prevent or reduce the risk of disease in order to provide substantiation for their claims. RA at 30. We reject Respondents' argument. Respondents' ads convey a net impression that scientific and medical evidence support their representations. We are simply holding Respondents to their claims by requiring the standard by which the scientific and medical communities would accept their claims of efficacy. We do not impose a standard requiring "dispositive" proof; rather we require the scientific standard for proof, which demands statistically significant results on a metric that is recognized as a valid marker for the particular disease in a controlled human clinical study. According to the expert testimony, statistical

---

[19] This testimony is consistent with the FDA's "Guidance for Industry: Evidence-Based Review System for the Scientific Evaluation of Health Claims – Final," *available at* http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/GuidanceDocuments/FoodLabelingNutrition/ucm073332.htm, which states: "When the substance is a food, it may not be possible to provide a placebo and therefore subjects in such a study may not be blinded. Although the study may not be blinded in this case, a control group is still needed to draw conclusions from the study."

[20] *See, e.g.*, IDF 808-818 (Ornish MP study), 849-859 (Ornish CIMT study), 872-883 (Davidson CIMT study), 941-943 (Heber/Hill Diabetes study).

24

significance with a p-value that is less than or equal to 0.05 is the recognized standard to show that a study's hypothesis has been proven.  IDF 618.  This is the level of "proof" that Respondents' must possess.

Respondents further argue that statistically significant proof requires studies that are too large and costly.  The response to this argument is twofold.  First the need for RCTs is driven by the claims Respondents have chosen to make (*i.e.*, establishment claims about a causal link between the Challenged POM Products and the treatment or prevention of serious diseases).  Second, the requisite size of a clinical trial – the number of subjects required for an appropriately designed study – is guided by several factors, including the need to produce both clinically and statistically significant results.  *See, e.g.*, CX1287 at 15 (Eastham Expert Report) (explaining that clinical and statistical significance for a prostate cancer treatment trial may require a sample population that involves hundreds to thousands of men).  A large number of participants is not always necessary, however.  RCTs differ widely in size, depending, in part, on what the study is trying to show.  If, despite a relatively small size, a well-conducted RCT produces significant results, then the study would constitute evidence of efficacy that would provide the substantiation that experts would accept.  The main limitation of smaller studies is that it may prove difficult to detect real differences between the active and control substances, because sampling variance is inversely related to sample size.  *Cf.* CX1338, *in camera* (Padma-Nathan, Dep. at 108-09) (larger number of participants may have helped Forest/Padma-Nathan study achieve overall statistical significance).  Smaller studies may require a large difference in outcomes between the two arms of a clinical trial to produce statistically significant results.  Thus, designers of clinical studies have a natural incentive to make them as large as possible.

Similarly, Respondents argue that it is improper to impose the testing standards for drugs on food products.  We do not impose such standards in this case.  Although the Commission does not enforce federal drug approval requirements, we note at the outset that our sister federal agency, the Food and Drug Administration, promulgates and enforces regulations regarding investigational new drug approvals, and that those regulations require multiple phases of clinical trials that collectively represent different – and considerably greater – substantiation than the RCTs required here.[21]  We note too, that FDA regulations separately require FDA approval of health claims made on behalf of food products, and that approval of such claims requires the submission of well-designed scientific evidence.[22]  Respondents' representations claim clinical proof of efficacy for treating, preventing, or reducing the risk of serious diseases (two of which are potentially fatal).  Nonetheless, the Commission's determination that experts in the field would require RCTs to support Respondents' health claims does not require the FDA standard of proof for drugs.

---

[21] *See, e.g.*, 21 CFR §§ 312.21-23 (regarding three phases of clinical trials for investigational new drug applications for products not previously tested, where both Phase 2 and Phase 3 trials comprise clinical studies of effectiveness).
[22] *See, e.g.*, 21 CFR § 101.14(c) (validity requirement for food health claims); *see also* FDA, Guidance for Industry: Evidence-Based Review System for the Scientific Evaluation of Health Claims, *available at* http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/GuidanceDocuments/FoodLabelingNutrition/ucm073332.htm.

1.    Evidence Regarding Substantiation for Heart Disease Claims

We find that the greater weight of credible expert testimony establishes that experts in the field of heart disease would require RCTs to support Respondents' claims that clinical studies establish that the Challenged POM Products treat, prevent or reduce the risk of heart disease. Complaint Counsel's expert, Dr. Frank Sacks, testified that to show that clinical studies, research, or trials prove that a product treats, prevents or reduces the risk of heart disease, it is necessary to rely on appropriately analyzed results of "well-designed, well-conducted, randomized, double-blinded, controlled human clinical studies (RCTs)."  CX1291 at 10-11 (Sacks Expert Report).  Dr. Sacks also opined that the findings of the studies must be statistically significant; the results must demonstrate significant changes in valid surrogate markers of cardiovascular health that are recognized by the FDA or experts in the field, such as blood pressure, LDL cholesterol, C-reactive protein, HDL cholesterol, and triglycerides.  IDF 711, 712, 761-63, 765-66.  Similarly, Dr. Meir Stampfer, another expert witness for Complaint Counsel, testified that scientists in the fields of clinical trial epidemiology and the prevention of cardiovascular disease would believe that randomized, double-blind, placebo-controlled studies are needed to show that products such as POM Juice, POMx Pills, and POMx Liquid can prevent, reduce the likelihood of, or treat cardiovascular disease because a well-controlled clinical trial is necessary to establish a causal inference.  Stampfer, Tr. 717-18.

Respondents' experts, Dr. David Heber and Dr. Dean Ornish, testified that the preponderance of scientific evidence from basic scientific studies, animal research, and human clinical trials reveals that pomegranates are likely to be beneficial in maintaining cardiovascular health and are likely to help reduce the risk of cardiovascular disease.  IDF 954, 959.  Yet, as we previously observed, Respondents' experts generally do not address the specific heart disease claims alleged in the Complaint.  For example, Dr. Ornish only addressed whether RCTs would be necessary "to test and substantiate health claims of something like pomegranate juice."  Ornish, Tr. 2329.  He did not specifically address whether *in vitro* and animal studies could provide support for claims that a product treats, prevents or reduces the risk of heart disease.  Similarly, Dr. Heber testified about "the juice's ability to promote health" when he explained that experts would look at the totality of science rather than requiring RCTs as the only acceptable evidence.  Heber, Tr. 1948-49; *see also* PX0192 at 9, 40 (Heber Expert Report) (explaining "[i]t is not appropriate to require the use of double-blind placebo-controlled studies for evaluating the *health benefits* of foods . . ." and "there is credible scientific evidence that pomegranate juice and pomegranate extracts have *significant health benefits* for human cardiovascular systems, including:  1) decreases in arterial plaque; 2) lowering of blood pressure; and 3) improvement of cardiac blood flow") (emphasis added).

Based on our evaluation of this evidence, we conclude that the expert testimony establishes that to support claims that clinical studies prove that the Challenged POM Products treat, prevent or reduce the risk of heart disease, experts in the field of heart disease would require RCTs.

Respondents have sponsored several *in vitro* and *in vivo* animal studies to examine the effect of the Challenged POM Products on cardiovascular health.  The ALJ considered 13 *in vitro* and *in vivo* studies and made findings regarding the results of the studies, as well as the

26

expert witnesses' assessments of the studies.  *See* IDF 732-55.  We adopt the ALJ's findings on this basic science and the preclinical studies regarding cardiovascular health.  As Judge Chappell observed, experts for both Complaint Counsel and Respondents acknowledge that some of Respondents' *in vitro* studies have shown pomegranate juice's favorable effects on particular mechanisms involved in cardiovascular disease, *see* IDF 745, 746, but experts for both sides also acknowledged that *in vitro* and animal studies do not provide reliable scientific evidence of what effects a treatment will have inside the human body.  IDF 752, 753.  Thus, while the basic research possessed by Respondents is part of the totality of evidence that must be examined, we conclude, similar to the ALJ, that experts in the field would agree that Respondents' *in vitro* and animal studies need to be replicated in humans to show an effect on preventing or treating a disease and therefore do not provide adequate substantiation for Respondents' heart disease claims alleged in the Complaint.  IDF 755.

    The Complaint alleges that Respondents claim that clinical studies, research, or trials prove that the Challenged POM Products treat, prevent or reduce the risk of heart disease by (1) lowering blood pressure; (2) decreasing arterial plaque; and/or (3) improving blood flow to the heart.  The Initial Decision methodically examines in detail Respondents' ten published clinical studies and several unpublished clinical studies on humans regarding the effect of the Challenged POM Products on cardiovascular health.  *See* IDF 756-947; ID at 256-69.  For each study, the ALJ describes the methodology, including any shortcomings in design, as well as the results.  The ALJ also describes the expert testimony regarding each study.  After evaluating each study in detail, Judge Chappell concludes that these studies "do[] not provide competent and reliable scientific evidence to support claims that the Challenged POM Products treat, prevent, or reduce the risk of heart disease."  IDF 786 (Aviram ACE/BP Study), 804 (Aviram CIMT/BP Study), 848 (Ornish MP Study), 868 (Ornish CIMT Study), 900 (Davidson CIMT Study), 914 (Davidson BART/FMD Study), 938 (Denver and San Diego Overweight Studies), 947 (Diabetes Studies).

    For Respondents' claims that the Challenged POM Products lower blood pressure, the ALJ describes and evaluates the Aviram ACE/BP Study, *see* IDF 774-86, and the Aviram CIMT/BP Study, *see* IDF 787-804, and examines the results of five other studies that measured blood pressure as part of the protocol.  The ALJ concludes that the expert testimony regarding the Aviram ACE/BP Study and Aviram CIMT/BP Study is conflicting, but "[t]he greater weight of the persuasive expert testimony on the studies sponsored by Respondents measuring blood pressure demonstrates that the scientific evidence relied upon by Respondents is not adequate to substantiate a claim that the Challenged POM Products treat, prevent, or reduce the risk of heart disease through reducing blood pressure, or that clinical studies show the same."  ID at 259.

    With respect to claims that the Challenged POM Products reduce arterial plaque, the ALJ describes and evaluates the Aviram CIMT/BP Study, *see* IDF 787-804, the Davidson CIMT Study, *see* IDF 869-900, and the Ornish CIMT Study, *see* IDF 849-68.  Again, the ALJ concludes that "[t]he greater weight of the persuasive expert testimony on the studies sponsored by Respondents measuring CIMT demonstrates that the scientific evidence relied upon by Respondents is not adequate to substantiate a claim that the Challenged POM Products treat, prevent, or reduce the risk of heart disease through reducing arterial plaque, or that clinical studies show the same."  ID at 265.

For Respondents' claims that the Challenged POM Products improve blood flow, the ALJ describes and evaluates the Ornish MP Study, *see* IDF 805-48.  Here, the ALJ concludes that "[t]he greater weight of the persuasive expert testimony on the Ornish MP Study demonstrates that the scientific evidence relied upon by Respondents is not adequate to substantiate a claim that the Challenged POM Products treat, prevent, or reduce the risk of heart disease through improving blood flow, or that clinical studies show the same."  ID at 269.

The ALJ also describes and evaluates additional clinical studies regarding heart disease.  The ALJ considers the Denver Overweight Study, *see* IDF 915-23, 934-36; the San Diego Overweight Study, *see* IDF 924-33; the Rock Diabetes Study, *see* IDF 939-40, 944; and the Heber/Hill Diabetes Studies, *see* IDF 941-47.  Again, the ALJ concludes that the studies do not provide scientific evidence to substantiate a claim that the Challenged POM Products treat, prevent or reduce the risk of heart disease.

We rely on the ALJ's detailed findings regarding each of the studies.  Indeed, Respondents do little on appeal to contest the ALJ's findings regarding the particular clinical studies regarding cardiovascular health and heart disease.  Instead, Respondents urge us only to overlook particular shortcomings of some of the studies in order to conclude that Respondents possess adequate substantiation for their claims.  *See* RR at 7-10.  We do not find Respondents' arguments persuasive and we agree with the ALJ's conclusions that each study fails to provide substantiation for Respondents' claim that clinical evidence proves that the Challenged POM Products treat, prevent or reduce the risk of heart disease.

In particular, Respondents encourage us to focus on the improved measurements of blood pressure and arterial plaque in the Aviram ACE/BP and Aviram CIMT/BP studies rather than focus on the small size of the studies.  RR at 7-8.  Yet, the criticism of the studies is not limited to their size.  In the Aviram ACE/BP study, ten elderly, hypertensive patients drank 50 ml of pomegranate concentrate daily for two weeks.  IDF 774.  The study was unblinded and had no control group.  Instead, each patient's "before" measures were compared to the "after" measures.  IDF 776.  Expert testimony criticized the study because the sample size was too small to provide reliable evidence that the observed effects would be generally applicable to a larger population; the two-week period was too short to provide evidence that the improvements would last; one of the measured endpoints (angiotensin converting enzyme (ACE) activity) is not a validated surrogate marker of cardiovascular disease; and the lack of a control group meant that it is not possible to conclude that consumption of the pomegranate concentrate was the cause of reported improvements in blood pressure levels.  IDF 780-81.

Similarly, in the Aviram CIMT/BP study, a group of ten patients with severe carotid artery stenosis drank up to 50 ml of concentrated pomegranate juice daily for one year, and five continued doing so for three years.  A second group of nine patients did not consume pomegranate juice and acted as a control group.  IDF 790.  Respondents emphasize that the study found that members of the group that drank pomegranate juice consumption experienced, after one year, a reduction in carotid intima-media thickness (CIMT) by up to 30% and statistically significant reductions in systolic blood pressure.  IDF 791, 794.  Expert testimony regarding the study explained, however, that "a qualified scientist would not be able to conclude with any credibility that the Aviram CIMT/BP Study's reported improvements in the treatment group

28

were caused by their consumption of pomegranate juice and not some other factor because of the lack of a randomized, placebo-controlled group; the fact that the patients in the active and control groups received different treatment; the small sample size, and the lack of any between-group statistical analysis." IDF 798. Even one of Respondents' experts conceded the study was "not at all conclusive, the study suggests a benefit." IDF 802 (quoting Dr. Ornish). We find that the limitations of the Aviram ACE/BP and Aviram CIMT/BP studies go beyond the small sample size. As discussed above, there are several ways in which these two studies do not satisfy the criteria for well-controlled, well-designed clinical studies that are necessary to demonstrate that a product treats, prevents or reduces the risk of heart disease.

Regarding the specifics of the Davidson CIMT Study, Respondents argue that the Study should be recognized for the positive results for patients at the 12-month mark despite the lack of positive results for the patient group at 18 months. RR at 9. Respondents argue that "[a]lthough these results were not replicated at 18 months for the entire patient group, . . . the most likely explanation for the drop-off was the fact that patients may have stopped following the protocol of drinking POM Juice." Id. We reject Respondents' arguments. First, "[a]dherence to study product consumption was assessed at each visit by reviewing daily consumption diaries maintained by the subjects." IDF 876. Second, while the Study reported the 12-month results, those results were not the basis for any conclusions. See IDF 878 (explaining, for instance, "anterior and posterior wall CIMT values and progression rates did not differ significantly between treatment groups at any time"). Moreover, peer reviewers of the study considering the study for publication concluded "it was a negative study." IDF 880, 881-82, 883. We do not find that the 12-month results of the Davidson CIMT Study provide evidence on which experts in the field of heart disease would rely to establish that there is clinical proof that the Challenged POM Products treat, prevent or reduce the risk of heart disease.

Respondents also argue that the Ornish MP Study provides substantiation for the heart disease claims because the Ornish MP study found that POM Juice caused a statistically significant 35% improvement in blood flow to the heart. Respondents emphasize the testimony of Dr. Ornish that blood flow to the heart is the "bottom line" when it comes to heart disease, and Respondents also point out that the "[s]cientists and clinicians routinely consider biomarkers for heart disease other than the two officially recognized by the FDA." RR at 8. Respondents' argument acknowledges that the Ornish MP Study does not provide evidence that experts in the field of heart disease would accept as support for claims that the Challenged POM Products treat, prevent or reduce the risk of heart disease because the study does not consider surrogate markers that are accepted as correlated to heart disease. IDF 825. As a result, Respondents' argument recognizes the failure of the Ornish MP Study to provide evidence of the issue that is before us. In addition, the Ornish MP Study suffered from significant problems, including that data on all patients was not reported; subjects in the placebo group did not receive a placebo treatment; a group of patients were unblinded before their test dates; the control group differed from the active group at the outset of the study; and the study was ended after three months even though it was designed to last for twelve months. See IDF 819-824, 835-837, 843-845. Dr. Ornish admitted many of the problems were not "optimal." IDF 819. As with the other studies, we conclude that the Ornish MP study does not provide clinical proof of the Challenged POM Products' efficacy for heart disease.

29

2.      Evidence Regarding Substantiation for Prostate Cancer Claims

We find that the expert testimony establishes that experts in the field of prostate cancer would require RCTs to support Respondents' claims that clinical studies establish that the Challenged POM Products treat, prevent or reduce the risk of prostate cancer.  Complaint Counsel's experts, Dr. James Eastham and Dr. Meir Stampfer, state that to support claims that the Challenged POM Products prevent prostate cancer, or that they have been clinically proven to do so, experts in the field of prostate cancer would require at least one well-designed, randomized, double-blind, placebo-controlled clinical trial involving an appropriate sample population and endpoint.  IDF 626, 648.  Drs. Eastham and Stampfer also stated that at least one well-designed, randomized, double-blind, placebo-controlled clinical trial would be necessary to support claims that the Challenged POM Products treat prostate cancer, or that they have been clinically proven to do so.  IDF 626, 648.  Dr. Eastham explained that the appropriate sample population for a cancer prevention trial would involve healthy men, aged 50 to 65, who have no sign of prostate cancer, and that the study must be conducted over a long enough period to see an effect over time.  IDF 1092-93.  He also testified that "[t]he primary endpoint in a prostate cancer prevention trial for measuring whether a product has been effective is the prevalence or incidence of prostate cancer between the treatment and placebo groups at the conclusion of the study."  IDF 1089.

Respondents' expert stated that *in vitro* and animal studies provide evidence that the Challenged POM Products promote prostate health.  Dr. Jean deKernion testified that the Challenged POM Products are beneficial to prostate health.  IDF 1124.  For instance, Dr. deKernion testified that RCTs are not necessary to substantiate "health benefit" claims for prostate health, but he did not address the level of science needed for prostate cancer treatment or prevention claims.  *See* IDF 965; *see also* IDF 1126 (explaining deKernion testified there is a high probability that the Challenged POM Products provide a special benefit to men with detectable PSA after radical prostatectomy).  Dr. David Heber similarly provided an opinion that *in vitro* studies, animal studies, and clinical evidence provide a strong scientific rationale for claims that pomegranate juice promotes prostate "health."  *See* PX0192 at 0027 (Heber Expert Report).  Respondents' experts did not specifically address the claims alleged in the Complaint, which we found Respondents to have made.  Therefore, we find that experts in the field of prostate cancer would require RCTs to support Respondents' claims that clinical studies establish that the Challenged POM Products treat, prevent or reduce the risk of prostate cancer.

Respondents had conducted four *in vitro* studies and four animal studies relating to prostate cancer by 2009.  IDF 1010.  As we have previously described, such studies are used to identify potential biologic mechanisms and generate hypotheses for studies in humans, IDF 594-97, and Respondents' *in vitro* and animal studies showed possible mechanism of action of pomegranates in the prostate.  *See* IDF 991-1017.  But, as experts for both Complaint Counsel and Respondents testified, the results from *in vitro* and animal studies cannot always be extrapolated to what the results would be in humans, so this evidence alone does not provide clinical evidence that shows that the Challenged POM Products treat, prevent or reduce the risk of prostate cancer.  IDF 1019 (describing opinions of Dr. Stampfer and Dr. Eastham), 1022 (describing opinion of Dr. deKernion), 1024.

30

Respondents also possessed two human clinical trials at the time of the hearing before Judge Chappell. In the Initial Decision, the ALJ makes detailed findings regarding the Pantuck Study, IDF 1026-1069, 1086-1094, 1105-1127, and the Carducci Study. IDF 1064-1085, 1096-1099, 1105-1127. We do not repeat the ALJ's detailed findings regarding the human clinical studies. Based on his findings regarding each study, Judge Chappell concluded "[t]here is insufficient competent and reliable scientific evidence to support the conclusion that the Challenged POM Products treat, prevent, or reduce the risk of prostate cancer or that clinical studies, research and/or trials establish these effects." IDF at 1143.

We reach the same conclusions. We note that neither study included a placebo-control group, *see* IDF 1037, 1068-69, so that even though the studies found statistically significant results, one cannot be sure that the effects observed in each study are attributable to consuming the Challenged POM Products. IDF 1083 ("Dr. Carducci . . . testified that without a placebo, he cannot be sure that the effect on [the observed outcome] in the Carducci Study is attributable to POMx."), 1087-88 (Dr. Stampfer and Dr. Eastham testified that without a placebo control group in the Pantuck Study, it is not possible to know whether the outcome would have been observed in the patient group without receiving the Challenged POM Products), 1096 (without a placebo control group in the Carducci Study, it is not possible to conclude POMx caused the change in outcome), 1114, 1118 (Dr. deKernion testified that a control arm is not necessary for a "Phase II study that is exploratory in nature," but "without a placebo, one cannot be certain that the effect on [outcome] seen in the Carducci Study is attributable to POMx.").

Additionally, both the Pantuck Study and the Carducci Study examined men who had been diagnosed with prostate cancer and had been treated with a radical prostatectomy or other radical treatment. Both studies used prostate specific antigen (PSA) doubling time as the primary endpoint for measuring results. The presence of detectable PSA after radical prostatectomy usually indicates cancer is present. IDF 1041. There is conflicting expert testimony regarding whether use of PSA doubling time is an appropriate measure. *See* IDF 1059 (Dr. Pantuck stated "[i]t remains controversial whether modulation of PSA levels represents an equally valid clinical endpoint"); 1060-1063 (explaining an RCT examining another product found that PSA levels changed for both the placebo and active groups, which "suggests caution is required when using changes in PSA [doubling time] as an outcome in uncontrolled trials"); 1101-1104 (describing opinions of Drs. Eastham and Stampfer); 1105-1113 (describing assessments by Drs. deKernion and Heber). Yet, experts for both Complaint Counsel and Respondents testified that PSA doubling time is not an accepted surrogate endpoint by experts in the field of prostate cancer. IDF 1100 (describing opinions of Drs. Eastham and Stampfer), 1111 (describing opinion of Dr. deKernion).

Moreover, both the Pantuck Study and the Carducci Study examined men who had been diagnosed with prostate cancer. Thus, the studies do not examine whether the Challenged POM Products prevent or reduce the risk of prostate cancer. IDF 1084 ("According to Dr. Carducci, the Carducci Study was never designed to prove, and did not prove, that POMx prevents or reduces the risk of prostate cancer."), 1091 (Pantuck Study was designed as a treatment study conducted in men with prostate cancer and does not provide any evidence that POM Juice is a prostate cancer preventative), 1099 (Carducci Study cannot provide support for prevention claims because it evaluated effect of POMx in men who already had prostate cancer).

31

Given these limitations of the Pantuck and Carducci Studies, like the ALJ we find that experts in the field of prostate cancer would not consider these studies to be clinical proof that the Challenged POM Products treat, prevent or reduce the risk of prostate cancer.

3.    Evidence Regarding Substantiation for Erectile Dysfunction (ED) Claims

We find that the expert testimony establishes that experts in the field of ED would require RCTs to support claims that clinical evidence proves a product treats, prevents or reduces the risk of ED. Complaint Counsel's expert, Dr. Melman,[23] opined that in order to make a claim that the Challenged POM Products have been clinically proven to treat, prevent or reduce the risk of ED, at least one well-designed human RCT involving several investigatory sites is required. IDF 654. Dr. Melman also opined that a well-designed human RCT must use a validated tool for measuring treatment outcomes and that the clinical trial must have a sample population that is large enough to produce statistically significant and clinically significant results. IDF 655.

Respondents' expert, Dr. Arthur Burnett, testified that a safe food product, which is not used as a substitute for proper medical treatment, does not require RCTs to substantiate erectile health claims. *See* IDF 683, 684. He testified that a combination of basic science and clinical evidence can support a conclusion that a product improves erectile health and function. *See* IDF 242. Similarly, Respondents' expert, Dr. Goldstein, opined that RCT studies are not required to substantiate claims that pomegranate juice can aid in erectile health and that *in vitro* and animal studies demonstrated a likelihood that pomegranate juice improves erectile health. *See* IDF 686. Yet, Dr. Burnett also testified that "experts in the field of erectile dysfunction would require that a product be scientifically evaluated through rigorous scientific and clinical studies, and believe that animal and *in vitro* studies alone are not sufficient, before concluding that pomegranate juice treats erectile dysfunction in a clinical sense." IDF 1148 (citing Burnett, Tr. 2261-64; 2285-86;

---

[23] We disagree with the ALJ's assessment that Dr. Melman's opinions are "attenuated," *see* ID at 284; we do not find Dr. Melman's opinions to lack credibility. We first note that Judge Chappell's assessment is not based on his observation of Dr. Melman's courtroom demeanor, but rather on his assessment of the breadth of Dr. Melman's knowledge about ED studies. *See id.* We disagree with the ALJ's assessment in light of the fact that Dr. Melman was part of an international consortium that defined the requirements of clinical trials in the field of ED, his prior role as an editor of *Sexuality and Disability*, and his role as an editorial reviewer for prominent medical and urological journals. Melman, Tr. 1113-1114; CX1289 at 2. The ALJ discounted Dr. Melman's testimony because Dr. Melman was unfamiliar with the Global Assessment Questionnaire (GAQ) used in Respondents' study. We do not find that Dr. Melman's unfamiliarity with the tool reduces the value of Dr. Melman's opinion because, as the ALJ and each expert recognized, the GAQ is not a validated measure for assessing erectile function. IDF 1196 (citing Melman, Burnett, Goldstein); Melman, Tr. 1100-1102 (explaining unvalidated tools have not been shown to be reliable, validated tools are commonly used and unvalidated tools would not be used alone). Moreover, Dr. Melman researched the GAQ to provide his opinion in this case. The ALJ also discounted Dr. Melman's opinion because Dr. Melman supposedly made claims about a gene transfer therapy for ED that was based on only an animal study and one preclinical study of eleven men. *See* ID at 284. Yet, the record shows that these alleged statements are not in conflict with his testimony in this case because Dr. Melman's actions were consistent with traditional scientific protocol. Dr. Melman made a presentation about the animal and preclinical study only to a scientific audience and publication. He did not state that such evidence supported marketing claims to the public. Moreover, he is continuing to test the product before it is marketed. Dr. Melman's publicly reported statements were made only in the context of an unsolicited interview with the popular press when he was approached after the scientific presentation. Melman, Tr. 1149-1157. We find Dr. Melman's testimony to be credible.

32

2303). *See also* Burnett, Tr. 2284-85 (explaining that the "erectile dysfunction" testimony of Respondents' nutrition expert, Dr. Heber, addressed the idea that the Challenged POM Products are beneficial to erectile health rather than the clinical condition). Because Respondents' experts testified about the support necessary for general claims regarding erectile function or erectile health rather than claims that a product treats, prevents or reduces the risk of ED, we conclude that, on the basis of the record in this case, experts in the field of ED would require RCTs to substantiate the ED claims alleged in the Complaint.

As the ALJ determined, Respondents did not possess the scientific evidence to substantiate their claims that clinical studies prove that the Challenged POM Products treat, prevent or reduce the risk of ED. *See* ID at 285-89. The ALJ systematically examined Respondents' scientific evidence. The ALJ analyzed Respondents' six preclinical *in vitro* and *in vivo* studies, and that analysis is not appealed. *See* IDF 1260-1302. Similar to the basic science evidence for heart disease and prostate cancer, preclinical studies "are used to identify potential biologic mechanisms and generate hypotheses." IDF 594. These results, however, often are not replicated in humans. *Id.* Here, the basic science describes a possible mechanism by which pomegranate juice may affect human penile erections, but the expert testimony indicated that the studies demonstrated only a "benefit to erectile function," *see, e.g.*, IDF 1299, 1298 ("potential benefit . . . to likely improve one's erection physiology"), 1300, but "cannot alone prove that POM Juice treats, prevents, or reduces the risk of erectile dysfunction in humans." IDF 1301.

Respondents relied on one human clinical trial regarding ED, the Forest/Padma-Nathan study.[24] That study was an RCT examining 53 men with mild to moderate ED, using the Global Assessment Questionnaire (GAQ) as the primary outcome measure. The GAQ is not a validated instrument for erectile function. In addition, the GAQ results for the Forest/Padma-Nathan study came close to statistical significance but failed to actually reach statistical significance. IDF 1210-25. The study also used the International Index of Erectile Function (IIEF), which is a validated tool; the IIEF results were "nowhere near approaching statistical significance." IDF 1226. Dr. Padma-Nathan testified that the study concluded there was a potential for beneficial effects on ED, but further studies were needed to confirm such a claim. IDF 1229. Moreover, a peer reviewer considering the study for publication stated that it was "a negative study" and the results should be presented that way, and a published review stated that the study had negative results.[25] IDF 1231, 1232. Thus, we conclude that Respondents' human clinical trial does not provide substantiation for the claim that clinical studies prove that the Challenged POM Products treat, prevent or reduce the risk of ED. *See* IDF 1253. In addition, we note that the Forest/Padma-Nathan study examined men with mild to moderate ED; Respondents do not possess any clinical studies examining the effects of consuming the Challenged POM Products on men without ED to substantiate the claims that the Challenged POM Products prevent or reduce the risk of ED.

---

[24] One cardiovascular study, the Davidson BART/FMD study, also asked a subset of participants to complete an ED questionnaire, but, as the ALJ found, the International Index of Erectile Function (IIEF) results of that study do not support the conclusion that consuming the Challenged POM Products treats, prevents or reduces the risk of ED. *See* IDF 1254-59.

[25] To the extent that the ALJ concluded that the expert testimony regarding the Forest/Padma-Nathan study demonstrates that pomegranate juice provides a positive benefit to erectile health and erectile function, *see* ID at 288, IDF 1250-52, we reject those conclusions because such benefits were not challenged and tried by Complaint Counsel.

33

Having fully considered and weighed all of the evidence and the expert testimony on Respondents' basic science and clinical trials, the greater weight of the persuasive expert testimony demonstrates that there is insufficient competent and reliable scientific evidence to substantiate a claim that clinical studies, research or trials prove that the Challenged POM Products treat heart disease, prostate cancer, or ED.  Similarly, we find that the greater weight of the persuasive expert testimony demonstrates that there is insufficient competent and reliable scientific evidence to substantiate a claim that clinical studies, research or trials prove that the Challenged POM Products prevent or reduce the risk of heart disease, prostate cancer, or ED.  Consequently, such claims are false.

Our conclusion is consistent with the ALJ's finding that Respondents' substantiation was inadequate to meet even the lower substantiation standard that he found was necessary to support Respondents' claims.  It naturally follows that Respondents' substantiation for the establishment claims is inadequate to satisfy the higher standard we find is demanded by the record.

B.      Claims Lacking A Reasonable Basis

We now turn to whether Respondents had a reasonable basis for the product claims at issue in this case.  The theory underlying the analysis is that claims about a product's attributes, performance, or efficacy carry with them the express or implied representation that the advertiser had a reasonable basis of support for the claim.  *See, e.g.*, *Daniel Chapter One*, 2009 WL 5160000 at *16; *Thompson Med. Co.*, 104 F.T.C. at 813 n.37; *Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d at 298.  "Consumers find these representations of support to be important in evaluating the reliability of the product claims.  Therefore, injury is likely if the advertiser lacks support for the claims."  *Thompson Med. Co.*, 104 F.T.C. at 813 n. 37.

For each of the ads for which there is an establishment claim that clinical studies or trials prove that the Challenged POM Products treat, prevent or reduce the risk of disease, Respondents also make a corresponding efficacy claim.  In addition, for two ads, Figures 5 and 7, we find that Respondents make efficacy claims without also representing that there is clinical proof of the Challenged POM Products' efficacy to treat, prevent or reduce the risk of disease. *See* discussion *infra* Claims Appendix.

We must first determine the level of substantiation the advertiser is required to have before we can determine whether Respondents had a reasonable basis to make their claims. Then, we determine whether Respondents possessed that level of substantiation.  *See, e.g.*, *Pantron I Corp.*, 33 F.3d at 1096; *Removatron Int'l Corp.*, 884 F.2d at 1498.  Respondents "have the burden of establishing what substantiation they relied on for their product claims. [Complaint Counsel] has the burden of proving that [Respondents'] purported substantiation is inadequate."  *QT, Inc.*, 448 F. Supp. 2d at 959.  If Respondents cannot meet that substantiation burden, then the ads will be found deceptive.

Starting with *Pfizer Inc.*, 81 F.T.C. 23, our reasonable basis cases have identified several factors that we will weigh in determining the appropriate level of substantiation the advertiser is required to have for objective advertising claims:  (1) the type of claim; (2) the type of product;

34

(3) the benefits of a truthful claim; (4) the ease of developing substantiation for the claim; (5) the consequences of a false claim; and (6) the amount of substantiation experts in the field would agree is reasonable. *See Substantiation Statement*, 104 F.T.C. at 840; *Removatron Int'l Corp.*, 111 F.T.C. at 306-07; *Thompson Med. Co.*, 104 F.T.C. at 821; *Daniel Chapter One*, 2009 WL 2584873 at *84 (FTC Aug. 5, 2009) (Initial Decision). As we explained in *Pfizer*, the analysis to determine the level of substantiation necessary to support the claims in an ad is not a simple tallying of the number of factors that demand higher or lower levels of substantiation; the analysis is a flexible application that considers the interplay of the *Pfizer* factors. *See Pfizer*, 81 F.T.C. at 64 ("The question of what constitutes a reasonable basis is essentially a factual issue which will be affected by the interplay of overlapping considerations such as (1) the type and specificity of the claim made . . . ; (2) the type of product . . .").

Applying those factors in this case leads us to conclude that Respondents' efficacy claims that POM products treat, prevent or reduce the risk of heart disease, prostate cancer, and ED must be substantiated with RCTs.

The first factor that we consider is the type of claim. Respondents made claims regarding serious diseases. The Commission has previously stated in general terms that the substantiation standard for health claims, including structure/function claims, for food products is "competent and reliable scientific evidence."[26] For such claims, competent and reliable scientific evidence means

> tests, analyses, research, studies or other evidence based on the expertise of professionals in the relevant area, that have been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results.[27]

Such a standard is consistent with prior cases that have determined that "claims whose truth or falsity would be difficult or impossible for consumers to evaluate by themselves" require a high level of substantiation. *See Removatron Int'l Corp.*, 111 F.T.C. at 306 n.20 (citing *Thompson Med. Co.*, 104 F.T.C. at 822) (discussion of this *Pfizer* factor explained that consumers' limited ability to evaluate claims that hair removal device's results were permanent "militates in favor of a one-clinical [test] requirement").

But our consideration of the type of claim goes beyond merely identifying Respondents' claims broadly as health claims. Here, the evidence in the record shows that many of Respondents' claims went beyond structure/function claims to represent that the Challenged POM Products treat, prevent or reduce the risk of serious diseases. As previously discussed, Respondents' specific disease claims require proof of causation. As the Commission has found in other cases (*see, e.g.*, *Thompson Med. Co.*, 104 F.T.C. at 321), and as demonstrated by the

---

[26] *Food Advertising Statement*. Health claims in food labeling are those that "characterize the relationship of a substance in a food to a disease or health-related condition" and "structure/function" claims are those that represent the "effect on the structure or function of the body for maintenance of good health and nutrition." *Id.* at n.2.

[27] *Id.* (citing *Gracewood Fruit Co*., 116 F.T.C. 1262, 1272 (1993); *Pompeian, Inc.*, 115 F.T.C. 933, 942 (1992)).

35

weight of expert testimony in this case, proof of causation requires RCTs.  *See* discussion *supra*, Section V.A.[28]

The second *Pfizer* factor we consider is the type of product.  In this case, the products are foods and dietary supplements derived from a fruit that is known to be safe.  Therefore, Respondents argue, and the ALJ concurred, that the level of substantiation for a food product should be set at a lower level than for other products such as drugs.  However, as previously discussed, the particular claims made by Respondents assert a causal relationship between the Challenged POM Products and the treatment, prevention or reduction of risk of disease.  *See, e.g.*, CX1291 at 10-11 (Sacks Expert Report) (explaining controlled studies are necessary to show a product, "including a conventional food or dietary supplement" treats, prevents, or reduces the risk of heart disease).  The relative safety of the product does not alter the requirement that the scientific evidence establish causality.

In other cases we have considered the third and fourth *Pfizer* factors in tandem.  The third factor is the benefit of a truthful claim.  The fourth factor is the ease of developing substantiation for the claim.  Our concern in analyzing these factors is to ensure that the level of substantiation we require is not likely to prevent consumers from receiving potentially valuable information about product characteristics.  *Thompson Med. Co.*, 104 F.T.C. at 823.

In the discussion of these factors and based on the rationale for their consideration, the ALJ found that in a nutritional context, RCTs can be prohibitively expensive and may not be feasible.  ID at 247-48.  Thus, in order to prevent limiting information about product characteristics that might provide benefits to consumers, he concluded that where the product is safe and where the advertisement does not suggest that the product be used as a substitute for conventional medical care or treatment, it is appropriate to favor disclosure.  *Id*. at 248.  But the ALJ's failure to distinguish Respondents' particular disease treatment and prevention claims from those asserting some general health benefits led him to an incorrect conclusion.  A determination that RCTs are necessary to support Respondents' specific claims that the Challenged POM Products treat, prevent or reduce the risk of particular diseases will not erect a barrier that will prevent the disclosure to the public of useful nutritional information.  We have not determined the level of substantiation that is required to support all health and nutritional claims.[29]  Thus, while our reasoning may be informative about our likely approach to evaluate

---

[28] See also *Food Advertising Statement* (explaining the level of substantiation required for claims about a diet-disease relationship:  "The NLEA directed FDA to apply [a] 'significant scientific agreement' standard in determining whether there was adequate substantiation to permit health claims for ten specific diet-disease relationships. . . .  In evaluating health claims, the Commission looks to a number of factors to determine the specific level of scientific support necessary to substantiate the claim.  Central to this analysis is an assessment of the amount of substantiation that experts in the field would consider to be adequate.  The Commission regards the 'significant scientific agreement' standard, as set forth in the NLEA and FDA's regulations, to be the principal guide to what experts in the field of diet-disease relationships would consider reasonable substantiation for an unqualified health claim.  Thus, it is likely that the Commission will reach the same conclusion as FDA as to whether an unqualified claim about the relationship between a nutrient or substance in a food and a disease or health-related condition is adequately supported by the scientific evidence.").

[29] Regarding support for structure/function claims, the Commission has previously indicated its desire for consistency with the Dietary Supplement Health and Education Act of 1994 (DSHEA)**:**  "DSHEA … requires that structure/function claims in labeling be substantiated and be truthful and not misleading.  This requirement is fully consistent with the FTC's standard that advertising claims be truthful, not misleading and substantiated."  Dietary

other health claims, our ruling in this case should address only the substantiation of claims regarding the efficacy of particular foods to treat, prevent or reduce the risk of serious diseases.

Moreover, we do not interpret these two *Pfizer* factors to give an advertiser license to make particular claims that go beyond the substantiation it possesses and then ask the Commission to excuse the inadequacy of its support by asserting that advertiser did the best it could because the proper substantiation for the actual claim would be too expensive. *See* Eastham, Tr. 1328-29 (explaining cost does not change scientific burden). As we have previously explained, "[w]here the demands of the purse require such compromises [in methodology], the advertiser must generally limit the claims it makes for its data or make appropriate disclosures to insure proper consumer understanding of the survey's results." *Kroger Co.*, 98 F.T.C. 639, 737 (1981).

We also observe that among the studies that Respondents present as support for their claims are several clinical trials that were designed as RCTs. *See, e.g.*, IDF 808-818 (describing Ornish MP study), 849-859 (describing Ornish CIMT study), 872-883 (describing Davidson CIMT study), 941-943 (describing Heber/Hill Diabetes study). Among the limitations of these studies was that the results were not statistically significant. As discussed above, we determined that these well-controlled human clinical trials do not provide substantiation for Respondents' claims. In our evaluation of the evidence, we interpret the failure of these RCTs to provide support for Respondents' claims as evidence that there is insufficient scientific and clinical evidence of the efficacy of the Challenged POM Products; we do not interpret the results of the particular studies as an indication that the appropriate standard here – that Respondents possess RCTs with statistically significant results – is set too high.

The fifth factor that we weigh is the consequences of a false claim. In this regard, the ALJ stated that he found no evidence that Respondents urged individuals to consume the Challenged POM Products in place of medical treatment. Thus, he concluded the injury is limited to consumers paying a premium for an ineffective product and that such economic injury is not a significant factor in determining the required level of substantiation in this case. ID at 248-49. [30] We disagree with the ALJ that the economic injury from unsubstantiated health benefits is immaterial under *Pfizer*. *See Thompson Med. Co.*, 104 F.T.C. at 824 (significant economic harm "result[s] from the repeated purchase of an ineffective product by consumers who are unable to evaluate" the efficacy claims, even where "there is little potential for the product to cause serious injury to consumers' health"); *FTC v. Pantron I Corp.*, 33 F.3d at 1102 ("[A] major purpose of the Federal Trade Commission Act is to prevent consumers from

---

Supplements: An Advertising Guide for Industry (2001), *available at* http://business.ftc.gov/documents/bus09-dietary-supplements-advertising-guide-industry. The FDA has also signaled its intent to be consistent with the FTC in the application of a standard for such claims: "The FTC has typically applied a substantiation standard of 'competent and reliable scientific evidence' to claims about the benefits and safety of dietary supplements and other health-related products. FDA intends to apply a standard for the substantiation of dietary supplement claims that is consistent with the FTC approach." Guidance for Industry: Substantiation for Dietary Supplement Claims Made Under Section 403(r) (6) of the Federal Food, Drug, and Cosmetic Act (2008), *available at* http://www.fda.gov/food/guidancecomplianceregulatoryinformation/guidancedocuments/dietarysupplements/ucm073200.htm.

[30] The ALJ noted that although these costs may not be insignificant at least for the POM Juice, consumers are at a minimum buying what is considered to be a premium fruit juice. ID at 249.

37

economic injuries."). Consumers pay a higher price for POM products at least in part because of their ostensible health benefits.[31]

The sixth and final factor that we consider is the amount of substantiation experts in the field would agree is reasonable. As the prior detailed discussion indicated, experts in the fields of heart disease, prostate cancer, and ED would expect RCTs to support Respondents' particular disease claims.

Therefore, based upon our review of the six *Pfizer* factors, the Commission concludes that the proper level of substantiation for Respondents' disease efficacy claims is RCTs. "The inability of consumers to evaluate" the treatment and prevention effects of the Challenged POM Products "by themselves in an uncontrolled environment is a persuasive reason for consumers to expect (and us to require) appropriate scientific testing before efficacy claims are made." *Thompson Med. Co.*, 104 F.T.C. at 826. We note that under this analysis we would expect the same attributes in RCTs as we discussed in Section V.A., *supra* (*i.e.*, randomized controls, valid endpoints, and statistically significant results).

Having determined that Respondents are required to have RCTs to support their claims that the Challenged POM Products treat, prevent or reduce the risk of heart disease, prostate cancer, and ED, and based upon our prior review of the substantiation that Respondents possess, we conclude they lack support for each of their claims.[32] We therefore hold that Respondents' advertising is deceptive for failure to have a reasonable basis. Thus, Respondents' advertising violates Sections 5(a) and 12 of the FTC Act. *See Removatron Int'l Corp.*, 884 F.2d at 1498 (finding that where advertisers lack a reasonable basis, their ads are deceptive as a matter of law).

## VI.    Respondents' False and Misleading Claims are Material

The ALJ found that a preponderance of the evidence demonstrated that the challenged claims that he determined were false and misleading are material to consumers' decisions to purchase the Challenged POM Products. ID at 292. On appeal, Respondents argue that any false or misleading claims are not material and accordingly that such claims cannot form the basis for liability under the FTC Act. Respondents argue that the lack of materiality is demonstrated by the results of the Reibstein Survey and the fact that none of the challenged advertisements had more than a single run such that consumers were not repeatedly exposed to them. RA at 36-37. Respondents further argue that the Commission should discount their

---

[31] As the ALJ noted, a one-year supply of POM Juice cost at least $780 and a one-year supply of POMx cost approximately $315, amounts that the ALJ acknowledged were "not insignificant." ID at 249. There is record evidence that consumers paid a premium for POM Products, at least in part because of the ostensible disease-fighting capability of the Challenged POM Products. *See* CX0221 at 0009 ("POM Juice's 16 oz skus are $4+/bottle, roughly a 30% premium to our pomegranate competitors."); CX0283 at 002 ("Health benefits – this is why they put up with the price").

[32] We separately find that Respondents lack support for their claims that (1) the Challenged POM Products treat heart disease, (2) the Challenged POM Products prevent or reduce the risk of heart disease, (3) the Challenged POM Products treat prostate cancer, (4) the Challenged POM Products prevent or reduce the risk of prostate cancer, (5) the Challenged POM Products treat erectile dysfunction, and (6) the Challenged POM Products prevent or reduce the risk of erectile dysfunction.

creative advertisement briefs because they were written by junior employees and only
demonstrated an intent to communicate generalized benefits, and that other surveys relied upon
by the ALJ as evidence of materiality were methodologically flawed.  RA at 37-39.  Although
we find that the challenged advertisements contain more false and misleading claims than found
by the ALJ (as set forth in Section IV), we agree with the ALJ's ultimate conclusion that such
claims are material and accordingly run afoul of Section 5 and Section 12 of the FTC Act.

     "A misleading claim or omission in advertising will violate Section 5 or Section 12,
however, only if the omitted information would be a material factor in the consumer's decision
to purchase the product."  *Am. Home Prods. Corp.*, 98 F.T.C. at 368.  A "material"
misrepresentation is defined as one that is likely to affect a consumer's conduct with respect to
the product or service.  *Deception Statement*, 103 F.T.C. at 182.  In determining whether false or
misleading claims in an advertisement are "material" to consumers, the Commission may first
consider whether a claim is presumptively material, including "express claims, claims
significantly involving health or safety, and claims pertaining to the central characteristic of the
product."  *Novartis Corp.*, 127 F.T.C. at 686 (citing *Deception Statement*, 103 F.T.C. at 182).  A
respondent may rebut a presumption of materiality by providing evidence that the claim is not
material:  "Respondent can present evidence that tends to disprove the predicate fact from which
the presumption springs (*e.g.*, that the claim did *not* involve a health issue) or evidence directly
contradicting the initial presumption of materiality.  This is not a high hurdle."  *Id.* at 686.  If
Respondent rebuts the presumption of materiality, then the Commission examines the facts that
gave rise to the presumption, any rebuttal evidence, and any other evidence on materiality
provided by Complaint Counsel.  *Id.* at 686-87.  The Commission should also consider an
advertiser's intent to make a claim, which, in the case of implied claims like the ones at issue in
this case, requires consideration of (though not reliance on) extrinsic evidence.  *Id*. at 687-88.

     The claims made in the challenged advertisements are health-related claims, which are
presumptively material as set forth in *Novartis Corp*.  ID at 292; IDF 580-83.  Respondents do
not refute this.  However, the ALJ determined that he need not rely on a presumption of
materiality given Respondents' presentation of rebuttal evidence because "the preponderance of
the evidence shows that the challenged claims are material."  ID at 292.  After considering the
fact that the claims in the challenged advertisements are health-related, Respondents' own
statements and creative briefs, and the three surveys relied upon by Complaint Counsel and
Respondents as either evidence of materiality or lack thereof, we agree that the preponderance of
the evidence demonstrates that the challenged claims are material.

     As set forth above, Respondents do not refute that the claims made in the challenged
advertisements are health-related.  In fact, their main argument with respect to what kind of
claims are made in the advertisements is that the advertisements make claims about the
Challenged POM Products' health benefits rather than disease claims.  Respondents' own
statements and creative briefs provide further evidence of materiality, as set forth in the ALJ's
opinion and detailed findings of fact.  ID at 292-95; IDF 113, 128, 131, 145-51, 154, 181, 1316-
21, 1323-35, 1340-43.  For example, Mrs. Resnick testified that POM juice is "health in a
bottle," which is its "unique selling proposition."  IDF 112; CX1375 at 41-42 (L. Resnick,
Tropicana Dep.).  Mr. Resnick similarly stated his belief that a large number of POM Juice
consumers purchase the product because they believe "that we've proven that . . . [POM Juice]

39

really does prolong people's lives if they are getting the onset of prostate cancer." IDF 1318 (quoting CX1376 at 218-19 (S. Resnick Ocean Spray Dep.)).

The focus of the ads challenged by Complaint Counsel were POM's disease claims, not the products' taste, price, or other attributes. The products' central characteristic, as depicted in the challenged ads, was their impact on heart disease, prostate cancer or ED. Respondents thought their products impact on health was such a strong selling point that they invested over $35 million to develop supporting evidence that they could use in marketing. ID at 295. As the ALJ explained, under these circumstances, "particularly that POM was aware that among those purchasing the Challenged POM Products were 'people that have heart disease or prostate cancer in their family, or have a fear of having it themselves,' [IDF] 1320, it defies credulity to suggest that Respondents would advertise study results related to these conditions if such advertising did not affect consumer behavior." We agree with the ALJ that it is "no great leap," *Novartis Corp.*, 127 F.T.C. at 687, to find that consumer purchasing decisions would likely be influenced by claims that the Challenged POM Products treat, prevent, or reduce the risk of these diseases.

In support of their contention that the claims were not material, Respondents rely on the Reibstein Survey. The ALJ rejected this argument, citing methodological and other flaws in that survey, including that "it only assessed consumer motivations generally; it did not actually assess whether any of the challenged claims . . . would be important to the survey respondent's decision to purchase the products," and "the survey did not ask any follow-up questions, including of the 35.2% of POM Juice purchasers who stated that they bought or would repurchase POM Juice because it was 'healthy.'" ID at 295-96; IDF 1354, 1361, 1373, 1375. We agree with the ALJ's assessment of the Reibstein Survey.

Accordingly, the Commission holds that Respondents' misleading claims were material.[33]

## VII.    First Amendment Analysis

Respondents contend that a finding of liability would violate the First Amendment. They argue that the ALJ ignored Supreme Court case law that defines what it means for commercial speech to be false or misleading. We disagree. As Respondents acknowledge, *see* RA at 19, commercial speech must at least "concern lawful activity and not be misleading" to qualify for constitutional protection. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980); *see also, e.g.*, *In re R.M.J.*, 455 U.S. 191, 200 (1982) ("False, deceptive or misleading advertising remains subject to restraint.").

Respondents first contend that the Commission cannot determine that ads are "actually misleading" unless there is empirical or extrinsic evidence that consumers were deceived. Next, Respondents contend that the FTC cannot judge an advertisement to be "inherently misleading" on its face when the ad states accurate and verifiable facts. Respondents then argue that based on the evidence the Commission may only determine that Respondents' ads are "potentially

---

[33] In light of this conclusion based on the foregoing considerations that Respondents' claims were important to consumers in making purchasing decisions, the Commission need not decide whether the OTX A&U Study or the Zoomerang study, on which Complaint Counsel relies, offer further evidence of materiality.

**JA-0624**

misleading." If the ads are only potentially misleading, according to Respondents' logic, then precedent establishes that, at most, the FTC could require limited disclaimers that are tailored to satisfy the test in *Central Hudson*, because a disagreement about the meaning of scientific evidence cannot justify a bar of Respondents' health claims. We address Respondents' arguments in turn.

    A.    Actually Misleading

Contrary to Respondents' claim, empirical or extrinsic evidence is not necessarily required for the Commission to conclude that Respondents' ads are actually misleading. Respondents mischaracterize the law in arguing that the Commission is limited to finding an advertisement is actually misleading only in instances where extrinsic or empirical evidence exists of actual deception. In terms of First Amendment jurisprudence, the Commission's determination of whether particular ads establish that the ads are "actually misleading" does not require extrinsic or empirical evidence. *See Kraft, Inc.*, 970 F.2d at 319, 325 (in a case where "the Commission found implied claims based solely on its own intuitive reading of the ads (although it did reinforce that conclusion by examining the proffered extrinsic evidence)," explaining "[t]o begin with, the Commission determined that the ads were *actually* misleading, not potentially misleading, thus justifying" the Commission's remedy); *Daniel Chapter One*, 2009 WL 5160000 at *20, n.2 (explaining "implied claims . . . have been specifically adjudicated in the present case to be actually misleading" in a case where Complaint Counsel did not introduce extrinsic evidence).

Just as in *Kraft* and *Daniel Chapter One*, in this case, the Commission's findings based on its own expertise – Respondents disseminated advertising or promotional material that contained implied claims, Respondents lacked substantiation to support those claims, and the claims are material – legally establish that Respondents' advertising is actually misleading. Here, in 34 ads, Respondents represented to consumers that clinical studies proved that the Challenged POM Products treat, prevent or reduce the risk of heart disease, prostate cancer, or ED when, in fact, well-controlled clinical studies did not establish such efficacy for the particular diseases; these claims that clinical research or studies proved the efficacy of the Challenged POM Products were false. Therefore, Respondents' ads were deceptive and actually misleading. In addition, in 36 ads, Respondents represented that the Challenged POM Products treat, prevent or reduce the risk of heart disease, prostate cancer, or ED when Respondents did not possess a reasonable basis to support such claims. Again, Respondents' ads are deceptive as a matter of law. *See FTC v. Direct Mktg. Concepts, Inc.*, 624 F.3d 1, 8 (1st Cir. 2010) ("Where the advertisers lack adequate substantiation evidence, they necessarily lack any reasonable basis for their claims. And where the advertisers so lack a reasonable basis, their ads are deceptive as a matter of law.") (citation omitted).

The proposition that the First Amendment requires extrinsic evidence in every case has been raised and rejected by the Supreme Court and courts of appeals. *See, e.g., Zauderer*, 471 U.S. at 652-53 (stating that no First Amendment concerns are raised when facially apparent claims are found without "conduct[ing] a survey of the . . . public" to determine that an ad is misleading); *Kraft, Inc.*, 970 F.2d at 321 ("Kraft's first amendment challenge is doomed by the Supreme Court's holding in *Zauderer*, which established that no first amendment concerns are

41

raised when facially apparent implied claims are found without resort to extrinsic evidence."); *Daniel Chapter One*, 2009 WL 5160000 at *14-15 ("Respondents repeatedly assert . . . the ALJ was obliged by the Due Process Clause and the First Amendment of the Constitution to consider 'extrinsic' evidence. More specifically, Respondents claim that 'Complaint Counsel should have been required to produce evidence that consumers were actually misled by Respondents' promotional efforts and representations[.]' . . . That is not the law. Federal courts have long held that the Commission has the common sense and expertise to determine 'what claims, including implied ones, are conveyed in a challenged advertisement, so long as those claims are reasonably clear.'") (citation omitted). Indeed, even the case which Respondents cite for their claim that empirical evidence is necessary, *Peel v. Att'y Registration & Disciplinary Comm'n*, 496 U.S. 91 (1990), relied on a facial analysis of the ads – not empirical evidence – to find that the ads were not actually misleading. *Id.* at 105-06 (describing evaluations and explaining "two state courts that have evaluated lawyers' advertisements of their certifications as civil trial specialists by NBTA have concluded that the statements were not misleading or deceptive *on their face*, and that, under our recent decisions, they were protected by the First Amendment") (emphasis added).

Once the Commission has determined that Respondents' ads are actually misleading, no further analysis is necessary because misleading commercial speech is not protected by the First Amendment. Each of the cases cited by Respondents acknowledges that '[t]he Federal Government [is] free to prevent the dissemination of commercial speech that is false, deceptive, or misleading." *Zauderer*, 471 U.S. at 638. The three-part analysis for determining whether regulation of commercial speech is constitutional under *Central Hudson* – whether the regulation is based on a substantial governmental interest, whether the regulation directly advances the governmental interest asserted, and whether the regulation is not more extensive than necessary to serve that interest – is applicable only if a threshold inquiry determines that the speech in question is not false or misleading. *See Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 566; *Edenfield v. Fane*, 507 U.S. 761, 768 (1993); *Daniel Chapter One*, 2009 WL 5160000 at *19-20. We nonetheless address Respondents' additional First Amendment arguments.

B.    Inherently Misleading

Respondents contend that "an advertisement cannot be inherently misleading on its face when it states objectively accurate and verifiable facts," but also admit "[a]n advertisement that states accurate and verifiable facts may, in some instances, be potentially misleading." RA at 20. Indeed, Respondents' admission is the more accurate description of the law. Courts have regularly found "that even literally true statements can have misleading implications" and challenging such deception does not violate the First Amendment. *Kraft Inc.*, 970 F.2d at 322 (citing *Zauderer*, 471 U.S. at 652; *Thompson Med. Co.*, 791 F.2d at 197; *Removatron Int'l Corp.*, 111 F.T.C. at 292-95; *Am. Home Prods. Corp.*, 695 F.2d at 687).

It appears that Respondents' argument is that when addressing advertising that is considered inherently misleading on its face, each element of the ad is to be evaluated in isolation for its accuracy. The cases that Respondents cite – *R.M.J.*, 455 U.S. at 205, *Zauderer*, 471 U.S. at 645; *Peel*, 496 U.S. at 100; *Ibanez v. Fla. Dep't of Bus. & Prof'l Regulation, Bd. of Accountancy*, 512 U.S. 136, 144 (1994) – addressed bans on statements in professional

42

advertising where the regulatory bodies found advertising to be misleading based on simple affirmative representations, such as stating the jurisdictions where the attorney was licensed or certifications that the attorney held. The Court struck down the regulations because it found that, for example, so long as the attorney was still licensed in the jurisdiction, providing the information to the public was not misleading because consumers could easily confirm the licensing or certification.

Respondents assert that the statements in their ads also are objectively accurate and verifiable facts. Respondents point to statements in their ads that the Challenged POM Products are high in antioxidants and to the citations of their studies to explain that the studies were conducted by world-renowned researchers, the results were published in peer-reviewed journals, and the statements about the disease-specific findings as proof the statements, like those in *R.M.J.*, are objectively are accurate and verifiable. We agree that many of the facts in Respondents' ads are verifiable. However, there are many omissions of material facts in Respondents' ads that consumers cannot verify independently. For example, consumers cannot verify that one of the five studies referenced in the ads, IDF 126, was rejected as an abstract by the American Heart Association and was rejected by the Journal of the American Medical Association because of shortcomings of the research, and was only accepted for publication in the American Journal of Cardiology without peer review. IDF 816-818. Similarly, consumers could not verify that the results of a much larger, well-designed, well-controlled study – the Davidson CIMT Study, which was completed in 2006 and showed, at most, a 5% decrease in arterial plaque in some patients measured at an interim point – were inconsistent with the statement in ads running through 2009 (*e.g.*, CX0029, CX0280, CX0328/CX0331/CX0337, CX0473) that asserted "Pomegranate juice consumption resulted in significant reduction in IMT (thickness of arterial plaque) by up to 30% after one year" based on the unblinded Aviram CIMT/BP study because Respondents delayed publication of the negative results. *See* CX0716 at 0033 (under study protocol, Respondents' approval was needed to present results of the study); S. Resnick, Tr. 1685-96 (explaining that Davidson was denied authorization to submit study results to the American Heart Association meeting in 2007 because of the study's inconsistent findings, but later allowing Davidson to submit the study for publication in 2008); CX1336 at 144, 165-68, 180-81 (Davidson Dep.). We conclude that many of Respondents' representations are qualitatively different from the verifiable statements in the professional advertising cases that Respondents cite.

C.    Potentially Misleading

Finally, Respondents argue that, because their ads are not actually misleading or inherently misleading, a position that this opinion has already rejected, then their ads can only be evaluated as potentially misleading, and potentially misleading commercial speech cannot be prohibited. Respondents assert that the D.C. Circuit's holding in *Pearson v. Shalala*, 164 F.3d 650 (D.C. Cir. 1999), leads to the conclusion that Respondents' representations cannot be banned on the basis of a genuine dispute about the level or meaning of scientific evidence. We do not interpret *Pearson v. Shalala* to preclude us from finding that Respondents' claims are misleading because they lack substantiation, even if the Commission's conclusion were evaluated as a finding that Respondents' ads are potentially misleading, rather than actually misleading.

43

In *Pearson*, manufacturers of dietary supplements sought pre-approval from the FDA for four health claims that the manufacturers wanted to make in labeling for their products. The FDA refused to approve the claims on the grounds that they were not supported by the "significant scientific agreement" standard of evidence under that agency's regulatory scheme. The FDA, consistent with agency practice, refused to consider the manufacturers' argument that the use of disclaimers could prevent these four health claims from being misleading. On appeal from a district court decision upholding the constitutionality of the FDA's determination, the D.C. Circuit reversed. When considering the government's argument that health claims for dietary supplements are potentially misleading to consumers if significant scientific agreement does not support the claims, the D.C. Circuit recognized that the government has a substantial interest in ensuring the accuracy of consumer information in the marketplace and that banning potentially misleading health claims would appear to directly advance that interest. *Id.* at 655-56. The court, however, went on to hold that the government did not meet its burden of proving that there was a reasonable fit between banning these claims and the government's interest in preventing fraud. *Id.* at 657. The D.C. Circuit concluded that potentially misleading claims could be remedied by "prominent" disclaimers. *Id.* at 658, 659.

In this case, we reviewed Respondents' claims in light of any disclaimers or disclosures that Respondents actually made in their ads. Respondents' disclaimers, disclosures, or qualifications to their claims are much less that what the D.C. Circuit hypothesized would be sufficient to prevent health claims with disputed scientific support from being misleading.[34] If Respondents' had made disclaimers such as those described in *Pearson* (*i.e.*, "the evidence in support of this claim is inconclusive," *id.* at 659), the Commission would have considered the representations in the ads in light of such statements. Without such disclaimers, Respondents' ads are deceptive and misleading.

In addition, the Commission's approach to address misleading advertising, which is a case-by-case adjudication *after* ads have been disseminated, differs from regulatory efforts that prohibit categories of speech or rely on *prior* approval of the language to be used. The latter serve as illustrations of "bars" on commercial speech and are inapplicable to the detailed *ex post* analysis we engage in here, based on a full record about the ads in question. *See Kraft Inc.*, 970 F.2d at 317 (explaining that "a prophylactic regulation applicable to all lawyers, completely prohibiting an entire category of potentially misleading commercial speech" at issue in *Peel*, is sufficiently distinct for constitutional purposes from "an individualized FTC cease and desist order prohibiting a particular set of deceptive ads") (citation omitted); *Daniel Chapter One*, 2009 WL 5160000 at *15 (citing *Kraft, Inc.* to explain that FTC finding that ads are misleading in administrative adjudication does not violate First Amendment). As the ALJ explained in this case, "Respondents' generalized assertion that none of its commercial speech should be 'barred' is without merit. Requiring adequate substantiation for advertising claims does not 'bar' commercial speech, but serves to prevent dissemination of misleading claims." ID at 323 n.32 (internal citation omitted). The FTC's case-by-case adjudication, which examines whether an advertiser made limited claims or provided appropriate disclaimers, neither bars nor discourages

---

[34] Commissioner Ohlhausen's view is that, with regard to some exhibits, the Respondents included sufficient qualifying language to at least raise the need for extrinsic evidence before finding implied misleading claims. *See* Commissioner Ohlhausen's Concurring Statement.

the free flow of commercial speech that would expand consumer knowledge regarding the goods and services available in the market.

## VIII.   Fifth Amendment Analysis

In Respondents' Answering Brief, Respondents argue for the first time that a finding that RCTs are required to substantiate Respondents' claims violates constitutional due process principles because the Commission would be retroactively applying a standard that deviates from the Commission's current approach articulated in both FTC policy statements and case law. RAns at 24-28.  As set forth above, the Commission finds that the required substantiation for Respondents' disease claims about the Challenged POM Products is RCTs.  Given that this substantiation finding is a fact-based determination based on the experts' opinion of what constitutes competent and reliable scientific evidence for the claims at issue, and that basing this factual determination on expert testimony follows clearly established legal precedent, we reject Respondents' claim that such a finding raises due process concerns.

"A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required.  This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment."  *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012) (citations omitted).  A number of the Commission's policy statements provide support for the principle that determining what constitutes sufficient substantiation for particular claims is a fact-based analysis that rests in large part on scientific expert opinion.  The *Substantiation Statement* discusses the fact that extrinsic evidence may be useful to determine the proper level of substantiation (including expert testimony or consumer surveys) regarding substantiation of implied efficacy claims:  "Extrinsic evidence, such as expert testimony or consumer surveys, is useful to determine what level of substantiation consumers expect to support a particular product claim and the adequacy of evidence an advertiser possesses."  *Substantiation Statement*, 104 F.T.C. at 840.  The *Food Advertising Statement* provides additional (and more detailed) support for the Commission's reliance on competent and reliable scientific evidence and expert determination of what constitutes such evidence for particular claims:

> Like FDA, the Commission imposes a rigorous substantiation standard for claims relating to the health or safety of a product, including health claims for food products. The Commission's standard that such claims be supported by "competent and reliable scientific evidence" has been more specifically defined in Commission orders addressing health claims for food products to mean:

>> tests, analyses, research, studies or other evidence based on the expertise of professionals in the relevant area, that have been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results.

> Thus, both the Commission and FDA look to well-designed studies, including clinical research and other forms of reliable and probative scientific evidence, in evaluating health claims for foods. (footnotes omitted).

45

. . .

In evaluating health claims, the Commission looks to a number of factors to determine the specific level of scientific support necessary to substantiate the claim. Central to this analysis is an assessment of the amount of substantiation that experts in the field would consider to be adequate. The Commission regards the "significant scientific agreement" standard, as set forth in the NLEA and FDA's regulations, to be the principal guide to what experts in the field of diet-disease relationships would consider reasonable substantiation for an unqualified health claim.

*Food Advertising Statement* at § IV.A; *see also id*. at n.79 ("This approach is consistent with the Commission's approach to evaluating the substantiation for claims made for drug products and medical devices regulated by FDA.").

A number of cases and Commission decisions reiterate the principle that the proper level of substantiation is a factual determination which is rooted in a reliance on expert testimony. *See, e.g.*, *Bristol-Myers Co.*, 102 F.T.C. at 332-38; *QT, Inc.*, 448 F. Supp. 2d at 961-62. Of particular relevance to this case is *Thompson Medical Company*, where the Commission applied the *Pfizer* factors to determine that well-controlled clinical tests (or RCTs) were required as a reasonable basis for efficacy claims regarding a topical analgesic. *Thompson Med. Co.*, 104 F.T.C. at 826. In addition to determining that the type of claim made, as in this matter, was one "whose truth or falsity would be difficult or impossible for consumers to evaluate by themselves," the Commission determined that experts in the field would require well-controlled clinical trials as reasonable substantiation for the efficacy of an analgesic. *Id.* at 822.

In sum, the Commission's determination that RCTs are required to substantiate Respondents' disease claims is founded on the well-established principle that determining the proper level of substantiation is a fact-based and case-specific analysis based on expert testimony as to what constitutes competent and reliable scientific evidence for the claims at issue. Respondents were on notice of this long-standing standard. Therefore, our decision in this case does not raise due process concerns.

## IX.    Media Interviews

The four media interviews in question on appeal include appearances by Mrs. Resnick on *The Martha Stewart Show* and *The Early Show*, sharing recipes and marketing ideas related in part to POM; a magazine interview with Mrs. Resnick in *Newsweek,* in part promoting the sale of her book about the POM business; and a television interview with Mr. Tupper on FOX Business discussing the current relevance of the pomegranate and pomegranate juice. ID at 208.

The ALJ found that the four media interviews challenged by Complaint Counsel do not constitute advertisements within the meaning of the FTC Act so that the Initial Decision does not evaluate whether any claims made during the interviews are deceptive or misleading. ID at 210. We do not adopt the predicate for the ALJ's ruling – that the media interviews must be advertisements (rather than deceptive commercial speech more broadly) in order to form the basis for liability under Section 5 of the FTC Act. Instead, given the limited evidence regarding the circumstances surrounding the context of these interviews and the numerous other deceptive

46

claims made by Respondents, the Commission declines to base liability on the four media interviews in question.

In focusing solely on whether or not an advertisement must be paid for in order to fall within the scope of Section 12 as "advertisements," the ALJ did not consider whether statements made during the media interviews violate Section 5 of the FTC Act as deceptive commercial speech.[35]  Section 5(a)(2) of the FTC Act states, "[t]he Commission is hereby empowered and directed to prevent persons, partnerships, or corporations . . . from using unfair methods of competition in or affecting commerce and unfair or deceptive act or practices in or affecting commerce."  In order to determine as a preliminary matter whether respondents are engaging in commercial speech, we consider a number of factors.

In *In re R.J. Reynolds Tobacco Company*, 111 F.T.C. 539, 547 (1988), the Commission held that respondents' advertisement discussing a "scientific study" that allegedly assessed the hazards of cigarette smoking constituted deceptive commercial speech, reversing the ALJ's ruling granting respondents' motion to dismiss on the grounds that the advertisement did not constitute commercial speech.  In considering whether the advertisement constituted commercial speech, the Commission considered (1) the content of the speech, *i.e.*, whether it contained a message promoting the demand for a product or service; (2) whether the speech referred to a specific product or service; (3) whether the speech included information about attributes of a product or service, such as type, price, or quality, including information about health effects associated with the use of a product; (4) the means used to publish the speech, including whether it is paid-for advertising; and (5) the speaker's economic or commercial motivation.  *Id.* at 544-46.  The Commission stated:

> Evidence that may be relevant to deciding whether the Reynolds advertisement is commercial speech includes facts concerning the publication or dissemination of the advertisement, such as whether it was paid-for, where and in which publications it was disseminated, whether it was placed in editorial space (such as an op-ed page) or advertising space in the publication, whether it was prepared as a letter to the editor, whether it was sent to representatives of the media for selection on merit by editorial boards, and to whom it was disseminated outside the media.

> Evidence about the promotional nature of the advertisement also may be relevant. Therefore, it might be useful to consider the circumstances surrounding the development of the advertisement, such as whether it was targeted to consumers or legislators; whether it was intended to affect demand for Reynolds' cigarettes or brands or to affect particular legislative or regulatory proposals; whether the advertisement was subjected to copy

---

[35] Notwithstanding Respondents' claims to the contrary, deceptive commercial speech is not constitutionally protected.  *See Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 566 ("For commercial speech [to be protected by the First Amendment], it at least must concern lawful activity and not be misleading.").  Where the Commission finds that claims disseminated through commercial speech lack proper substantiation, such findings establish as a matter of law that such claims are deceptive and thus not protected by the First Amendment.  *See Direct Mktg. Concepts, Inc.*, 624 F.3d at 8 ("Where the advertisers lack adequate substantiation evidence, they necessarily lack any reasonable basis for their claims.  And where the advertisers so lack a reasonable basis, their ads are deceptive as a matter of law.") (citation omitted).

testing or to review by focus groups and, if so, the nature of the questions used in the copy tests or focus group sessions; and the results of those procedures both in terms of what they showed and what changes, if any, Reynolds made in response to those showings. Evidence relating to the message(s) Reynolds itself intended to convey through the advertisement also may be relevant. In addition, Reynolds' share of the cigarette market may be relevant to deciding whether including a brand name reference is a prerequisite to a determination that the advertisement constitutes commercial speech.

*Id.* at 550. In other words, the evidence considered by the Commission in *R.J. Reynolds Tobacco Company* focuses in large part on the "means" used to publish the speech, as well as where and in which publications it was disseminated and where it was placed within such publications. These factors may apply differently when determining whether statements fall within the definition of commercial speech outside of the advertising context. *Compare Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 562-563 ("'commonsense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech") *with id.* at 546 (discussing case decided by Court on the same day, *Consol. Edison Co. v. Public Serv. Comm'n*, 447, U.S. 530, 544 (1980), holding that "[PSC]'s suppression of bill inserts that discuss controversial issues of public policy directly infringes the freedom of speech protected by the First and Fourteenth Amendments."); *see also Oxycal Labs. v. Jeffers*, 909 F. Supp. 719, 724 (S.D. Cal. 1995) (denying request for injunction pursuant to the Lanham Act after determining that statements in a book about the carcinogenic effects of plaintiffs' vitamins did not constitute commercial speech even though the book also promoted defendants' products: "The Court finds that the main purpose of [defendant's] Book is not to propose a commercial transaction, and [defendant's] writing is not solely related to the economic interests of the speaker and its audience.").

The factual record in this case, however, lacks evidence about several of the commercial speech factors described in *R.J. Reynolds Tobacco Company.* Specifically, in considering the "means" by which such statements were made, we consider that these statements were made in the context of much longer interviews with the media, that the interviewer rather than the interviewee may have a certain amount of control over the content of the speech based on the content of the questions, and that the interviewer may have his or her own agenda that does not focus on advancing the commercial interests of Respondents. Here, the record is devoid of answers to key questions. The record does not reveal, for example, whether and how each of these interviews came to pass or any understanding between the media organizations and Respondents regarding the content of the interviews. Also lacking in the record is evidence about how the media interviews were arranged or procured, and whether Respondents paid for them. These factors are not necessarily all required or dispositive, and may be considered on a sliding scale. However, absent answers to these questions, we cannot make an informed determination with respect to the media interviews at issue.

Moreover, in light of the number of deceptive claims made in the other challenged exhibits by Respondents, we need not base Respondents' liability in this case on these four media appearances. We follow a precedent of restraint exhibited in other decisions where liability has been found on other grounds. *In re Rubbermaid*, 87 F.T.C. 676, 1976 WL 179998 at *20 (F.T.C. Apr. 13, 1976) ("Because we have found the contracts to be generally violative of

Section 5 [as alleged in Count I's charge of illegal price maintenance], there is no need to reach Count II's charge of violations with regard to transactions between certain States, and we decline to do so.").

## X.     Remedy

### A.     Cease and Desist Order

The ALJ determined that a cease and desist order is warranted against all Respondents, finding that Respondents' conduct is transferable, serious, and deliberate. ID at 309-13. On appeal, Respondents argue that injunctive relief is not warranted with respect to the Challenged POM products because POM has already stopped running the ads found to contain claims. In addition, Respondents argue that the remedy is not necessary because they began implementing a new review process for POM ads in 2006 and only a handful of ads and web captures of offending claims were made after that implementation. RA at 39-40. At the outset, the Commission rejects Respondents' argument that a cease and desist order is not warranted because some of the advertisements, representing a small subset of the advertisements that the Commission finds to contain false or misleading claims, were issued in or prior to 2006. The Commission also agrees with the ALJ's conclusion that a cease and desist order is appropriate with respect to all Respondents and adopts the ALJ's findings with respect thereto.

In considering whether a cease and desist order is appropriate, the Commission must determine that an order is both sufficiently clear and reasonably related to the unlawful practices at issue. *See Colgate-Palmolive Co.*, 380 U.S. at 392, 394-95. Specifically, when determining whether an order is reasonably related to the unlawful practices, the Commission should consider "(1) the seriousness and deliberateness of the violation; (2) the ease with which the violative claim may be transferred to other products; and (3) whether the respondent has a history of prior violations." *Stouffer Foods Corp.*, 118 F.T.C. at 811; *see also Telebrands Corp.*, 457 F.3d 354, 358 (4th Cir. 2006); *Kraft, Inc.*, 970 F.2d at 326. "The reasonable relationship analysis operates on a sliding scale — any one factor's importance varies depending on the extent to which the others are found. . . . All three factors need not be present for a reasonable relationship to exist." *Telebrands Corp.*, 457 F.3d at 358-59.

We agree with the ALJ's conclusion that Respondents' actions were serious and deliberate. Respondents claimed the Challenged POM Products treat, prevent or reduce the risk of heart disease, prostate cancer, or ED. Respondents made serious yet unsupported claims about three diseases, some of which can be life-threatening. Respondents also made numerous deceptive representations and were aware that they were making such representations despite the inconsistency between the results of some of their later studies and the results of earlier studies to which Respondents refer in their ads. *See supra* Section V; *see also Standard Oil Co. v. FTC*, 577 F.2d 653, 662 (9th Cir. 1978) ("Among the circumstances which should be considered in evaluating the relation between the order and the unlawful practice are whether the respondents acted in blatant and utter disregard of the law.").

The Commission finds that a greater number of ads than those identified by the ALJ convey the claims alleged by Complaint Counsel. Nevertheless, injunctive relief, such as that

49

ordered by Judge Chappell, is justified even if based only on the smaller number of ads where the ALJ found Respondents conveyed the claims.  Thus, whether based on the ALJ's findings or our findings, Complaint Counsel has demonstrated that Respondents disseminated numerous advertisements making the claims alleged in the Complaint.  It is unnecessary to find that all of the challenged ads made the alleged claims in order to warrant injunctive relief for deceptive advertising.  *Bristol-Myers Co.*, 102 F.T.C. at 321 n.5 ("Although we find a smaller number of violative ads than did the ALJ, there is certainly an adequate number to support the order . . . ."); *Fedders Corp.* 85 F.T.C. 38, 71-72 (1975) ("The Commission has previously issued orders in cases involving no more than one or a few deceptive advertisements.").

We also agree with the ALJ's conclusion that the kind of claims made by Respondents in this case would be transferable to other products.  A violation is transferrable where other products could be sold utilizing similar techniques.  *Colgate-Palmolive Co.*, 380 U.S. at 394-95; *Sears, Roebuck & Co. v. FTC*, 676 F.2d 385, 392, 394-95 (9th Cir. 1982).  Here, Respondents could use similar marketing techniques to make disease claims about other food products, including the other food products Respondents currently sell.  By way of analogy, in the context of drug products, "misrepresenting that doctors prefer a product, or that tests prove the product's superiority, is a form of deception that could readily be employed for any non-prescription drug product."  *Am. Home Prods. Corp.*, 695 F.2d at 708; *see also Daniel Chapter One*, 2009 WL 2584873 at *104 ("In this case, the claims that the Challenged Products prevent, treat, or cure cancer, and the use of testimonials by doctors and consumers to make such claims, could readily be employed for any dietary supplement.").  Although, as set forth by the ALJ, Respondents do not have a history of prior violations, ID at 314, the other factors strongly weigh in favor of restraining Respondents' conduct in the future.

B.     Fencing-In Provisions

It is well established that the Commission may issue orders containing fencing-in provisions, that is, "provisions that are broader than the conduct that is declared unlawful."  *Telebrands Corp.*, 457 F.3d at 357 n.5; *see also*, *e.g.*, *Colgate-Palmolive Co.*, 380 U.S. at 394-95; *FTC v. Ruberoid Co.*, 343 U.S. 470, 473 (1952).  As the Supreme Court recognized in *Ruberoid*, the Commission's orders need not be restricted to the "narrow lane" of a respondent's past actions; the Commission may effectively "close all roads to the prohibited goal, so that its order may not be by-passed with impunity."  *Ruberoid Co.*, 343 U.S. at 473.

Consequently, the Order we impose applies to the Challenged POM Products as well as to any other food, drug, or dietary supplement products sold by POM and the other Roll entities.  *See* Order, Definitions, ¶ 4 ("Covered Product" means any food, drug, or dietary supplement, including, but not limited to the POM Products.").  Courts have agreed that fencing-in provisions that extend to products beyond those involved in the violations are appropriate.  *See*, *e.g.*, *Colgate-Palmolive Co.*, 380 U.S. at 394-95; *Telebrands Corp.*, 457 F.3d at 361-62; *Kraft, Inc.*, 970 F.2d at 326-27; *Am. Home Prods. Corp.*, 695 F.2d at 704-10.  As our prior analysis indicated, and as the ALJ recognized, the kind of claims made by Respondents in this case would easily be transferable to other products.  *See* discussion *supra*, Section X.A; ID at 310-12.  As the ALJ explained, it is not material that the Challenged POM Products are only a small portion of the products sold by Respondents when the advertising claims made for the Challenged POM

50

Products are readily transferable to the other categories of products covered by the Order, particularly when Respondents have acknowledged that they have sponsored research of the health benefits of other products they sell, such as Wonderful Pistachios and FIJI Water.  *See* ID at 311.

In addition, we hold that the Respondents must have at least two RCTs before making any representation regarding a product's effectiveness in the diagnosis, treatment, or prevention of any disease.[36]  *See* Order, Part I.  Although we did not need to decide how many RCTs are necessary to substantiate Respondents' disease claims in order to establish liability, we specify a two RCT requirement in the Order for two reasons.

First, such a requirement is consistent with Commission precedent, *see Thompson Med. Co.,* 104 F.T.C. at 831-32 ("no lesser standard than two well-controlled clinical tests is appropriate as a general rule for any analgesic product"), and expert testimony in the record before us recognized the need for consistent results in independently-replicated studies.  As one expert explained, "[e]ven with the safeguards contained in an RCT, the results contained in any one study may be due to chance or may not be generalizable due to the uniqueness of the study sample."  *See* CX1291 at 14-15 (Sacks Expert Report); Sacks, Tr. 1446-47.

Second, Respondents have a demonstrated propensity to misrepresent to their advantage the strength and outcomes of scientific research, as reflected by our conclusion that they made false and misleading claims about serious diseases, including cancer, in a number of the advertisements before us.  Like the ALJ, *see* ID at 312, the Commission finds that Respondents have engaged in a deliberate and consistent course of conduct – no mere isolated incident or mistake – in deceptively touting the Challenged POM Products' purported ability to affect diseases and the scientific studies ostensibly showing such effects.  To ensure that Respondents do not bypass our order, we therefore require that they have two substantiating RCTs before they again advertise that one of their products prevents, reduces the risk, or treats any disease.

In imposing a requirement of two RCTs, we reject Complaint Counsel's argument that our Order should prohibit Respondents from making disease-related establishment and efficacy

---

[36] Commissioner Ohlhausen disagrees with the majority's view that two RCTs are warranted in the order as fencing-in relief.  She would require only one RCT and would regard that study in view of other available scientific evidence.  Requiring a second RCT is not reasonably related to the violations at issue in this case because a second study would not cure any particular statistical or methodological problems.  As stated in Section I of this opinion, the Commission did not reach the question of the number of trials that are needed to establish liability.  Repetition or replication of poorly designed studies does not make those studies sound.  Moreover, although it might provide the Commission with some subjective comfort, requiring two RCTs does so at the expense of limiting consumer access to potentially useful information.  The product at issue is an admittedly safe food product – a type of fruit juice.  To set an unnecessarily high bar for such a product is in tension with the balanced approach to substantiation set forth in the Commission's own *Pfizer* factors and with our policy commitment to avoid imposing "unduly burdensome restrictions that might chill information useful to consumers in making purchasing decisions."  FTC Staff Comment Before the Food and Drug Administration In the Matter of Assessing Consumer Perceptions of Health Claims, Docket No. 2005N-0413 (2006), *available at* http://www.ftc.gov/be/V060005.pdf.  To set an especially high bar without an adequate rationale also raises First Amendment concerns.  As the court in *Pearson* noted, "[t]he government insists that . . . the commercial speech doctrine does not embody a preference for disclosure over outright suppression.  Our understanding of the doctrine is otherwise." *Pearson*, 164 F.3d at 657 (citing *Bates v. State Bar of Arizona*, 433 U.S. 350 (1977)).

claims about the Challenged POM Products unless such claims are pre-approved by the FDA. According to Complaint Counsel, FDA pre-approval would be reasonably related to the challenged acts "[b]ecause the level of evidence required to support disease treatment, prevention, and reduction of risk claims found in this matter are similar to FDA's evidentiary standards[.]"  CCA at 37-38.  We agree with the ALJ's conclusion, *see* ID at 317, that FDA pre-approval is not warranted as part of the remedy in this case.

Complaint Counsel argues that requiring FDA pre-clearance before Respondents may again advertise that their products treat, prevent, or reduce the risk of a disease would offer a number of benefits, including a clear, bright-line standard that would be easy to enforce and, at the same time, provide certainty for Respondents.  CCA at 41.  The order we issue today sufficiently accomplishes those goals by requiring at least two RCTs.[37]

The requirement for two RCTs in Part I of the Order applies only to claims for disease prevention, risk reduction, and treatment; future representations relating to efficacy or health benefits of covered products that fall short of disease claims are covered by Part III of the Order. That provision requires substantiation consisting of competent and reliable scientific evidence (as defined in that Part), that must be sufficient in quality and quantity when considered in the light of the entire body of relevant and reliable scientific evidence, to substantiate that the representation is true.

C.     Appropriateness of Applying the Final Order to Matthew Tupper

Respondent Matthew Tupper argues that he should not be held individually liable or subject to any order in this case.  We agree with the ALJ's legal conclusions and factual findings holding Matthew Tupper individually liable and determining that he should be subject to a Final Order along with the other Respondents.

Courts and the Commission consistently have held that to find an individual liable for deceptive acts or practices, the individual must either have participated directly in or had the authority to control the acts or practices at issue; both participation and control are not required. *See QT*, 512 F.3d at 864 ("[The individual respondent] not only participated in the false promotional activities but also had the authority to control them.  Either participation or control suffices."); *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1204 (10th Cir. 2005) ("To justify the imposition of injunctive relief against [an] individual, the FTC is required to show the individual participated directly in the business entity's deceptive acts or practices, *or had the authority to control* such acts or practices."); *FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th Cir. 1997); *FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564, 573 (7th Cir. 1989); *FTC v. Consumer Alliance, Inc.*, 2003 WL 22287364 at *5 (N.D. Ill. Sept. 30, 2003).

Even though participation and control are not both required, the record shows that Mr. Tupper both participated directly in and had the authority to control the acts or practices at issue.

---

[37] In exercising its substantial discretion to fashion relief appropriate to the circumstances of a particular case, the Commission has in several settlements of false advertising claims imposed a FDA pre-approval requirement.  Our ruling today does not foreclose that we may again conclude, in an appropriate case, that FDA pre-approval would be an appropriate remedy.

**JA-0636**

With respect to his participation in the acts at issue, Mr. Tupper "implement[ed] POM's direction with regard to health benefit advertising and the use of science in connection with the advertising." ID at 305; IDF 51. Mr. Tupper participated in meetings reviewing advertising concepts and content, and reviewed, edited, and in some cases had the final say on advertising concepts and advertising copy. ID at 305; IDF 156, 160, 162, 1410, 1416, 1419-20. Mr. Tupper also participated in reviewing creative briefs, providing specific medical language for use in advertisements, drafting magazine cover wraps found by the ALJ (and here by the Commission) to have made the claims alleged by Complaint Counsel, and reviewing press releases. ID at 305; IDF 306-10, 581, 1417, 1421, 1430-31. Mr. Tupper was heavily involved in the direction of POM's medical research. ID at 305; IDF 53, 119, 142, 144, 1412, 1424-29. Mr. Tupper, in his capacity as an officer of POM, also had the authority to control its challenged practices. ID at 306-07 ("in his capacity as an officer [of POM], Mr. Tupper, together with others, formulated, directed, or controlled the policies, acts, or practices of POM."); IDF 37-38, 42. Mr. Tupper managed the day-to-day affairs of POM, including its marketing team, oversaw and administered its budget, signed checks and contracts on behalf of the company, and had the authority to determine which advertisements should run. ID at 306; IDF 25, 44, 45, 1406. He also had numerous employees report to him directly and had the authority to hire and fire POM employees, including the head of POM's marketing department. ID at 306-07; IDF 46-50.

In sum, the ordered relief is reasonably related to the deceptive acts and practices of all the Respondents, including Mr. Tupper.

## XI.    Conclusion

For all the foregoing reasons, we conclude that the Respondents have violated Sections 5(a) and 12 of the FTC Act and we affirm the ALJ's finding as to liability. Consequently, we issue a Final Order to address Respondents' conduct.

Opinion of the Commission, Final Order, and Concurring Statements of Commissioner Rosch and Commissioner Ohlhausen Issued On January 10, 2013

APPENDIX A
POM Claims Appendix[1]

Below we examine each of the advertisements and other promotional materials challenged by Complaint Counsel and explain our analysis of the net impression conveyed. We begin with a discussion of recurring elements[2] found in a number of these exhibits and then turn to our review of each challenged ad.

## A. Recurring Elements

**Medical Imagery, Symbols, and Terminology.** Many of the challenged ads include images and symbols strongly associated with medicine, physicians, and equipment, among them the caduceus symbol of the medical profession or the "x" in POMx resembling the $R_x$ abbreviation. These images and symbols contribute to a net impression that certain ads conveyed the disease-related claims challenged by Complaint Counsel. As discussed below, even the use of medical imagery in a humorous manner can buttress this message, such as a POM bottle turned upside down appearing as an intravenous drip bag (Figure 5), a POM bottle connected to electrocardiogram leads (Figure 6), and a POM bottle inside a blood pressure cuff (Figure 11). Medical terminology also contributes to a net impression that the ads conveyed the challenged claims. In several challenged exhibits, the use of the word "disease" as well as references to specific diseases and disease symptoms (*e.g.*, "cancer," "prostate cancer," "erectile dysfunction," "coronary heart disease," "atherosclerosis," "high blood pressure," "hardening of the arteries," and "stroke") conveyed that the Challenged POM Products treat, prevent or reduce the risk of disease.

**References to Medical Professionals, Scientific Studies, and Medical Journals.** References to physicians by name or to FDA approval or review also contribute to the net impression that the ads conveyed the challenged claims. Moreover, references to medical studies, particular medical journals, or other types of scientific evaluation helped convey the asserted efficacy and establishment claims, as did the use of statements quantifying the amount of money spent on research (*e.g.*, "backed by $25 million in vigilant medical research"). Further, the characterization of the research specifically as "medical" (as opposed to simply "research" or even "nutritional research") contributes to the net impression that the ads conveyed the challenged claims.

**Performance Results Requiring Scientific Measurement.** Several ads contain references to quantifiable results (*e.g.*, "eight ounces of POM a day can reduce plaque in the arteries by up to 30%!"). Such references tend to communicate that the product's attributes are supported by scientific research because a reduction in the amount of plaque in an individual's arteries cannot be known through casual observation, *i.e.*, it must be measured by a medical

---

[1] For most of the challenged advertisements, Commissioner Ohlhausen agrees with the majority of the Commission about the claims conveyed. However, as explained in her Concurring Statement, for some advertisements, Commissioner Ohlhausen either did not find certain claims were made or believes extrinsic evidence is necessary to determine whether consumers would take away such claims.
[2] The Commission reviewed each ad separately, however, and no individual element should be necessarily construed as sufficient to convey a claim. Instead, each element may contribute to an ad's net impression in combination with other elements as described for each ad in this Claims Appendix.

professional.

 **Use of Humor.**  Contrary to Respondents' assertion, the use of lighthearted or humorous elements does not detract from the substance of the claims conveyed by the challenged ads.  For instance, Figure 6 shows a bottle of POM Wonderful connected to leads for an EKG, along with the title, "Amaze your cardiologist."  The ad text further reads, "Ace your EKG . . . .  A glass a day can reduce plaque by up to 30%!  Trust us, your cardiologist will be amazed."  While the depiction of the bottle of pomegranate juice undergoing a medical test is meant to be humorous, the humorous element includes medical imagery that reinforces the claims conveyed by the text.  Thus, the ad conveyed the net impression that drinking POM will reduce plaque by up to 30% and produce improvements measurable by an EKG that will be great enough in magnitude to impress a cardiologist.  Likewise, Figure 7 depicts a bottle of POM in a noose, along with the headline "Cheat death" and additional text that says "Dying is so dead … POM Wonderful … has more antioxidants than any other drink and can help prevent premature aging, heart disease, stroke, Alzheimer's, even cancer . . . ."  Again, while the depiction of the bottle in a noose is meant to be humorous, it does not undercut the net impression that drinking POM extends your life to the extent that the drinker will "Cheat death."

 **Qualifying Language.**  Many of the ads also include adjectives attached to scientific claims (*e.g.*, "*emerging* science suggests," "*promising* results," "*preliminary* studies, " "*initial* scientific research") (emphasis added).  However, the Commission does not find that these adjectives effectively qualify the claims conveyed in the challenged ads, when viewed in the context of each ad in its entirety.[3]  For example, Figure 20 states in part: "POM Wonderful 100% pomegranate Juice is supported by $23 million of initial scientific research from leading universities, which has uncovered encouraging results . . . ."  While the ad literally states that the research is "initial" and has produced "encouraging results," the references to the fact that the research has taken place at "leading universities" and that it cost $23 million overwhelm these qualifiers.  Moreover, in ads specifically discussing the results of scientific studies, simply stating that the studies are "initial" or "hopeful" or "promising" does not neutralize the claims made when the specific results are otherwise described in unequivocally positive terms.  For instance, Figures 25 and 28-32 state that "an initial UCLA study on our juice found hopeful results for prostate health, reporting 'statistically significant prolongation of PSA doubling times,' according to Dr. Allen J. Pantuck in *Clinical Cancer Research*, 2006."  In these examples, the words "initial" and "hopeful" do not undercut the message that the results of the study were statistically significant and positive for PSA doubling times.  The application of these principles regarding qualifiers is consistent with the Commission's experience in other advertising contexts.  *See, e.g.*, Guides Concerning Use of Endorsements and Testimonials in Advertising, 16 C.F.R. § 255.2 (ads with consumer endorsements will likely be interpreted as conveying that the endorser's experience is representative of what consumers will generally achieve, even when they include disclaimers such as "Results not typical" and "These testimonials are based on the experiences of a few people and you are not likely to have similar

---

[3] Commissioner Ohlhausen's view is that, in the context of certain challenged ads, the use of these qualifiers warrant the introduction of extrinsic evidence before the Commission can find that an advertisement conveys establishment claims.  *See* Commissioner Ohlhausen's Concurring Statement.

results");[4] and FTC Staff Report, *Effects of Bristol Windows Advertisement with an "Up To" Savings Claim on Consumer Take-Away and Beliefs*, (May 2012) *available at* http://www.ftc.gov/opa/2012/06/uptoclaims.shtm (when marketers use the phrase "up to" in their ads, such as making a claim that consumers will save "up to 47%" in energy costs by purchasing replacement windows, the qualifier does not affect consumers' overall takeaway that the percentage savings depicted is typical of what they can expect to achieve).

## B. Facial Analysis of Individual Exhibits

**Figure 1.      CX0013: 2003 press release**
The Commission adopts the findings and conclusions of the ALJ with regard to CX0013.  *See* ID at ¶¶ 416-420.  Accordingly, we conclude that this press release conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily treats, prevents or reduces the risk of heart disease and that these claims have been scientifically established.

**Figure 2.      CX0016: "Drink and be healthy" print advertisement**
The Commission adopts the findings and conclusions of the ALJ with regard to CX0016.  *See* ID at ¶¶ 290-296.  Accordingly, we conclude that CX0016 conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily prevents or reduces the risk of heart disease and that these claims have been scientifically established.

**Figure 3.      CX0029: "10 out of 10 People" print advertisement**
The Commission adopts the findings and conclusions of the ALJ with regard to CX0029.  *See* ID at ¶¶ 297-299, 301-305.  Accordingly, we conclude that CX0029 conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily treats, prevents or reduces the risk of heart disease and that these claims have been scientifically established.

**Figure 4.      CX0031: "Floss Your Arteries" print advertisement**
The Commission adopts the conclusions of the ALJ that CX0031 conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily treats, prevents or reduces the risk of heart disease.  *See* ID at ¶¶ 440-445.  The statement that just drinking eight ounces a day "can reduce plaque by up to 30%" contributes to the treatment, prevention, and risk reduction messages, because an elevated level of plaque in the arteries is associated with the heart disease.

Additionally, the Commission reverses the ALJ's conclusion that the ad did not convey that the efficacy claims are clinically proven.  *See* ID at ¶ 448.  The Commission concludes that the precise language that "[j]ust eight ounces a day can reduce plaque by up to 30%," within the context of the advertisement's headline and imagery of the POM bottle on a medicine cabinet shelf, conveyed to at least a significant minority of reasonable consumers that the efficacy claims made in this advertisement have been scientifically established.  A reduction in the amount of plaque in an individual's arteries cannot be known through casual observation; it must be

---

[4]  In Commissioner Ohlhausen's view, the use of qualified terms such as "preliminary studies," or "initial studies" in the main text of an ad is significantly different than including a disclosure like "results not typical" in small print at the bottom of an ad.

measured by a medical professional. Thus, the use of language communicating this specific quantified result conveyed that the results were gauged through scientific measurement and that the claim is therefore scientifically established.

**Figure 5.       CX0033: "Life Support" print advertisement**
The Commission adopts the findings and conclusions of the ALJ with regard to CX0033. *See* ID at ¶¶ 449-455. Accordingly, we conclude that this ad conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily prevents or reduces the risk of heart disease.

**Figure 6.       CX0034: "Amaze Your Cardiologist" print advertisement**
The Commission adopts the findings and conclusions of the ALJ that CX0034 conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily, treats, prevents or reduces the risk of heart disease. *See* ID at ¶¶ 456-464.

The statement that the antioxidants in POM fight free radicals that "can cause sticky, artery clogging plaque" helped convey that POM prevents or reduces the risk of heart disease. The statement that a glass a day "can reduce plaque by up to 30%" bolsters this prevention and risk reduction message and also contributes to a claim that POM treats existing heart disease, as an elevated level of plaque in the arteries is associated with heart disease. Further, the ad makes two references to being able to "amaze[]" a cardiologist, a physician specializing in heart disorders such as coronary disease. Most consumers would not have any reason to visit a cardiologist except for diagnosis or treatment of heart disease. Thus, the statement "amaze your cardiologist" along with the remaining text implies that drinking POM will produce significant results for a consumer with reason to visit a cardiologist, *i.e.*, with heart disease.

The Commission reverses the ALJ's finding that this advertisement did not include an establishment claim. *See* ID at ¶¶ 465-468. The Commission concludes that the precise language that a "glass a day can reduce plaque by up to 30%," within the context of the advertisement's headline, medical imagery, and text conveyed to at least a significant minority of reasonable consumers that the efficacy claims made in this advertisement have been scientifically established. A reduction in the amount of plaque in an individual's arteries cannot be known through casual observation; it must be measured by a medical professional. Thus, the use of language communicating this specific quantified result conveyed that the results were gauged through scientific measurement, and that the claim is therefore scientifically established.

**Figure 7.       CX0036: "Cheat Death" print advertisement**
The Commission adopts the findings and conclusions of the ALJ that CX0036 conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily reduces the risk of heart disease. *See* ID at ¶¶ 469-476. We also find that the advertisement conveyed to a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily prevents heart disease. The Commission reverses the ALJ to the extent that he did not make this finding. ID at ¶ 474. We make this finding based on the net impression of the advertisement, including the statements that drinking eight ounces of POM Juice a day "can help prevent … heart disease," and "[t]he sooner you drink it, the longer you

A-4

will enjoy it," as well as imagery of the POM Juice bottle with a noose around the neck of the bottle.

**Figure 8.        CX0044: September 2005 press release**
The Commission adopts the findings and conclusions of the ALJ with regard to CX0044. Accordingly, we conclude that this exhibit conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily, treats, prevents or reduces the risk of heart disease, and that these claims have been scientifically established. *See* ID at ¶¶ 421-427.

**Figure 9.        CX0065: July 2006 press release**
The Commission adopts the findings and conclusions of the ALJ that CX0065 conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice or taking one POMx Pill daily treats prostate cancer, and that this claim has been scientifically established. *See* ID at ¶¶ 428-431. We also conclude that the press release conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice or taking one POMx Pill daily prevents or reduces the risk of heart disease, and that these claims are scientifically established. In this regard, the decision of the ALJ is reversed. *See* ID at ¶¶ 585-586. Several factors contribute to this overriding message regarding the impact of POMx Pills and POM Juice on heart disease and prostate cancer. First, the press release references scientific research specifically indicating that POMx and POM Juice "may protect against cardiovascular … disease[]." Likewise, the press release refers specifically to published research from the American Association for Cancer Research, which claimed that daily consumption of pomegranate juice significantly prolonged PSA doubling time, which is a protein marker for prostate cancer. In addition, the press release quoted comments by a "Professor of Medicine" and "Director, UCLA Center for Human Nutrition" about "the effects" of POMx and POM Juice on prostate cancer.

**Figure 10.       CX1426 Ex. I: Antioxidant Superpill Brochure**
The Commission adopts the findings and conclusions of the ALJ with regard to CX1426 Ex. I. Accordingly, we conclude that this exhibit conveyed to least a significant minority of reasonable consumers that drinking eight ounces of POM Juice or taking one POMx Pill daily treats, prevents or reduces the risk of heart disease and prostate cancer, and that these claims have been scientifically established. *See* ID at ¶¶ 328-342.

The efficacy and establishment claims for treatment of prostate cancer and heart disease are conveyed through language describing scientific studies purportedly showing that drinking POM slows PSA doubling time by 350% and causes a significant decrease in cancer regrowth rate for men with advanced prostate cancer, and that drinking POM caused a 30% decrease in arterial plaque for patients with atherosclerosis and a 17% improvement in blood flow for patients with impaired blood flow to the heart.

The ad also conveyed prevention and risk reduction claims for these two diseases. The ad underscores the importance of taking an antioxidant supplement by identifying the underlying problem of free radicals, which may be linked to "serious health threats like cancer and heart disease. In fact, scientists have already linked free radicals to as many as 60 different types of

A-5

diseases." The ad also states that: "Science tells us that pomegranate antioxidants neutralize free radicals, helping to prevent the damage that can lead to disease," and that POM "promotes heart and prostate health" and "guards your body against free radicals." These statements contributed to the net impression that the POMx Pill or POM Juice will prevent or reduce the risk of heart disease and prostate cancer in addition to treating these diseases.

**Figure 11.     CX0103: "Decompress" print advertisement**
The Commission adopts the findings and conclusions of the ALJ that the evidence fails to show that CX0103 conveyed to a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily treats heart disease. *See* ID at ¶ 587. However, we find that this exhibit conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily prevents or reduces the risk of heart disease and that these claims have been scientifically established. In this regard, the decision of the ALJ is reversed. The ad containing medical imagery depicts the POM Juice bottle wrapped in a blood pressure cuff. Moreover, express language in the ad establishes a link between POM Juice, which "helps guard … against free radicals [that] … contribute to disease," and the $20 million of "scientific research from leading universities, which has uncovered encouraging results in prostate and cardiovascular health." The ad also states that POM Juice will help "[k]eep your ticker ticking." In combination, these elements communicate the message that POM Juice prevents or reduces the risk of heart disease, and that those efficacy claims are scientifically established.

**Figure 12.     CX0109: "Heart Therapy" print advertisement**
The Commission finds that CX0109 conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily prevents or reduces the risk of heart disease. This exhibit is analogous to CX0103 (Figure 11 above) in that the text of the advertisement states that drinking eight ounces of POM Juice will "[k]eep your heart healthy," and that scientific evidence "has uncovered encouraging results in . . . cardiovascular health." We also note the bold headline touting "Heart Therapy." In this regard, the decision of the ALJ is reversed. ID at ¶ 587. Additionally, the Commission finds that this advertisement conveyed to at least a significant minority of reasonable consumers that the efficacy claims have been scientifically established. The text stating that POM Juice "is supported by $20 million of initial scientific research from leading universities, which has uncovered encouraging results in prostate and cardiovascular health" contributes to this net impression. In this regard, the decision of the ALJ is also reversed.

**Figures 13-14.          CX0120: "One small pill for mankind;" and CX0122: "Science Not Fiction" print advertisements**
The Commission adopts the findings and conclusions of the ALJ with regard to CX0120 and CX0122 that the evidence fails to demonstrate that these exhibits conveyed to a significant minority of reasonable consumers that drinking eight ounces of POM Juice or taking one POMx Pill daily prevents or reduces the risk of prostate cancer. *See* ID at ¶ 587.

However, the Commission finds that these exhibits conveyed to at least a significant minority of consumers that drinking eight ounces of POM Juice or taking one POMx Pill daily treats prostate cancer. The text in CX0120 and CX0122 specifically states that a study showed "hopeful results for men with prostate cancer." Further, in CX0120, the advertising copy, indicating that it is a

A-6

quote from the *New York Times*, states that "[f]indings from a small study suggest that pomegranate juice may one day prove an effective weapon against prostate cancer." While the ads include language that attempts to qualify the claims conveyed, the Commission finds that these attempts to qualify fail to counteract the net impression conveyed through the use of strong descriptive language such as "incredibly powerful," "astonishing levels of antioxidants," and "so extraordinary, it's patent pending." In this regard, the decision of the ALJ is reversed.

Additionally, the Commission finds that the claims made in these exhibits conveyed to at least a significant minority of reasonable consumers that the prostate cancer treatment claims have been scientifically established. Both exhibits state that "an initial UCLA medical study … showed hopeful results for men with prostate cancer." Further, the subtitle in CX0122 states that the product is "backed by $20 million in medical research." In this regard, the decision of the ALJ is also reversed.

**Figure 15.      CX0128: June 2007 press release**
The Commission adopts the findings and conclusions of the ALJ with regard to CX0128. Accordingly, we conclude that this exhibit conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice or taking one POMx Pill daily treats erectile dysfunction and that this claim has been scientifically established. *See* ID at ¶¶ 432-439.

**Figure 16.      CX1426 Ex. M: POMx Heart Newsletter**
The Commission adopts the findings and conclusions of the ALJ with regard to CX1426 Ex. M. Accordingly, we conclude that this exhibit conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice or taking one POMx Pill daily treats, prevents or reduces the risk of heart disease, and that these claims have been scientifically established. *See* ID at ¶¶ 346-350.

**Figure 17.      CX1426 Ex. N: POMx Prostate Newsletter**
The Commission adopts the findings and conclusions of the ALJ with regard to CX1426 Ex. N. Accordingly, we conclude that this exhibit conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice or taking one POMx Pill daily treats, prevents or reduces the risk of prostate cancer, and that these claims have been scientifically established. *See* ID at ¶¶ 351-354. The Commission finds, as the ALJ did, that this newsletter draws a clear link between antioxidants and a reduction in the risk of prostate cancer. After noting that prostate cancer is "the second leading cause of cancer related to death in the United States," the newsletter addresses "risk factors" for prostate cancer, including "diet," and advises a diet that is rich in antioxidants. The newsletter also expressly informs readers of medical research in "top peer-reviewed medical journals that document the pomegranate's antioxidant health benefits such as heart and prostate health."

**Figure 18.      CX0169/CX1426 Ex. L: "The Power of POM" print advertisement**
Based on the overall net impression of CX0169/CX1426 Ex. L, the Commission finds that this exhibit conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice or taking a POMx Pill daily treats, prevents or reduces the risk of heart disease and prostate cancer, and that these claims are scientifically established. This ad includes

A-7

a discussion of the effects of antioxidants on "free radicals [that] aggressively destroy healthy cells in your body – contributing to premature aging and even disease.  The good news is POM Wonderful pomegranate antioxidants neutralize free radicals."  The ad also describes $23 million in medical research including a study published in *Clinical Cancer Research*, in which pomegranate juice "delays PSA doubling time in humans."  In addition, the ad discusses two studies showing "promising results for heart health," including improvement in "myocardial perfusion in coronary heart patients," and the beneficial effect of pomegranate juice on atherosclerosis.  Although the ad attempts to qualify the discussion of the medical research by using the words "promising," "hopeful," and "preliminary," the Commission finds that these adjectives are ineffective, especially where the references to the studies are introduced with a bolded "**Backed by Science**" statement.  We also find that the "results" of the studies are made especially notable by being presented in red text.

In addition, the medical imagery of the prominent caduceus symbol and the use of the subscript "x" in POMx, as well as the reference to $23 million dollars in medical research published in named medical journals all combine to convey to at least a significant minority of reasonable consumers that the claims have been scientifically established.  Finally, we note that the text and imagery indicate equivalence between eight ounces of POM Juice and one POMx Pill.  Therefore, we reverse the findings of the ALJ with regard to this exhibit.

### Figures 19 and 24.    CX0180/CX1426 Ex. K: "The antioxidant Superpill;" and CX0279: "Science, Not Fiction" print advertisements

Based on the overall net impression of CX0180/CX1426 Ex. K and CX0279, the Commission finds that these exhibits conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice or taking a POMx Pill daily treats, prevents or reduces the risk of heart disease and prostate cancer, and that these claims are scientifically established.  These ads include references to $23 million and $25 million in medical research including a study published in *Clinical Cancer Research* that reports "statistically significant prolongation of PSA doubling times."  The ads also describe two studies showing a decrease in "stress-induced ischemia," and "[p]omegranate juice consumption resulted in a significant IMT reduction by up to 30% ," referring to arterial plaque.

In addition, the medical imagery of the caduceus symbol and the use of the subscript "x" in POMx, the references to millions of dollars in medical research published in named medical journals, and the attribution of results to three specific named doctors, all combine to convey to at least a significant minority of reasonable consumers that the claims have been scientifically established.  Finally, we note that the text and imagery indicate equivalence between eight ounces of POM Juice and one POMx Pill.  Therefore, we reverse the findings of the ALJ with regard to these exhibits.

### Figure 20.      CX0192: "What Gets Your Heart Pumping" print advertisement

The Commission concludes that the express language of this ad referring to "healthy arteries," the fact that pomegranate juice "helps guard your body against free radicals" that "aggressively destroy healthy cells in your body and contribute to disease," and that "[e]ight ounces a day is enough to keep your heart pumping," created the net impression to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily prevents or reduces the

risk of heart disease.  In addition, we find the specific reference to "$23 million of initial scientific research from leading universities, which has uncovered encouraging results in prostate and cardiovascular health," signals that this beneficial effect has been scientifically established. We therefore reverse the findings of the ALJ with regard to this exhibit.

**Figures 21 and 27.     CX0314: "Drink to Prostate Health;" and CX0372, CX0379, CX0380: Super Health Powers series, magazine wraps**
The Commission adopts the findings and conclusions of the ALJ with regard to CX0314, CX0372, CX0379, CX0380.  *See* ID at ¶¶ 306-320.  Accordingly, we conclude that these exhibits conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily treats, prevents or reduces the risk of prostate cancer, and that these claims have been scientifically established.

**Figure 22.     CX0260/CX1426 Ex. B: "Drink to Prostate Health" print advertisement**
The Commission finds that this exhibit conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily treats prostate cancer and that this claim is scientifically established.  Factors contributing to this net impression include the language "Drink to prostate health," and express language equating POM Juice to "good medicine."  Furthermore, the ad describes a "recently published preliminary medical study [that] followed 46 men previously treated for prostate cancer" which found that "[a]fter drinking 8 ounces of POM Wonderful 100% Pomegranate Juice daily for at least two years, these men experienced significantly longer PSA doubling times."  Therefore, we reverse the findings of the ALJ with regard to this exhibit.

**Figure 23.     CX0274/CX1426 Ex. C: "I'm Off to Save Prostates" print advertisement**
Based on the overall net impression, the Commission finds that this exhibit conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily prevents or reduces the risk of prostate cancer, and that these claims are scientifically established.  The headline "I'm off to save PROSTATES" when read in conjunction with the text that POM Juice "is committed to defending healthy prostates" and will "improve prostate health," implies that POM Juice protects men from prostate cancer.  In particular, the word "defend[]" in conjunction with "save" gives the impression that the ad is conveying information about a serious threat to prostates — prostate cancer.  The message of "defense" is one of warding off this danger, *i.e*., preventing or reducing the risk of prostate cancer.  In addition, the language that POM Juice is "backed by $25 million in vigilant medical research" communicates that these claims are scientifically established.  Therefore, we reverse the findings of the ALJ with regard to this advertisement.

**Figures 25 and 28-32.          CX0280: "Live Long Enough;" CX0331/CX1426 Ex. J: "Healthy Wealthy;" CX0328: "Your New Health Care Plan;" CX0337: "First Bottle You Should Open;" CX0342/CX0353: "Life Insurance Supplement;" and CX0348/CX0350: "24 Scientific Studies" print advertisements**
The Commission concludes that these exhibits conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice or taking one POMx Pill daily treats, prevents or reduces the risk of heart disease and prostate cancer and that these claims have been scientifically established.  These ads begin with the general proposition that "antioxidants

A-9

are critically important to maintaining good health because they protect you from free radicals, which can damage your body," and that POMx is an "ultra-potent antioxidant extract," that will "help protect you from free radicals." Further, the ads state that research has "revealed promising results for prostate and cardiovascular health." In combination, these statements contribute to the net impression that POM prevents and reduces the risk of prostate cancer and heart disease.

Each of these ads describe a UCLA study on POM juice in *Clinical Cancer Research* that found "statistically significant prolongation of PSA doubling times." Because PSA doubling time is associated with prostate cancer, this statement implies that POM juice treats prostate cancer. In addition, the ads cite a medical study in the *American Journal of Cardiology* that showed a reduction in stress-induced ischemia, which the ad explains means restricted blood flow to the heart. Four of the six ads (CX0280, CX0331, CX0328, and CX0337) also discuss a study that showed consumption of pomegranate juice "resulted in significant reduction in IMT (thickness of arterial plaque) by up to 30% after one year."

Several elements create the net impression that the above claims are scientifically established, including: the express references to $25 million and $32 million in "medical research at the world's leading universities;" the findings of studies regarding POM Juice's impact on PSA doubling times and stress-induced ischemia published in *Clinical Cancer Research* and the *American Journal of Cardiology*, respectively; and the attribution of these test results to several specifically-named doctors. We note that the text and imagery indicate equivalence between eight ounces of POM Juice and one POMx Pill.

Accordingly, we reverse the ALJ's findings with regard to these ads.

**Figure 26.     CX0475/CX1426 Ex. A: Juice Bottle Hang Tag**
The Commission adopts the findings and conclusions of the ALJ with regard to CX0475/CX1426 Ex. A that the evidence fails to establish that the juice bottle hang tag conveyed to a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily treats, prevents or reduces the risk of heart disease, prostate cancer, or ED, or that such claims are clinically established.

**Figure 33.     CX0351/CX0355: "Only Antioxidant Supplement Rated X" print advertisement**
The Commission adopts the ALJ's findings and conclusions that these exhibits conveyed to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice or taking one POMx Pill daily treats, prevents or reduces the risk of, erectile dysfunction, and that these claims are clinically proven. *See* ID at ¶¶ 321-327.

The Commission also concludes that these nearly identical advertisements convey to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice or taking one POMx Pill daily treats, prevents or reduces the risk of heart disease and prostate cancer, and that these claims have been scientifically established. These ads begin with the general proposition that "antioxidants are critically important to maintaining good health because they protect you from free radicals, which can damage your body," and that POMx is an "ultra-potent

A-10

antioxidant extract," that will "help protect you from free radicals." Further, the ads state that research has "revealed promising results for . . . prostate and cardiovascular health." In combination, these statements contribute to the net impression that POM prevents and reduces the risk of prostate cancer and heart disease.

Each ad describes a UCLA study on POM juice in *Clinical Cancer Research* that found "statistically significant prolongation of PSA doubling times." Because PSA doubling time is associated with prostate cancer, this statement implies that POM juice treats prostate cancer. In addition, the ads cite a medical study on POM Juice in the *American Journal of Cardiology* showing a reduction in stress-induced ischemia, which the ad explains means restricted blood flow to the heart. We note that the text and imagery indicate equivalence between eight ounces of POM Juice and one POMx Pill.

Several elements create the net impression that the prostate cancer and heart disease claims are scientifically established. Each ad explicitly references $32 million or $34 million in "medical research at the world's leading universities" and then goes on to elaborate on the findings of studies regarding the impact of POM Juice on PSA doubling times, as published in *Clinical Cancer Research*, and POM Juice's impact on stress-induced ischemia, as published in the *American Journal of Cardiology*.

Accordingly, we reverse the ALJ's findings insofar as we find the ads convey efficacy and establishment claims of prostate cancer and heart disease treatment, risk reduction, and prevention.

**Figure 34.    CX0463: "Heart Therapy" Animated Online Ad**
The Commission adopts the findings and conclusions of the ALJ with regard to CX0463 that the evidence fails to establish that this online advertisement conveyed to a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily prevents or reduces the risk of heart disease. *See* ID at ¶ 587.

**Figure 35.    CX0466/CX1426 Ex. H "Off to Save Prostates" Animated Online Ad**
The Commission adopts the findings and conclusions of the ALJ with regard to CX0466/CX1426 Ex. H that the evidence fails to establish that this advertisement conveyed to a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily prevents or reduces the risk of prostate cancer. *See* ID at ¶ 587.

**Figures 36 and 37.    CX0473: Video Captures of POMWonderful.com Website, including the "Community" Section of the Site; CX0336: Printout of portions of POMWonderful.com "Community" Section of the Site**
CX0473 contains video captures of the POMWonderful.com website, including the "Community" section the site, on various dates in 2009 and 2010. CX0336 is a printout of several pages from the "Community" section of the POMWonderful.com website from December 2010. It is unclear whether the ALJ considered the Community section of the POMWonderful.com site separately from the rest of the site. *See* IDF ¶¶ 368-85. Here, we address the site in its entirety.

A-11

In the video captures, textual references, graphs, medical imagery, commentary from POM executives and "POM experts" with medical backgrounds, and citations to scientific studies in combination convey the following claims:

*Prevention and Risk Reduction Claims.*  Some examples of the elements that contribute to the message that POM prevents or reduces the risk of heart disease and prostate cancer are:

- One video on the site opens with a voiceover stating that "Pomegranate contains powerful antioxidants needed to prevent cancer and diseases" Videotape: PomWonderful Ads at 00:23-1:03 (Apr.-May 2009).  A page on the site titled "Cancer – Emerging Science" states that: "Emerging science has shown that diets rich in fruits and vegetables that contain antioxidants, along with regular exercise, might slow or prevent the development of cancer.  [A] great source[] of antioxidants [is] POM Wonderful Pomegranate Juice … ."  Videotape: PomWonderful Ad Health Benefits at 03:44 (April-May 2009).  The one specific type of cancer highlighted on the website is prostate cancer.  For example, the website features a video nearly seven minutes in length titled "Let's Talk About Prostate Cancer with David Heber, MD" Videotape: PomWonderful Ad at 00:14-07:07 (Dec. 2009).  A portion of the "Community" portion of the website titled "POM's Health Benefits:  Fact or Fiction" quotes Dr. Bradley Gillespie, identified as POM's Vice President of Clinical Development, as stating: "Some of our research areas are beginning to accumulate quite impressive clinical data.  For example, I think the human evidence in prostate health is one of the strongest areas, and we continue to fund more research here."  CX0336 at 1.

- The site states that the antioxidant activity in POM Juice decreases inflammation, and that along with oxidative stress, inflammation has been implicated in a number of identified diseases, including atherosclerosis, heart failure, hypertension, and cancer.  Videotape: PomWonderful Ad at 02:22-02:32 (Oct. 2009).

- In addition, on a page of the website titled "Other protective effects," it states that "Pomegranate juice has a superior ability to prevent LDL cholesterol from being oxidized by free radicals," and that LDL oxidation "may be a precursor to atherosclerosis or arterial plaque."  Videotape: PomWonderful Ad at 01:45-02:02 (Oct. 2009).

*Treatment Claims.*  The site describes in detail studies of patients with heart disease, prostate cancer, and erectile dysfunction who experienced positive effects from drinking POM juice, thereby conveying that POM products treat these three diseases.

*Establishment Claims*.  Through a variety of means the site conveys that all of these disease prevention, risk reduction, and treatment claims are clinically proven, such as citation to clinical studies, reference to specific named physicians – including one identified as a winner of the Nobel Prize in medicine – and statements that POM is backed by tens of millions of dollars in scientific research and "backed by science."   We also note the statement from Defendant Tupper that: "When you look at the medical research that has been conducted on POM and compare it to research that's been done on other foods and beverages, what's been done on POM is way, way

A-12

more extensive. It's almost more akin to research being done on pharmaceutical drugs." CX0336 at 0001.

**Figure 38.        CX0473: Video Capture of PomegranateTruth.com Website**

CX0473 contains a video capture of the PomegranateTruth.com website from April-May 2009. The Commission adopts the findings and conclusions of the ALJ that the PomegranateTruth.com website conveys to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice or taking one POMx Pill daily treats, prevents or reduces the risk of heart disease and that these claims have been scientifically proven. *See* ID at ¶¶ 411-414. The Commission also adopts the findings and conclusions of the ALJ that the PomegranateTruth.com website fails to establish that a significant minority of reasonable consumers would interpret the website to claim that drinking eight ounces of POM Juice or taking one POMx Pill daily prevents or reduces the risk of prostate cancer or erectile dysfunction. *See* ID at ¶ 591.

However, the Commission also finds that the PomegranateTruth.com website conveys to a significant minority of reasonable consumers that drinking eight ounces of POM Juice or taking one POMx Pill daily treats prostate cancer and erectile dysfunction and that these claims have been scientifically proven. In this regard, the decision of the ALJ is reversed.

With regard to the prostate cancer treatment claim, the Commission notes the description of the UCLA study of men with prostate cancer who drank POM Juice and experienced an increase in PSA doubling time from 15 to 54 months. The site states, "PSA is a protein marker for prostate cancer, and slower PSA doubling time indicates slower disease progression." This description of the study constitutes both an efficacy and an establishment claim for prostate cancer treatment, although the establishment claim is bolstered through other elements, such as the statement that POM products are "Backed by science" and $25 million in medical research, alongside the prominent depiction of a caduceus.

With regard to the erectile dysfunction treatment claim, the Commission notes the description of a study published in the *International Journal of Impotence Research* regarding 61 subjects with mild to moderate erectile dysfunction who drank POM Juice and were 50% more likely to experience improved erections. This description constitutes both an efficacy and an establishment claim, although the establishment claim is bolstered by the same elements described above.

**Figure 39.        CX0473: Video Captures of POMPills.com Websites**

CX0473 contains video captures of the POMPills.com website from April-May 2009 and January 2010.

The Commission adopts the findings and conclusions of the ALJ that the POMPills.com website conveys to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice or taking one POMx Pill daily treats, prevents or reduces the risk of heart disease and prostate cancer, and that these claims have been scientifically proven. See ID at ¶¶ 386-410. The Commission also adopts the findings and conclusions of the ALJ that the POMPills.com website conveys to at least a significant minority of reasonable consumers that drinking eight ounces of POM Juice or taking one POMx Pill daily treats erectile dysfunction and that this

A-13

claim have been scientifically proven.  *See also* ID at ¶¶ 387, 408.  To the extent that the ALJ's decision can be read to state that the ALJ found that the website conveyed claims that POMx prevents and reduces of risk for erectile dysfunction, *see* ID ¶ 387, that finding is reversed.

# APPENDIX B
# POM Figures Appendix

| Figure | Exhibit Number | Date | Description |
|---|---|---|---|
| 1 | CX0013 | 01/09/2003 | January 2003 POM Juice Press Release |
| 2 | CX0016 | 10/12/2003 | "Drink and be healthy." Ad |
| 3 | CX0029 | 11/01/2004 | "10 Out of 10 People Don't Want to Die" Ad |
| 4 | CX0031 | 12/01/2004 | "Floss your arteries. Daily." Ad |
| 5 | CX0033 | 12/30/2004 | "Life support." Ad |
| 6 | CX0034 | 02/01/2005 | "Amaze your cardiologist." Ad |
| 7 | CX0036 | 03/10/2005 | "Cheat death." Ad |
| 8 | CX0044 | 09/16/2005 | September 2005 POM Juice Press Release |
| 9 | CX0065 | 07/10/2006 | July 2006 POMx Press Release |
| 10 | CX1426 at 0038-42 Ex. I | 2007 | "Antioxidant Superpill." Brochure |
| 11 | CX0103 | 03/01/2007 | "Decompress." Ad |
| 12 | CX0109 | 04/01/2007 | "Heart therapy." Ad |
| 13 | CX0120 | 05/28/2007 | "One small pill for mankind." Ad |
| 14 | CX0122 | 06/01/2007 | "Science, not fiction." Ad |
| 15 | CX0128 | 06/27/2007 | June 2007 POM Juice Press Release |
| 16 | CX1426 Ex. M | Summer 2007 | POMx Heart Newsletter |
| 17 | CX1426 Ex. N | Fall 2007 | POMx Prostate Newsletter |
| 18 | CX0169/ CX1426 Ex. L | 01/06/2008 | "The power of POM" Ad |
| 19 | CX 0180/ CX1426 Ex. K | 02/03/2008 | "The antioxidant superpill." Ad |
| 20 | CX0192 | 05/01/2008 | "What gets your heart pumping?" Ad |
| 21 | CX0314 | 08/25/2008 | "Drink to prostate health." Magazine Wrap |
| 22 | CX0260/ CX1426 Ex. B | 12/01/2008 | "Drink to prostate health." Ad |
| 23 | CX0274/ CX1426 Ex. C | 02/01/2009 | "I'm off to save PROSTATES!" Ad |
| 24 | CX0279 | 03/01/2009 | "Science, not fiction." Ad |
| 25 | CX0280 | 03/12/2009 | "Love Long Enough." Ad |
| 26 | CX0475/CX1426 Ex. A | September 2009 | "Super Health Powers" Juice Bottle Hang Tag |
| 27 | CX0372/ CX0379/ CX0380 | 09/02/2009 | "Lucky I have super Health Powers" Magazine Wrap |
| 28 | CX0331/ CX1426 Ex. J | 09/27/2009 | "Healthy. Wealthy. And Wise." Ad |
| 29 | CX0328 | 11/08/2009 | "Your New Health Care Plan." Ad |
| 30 | CX0337 | 01/03/2010 | "The First Bottle You Should Open in 2010" Ad |
| 31 | CX0342/ CX0353 | 02/22/2010 | "Take Out a Life Insurance Supplement" Ad |
| 32 | CX0348/ CX0350 | 04/01/2010 | "24 Scientific Studies" Ad |
| 33 | CX0351/ CX0355 | 06/01/2010 | "The Only Antioxidant Supplement Rated X" Ad |

# Figure 1

FOR MORE INFORMATION:
Fiona Posell
(310) 966-5810
fposell@pomwonderful.com

**FOR IMMEDIATE RELEASE**

*Editor's Note: Copies of the medical research, digital photos, interviews and juice samples are available upon request.*

## CONSUMER DEMAND FOR POM WONDERFUL'S REFRIGERATED ALL-NATURAL POMEGRANATE JUICE GROWS AS THE HEALTH BENEFITS OF POMEGRANATE JUICE BECOME RECOGNIZED.

*Scientific support indicates that drinking pomegranate juice provides the body with an active source of antioxidants and shows promise against cardiovascular disease.*

**LOS ANGELES** (January 9 - 2003) - POM Wonderful®, the first company to sell a refrigerated super-premium pomegranate juice, today released information from published medical research regarding the important health benefits associated with its pomegranate juice. It was announced that the antioxidant activity of POM Wonderful pomegranate juice exceeds that of other popular beverages known for their antioxidant properties including red wine, cranberry juice, blueberry juice, orange juice, white wine, red grape juice, white grape juice, apple juice, and grapefruit juice. The antioxidant activity of pomegranate juice is high due to the polyphenols it contains. Polyphenols are powerful, natural antioxidants. Antioxidants may be useful in counteracting premature aging, Alzheimer's, and cancer.

The research shows that the antioxidants found in pomegranate juice may also be more important than previously thought in promoting optimum cardiovascular health. Medical research shows that daily consumption of just 1.5 mmol of polyphenols from pomegranate juice (the equivalent of an 8 fl oz serving of POM Wonderful pomegranate juice) confers heart health benefits by lessening factors that contribute to atherosclerosis (plaque in the arteries).[1] According to the American Heart Association, cardiovascular diseases rank as America's No. 1 killer. In addition, 61.8 million Americans have some form of cardiovascular disease such as diseases of the heart, high blood pressure, and hardening of the arteries.[2]

### General Antioxidant Effects

Free radicals are produced as a result of normal metabolic processes, pollution and chemicals in the foods we eat. They attack and damage molecules in the body so that their function is altered. One molecule that is particularly susceptible to attack is LDL (low-density

**POSSREV002651**

CX0013_0002

lipoprotein) cholesterol. Once attacked and damaged, LDL is said to be oxidized. LDL oxidation is a key factor in the formation of plaque in the arteries, also called atherosclerosis. One of the best ways to defend against the damaging effects of free radicals is to consume foods and beverages that are rich in antioxidants.

Two studies have shown the superior potency of pomegranate antioxidants compared to other popular beverages. In the first study, which used four well-established tests of antioxidant activity, pomegranate juice squeezed from the Wonderful variety of pomegranates had twice the antioxidant activity of both red wine and green tea. Furthermore, pomegranate juice was shown to contain antioxidant compounds not present in either of the other beverages.[3] In a second study, ten beverages known for their antioxidant capacity were tested for their total polyphenol content and their ability to prevent the oxidation of LDL cholesterol (a factor in atherosclerosis). Beverages tested included pomegranate juice (from the Wonderful variety), red wine, apple juice, orange juice, white wine, red grape juice, white grape juice, cranberry juice, blueberry juice, and grapefruit juice. Pomegranate juice surpassed all the other juices in total polyphenol content. It was also the best inhibitor of LDL oxidation.[2]

### Effects on Heart Health

The heart is one of the most susceptible of all the organs to premature aging and free radical oxidative stress. Though vulnerable to the effects of oxidative stress, the heart is also receptive to the benefits of antioxidants.[4] New research is showing that antioxidants can play a highly beneficial role in reducing one of the major risk factors in heart disease: atherosclerosis (plaque in the arteries). The progression of atherosclerosis depends on several steps including the oxidation of LDL cholesterol, the uptake of oxidized cholesterol into macrophage cells, clumping of LDL molecules together, and the adhesion of LDL molecules to the inner walls of the blood vessel. In one human study, drinking pomegranate juice containing 1.5 mmol of polyphenols daily for two weeks lowered the susceptibility of LDL cholesterol to oxidation, clumping and adhesion. Furthermore, it increased blood levels of an enzyme, paraoxonase, which protects against oxidation. An additional human study showed that consuming pomegranate juice reduces another enzyme: ACE (angiotensin converting enzyme). Inhibition of ACE lessens the progression of atherosclerosis and it is this enzyme that is targeted by blood pressure medications. Pomegranate juice inhibited ACE by 36% after two weeks of juice consumption. It also caused a 5% decrease in systolic blood pressure, and high blood pressure is a known risk factor for atherosclerosis.[5]

Studies in mice have revealed additional exciting results. When mice predisposed to

POSSREV002652

CX0013_0003

atherosclerosis were given pomegranate juice for 11-14 weeks, the level of LDL oxidation and the uptake of LDL cholesterol into macrophage cells was reduced. Remarkably, the production of atherosclerotic lesions and foam cells (indicators of advanced atherosclerosis) was also reduced by almost half compared to controls.[6]  A subsequent study showed that pomegranate juice could actually reduce the size of existing atherosclerotic lesions after two months of pomegranate juice consumption, in effect, reversing atherosclerosis.[7]

## About POM Wonderful

POM Wonderful, a subsidiary of Roll International Corporation, cultivates the Wonderful variety of pomegranates in orchards located in the sunny San Joaquin Valley, southwest of Kettleman City, in Central California. The Wonderful variety of pomegranate is renowned for its exquisite sweet flavor, beautiful color, and bountiful juice. In addition to selling fresh pomegranates throughout the United States, POM Wonderful has also created a unique, healthy, refreshing super-premium pomegranate juice that is now on sale in the refrigerated produce section of over 900 grocery stores and supermarkets in Southern California, including Von's, Ralph's, Stater Brothers, Bristol Farms, and Gelson's. POM Wonderful uses the juice from its fresh pomegranates to make its juice. Pomegranate juice can be enjoyed as a beverage, a drink mixer and in recipes. Each 8 fl oz serving of pomegranate juice contains the juice from approximately two pomegranates. POM Wonderful's pomegranate juice is currently available in four flavors, Pure POM, POM Mango, POM Tangerine and POM Blueberry and two sizes - 15.2 fl oz and 24 fl oz. The 15.2 fl oz size retails for approximately $3.49, and the 24 fl oz size retails for approximately $5.79. POM Wonderful pomegranates and POM Wonderful pomegranate juice products promise consistent quality and superb taste. Only fruit and juice that meet the company's strict quality standards appear in store produce sections. POM Wonderful prides itself on the quality of its farming operation the sensitivity with which the fruit is hand picked and carried to its sorting and modern juicing facilities, and ultimately delivered to your table. POM Wonderful's mission is to educate consumers about the splendor and versatility of this luscious fruit, as well as its refreshing taste and health benefits. To learn more, visit www.pomwonderful.com.

POM Wonderful is a registered trademark of POM Wonderful LLC.

## Citations

[1]Aviram M, Dornfeld L, Kaplan M, Coleman R, Gaitini D, Nitecki S, Hofman A, Rosenblat M, Volkova N, Presser D, Attias J, Hayek T, Fuhrman B. Pomegranate juice flavonoids inhibit low-density lipoprotein and cardiovascular diseases: studies in atherosclerotic mice and humans. Drugs Under Experimental and Clinical Research 2002, 28(2/3):49-62.

[2]CDC/NCHS and The American Heart Association, 2002.

[3]Gil MI, Tomas-Barberan FA, Hess-Pierce B, Holcroft DM, Kader AA. Antioxidant activity of pomegranate juice and its relationship with phenolic composition and processing. J Agri Food Chem. 2000, 48:4581-4589.

[4] Sinatra ST, DeMarco J. Free radicals, oxidative stress, oxidized low density lipoprotein

**POSSREV002653**

(LDL), and the heart: antioxidants and other strategies to limit cardiovascular damage.  Conn Med 1995 Oct;59 (10):579-88.

[5]Aviram M and Dornfeld L.  Pomegranate juice consumption inhibits serum angiotensin converting enzyme activity and reduces systolic blood pressure.  Atherosclerosis 2001, 158:195-198.

[6]Aviram M, Dornfeld L, Rosenblat M, Volkova N, Kaplan M, Coleman R, Hayek T, Presser D and Fuhrman B.  Pomegranate juice consumption reduces oxidative stress, atherogenic modifications to LDL, and platelet aggregation: studies in humans and in atherosclerotic apolipoprotein E-deficient mice.  Amer J Clin Nutr 2000, 71(5):1062-1076.

[7]Kaplan M, Hayek T, Raz A, Coleman R, Dornfeld L, Vaya J and Aviram M.  Pomegranate juice supplementation to atherosclerotic mice reduces macrophage lipid peroxidation, cellular cholesterol accumulation and development of atherosclerosis.  J Nutr  2001, 131(8): 2082-2089.

### #

POSSREV002654

CX0013_0005

Figure 2



VMS-0000198

Figure 3

advertisement

POMEGRANATE JUICE.

# STUDIES SHOW THAT 10 OUT OF 10 PEOPLE DON'T WANT TO DIE

IT'S NOT EASY BEING ALIVE IN TODAY'S POLLUTED, STRESSED OUT WORLD. Here's a tip: with more naturally occurring antioxidant power than any other drink, a glass of POM Wonderful® Pomegranate Juice a day might be just what the doctor ordered.

### Fighting Free Radicals

Let's start with the problem: free radicals...unstable little molecules that can accelerate aging, lead to heart disease and stroke, and have even been implicated in cancer. Where do they come from? Everywhere. Free radicals are formed by exposure to air pollution, alcohol, pesticides, sunlight, tobacco smoke, drugs, even fried foods. Of course, when you're very young, your body's self-repair mechanism can neutralize the activity of many free radicals. But by the time you're in your twenties, those mechanisms just don't work as well. That's where antioxidants come in. They neutralize



*fig.1* THE HEART

free radicals, helping to prevent the cell and tissue damage that leads to disease. Which brings us back to POM Wonderful Pomegranate Juice.

### Not All Antioxidants are Equal

Since our bodies don't produce enough antioxidants to do the job on their own, we need a little outside help. POM Wonderful Pomegranate Juice, with a higher

In the refrigerated produce section of your grocer.

©2004 POM Wonderful, LLC. All rights reserved. POM Wonderful and Antioxidant Superpower are trademarks of POM Wonderful, LLC.

VMS-0000205

advertisement



ABILITY TO PREVENT LDL OXIDATION

level of antioxidants than any other drink, is a real Antioxidant Superpower.™

### Our Research: Heartening

We've been working with a number of top scientists, including a Nobel Laureate, for 6 years now and our seven published, peer-reviewed papers reveal heartening results. Here's the story: Free radicals are the culprits that turn LDL – or "bad" cholesterol – into that sticky stuff that becomes the plaque that clogs your arteries. Our scientific research shows that pomegranate juice is 8 times better than green tea at preventing formation of oxidized (sticky) LDL.[1] And a clinical pilot study shows that an 8 oz. glass of POM Wonderful 100% Pomegranate Juice, consumed daily, reduces plaque in the arteries up to 30%.[2]

### The Heart Stopping Truth

Remember: heart disease is America's number one killer. For women as well as men. 98% of heart attacks are due to atherosclerosis, or too much plaque in the arteries. That same plaque increases your chance of stroke. One final scary statistic: half of patients who have a severe heart attack have normal cholesterol levels. In other words, we're all at risk.

### Just a Glass a Day

To keep your heart healthy: exercise regularly. Eat a healthy diet. And drink 8 ounces of POM Wonderful Pomegranate Juice. Make every day a good day to be alive.

[1] Aviram, M., Drugs Under Experimental and Clinical Research, 2002. Indexed value, based on relative amount of oxidized LDL created. [2] Aviram, M., Clinical Nutrition, 2004.

**POM Wonderful Pomegranate Juice
Is the Antioxidant Superpower.™ Drink a glass a day!**

For more medical research on the Antioxidant Superpower, visit pomwonderful.com

Figure 4



# Floss your arteries.
# Daily.

Clogged arteries lead to heart trouble. It's that simple. That's where we come in. Delicious POM Wonderful Pomegranate Juice has more naturally occurring antioxidants than any other drink. These antioxidants fight free radicals—molecules that are the cause of sticky, artery clogging plaque. Just eight ounces a day can reduce plaque by up to 30%!* So every day: wash your face, brush your teeth, and drink your POM Wonderful.



**POM Wonderful Pomegranate Juice. The Antioxidant Superpower.**

*Aviram, M. Clinical Nutrition, 2004. Based on clinical pilot study.

**VMS-0000212**

**JA-0664**

CX0031_0001

# Figure 5



Life support.

POM Wonderful Pomegranate Juice fills your body with what i needs. On top of being refreshing and delicious, this amazing juice has more naturally occurring antioxidants than any other drink. These antioxidants fight hard against free radicals that can cause heart disease, premature aging, Alzheimer's, even cancer. Just drink eight ounces a day and you'll be on life support—in a good way.

**POM Wonderful Pomegranate Juice. The Antioxidant Superpower.**



pomwonderful.com

VMS-0000214

JA-0666

CX0033_0001

# Figure 6



Ace your EKG: just drink 8 ounces of delicious POM Wonderful
Pomegranate Juice a day. It has more naturally occurring antioxidants than
any other drink. Antioxidants fight free radicals… nasty little molecules that
can cause sticky, artery clogging plaque. A glass a day can reduce
plaque by up to 30%!* Trust us, your cardiologist will be amazed.



pomwonderful.com

**POM Wonderful Pomegranate Juice. The Antioxidant Superpower.**

*Israeli Sci. Clinical Nutrition 2004. Based on a male population.

**VMS-0000219**

Figure 7

JA-0669

VMS ID: 050321070
RUN DATE: 03/10/2005



# Cheat death.

Dying is so dead. Drink to life with POM Wonderful Pomegranate Juice, the world's most powerful antioxidant. It has more antioxidants than any other drink and can help prevent premature aging, heart disease, stroke, Alzheimer's, even cancer. Eight ounces a day is all you need. The sooner you drink it, the longer you will enjoy it.



pomwonderful.com

**POM Wonderful Pomegranate Juice. The Antioxidant Superpower.**

VMS-0000221

CX0036_0001

Figure 8

## Pomegranate Juice May Affect the Progression of Coronary Heart Disease

LOS ANGELES—(BUSINESS WIRE)—Sept. 16, 2005—Men and women with coronary heart disease who drink one glass of pomegranate juice daily may improve blood flow to their heart, according to a new study.

This research is the first randomized, double-blind, placebo-controlled trial showing that pomegranate juice may affect the progression of coronary heart disease, which is the #1 cause of death in the U.S. and in most of the world. Promising results from this research will be published in the September 16th issue of the American Journal of Cardiology, one of the leading peer-reviewed cardiology journals (www.ajconline.org).

Researchers from the non-profit Preventive Medicine Research Institute, University of California, San Francisco, and California Pacific Medical Center studied patients with coronary heart disease who had reduced blood flow to the heart. These 45 patients were randomly assigned into one of two groups: one group who drank a glass of pomegranate juice each day (240 ml/day, which is approximately 8.5 oz/day) or to a placebo group, who drank a beverage of similar caloric content, amount, flavor and color.

After only three months, blood flow to the heart improved approximately 17% in the pomegranate juice group but worsened approximately 18% in the comparison group (i.e., a 35% relative between-group difference). These differences were statistically significant. This benefit was observed without changes in cardiac medications or revascularization in either group. Also, there were no negative

T'S EXHIBIT 10
1-19-2011
Posell

CONFIDENTIAL 16 C.F.R. 4.10(a)(8)

POM-LRESNICK00129

00011600

**JA-0672**

CX0044_0001

effects on lipids, blood glucose, hemoglobin A1c, body weight or blood pressure.

Pomegranate juice is rich in polyphenols and other naturally-occurring antioxidants. It demonstrates high capability in scavenging free radicals and inhibiting low-density lipoprotein oxidation in vitro and in vivo. Other studies have shown that pomegranate juice has a number of important health benefits.

"Although the sample in this study was relatively small, the strength of the design and the significant improvements in blood flow to the heart observed after only three months suggest that pomegranate juice may have important clinical benefits in those with coronary heart disease," said senior author, Dean Ornish, M.D., who is founder of the Preventive Medicine Research Institute and clinical professor of medicine at UCSF. "Also, it may help to prevent it."

Pomegranate juice from POM Wonderful was used in this study.

About POM Wonderful

POM Wonderful is the largest producer of California Wonderful pomegranates, and the company exclusively grows and sells this variety. POM Wonderful's pomegranates are grown in Central California, in the sunny San Joaquin Valley. Known for its exquisite sweet flavor, health benefits, large size and plentiful juice, the Wonderful variety is popular with consumers throughout the country. POM Wonderful's pomegranates promise consistent quality. POM Wonderful prides itself on the quality of its farming operation, the sensitivity with which the fruit is hand picked and carried to their sorting and modern juicing facilities, and ultimately delivered to your table. Only fruit that meets the company's strict quality standards appears in store produce sections.

The company also juices its fresh pomegranates to make its delicious, all-natural, POM Wonderful pomegranate juice. POM Wonderful pomegranate juice is available year-round at retail and is found in the refrigerated section of supermarkets and grocery stores nationwide. POM Wonderful pomegranate juice is available in five flavors: POM 100% Pomegranate, POM Cherry, POM Blueberry, POM Tangerine and POM Mango. Each flavor of POM Wonderful pomegranate juice is all-natural, preservative-free and has no added sugar.

POM Wonderful's mission is to educate consumers about the pomegranate's splendor and versatility as well as its refreshing taste and health benefits. To learn more, visit http://www.pomwonderful.com.

POM Wonderful is a registered trademark of POM Wonderful LLC.

Note to Editors: Interviews with Dr. Dean Ornish, Senior Author, are available upon request.

**Contacts**

Fiona Posell
Vice President, Corporate Communications
POM Wonderful

11444 W Olympic Blvd., Los Angeles, CA 90064-1544

Tel: 310 966 5810
Fax: 310 966 5801

CONFIDENTIAL  16 C.F.R. 4.10(a)(8)

POM-LRESNICK00130

00011601

CX0044_0002

Figure 9



**WONDERFUL.**

**Contact:** Fiona Posell (310) 966 5810
fposell@pomwonderful.com

*Note to Editors: Interviews with medical researchers quoted are available upon request.*

## POMx, a Highly Concentrated Form of Healthy Pomegranate Antioxidants, Becomes Available to Consumers for the First Time

**LOS ANGELES** (July 10 - 2006) –   Three years after introducing consumers to the health benefits and delicious taste of the world's first refrigerated, super-premium pomegranate juice, **POM** Wonderful® announced today that it has developed a concentrated form of pomegranate antioxidants known as **POM**x.   **POM**x, already being noted by medical researchers as an important natural ingredient, is so concentrated that only a small amount is needed to obtain an optimal level of daily antioxidants.   For consumers who are not seeking additional calories and sugars, this is an important product benefit.   **POM**x comes from the same Wonderful variety of pomegranates that are used to make **POM** Wonderful's healthy pomegranate juices.   It also has a similar biochemical profile to pomegranate juice since both contain a diverse range of phytochemicals, of which polyphenols make up a large proportion.   **POM**x is currently an active ingredient in **POM** Tea (http://pomtea.com), a refreshing, healthy, ready-to-drink iced tea that is available in retail stores nationally.

According to Michael Aviram, DSc, Professor of Biochemistry and Head Lipid Research Laboratory, Technion Faculty of Medicine and Rambam Medical Center, Haifa, Israel, who was at the forefront of the initial research on pomegranates, the research on **POM**x looks very promising.   In 2006, Aviram led a study on **POM**x which was recently published (*Journal of Agriculture and Food Chemistry*, 2006 54:1928-1935).   Commenting on this research, Professor Aviram remarks, "The results showed that **POM**x is as potent an antioxidant as pomegranate juice and just like pomegranate juice may protect against cardiovascular as well as other diseases."

Δ π EXHIBIT
Staci Filovsky
Deponent
Date 1-12-11   Rptr
www.DEPOBOOK.COM

1 of 4 pgs

CONFIDENTIAL

POM_Q9-0004664

CX0065_0001

The POMx research comes as the benefits derived from the Wonderful variety of pomegranate are, once again, being noted by the worldwide medical community. Recently, the American Association for Cancer Research published research that indicates that a daily pomegranate regimen has a positive effect for men with prostate cancer. Specifically, drinking 8 ounces of POM Wonderful pomegranate juice daily prolonged post-prostate surgery PSA doubling time from 15 to 54 months (*Clinical Cancer Research*, July 1, 2006). PSA is a protein marker for prostate cancer and the faster PSA levels increase in the blood of men after treatment, the greater their potential for dying of prostate cancer.

David Heber, MD, PhD, Professor of Medicine and Director, UCLA Center for Human Nutrition, provided additional commentary on POMx as it relates to prostate cancer. "Basic studies indicate that the effects of POMx and POM Wonderful pomegranate juice on prostate cancer are the same. The most abundant and most active ingredients in pomegranate juice are also found in POMx."

The Wonderful variety of pomegranate is a type of pomegranate rather than a brand. Just as there are different varieties of apples, oranges and grapes, there are several different varieties of pomegranates grown in the United States and in other countries. POM Wonderful's products only use extractions from the Wonderful variety of pomegranate. Of the many published peer-reviewed medical papers that speak to the health benefits of the pomegranate, most were conducted using juice or pomegranate extract from this variety of pomegranate.

### About POM Wonderful

POM Wonderful is the largest grower of the Wonderful variety of pomegranate. The company exclusively grows and sells this variety because of its exquisite sweet flavor, health benefits, large size and plentiful juice. POM Wonderful's pomegranates are grown in Central California, in the sunny San Joaquin Valley. Fresh pomegranates are in season from October through January and November is National Pomegranate Month. In addition to selling the fresh fruit, the company also juices its fresh pomegranates to make POM Wonderful pomegranate juice and POMx. To learn more, visit http://www.pomwonderful.com.

###

6-2

CONFIDENTIAL                                                    POM_Q9-0004665

CX0065_0002

# Figure 10



Exhibit I, Page 1

CX1426_00038

JA-0678

## POMx™ is the first and only pomegranate antioxidant supplement reviewed for safety by the FDA.

POMx™ is a highly concentrated, incredibly powerful blend of all-natural polyphenol antioxidants made from the very same pomegranates in POM Wonderful 100% Pomegranate Juice. In fact, our method of harnessing astonishing levels of antioxidants is so extraordinary, it's patent-pending.

### The power of POM. Now in one little pill.™

All of the antioxidant power of an 8oz glass of POM Wonderful 100% Pomegranate Juice is now available in the convenience of a single calorie-free pill. Take one daily. Each bottle contains a one-month supply of 30 pills.



8oz =

Exhibit I, Page 2

CX1426_0039

# Our antioxidants make other antioxidants feel inferior.



**fact 1 More polyphenol antioxidants than any other 100% pomegranate supplement**

**fact 3 An astonishing 1000mg of natural pomegranate polyphenol extract in every pill**

**fact 2 The antioxidant power of an 8oz glass of our juice, in a calorie-free pill**

**fact 4 Made from the same California pomegranates in POM Wonderful 100% Pomegranate Juice**

## Why take an antioxidant supplement?

Let's start with the problem: free radicals. Emerging science tells us these unstable molecules aggressively destroy healthy cells in your body and may be linked to everything from the wrinkles we get as we age to more serious health threats like cancer and heart disease. In fact, scientists have already linked free radicals to as many as 60 different types of diseases.

## Fighting free radicals.

Where do free radicals come from? Everywhere. They're formed by exposure to alcohol, sunlight, tobacco smoke, air pollution,

pesticides and even fried foods. That's where antioxidants come in. Science tells us that pomegranate antioxidants neutralize free radicals, helping to prevent the damage that can lead to disease. In the fight against free radicals, POMx is the Antioxidant Superpill.™

## Not all antioxidants are equal.

POMx is made from pomegranates only—nothing else. When other supplements add non-pomegranate ingredients or even other antioxidants, they can disrupt the balance of molecules that nature intended the pomegranate to have. The polyphenol antioxidants in POMx are as natural and unadulterated as those in our fresh, California-grown POM Wonderful Pomegranates.

# "Findings from a small study suggest that pomegranate juice may one day prove an effective weapon against prostate cancer."

*The New York Times (July 4, 2006)*

## Prostate health.

Prostate cancer is the most commonly diagnosed cancer among men in the United States and the second-leading cause of cancer death in men after lung cancer.[1]

## Time pill.

Stable levels of prostate-specific antigens (or PSA levels) are critical for men with prostate cancer. Patients with quick PSA doubling times are more likely to die from their cancer.[2] According to a UCLA study of 46 men age 65 to 70 with



advanced prostate cancer, drinking an 8oz glass of POM Wonderful 100% Pomegranate Juice every day slowed their PSA doubling time by nearly 350%.[3]

83% of those who participated in the study showed a significant decrease in their cancer regrowth rate.[3]



"The most abundant and most active ingredients in pomegranate juice are also found in POMx. Basic studies indicate that POMx and POM Wonderful Pomegranate Juice may have the same effects on prostate health."

*David Heber, MD, PhD, Professor of Medicine and Director,*
*UCLA Center for Human Nutrition*

## One small pill for mankind.

New studies are under way to further investigate the possibilities of POM Wonderful pomegranate antioxidants and their potential ability to slow the rise of PSA levels in patients with prostate cancer.

To learn more, visit pompills.com/research.

These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease.
[1] American Cancer Society [2] Vital Signs newsletter: UCLA Healthcare, April 2007 [3] pompills.com/research. [Data on file.

Exhibit I, Page 4

CX1426_00041

# "POM Wonderful Pomegranate Juice has been proven to promote cardiovascular health, and we believe that POMx may have the same health benefits."

*Dr. Michael Aviram, Lipid Research Laboratory, Technion Faculty of Medicine, Haifa, Israel*

## Heart health.

In two groundbreaking preliminary studies, patients who drank POM Wonderful 100% Pomegranate Juice experienced impressive cardiovascular results. A pilot study at the Rambam Medical Center in Israel included 19 patients with atherosclerosis (clogged arteries). After a year, arterial plaque decreased 30% for those patients who consumed 8oz of POM Wonderful 100% Pomegranate Juice daily.[2]

An additional study at the University of California, San Francisco included 45 patients with impaired blood flow to the heart. Patients who consumed 8oz of POM Wonderful 100% Pomegranate Juice daily for three months experienced a 17% improvement in blood flow.[3] Initial studies on POMx share similar promise for heart health, and our research continues.



*fig. I* THE HEART

## The POMx Difference

### Ultra-Potent:

- 1000mg of natural pomegranate polyphenol extract in every pill
- More antioxidants than any other pomegranate supplement
- One POMx pill = the antioxidant power of 8oz of POM Wonderful 100% Pomegranate Juice
- Your daily antioxidants in a single pill
- A full spectrum of pomegranate polyphenol antioxidants

### Natural:

- Made from pomegranates and nothing else

### Science, Not Fiction:

- No synthetic or other antioxidants added
- No sugar, artificial colors or preservatives
- Calorie-free, vegan, kosher
- Made from the only pomegranates backed by $20 million in medical research and the POM Wonderful brand
- Promotes heart and prostate health
- Guards your body against free radicals[4]
- Proven to be easily absorbed[5]
- Clinically tested on adults[6]

To access the original published studies mentioned, visit pompills.com/research.

# Figure 11



# Decompress.

Amaze your cardiologist. Drink POM Wonderful Pomegranate Juice. It helps guard your body against free radicals, unstable molecules that emerging science suggests aggressively destroy and weaken healthy cells in your body and contribute to disease. POM Wonderful Pomegranate Juice is supported by $20 million of initial scientific research from leading universities, which has uncovered encouraging results in prostate and cardiovascular health. Keep your ticker ticking and drink 8 ounces a day.



pomwonderful.com

**POM Wonderful Pomegranate Juice. The Antioxidant Superpower.**

©2007 PomWonderful LLC. All rights reserved. POM Wonderful, and "the Antioxidant Superpower" are trademarks of PomWonderful, LLC.

**VMS-0000242**

Figure 12



# Heart therapy.

Seek professional help for your heart. Drink POM Wonderful Pomegranate Juice. It helps guard your body against free radicals, unstable molecules that emerging science suggests aggressively destroy and weaken healthy cells in your body and contribute to disease. POM Wonderful Pomegranate Juice is supported by $20 million of initial scientific research from leading universities, which has uncovered encouraging results in prostate and cardiovascular health. Keep your heart healthy and drink 8 ounces a day.



pomwonderful.com

**POM Wonderful Pomegranate Juice. The Antioxidant Superpower.**

©2007 PomWonderful LLC. All rights reserved. POM Wonderful and "The Antioxidant Superpower" are trademarks of PomWonderful LLC.

VMS-0000245

# Figure 13

VMS ID: 070522924
RUN DATE: 05/28/2007



# One small pill for mankind.

### "Findings from a small study suggest that pomegranate juice may one day prove an effective weapon against prostate cancer."

*The New York Times* (July 4, 2006).

Introducing POMx™– a highly concentrated, incredibly powerful blend of all-natural polyphenol antioxidants made from the very same pomegranates in **POM Wonderful 100% Pomegranate Juice**. Our method of harnessing astonishing levels of antioxidants is so extraordinary, it's patent-pending. So now you can get all the antioxidant power of an 8oz glass of juice in the convenience of a calorie-free capsule.

Ready to take on free radicals? Put up your POMx and fight them with a mighty 1000mg capsule – that's more concentrated pomegranate polyphenol antioxidants than any other 100% pomegranate supplement. An initial UCLA medical study on POM Wonderful 100% Pomegranate Juice showed hopeful results for men with prostate cancer.[1,3] And preliminary human research suggests that our California-grown pomegranate juice also promotes heart health.[2,3] Take your antioxidants into your own hands. **Call 1-888-POM-PILL now, or visit pompills.com/fort and get your first monthly shipment for just ~~$29.95~~ $24.95 with coupon.**

## POM IN A PILL™

### CALL 1-888-POM-PILL now, or visit pompills.com/fort
### Not available in stores | 100% money-back guarantee



**SAVE $5** ON YOUR FIRST ORDER.
Call 1-888-POM-PILL or visit pompills.com/fort and mention or enter code **FORT5** at checkout. To pay by check, call 1-888-POM-PILL for instructions. Hurry, offer expires July 31, 2007.

CONSUMER: This offer expires July 31, 2007. Mention or enter coupon code FORT5 at checkout. This coupon can only be used on POMx products. One coupon redemption per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents will be given. We reserve the right to modify or discontinue this promotion at any time. Coupon is one-time only at pompills.com/fort or 1-888-POM-PILL.

 ¹ pomwonderful.com/cancer.html ² pomwonderful.com/heart_health.html ³ These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease.

© 2007 PomWonderful LLC. All rights reserved. POM Wonderful, POMx and "POM in a pill" are trademarks of PomWonderful LLC.

**VMS-0000246**

# Figure 14

# Science, not fiction.

## Made from the only pomegranates backed by $20 million in medical research.

Introducing POMx™– a highly concentrated, incredibly powerful blend of all-natural polyphenol antioxidants made from the very same pomegranates in **POM Wonderful 100% Pomegranate Juice**. Our method of harnessing astonishing levels of antioxidants is so extraordinary, it's patent-pending. So now you can get all the antioxidant power of an 8oz glass of juice in the convenience of a calorie-free pill.

Ready to take on free radicals? Put up your POMx and fight them with a mighty 1000mg capsule – that's more concentrated pomegranate polyphenol antioxidants than any other 100% pomegranate supplement. An initial UCLA medical study on POM Wonderful 100% Pomegranate Juice showed hopeful results for men with prostate cancer.[1,3] And preliminary human research suggests that our California-grown pomegranate juice also promotes heart health.[2,3] Take your antioxidants into your own hands. **Call 1-888-POM-PILL now, or visit pompills.com/dvr and get your first monthly shipment for just ~~$29.95~~ $24.95 with coupon.**

# POM IN A PILL™

### CALL 1-888-POM-PILL now, or visit pompills.com/dvr
### Not available in stores | 100% money-back guarantee



**SAVE $5** ON YOUR FIRST ORDER.
Call 1-888-POM-PILL or visit pompills.com/dvr and mention or enter code **DVR5** at checkout. To pay by check, call 1-888-POM-PILL for instructions. Hurry, offer expires July 31, 2007.

CONSUMER: This offer expires July 31, 2007. This coupon can only be used on POMx products. One coupon redemption per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents will be given. We reserve the right to modify or discontinue this promotion at any time. Coupon code valid only at pompills.com/dvr or 1-888-POM-PILL.



[1] pomwonderful.com/cancer.html  [2] pomwonderful.com/heart_health.html  [3] These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease.

© 2007 PomWonderful LLC. All rights reserved. POM Wonderful, POMx and "POM in a pill" are trademarks of PomWonderful LLC.

VMS-0000247

# Figure 15

**POM**
WONDERFUL.

**Contact:** Pam Holmgren (310) 966 5894
pholmgren@pomwonderful.com

*Note to Editors: Interviews with medical researcher quoted are available upon request.*

## POM Wonderful 100% Pomegranate Juice May Improve Mild to Moderate Cases of Erectile Dysfunction, Study Finds

*Research shows 8 ounces a day of POM Wonderful 100% Pomegranate Juice may help the management of erectile dysfunction*

**LOS ANGELES** (June 27 - 2007) – According to a pilot study released in the *International Journal of Impotence Research* (http://www.nature.com/ijir*)*, POM Wonderful 100% Pomegranate Juice was found to have beneficial effects on erectile dysfunction (ED), a disorder that affects 1 in 10 men worldwide and 10 to 30 million men in the United States alone.[1,2] ED can be caused by several factors, including arterial plaque, high blood pressure, heart disease, diabetes, nerve damage, endocrine imbalance or depression. Ultimately, ED is a condition that affects the blood flow to the penis during sexual stimulation.

This randomized, placebo-controlled, double-blind, crossover pilot study examined the efficacy of pomegranate juice versus placebo in improving erections in 61 male subjects. To qualify, participants had to experience mild to moderate ED for at least 3 months; be in a stable, monogamous relationship with a consenting female partner; and be willing to attempt sexual intercourse on at least one occasion per week during each study period.

Mild ED is defined as the mildly decreased ability to get and keep an erection, while moderate ED is the moderately decreased ability to get and keep an erection. The majority of men with ED have moderate ED.

For the first four weeks of the study, the subjects were assigned to drink either 8 oz. of POM Wonderful Pomegranate Juice or 8 oz. of placebo beverage daily with their evening

POM-RPFEFFER00014

00010805

CX0128_0002

meal or shortly after. After a two-week washout period during which the subjects did not
consume any study beverage nor utilize any ED treatment, they were assigned to drink 8
oz. of the opposite study beverage every evening for another four weeks. At the end of
the each four week period, efficacy was assessed using the International Index of Erectile
Function (IIEF) and Global Assessment Questionnaires (GAQ). The IIEF is a validated
questionnaire that has been demonstrated to correlate with ED intensity. The GAQ elicits
the patient's self-evaluation of the study beverages' effect on erectile activity.

Forty seven percent of the subjects reported that their erections improved with POM
Wonderful Pomegranate Juice, while only 32% reported improved erections with the placebo
(p=0.058). These results compare favorably to a recent 24-week study using a PDE5 inhibitor
(such as Cialis), in which roughly 73% of subjects reported a benefit from the PDE5 inhibitor
and 26% reported a "placebo effect" (i.e. experiencing improvement while on the placebo).[3]

Although the study did not achieve overall statistical significance, the authors conclude that
additional studies with more patients and longer treatment periods may in fact reach statistical
significance. The strong directional results of this pilot study are encouraging because almost
half of the test subjects experienced a benefit simply by adding pomegranate juice to their daily
diet, without the use of ED drugs.

Researchers believe that the results might be due to the potent antioxidant content of
pomegranate juice, which can prevent free radical molecules from disrupting proper circulatory
function. In several previously published medical studies, pomegranate juice has been shown
to enhance blood flow and to slow or reverse arterial plaque growth.[4,5,6] Because an erection
requires significant blood flow, these potent pomegranate antioxidants may provide benefit by
mitigating arterial plaque and promoting blood vessel dilation.

According to study co-author Harin Padma-Nathan, MD, FACS, FRCS, Clinical Professor of
Urology at the Keck School of Medicine, University of Southern California, "These findings
are very encouraging as they suggest there is a non-invasive, non-drug way to potentially
alleviate this quality of life issue that affects so many men. For men with ED, it is important to

CONFIDENTIAL  16 C.F.R. 4.10(a)(8)

maintain a healthy diet and exercise. Drinking pomegranate juice daily could be an important addition to the diet in the management of this condition."

## About POM Wonderful

POM Wonderful is the largest producer of California Wonderful pomegranates and the company exclusively grows and sells this variety. POM Wonderful's pomegranates grow in central California, in the sunny San Joaquin Valley. Fresh pomegranates are in season from October through January and November is National Pomegranate Month.

The company also uses its fresh pomegranates to make its delicious, all-natural, POM Wonderful Pomegranate Juice and POMx, a highly-concentrated blend of all-natural polyphenol antioxidants harnessed from the pomegranate by a patent-pending process. POMx is found exclusively in POM Tea, POMx Pills and POMx Liquid.

POM Wonderful Pomegranate Juice and POM Tea are available year-round at retail and are found in the refrigerated section of supermarkets nationwide. POMx Pills and POMx liquid are available at http://www.pompills.com. To learn more, visit http://www.pomwonderful.com.

###

### References
1   Furlow WL. Prevalence of impotence in the United States. *Med Aspects Hum Sex* 1985, 19: 13-16.

2   Kaiser FE. Erectile dysfunction in the aging man. *Med Clin North Am* 1999; 83: 1267-1278.

3   Rajfer J, Aliotta PJ, Steidle CP, Fitch III WP, Zhao Y, and Yu A. Tadalafil dosed once a day in men with erectile dysfunction: a randomized, double-blind, placebo-controlled study in the US. *International Journal of Impotence Research* 2007, 19: 95-103.

4   Ignarro LJ, Byrns RE, Sumi D, de Nigris F, Napoli C. Pomegranate juice protects nitric oxide against oxidative destruction and enhances the biological actions of nitric oxide. *Nitric Oxide* 2006; 15: 93–102.

5   Aviram M, Rosenblat M, Gaitini D, Nitecki S, Hoffman A, Dornfeld L, Volkova N, Presser D, Attias J, Liker H, and Liker H. Pomegranate juice consumption for 3 years with patients with carotoid artery stenosis reduces common carotid intima-media thickness, blood pressure and LDL oxidation. *Clinical Nutrition*, 2004, 23: 423-433.

6   Summer MD, Elliot-Eller M, Weidner G, Daubenmier JJ, Chew MH, Marlin R, Raisin CJ and Ornish, D. Effects of pomegranate juice consumption on myocardial perfusion in patients with coronary heart disease. *American Journal of Cardiology* 2005, 96: 810-814.

CONFIDENTIAL  16 C.F.R. 4.10(a)(8)

POM-RPFEFFER00016

00010807

**JA-0694**                                               CX0128_0004

# Figure 16

**POMx Heart Newsletter**
Pills and Liquid
Monthly
2nd Continuity Shipment

Summer '07 - present ( ongoing )

 **POM X** **YOUR PARTNER IN PROMOTING LIFELONG HEALTH**

VOLUME 1, ISSUE 1: FOR YOUR HEART

## What's New in the Lab by Dr. Mark Dreher

 **Mark Dreher, PhD**
**Chief Science Officer**
**POMWonderful, LLC**

Hi, I'm Dr. Mark Dreher, Chief Science Officer at POM, and your guide to continuing new research on the benefits of POMx and POM Wonderful pomegranates as they relate to your health. Welcome to Your First Issue of the POMx Newsletter! There's more to come, so please stay tuned in the coming months for:...

Future newsletters will contain content derived from these questions and reader feedback. We look forward to hearing from you!

♥ ♥ ♥

## Enjoy Your Life With a Healthy Heart

According to the American Heart Association (AHA), at least 58.8 million Americans suffer from some form of heart disease. Maintaining a healthy heart by reducing your risk for cardiovascular disease should be at the core of every lifelong

**Exhibit M, Page 1**

CX1426_00046

# POM X — YOUR PARTNER IN PROMOTING LIFELONG HEALTH

VOLUME 1, ISSUE 1: FOR YOUR HEART

## What's New in the Lab by Dr. Mark Dreher



**Mark Dreher, PhD**
Chief Science Officer
POMWonderful, LLC

Hi, I'm Dr. Mark Dreher, Chief Science Officer at POM, and your guide to continuing new research on the benefits of POMx and POM Wonderful pomegranates as they relate to your health. Welcome to Your First Issue of the POMx Newsletter! There's more to come, so please stay tuned in the coming months for:...

- POM Wonderful's latest research
- Health tips
- Pomegranate facts
- New product information

There's a strong pipeline of research supporting initial findings that POM Wonderful 100% Pomegranate Juice and its counterpart, POMx, are successfully fulfilling their promise for promoting heart health. We are committed to continually testing our products, not only prior to market

Future newsletters will contain content derived from these questions and reader feedback. We look forward to hearing from you!

❤ ❤ ❤

## Enjoy Your Life With a Healthy Heart

According to the American Heart Association (AHA), at least 58.8 million Americans suffer from some form of heart disease. Maintaining a healthy heart by reducing your risk for cardiovascular disease should be at the core of every lifelong wellness plan. A nutrient-rich diet and active lifestyle are the best weapons you have for combatting heart disease and enhancing your vitality at any age.

The AHA recommends eating plenty of fruits and vegetables loaded with the vitamins, minerals and fiber your body requires, without the extra calories it doesn't need. But even though you may be eating enough of the right foods, your body still may not be getting all the nutrients it needs to keep your heart truly healthy.

### Did You Know?

**POLYPHENOLS**

Polyphenols are antioxidants that naturally occur in pomegranates. These antioxidants neutralize free radicals, helping to prevent the cell and tissue damage that can lead to disease. The heart health benefits associated with California grown, Wonderful variety pomegranates are due to their very high levels of polyphenols.

release but at every step in their evolution. Various patient studies across a wide variety of health concerns are in the works, and we look forward to sharing the results of this research with you.

At POM Wonderful, we aim to be your partner in the promotion of good health that lasts a lifetime. It is our commitment to you and our mission as a company. If you have any questions and/or concerns please send them directly to me at: chiefscienceofficer@pomwonderful.com

### ANTIOXIDANTS: YOUR ALLY IN FIGHTING HEART DISEASE

In order to keep your body in tip-top shape and your heart beating to the rhythm of all you wish to do in life, you need help in the prevention of cell and tissue damage that can lead to disease.

Science tells us that antioxidants neutralize the free radicals that can aggressively destroy healthy cells in your body. But not all antioxidants are equal — some are better at neutralizing free radicals than others. And because your body may not always produce enough of the antioxidants required to neutralize all the free radicals that can lead to cell damage, we have developed POMx to harness and deliver the most potent antioxidants around.

### THE FREE RADICAL FIGHTER

Pomegranates contain polyphenols — powerful antioxidants that are important as part of a balanced diet. Published research has shown that the unique polyphenol antioxidants

[please turn to back]

CX1426_00047

*Healthy Heart (from front)*
in POMx and POM Wonderful 100% Pomegranate Juice are superior fighters in the battle against free radicals. Each dose of POMx contains the same amount of antioxidant polyphenols found in 8oz of POM Wonderful 100%.

### The antioxidants in POMx are supported by $20 million in initial scientific research

Pomegranate Juice, and POMx is the most concentrated source of pomegranate polyphenol antioxidants available.

POM Wonderful is committed to understanding the effects of POM Wonderful Pomegranate Juice on cardiovascular health. To date, our scientists have found that pomegranate juice may help counteract factors leading to arterial plaque build up, as well as inhibit a number of factors associated with heart disease.

NEW RESEARCH OFFERS FURTHER PROOF OF THE HEART-HEALTHY BENEFITS OF POM WONDERFUL JUICE

#### 30% DECREASE IN ARTERIAL PLAQUE

After one year of a pilot study conducted at the Technion Institute in Israel involving 19 patients with atherosclerosis (clogged arteries),

In his 2006 POMx study, Dr. Michael Aviram, one of the world's pre-eminent cardiovascular researchers from the Technion Institute in Israel, remarked that "POMx is as potent an antioxidant as pomegranate juice and just like pomegranate juice, POMx may promote cardiovascular health."

those patients who consumed 8oz of POM Wonderful 100% Pomegranate Juice daily saw a 30% decrease in arterial plaque.

#### 17% IMPROVED BLOOD FLOW

A recent study at the University of California, San Francisco (UCSF) included 45 patients with impaired blood flow to the heart. Patients who consumed 8oz of POM Wonderful 100% Pomegranate

Juice daily for three months experienced 17% improved blood flow. Those who drank a placebo experienced an 18% decline.

### PROMOTES HEALTHY BLOOD VESSELS

An in vitro study at the University of California, Los Angeles (UCLA) showed that pomegranate juice uniquely possesses enough antioxidant activity to protect nitric oxide (an important bio-chemical that helps maintain healthy blood vessels for proper blood flow) against oxidative destruction thereby enhancing its biological activity. In other words, pomegranate juice by protecting nitric oxide promotes healthy blood flow.

THE POWER OF POMx
The antioxidants in POMx are supported by $20 million in initial scientific research from leading universities and so far we've uncovered encouraging results.

### POMx supplements your diet without adding calories, allowing you to more easily maintain a healthy weight while still getting the necessary antioxidants

Due to this promising information, our studies on POMx and heart health continue. It is our mission to deliver the latest information on our research to you in this newsletter as soon as studies are completed. At POM Wonderful we are committed to learning all we can about the health benefits of this miraculous fruit and sharing them with you.

♥  ♥  ♥

NEXT ISSUE: PROSTATE HEALTH

One out of every six men will get prostate cancer, but only one out of 34 will die from the disease. In our newsletter next month, we will discuss preventative measures all men need to know to manage their prostate health.

1.888.POMPILL
WWW.POMPILLS.COM



Figure 17

**POMx Prostate Newsletter**
Pills and Liquid
Monthly
3rd Continuity Shipment

Fall '07 - present (ongoing)

# POMx YOUR PARTNER IN PROMOTING LIFELONG HEALTH

VOLUME 1, ISSUE 2: PROSTATE HEALTH

## Prostate Cancer Affects 1 Out of Every 6 Men

Prostate cancer is the second leading cause of cancer related death in men in the United States according to the National Cancer Institute. Prostate cancer incidence rates rose dramatically in the late 1980's with improved detection and diagnosis through widespread use of prostate-specific antigen (PSA) testing.

---

**Prostate cancer is the second leading cause of**

fruits and vegetables. Doctors are not sure which of these factors causes the risk to go up but the best advice is to consume daily the equivalent of five or

*(continued on back)*

## What's New in the Lab by Dr. Mark Dreher



Mark Dreher, PhD
Chief Science Officer
POMWonderful, LLC

Research studies like the ones discussed in this newsletter and

**Exhibit N, Page 1**

## POM X YOUR PARTNER IN PROMOTING LIFELONG HEALTH

VOLUME 1, ISSUE 2: PROSTATE HEALTH

### Prostate Cancer Affects 1 Out of Every 6 Men

Prostate cancer is the second leading cause of cancer related death in men in the United States according to the National Cancer Institute. Prostate cancer incidence rates rose dramatically in the late1980's with improved detection and diagnosis through widespread use of prostate-specific antigen (PSA) testing.

> Prostate cancer is the second leading cause of cancer related to death in men in the United States according to the National Cancer Institute

Since the early 1990's, prostate cancer incidence and deaths have been declining, but the American Cancer Society estimates that there will still be about 218,890 new cases of prostate cancer and 27,050 deaths in the United States in 2007.

According to the American Cancer Society, some of the risk factors for prostate cancer include:

**Age** – Growing older raises a man's risk of prostate cancer. About two of every three prostate cancers are found in men over the age of 65.

**Family History** – Men with close family members (father or brother) who have had prostate cancer are more likely to get it themselves, especially if their relatives were young when they got the disease.

**Diet** – One risk factor that can be changed is diet. The National Cancer Institute's research suggest that obesity and weight gain is linked to increased prostate cancer mortality.

Men who eat a lot of red meat or high-fat dairy products seem to have a greater chance of getting prostate cancer. These men also tend to eat fewer

fruits and vegetables. Doctors are not sure which of these factors causes the risk to go up but the best advice is to consume daily the equivalent of five or
(continued on back)

### What's New in the Lab by Dr. Mark Dreher



Mark Dreher, PhD
Chief Science Officer
POMWonderful, LLC

Research studies like the ones discussed in this newsletter and conducted by UCLA (my alma mater) serve to validate the many reasons I am proud to be affiliated with POM Wonderful and POMx.

POM Wonderful 100% Pomegranate Juice and POMx are backed by a $25 million dollar investment in world-class scientific research. This includes ten clinical studies published in top peer-reviewed medical journals that document the pomegranate's antioxidant health benefits such as heart and prostate health.

Working at POM Wonderful gives me the unique opportunity to really make a difference in the world. That's what gets me up every morning! I get to work with renowned scientists, including a Nobel Laureate, at leading

> Studies funded by POM represent the vast majority of medical research ever conducted on pomegranates.

universities around the world. In fact, studies funded by POM represent the vast majority of human medical research ever conducted on pomegranates. No other company that I know of is as dedicated as POM in pursuing the truth and keeping our customers informed.

At POM Wonderful, we aim to be your partner in the promotion of good health that lasts a lifetime. It is our commitment to you, our mission as a company.

Exhibit N, Page 2

CX1426_00050

*Prostate Cancer (from front)*
more servings of vegetables
and fruits rich in antioxidants
and to eat less red meat and
high-fat foods.

## EARLY DETECTION SEEN AS KEY TO INCREASING SURVIVAL RATES*

The prostate-specific antigen (PSA)
test and rectal exam can be used to
detect the presence of prostate
cancer when no symptoms are
present. They may help catch the
disease at an early stage when
treatment is more effective.

During a PSA test, a small amount
of blood is drawn and the level
of PSA (a protein produced by the
prostate) is measured to determine
the level of risk. When prostate
cancer is found and treated, the PSA
test may also measure the potential
risk for the cancer to return.

* *Please talk to your doctor for more
specific prostate cancer information.*

## NEW POMEGRANATE RESEARCH OFFERS HOPE TO PROSTATE CANCER PATIENTS

A preliminary UCLA medical study
involving POM Wonderful 100%
Pomegranate Juice revealed
promising news. 46 men who had
been treated for prostate cancer with
surgery or radiation were given 8oz
of POM Wonderful 100%
Pomegranate Juice to drink daily. A

---

**Patients with prostate
cancer showed a
prolongation of
PSA doubling time,
coupled with
corresponding lab effects
on reduced prostate
cancer as well as
reduced oxidated stress.**

---

majority of the patients experienced
a significantly extended PSA
doubling time. Doubling time is an
indicator of prostate cancer
progression – extended doubling
time may indicate slower disease
progression.

Before the study, the mean doubling
time was 15 months. After
drinking 8oz of pomegranate juice
daily for two years, the mean PSA
doubling time increased to 54
months. Testing on patient blood
serum showed a 12% decrease in
cancer cell proliferation and a 17%

increase in cancer cell death
(apoptosis).

In another study, in vitro laboratory
testing at UCLA showed that POMx
significantly decreased human
prostate cancer cell growth and
increased cancer cell death.

Based on the promising results of
these preliminary studies, two
additional studies are underway to
more fully investigate the potential of
POMx to extend PSA doubling time.

---

**According to Dr. David Heber,
Director of UCLA's
Center for Human Nutrition,
"The most abundant
and most active ingredients
in pomegranate juice
are also found in POMx.
Basic studies in our
laboratory so far indicate
that POMx and pomegranate
juice may have
the same effects."**

---

## SEND US YOUR QUESTIONS AND COMMENTS

We encourage you
to participate in our commitment
to a lifetime of good health
by sending your questions
and/or concerns to
chiefscienceofficer@pompills.com
Future newsletters will contain
content derived from these
questions and reader feedback.
We look forward to
hearing from you!

♥ ♥ ♥

## NEXT ISSUE: POMEGRANATE SUPPLEMENT COMPARISONS

How does POMx compare with
other pomegranate supplements for
antioxidant potency?

♥ ♥ ♥

1.888.POMPILL
WWW.POMPILLS.COM



**Exhibit N, Page 3**

CX1426_00051

# Figure 18



VMS ID: 080106753
RUN DATE: 01/06/2008

# The power of POM, in one little pill.

The easy, portable, calorie-free way to get your daily antioxidants.

**Antioxidant Superpill.**[iv] Not all antioxidants are created equal. POMx™ fights free radicals with a mighty 1000mg in every pill. That's more concentrated antioxidants than any other pomegranate antioxidant supplement. There are antioxidants, and then there are POMx antioxidants.

**Peace of Mind in a Pill.** POMx is a highly concentrated, powerful blend of polyphenol antioxidants made from the very same pomegranates as POM Wonderful® 100% Pomegranate Juice. The same pomegranates we grow exclusively in California, where they're hand-picked on site.

**Safe and Natural.** POMx is made from pure pomegranates. So there are no added sugars, preservatives or any other ingredients – just 100% pomegranate polyphenol antioxidants. So naturally, POMx is absorbed safely into your body. In fact, POMx is the first and only antioxidant supplement reviewed for safety by the FDA.

**Backed by Science.** POMx is made from the only pomegranates supported by $23 million in medical research. Emerging science suggests that free radicals aggressively destroy healthy cells in your body – contributing to premature aging and even disease. The good news is POM Wonderful pomegranate antioxidants neutralize free radicals. An initial UCLA MEDICAL STUDY on POM Wonderful 100% Pomegranate Juice found *hopeful results for prostate health.* "Pomegranate juice delays PSA doubling time in humans," according to AJ Pantuck, et al, in Clinical Cancer Research, 2006.[1,2,3] Two additional preliminary studies on our juice showed *promising results for heart health.* "Pomegranate juice improves myocardial perfusion in coronary heart patients," per D. Ornish, et al, in



California-grown.

the American Journal of Cardiology, 2005.[2,4] "Pomegranate juice pilot research suggests anti-atherosclerosis benefits," according to M. Aviram, et al, in Clinical Nutrition, 2004.[2,5]

**One a Day, For Life.** Ready to take on free radicals? A daily POMx pill is all you need. Invest in your health and order your 30-day supply today. Call now to get your first monthly shipment.

## Call 1-888-POM-PILL (766-7455) or visit pompills.com/nb and enter NB30 at checkout.



The antioxidant power of our 8 oz. juice.



Reviewed for Safety by the FDA.



100% Natural Pomegranate Extract.

## Try POMx for one month – FREE!
### We'll even pay for the shipping. Visit pompills.com/nb or call 1-888-POM-PILL. Use discount code: NB30

SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires April 15, 2008. The first month free plus free shipping offer applies only to the purchase price for the first month of POMx Monthly. Following months will be $29.95 per bottle. This discount can only be used on POMx products. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents will be given. We reserve the right to modify or discontinue this promotion at any time. We reserve the right to change product price or shipping charge at any time. Offer valid only at pompills.com/nb or 1-888-POM-PILL. Discount code is not valid on POMx trial.

[1] pompills.com/research  [2] These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. [3] 45 men with rising PSA after surgery or radiotherapy drank 8 oz. 100% pomegranate juice daily for two years. [4] 45 patients with coronary heart disease and myocardial ischemia drank 8 oz. 100% pomegranate juice daily for three months. [5] 19 patients aged 65-75 years with severe atherosclerosis drank 8 oz. 100% pomegranate juice daily for one year. ©2008 PomWonderful LLC. All rights reserved. POM Wonderful, POMx and "Antioxidant Superpill" are trademarks of PomWonderful LLC.



**VMS-0000255**

CX0169_0001

PX7585_PillPrintAds_NYT0308_F.qxd  12/18/07  5:12 PM  Page 1

**New York Times Magazine**
Issue: January 6th, 2008
In Home: 1/6/08



The easy, portable, calorie-free way to get your daily antioxidants.

# The power of POM, in one little pill.

**Antioxidant Superpill.™** Not all antioxidants are created equal. POMx™ fights free radicals with a mighty 1000mg in every pill. That's more concentrated antioxidants than any other pomegranate antioxidant supplement. There are antioxidants, and then there are POMx antioxidants.

**Peace of Mind in a Pill.** POMx is a highly concentrated, powerful blend of polyphenol antioxidants made from the very same pomegranates as POM Wonderful® 100% Pomegranate Juice. The same pomegranates we grow exclusively in California, where they're hand-picked on site.

**Safe and Natural.** POMx is made from pure pomegranates. So there are no added sugars, preservatives or any other ingredients – just 100% pomegranate polyphenol antioxidants. So naturally, POMx is absorbed safely into your body. In fact, POMx is the first and only antioxidant supplement reviewed for safety by the FDA.

**Backed by Science.** POMx is made from the only pomegranates supported by $23 million in medical research. Emerging science suggests that free radicals aggressively destroy healthy cells in your body - contributing to premature aging and even disease. The good news is POM Wonderful pomegranate antioxidants neutralize free radicals. An initial UCLA MEDICAL STUDY on POM Wonderful 100% Pomegranate Juice found *hopeful results for prostate health.* *Pomegranate juice delays PSA doubling time in humans,*" according to A.J. Pantuck, et al, in Clinical Cancer Research, 2006. Two additional preliminary studies on our juice showed *promising results for heart health.* "Pomegranate juice improves myocardial perfusion in coronary heart patients," per D. Ornish, et al, in



California-grown.

the American Journal of Cardiology, 2005. "Pomegranate juice pilot research suggests anti-atherosclerosis benefits," according to M. Aviram, et al, in Clinical Nutrition, 2004.

**One a Day, For Life.** Ready to take on free radicals? A daily POMx pill is all you need. Invest in your health and order your 30-day supply today. Call now to get your first monthly shipment.

Call 1-888-POM-PILL (766-7455) or visit pompills.com/nb
and enter NB30 at checkout.



The antioxidant power of our 8 oz. juice.



Reviewed for Safety by the FDA.



100% Natural Pomegranate Extract.

## Try POMx for one month – FREE!
We'll even pay for the shipping. Visit pompills.com/nb or call 1-888-POM-PILL. Use discount code: NB30

SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING.

pompills.com/nb/rb  † These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease.



WONDERFUL.

# Figure 19



VMS ID: 080203607
RUN DATE: 02/03/2008

# The antioxidant superpill.™

## 1000 milligrams. 0 calories.

Ready to take your antioxidants into your own hands? Introducing POMx™ – a highly concentrated, incredibly powerful blend of all-natural polyphenol antioxidants made from the same pomegranates as POM Wonderful® 100% Pomegranate Juice.

POMx fights free radicals with a powerful 1000 milligrams. That's more concentrated polyphenol antioxidants than any other pomegranate supplement. And POMx is the first and only antioxidant supplement reviewed for safety by the FDA.



100% All-natural.



The antioxidant power of our 8 oz. juice.

POMx is made from the only pomegranates backed by $23 million in medical research, the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice. An initial UCLA MEDICAL STUDY on POM Wonderful 100% Pomegranate Juice found *hopeful results for prostate health.* The study reports "statistically significant prolongation of PSA doubling times," according to Dr. Allen J. Pantuck in Clinical Cancer Research, 2006.[1,2,3] Two additional preliminary studies on our juice showed *promising results for heart health.* "Stress-induced ischemia decreased in the pomegranate group," Dr. Dean Ornish reported in the American Journal of Cardiology, 2005.[2,4] "Pomegranate juice consumption resulted in a significant IMT† reduction by up to 30% after one year," said Dr. Michael Aviram, referring to reduced arterial plaque in Clinical Nutrition, 2004.[2,5]

### CALL 1-888-POM-PILL (766-7455) now or visit pompills.com/la

## Try POMx for one month – FREE!
**We'll even pay for the shipping.** Visit pompills.com/la or call 1-888-POM-PILL. Use discount code: LA30

SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires April 15, 2008. The first month free plus free shipping offer applies only to the purchase price for the first month of POMx Monthly. Following months will be $29.95 per bottle. This discount can only be used on POMx products. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents will be given. We reserve the right to modify or discontinue this promotion at any time. We reserve the right to change product price or shipping charge at any time. Offer valid only at pomxlfe.com/la or 1-888-POM-PILL. Discount code is not valid on POMx trial.



¹ pompills.com/research  ² These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. ³ 45 men with rising PSA after surgery or radiotherapy drank 8 oz. 100% pomegranate juice daily for two years. ⁴ 45 patients with coronary heart disease and myocardial ischemia drank 8 oz. 100% pomegranate juice daily for three months. † Study measured intima-media thickness (IMT). ⁵ 19 patients aged 65-75 years with severe atherosclerosis drank 8 oz. 100% pomegranate juice daily for one year. ©2008 PomWonderful LLC. All rights reserved. POM Wonderful, POMx and "antioxidant superpill" are trademarks of PomWonderful LLC.



POM
WONDERFUL®

VMS-0000261

CX0180_0001



# The antioxidant superpill.™

## 1000 milligrams. 0 calories.

Ready to take your antioxidants into your own hands? Introducing POMx™ – a highly concentrated, incredibly powerful blend of all-natural polyphenol antioxidants, made from the same pomegranates as **POM Wonderful® 100% Pomegranate Juice.**

POMx fights free radicals with a powerful 1000 milligrams. That's more concentrated polyphenol antioxidants than any other pomegranate supplement. And POMx is the first and only antioxidant supplement reviewed for safety by the FDA.



100% All-natural.



The antioxidant power of our 8oz juice.

POMx is made from the only pomegranates backed by $32 million in medical research. These are the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice, on which each of the following medical studies was conducted. An initial UCLA MEDICAL STUDY on POM Wonderful 100% Pomegranate Juice found *hopeful results for prostate health.* The study reports "statistically significant prolongation of PSA doubling times," according to Dr. Allen J. Pantuck in Clinical Cancer Research, 2006.[1,2,3]

Two additional preliminary studies on our juice found *promising results for heart health.* "Stress-induced ischemia decreased in the pomegranate group," Dr. Dean Ornish reported in the American Journal of Cardiology, 2005.[1,2,4] "Pomegranate juice consumption resulted in a significant IMT* reduction by up to 30% after one year," said Dr. Michael Aviram, referring to reduced arterial plaque in Clinical Nutrition, 2004.[1,2,6]

## ORDER NOW: 1-888-POM-PILL (766-7455) or www.pompills.com/fsin

### Try POMx for one month – FREE!
**We'll even pay for the shipping.**
Visit pompills.com/fsin or call 1-888-POM-PILL. Use discount code: FN30

SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires April 15, 2010. The first month free plus free shipping offer applies only to the purchase price for the first month of POMx Monthly. Following months will be $29.95 per bottle. This discount can only be used on POMx products. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalent will be given. We reserve the right to modify or discontinue this promotion at any time. We reserve the rights to change product price or shipping charge at any time. Offer valid only at pompills.com/fsin or 1-888-POM-PILL. Discount code is not valid on POMx Trial.

 pompills.com/research. [1] These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. [2] 45 men with rising PSA after surgery or radiotherapy drank 8oz 100% pomegranate juice daily for two years. [3] 45 patients with coronary heart disease and myocardial ischemia (insufficient blood flow to the heart) drank 8oz 100% pomegranate juice daily for three months. [4] Study measured intima-media thickness (IMT), which indicates plaque buildup in the carotid artery. [5] 19 patients aged 65-75 years with severe atherosclerosis drank 8oz 100% pomegranate juice daily for one year. ©2010 PomWonderful LLC All rights reserved. POM Wonderful, POMx and "antioxidant superpill" are trademarks of PomWonderful LLC. PP2885.



**Exhibit K**

CX1426_00044

Figure 20



VMS ID: 080505048
RUN DATE: 05/01/2008

# What gets your heart pumping?

Supermodels or beaches? 36-24-36? Or perhaps healthy arteries. Drink POM Wonderful 100% Pomegranate Juice. It helps guard your body against free radicals, unstable molecules that emerging science suggests aggressively destroy healthy cells in your body and contribute to disease. POM Wonderful 100% Pomegranate Juice is supported by $23 million of initial scientific research from leading universities, which has uncovered encouraging results in prostate and cardiovascular health. Eight ounces a day is enough to keep your heart pumping, even if you're not dating a supermodel.



pomegranatetruth.com

**POM Wonderful 100% Pomegranate Juice. The Antioxidant Superpower.**

©2008 PomWonderful LLC. All rights reserved. POM Wonderful and "The Antioxidant Superpower" are trademarks of PomWonderful LLC.

**VMS-0000266**

CX0192_0001

Figure 21



| ID NO: PJ9745 | TRIM: 7.875"x10.5" | COLOR: 4/C PROS | DATE IN: 08-25-08 |
| PROJECT: NY Times Magazine Wrap | SPEC: 7.125" x 9.75" | FINAL BLEED (DO NOT PRINT) | DATE OUT: 09-09-08 |
| SCALE: 1 : 1 | BLEED: 8.375" x 11" | PRINTOUT SIZE: 100% | PROOF ROUND: F |

CONFIDENTIAL, SUBJECT TO A PROTECTIVE ORDER

POM-OS00001566

**CONFIDENTIAL-FTC Docket NO. 9344**

**RESP024721**

JA-0712

CX0314_0003

## POM Wonderful and Prostate Health

**POM WONDERFUL**

A recently published medical study involving POM Wonderful 100% Pomegranate Juice followed 46 men previously treated for prostate cancer either with surgery or radiation.

After drinking eight ounces of POM Wonderful 100% Pomegranate Juice daily for at least two years, these men experienced significantly slower PSA doubling times. PSA (Prostate-Specific Antigen) is a biomarker that indicates the presence of prostate cancer. "PSA doubling time" is a measure of how long it takes for PSA levels to double. A longer doubling time may indicate slower progression of the disease.

At the beginning of the study, PSA levels doubled on average every 15 months. By the end of the study, doubling time had slowed to 54 months – nearly a four-fold improvement.

"This is a big increase. I was surprised when I saw such an improvement in PSA numbers," said Dr. Allan Pantuck, lead author of the UCLA Study.

In addition, in-vitro testing using blood serum from the patients who drank pomegranate juice showed a 17% increase in prostate cancer cell death and a 12% decrease in cancer cell growth.

One important note:   All patients drank the same POM Wonderful 100% Pomegranate Juice which is available in your supermarket produce section.

*Prostate Cancer is the most commonly diagnosed cancer in men in the United States. After lung cancer, it's the second leading cause of cancer death in men. However, emerging science suggests that diet and lifestyle may be able to significantly improve prostate health.*

The Research Continues  Results from this study were so promising that many of the original patients continued to drink pomegranate juice daily, and their PSA doubling times remained suppressed. Three more clinical studies are now underway to further investigate the effects of POM on prostate health.

Learn why POM Wonderful is the only pomegranate juice you can trust.
*[See inside back cover of this wrap.]*

**POM WONDERFUL**  pomwonderful.com

PJ9745_POMlime wrap_F.indd  2

9/1008  5:24:12 AM

| JOB NO.: PJ9745 | TRIM: 7.875"x10.5" | COLOR: 4/C PROS | DATE IN: 08-25-08 |
|---|---|---|---|
| PROJECT: NY Times Magazine Wrap | LIVE: 7.125" x 9.75" | TRIM BLEED (DO NOT PRINT) | DATE OUT: 09-09-08 |
| SCALE: 1 : 1 | BLEED: 8.375" x 11" | PRINTOUT SIZE: 100% | PROOF ROUND: F |

CONFIDENTIAL, SUBJECT TO A PROTECTIVE ORDER

POM-OS00001567

# The proof is in the POM

### 100% Authentic
POM is the only brand guaranteed to contain 100% real pomegranate juice. We wish other brands were as honest. In fact, according to recent independent tests, nine out of ten so-called "pomegranate" juices were found to have added sugar, colorants and other low-grade fruit juices.

### Tree to Bottle
POM is the only brand that controls its juice from tree to bottle, batch to batch, year to year. We only grow "Wonderful" variety pomegranates, renowned for their superior antioxidants and delicious taste. And every 16oz bottle contains the juice of five whole pomegranates.

### The Antioxidant Superpower™
With uniquely high levels of powerful antioxidants, POM Wonderful 100% Pomegranate Juice has demonstrated superior ability to neutralize harmful free radicals and to inhibit excess inflammation.

### Backed by Science
Only POM is backed by $25 million in medical research conducted at the world's leading universities. Clinical studies have documented the benefits of drinking POM Wonderful 100% Pomegranate Juice, including improved cardiovascular and prostate health.

### More Antioxidants
Sip for sip, POM Wonderful 100% Pomegranate Juice has more polyphenol antioxidants than red wine, green tea and other juices.



 pomwonderful.com

*Index combines result from four leading antioxidant tests (ORAC, DPPH, FRAP, TEAC). N. Seeram, et al., "Comparison of Antioxidant Potency of Commonly Consumed Polyphenol-Rich Beverages in the United States.", Journal of Agricultural Food and Chemistry (2008).

PJ9745_POMtime wrap_F.indd 3                                                                              9/10/08 8:24:12 AM

| JOB NO.: PJ9745 | TRIM: 7.875"x10.5" | COLOR: 4/C PROS | DATE IN: 08-25-08 |
|---|---|---|---|
| PROJECT: NY Times Magazine Wrap | LIVE: 7.125" x 9.75" | INK: TRIM, BLEED (DO NOT PRINT) | DATE OUT: 09-09-08 |
| SCALE: 1:1 | BLEED: 8.375" x 11" | PRINTOUT SIZE: 100% | PROOF ROUND: F |

CONFIDENTIAL, SUBJECT TO A PROTECTIVE ORDER

POM-OS00001568

**CONFIDENTIAL-FTC Docket NO. 9344**

**RESP024723**

**JA-0714**

CX0314_0005



# The Antioxidant Superpower.™

What's it like to have a personal superhero? Find out by drinking delicious and refreshing POM Wonderful® 100% Pomegranate Juice. It has more naturally occurring antioxidants than other drinks. Antioxidants fight free radicals, villainous little molecules that may cause premature aging, heart disease, stroke, Alzheimer's, even cancer. All you need is eight ounces to save the day. Every day.

The Antioxidant Superpower.™ 100% Pure Pomegranate Juice.



pomwonderful.com

©200X PomWonderfulLLC. All rights reserved. POM Wonderful and The Antioxidant Superpower are trademarks of PomWonderful LLC.

| JOB NO.: PJ9745 | TRIM: 7.875"x10.5" | COLOR: 4/C PROS | DATE IN: 08-25-08 |
|---|---|---|---|
| PROJECT: NY Times Magazine Wrap | LIVE: 7.125" x 9.75" | LIVE, TRIM, BLEED (DO NOT PRINT) | DATE OUT: 09-09-08 |
| SCALE: 1 : 1 | BLEED: 8.375" x 11" | PRINTOUT SIZE: 100% | PROOF ROUND: F |

CONFIDENTIAL, SUBJECT TO A PROTECTIVE ORDER

POM-OS00001569



CONFIDENTIAL, SUBJECT TO A PROTECTIVE ORDER

POM-OS00001570

**CONFIDENTIAL-FTC Docket NO. 9344**

**RESP024725**

## POM Wonderful and Prostate Health 

**A recently published medical study involving POM Wonderful 100% Pomegranate Juice followed 46 men previously treated for prostate cancer either with surgery or radiation.**

After drinking eight ounces of POM Wonderful 100% Pomegranate Juice daily for at least two years, these men experienced significantly slower PSA doubling times. PSA (Prostate-Specific Antigen) is a biomarker that indicates the presence of prostate cancer. "PSA doubling time" is a measure of how long it takes for PSA levels to double. A longer doubling time may indicate slower progression of the disease.

At the beginning of the study, PSA levels doubled on average every 15 months. By the end of the study, doubling time had slowed to 54 months – nearly a four-fold improvement.

"This is a big increase. I was surprised when I saw such an improvement in PSA numbers," said Dr. Allan Pantuck, lead author of the UCLA Study.

In addition, in-vitro testing using blood serum from the patients who drank pomegranate juice showed a 17% increase in prostate cancer cell death and a 12% decrease in cancer cell growth.

*One important note:* All patients drank the same POM Wonderful 100% Pomegranate Juice which is available in your supermarket produce section.

---

*Prostate Cancer is the most commonly diagnosed cancer in men in the United States. After lung cancer, it's the second leading cause of cancer death in men. However, emerging science suggests that diet and lifestyle may be able to significantly improve prostate health.*

---

**The Research Continues** Results from this study were so promising that many of the original patients continued to drink pomegranate juice daily, and their PSA doubling times remained suppressed. Three more clinical studies are now underway to further investigate the effects of POM on prostate health.

Learn why POM Wonderful is the only pomegranate juice you can trust. *(See inside back cover of this wrap.)*

  pomwonderful.com

PJ0225_TIME-Wrap_Dec08_F.indd  2

CONFIDENTIAL, SUBJECT TO A PROTECTIVE ORDER

10/23/08  5:33:02 PM

POM-OS00001571

**CONFIDENTIAL-FTC Docket NO. 9344**

**RESP024726**

CX0314_0008

## The proof is in the POM

### 100% Authentic
POM is the only brand guaranteed to contain 100% real pomegranate juice. We wish other brands were as honest. In fact, according to recent independent tests, nine out of ten so-called "pomegranate" juices were found to have added sugar, colorants and other low-grade fruit juices.

### Tree to Bottle
POM is the only brand that controls its juice from tree to bottle, batch to batch, year to year. We only grow "Wonderful" variety pomegranates, renowned for their superior antioxidants and delicious taste. And every 16oz bottle contains the juice of five whole pomegranates.

### The Antioxidant Superpower*
With uniquely high levels of powerful antioxidants, POM Wonderful 100% Pomegranate Juice has demonstrated superior ability to neutralize harmful free radicals and to inhibit excess inflammation.

### Backed by Science
Only POM is backed by $25 million in medical research conducted at the world's leading universities. Clinical studies have documented the benefits of drinking POM Wonderful 100% Pomegranate Juice, including improved cardiovascular and prostate health.

### More Antioxidants
Sip for sip, POM Wonderful 100% Pomegranate Juice has more polyphenol antioxidants than red wine, green tea and other juices.



 **pomwonderful.com**

*Index combines results from four leading antioxidant tests (ORAC, DPPH, FRAP, TEAC). N. Seeram, et al., "Comparison of Antioxidant Potency of Commonly Consumed Polyphenol-Rich Beverages in the United States," Journal of Agricultural Food and Chemistry (2008).

PJ0225_TIME-Wrap_Dec08_F.indd   3

10/23/08   5:33:03 PM

CONFIDENTIAL, SUBJECT TO A PROTECTIVE ORDER

POM-OS00001572

**CONFIDENTIAL-FTC Docket NO. 9344**

**RESP024727**





# Ingredients: pomegranates, $25 million in medical research.

What goes into our POM Wonderful bottle goes into you—100% authentic Wonderful variety pomegranate juice, your daily dose of free-radical-fighting antioxidants, $25 million in published medical research and proven health benefits. Nothing else. That means no cheap filler juices. No sweeteners. And no added colorants. So read the label. And drink to your health. **Trust in POM.**

pomwonderful.com

CONFIDENTIAL, SUBJECT TO A PROTECTIVE ORDER

POM-OS00001573

CONFIDENTIAL-FTC Docket NO. 9344

RESP024728

# Figure 22



VMS-0000276

CX0260_0001



Exhibit B

CX1426_00028

Figure 23

VMS ID: 090200523
RUN DATE: 02/01/2009



VMS-0000281

CX0274_0001



Exhibit C

CX1426_00029

# Figure 24



VMS ID: 090300701
RUN DATE: 03/01/2009

# Science, not fiction.

## Made from the only pomegranates backed by $25 million in medical research.

Ready to take your antioxidants into your own hands? Introducing POMx™ – a highly concentrated, incredibly powerful blend of all-natural polyphenol antioxidants made from the same pomegranates as **POM Wonderful**® **100% Pomegranate Juice.**

POMx fights free radicals with a powerful 1000 milligrams. That's more concentrated polyphenol antioxidants than any other pomegranate supplement. And POMx is the first and only antioxidant supplement reviewed for safety by the FDA. 

100% All-natural.



The antioxidant power of our 8oz juice.

POMx is made from the only pomegranates backed by $25 million in medical research, the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice. An initial UCLA MEDICAL STUDY on POM Wonderful 100% Pomegranate Juice found *hopeful results for prostate health.* The study reports "statistically significant prolongation of PSA doubling times," according to Dr. Allen J. Pantuck in Clinical Cancer Research, 2006.[1,2,3] Two additional preliminary studies on our juice showed *promising results for heart health.*

"Stress-induced ischemia decreased in the pomegranate group," Dr. Dean Ornish reported in the American Journal of Cardiology, 2005.[1,2,4] "Pomegranate juice consumption resulted in a significant IMT[5] reduction by up to 30% after one year," said Dr. Michael Aviram, referring to reduced arterial plaque in Clinical Nutrition, 2004.[1,2,6]

### ORDER NOW: 1-888-POM-PILL (766-7455) or pompills.com/pop

## Try POMx for one month – FREE!
**We'll even pay for the shipping.** Visit pompills.com/pop or call 1-888-POM-PILL. Use discount code: POP30

SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires June 30, 2009. The first month free plus free shipping offer applies only to the purchase price for the first month of POMx Monthly. Following months will be $29.95 per bottle. This discount can only be used on POMx products. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents will be given. We reserve the right to modify or discontinue this promotion at any time. We reserve the right to change product price or shipping charge at any time. Offer valid only at pompills.com or 1-888-POM-PILL. Discount code is not valid on POMx trial.

 pompills.com/research [1] These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. [2] 48 men with rising PSA after surgery or radiotherapy drank 8oz 100% pomegranate juice daily for two years. [3] 45 patients with coronary heart disease and myocardial ischemia drank 8oz 100% pomegranate juice daily for three months. [4] Study measured intima-media thickness (IMT). [5] 19 patients aged 65-75 years with severe atherosclerosis drank 8oz 100% pomegranate juice daily for one year. ©2009 PomWonderful LLC. All rights reserved. POM Wonderful and POMx are trademarks of PomWonderful LLC.



VMS-0000291

CX0279_0001

# Figure 25

# LIVE LONG ENOUGH TO WATCH YOUR 401(K) RECOVER.

## Antioxidants are a necessity. Not a luxury.

Emerging science suggests that antioxidants are critically important to maintaining good health because they protect you from free radicals, which can damage your body. Taking one POMx pill a day will help protect you from free radicals and keep you at your healthy best. Even when you're going through the worst.

## Recession-proof your health with POMx.

POMx — an ultra-potent anti-oxidant extract made from the same



The antioxidant power of our 8oz juice.

pomegranates as POM Wonderful® 100% Pomegranate Juice — is the most potent natural anti-oxidant supplement

available. Each 1000mg POMx pill has the antioxidant power of a full glass of POM Wonderful 100% Pomegranate Juice.



**The Antioxidant Superpill.™**

## $25 million in medical research. A sound investment.

POMx is made from the only pomegranates backed by $25 million in medical research at the world's leading universities. Not only has this research

documented the unique and superior antioxidant power of pomegranates, it has revealed promising results for prostate and cardiovascular health.

## Hope for the future. Yours.

Our POMx pills are made from the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice, on which each of the following medical studies was conducted.

An initial UCLA study on our juice found hopeful results for prostate health, reporting "statistically significant prolongation of PSA doubling times," according to Dr. Allen J. Pantuck in *Clinical Cancer Research*, '06.[1,2,5]

Two additional preliminary studies on our juice showed promising results for heart health. "Stress-induced ischemia (restricted blood flow to the heart) decreased in the pomegranate group," Dr. Dean Ornish reported in the *American Journal of Cardiology*, '05.[2,4]

"Pomegranate juice consumption resulted in significant reduction in IMT[6] (thickness of arterial plaque) by up to 30% after one year," said Dr. Michael Aviram in *Clinical Nutrition*, '04.[2,5,6]

## Try POMx Monthly FREE for ONE MONTH.
We'll even pay for the shipping.

## Order Now: 888-766-7455 or pompills.com/n3
Use discount code: N330



*SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLEMENTARY SHIPPING. Offer expires 6/30/09 and applies only to the purchase price for the first bottle of POMx Monthly. Following months will be $29.95 per bottle. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents. We reserve the right to discontinue this promotion, change product price or shipping charge at any time. Valid only at pompills.com or 1-888-766-7455. Not valid on POMx Trial or other POM products.

pompills.com/research *These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. ...ooo POM Wonderful LLC. All rights reserved. POM Wonderful, POMx and Antioxidant superpill are trademarks of PomWonderful LLC. PP090

VMS-0000293

CX0280_0001

Figure 26



# 100% PURE POMEGRANATE JUICE.

It's 100% pure! It's heroically healthy! It's The Antioxidant Superpower, POM Wonderful 100% authentic pomegranate juice.



Backed by $25 million in medical research. Proven to fight for cardiovascular, prostate and erectile health. Committed to keeping you healthy for a good, long time!

**Exhibit A**

CX1426_00027





**100% PURE POMEGRANATE JUICE.**

It's 100% pure! It's heroically healthy! It's The Antioxidant Superpower, POM Wonderful 100% authentic pomegranate juice.

Backed by $25 million in medical research. Proven to fight for cardiovascular, prostate and erectile health. Committed to keeping you healthy for a good, long time!

PLF_____    DEF_____
EXHIBIT_____    4
WITNESS_____  m Thppe
DATE _____  2 / 2 / 11
TONI COHEN

**Exhibit A**

CX0475_0001

# Figure 27









CONFIDENTIAL-FTC Docket NO. 9344                    RESP023831

CX0372_0004



POM WONDERFUL



**HOLY HEALTH!** $32 million in medical research.

## A recently published pilot study* involving POM Wonderful 100% Pomegranate Juice followed 46 men previously treated for prostate cancer either with surgery or radiation.

After drinking eight ounces of POM Wonderful 100% Pomegranate Juice daily for at least two years, these men experienced significantly slower average PSA doubling times. PSA (Prostate-Specific Antigen) is a biomarker that indicates the presence of prostate cancer. PSA doubling time is a measure of how long it takes for PSA levels to double. A longer doubling time may indicate slower progression of the disease.

At the beginning of the study, PSA levels doubled on average every 15 months. By the end of the study, doubling time had slowed to 54 months – nearly a four-fold improvement. "*This is a big increase. I was surprised when I saw such an improvement in PSA numbers,*" said Dr. Allan Pantuck, lead author of the UCLA Study.

One important note: All of the patients drank the same POM Wonderful 100% Pomegranate Juice which is available in your supermarket produce section.

*Prostate cancer is the most commonly diagnosed cancer in men in the United States. After lung cancer, it's the second leading cause of cancer death in men. However, emerging science suggests that diet and lifestyle may be able to significantly improve prostate health.*

**The Research Continues** Results from this study were so promising that many of the original patients continued to drink pomegranate juice daily, and their PSA doubling times remained suppressed. Three more clinical studies are now underway to further investigate the effects of POM on prostate health.

Learn why POM Wonderful is the only pomegranate juice you can trust. *(See inside back cover of this wrap.)*

**pomwonderful.com**

POM WONDERFUL

* Pantuck et al., Phase II study of pomegranate juice for men with rising prostate specific antigen following surgery or radiation for prostate cancer, Clinical Cancer Research (2006). Visit pomwonderful.com/health/research to review this and other published studies.

PJ2005_TimeWrapOct09_F2.indd   2                                                                                           8/20/09  3:47:27 PM

| JOB NO.: PJ2005 | TRIM: 7.875"x10.5" | COLOR: 4/C PROCESS | DATE IN: 7-22-09 |
| PROJECT: TimeWrap Oct09 | LIVE: 7.125" x 9.75" | LIVE, TRIM, BLEED (DO NOT PRINT) | DATE OUT: 8-20-09 |
| SCALE: 1 : 1 | BLEED: 8.375" x 11" | PRINTOUT SIZE: 100% | PROOF ROUND: F2 |

**CONFIDENTIAL-FTC Docket NO. 9344**                              **RESP023814**





## 100% Authentic

POM is the only brand guaranteed to contain 100% real pomegranate juice. We wish other brands were as honest. In fact, according to recent independent tests, nine out of ten so-called "pomegranate" juices were found to have added sugar, colorants and other low-grade fruit juices.

## Tree to Bottle

POM is the only brand that controls its juice from tree to bottle, batch to batch, year to year. We only grow "Wonderful" variety pomegranates, renowned for their superior antioxidants and delicious taste. And every 16oz bottle contains the juice of five whole pomegranates.

## The Antioxidant Superpower*

With uniquely high levels of powerful antioxidants, POM Wonderful 100% Pomegranate Juice has demonstrated superior ability to neutralize harmful free radicals and to inhibit excess inflammation.

## Backed by Science

Only POM products are backed by $32 million in medical research conducted at the world's leading universities, primarily in the areas of cardiovascular, prostate and erectile function.

## More Antioxidants

Sip for sip, POM Wonderful 100% Pomegranate Juice has more polyphenol antioxidants than red wine, green tea and other juices.



pomwonderful.com

*Index combines results from four leading antioxidant tests (ORAC, DPPH, FRAP, TEAC). N. Seeram, et al., Comparison of Antioxidant Potency of Commonly Consumed Polyphenol-Rich Beverages in the United States. Journal of Agricultural and Food Chemistry (2008). Study found at pomwonderful.com /compare.

PJ2005_TimeWrapOct09_F2.indd   3                                                                                              8/20/09  3:47:28 PM

| JOB NO.: PJ2005 | TRIM: 7.875"x10.5" | COLOR: 4/C PROCESS | DATE IN: 7-22-09 |
| --- | --- | --- | --- |
| PROJECT: TimeWrap Oct09 | LIVE: 7.125" x 9.75" | LIVE, TRIM, BLEED (DO NOT PRINT) | DATE OUT: 8-20-09 |
| SCALE: 1 : 1 | BLEED: 8.375" x 11" | PRINTOUT SIZE: 100% | PROOF ROUND: F2 |

**CONFIDENTIAL-FTC Docket NO. 9344**                    **RESP023815**

JA-0740                                    CX0379_0003



CONFIDENTIAL-FTC Docket NO. 9344     RESP023816

JA-0741     CX0379_0004



CONFIDENTIAL-FTC Docket NO. 9344                    RESP023821



$32 million in medical research.

A recently published pilot study[1] involving POM Wonderful 100% Pomegranate Juice followed 46 men previously treated for prostate cancer either with surgery or radiation.

After drinking eight ounces of POM Wonderful 100% Pomegranate Juice daily for at least two years, these men experienced significantly slower average PSA doubling times. PSA (Prostate-Specific Antigen) is a biomarker that indicates the presence of prostate cancer. PSA doubling time is a measure of how long it takes for PSA levels to double. A longer doubling time may indicate slower progression of the disease.

At the beginning of the study, PSA levels doubled on average every 15 months. By the end of the study, doubling time had slowed to 54 months – nearly a four-fold improvement. "This is a big increase. I was surprised when I saw such an improvement in PSA numbers," said Dr. Allan Pantuck, lead author of the UCLA Study.

One important note: All of the patients drank the same POM Wonderful 100% Pomegranate Juice which is available in your supermarket produce section.

*Prostate cancer is the most commonly diagnosed cancer in men in the United States. After lung cancer, it's the second leading cause of cancer death in men. However, emerging science suggests that diet and lifestyle may be able to significantly improve prostate health.*

The Research Continues Results from this study were so promising that many of the original patients continued to drink pomegranate juice daily, and their PSA doubling times remained suppressed. Three more clinical studies are now underway to further investigate the effects of POM on prostate health.

Learn why POM Wonderful is the only pomegranate juice you can trust. (See inside back cover of this wrap.)

pomwonderful.com

POM WONDERFUL

| JOB NO.: PJ2006 | TRIM: 7.875" x 10.5" | COLOR: 4/C PROS | DATE IN: 8-01-08 | CREATIVE: CJ |
|---|---|---|---|---|
| PROJECT: Time Magazine Wrap - Nov 08 | LIVE: 7.125" x 9.75" | LIVE, TRIM, BLEED (DO NOT PRINT) | CLIENT SIGN OFF: 00-00-00 | PRODUCTION: MS |
| SCALE: 1 : 1 | BLEED: 8.375" x 11.0" | PRINTOUT SIZE: 100% | RELEASE DATE: 8-10-08 | PROOF: F2 |

•PLEASE MARK ALL CHANGES ON INSITE DOCUMENT   •NO CHANGES ON PRINTED FLAT WILL BE MADE

CONFIDENTIAL-FTC Docket NO. 9344          RESP023822

CX0380_0002



**100% Authentic**

POM is the only brand guaranteed to contain 100% real pomegranate juice. We wish other brands were as honest. In fact, according to recent independent tests, nine out of ten so-called "pomegranate" juices were found to have added sugar, colorants and other low-grade fruit juices.

**Tree to Bottle**

POM is the only brand that controls its juice from tree to bottle, batch to batch, year to year. We only grow "Wonderful" variety pomegranates, renowned for their superior antioxidants and delicious taste. And every 16oz bottle contains the juice of five whole pomegranates.

**The Antioxidant Superpower**

With uniquely high levels of powerful antioxidants, POM Wonderful 100% Pomegranate Juice has demonstrated superior ability to neutralize harmful free radicals and to inhibit excess inflammation.

**Backed by Science**

Only POM products are backed by $32 million in medical research conducted at the world's leading universities, primarily in the areas of cardiovascular, prostate and erectile function.

**More Antioxidants**

Sip for sip, POM Wonderful 100% Pomegranate Juice has more polyphenol antioxidants than red wine, green tea and other juices.

pomwonderful.com

CONFIDENTIAL-FTC Docket NO. 9344          RESP023823

**JA-0744**

CX0380_0003



**CONFIDENTIAL-FTC Docket NO. 9344**       **RESP023824**

CX0380_0004





CONFIDENTIAL-FTC Docket NO. 9344

RESP023825

JA-0746

CX0380_0005





# Figure 28

VMS ID: 090921830
RUN DATE: 09/27/2009

# HEALTHY. ~~WEALTHY.~~ AND WISE.
## ( 2 OUT OF 3 IN THIS ECONOMY AIN'T BAD. )



**The Antioxidant Superpill.™**

### Antioxidants are a necessity. Not a luxury.

Emerging science suggests that antioxidants are critically important to maintaining good health because they protect you from free radicals, which can damage your body. Taking one POMx pill a day will help protect you from free radicals and keep you at your healthy best. Even when you're going through the worst.



The antioxidant power of our 8oz juice.

### Recession-proof your health with POMx.

POMx is an all-natural, ultra-potent antioxidant extract. Containing a full spectrum of pomegranate polyphenols, POMx is so concentrated that a single capsule has the antioxidant power of a full glass of POM Wonderful® 100% Pomegranate Juice.

### $32 million in medical research. A sound investment.

POMx is made from the only pomegranates backed by $32 million in medical research at the world's leading universities. Not only has this research



documented the unique and superior antioxidant power of pomegranates, it has revealed promising results for prostate and cardiovascular health.

### Hope for the future. Yours.

Our POMx pills are made from the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice, on which each of the following medical studies was conducted.

An initial UCLA study on our juice found hopeful results for prostate health, reporting "statistically significant prolongation of PSA doubling times," according to Dr. Allen J. Pantuck in *Clinical Cancer Research*, '06.[1,2,3]

Two additional preliminary studies on our juice showed promising results for heart health. "Stress-induced ischemia (restricted blood flow to the heart) decreased in the pomegranate group," Dr. Dean Ornish reported in the *American Journal of Cardiology*, '05.[1,2,4]

"Pomegranate juice consumption resulted in significant reduction in IMT* (thickness of arterial plaque) by up to 30% after one year," said Dr. Michael Aviram in *Clinical Nutrition*, '04.[1,3,5,6]

### Try POMx Monthly
## FREE for ONE MONTH.
We'll even pay for the shipping.*



### Order Now: 888-766-7455 or pompills.com/ph
### Use discount code: PH30

"SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires 12/15/09 and applies only to the purchase price for the first bottle of POMx Monthly. Following months will be $29.95 per bottle. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents. We reserve the right to discontinue this promotion, change product price or shipping charge at any time. Valid only at pompills.com/ph or 1-888-766-7455. Not valid on POMx Trial or other POM products.

**POM WONDERFUL®**

¹pompills.com/research. ²These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. ³46 men with rising PSA after surgery or radiotherapy drank 8oz 100% pomegranate juice daily for two years. ⁴45 patients with coronary heart disease and myocardial ischemia drank 8oz 100% pomegranate juice daily for three months. ⁵Stub measured intima-media thickness (IMT). ⁶19 patients aged 65-75 years with severe atherosclerosis drank 8oz 100% pomegranate juice daily for one year. ©2009 PomWonderful LLC. All rights reserved. POM Wonderful, POMx and Antioxidant Superpill are trademarks of PomWonderful LLC. PP5335

VMS-0000299

CX0331_0001

# HEALTHY. ~~WEALTHY.~~ AND WISE.
## ( 2 OUT OF 3 IN THIS ECONOMY AIN'T BAD. )

### Antioxidants are a necessity.
### Not a luxury.

Emerging science suggests that antioxidants are critically important to maintaining good health because they protect you from free radicals, which can damage your body. Taking one POMx pill a day will help protect you from free radicals and keep you at your healthy best. Even when you're going through the worst.



The antioxidant power
of our 8oz juice.

### Recession-proof your health
### with POMx.

POMx is an all-natural, ultra-potent antioxidant extract. Containing a full spectrum of pomegranate polyphenols, POMx is so concentrated that a single capsule has the anti-oxidant power of a full glass of POM Wonderful® 100% Pomegranate Juice.



**The Antioxidant
Superpill.™**

### $32 million in medical research.
### A sound investment.

POMx is made from the only pomegranates backed by $32 million in medical research at the world's leading universities.
Not only has
this research



documented the unique and superior antioxidant power of pomegranates, it has revealed promising results for prostate and cardiovascular health.

### Hope for the future.
### Yours.

Our POMx pills are made from the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice, on which each of the following medical studies was conducted.

An initial UCLA study on our juice found hopeful results for prostate health, reporting "statistically significant prolongation of PSA doubling times," according to Dr. Allen J. Pantuck in *Clinical Cancer Research*, '06.[1,2,3]

Two additional preliminary studies on our juice showed promising results for heart health. "Stress-induced ischemia (restricted blood flow to the heart) decreased in the pomegranate group," Dr. Dean Ornish reported in the *American Journal of Cardiology*, '05.[1,2,4]

"Pomegranate juice consumption resulted in significant reduction in IMT[6] (thickness of arterial plaque) by up to 30% after one year," said Dr. Michael Aviram in *Clinical Nutrition*, '04.[1,2,5,6]

### Try POMx Monthly
# FREE for
# ONE MONTH.
We'll even pay for the shipping.*



### Order Now: 888-766-7455 or pompills.com/ph
### Use discount code: PH30

*SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires 12/15/09 and applies only to the purchase price for the first bottle of POMx Monthly. Following months will be $29.95 per bottle. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents. We reserve the right to discontinue this promotion, change product price or shipping charge at any time. Valid only at pompills.com/ph or 1-888-766-7455. Not valid on POMx Trial or other POM products.

**POM WONDERFUL®**

pompills.com/research. ²These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. ³46 men with rising PSA after surgery or radiotherapy drank 8oz 100% pomegranate juice daily for two years. ⁴45 patients with coronary heart disease and myocardial ischemia drank 8oz 100% pomegranate juice daily for three months. ⁵Study measured intima-media thickness (IMT). ⁶19 patients aged 65-75 years with severe atherosclerosis drank 8oz 100% pomegranate juice daily for one year. ©2009 PomWonderful LLC. All rights reserved. POM Wonderful, POMx and Antioxidant Superpill are trademarks of PomWonderful LLC. PJ1332

**Exhibit J**

# Figure 29

VMS ID: 091107449
RUN DATE: 11/08/2009

# YOUR NEW HEALTH CARE PLAN.
## (NO TOWN HALL MEETING REQUIRED.)



**The Antioxidant
Superpill.**

### Antioxidant Health Insurance.

Emerging science suggests that antioxidants are critically important to maintaining good health because they protect you from free radicals, which can damage your body. Taking one POMx pill a day will help protect you from free radicals and keep you at your healthy best. Better yet, it's a health plan that's open to everyone.



The antioxidant power
of our 8oz juice.

### All-natural. Non-political.

POMx is an all-natural, ultra-potent antioxidant extract. Containing a full spectrum of pomegranate polyphenols, POMx is so concentrated that a single capsule has the antioxidant power of a full glass of POM Wonderful® 100% Pomegranate Juice.

### $32 million in medical research. Zero deductible.

POMx is made from the only pomegranates backed by $32 million in medical research at the world's leading universities. Not only has this research documented the unique and superior antioxidant power of pomegranates, it has revealed promising results for prostate and cardiovascular health.

### A health care plan for a healthy future.

Our POMx pills are made from the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice, on which each of the following medical studies was conducted.

An initial UCLA study on our juice found hopeful results for prostate health, reporting "statistically significant prolongation of PSA doubling times," according to Dr. Allen J. Pantuck in *Clinical Cancer Research*, '06.[1,2,3]

Two additional preliminary studies on our juice showed promising results for heart health. "Stress-induced ischemia (restricted blood flow to the heart) decreased in the pomegranate group." Dr. Dean Ornish reported in the *American Journal of Cardiology*, '05.[3,4]

"Pomegranate juice consumption resulted in significant reduction in IMT* (thickness of arterial plaque) by up to 30% after one year," said Dr. Michael Aviram, in *Clinical Nutrition*, '04.[2,3,5]

**Try POMx Monthly
FREE for
ONE MONTH.**
We'll even pay for the shipping.



### Order Now: 888-766-7455 or pompills.com/wp
### Use discount code: WP30

*SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires 4/30/10 and applies only to the purchase price for the first bottle of POMx Monthly. Following months will be $29.95 per bottle. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents. We reserve the right to discontinue this promotion, change product price or shipping charge at any time. Valid only at pompills.com or 1-888-766-7455. Not valid on POMx Trial or other POM products.

**POM WONDERFUL®**

[footnotes at bottom — partially illegible medical disclaimer and copyright text] These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. ... POM Wonderful LLC. All rights reserved. POM Wonderful, Antioxidant Superpill and POMx are trademarks of PomWonderful LLC. PP1601

**VMS-0000303**

CX0328_0001

# Figure 30

VMS ID: 100101214
RUN DATE: 01/03/2010

# THE FIRST BOTTLE
# YOU SHOULD OPEN IN 2010.



**The Antioxidant Superpill.™**

## 2010, Year of the Antioxidant.

Emerging science suggests that antioxidants are critically important to maintaining good health because they protect you from free radicals, which can damage your body. Taking one POMx pill a day will help protect you from free radicals and keep you at your healthy best. Make it your first New Year's resolution.



The antioxidant power of our 8oz juice.

## POMx: Ultra-potent. Hangover-free.

POMx is an all-natural, ultra-potent antioxidant extract. Containing a full spectrum of pomegranate polyphenols, POMx is so concentrated that a single capsule has the antioxidant power of a full glass of POM Wonderful® 100% Pomegranate Juice.

## $32 million in medical research. Cheers.

POMx is made from the only pomegranates backed by $32 million in medical research at the world's leading universities.
Not only has this research



documented the unique and superior antioxidant power of pomegranates, it has revealed promising results for prostate and cardiovascular health.

## Our bottle. Your health.

Our POMx pills are made from the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice, on which each of the following medical studies was conducted.

An initial UCLA study on our juice found hopeful results for prostate health, reporting "statistically significant prolongation of PSA doubling times," according to Dr. Allen J. Pantuck in *Clinical Cancer Research*, '06.[1,3]

Two additional preliminary studies on our juice showed promising results for heart health. "Stress-induced ischemia (restricted blood flow to the heart) decreased in the pomegranate group," Dr. Dean Ornish reported in the *American Journal of Cardiology*, '05.[3,4]

"Pomegranate juice consumption resulted in significant reduction in IMT* (thickness of arterial plaque) by up to 30% after one year," said Dr. Michael Aviram, in *Clinical Nutrition*, '04.[2,5,6]

## Try POMx Monthly
## FREE for ONE MONTH.
We'll even pay for the shipping.*



## Order Now: 888-766-7455 or pompills.com/n3
## Use discount code: N330

*SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires 2/31/10 and applies only to the purchase price for the first bottle of POMx Monthly. Following months will be $29.95 per bottle. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents. We reserve the right to discontinue this promotion, change product price or shipping charge at any time. Valid only at pompills.com or 1-888-766-7455. Not valid on POMx Trial or other POM products.



**POM WONDERFUL®**

pompills.com/research. *These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. 1 40-member's took PSA after surgery. 2 valsalva average blank. 4 45 patients with coronary heart disease, not myocardial ischemia drank 8oz 100% pomegranate juice daily for three months. 3 Study measured intima-media thickness (IMT). 6 19 subjects aged 65-75 years with severe atherosclerosis drank 8oz 100% pomegranate juice daily for one year. ©2010 PomWonderful LLC. All rights reserved. POM Wonderful, POMx and Antioxidant Superpower are trademarks of PomWonderful LLC. PP2931

VMS-0000304

JA-0755

CX0337_0001

# Figure 31

VMS ID: 100208568
RUN DATE: 02/22/2010

# TAKE OUT A LIFE INSURANCE SUPPLEMENT.

## Antioxidants? We've got you covered.

Emerging science suggests that antioxidants are critically important to maintaining good health because they protect you from free radicals, which can damage your body. Taking one POMx pill a day will help protect you from free radicals and keep you at your healthy best. (Just the way insurers like you to be.)



The antioxidant power of our 8oz juice.

## POMx. Now that's a plan.

POMx is an all-natural, ultra-potent antioxidant extract. Containing a full spectrum of pomegranate polyphenols, POMx is so concentrated that a single capsule has the anti-oxidant power of a full glass of POM Wonderful® 100% Pomegranate Juice.



### The Antioxidant Superpill.™

### $32 million in medical research. No deductible.

POMx is made from the only pomegranates backed by $32 million in medical research at the world's leading universities. Not only has this research documented the unique and superior antioxidant power of pomegranates, it has revealed promising results for prostate and cardiovascular health.

## Get the maximum benefits.

Our POMx pills are made from the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice, on which each of the following medical studies was conducted.

An initial UCLA study on our juice found hopeful results for prostate health, reporting "statistically significant prolongation of PSA doubling times," according to Dr. Allen J. Pantuck in *Clinical Cancer Research*, 2006.[1,2,3]

Additional preliminary study on our juice showed promising results for heart health. "Stress-induced ischemia (restricted blood flow to the heart) decreased in the pomegranate group," Dr. Dean Ornish reported in the *American Journal of Cardiology*, 2005.[1,3,4]

## FREE ONE MONTH TRIAL

We'll even pay for the shipping.*

### Order Now: 888-766-7455 or pompills.com/t Use discount code: T30

*SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires 6/30/10 and applies only to the purchase price for the first bottle of POMx Monthly. Following months will be $29.95 per bottle. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents. We reserve the right to discontinue this promotion, change product price or shipping charge at any time. Valid only at pompills.com or 1-888-766-7455. Not valid on POMx Trial or other POM products.

1pompills.com/research 2These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. 3,46 men with rising PSA after surgery or radiotherapy drank 8oz 100% pomegranate juice daily for two years. 4,45 patients with coronary heart disease and myocardial ischemia drank 8oz 100% pomegranate juice daily for three months. ©2010 PomWonderful LLC. All rights reserved. POM Wonderful, POMx and Antioxidant Superpill are trademarks of PomWonderful LLC. PP5719

VMS-0000306

CX0342_0001

# TAKE OUT A LIFE INSURANCE SUPPLEMENT.

## Antioxidants? We've got you covered.

Emerging science suggests that antioxidants are critically important to maintaining good health because they protect you from free radicals, which can damage your body. Taking one POMx pill a day will help protect you from free radicals and keep you at your healthy best. (Just the way insurers like you to be.)



The antioxidant power of our 8oz juice.

## POMx. Now that's a plan.

POMx is an all-natural, ultra-potent antioxidant extract. Containing a full spectrum of pomegranate polyphenols, POMx is so concentrated that a single capsule has the antioxidant power of a full glass of POM Wonderful® 100% Pomegranate Juice.



**The Antioxidant Superpill.™**

## $34 million in medical research. No deductible.

POMx is made from the only pomegranates backed by $34 million in medical research at the world's leading universities. Not only has this research documented the unique and superior antioxidant power of pomegranates, it has revealed promising results for prostate and cardiovascular health.

## Get the maximum benefits.

Our POMx pills are made from the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice, on which each of the following medical studies was conducted.

An initial UCLA study on our juice found hopeful results for prostate health, reporting "statistically significant prolongation of PSA doubling times," according to Dr. Allen J. Pantuck in *Clinical Cancer Research*, 2006.[1,2,3]

An additional preliminary study on our juice showed promising results for heart health. "Stress-induced ischemia (restricted blood flow to the heart) decreased in the pomegranate group," Dr. Dean Ornish reported in the *American Journal of Cardiology*, 2005.[1,2,4]

TRY POMx MONTHLY FREE!

## Try POMx Monthly FREE for ONE MONTH.

We'll even pay for the shipping.*



## Order Now: 888-766-7455 or pompills.com/sm Use discount code: SM30

*SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires 10/31/10 and applies only to the purchase price for the first bottle of POMx Monthly. Following months will be $29.95 per bottle. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents. We reserve the right to modify or discontinue this promotion, change the product price or change the shipping charge at any time. Valid only at pompills.com or 1-888-766-7455. Not valid on POMx Trial or other POM products. Credit or debit card required. WONDERFUL

POM WONDERFUL

'pompills.com/research ²These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. ³46 men with rising PSA after surgery or radiotherapy drank 8oz 100% pomegranate juice daily for two years. ⁴45 patients with coronary heart disease and myocardial ischemia drank 8oz 100% pomegranate juice daily for three months. ©2010 PomWonderful LLC. All rights reserved. POM Wonderful, POMx, and Antioxidant Superpill are trademarks of PomWonderful LLC, PP1630

VMS-0000320

CX0353_0001

# Figure 32

VMS ID: 100400591
RUN DATE: 04/01/2010

# 24 SCIENTIFIC STUDIES
## NOW IN ONE EASY-TO-SWALLOW PILL.



**FREE SHIPPING!**

### Antioxidants 101.

Emerging science suggests that antioxidants are critically important to maintaining good health because they protect you from free radicals, which can damage your body. Taking one POMx pill a day will help protect you from free radicals. It's just that simple.



The antioxidant power of our 8oz juice.

### POMx is powerful. Naturally.

POMx is an all-natural, ultra-potent antioxidant extract. Containing a full spectrum of pomegranate polyphenols, POMx is so concentrated that a single capsule has the antioxidant power of a full glass of POM Wonderful® 100% Pomegranate Juice.



**The Antioxidant Superpill.™**

### $32 million in medical research. Science. Not fiction.

POMx is made from the only pomegranates backed by $32 million in medical research at the world's leading universities. Not only has this research documented the unique and superior antioxidant power of pomegranates, it has revealed promising results for prostate and cardiovascular health.

### Complicated studies. Simplified.

Our POMx pills are made from the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice, on which each of the following medical studies was conducted.

An initial UCLA study on our juice found hopeful results for prostate health, reporting "statistically significant prolongation of PSA doubling times," according to Dr. Allen J. Pantuck in Clinical Cancer Research, 2006.

Additional preliminary study on our juice showed promising results for heart health. "Stress-induced ischemia (restricted blood flow to the heart) decreased in the pomegranate group," Dr. Dean Ornish reported in the American Journal of Cardiology, 2005.

### Try POMx Monthly FREE for ONE MONTH.
We'll even pay for the shipping.*

### Order Now: 888-766-7455
or pompills.com/mh Use discount code: MH30

*SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires 8/31/10 and applies only to the purchase price for the first bottle of POMx Monthly. Following months will be $29.95 per bottle. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents. We reserve the right to discontinue this promotion, change product price or shipping charge at any time. Valid only at pompills.com or 1-888-766-7455. Not valid on POMx Trial or other POM products.

# 24 SCIENTIFIC STUDIES.
## NOW IN ONE EASY-TO-SWALLOW PILL.



FREE SHIPPING!

### Antioxidants 101.

Emerging science suggests that antioxidants are critically important to maintaining good health because they protect you from free radicals, which can damage your body. Taking one POMx pill a day will help protect you from free radicals. It's just that simple.



The antioxidant power of our 8oz juice.

### POMx is powerful. Naturally.

POMx is an all-natural, ultra-potent antioxidant extract. Containing a full spectrum of pomegranate polyphenols, POMx is so concentrated that a single capsule has the antioxidant power of a full glass of POM Wonderful® 100% Pomegranate Juice.

**The Antioxidant Superpill.™**

### $34 million in medical research. Science. Not fiction.

POMx is made from the only pomegranates backed by $34 million in medical research at the world's leading universities. Not only has this research documented the unique and superior antioxidant power of pomegranates, it has revealed promising results for prostate and cardiovascular health.

### Complicated studies. Simplified.

Our POMx pills are made from the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice, on which each of the following medical studies was conducted.

An initial UCLA study on our juice found hopeful results for prostate health, reporting "statistically significant prolongation of PSA doubling times," according to Dr. Allen J. Pantuck in Clinical Cancer Research, 2006.[1]

Additional preliminary study on our juice showed promising results for heart health. "Stress-induced ischemia (restricted blood flow to the heart) decreased in the pomegranate group," Dr. Dean Ornish reported in the American Journal of Cardiology, 2005.[2]

## Try POMx Pills FREE FOR ONE MONTH
when you sign up for POMx Monthly delivery.*
Cancel Anytime.

## Order Now: 888-766-7455
### or pompills.com/t Use discount code: T30

*SIGN UP FOR POMx MONTHLY AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires 7/31/10 and applies only to the purchase price for the first bottle of POMx Monthly. Following months will be $29.95 per bottle. One bottle is one month's supply. Cancel or continue with other offers. No substitutions. Void for cash equivalents. We reserve the right to modify or discontinue this promotion, change the product price or change the shipping charge at any time. Valid only at pompills.com or 1-888-766-7455. Not valid on POMx Trial or other POM products. Credit or debit card required.

POM WONDERFUL

[fine print illegible]

**VMS-0000313**

CX0350_0001

# Figure 33

# THE ONLY ANTIOXIDANT SUPPLEMENT RATED X.

FREE SHIPPING!

### Always use protection.

Emerging science suggests that antioxidants are critically important to maintaining good health because they protect you from free radicals, which can damage your body. Taking one POMx pill a day will help protect you from free radicals and keep you at your healthy best.



The antioxidant power of our 8oz juice.

### POMx. Super-potent. Like you.

POMx is an all-natural, ultra-potent antioxidant extract. Containing a full spectrum of pomegranate polyphenols, POMx is so concentrated that a single capsule has the antioxidant power of a full glass of POM Wonderful® 100% Pomegranate Juice.



**The Antioxidant Superpill.™**

### $32 million in research. We're not just playing doctor.

POMx is made from the only pomegranates backed by $32 million in medical research at the world's leading universities. Not only has this research documented the unique and superior antioxidant power of pomegranates, it has revealed promising results for erectile, prostate and cardiovascular health.

### Is that POMx in your pocket?

Our POMx pills are made from the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice, on which each of the following medical studies was conducted.

In a preliminary study on erectile function, men who consumed POM Juice reported a 50% greater likelihood of improved erections as compared to placebo. "As a powerful antioxidant, enhancing the actions of nitric oxide in vascular endothelial cells, POM has potential in the management of ED... further studies are warranted." *International Journal of Impotence Research,* '07. [1,2,3]

An initial UCLA study on our juice found hopeful results for prostate health, reporting "statistically significant prolongation of PSA doubling times." *Clinical Cancer Research,* '06. [1,2,4]

A preliminary study on our juice showed promising results for heart health. "Stress-induced ischemia (restricted blood flow to the heart) decreased in the pomegranate group." *American Journal of Cardiology,* '05. [1,2,5]

---

## Try POMx Pills FREE FOR ONE MONTH
when you sign up for POMx Monthly delivery.*
(cancel anytime)

## Order Now: 888-766-7455
or pompills.com/adv Use discount code: ADV30

*SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires 9/30/10 and applies only to the purchase price for the first bottle of POMx Monthly. Following months will be $29.95 per bottle. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents. We reserve the right to modify or discontinue this promotion or change the product price or change the shipping charge at any time. Valid only at pompills.com or 1-888-766-7455. Not valid on POMx Trial or other POM products. Credit or debit card required.

POM WONDERFUL®

†pompills.com/research  ‡These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease.  ¹53 men with mild/moderate erectile dysfunction drank 8oz 100% pomegranate juice daily for one month.  ²46 men with rising PSA after surgery or radiotherapy drank 8oz 100% pomegranate juice daily for two years.  ³45 patients with coronary heart disease and myocardial ischemia drank 8oz 100% pomegranate juice daily for three months. ©2010 Pom Wonderful LLC. All rights reserved. POM Wonderful, POMx and Antioxidant Superpill are trademarks of Pom Wonderful LLC. PP5425

VMS-0000319

JA-0763

CX0351_0001

VMS ID: 100700683
RUN DATE: 07/01/2010

# THE ONLY ANTIOXIDANT SUPPLEMENT RATED X.

FREE SHIPPING!



**The Antioxidant Superpill.™**

### Always use protection.

Emerging science suggests that antioxidants are critically important to maintaining good health because they protect you from free radicals, which can damage your body. Taking one POMx pill a day will help protect you from free radicals and keep you at your healthy best.



The antioxidant power of our 8oz juice.

### POMx. Super-potent. Like you.

POMx is an all-natural, ultra-potent antioxidant extract. Containing a full spectrum of pomegranate polyphenols, POMx is so concentrated that a single capsule has the antioxidant power of a full glass of POM Wonderful® 100% Pomegranate Juice.

### $34 million in research. We're not just playing doctor.

POMx is made from the only pomegranates backed by $34 million in medical research at the world's leading universities. Not only has this research documented the unique and superior antioxidant power of pomegranates, it has revealed promising results for erectile, prostate and cardiovascular health.

### Is that POMx in your pocket?

Our POMx pills are made from the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice, on which each of the following medical studies was conducted.

In a preliminary study on erectile function, men who consumed POM Juice reported a 50% greater likelihood of improved erections as compared to placebo. "As a powerful antioxidant, enhancing the actions of nitric oxide in vascular endothelial cells, POM has potential in the management of ED... further studies are warranted." *International Journal of Impotence Research*, '07.[1,2,3]

An initial UCLA study on our juice found hopeful results for prostate health, reporting "statistically significant prolongation of PSA doubling times." *Clinical Cancer Research*, '06.[3,4]

A preliminary study on our juice showed promising results for heart health. "Stress-induced ischemia (restricted blood flow to the heart) decreased in the pomegranate group." *American Journal of Cardiology*, '05.[5,6]

---

## Try POMx Monthly FREE for ONE MONTH
We'll even pay for the shipping.*

## Order Now: 888-766-7455 or pompills.com/ga Use discount code: GA30

SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95, WITH COMPLIMENTARY SHIPPING. Offer expires 9/30/10 and applies only to the purchase price for the first bottle of POMx Monthly. Following months will be $29.95 per bottle. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents. We reserve the right to modify or discontinue this promotion, change the product price or change the shipping charge at any time. Valid only at pompills.com or 1-888-766-7455. Not valid on POMx Trial or other POM products. Credit or debit card required.

POM WONDERFUL

†pompills.com/uhsev.u ‡These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. §32 men with mild/moderate erectile dysfunction drank 8oz 100% pomegranate juice daily for one month. ¶48 men with rising PSA after surgery or radiotherapy drank 8oz 100% pomegranate juice daily for two years. °45 patients with coronary heart disease and myocardial ischemia drank 8oz 100% pomegranate juice daily for three months. ©2010 PomWonderful LLC All rights reserved. POM Wonderful, POMx and Antioxidant Superpill are trademarks of PomWonderful LLC. POM310

VMS-0000323

CX0355_0001

## Summary Table of Commission Findings Regarding POM Exhibits

Note:
- "y" means that the Commission finds an exhibit to make a challenged claim.
- "n" means that the Commission does not have sufficient evidence to find an exhibit to make a challenged claim.
- "(y)" or "(n)" means the Commission overrules a specific finding by the ALJ.
- Shaded box means the claim was not challenged by Complaint Counsel.

| Exhibit | Heart Disease | | | Prostate Cancer | | | Erectile Dysfunction | | | Estab. |
|---|---|---|---|---|---|---|---|---|---|---|
| | Treat | Prevent | Reduce Risk | Treat | Prevent | Reduce Risk | Treat | Prevent | Reduce Risk | |
| 1. CX0013 2003 Press Release | y | y | y | | | | | | | y |
| 2. CX0016 Drink and Be Healthy | | y | y | | | | | | | y |
| 3. CX0029 10 Out of 10 People | y | y | y | | | | | | | y |
| 4. CX0031 Floss Your Arteries | y | y | y | | | | | | | (y) |
| 5. CX0033 Life Support | | y | y | | | | | | | |
| 6. CX0034 Amaze Your Cardiologist | y | y | y | | | | | | | (y) |
| 7. CX0036 Cheat Death | | (y) | y | | | | | | | |
| 8. CX0044 2005 Press Release | y | y | y | | | | | | | y |
| 9. CX0065 2006 Press Release | | (y) | (y) | y | | | | | | y |
| 10. CX1426 Ex. I Antioxidant Superpill Brochure | y | y | y | y | y | y | | | | y |
| 11. CX0103 Decompress | n | (y) | (y) | | | | | | | (y) |
| 12. CX0109 Heart Therapy | | (y) | (y) | | | | | | | (y) |
| 13. CX0120 One Small Pill | | | | (y) | n | n | | | | (y) |
| 14. CX0122 Science, Not Fiction | | | | (y) | n | n | | | | (y) |
| 15. CX0128 2007 Press Release | | | | | | | y | | | y |
| 16. CX1426 Ex. M POMx Heart | y | y | y | | | | | | | y |

| Exhibit | Heart Disease | | | Prostate Cancer | | | Erectile Dysfunction | | | Estab. |
|---------|-------|---------|----------------|-------|---------|----------------|-------|---------|----------------|-------|
|         | Treat | Prevent | Reduce Risk | Treat | Prevent | Reduce Risk | Treat | Prevent | Reduce Risk |       |
| 17. CX1426 Ex. N POMx Prostate |  |  |  | y | y | y |  |  |  | y |
| 18. CX0169/ CX1426 Ex. L Power of POM | (y) | (y) | (y) | (y) | (y) | (y) |  |  |  | (y) |
| 19. CX0180/ CX1426 Ex. K Antioxidant Superpill | (y) | (y) | (y) | (y) | (y) | (y) |  |  |  | (y) |
| 20. CX0192 Heart Pumping |  | (y) | (y) |  |  |  |  |  |  | (y) |
| 21. CX0314 Drink to Prostate Health |  |  |  | y | y | y |  |  |  | y |
| 22. CX0260/ CX1426 Ex. B Prostate Health |  |  |  | (y) |  |  |  |  |  | (y) |
| 23. CX0274/ CX1426 Ex. C Off to Save Prostates |  |  |  |  | (y) | (y) |  |  |  | (y) |
| 24. CX0279 Science, Not Fiction | (y) | (y) | (y) | (y) | (y) | (y) |  |  |  | (y) |
| 25. CX0280 Live Long Enough | (y) | (y) | (y) | (y) | (y) | (y) |  |  |  | (y) |
| 26. CX0475/ CX1425 Ex. A Juice Bottle Hang Tag | n | n | n | n | n | n | n | n | n | n |
| 27. CX0372/ CX0379/ CX0380 Super Health |  |  |  | y | y | y |  |  |  | y |
| 28. CX0331/ CX1426 Ex. J Healthy Wealthy | (y) | (y) | (y) | (y) | (y) | (y) |  |  |  | (y) |
| 29. CX0328 Your New Health Care Plan | (y) | (y) | (y) | (y) | (y) | (y) |  |  |  | (y) |
| 30. CX0337 First Bottle You Should Open | (y) | (y) | (y) | (y) | (y) | (y) |  |  |  | (y) |
| 31. CX0342/CX0353 Life Insurance Supplement | (y) | (y) | (y) | (y) | (y) | (y) |  |  |  | (y) |

| Exhibit | Heart Disease | | | Prostate Cancer | | | Erectile Dysfunction | | | Estab. |
|---|---|---|---|---|---|---|---|---|---|---|
| | Treat | Prevent | Reduce Risk | Treat | Prevent | Reduce Risk | Treat | Prevent | Reduce Risk | |
| 32. CX0348/CX0350 24 Scientific Studies | (y) | (y) | (y) | (y) | (y) | (y) | | | | (y) |
| 33. CX0351/CX0355 Only Antioxidant Pill Rated X | (y) | (y) | (y) | (y) | (y) | (y) | y | y | y | (y) |
| 34. CX0463 Heart Therapy | | n | n | | | | | | | |
| 35. CX0466/ CX1426 Ex. H Off to Save Prostates | | | | | n | n | | | | |
| 36. CX0473 Capture of POMWonderful.com Community Website | (y) | (y) | (y) | (y) | (y) | (y) | (y) | (n) | (n) | (y) |
| 37. CX0473 Capture of POMWonderful.com Website | y | y | y | y | y | y | y | (n) | (n) | y |
| 38. CX0473 Capture of PomegranateTruth.com Website | y | y | y | (y) | n | n | (y) | n | n | y |
| 39. CX0473 Capture of POMPills.com Website | y | y | y | y | y | y | y | (n) | (n) | y |
| 40-43. CX0473 Media Interviews | The Commission does not reach the challenged media interviews.  See section IX. of the Commission's Opinion. | | | | | | | | | |

**Concurring Statement of Commissioner Maureen K. Ohlhausen**
**In the Matter of POM Wonderful**
Docket No. 9344
January 10, 2013

        I disagree with the majority's findings of implied disease efficacy and establishment claims with regard to the exhibits detailed below for several reasons.  First, several of these exhibits contain claims about the general effects of the POM products on the continued healthy functioning of the body but do not make references to diseases or health-related conditions.[1] Despite the absence of such references or of other suggestive indicators (*e.g.,* strong medical imagery), the majority finds that these exhibits contain *implied* disease-related claims without extrinsic evidence that consumers viewing the exhibits would actually perceive such stronger claims and not simply  perceive healthy functioning claims (akin to "structure/function" or "S/F" claims under Food and Drug Administration regulations).[2]  I am concerned that, if the Commission too easily finds implied disease efficacy or establishment claims in advertisements for foods, absent extrinsic evidence, then it may tend to undermine an important balance that is struck in the regulation of food, supplement, and drug advertising under the FTC Act and other federal laws.[3]

        Second, for a number of advertisements, I believe the majority conflates disease treatment claims with prevention/risk reduction claims.  In one instance, they find implied disease treatment claims where the exhibit appears only to claim or suggest that the risk of disease is, or may be, reduced by POM products.[4]  Conversely, in several others, they find implied prevention/risk reduction claims (not solely disease treatment claims) for exhibits that describe studies of subjects already suffering from prostate cancer or ED.[5]  For all of these exhibits, we lack extrinsic evidence that consumers would perceive all the various claims that the majority finds are implied by the exhibits.  Because it seems unlikely that a consumer would assume that any food or food product that lowers the risk of disease is also a viable treatment for that disease, I disagree with the majority's conclusions that such claims are facially present in certain exhibits.  Likewise, because it seems unlikely that a consumer would assume that a treatment for existing cancer or heart disease would necessarily prevent the onset of these conditions, I disagree with the majority's conclusion that such claims are facially present in certain other exhibits.

        Finally, because a number of exhibits contain descriptions of studies that are highly qualified with terms such as "small study," "initial scientific research," and "promising," "hopeful" or "encouraging" results, I disagree with the conclusion that these exhibits make

---

[1] *See* Figs. 4, 12, 18-20, 23-25, and 28-33.
[2] The fact that I find these claims more akin to structure/function claims does not mean I take a position on whether Respondents possessed adequate substantiation or otherwise met the requirements to make structure/function claims.
[3] The FTC has long recognized "the importance of consistent treatment of nutrient content and health claims in food advertising and labeling and [sought] to harmonize its advertising enforcement program with FDA's food labeling regulations to the fullest extent possible under the statutory authority of the FTC Act."  FTC Enforcement Policy Statement on Food Advertising, (1994), *available at*  http://www.ftc.gov/bcp/policystmt/ad-food.shtm.
[4] *See* Fig. 6.
[5] *See* Figs. 10, 17, and 36-39.

MKO-1

establishment claims in the absence of extrinsic evidence supporting such a conclusion.[6] Moreover, the majority argues that the challenged ads reinforce the disease-related establishment claims by mentioning that POM spent millions on research.[7]  However, the references to the money spent on research appear to be significantly related to demonstrating the amount of antioxidants in the POM products and the general effects of those antioxidants on the human body.  Therefore, we need extrinsic evidence to show that consumers would also take away the impression that the research supporting the disease claims is established and not merely preliminary.

Virtually none of the claims found by the Commission in the challenged exhibits is express – they are deemed to be implied.  The Commission may undertake a net impression analysis and find implied claims when it can "conclude with confidence after examining the interaction of all the different elements in [an advertisement] that they contain a particular implied claim."  *In re Thompson Med. Co.,* 104 F.T.C. 648, 788-89 (1984); *Telebrands Corp.,* 140 F.T.C. 278, 290 (2004) (citing *Thompson Medical*).  When such confidence is lacking (*e.g.,* due to well-qualified claims or contradicting statements), however, "we will not find the ad to make the implied claim unless extrinsic evidence allows us to conclude that such a reading of the ad is reasonable."  *Thompson Med. Co.*, 104 F.T.C at 789; *Telebrands,* 140 F.T.C. at 291 (citing *Thompson Med. Co.*).

With respect to the claims described below, such extrinsic evidence is unavailable or inadequate.  Although Complaint Counsel offered the expert testimony of Dr. Stewart, he did not conduct his own facial analysis of the challenged advertisements and could not opine on what they meant.  IDF 513.  Also, unlike in cases such as *Thompson Medical* and *Telebrands*, Complaint Counsel did not introduce copy testing evidence to demonstrate what claims consumers may perceive from well-qualified or contradictory statements in advertisements.  Because a number of exhibits contain references to the continued healthy functioning of the body without mentioning disease or health-related conditions, discuss only treatments for patients already suffering certain diseases, discuss risk reduction without mentioning treatment of certain diseases, or contain extensive qualifying language, I do not share the majority's ability to "conclude with confidence," that no extrinsic evidence is needed to read stronger claims between the lines.  I am concerned with, and thus disagree with, these particular majority findings.[8]

As our opinion today observes, the Commission has paid particular attention to the balancing of pertinent consumer interests in describing the *Pfizer* factors applicable to the question of what constitutes a reasonable basis for a claim.[9]  The Commission also has been clear that our substantiation standards and claims interpretation are inextricably linked.  Hence, in delineating standards for prior substantiation, we state "[t]he Commission will take care to assure

---

[6] *See* Figs. 4, 6, 12-14, 18-20, 24, 25, and 28-33.
[7] "When an ad represents that tens of millions of dollars have been spent on medical research, it tends to reinforce the impression that the research supporting product claims is established and not merely preliminary."  *See* Section IV.A. of the opinion.
[8] Engaging in broad claim interpretation also raises questions about whether this approach qualifies as a case-by-case analysis or is more like a broad prohibition on certain categories of speech, which has implications for First Amendment review of our actions.
[9] *See In re Pfizer Inc.*, 81 F.T.C. 23, 91-2 (1972); *see FTC Policy Statement Regarding Advertising Substantiation*, 104 F.T.C. 839 (1984) (appended to *Thompson Med. Co.*, 104 F.T.C. 648 (1984)) ("*Substantiation Statement*").

MKO-2

that it *only* challenges *reasonable interpretations* of advertising claims."[10]  As a procedural matter, we may begin by asking what particular claims – and categories of claims – are being made, and then ask what evidence should be required to substantiate such claims.  We must keep in mind, however, that if we are too quick to find stronger claims than the ones reasonable consumers actually perceive, then we will inadvertently, but categorically, require an undue level of substantiation for those claims.

    In particular, Congress and the Food and Drug Administration have created carefully drawn boundaries between different types of claims regarding the effect of food and dietary supplement products on nutrition and health.  FDA regulations distinguish between various categories of claims that may be associated with food products and dietary supplements – including "qualified health claims," "health claims," and "structure/function" claims – and the level of substantiation required for each category of claim.[11]  According to FDA guidance, health claims and qualified health claims expressly or by implication characterize the relationship of a substance to a disease (*e.g.,* heart disease) or health-related condition (*e.g.,* high blood pressure).[12]  By contrast, structure/function claims describe the effect that a substance has on the structure or function of the body for maintenance of good health and nutrition but do not make reference to a disease.[13]  The FDA imposes different and more stringent requirements on health claims than it does on structure/function claims.[14]

    I am concerned that the majority's interpretation of certain exhibits blurs these boundaries and creates an inconsistency between FTC advertising requirements and FDA food labeling and advertising requirements by concluding that the mere mention of "health" or healthy functioning can imply a disease-related efficacy (*i.e.,* a health claim in FDA terms) and that the

---

[10] *Substantiation Statement* at 840 n. 3 (emphasis added) ("Notwithstanding … variations in approach, the focus of all Commissioners on reasonable interpretations of claims is intended to ensure that advertisers are not required to substantiate claims that were not made.")

[11] *See generally* FDA, Guidance for Industry: A Food Labeling Guide (September 1994; Revised April 2008; Revised October 2009), *available at*
http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/GuidanceDocuments/FoodLabelingNutrition /FoodLabelingGuide/default.htm; FDA, Guidance for Industry: Evidence-Based Review System for the Scientific Evaluation of Health Claims – Final (2009), *available at*
http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/GuidanceDocuments/FoodLabelingNutrition /ucm073332.htm; FDA Guidance for Industry: FDA's Implementation of "Qualified Health Claims": Questions and Answers; Final Guidance (May 12, 2006), *available at*
http://www.fda.gov/Food/GuidanceComplianceRegulatoryInformation/GuidanceDocuments/FoodLabelingNutrition /ucm053843.htm.

[12] FDA, Guidance for Industry: A Food Labeling Guide, at 8.Claims H1, Q1.

[13] *Id.* at 8.Claims S1, S7.

[14] "Health claims are required to be reviewed and evaluated by FDA prior to use." FDA, Guidance for Industry: A Food Labeling Guide, at 8.Claims H1.  FDA also distinguishes "health claims that meet the Significant Scientific Agreement (SSA) standard," from "S/F claims [that] must be truthful and not misleading and are not pre-reviewed or authorized by FDA."). *id.* at 8.Claims H3.  In addition, "FDA does not require conventional food manufacturers to notify FDA about their S/F claims and disclaimers are not required for conventional foods."  FDA, Structure/Function Claims, *available at*
http://www.fda.gov/Food/LabelingNutrition/LabelClaims/StructureFunctionClaims/ucm2006881.htm.
Structure/function claims were specifically authorized by the Dietary Supplement Health and Education Act of 1994, 108 Stat. 4325 (codified as amended in scattered sections of 21 U.S.C.); *see also* Dep't Health & Human Servs., Food & Drug Admin., Regulations on Statements Made for Dietary Supplements Concerning the Effect of the Product on the Structure or Function of the Body, Final Rule, 65 Fed. Reg. 1000 at 1034-35 (Jan. 6, 2000).

mere mention of scientific evidence can imply a related establishment claim. For instance, Figures 12, 20, and 23 seem limited to addressing the product's general health benefits by providing antioxidants and fighting free radicals, and thus potentially reducing the risk of disease, while claiming that these benefits are backed by significant scientific or medical research about prostate or cardiovascular health. Based on the majority's views about these exhibits, it is difficult to imagine any structure/function claims that POM could associate with its products in the marketplace without such claims being interpreted, under the FTC precedent set in this case, as disease-related claims.[15]

A possible (though not plausible) argument for the majority's position is that these exhibits are somehow infused with messages from other ads included in some of POM's advertising campaigns that mentioned specific diseases or health conditions. However, we should not reach such a conclusion in the absence of extrinsic evidence in the record. *Thompson Med. Co.*, 104 F.T.C. at 789; *Telebrands*, 140 F.T.C. 379, 436 (2004) (ALJ Decision), *adopted by* the Commission in *Telebrands*, 140 F.T.C. 278, 281 (2004) (requiring extrinsic evidence even though the ads at issue contained express references to other ads). More generally, we should be careful not to interpret claims so broadly that we undermine distinctions between types of claims, and the substantiation appropriate to them, that Congress and our sister agency have found important to the public's health and wellbeing.

In sum, the majority's findings with regard to the exhibits detailed below in the absence of extrinsic evidence leave questionable room for marketers to make well-qualified and substantiated structure/function type efficacy or establishment claims because of the high risk that such claims will be found to imply the treatment, prevention, or risk-reduction of a disease, or that they are clinically proven.

I incorporate these arguments by reference to my views for specific exhibits in my comments below.

## Figure 4. CX0031: "Floss Your Arteries" print advertisement

I disagree with the majority view that this print ad conveyed to a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily treats – rather than prevents or reduces the risk of – heart disease. I also disagree with the majority and would uphold the ALJ's finding that the evidence fails to show that this print ad conveys to a significant minority

---

[15] I am concerned that, for these exhibits, the majority readings are in conspicuous tension with the express findings and intent of Congress in enacting the Dietary Supplement Health and Education Act of 1994 (DSHEA), wherein Congress provides for structure/function claims that may be made on behalf of dietary supplements. In the statute itself are express findings that healthful diets may reduce the risk of disease and the need for medical intervention; that "consumers should be empowered to make choices about preventive health care programs," *id.* at § 2(8), based on available scientific evidence; and that, "although the Federal Government should take swift action against products that are unsafe or adulterated, the Federal Government should not take any actions to impose unreasonable regulatory barriers limiting or slowing the flow of safe products and accurate information to consumers." *Id.* at § 2(13). Moreover, although the DSHEA regards dietary supplements in particular, FDA has concluded that "structure/function claims may be made on a conventional food provided the effects are derived from the nutritive value of the food." FDA, Guidance for Industry: A Food Labeling Guide, at 8.Claims S1. Hence, "[o]n December 20, 2002, the agency announced its intention to extend its approach to implementing the *Pearson* decision to include health claims for conventional foods (67 Fed. Reg. 78002)." FDA, Guidance for Industry: Evidence-Based Review System for the Scientific Evaluation of Health Claims – Final, at § II (background).

of reasonable consumers that the claims contained in the advertisement are clinically proven. The advertisement's language qualifies that drinking POM Juice "*can* reduce plaque by up to 30%" (emphasis added) and the citation to a study appears in a footnote too small to be clear and conspicuous under our own standards.[16] *See* ID at ¶ 447. Further, the imagery in the advertisement is that of regular hygiene, such as tooth brushing and flossing, not medical imagery related to heart disease that appears in other challenged advertisements where the Commission unanimously found an implied establishment claim.

**Figure 6. CX0034: Amaze Your Cardiologist**
I disagree with the majority view that this print ad conveys to a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily treats – rather than prevents or reduces the risk of – heart disease. I also disagree with the majority and would uphold the ALJ's finding that the evidence fails to show that this exhibit conveys to a significant minority of reasonable consumers that the claims contained in the advertisement are clinically proven because the statement regarding plaque reduction is well-qualified ("*can* reduce plaque by up to 30%" (emphasis added)) and the reference to a study appears in a footnote too small to be clear and conspicuous under our own standards. *See* ID at ¶¶ 465-468.

**Figures 10 and 17. CX1426 Ex. I: Antioxidant Superpill Brochure; CX1426 Ex. N: POMx Prostate Newsletter**
I disagree with the majority's view that these exhibits convey to a significant minority of reasonable consumers that daily consumption of POM products prevents or reduces the risk of prostate cancer, as opposed to treating prostate cancer. All references to that disease in the exhibit appear rooted in a study of 46 men age 65 to 70 who had been treated for prostate cancer. Further, CX1426 Ex. I specifically references "new studies are under way … in patients *with* prostate cancer" (emphasis added).

**Figure 12. CX0109: Heart Therapy**
I disagree with the majority and would uphold the ALJ's findings that the evidence fails to show that this print ad conveys to a significant minority of consumers that drinking eight ounces of POM Juice daily prevents or reduces the risk of heart disease or that such claims are clinically proven. The imagery in this ad, which is a POM bottle reclining on a couch, suggests psychotherapy, not treatment for heart disease. The text is qualified with references such as "emerging science," "initial scientific research," and "encouraging results in prostate and cardiovascular health." There is also an exhortation to "keep your heart healthy," without mention of or linkage to a specific disease, which seems more indicative of general structure/function type claims rather than health claims involving disease prevention or risk reduction.

---

[16] Advertisers cannot use fine print to contradict other statements in an ad or to clear up misimpressions the ad would otherwise leave. *FTC Deception Policy Statement*, appended to *Cliffdale Associates, Inc.,* 103 F.T.C. 110, 180-81 (1984). To be effective, Commission orders require such disclosures to be clear and conspicuous. *E.g., Thompson Med. Co.,* 104 F.T.C. at 842-43. For print ads, for instance, past Commission orders have defined "clear and conspicuous" to mean in a type size and location sufficiently noticeable for an ordinary consumer to read and understand it and in print that contrasts with the background against which it appears. *See, e.g., FTC v. Green Millionaire, LLC,* No. 1:12-cv-01102-BEL (D. Md. filed Apr. 12, 2012) (proposed order granting stipulated permanent injunction), *available at* http://www.ftc.gov/os/caselist/1023204/120416greenmillstip.pdf.

MKO-5

**Figures 13-14. CX0120: One small pill for mankind; CX0122: Science Not Fiction**
I disagree with the majority and would uphold the ALJ's conclusion that the record does not support a finding that these exhibits convey to a significant minority of reasonable consumers that drinking eight ounces of POM Juice or taking one POMx Pill daily treats prostate cancer or that such claim is clinically proven. The exhibits contain conflicting elements and heavily qualified descriptions of studies, thus suggesting the need for extrinsic evidence to determine what consumers take away. For instance, the exhibits state that "[f]indings from *a small study suggest* … pomegranate juice *may one day prove* an effective weapon" or "[a]n *initial* UCLA medical study … showed *hopeful results* for men with prostate cancer" (emphasis added).

**Figures 18-19 and 24. CX0169/CX1426 Ex. L: "The Power of POM;" CX0180/CX1426 Ex. K: "The antioxidant Superpill;" and CX0279: "Science, Not Fiction" print advertisement**
I  disagree with the majority and would uphold the ALJ's conclusion that the evidence fails to show that these print ads convey to a significant minority of reasonable consumers that taking a POMx Pill daily treats, prevents, or reduces the risk of heart disease and prostate cancer or that these claims are clinically proven. The ads mention the potential benefits for "prostate health" and "heart health," and exhort the consumer to "invest in your health," which are statements likely more correlated to structure/function type claims than to health/disease claims. Moreover, the exhibits discuss the available science with qualifiers such as "preliminary studies," "hopeful results," or "suggests anti-atherosclerosis benefits." In addition, the caduceus symbol in CX0169 is next to the tag line "Reviewed for Safety by the FDA." Further, the text of any statements at the bottom of these exhibits is too small to qualify any claims adequately. Thus, extrinsic evidence would be necessary to conclude that consumers would take away health/disease claims or establishment claims from these ads.

**Figure 20. CX0192: What Gets Your Heart Pumping print advertisement**
I disagree with the majority and would uphold the ALJ's conclusion that the evidence fails to show that this print ad conveys to a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily prevents or reduces the risk of heart disease or that these claims are clinically proven. In contrast to certain other exhibits, this ad's imagery, a POM bottle in a bikini top, does not include medical imagery but rather invokes sexual attraction. Moreover, the ad contains statements such as "healthy arteries" and "cardiovascular health," which seem similar to structure/function type claims rather than health/disease claims. Further, the ad's references to science are qualified as "initial" scientific research that has uncovered "encouraging" results. Thus, extrinsic evidence would be necessary to conclude that consumers would take away health/disease claims or establishment claims from this ad.

**Figure 23. CX0274/CX1426 Ex. C: "I'm Off to Save Prostates" print advertisement**
I disagree with the majority and would uphold the ALJ's conclusion that the evidence fails to show that this print ad conveys to a significant minority of reasonable consumers that drinking eight ounces of POM Juice daily prevents or reduces the risk of prostate cancer or that these claims are clinically proven. Statements such as "defending healthy prostates" and "improve prostate health" are more akin to structure/function type claims than to health/disease claims. Moreover, the mention of research in this ad is not tied to any disease generally or cancer specifically. Further, the ad lacks any medical imagery. Thus, the Commission should require extrinsic evidence to find implied health/disease or establishment claims.

MKO-6

**Figures 25 and 28-33. CX0280: Live Long Enough; CX0331/CX1426 Ex. J: Healthy Wealthy; CX0328: Your New Health Care Plan; CX0337: First Bottle You Should Open; CX0342/CX0353: Life Insurance Supplement; CX0348/CX0350: 24 Scientific Studies; CX0351/CX0355:  Only Antioxidant Supplement Rated X**

I disagree with the majority and would uphold the ALJ's conclusion that the evidence in the record fails to show that these print ads convey to a significant minority of reasonable consumers that drinking eight ounces of POM Juice or taking one POMx Pill daily treats, prevents or reduces the risk of heart disease or prostate cancer or that these claims are clinically proven. These ads state "keep you at your healthy best" and "prostate and cardiovascular health" and do not refer to any disease, making the claims akin to structure/function type claims.  The imagery regarding pills is linked to the antioxidant power of the product.  The studies referenced are strongly qualified, stating that "*preliminary* studies … showed *promising* results for heart health" or that an "*initial* UCLA study … found *hopeful* results for prostate health" (emphasis added).  Moreover, any disclaimers at the bottom of the ad are too small to be interpreted in conjunction with other messages.  For similar reasons, I also disagree with the majority's view that exhibits CX0351 and CX0355 convey to a significant minority of reasonable consumers that drinking eight ounces of POM Juice or taking one POMx Pill daily treats, prevents, or reduces the risk of erectile dysfunction or that those claims are clinically proven.  The statements about the studies referenced are qualified; for instance, the ad refers to a "*preliminary* study on erectile function" (emphasis added) and notes that "further studies are warranted."  Thus, the Commission should require extrinsic evidence to find implied health/disease or establishment claims.

**Figures 36 and 39. CX0473: Capture of POMWonderful.com Community Website; CX0473: Capture of POMPills.com Websites**

I disagree with the majority's view that these exhibits convey to a significant minority of reasonable consumers that taking eight ounces of POM Juice or one POMx Pill daily prevents or reduces the risk of – rather than treats – prostate cancer.  Because the science referenced in these exhibits consists of subjects who had already been diagnosed with that disease, I would require extrinsic evidence before finding implied claims of disease prevention or risk reduction.

**Figure 37. CX0473: Capture of POMWonderful.com Website**

For the same reasons noted for exhibits 36 and 39, I disagree with the majority's view that this exhibit conveys to a significant minority of reasonable consumers that taking eight ounces of POM Juice or one POMx Pill daily prevents or reduces the risk of – rather than treats – prostate cancer.  Because the science referenced in this exhibit consists of subjects who had already been diagnosed with cancer, I would require extrinsic evidence before finding such implied claims.

**Concurring Statement of Commissioner J. Thomas Rosch**
**In the Matter of POM Wonderful**
Docket No. 9344
January 10, 2013

The Commission Opinion states that "[t]here are two analytical routes by which Complaint Counsel can prove that Respondents' ads are deceptive or misleading and both arise in this case." Commission Opn. at 17. The first is to demonstrate that the claims in the ads are false. The second approach relies on the "reasonable basis" theory; that is, that an objective claim about a product's performance or efficacy carries with it a representation that the advertiser had a reasonable basis of support for the claim. *Id.* I agree with these assertions.

Using this framework, the Commission Opinion separately analyzes the efficacy claims and the level of substantiation claimed by those advertisements. More specifically, the Commission first determines for itself whether and to what extent the ads make efficacy claims (*see, e.g.*, *id.* at 9); but the Commission relies on extrinsic evidence (the testimony of experts) to determine the level of substantiation required to support the claims made by the ads in that respect. The Commission ends up concluding on the basis of the testimony of those experts that the highest level of well-controlled studies (the "gold standard" of RCTs) is required to support the latter claims. *Id.* at 20, 22-23, 25-26, 30, 32, 35, and 38.

I agree with the Commission's conclusion. Moreover, I agree that the Commission reached that conclusion by using the most traditional (that is to say the safest) analytical route. However, that route entails a discussion of both the expert testimony and how the *Pfizer* factors should apply in this case. *Id.* at 20-38. I consider that lengthy discussion to be unnecessary. Beyond that, having served as a Commissioner for seven years and having been a trial lawyer for nearly 40 years before that, I am somewhat skeptical of relying so heavily on the opinions of experts who are paid by both Complaint Counsel and Respondents. Fortunately, I do not have to do so.

Instead, I would decide that the "net impression" left by the ads includes claims about what level of substantiation the advertiser is purporting to have; that a net impression may be conveyed both expressly and by implication; and that the substantiation claims in these ads are false.

First, let me emphasize that I, like my colleagues, have examined the ads myself. There can be no dispute that the net impression of the ads is what counts in determining what impression is conveyed to consumers. The case law has long held that. *See, e.g., American Home Prods. v. FTC*, 695 F.2d 681, 687 (3d Cir. 1982); *FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 674 (2d Cir. 1963). Moreover, there can be no quarrel with the proposition that the net impression conveyed by an ad includes implied claims, as well as express claims. The Commission itself has repeatedly been held to have the common sense and expertise to determine the net impression conveyed, "so long as those claims are reasonably clear." *Kraft,*

JTR-1

*Inc. v. FTC*, 970 F.2d 311, 319 (7th Cir. 1992);[1] *accord FTC v. Nat'l Urological Group, Inc.*, 645 F. Supp. 2d 1167, 1189-90 n.12 (N.D. Ga. 2008); *see also FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 391-92 (1965).

Second, neither *Kraft* nor *Colgate-Palmolive* contains any suggestion that the Commission itself lacks the common sense and expertise to determine whether any false substantiation claims are conveyed by the ads, as part of its examination of the ads' net impression. Nor do other cases require that there ordinarily be any form of extrinsic evidence in that inquiry. *See, e.g.*, *FTC v. Nat'l Urological Group, Inc.*, 645 F. Supp. 2d 1167, 1189 (extrinsic evidence "is only necessary when the asserted claims fall on the 'barely discernible' side of the continuum"); *FTC v. QT, Inc.*, 448 F. Supp. 2d 908, 958 (N.D. Ill. 2006), *aff'd*, 512 F.3d 858 (7th Cir. 2008). Indeed, as the Commission Opinion acknowledges, *Sterling Drug*, 102 F.T.C. 395, 436 (1983), stands for the straightforward notion that "when an advertiser represents in its ad that there is a particular level of support for a claim, the absence of that support makes the claim false." Commission Opn. at 16, 20. Thus, I would hold that claims about the level of substantiation, no less than any other net impression conveyed by the ads, can be false, and that the Commission itself can make that determination.

Third, I would agree that if POM's ads simply made health claims, standing alone, they could not properly be challenged as false or deceptive. But they do not stand alone. In some instances the alleged health claim is expressly linked to a claim that the POM products treat, prevent or reduce the risk of heart disease or prostate cancer. The link between POM and the treatment, prevention or reduction of risk of those very serious diseases is at least implicit in many other instances. Those express and implicit links create a net impression that the highest possible level of substantiation exists for the POM product being advertised, and that claim is false.

More specifically, many of the advertisements expressly link POM to the treatment, prevention or reduction of the risk of heart disease or prostate cancer. *See, e.g.,* POM Claims Appendix, ads numbered 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 12, 14, 16, 19, 20, 28, 29, 30, 31, 32, and 33. Other ads at least implicitly link POM or POMx to the treatment, prevention, or the reduction of risk of those very serious diseases by liberally quoting physicians. *See id.*, ads numbered 16, 18, 19, 21, 24, 25, 27, 28, 29, 30, 31, 32, and 33 in the Claims Appendix. Another set of ads implicitly link POM to the treatment, prevention, or the reduction of risk of heart disease or prostate cancer by equating POM with POMx (which is depicted as a prescription drug), or by depicting POM itself as a medicine. *See id.*, ads numbered 10, 13, 14, 16, 17, 18, 19, 22, 25, 28, 29, 30, 31, and 32. Furthermore, ads implicitly link POM to the treatment, prevention, or reduction of risk of these life-threatening diseases by describing POM as a life insurance supplement or a healthcare plan. *See id.*, ads numbered 29 and 31. Each of these claims creates

---

[1] It is worth noting that all of the appellate authority respecting the need for the Commission to consider expert opinions *predates* the *Kraft* case.

JTR-2

the net impression that the highest form of substantiation exists to support the claims linking POM to the treatment, prevention or reduction of risk from these serious diseases.

Fourth, I do not consider erectile dysfunction to be as serious as heart disease or prostate cancer.  For example, while erectile dysfunction afflicts many men, it is generally not life-threatening.  Thus, I do not think that linking POM with the treatment, prevention or reduction of risk of erectile dysfunction, standing alone, creates a net impression that claims respecting that malady are supported by the highest level of substantiation.  But that does not mean the Commission Opinion is wrong in requiring that level of substantiation for erectile dysfunction as well.  The Commission has long considered so-called "establishment" claims to be binding on the advertisers that make them.  *See FTC Policy Statement Regarding Advertising Substantiation*, appended to *Thompson Med. Co.*, 104 F.T.C. 648, 839 (1984), *aff'd*, 791 F.2d 189 (D.C. Cir. 1986) (for ads that "contain express or implied statements regarding the amount of support the advertiser has for the product claim . . ., the advertiser must possess the amount and type of substantiation the ad actually communicates to consumers").  In this case, those associated with POM have made such claims.  *See, e.g.,* POM Claims Appendix, ad numbered 33.

JTR-3



UNITED STATES OF AMERICA
**FEDERAL TRADE COMMISSION**
WASHINGTON, D.C. 20580

Office of the Secretary

November 30, 2000

Jonathan W. Emord, Esq.
Emord & Associates, P.C.
1050 Seventeenth Street, N.W.
Suite 600
Washington, D.C. 20036

                RE:    Petition For Rulemaking
                           Dr. Julian M. Whitaker et al.
                           Project No. P004501

Dear Mr. Emord:

This letter is in response to your Petition for Rulemaking on behalf of Dr. Julian Whitaker, Pure Encapsulations, Inc., Imagenetix, Inc. and XCEL Medical Pharmacy, Ltd. (hereinafter "Petitioners"). The Petition requests that the Commission promulgate either: 1) a rule whereby the agency would issue advisory opinions on the adequacy of substantiation for advertising claims for dietary supplements or, in the alternative; 2) a rule further defining the principles of substantiation for such claims. After careful consideration of the Petition and for the reasons stated below, the Commission has decided to deny the Petition.

Petitioners' proposal that the agency implement a policy of pre-approving, through advisory opinions, advertising claims about the benefits of supplements does not conform to the Commission's Rules of Practice[1] governing the appropriate use of advisory opinions. Moreover, the proposed policy would be unfeasible because of the large number of potential claims and the extensive resources that would be required to conduct a thorough analysis of the scientific literature relevant to each claim. Petitioners request in the alternative that the Commission promulgate a rule that more definitively sets out the specific elements of the "competent and reliable scientific evidence" standard. Such a rule is unnecessary given the guidance that is already available.[2]

---

    [1]  16 C.F.R.§ 1.1.

    [2]  For example, specific guidance on how the Commission's standard applies to dietary supplement advertising is set out in *Dietary Supplements: An Advertising Guide for Industry*, FTC, Bureau of Consumer Protection (1998). The Supplement Advertising Guide addresses many of the questions enumerated in the petition.

Jonathan W. Emord, Esq. -- Page 2

Although we deny the rulemaking request, the Commission believes it would be helpful to Petitioners, and others, to address some of the questions and criticisms about the FTC's approach to evaluating supplement advertising. In addition, we respond to the contention that this approach violates Petitioners' Constitutional rights and is insufficient under the Administrative Procedure Act.

**FTC Approach to Evaluating Dietary Supplement Advertising: Background**

The Federal Trade Commission is primarily a law enforcement agency. The FTC's authority over dietary supplement advertising derives from Sections 5 and 12 of the Federal Trade Commission Act.[3] With respect to advertising, these sections impose two basic obligations: 1) advertising must be truthful and not misleading; and 2) before disseminating an ad, advertisers must have adequate substantiation for objective product claims.[4] Under the FTC Act, there is no regulatory scheme for the pre-market review and approval of advertising claims for products or services, including dietary supplements. Instead, advertisers are free to make the advertising claims they deem appropriate, subject to these two basic obligations. When there are concerns about specific claims, the Commission staff conducts non-public investigations and the Commission may institute an enforcement action if it finds reason to believe that the claims are false, misleading, or unsubstantiated and that a law enforcement action would be in the public interest.[5]

In assessing substantiation for claims, staff reviews all of the materials submitted by the advertiser and also reviews the pertinent scientific literature.[6] The assessment of the proffered

---

[3] Section 5 of the FTC Act broadly prohibits deceptive and unfair acts or practices in or affecting commerce, including deceptive advertising. 15 U.S.C. § 45. In addition, supplement advertising falls under Sections 12 and 15 of the FTC Act, which prohibit false advertisements, defined as advertisements that are misleading in a material respect. 15 U.S.C. §§ 52, 55.

[4] These principles are articulated in the FTC's Deception Policy Statement, appended to *Cliffdale Associates, Inc.,* 103 F.T.C. 110, 174 (1984); and Substantiation Policy Statement, appended to *Thompson Medical Co.,* 104 F.T.C. 648, 839 (1984).

[5] Staff's investigations are non-public in large part to protect the reputation of the party under investigation and the confidentiality of the materials they submit. No public announcement is made about a case until the Commission has made a formal allegation of law violation.

[6] In reviewing the science, the Commission has indicated that it gives great deference to FDA determinations of whether there is adequate support for such claims. *See* Supplement Advertising Guide at 1. In that regard, the Commission notes that FDA has recently reviewed the science relating to a variation of one of the claims referenced by Petitioners. As a result of that review, FDA has now authorized, for labeling, a claim relating to omega-3 fatty acids and cardiovascular health. The FDA-authorized claim is carefully qualified, with detailed disclosures about the inconclusive nature of the science. *FDA Letter to Jonathan Emord,* Oct. 31, 2000

Jonathan W. Emord, Esq. -- Page 3

substantiation is closely tied to how the claims are presented and the extent to which they are qualified. Typically, the advertiser has an opportunity to discuss the alleged violations with staff and the Commissioners before any formal action is taken.[7] In a case involving unsubstantiated claims, staff routinely explains to the advertiser the factors leading to the conclusion that the claims have not been adequately substantiated and provides the advertiser with an opportunity to respond.

If staff concludes that the substantiation is inadequate or that the claim is not sufficiently qualified to accurately reflect the substantiation that exists, staff will lay out the alleged violations in a draft complaint and will propose an appropriate remedy. This relief typically includes a provision prohibiting the advertiser from making false or unsubstantiated claims.[8] In appropriate cases, staff also seeks additional relief, such as disclosures about the efficacy or safety of the product, redress for consumers, disgorgement of profits, or corrective advertising.

The Commission believes that requiring advertisers to possess adequate substantiation for their claims in the first instance is the best way to protect consumers and is the most efficient use of government resources. It also provides maximum flexibility for advertisers to fashion claims and develop support with minimal government involvement. The Commission believes that its enforcement approach best serves the interests of consumers and businesses.

**Rulemaking to Define "Competent and Reliable Scientific Evidence"**

"Competent and reliable scientific evidence" is the standard the Commission requires for all claims relating to the safety or health benefits of a dietary supplement.[9] Petitioners have

---

(No. 91N-0103).

[7] The opportunity to discuss the matter generally will not be provided in certain circumstances such as where doing so might risk the dissipation of assets or destruction of documents or otherwise frustrate effective final relief.

[8] An order provision prohibiting an unsubstantiated claim does not preclude the advertiser from making the challenged claim in future advertising if the advertiser subsequently develops adequate substantiation or qualifies the claim sufficiently to reflect the current state of the science.

[9] Petitioners refer in their rulemaking request to "structure/function" claims for dietary supplements, referencing the definition of that term established by the Dietary Supplement Health and Education Act of 1994 ("DSHEA"), Pub. L. No. 103-417, 108 Stat. 4325. Under DSHEA, "structure/function" claims are permitted in labeling without prior FDA approval, provided they are truthful, not misleading and substantiated, and provided other notification and disclaimer requirements are met. In contrast, "health" claims in labeling must be submitted to FDA for prior approval pursuant to rulemaking. Under FTC law, the Commission does not similarly categorize claims and all advertising claims that pertain to a supplement's health-related benefit must be substantiated by "competent and reliable scientific evidence." The FTC

Jonathan W. Emord, Esq. -- Page 4

requested that the Commission promulgate a rule to define this term. The Commission, however, believes that it has already adequately defined its standard and that such a rule is unwarranted.

There is significant guidance for advertisers on how the FTC interprets and applies its substantiation standard. Sources include: 1) the FTC's Substantiation Policy Statement;[10] 2) a body of case law, including cases involving dietary supplements;[11] 3) the FTC's Supplement Advertising Guide, written specifically for the dietary supplement industry, which illustrates the principles of substantiation with numerous examples;[12] and 4) public presentations on this subject made by FTC officials at various industry conferences.[13] In addition to these sources, acknowledged in the Petition, additional sources of guidance include the Commission's Food Policy Statement, which lays out the FTC's approach to substantiation of health claims for food advertising;[14] two staff comments, one submitted to FDA and the other to the Presidential

---

does not pre-approve any claims. References to "claims" in this document are to any health-related claim whether relating to structure/function or disease.

[10] Substantiation Policy Statement, 104 F.T.C. 648, 839 (1984).

[11] The substantiation doctrine was first articulated by the Commission in *Pfizer, Inc.*, 81 F.T.C. 23 (1972). That opinion set out the factors that determine what level of substantiation is appropriate in a particular case where no express claim has been made about the level of support. The six "Pfizer factors" are: 1) the type of product; 2) the type of claim; 3) the benefits of a truthful claim; 4) the cost/feasibility of developing substantiation; 5) the consequences of a false claim; and 6) the amount of substantiation that experts in the field believe is reasonable. *Id.* For claims related to health or safety, the Commission has determined that these factors translate to "competent and reliable scientific evidence," which has been defined in numerous consent orders as: "tests, analyses, research, studies, or other evidence based upon the expertise of professionals in the relevant area, that has been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results." *See, e.g., Schering Corp.*, 118 F.T.C. 1030 (1994)(consent order); *The Quigley Corp.*, C-3926 (Feb. 10, 2000)(consent order); *Met-RX USA, Inc. et al.*, Civ. No. SACV99-1407 DOC(ANX) (C.D.Cal. Nov. 24, 1999)(Stipulated Final Order).

[12] *Supplement Advertising Guide* (1998).

[13] Individual Commissioners and FTC staff make presentations on the subject of dietary supplement advertising, including the FTC's approach to substantiation of claims, in a variety of public forums. These workshops and conferences, sponsored by the major dietary supplement trade associations and others, are widely attended by supplement industry members and typically provide an opportunity for parties to pose questions to staff.

[14] *Enforcement Policy Statement on Food Advertising*, 59 Fed. Reg. 28388 (June 1, 1994)("Food Policy Statement"). Although the Commission issued the Food Policy Statement to describe how its approach to food advertising related to FDA's regulation of food labeling under the Nutrition Labeling and Education Act of 1990, the principles of claim substantiation set forth

Jonathan W. Emord, Esq. -- Page 5

Commission on Dietary Supplement Labels, concerning the regulation of dietary supplement claims;[15] and business education materials, available both in print and through the Commission's Web site at *www.ftc.gov*.[16]

Petitioners assert that, notwithstanding these sources of guidance, the Commission has failed to provide sufficient certainty about the criteria it uses to evaluate the scientific support for a claim. According to Petitioners, this failure, coupled with the agency's active enforcement program, has deterred Petitioners from making certain claims for their products.[17]   The Commission has not established particular requirements for size, duration or protocol of a scientific study, nor has it provided any single fixed formula for the number and type of studies required to substantiate a claim. Instead, the Commission's substantiation doctrine allows for some flexibility in the type and amount of evidence required depending on the nature of the claim and how it is presented and qualified. The Commission has determined that further refinement of the standard through rulemaking might result in a more rigid standard that, in some instances, could be higher than necessary to ensure adequate scientific support for certain specific claims.

The Petition lists a number of specific questions about the Commission's substantiation standard. Most of these questions have already been addressed with as much specificity as possible in the Supplement Advertising Guide. While there may not be a single dispositive answer to every question, the Commission has set out simple and clear principles to determine what type and amount of scientific support will be required in any given case. Examples of questions raised in the petition include:

---

in the Policy Statement are no different than for claims about dietary supplements or other health-related products.

[15] FTC Staff Comment on Draft Report of the Commission on Dietary Supplement Labels, Letter to Kenneth D. Fisher, Ph.D., Executive Director (Aug. 14, 1997); In the Matter of Regulations on Statements Made for Dietary Supplements Concerning the Effect of the Product on the Structure or Function of the Body; Proposed Rule: Comments of the Staff of the Bureau of Consumer Protection of the Federal Trade Commission, Docket No. 98N-0044 (Aug. 27, 1998).

[16] *See, e.g., Frequently Asked Advertising Questions: A Guide for Small Business.*

[17] A review of Petitioners' Web sites suggests that they have not been completely deterred from making the claims at issue in the Petition. For example, at the time Petitioners filed the petition, Dr. Whitaker's web site, www.healthydirections.com, was advertising a product "EPA/GLA Essentials: Balanced Omega Oil Complex" to "enhance your cardiovascular health." The same site currently markets "Prostate Health," a supplement containing saw palmetto and pygeum, to "maintain healthy prostate size and normal sexual and urinary function." These are two of the specific claims that Petitioners charge the FTC's policy has chilled.

Jonathan W. Emord, Esq. -- Page 6

*Type of Studies Required (Human vs. Animal or In Vitro)*

Petitioners list a series of questions relating to the nature, quality and quantity of evidence required. The Supplement Advertising Guide outlines the principles for assessing what amount and type of evidence is necessary, as well as the criteria for evaluating the design, implementation and other aspects of the quality of individual studies. In response to Petitioners' question about whether animal studies are sufficient, the Supplement Advertising Guide makes clear that, "as a general rule, well-controlled human clinical studies are the most reliable form of evidence."[18] The Supplement Advertising Guide also indicates, however, that the Commission will consider other forms of evidence, like animal and *in vitro* studies "where they are widely considered to be acceptable substitutes for human research or where human research is infeasible."[19]

*Number of Studies Required*

Petitioners also ask how many studies are necessary to substantiate a claim. The Supplement Advertising Guide states expressly that "there is no requirement that a dietary supplement claim be supported by any specific number of studies" and also emphasizes that "the quality of studies will be more important than quantity."[20] At the same time, the Supplement Advertising Guide notes that "replication of research results in an independently-conducted study adds to the weight of the evidence."[21] The Commission has determined that there is no set number of studies that would fit every situation. Consideration has to be given to such widely variable factors as the nature of the claim being made, the nature of the product being studied, how dramatic or subtle the studied effect is, and the context of the surrounding scientific literature.[22]

---

[18] Supplement Advertising Guide at Section B.2. Petitioners suggest that the cost of controlled blinded clinical trials would be prohibitive, particularly since supplements cannot be patented. The Commission is confident that adequate studies can be conducted for far less than the "several hundred million dollars" cited by Petitioners. In addition, the advertiser may rely on existing research provided it is relevant to the product and claims advertised.

[19] *Id.*

[20] *Id.*

[21] *Id.*

[22] The Commission's consent order with Schering Corp. provides one example of a specific determination of the type and number of studies required in a particular case. In that matter, the Commission concluded that "at least two adequate and well-controlled, double-blinded clinical studies" would be necessary to substantiate weight loss and appetite suppressant claims for the supplement, Fibre Trim. *Schering Corp.*, 118 F.T.C. 1030 at 1127 (1994)(consent order).

Jonathan W. Emord, Esq. -- Page 7

*Study of Individual Ingredients in a Product*

Petitioners also ask whether advertisers must test each ingredient in a multi-ingredient product and whether the product itself must be tested. Rather than imposing an absolute rule that all ingredients in a product must be evaluated or that the specific product itself must always be tested, the Supplement Advertising Guide lays out clear principles for making these determinations on a case-by-case basis. In an example designed to specifically illustrate this point, the Supplement Advertising Guide states, "where there is a reason to suspect that the combination of multiple ingredients might result in interactions that would alter the effect or safety of the individual ingredients, studies showing the effect of the individual ingredients may be insufficient...."[23] The Supplement Advertising Guide also makes clear that if an advertiser wishes to rely on research done on other products, it must make sure that its own product is consistent in dosage and formulation with the product that has been studied.[24]

*Publication in Peer-Reviewed Journal*

Petitioners also ask whether studies in peer-reviewed scientific journals are preferred over unpublished clinical trials. The Supplement Advertising Guide indicates clearly that "the FTC does not require that studies be published and will consider unpublished, proprietary research." However, it also recognizes that "the publication of a peer-reviewed study in a reputable journal indicates that the research has received some measure of scrutiny."[25] More important to the Commission than the question of publication is the actual quality of the study design and implementation and the reliability of the written report on the study results.

*Criteria for Evaluating Internal Validity of Study*

Petitioners also raise a series of questions about the criteria the FTC uses to evaluate studies. As set forth in the Supplement Advertising Guide, the Commission considers various factors in evaluating research. Among these, the Commission looks at whether the study uses specific methods accepted to enhance validity, such as control, blinding of subjects and researchers, and adequate duration to ensure that the effect will persist. The Supplement Advertising Guide also stresses the importance of results that are both statistically and clinically significant.[26] These are some of the more fundamental aspects of what constitutes competent and reliable scientific research. More specific guidance about how the Commission evaluates scientific evidence is set out in some of the Commission's litigated cases involving dietary

---

[23] Supplement Advertising Guide at Section B.5, Example 24.

[24] *Id.* at Section B.5.

[25] *Id.* at Section B.3. At the same time, the fact that a study has been peer-reviewed does not, in and of itself, establish that the study is competent and reliable proof of a supplement's efficacy.

[26] *Id.*

Jonathan W. Emord, Esq. -- Page 8

supplements and other health-related products. For example, having determined that the appropriate evidence for the weight loss claims made in the case were clinical trials, the Initial Decision in the *Schering* case provides a detailed discussion of the requirements for a well-designed clinical trial and applies those requirements to the studies relied on by Schering.[27]

### Guidance from FTC Consent Orders

Petitioners assert that they cannot adequately discern the criteria staff applies in evaluating substantiation in part because consent agreements do not describe the basis for a determination that the claims have not been adequately substantiated. Materials submitted in the course of an investigation, including materials relating to the scientific support for a claim, are often proprietary or otherwise protected by confidentiality privileges. For that reason, the Commission typically refrains from discussing the details of specific studies submitted by a supplement marketer unless the matter is litigated and a decision is issued. The Commission is aware, however, that its reasoning in certain settled cases can be a useful source of guidance. In recent settlements, the Commission has provided specific information about the shortcomings of the substantiation for a claim, either in the complaint and consent order or in materials accompanying the settlement. This practice will continue.[28]

### Rulemaking for Issuance of Advisory Opinions

Petitioners have alternatively requested that the Commission promulgate a rule providing for the issuance of advisory opinions on the adequacy of substantiation for dietary supplement advertising claims. In fact, Section 1.1 of the Commission's rules already provides for the issuance of advisory opinions by the Commission or its staff in appropriate circumstances and "where practicable."[29] Petitioner's request for such advisory opinions on substantiation of supplement claims, however, is not practicable for several reasons.

Section 1.1 provides in relevant part that a "request for advice will ordinarily be considered inappropriate where: * * * (2) an informed opinion cannot be made or could be

---

[27] *Schering Corp.*, 118 F.T.C. at 1080-1119.

[28] *See, e.g., Michael D. Miller d/b/a Natural Heritage Enterprises*, C-3941 (Consent Order)(May 16, 2000). The settlement in that matter included a letter to customers describing with specificity the lack of adequate scientific evidence on the relationship between the herbal product, Essiac Tea, and cancer and other diseases. *See also Melinda R. Sneed and John L. Sneed d/b/a Arthritis Pain Care Center*, C-3896 (Consent Order)(Sept. 7, 1999). These cases are typical of many of the Commission's supplement cases in that the claims challenged were extreme and unqualified (cures arthritis, lupus, breast cancer, prostate cancer) and the scientific support either nonexistent or clearly inadequate by any objective standard.

[29] 16 C.F.R. § 1.1.

Jonathan W. Emord, Esq. -- Page 9

made only after extensive investigation, clinical study, testing or collateral inquiry."[30]  The review of scientific literature that would be necessary in order for the Commission to issue an informed opinion on the adequacy of substantiation for specific claims clearly would require extensive investigation and collateral inquiry.  For example, for the limited number of specific claims that are the subject of this petition alone, Petitioners have submitted approximately 2,000 pages of exhibits setting out some of the scientific literature relevant to the claims at issue. Before the Commission or its staff could issue an advisory opinion on the adequacy of substantiation for these claims, the agency would have to hire scientific experts in each of the relevant fields of inquiry, and, with the help of those experts, conduct a comprehensive review of the scientific literature, including both the materials submitted by Petitioners and any other relevant scientific evidence.[31]

The resource commitment necessary to implement a general policy of advisory opinions for supplement advertising substantiation would be considerable.  Such a policy would redirect Commission resources away from law enforcement efforts.  FDA has estimated that there are more than 29,000 dietary supplement products in the market with about 75,000 distinct labels. Of these, the agency estimates that sixty percent, or 17,400, are marketed with specific claims.[32] The number and variation of claims that are being made in supplement advertising are likely to be far larger and review of even a small percentage of these claims would be too great a strain on Commission resources.[33]

The task of pre-approving specific supplement claims or ads would be further complicated by the many elements of advertising that can effect ad meaning.  The question of whether a claim about a particular health benefit of a dietary supplement has been adequately substantiated depends in large part on how the claim is worded, what disclosures and qualifications are included in the ad, as well as other elements of the ad that might affect what the claims actually convey to consumers.[34]

---

[30] Id. at § 1.1(b)(2).

[31] In other areas where the Commission or its staff have issued advisory opinions, the type of extensive collateral investigation envisioned by Petitioner's proposal has not been required.

[32] See discussion of supplement industry in *Regulations on Statements Made for Dietary Supplements Concerning the Effect of the Product on the Structure or Function of the Body*, 65 Fed. Reg. 1000, 1046 (Jan. 6, 2000).

[33] It would also be difficult to justify issuing advisory opinions for supplement advertising claims but not for other competing health-related industries.

[34] In many cases, it might also be necessary, in order to determine the precise nature of the claims being communicated by the ad, to conduct consumer research before issuing an advisory opinion. As an example, it is possible under FTC law to make a carefully qualified claim about an area of emerging science in a situation where the science has not yet reached the

Jonathan W. Emord, Esq. -- Page 10

Although it is not practicable for the Commission or its staff to issue formal advisory opinions based on comprehensive evaluations of scientific evidence, Commission staff routinely provides informal advice to supplement marketers about how to ensure that they have adequate scientific support for a claim and how to present claims that accurately reflect that support. As part of its regular industry outreach efforts, staff encourages supplement marketers to contact them with any questions they may have about FTC law and how it applies to their advertising. Staff has met in person or by telephone with supplement marketers who are preparing new advertising campaigns in order to provide general guidance on the agency's substantiation policy. While such advice does not give the advertiser a definitive answer on scientific questions, it can assist in identifying potential problems with a claim or the support behind it, as well as identifying measures to address any shortcomings.

**Petitioners' APA and Fifth Amendment Challenges**

Petitioners have raised a number of objections to the Commission's current approach to substantiation of supplement advertising claims, including that it violates both the Administrative Procedure Act (APA) and the Fifth Amendment because of vagueness. The Commission believes that both challenges are without merit.

Petitioners assert that the FTC has not adequately defined the criteria for determining what constitutes competent and reliable scientific evidence and that this failure to define the standard is arbitrary and capricious in violation of the APA. They similarly assert that the standard is unconstitutionally vague in violation of the Fifth Amendment in that it deprives the Petitioners of their liberty and property rights because the uncertainty of the standard forces them to refrain from making the claims at issue. As discussed above, the Commission has provided guidance defining the criteria it uses in evaluating substantiation, through policy statements, guides and case law, and in the specific context of dietary supplement advertising, through a special guide for this industry.

Petitioners' reliance on the D.C. Circuit Court's opinion in *Pearson v. Shalala,* as authority that the Commission has violated the APA, is misplaced.[35] The court in *Pearson* ruled that FDA had completely failed to give content to its significant scientific agreement standard, either through general guidance or on a case-by-case basis, and that this failure violated the APA.[36] The FTC, in contrast, has developed a large body of guidance both general and case-specific, formal and informal, that gives content to the agency's competent and reliable scientific

---

level of certainty necessary for an unqualified claim. Before approving such a qualified claim, however, the Commission would need to assess whether the wording of the claim effectively communicated the limitations of the scientific support.

[35] *See Pearson v. Shalala,* 164 F.3d 650 (D.C. Cir. 1999), *reh'g denied en banc*, 172 F.3d 72 (1999).

[36] *Id.* at 660-661. Having ruled that FDA's failure to define its standard violated the APA, the court did not reach the Fifth Amendment argument.

Jonathan W. Emord, Esq. -- Page 11

evidence standard. In fact, this standard has been repeatedly upheld by the courts in response to challenges of "vagueness."[37]

In addition, the FDA regulatory regime at issue in the *Pearson* case is fundamentally different from the FTC's law enforcement approach. The statutory framework for health claims in dietary supplement labeling requires the manufacturer to obtain *prior approval* from FDA.[38] The manufacturer must file a petition with FDA requesting authorization of the specific health claim, must submit scientific evidence to persuade the agency that the health benefit is supported by "significant scientific agreement," and must wait for FDA approval before it can put the claim on labeling. Under FTC law, there is no requirement that a supplement marketer obtain prior agency approval before making health-related advertising claims.[39] Instead, the Commission reviews the substantiation for claims already in the market in response to complaints or when it has concerns that the claims are false or unsubstantiated. Only after investigation and review of the supporting science and a determination that the evidence is lacking will the FTC seek to stop advertising claims through a negotiated consent agreement or litigation. In cases where the FTC decides to challenge advertising claims as unsubstantiated, other than cases of outright fraud, Commission staff will typically meet with the advertiser, explain staff's assessment of the substantiation and provide an opportunity for the advertiser to respond before determining whether formal agency action is necessary. The Commission's approach, therefore, is in no way analogous to the *Pearson* court's characterization of the FDA practice as "simply saying no without explanation."[40]

**Petitioners' First Amendment Challenge**

Finally, Petitioners have asserted that the FTC's approach to supplement advertising violates the First Amendment. Petitioners' analysis, however, appears to be largely founded on the incorrect premise that the Commission has a policy of opting for outright bans over qualification as a means of remedying potentially misleading advertising claims. In fact, the Commission has a long history of allowing, and even encouraging, the use of disclaimers or qualifiers as a means of curing potential deception. The Commission reiterated this policy in its

---

[37] *See, e.g., Bristol-Myers Co. v. FTC*, 738 F.2d 554, 560 (2d Cir. 1984); *Sterling Drug, Inc. v. FTC*, 741 F.2d 1145, 1156-57 (9th Cir. 1984); *Thompson Medical Co. v. FTC*, 791 F.2d 189, 194-96 (D.C. Cir. 1986). *See also U.S. v. Alpine Industries, Inc.*, No. 2:97-CV-509 (E.D. Tenn. 1999).

[38] 21 U.S.C. §§ 343(r)(1)(B) and (r)(5)(D).

[39] In contrast to the *Pearson* case, where FDA had prohibited certain labeling claims, Petitioners in this matter have continued to make some of the claims that are the subject of the petition.

[40] *Pearson* at 660. In response to the *Pearson* decision, FDA has issued guidance on its "significant scientific agreement" standard. *Guidance for Industry: Significant Scientific Agreement in the Review of Health Claims*, 64 Fed. Reg. 71794 (Dec. 22, 1999).

Jonathan W. Emord, Esq. -- Page 12

1994 Food Policy Statement and again in the 1998 Supplement Advertising Guide. Both documents clearly acknowledge that there is room for carefully qualified claims based on emerging science, provided the claims are expressly qualified to convey effectively the extent of the scientific support.[41]

Petitioners also assert that, in failing to provide adequate guidance, the Commission has chilled claims in violation of the First Amendment. They object that the Commission has not only failed to adequately define the type and amount of science required to substantiate a claim, but also has failed to specify the circumstances in which claims can be rendered "unobjectionable" through use of appropriate disclaimers. As already discussed, the Commission has provided substantial guidance on its substantiation standard. It has similarly provided detailed guidance on the use of disclaimers. The Supplement Advertising Guide, for example, includes sections on when to disclose qualifying information and how to ensure that such disclosures are sufficiently clear and prominent.[42]  In addition, in 1998 the Commission published the results of a three-part copy test that addresses a number of specific issues relating to the types of disclosures necessary to effectively qualify claims about the benefits of foods and dietary supplements.[43]  Advertisers who remain uncertain about whether their claim is adequately qualified can also conduct their own copy testing or other forms of consumer research to ensure that their ad does not convey deceptive or misleading messages. The Commission routinely considers any such extrinsic evidence obtained from the advertiser when evaluating claims.

The Commission believes its approach is fully consistent with the First Amendment and sees no indication of a chilling effect on claims by supplement marketers. In fact, supplement advertising has increased dramatically in recent years.[44]  We note again that Petitioners are making numerous claims for their supplement products, including some that are the subject of this petition.[45]

---

[41] Food Policy Statement, 59 Fed. Reg. 28388, 28394; Supplement Advertising Guide at Section B.4 and B.5.

[42] Supplement Advertising Guide at Section A. The Commission also recently published a business education piece on the effective use of disclosures in Internet advertising. *Dot Com Disclosures: Information about Online Advertising.*

[43] *Generic Copy Test of Food Health Claims in Advertising*, FTC Bureaus of Economics and Consumer Protection (Nov. 1998). The Food Copy Test examines, among other things, the type of disclosures required to convey limitations on the scientific support for a health related claim.

[44] A 1998 report in Advertising Age, for example, estimated that media spending had increased 40% over one year from 1997 estimated expenditures of $184.5 million. *St. John's Wort Brand is First Backed by National Advertising,* Advertising Age, Sept.7, 1998 at 3, 43.

[45] *See supra* n.17.

Jonathan W. Emord, Esq. -- Page 13

**Conclusion**

        The Commission is committed to providing clear and specific guidance on its enforcement policies to dietary supplement marketers and to all other industries it regulates. For this reason, the agency has engaged in extensive efforts to define its substantiation standard and to illustrate, through its Supplement Advertising Guide, how that standard applies to supplement advertisers. The Commission will continue to refine and elaborate on its guidance as new questions arise. At present, however, the Commission believes that it has provided sufficiently specific and concrete guidance about the "competent and reliable scientific evidence" standard. As the courts have noted in reviewing this standard, "...absolute precision is not possible."[46] Any standard that must be applied to such a wide variety of products, claims, and fields of science must include flexibility. Further refinement would result in greater rigidity and overbroad regulation.

        Nor is it practical for the Commission to review and pre-approve through advisory opinions each claim submitted by a supplement marketer. Such an effort would require resources far exceeding those available to the Commission and could not fairly be limited to the supplement industry alone.

        For all of the foregoing reasons, the Commission denies Petitioners' request for rulemaking.

        By direction of the Commission.

                                        Donald S. Clark
                                        Secretary

---

[46] *See Bristol-Myers*, 738 F.2d at 560.

# DIETARY SUPPLEMENTS:







## AN ADVERTISING GUIDE FOR INDUSTRY



# TABLE OF CONTENTS

**I  INTRODUCTION**                                                                                      **1**

**II  APPLICATION OF FTC LAW TO DIETARY SUPPLEMENT ADVERTISING**          **3**

**A.  Identifying Claims and Interpreting Ad Meaning**                                   **3**

  1. Identifying Express and Implied Claims ...................................................... 3
  2. When to Disclose Qualifying Information ................................................... 5
  3. Clear and Prominent Disclosure ................................................................. 6

**B.  Substantiating Claims**                                                                           **8**

  Overview ............................................................................................................ 8
  1. Ads that Refer to a Specific Level of Support .......................................... 9
  2. The Amount and Type of Evidence ........................................................... 10
  3. The Quality of the Evidence ...................................................................... 12
  4. The Totality of the Evidence ..................................................................... 14
  5. The Relevance to the Evidence to the Specific Claim ........................... 16

**C.  Other Issues Relating to Dietary Supplement Advertising**                    **18**

  1. Claims based on Consumer Testimonials and Expert Endorsements ......... 18
  2. Claims based on Traditional Use .............................................................. 20
  3. Use of the DSHEA Disclaimer in Advertising ........................................ 23
  4. Third Party Literature ................................................................................ 24

**III  CONCLUSION**                                                                                     **25**

  End Notes                                                                                               **26**

# INTRODUCTION

The dietary supplement industry is a dynamic one. Scientific research on the associations between supplements and health is accumulating rapidly. The number of products — and the variety of uses for which they are promoted — have increased significantly in the last few years. The role of the Federal Trade Commission, which enforces laws outlawing "unfair or deceptive acts or practices," is to ensure that consumers get accurate information about dietary supplements so that they can make informed decisions about these products.[1]

The Federal Trade Commission (FTC) and the Food and Drug Administration (FDA) work together under a long-standing liaison agreement governing the division of responsibilities between the two agencies. As applied to dietary supplements, the FDA has primary responsibility for claims on product <u>labeling</u>, including packaging, inserts, and other promotional materials distributed at the point of sale. The FTC has primary responsibility for claims in <u>advertising</u>, including print and broadcast ads, infomercials, catalogs, and similar direct marketing materials. Marketing on the Internet is subject to regulation in the same fashion as promotions through any other media. Because of their shared jurisdiction, the two agencies work closely to ensure that their enforcement efforts are consistent to the fullest extent feasible.

In 1994, the Dietary Supplements Health and Education Act (DSHEA) significantly changed the FDA's role in regulating supplement labeling.[2] These claims are commonly referred to as "structure/function" claims.[3] Although DSHEA does not directly apply to advertising, it has generated many questions about the FTC's approach to dietary supplement advertising. The answer to these questions is that advertising for <u>any</u> product — including dietary supplements — must be truthful, not misleading, and substantiated. Given the dramatic increase in the volume and variety of dietary supplement advertising in recent years, FTC staff is issuing this guide to clarify how long-standing FTC policies and enforcement practices relate to dietary supplement advertising.



Advertising for ANY product must be truthful, not misleading, and substantiated.

The FTC's approach to supplement advertising is best illustrated by its Enforcement Policy Statement on Food Advertising (Food Policy Statement). Although the Food Policy Statement does not specifically refer to supplements, the principles underlying the FTC's regulation of health claims in food advertising are relevant to the agency's approach to health claims in supplement advertising. In general, the FTC gives great deference to an FDA determination of whether there is adequate support for a health claim. Furthermore, the FTC and the FDA will generally arrive at the same conclusion when evaluating unqualified health claims. As the Food Policy Statement notes, however, there may

1

be certain limited instances when a carefully qualified health claim in advertising may be permissible under FTC law, in circumstances where it has not been authorized for labeling. However, supplement marketers are cautioned that the FTC will require both strong scientific support and careful presentation for such claims.[5]

Supplement marketers should ensure that anyone involved in promoting products is familiar with basic FTC advertising principles.  The FTC has taken action not just against supplement manufacturers, but also, in appropriate circumstances, against ad agencies, distributors, retailers, catalog companies, infomercial producers and others involved in deceptive promotions.  *Therefore, all parties who participate directly or indirectly in the marketing of dietary supplements have an obligation to make sure that claims are presented truthfully and to check the adequacy of the support behind those claims.*

2

**II**

# APPLICATION OF FTC LAW TO DIETARY SUPPLEMENT ADVERTISING

The FTC's truth-in-advertising law can be boiled down to two common-sense propositions:

> 1) advertising must be truthful and not misleading; and
> 2) before disseminating an ad, advertisers must have adequate substantiation for all objective product claims.[6]

A deceptive ad is one that contains a misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances to their detriment. The FTC's substantiation standard is a flexible one that depends on many factors. When evaluating claims about the efficacy and safety of foods, dietary supplements and drugs, the FTC has typically applied a substantiation standard of competent and reliable scientific evidence.

To determine whether an ad complies with FTC law, it is first necessary to identify all express and implied claims that the ad conveys to consumers. Once the claims are identified, the scientific evidence is assessed to determine whether there is adequate support for those claims. The following sections describe this two-step process with examples illustrating how principles of ad interpretation and substantiation apply in the context of dietary supplement advertising. The examples have been simplified to illustrate one or two specific points. Therefore, advertisers should use these examples as general guidance only.[7]

## A. Identifying Claims and Interpreting Ad Meaning

### 1. Identifying Express and Implied Claims

The first step in evaluating the truthfulness and accuracy of advertising is to identify all express and implied claims an ad conveys to consumers. Advertisers must make sure that whatever they say expressly in an ad is accurate. Often, however, an ad conveys other claims beyond those expressly stated. Under FTC law, an advertiser is equally responsible for the accuracy of claims suggested or implied by the ad. Advertisers cannot suggest claims that they could not make directly.

When identifying claims, advertisers should not focus just on individual phrases or statements, but rather should consider the ad as a whole, assessing the "net impression" conveyed by all elements of the ad, including the text, product name, and depictions. When an ad lends itself to more than one reasonable interpretation, the advertiser is responsible for substantiating each

**3**

interpretation. Copy tests, or other evidence of how consumers actually interpret an ad, can be valuable. In many cases, however, the implications of the ad are clear enough to determine the existence of the claim by examining the ad alone, without extrinsic evidence.

### Example 1

An advertisement claims that "university studies prove" that a mineral supplement can improve athletic performance. The advertiser has expressly stated the level of support for the claimed benefit and is therefore responsible for having "university studies" that document the advertised benefit. Furthermore, the implied reference to scientific evidence likely conveys to consumers the implied claim that the studies are methodologically sound.

### Example 2

An advertisement for a vitamin supplement claims that 90% of cardiologists regularly take the product. In addition to the literal claim about the percentage of cardiologists who use the product, the ad likely conveys an implied claim that the product offers some benefit for the heart. Therefore, the advertiser must have adequate support for both representations.

Depending on how it is phrased, or the context in which it is presented, a statement about a product's effect on a normal "structure or function" of the body may also convey to consumers an implied claim that the product is beneficial for the treatment of a disease. If elements of the ad imply that the product also provides a disease benefit, the advertiser must be able to substantiate the implied disease claim even if the ad contains no express reference to disease.

### Example 3

An ad for an herbal supplement makes the claim that the product boosts the immune system to help maintain a healthy nose and throat during the winter season. The ad features the product name "Cold Away" and includes images of people sneezing and coughing. The various elements of the ad — the product name, the depictions of cold sufferers, and the reference to nose and throat health during the winter season — likely convey to consumers that the product helps prevent colds. Therefore, the advertiser must be able to substantiate

**4**

that claim.  Even without the product name and images,
the reference to nose and throat health during the
winter season may still convey a cold prevention claim.

### Example 4

An ad for a dietary supplement called "Arthricure" claims
that the product maintains joint health and mobility
into old age.  The "before" picture shows an elderly
women using a walker.  The "after" picture shows her
dancing with her husband.  The images and product
name likely convey implied claims that the product is
effective in the treatment of the symptoms of arthritis,
and may also imply that the product can cure or
mitigate the disease.  The advertiser must be able to
substantiate these implied claims.

## 2. When to Disclose Qualifying Information

An advertisement can also be deceptive because of what it fails to say.  Section 15 of the FTC
Act requires advertisers to disclose information if it is material in light of representations made
or suggested by the ad, or material considering how consumers would customarily use the
product.  Thus, if an ad would be misleading without certain qualifying information, that
information must be disclosed.  For example, advertisers should disclose information relevant
to the limited applicability of an advertised benefit.  Similarly, advertising that makes either an
express or implied safety representation should include information about any significant safety
risks.  Even in the absence of affirmative safety representations, advertisers may need to
inform consumers of significant safety concerns relating to the use of their product.

### Example 5

An advertisement for a multi-vitamin/mineral
supplement claims that the product can eliminate a
specific mineral deficiency that results in
feelings of fatigue.  In fact, less than 2% of
the general population to which the ad is
targeted suffers from this deficiency.
The advertiser should disclose this fact
so that consumers will understand that
only the small percentage of people who
suffer from the actual mineral deficiency are
likely to experience any reduction in fatigue
from using the product.

5

### Example 6

An advertiser for a weight loss supplement cites a placebo-controlled, double-blind clinical study as demonstrating that the product resulted in an average weight loss of fifteen pounds over an eight-week period. The weight loss for the test group is, in fact, significantly greater than for the control subjects. However, both the control and test subjects engaged in regular exercise and followed a restricted-calorie diet as part of the study regimen.  The advertisement should make clear that users of the supplement must follow the same diet and exercise regimen to achieve the claimed weight loss results.

### Example 7

An advertiser claims that its herbal product is a natural pain reliever "without the side effects of over-the-counter pain relievers."  However, there is substantial evidence that the product can cause nausea in some consumers when taken regularly.  Because of the reference to the side effects of other pain relievers, consumers would likely understand this ad to mean that the herbal product posed no significant adverse effects. Therefore, the advertiser should disclose information about the adverse effects of the herbal product.

### Example 8

An herbal weight loss product contains an ingredient which, when consumed daily over an extended period, can result in a significant increase in blood pressure. Even in the absence of any representation about the product's safety, the advertiser should disclose this potentially serious risk.

## 3. Clear and Prominent Disclosure

When the disclosure of qualifying information is necessary to prevent an ad from being deceptive, that information should be presented clearly and prominently so that it is actually noticed and understood by consumers.  A fine-print disclosure at the bottom of a print ad, a

6

disclaimer buried in a body of text, a brief video superscript in a television ad, or a disclaimer that is easily missed on an Internet web site, are not likely to be adequate.  To ensure that disclosures are effective, marketers should use clear language, avoid small type, place any qualifying information close to the claim being qualified, and avoid making inconsistent statements or distracting elements that could undercut or contradict the disclosure.  Because consumers are likely to be confused by ads that include inconsistent or contradictory information, disclosures need to be both direct and unambiguous to be effective.

### Example 9

A marketer promotes a supplement as a weight loss aid. There is adequate substantiation to indicate that the product can contribute to weight loss when used in conjunction with a diet and exercise regimen.  The banner headline claims "LOSE 5 POUNDS IN 10 DAYS," the ad copy discusses how easy it is to lose weight by simply taking the product 3 times a day, and the ad includes dramatic before-and-after pictures.  A fine print disclosure at the bottom of the ad, "Restricted calorie diet and regular exercise required," would not be sufficiently prominent to qualify the banner headline and the overall impression that the product alone will cause weight loss.  The ad should be revised to remove any implication that the weight loss can be achieved by use of the product alone.  This revision, combined with a prominent indication of the need for diet and exercise, may be sufficient to qualify the claim.  However, if the research does not show that the product contributes anything to the weight loss effect caused by diet and exercise, it would be deceptive, even with a disclosure, to promote the product for weight loss.

Qualifying information should be sufficiently simple and clear that consumers not only notice it, but also understand its significance.  This can be a particular challenge when explaining complicated scientific concepts to a general audience, for example, if an advertiser wants to promote the effect of a supplement where there is an emerging body of science supporting that effect, but the evidence is insufficient to substantiate an unqualified claim. The advertiser should make sure consumers understand both the extent of scientific support and the existence of any significant contrary evidence. Vague qualifying terms — for example, that the product "may" have the claimed benefit or "helps" achieve the claimed benefit — are unlikely to be adequate.  Furthermore, advertisers should not make qualified claims where the studies they rely on are contrary to a stronger body of evidence.  In such instance, even a qualified claim could mislead consumers.

7

*Example 10*

A company has results from two studies suggesting that the main ingredient in its supplement helps to maintain healthy cholesterol levels. There are, however, significant limitations to each of the studies and a better controlled study is necessary to confirm whether the effect is genuine. The company makes a claim in advertising that "scientific studies show that our product may be effective in reducing cholesterol." The use of the word "may" is not likely to be a sufficient disclaimer to convey the limitations of the science. A disclosure that clearly describes the limitations of the research, in language consumers can easily understand, and states directly and unambiguously that additional research is necessary to confirm the preliminary results is more likely to be effective. As discussed in the following section on substantiating claims, the extent to which studies support an unqualified claim will depend largely on what experts in the relevant field would consider to be adequate support.

## B. Substantiating Claims

In addition to conveying product claims clearly and accurately, marketers need to verify that there is adequate support for their claims. Under FTC law, before disseminating an ad, advertisers must have a reasonable basis for all express and implied product claims. What constitutes a reasonable basis depends greatly on what claims are being made, how they are presented in the context of the entire ad, and how they are qualified. The FTC's standard for evaluating substantiation is sufficiently flexible to ensure that consumers have access to information about emerging areas of science. At the same time, it is sufficiently rigorous to ensure that consumers can have confidence in the accuracy of information presented in advertising. A number of factors determine the appropriate amount and type of substantiation, including:



- **The Type of Product.** Generally, products related to consumer health or safety require a relatively high level of substantiation.

- **The Type of Claim.** Claims that are difficult for consumers to assess on their own are held to a more exacting standard. Examples include health claims that may be subject to a placebo effect or technical claims that consumers cannot readily verify for themselves.

8

- **The Benefits of a Truthful Claim** and **The Cost/Feasibility of Developing Substantiation for the Claim.** These factors are often weighed together to ensure that valuable product information is not withheld from consumers because the cost of developing substantiation is prohibitive. This does not mean, however, that an advertiser can make any claim it wishes without substantiation, simply because the cost of research is too high.

- **The Consequences of a False Claim.** This includes physical injury, for example, if a consumer relies on an unsubstantiated claim about the therapeutic benefit of a product and foregoes a proven treatment. Economic injury is also considered.

- **The Amount of Substantiation that Experts in the Field Believe is Reasonable.** In making this determination, the FTC gives great weight to accepted norms in the relevant fields of research and consults with experts from a wide variety of disciplines, including those with experience in botanicals and traditional medicines. Where there is an existing standard for substantiation developed by a government agency or other authoritative body, the FTC accords great deference to that standard.

The FTC typically requires claims about the efficacy or safety of dietary supplements to be supported with "competent and reliable scientific evidence," defined in FTC cases as "tests, analyses, research, studies, or other evidence based on the expertise of professionals in the relevant area, that have been conducted and evaluated in an objective manner by persons qualified to do so, using procedures generally accepted in the profession to yield accurate and reliable results." This is the same standard the FTC applies to any industry making health-related claims. There is no fixed formula for the number or type of studies required or for more specific parameters like sample size and study duration. There are, however, a number of considerations to guide an advertiser in assessing the adequacy of the scientific support for a specific advertising claim.

## 1. Ads that Refer to a Specific Level of Support

If an advertiser asserts that it has a certain level of support for an advertised claim, it must be able to demonstrate that the assertion is accurate. Therefore, as a starting point, advertisers must have the level of support that they claim, expressly or by implication, to have.

> *Example 11*
> An ad for a supplement includes the statement "Scientists Now Agree!" in discussing the product's benefit. This statement likely conveys to consumers that the state of science supporting the benefit has reached the level of scientific consensus. Unless the advertiser possesses this level of evidence, the claim is not substantiated.

9

*Example 12*

An advertiser claims that its product has been "studied for years abroad" and is now the "subject of U.S. government-sponsored research." In addition to the explicit claim that the product has been studied, such phrases likely convey to consumers an implied claim that there exists a substantial body of competently-conducted scientific research supporting the efficacy of the product. The advertiser would be responsible for substantiating both claims.

## 2. The Amount and Type of Evidence

When no specific claim about the level of support is made, the evidence needed depends on the nature of the claim. A guiding principle for determining the amount and type of evidence that will be sufficient is what experts in the relevant area of study would generally consider to be adequate. The FTC will consider all forms of competent and reliable scientific research when evaluating substantiation. As a general rule, well-controlled human clinical studies are the most reliable form of evidence. Results obtained in animal and *in vitro* studies will also be examined, particularly where they are widely considered to be acceptable substitutes for human research or where human research is infeasible. Although there is no requirement that a dietary supplement claim be supported by any specific number of studies, the replication of research results in an independently-conducted study adds to the weight of the evidence. In most situations, the quality of studies will be more important than quantity. When a clinical trial is not possible (e.g., in the case of a relationship between a nutrient and a condition that may take decades to develop), epidemiologic evidence may be an acceptable substitute for clinical data, especially when supported by other evidence, such as research explaining the biological mechanism underlying the claimed effect.

Anecdotal evidence about the individual experience of consumers is not sufficient to substantiate claims about the effects of a supplement. Even if those experiences are genuine, they may be attributable to a placebo effect or other factors unrelated to the supplement. Individual experiences are not a substitute for scientific research.[8]

*Example 13*

An advertiser relies on animal and *in vitro* studies to support a claim that its vitamin supplement is more easily absorbed into the bloodstream than other forms of the vitamin. However, the animal research uses a species of animal that, unlike humans, is able to synthesize the vitamin, and the *in vitro* study uses a different formulation with a higher concentration of the

**10**

compound than the product being marketed.  In addition, human research is feasible and relatively inexpensive to conduct in light of the potential sales of the product and is the type of research generally accepted in this particular field of study.  The substantiation is likely to be inadequate in this case, both because there are significant methodological problems and because, in this particular instance, human research is both feasible and the accepted approach in the field.

### Example 14

A company wants to advertise its supplement as helpful in maintaining good vision into old age.  There have been two long-term, large-scale epidemiologic studies showing a strong association between life-long high consumption of the principal ingredient in the supplement and better vision in those over 70.  Experts have also discovered a plausible biological mechanism that might explain the effect.  A clinical intervention trial would be very difficult and costly to conduct.  Assuming that experts in the field generally consider epidemiological evidence to be adequate to support the potential for a protective effect, and assuming the absence of any stronger body of  contrary evidence, a claim that is qualified to accurately convey the nature and extent of the evidence would be permitted.

### Example 15

An advertisement for a supplement claims that the product will cause dramatic improvements in memory and describes the experiences of 10 people who obtained these results.  The descriptions of these anecdotal experiences are truthful, but the advertiser has no scientific substantiation for the effect of its product on memory and cannot explain why the product might produce such results.  The individual experiences are not adequate to substantiate the claim without confirming scientific research.

11

## 3. The Quality of the Evidence

In addition to the amount and type of evidence, the FTC will also examine the internal validity of each piece of evidence.  Where the claim is one that would require scientific support, the research should be conducted in a competent and reliable manner to yield meaningful results.  The design, implementation, and results of each piece of research are important to assessing the adequacy of the substantiation.

There is no set protocol for how to conduct research that will be acceptable under the FTC substantiation doctrine. There are, however, some principles generally accepted in the scientific community to enhance the validity of test results.  For example, a study that is carefully controlled, with blinding of subjects and researchers, is likely to yield more reliable results.  A study of longer duration can provide better evidence that the claimed effect will persist and resolve potential safety questions.  Other aspects of the research results — such as evidence of a dose-response relationship (*i.e.*, the larger the dose, the greater the effect) or a recognized biological or chemical mechanism to explain the effect — are examples of factors that add weight to the findings.  Statistical significance of findings is also important.  A study that fails to show a statistically significant difference between test and control group may indicate that the measured effects are merely the result of placebo effect or chance.   The results should also translate into a meaningful benefit for consumers.  Some results that are statistically significant may still be so small that they would mean only a trivial effect on consumer health.

The nature and quality of the written report of the research are also important.  Research cannot be evaluated accurately on the basis of an abstract or an informal summary.  In contrast, although the FTC does not require that studies be published and will consider unpublished, proprietary research, the publication of a peer-reviewed study in a reputable journal indicates that the research has received some measure of scrutiny.  At the same time, advertisers should not rely simply on the fact that research is published as proof of the efficacy of a supplement.  Research may yield results that are of sufficient interest to the scientific community to warrant publication, but publication does not necessarily mean that such research is conclusive evidence of a substance's effect.  The FTC considers studies conducted in foreign countries as long as the design and implementation of the study are scientifically sound.[9]

### Example 16

An advertiser conducts a literature search and finds several abstracts summarizing research about the association between a nutrient and the ability to perform better on memory tests.  The advertiser relies on these summaries to support a claim that its supplement, which contains the same nutrient, aids memory.  However, without looking carefully at the specifics of the study design, implementation, and results, there is

no way for an advertiser to ascertain whether the research substantiates the product claims. (For example, did the research use a comparable formulation of the ingredient? Was the study adequately controlled? Did the study yield results that are statistically significant?) The advertiser should carefully review the underlying science, with the assistance of an expert if necessary, before drafting advertising claims.

### *Example 17*

An advertiser makes an unqualified claim about the anti-clotting effect of a supplement that contains a compound extracted from fruit. There are three studies supporting the effect and no contrary evidence. One study consists of subjects tested over a one-week period, with no control group. The second study is well-controlled, of longer duration, but shows only a slight effect that is not statistically significant. The third study administers the compound through injection and shows a significant anti-clotting effect, but there is some question whether the compound would be absorbed into the bloodstream if administered orally. Because the studies all have significant limitations, it would be difficult to draft even a carefully qualified claim that would adequately convey to consumers the limited nature of the evidence. The advertiser should not base a claim on these studies.

### *Example 18*

The marketer of an herbal supplement claims that its product promotes healthy vision and is approved in Germany for this purpose. The product has been used extensively in Europe for years and has obtained approval by the German governmental authorities, through their monograph process, for use to improve vision in healthy people. The company has two abstracts of German trials that were the basis of the German monograph, showing that the ingredient significantly improved the vision of healthy individuals in the test group over the placebo group. Animal trials done by the company suggest a plausible mechanism to explain the

13

effect.  Although approval of the supplement under the German monograph suggests that the supplement is effective, advertisers should still examine the underlying research to confirm that it is relevant to the advertiser's product (for example, that the dosage and formulation are comparable) and to evaluate whether the studies are scientifically sound.  Advertisers should also examine any other research that exists, either supporting or contradicting the monograph, especially if it is not possible to identify and review the research on which the monograph is based.

## 4. The Totality of the Evidence

Studies cannot be evaluated in isolation.  The surrounding context of the scientific evidence is just as important as the internal validity of individual studies.  Advertisers should consider all relevant research relating to the claimed benefit of their supplement and should not focus only on research that supports the effect, while discounting research that does not.  Ideally, the studies relied on by an advertiser would be largely consistent with the surrounding body of evidence.  Wide variation in outcomes of studies and inconsistent or conflicting results will raise serious questions about the adequacy of an advertiser's substantiation.  Where there are inconsistencies in the evidence, it is important to examine whether there is a plausible explanation for those inconsistencies.  In some instances, for example, the differences in results are attributable to differences in dosage, the form of administration (e.g., oral or intravenous), the population tested, or other aspects of study methodology.  Advertisers should assess how relevant each piece of research is to the specific claim they wish to make, and also consider the relative strengths and weaknesses of each.  If a number of studies of different quality have been conducted on a specific topic, advertisers should look first to the results of the studies with more reliable methodologies.

The surrounding body of evidence will have a significant impact both on what type, amount and quality of evidence is required to substantiate a claim and on how that claim is presented — that is, how carefully the claim is qualified to reflect accurately the strength of the evidence.  If a stronger body of surrounding evidence runs contrary to a claimed effect, even a qualified claim is likely to be deceptive.

### Example 19

An advertiser wishes to make the claim that a supplement product will substantially reduce body fat. The advertiser has two controlled, double-blind studies showing a modest but statistically significant loss of fat at the end of a six-week period.  However, there is an equally well-controlled, blinded 12-week study showing

no statistically significant difference between test and control groups.  Assuming other aspects of methodology are similar, the studies taken together suggest that, if the product has any effect on body fat, it would be very small.  Given the totality of the evidence on the subject, the claim is likely to be unsubstantiated.

### Example 20

Advertisements for a fiber supplement make the claim that the product is "proven" to aid weight loss.  Although the company has two published, peer-reviewed studies showing a relationship between fiber and weight loss, neither of these studies used the same proportions of soluble and insoluble fiber or the same total amount of fiber as the supplement product.  There are numerous controlled, published human clinical studies, however, using the amount and type of fiber in the supplement product, that provide evidence that the product would not result in measurable weight loss.  The totality of the evidence does not support the "proven" claim and, given the stronger body of contrary evidence, even a qualified claim is likely to be deceptive.

### Example 21

An advertiser runs an ad in a magazine for retired people, claiming that its supplement product has been found effective in improving joint flexibility.  The company sponsored a 6-week study of its supplement, involving 50 subjects over the age of 65, to test the product's effect on improving flexibility.  The study was double-blinded and placebo-controlled and has been accepted for publication in a leading medical journal.  The study showed dramatic, statistically significant increases in joint flexibility compared to placebo, based on objective measurements.  In addition, several large trials have been conducted by European researchers using a similar formulation and dose of the active ingredient in the supplement.  These trials also found statistically significant results. The advertiser reviewed the underlying European research and confirmed that it meets accepted research standards. The evidence as a whole likely substantiates the claim.

15

## 5. The Relevance of the Evidence to the Specific Claim

A common problem in substantiation of advertising claims is that an advertiser has valid studies, but the studies do not support the claim made in the ad. Advertisers should make sure that the research on which they rely is not just internally valid, but also relevant to the specific product being promoted and to the specific benefit being advertised. Therefore, advertisers should ask questions such as: How does the dosage and formulation of the advertised product compare to what was used in the study? Does the advertised product contain additional ingredients that might alter the effect of the ingredient in the study? Is the advertised product administered in the same manner as the ingredient used in the study? Does the study population reflect the characteristics and lifestyle of the population targeted by the ad? If there are significant discrepancies between the research conditions and the real life use being promoted, advertisers need to evaluate whether it is appropriate to extrapolate from the research to the claimed effect.

In drafting ad copy, the advertiser should take care to make sure that the claims match the underlying support. Claims that do not match the science, no matter how sound that science is, are likely to be unsubstantiated. Advertising should not exaggerate the extent, nature, or permanence of the effects achieved in a study, and should not suggest greater scientific certainty than actually exists. Although emerging science can sometimes be the basis for a carefully qualified claim, advertisers must make consumers aware of any significant limitations or inconsistencies in the scientific literature.

*Example 22*

An ad for a supplement claims that a particular nutrient helps maintain healthy cholesterol levels. There is a substantial body of epidemiologic evidence suggesting that foods high in that nutrient are associated with lower cholesterol levels. There is no science, however, demonstrating a relationship between the specific nutrient and cholesterol, although it would be feasible to conduct such a study. If there is a basis for believing that the health effect may be attributable to other components of the food, or to a combination of various components, a claim about the cholesterol maintenance benefits of the supplement product is likely not substantiated by this evidence.

16

### Example 23

A number of well-controlled clinical studies have been conducted to suggest that a mineral supplement can improve mental alertness and memory in subjects with significantly impaired blood circulation to the brain.  A claim suggesting that the supplement will improve memory or mental alertness in healthy adults may not be adequately substantiated by this evidence.  Advertisers should not rely on research based on a specific test population for claims targeted at the general population without first considering whether it is scientifically sound to make such extrapolations.

### Example 24

An advertiser wants to make claims that its combination herbal product helps increase alertness and energy safely and naturally.  The product contains two herbs known to have a central nervous system stimulant effect.  The advertiser compiles competent and reliable scientific research demonstrating that each of the herbs, individually, is safe and causes no significant side effects in the recommended dose.  This evidence may be inadequate to substantiate an unqualified safety claim.  Where there is reason to suspect that the combination of multiple ingredients might result in interactions that would alter the effect or safety of the individual ingredients, studies showing the effect of the individual ingredients may be insufficient to substantiate the safety of the multiple ingredient product.  In this example, the combination of two herbs with similar stimulant properties could produce a stronger cumulative stimulant effect that might present safety hazards.  A better approach would be to investigate the safety of the specific combination of ingredients contained in the product.

17

*Example 25*

Several clinical trials have been done on a specific botanical extract showing consistently that the extract is effective for supporting the immune system. The studied extract is a complex combination of many constituents and the active constituents that may produce the benefit are still unknown. An advertiser wishes to cite this research in its advertising, as proof that its product will support the immune system. The advertiser's product is made using a different extraction method of the same botanical. An analysis of the extract reveals that it has a significantly different chemical profile from the studied extract. The advertiser should not rely on these clinical trials alone as substantiation because the difference in extracts may result in significant differences in the two products' efficacy.

## C. Other Issues Relating to Dietary Supplement Advertising

In addition to the basic principles of ad meaning and substantiation discussed above, a number of other issues commonly arise in the context of dietary supplement advertising. The following sections provide guidance on some of these issues including: the use of consumer or expert endorsements in ads; advertising claims based on traditional uses of supplements; use of the DSHEA disclaimer in advertising; and the application to advertising of the DSHEA exemption for certain categories of publications, commonly referred to as "third party literature."

### 1. Claims Based on Consumer Testimonials or Expert Endorsements

An overall principle is that advertisers should not make claims either through consumer or expert endorsements that would be deceptive or could not be substantiated if made directly.[10] It is not enough that a testimonial represents the honest opinion of the endorser. Under FTC law, advertisers must also have appropriate scientific evidence to back up the underlying claim.

Consumer testimonials raise additional concerns about which advertisers need to be aware. Ads that include consumer testimonials about the efficacy or safety of a supplement product should be backed by adequate substantiation that the testimonial experience is representative of what consumers will generally achieve when using the product. As discussed earlier, anecdotal evidence of a product's effect, based solely on the experiences of individual consumers, is generally insufficient to substantiate a claim. Further, if the advertiser's substantiation does not demonstrate that the results are representative, then a clear and

18

conspicuous disclaimer is necessary. The advertiser should either state what the generally expected results would be or indicate that the consumer should not expect to experience the attested results. Vague disclaimers like "results may vary" are likely to be insufficient.

### Example 26

An advertisement for a weight loss supplement features a before-and-after photograph of a woman and quotes her as saying that she lost 20 pounds in 8 weeks while using the supplement. An asterisk next to the quotation references a disclaimer in fine print at the bottom of the ad that reads, "Results may vary." The experience of the woman is accurately represented, but the separate, competent research demonstrating the efficacy of the supplement showed an average weight loss of only 6 pounds in 8 weeks. Therefore, the disclosure does not adequately convey to consumers that they would likely see much less dramatic results. The placement and size of the disclaimer is also insufficiently prominent to qualify the claim effectively. One approach to adequate qualification of this testimonial would be to include a disclaimer immediately adjacent to the quote, in equal print size that says, "These results are not typical. Average weight loss achieved in clinical study was 6 pounds."

When an advertiser uses an expert endorser, it should make sure that the endorser has appropriate qualifications to be represented as an expert and has conducted an examination or testing of the product that would be generally recognized in the field as sufficient to support the endorsement. In addition, whenever an expert or consumer endorser is used, the advertiser should disclose any material connection between the endorser and the advertiser of the product. A material connection is one that would affect the weight or credibility of the endorsement, or put another way, a personal, financial, or similar connection that consumers would not reasonably expect.

### Example 27

An infomercial for a dietary supplement features an expert referred to as a "Doctor" and a "leading clinician in joint health" discussing the effect of a supplement product on the maintenance of healthy joints. The expert is not licensed to practice medicine, but has a graduate degree and is a trained physical therapist, running a sports clinic. The expert has not conducted

**19**

any review of the scientific literature on the active component of the supplement.  In return for appearing in the infomercial, she is given a paid position as an officer the company. The ad is likely to be deceptive for several reasons.  First, her qualifications as an expert have been overstated and she has not conducted sufficient examination of the product to support the endorsement.  In addition, her connection to the company is one that consumers might not expect and may affect the weight and credibility of her endorsement.  Even if she is adequately qualified and has conducted an adequate review of the product, her position as an officer of the company should be clearly disclosed.

*Example 28*
A best-selling book about the benefits of a supplement product includes a footnote mentioning the most effective brand of the supplement, by name.  The manufacturer of the brand cited in the book has an exclusive promotional agreement with the author and has paid him to reference the product by name.  The manufacturer's ad touts the fact that its product is the only brand recommended in this best-selling book.  The ad is deceptive since it suggests a neutral endorsement when, in fact, the author has been paid by the manufacturer to promote the product.

## 2. Claims Based on Traditional Use

Claims based on historical or traditional use should be substantiated by confirming scientific evidence, or should be presented in such a way that consumers understand that the sole basis for the claim is a history of use of the product for a particular purpose.  A number of supplements, particularly botanical products, have a long history of use as traditional medicines in the United States or in other countries to treat certain conditions or symptoms. Several European countries have a separate regulatory approach to these traditional medicines, allowing manufacturers to make certain limited claims about their traditional use for treating certain health conditions.  Some countries also require accompanying disclosures about the fact that the product has not been scientifically established to be effective, as well as disclosures about potential adverse effects.  At this time there is no separate regulatory process for approval of claims for these traditional medicine products under DSHEA and FDA labeling rules.

20

In assessing claims based on traditional use, the FTC will look closely at consumer perceptions and specifically at whether consumers expect such claims to be backed by supporting scientific evidence. Advertising claims based solely on traditional use should be presented carefully to avoid the implication that the product has been scientifically evaluated for efficacy. The degree of qualification necessary to communicate the absence of scientific substantiation for a traditional use claim will depend in large part on consumer understanding of this category of products. As consumer awareness of and experience with "traditional use" supplements evolve, the extent and type of qualification necessary is also likely to change.



There are some situations, however, where traditional use evidence alone will be inadequate to substantiate a claim, even if that claim is carefully qualified to convey the limited nature of the support. In determining the level of substantiation necessary to substantiate a claim, the FTC assesses, among other things, the consequences of a false claim. Claims that, if unfounded, could present a substantial risk of injury to consumer health or safety will be held to a higher level of scientific proof. For that reason, an advertiser should not suggest, either directly or indirectly, that a supplement product will provide a disease benefit unless there is competent and reliable scientific evidence to substantiate that benefit. The FTC will closely scrutinize the scientific support for such claims, particularly where the claim could lead consumers to forego other treatments that have been validated by scientific evidence, or to self-medicate for potentially serious conditions without medical supervision.

The advertiser should also make sure that it can document the extent and manner of historical use and be careful not to overstate such use. As part of this inquiry, the advertiser should make sure that the product it is marketing is consistent with the product as traditionally administered. If there are significant differences between the traditional use product and the marketed product, in the form of administration, the formulation of ingredients, or the dose, a "traditional use" claim may not be appropriate.

### *Example 29*

The advertiser of an herbal supplement makes the claim, "Ancient folklore remedy used for centuries by Native Americans to aid digestion." The statement about traditional use is accurate and the supplement product is consistent with the formulation of the product as traditionally used. However, if, in the context of the ad, this statement suggests that there is scientific evidence demonstrating that the product is effective for aiding digestion, the advertiser would need to include a clear and prominent disclaimer about the absence of such evidence.

21

### Example 30

A supplement manufacturer wants to market an herbal product that has been used in the same formulation in China as a tonic for improving mental functions. The manufacturer prepares the product in a manner consistent with Chinese preparation methods. The ad claims, "Traditional Chinese Medicine — Used for Thousands of Years to Bring Mental Clarity and Improve Memory." The ad also contains language that clearly conveys that the efficacy of the product has not been confirmed by research, and that traditional use does not establish that the product will achieve the claimed results. The ad is likely to adequately convey the limited nature of support for the claim.

### Example 31

A supplement manufacturer markets a capsule containing a concentrated extract of a botanical product that has been used in its raw form in China to brew teas for increasing energy. The advertisement clearly conveys that the energy benefit is based on traditional use and has not been confirmed by scientific research. The ad may still be deceptive, however, because the concentrated extract is not consistent with the traditional use of the botanical in raw form to brew teas and may produce a significantly different effect.

### Example 32

A supplement ad claims that a supplement liquid mineral solution has been a popular American folk remedy since early pioneer days for shrinking tumors. The ad is likely to convey to consumers that the product is an effective treatment for cancer. There is no scientific support for this disease benefit. Because of the potential risks to consumers of taking a product that may or may not be effective to treat such a serious health condition, possibly without medical supervision, the advertiser should not make the claim.

22

## 3. Use of the DSHEA Disclaimer in Advertising

Under DSHEA, all statements of nutritional support for dietary supplements must be accompanied by a two-part disclaimer on the product label: that the statement has not been evaluated by FDA and that the product is not intended to "diagnose, treat, cure or prevent any disease." Although DSHEA does not apply to advertising, there are situations where such a disclosure is desirable in advertising as well as in labeling to prevent consumers from being misled about the nature of the product and the extent to which its efficacy and safety have been reviewed by regulatory authorities. For example, a disclosure may be necessary if the text or images in the ad lead consumers to believe that the product has undergone the kind of review for safety and efficacy that the FDA conducts on new drugs and has been found to be beneficial for the treatment of disease. Failure to correct those misperceptions may render the advertising deceptive.

At the same time, the inclusion of a DSHEA disclaimer or similar disclosure will not cure an otherwise deceptive ad, particularly where the deception concerns claims about the disease benefits of a product. In making references to DSHEA and FDA review, advertisers should also be careful not to mischaracterize the extent to which a product or claim has been reviewed or approved by the FDA. Compliance with the notification and disclaimer provisions of DSHEA does not constitute authorization of a claim by FDA and advertisers should not imply that FDA has specifically approved any claim on that basis.

*Example 33*

A company markets a supplement for "maintaining joint flexibility." The product packaging is similar in color and design to a nonprescription drug used to treat joint pain associated with arthritis and the product name is similar to the drug counterpart. The ad includes statements urging consumers to "ask their pharmacist" and "accept no generic substitute." The various elements of the ad may lead consumers to believe that the supplement is, in fact, an approved drug, or may give consumers more general expectations that the product has been subjected to similar government review for safety and efficacy. A clear and prominent disclaimer may be necessary to indicate that the product has not been evaluated by FDA and is not an approved drug product.

23

*Example 34*

An advertisement for an herbal supplement includes strong, unqualified claims that the product will effectively treat or prevent diabetes, heart disease, and various circulatory ailments. The advertiser does not have adequate substantiation for this claim, but includes the DSHEA disclaimer prominently in the ad. In face of the strong contradictory message in the ad, the inclusion of the DSHEA disclaimer is not likely to negate the explicit disease claims made in the ad, and will not cure the fact that the claims are not substantiated.

*Example 35*

A dietary supplement advertisement makes a number of claims about the benefits of its product for supporting various body functions. The ad also includes the statement, "Complies with FDA notification procedures of the Dietary Supplement Health and Education Act." This statement may suggest to consumers that FDA has authorized the claims made in the ad or that it has reviewed the support for the claims and found the product to be effective. Because there is no review and authorization process for such claims under DSHEA, this would be deceptive.

## 4. Third Party Literature

Dietary supplement advertisers should be aware that the use of newspaper articles, abstracts of scientific studies, or other "third party literature" to promote a particular brand or product can have an impact on how consumers interpret an advertisement and on what claims the advertiser will be responsible for substantiating. For purposes of dietary supplement labeling, Section 5 of DSHEA provides an exemption from labeling requirements for scientific journal articles, books and other publications used in the sale of dietary supplements, provided these materials are reprinted in their entirety, are not false or misleading, do not promote a specific brand or manufacturer, are presented with other materials to create a balanced view of the scientific information, and are physically separate from the supplements being sold.

The FTC will generally follow an approach consistent with the labeling approach when evaluating the use of such publications in other contexts, such as advertising. Although the FTC does not regulate the content or accuracy of statements made in independently written and published books, articles, or other non-commercial literature, FTC law does prohibit the deceptive use of such materials in marketing products. The determination of whether the

materials will be subject to FTC jurisdiction turns largely on whether the materials have been created or are being used by an advertiser specifically for the purpose of promoting its product.  As a practical matter, publications and other materials that comply with the elements of the DSHEA provision, particularly with the requirement that such materials be truthful, not misleading and balanced, are also likely to comply with FTC advertising law.

### Example 36

An author publishes a book on the curative properties of an herb.  The book title is "The Miracle Cancer Cure." The book does not endorse or otherwise mention any particular supplement brand.  The author/publisher does not sell the herbal supplement and does not have any material connection to any marketers of the herb.  As non-commercial speech, the book itself would not be subject to the FTC's jurisdiction over advertising. However, if a marketer of the herb referred to the book in advertising materials (for instance, by quoting the title and using excerpts to describe the anti-cancer benefits of its product), such references would likely be considered advertising. The advertiser would be responsible for substantiating any claims about the advertiser's product that are conveyed by these references.



# CONCLUSION

Marketers of dietary supplements should be familiar with the requirements under both DSHEA and the FTC Act that labeling and advertising claims be truthful, not misleading and substantiated.  The FTC approach generally requires that claims be backed by sound, scientific evidence, but also provides flexibility in the precise amount and type of support necessary.  This flexibility allows advertisers to provide truthful information to consumers about the benefits of supplement products, and at the same time, preserves consumer confidence by curbing unsubstantiated, false, and misleading claims.  To ensure compliance with FTC law, supplement advertisers should follow two important steps: 1) careful drafting of advertising claims with particular attention to how claims are qualified and what express and implied messages are actually conveyed to consumers; and 2) careful review of the support for a claim to make sure it is scientifically sound, adequate in the context of the surrounding body of evidence, and relevant to the specific product and claim advertised.

25

# Endnotes

[1] The FTC's authority derives from Section 5 of the FTC Act. In addition, supplements have traditionally been regulated under Sections 12 and 15, which prohibit false advertisements, defined as those that are "misleading in a material respect," for foods, drugs, devices or cosmetics.

[2] Under DSHEA, supplement marketers are allowed to make two kinds of claims on labeling: 1) health claims specifically authorized by the FDA; and 2) statements of nutritional support. Health claims — representations about the relationship between a nutrient and a disease or health-related condition — are permitted only if they have been authorized by an FDA finding that there is "significant scientific agreement" to support the claim. The Food and Drug Administration Modernization Act of 1997 (FDAMA) also now allows health claims that are based on "authoritative statements" from certain federal scientific bodies, such as NIH and the National Academy of Sciences. Aside from these authorized claims, supplement marketers are prohibited from making any labeling claim about the diagnosis, mitigation, treatment or cure of a disease. In contrast to health claims, "structure/function" claims, within the broader category of "statements of nutritional support," refer to representations about a dietary supplement's effect on the structure or function of the body for maintenance of good health and nutrition.

[3] Structure/function claims are not subject to FDA pre-authorization. A marketer may make these claims in labeling if it notifies FDA and includes a disclaimer that the claim has not been evaluated by FDA and that the product is not intended to diagnose, mitigate, treat, cure, or prevent disease. DSHEA also requires that structure/function claims in labeling be substantiated and be truthful and not misleading. This requirement is fully consistent with the FTC's standard that advertising claims be truthful, not misleading and substantiated.

[4] FTC policy statements and other information for businesses and consumers are available on the FTC's Internet home page, **www.ftc.gov**.

[5] As indicated in the Food Policy Statement, the FTC will be "especially vigilant in examining whether qualified claims are presented in a manner that ensures that consumers understand both the extent of the support for the claim and the existence of any significant contrary view within the scientific community. In the absence of adequate qualification the Commission will find such claims deceptive."

[6] These principles are articulated in the FTC's Deception Policy Statement and Advertising Substantiation Policy Statement, available at **www.ftc.gov**. The FTC also has authority to challenge unfair trade practices. An unfair practice is one that causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or competition. The majority of advertising cases are brought pursuant to the FTC's deception authority.

[7] Throughout these examples the terms "advertiser," "marketer," "supplement manufacturer" and "company" are used interchangeably.

[8] Additional guidance on the use of consumer testimonials is provided in Part C.1.

[9] Any foreign research submitted to the FTC in the course of an investigation should be presented in English translation and with sufficient detail to allow the agency to evaluate the study.

[10] The FTC has provided detailed guidance on this subject in its Guides Concerning Use of Endorsements and Testimonials in Advertising, available at **www.ftc.gov**.

26



| FEDERAL TRADE COMMISSION | TOLL-FREE 1-877-FTC-HELP |
|---|---|
| WWW.FTC.GOV | FOR THE CONSUMER |

JA-0822



VMS-0000198

**vms**
KNOW BETTER.™

Product: POM Wonderful
Media: Print
Ad Title: FSI: DRINK AND BE HEALTHY.
VMS Ad ID: 031022864
Date Range:

| Run Date | Market | Rank | Media Vehicle | Media Type | Unit | Cost |
|---|---|---|---|---|---|---|
| 10/12/2003 | Chicago | 3 | Chicago Tribune | Local Newspaper | Full Page | $80,345 |
| | Total 1 Occurrence(s) | | | | | $80,345 |

VMS-0000517
CX0016_0002

**JA-0824**

advertisement

POMEGRANATE JUICE.

## STUDIES SHOW THAT 10 OUT OF 10 PEOPLE DON'T WANT TO DIE

IT'S NOT EASY BEING ALIVE IN TODAY'S POLLUTED, STRESSED OUT WORLD. Here's a tip: with more naturally occurring antioxidant power than any other drink, a glass of POM Wonderful® Pomegranate Juice a day might be just what the doctor ordered.

### Fighting Free Radicals

Let's start with the problem: free radicals...unstable little molecules that can accelerate aging, lead to heart disease and stroke, and have even been implicated in cancer. Where do they come from? Everywhere. Free radicals are formed by exposure to air pollution, alcohol, pesticides, sunlight, tobacco smoke, drugs, even fried foods. Of course, when you're very young, your body's self-repair mechanism can neutralize the activity of many free radicals. But by the time you're in your twenties, those mechanisms just don't work as well. That's where antioxidants come in. They neutralize free radicals, helping to prevent the cell and tissue damage that leads to disease. Which brings us back to POM Wonderful Pomegranate Juice.



*fig. 1 THE HEART*

### Not All Antioxidants are Equal

Since our bodies don't produce enough antioxidants to do the job on their own, we need a little outside help. POM Wonderful Pomegranate Juice, with a higher

In the refrigerated produce section of your grocer.

©2004 POM Wonderful, LLC. All rights reserved. POM Wonderful and Antioxidant Superpower are trademarks of POM Wonderful, LLC.

advertisement



level of antioxidants than any other drink, is a real Antioxidant Superpower.™

**Our Research: Heartening**

We've been working with a number of top scientists, including a Nobel Laureate, for 6 years now and our seven published, peer-reviewed papers reveal heartening results. Here's the story: Free radicals are the culprits that turn LDL – or "bad" cholesterol – into that sticky stuff that becomes the plaque that clogs your arteries. Our scientific research shows that pomegranate juice is 8 times better than green tea at preventing formation of oxidized (sticky) LDL.[1] And a clinical pilot study shows that an 8 oz. glass of POM Wonderful 100% Pomegranate Juice, consumed daily, reduces plaque in the arteries up to 30%.[2]

**The Heart Stopping Truth**

Remember: heart disease is America's number one killer. For women as well as men. 98% of heart attacks are due to atherosclerosis, or too much plaque in the arteries. That same plaque increases your chance of stroke. One final scary statistic: half of patients who have a severe heart attack have normal cholesterol levels. In other words, we're all at risk.

**Just a Glass a Day**

To keep your heart healthy: exercise regularly. Eat a healthy diet. And drink 8 ounces of POM Wonderful Pomegranate Juice. Make every day a good day to be alive.

[1]Aviram, M., Drugs Under Experimental and Clinical Research, 2002. Indexed values, based on relative amount of oxidized LDL created. [2]Aviram, M., Clinical Nutrition, 2004.

**POM Wonderful Pomegranate Juice
is the Antioxidant Superpower.™ Drink a glass a day!**

For more medical research on the Antioxidant Superpower, visit pomwonderful.com

VMS-0000206

CX0029_0002

**vms**
KNOW BETTER.™

Product        POM Wonderful
Media:         Print
Ad Title:      STUDIES SHOW THAT 10 OUT OF 10 PEOPLE DON'T WANT TO DIE
VMS Ad ID:     041120201
Date Range:

| Run Date | Market | Rank | Media Vehicle | Media Type | Unit | Cost |
|---|---|---|---|---|---|---|
| 05/01/2005 | NATIONAL | 0 | MARTHA STEWART LIVING | Magazine | Full Page | $100,214 |
| 01/01/2005 | NATIONAL | 0 | PREVENTION | Magazine | 2 Pages | $193,920 |
| 11/01/2004 | NATIONAL | 0 | Prevention | Magazine | 2 Pages | $193,920 |
| Total 3 Occurrence(s) | | | | | | $488,054 |

VMS-0000523
CX0029_0003

**JA-0827**



Ace your EKG: just drink 8 ounces of delicious POM Wonderful Pomegranate Juice a day. It has more naturally occurring antioxidants than any other drink. Antioxidants fight free radicals… nasty little molecules that can cause sticky, artery clogging plaque. A glass a day can reduce plaque by up to 30%! Trust us, your cardiologist will be amazed.

**POM Wonderful Pomegranate Juice. The Antioxidant Superpower.**



pomwonderful.com

**VMS-0000219**

**vms**
KNOW BETTER.™

Product: POM Wonderful
Media: Print
Ad Title: AMAZE YOUR CARDIOLOGIST.
VMS Ad ID: 050220377
Date Range:

| Run Date | Market | Rank | Media Vehicle | Media Type | Unit | Cost |
|----------|--------|------|---------------|------------|------|------|
| 02/01/2005 | NATIONAL | 0 | PREVENTION | Magazine | Full Page | $96,960 |
| | Total 1 Occurrence(s) | | | | | $96,960 |

VMS-0000531
CX0034_0002

JA-0829



# Cheat death.

Dying is so dead. Drink to life with POM Wonderful Pomegranate Juice, the world's most powerful antioxidant. It has more antioxidants than any other drink and can help prevent premature aging, heart disease, stroke, Alzheimer's, even cancer. Eight ounces a day is all you need. The sooner you drink it, the longer you will enjoy it.

**POM Wonderful Pomegranate Juice. The Antioxidant Superpower.™**



pomwonderful.com

VMS-0000221

JA-0830

CX0036_0001

vms
KNOW BETTER.™

Product        POM Wonderful
Media:         Print
Ad Title:      CHEAT DEATH.
VMS Ad ID:     050321070
Date Range:

| Run Date | Market | Rank | Media Vehicle | Media Type | Unit | Cost |
|---|---|---|---|---|---|---|
| 01/01/2006 | NATIONAL | 0 | FITNESS | Magazine | Full Page | $92,880 |
| 05/01/2005 | NATIONAL | 0 | PREVENTION | Magazine | Full Page | $96,960 |
| 07/28/2005 | NATIONAL | 0 | ROLLING STONE | Magazine | Full Page | $110,608 |
| 06/30/2005 | NATIONAL | 0 | ROLLING STONE | Magazine | Full Page | $110,608 |
| 03/10/2005 | NATIONAL | 0 | ROLLING STONE | Magazine | Full Page | $110,608 |

Total 5 Occurrence(s)                                                $521,664

VMS-0000533
CX0036_0002

JA-0831


U.S. Department of Health & Human Services    National Institutes of Health    Document 14-6 Health    Filed: 03/12/2014    Page 263 of 387

Font Size ⊖ ⊕

**NIH** National Institutes of Health
*Office of Dietary Supplements*

Strengthening Knowledge and
Understanding of Dietary Supplements

| Health Information | News & Events | Research & Funding | About ODS |

Search

## Health Information

print | view as pdf | share ➕

| Other Resources | Health Professional | Datos en español | QuickFacts |

### Making Decisions

- Dietary Supplement Fact Sheets
- Frequently Asked Questions
- Dietary Supplements: What You Need to Know
- My Dietary Supplements (MyDS) Mobile App
- The Savvy Supplement User (FDA)
- Tips for Older Supplement Users (FDA)
- Human Performance Resource Center: Dietary Supplements (DoD)
- How To Evaluate Health Information on the Internet: Questions and Answers
- Información en español

### Consumer Protection

- FDA: Consumer Updates on Dietary Supplements
- FDA: Warnings and Safety Information
- FDA: How to Spot Health Fraud
- FTC: Drugs & Dietary Supplements
- FTC: Weight Loss & Fitness

### Nutrient Recommendations

- Dietary Reference Intake (DRI) Reports and Tables
- Online DRI Tool
- Daily Value (DV) Tables

# Vitamin C

Fact Sheet for Health Professionals

## Introduction

Vitamin C, also known as L-ascorbic acid, is a water-soluble vitamin that is naturally present in some foods, added to others, and available as a dietary supplement. Humans, unlike most animals, are unable to synthesize vitamin C endogenously, so it is an essential dietary component [1].



See **QuickFacts** for easy-to-read facts about Vitamin C.

Vitamin C is required for the biosynthesis of collagen, L-carnitine, and certain neurotransmitters; vitamin C is also involved in protein metabolism [1,2]. Collagen is an essential component of connective tissue, which plays a vital role in wound healing. Vitamin C is also an important physiological antioxidant [3] and has been shown to regenerate other antioxidants within the body, including alpha-tocopherol (vitamin E) [4]. Ongoing research is examining whether vitamin C, by limiting the damaging effects of free radicals through its antioxidant activity, might help prevent or delay the development of certain cancers, cardiovascular disease, and other diseases in which oxidative stress plays a causal role. In addition to its biosynthetic and antioxidant functions, vitamin C plays an important role in immune function [4] and improves the absorption of nonheme iron [5], the form of iron present in plant-based foods. Insufficient vitamin C intake causes scurvy, which is characterized by fatigue or lassitude, widespread connective tissue weakness, and capillary fragility [1,2,4,6-9].

### Table of Contents

- Introduction
- Recommended Intakes
- Sources of Vitamin C
- Vitamin C Intakes and Status
- Vitamin C Deficiency
- Groups at Risk of Vitamin C Inadequacy
- Vitamin C and Health
- Health Risks from Excessive Vitamin C
- Interactions with Medications
- Vitamin C and Healthful Diets
- References
- Disclaimer

The intestinal absorption of vitamin C is regulated by at least one specific dose-dependent, active transporter [4]. Cells accumulate vitamin C via a second specific transport protein. In vitro studies have found that oxidized vitamin C, or dehydroascorbic acid, enters cells via some facilitated glucose transporters and is then reduced internally to ascorbic acid. The physiologic importance of dehydroascorbic acid uptake and its contribution to overall vitamin C economy is unknown.

Oral vitamin C produces tissue and plasma concentrations that the body tightly controls. Approximately 70%-90% of vitamin C is absorbed at moderate intakes of 30-180 mg/day. However, at doses above 1 g/day, absorption falls to less than 50% and absorbed, unmetabolized ascorbic acid is excreted in the urine [4]. Results from pharmacokinetic studies indicate that oral doses of 1.25 g/day ascorbic acid produce mean peak plasma vitamin C concentrations of 135 micromol/L, which are about two times higher than those produced by consuming 200-300 mg/day ascorbic acid from vitamin C-rich foods [10].

**JA-0832**

USCA Case #13-1060    Document #1483686    Filed: 03/11/2014    Page 264 of 387

Pharmacokinetic modeling predicts that even doses as high as 1.25 g ascorbic acid taken every 4 hours would produce peak plasma concentrations of only 220 micromol/L [10].

The total body content of vitamin C ranges from 300 mg (at near scurvy) to about 2 g [4]. High levels of vitamin C (millimolar concentrations) are maintained in cells and tissues, and are highest in leukocytes (white blood cells), eyes, adrenal glands, pituitary gland, and brain. Relatively low levels of vitamin C (micromolar concentrations) are found in extracellular fluids, such as plasma, red blood cells, and saliva [4].

## Recommended Intakes

Intake recommendations for vitamin C and other nutrients are provided in the Dietary Reference Intakes (DRIs) developed by the Food and Nutrition Board (FNB) at the Institute of Medicine (IOM) of the National Academies (formerly National Academy of Sciences) [8]. DRI is the general term for a set of reference values used for planning and assessing nutrient intakes of healthy people. These values, which vary by age and gender [8], include:

- Recommended Dietary Allowance (RDA): average daily level of intake sufficient to meet the nutrient requirements of nearly all (97%-98%) healthy individuals.
- Adequate Intake (AI): established when evidence is insufficient to develop an RDA and is set at a level assumed to ensure nutritional adequacy.
- Tolerable Upper Intake Level (UL): maximum daily intake unlikely to cause adverse health effects [8].

Table 1 lists the current RDAs for vitamin C [8]. The RDAs for vitamin C are based on its known physiological and antioxidant functions in white blood cells and are much higher than the amount required for protection from deficiency [4,8,11]. For infants from birth to 12 months, the FNB established an AI for vitamin C that is equivalent to the mean intake of vitamin C in healthy, breastfed infants.

Table 1: Recommended Dietary Allowances (RDAs) for Vitamin C [8]

| Age | Male | Female | Pregnancy | Lactation |
|---|---|---|---|---|
| 0-6 months | 40 mg* | 40 mg* | | |
| 7-12 months | 50 mg* | 50 mg* | | |
| 1-3 years | 15 mg | 15 mg | | |
| 4-8 years | 25 mg | 25 mg | | |
| 9-13 years | 45 mg | 45 mg | | |
| 14-18 years | 75 mg | 65 mg | 80 mg | 115 mg |
| 19+ years | 90 mg | 75 mg | 85 mg | 120 mg |
| Smokers | Individuals who smoke require 35 mg/day more vitamin C than nonsmokers. | | | |

* Adequate Intake (AI)

## Sources of Vitamin C

*Food*
Fruits and vegetables are the best sources of vitamin C (see Table 2) [12]. Citrus fruits, tomatoes and tomato juice, and potatoes are major contributors of vitamin C to the American diet [8]. Other good food sources include red and green peppers, kiwifruit, broccoli, strawberries, Brussels sprouts, and cantaloupe (see Table 2) [8,12]. Although vitamin C is not naturally present in grains, it is added to some fortified breakfast cereals. The vitamin C content of food may be reduced by prolonged storage and by cooking because ascorbic acid is water soluble and is destroyed by heat [6,8]. Steaming or microwaving may lessen cooking losses. Fortunately, many of the best food sources of vitamin C, such as fruits and vegetables, are usually consumed raw. Consuming five varied servings of fruits and vegetables a day can provide more than 200 mg of vitamin C.

Table 2: Selected Food Sources of Vitamin C [12]

| Food | Milligrams (mg) per serving | Percent (%) DV* |
|---|---|---|
| Red pepper, sweet, raw, ½ cup | 95 | 158 |
| Orange juice, ¾ cup | 93 | 155 |
| Orange, 1 medium | 70 | 117 |
| Grapefruit juice, ¾ cup | 70 | 117 |
| Kiwifruit, 1 medium | 64 | 107 |

USCA Case #13-1060      Document #1483685      Filed: 03/12/2014      Page 265 of 387

| | | |
|---|---|---|
| Orange juice, ¾ cup | 93 | 155 |
| Broccoli, cooked, ½ cup | 51 | 85 |
| Strawberries, fresh, sliced, ½ cup | 49 | 82 |
| Brussels sprouts, cooked, ½ cup | 48 | 80 |
| Grapefruit, ½ medium | 39 | 65 |
| Broccoli, raw, ½ cup | 39 | 65 |
| Tomato juice, ¾ cup | 33 | 55 |
| Cantaloupe, ½ cup | 29 | 48 |
| Cabbage, cooked, ½ cup | 28 | 47 |
| Cauliflower, raw, ½ cup | 26 | 43 |
| Potato, baked, 1 medium | 17 | 28 |
| Tomato, raw, 1 medium | 17 | 28 |
| Spinach, cooked, ½ cup | 9 | 15 |
| Green peas, frozen, cooked, ½ cup | 8 | 13 |

*DV = Daily Value. DVs were developed by the U.S. Food and Drug Administration (FDA) to help consumers compare the nutrient contents of products within the context of a total diet. The DV for vitamin C is 60 mg for adults and children aged 4 and older. The FDA requires all food labels to list the percent DV for vitamin C. Foods providing 20% or more of the DV are considered to be high sources of a nutrient.

The U.S. Department of Agriculture's Nutrient Database Web site lists the nutrient content of many foods and provides a comprehensive list of foods containing vitamin C.

*Dietary supplements*

Supplements typically contain vitamin C in the form of ascorbic acid, which has equivalent bioavailability to that of naturally occurring ascorbic acid in foods, such as orange juice and broccoli [13-15]. Other forms of vitamin C supplements include sodium ascorbate; calcium ascorbate; other mineral ascorbates; ascorbic acid with bioflavonoids; and combination products, such as Ester-C®, which contains calcium ascorbate, dehydroascorbate, calcium threonate, xylonate and lyxonate [16].

A few studies in humans have examined whether bioavailability differs among the various forms of vitamin C. In one study, Ester-C® and ascorbic acid produced the same vitamin C plasma concentrations, but Ester-C® produced significantly higher vitamin C concentrations in leukocytes 24 hours after ingestion [17]. Another study found no differences in plasma vitamin C levels or urinary excretion of vitamin C among three different vitamin C sources: ascorbic acid, Ester-C®, and ascorbic acid with bioflavonoids [16]. These findings, coupled with the relatively low cost of ascorbic acid, led the authors to conclude that simple ascorbic acid is the preferred source of supplemental vitamin C [16].


## Vitamin C Intakes and Status

According to the 2001-2002 National Health and Nutrition Examination Survey (NHANES), mean intakes of vitamin C are 105.2 mg/day for adult males and 83.6 mg/day for adult females, meeting the currently established RDA for most nonsmoking adults [18]. Mean intakes for children and adolescents aged 1-18 years range from 75.6 mg/day to 100 mg/day, also meeting the RDA for these age groups [18]. Although the 2001-2002 NHANES analysis did not include data for breastfed infants and toddlers, breastmilk is considered an adequate source of vitamin C [8,13]. Use of vitamin C-containing supplements is also relatively common, adding to the total vitamin C intake from food and beverages. NHANES data from 1999-2000 indicate that approximately 35% of adults take multivitamin supplements (which typically contain vitamin C) and 12% take a separate vitamin C supplement [19]. According to 1999-2002 NHANES data, approximately 29% of children take some form of dietary supplement that contains vitamin C [20].

Vitamin C status is typically assessed by measuring plasma vitamin C levels [4,13]. Other measures, such as leukocyte vitamin C concentration, could be more accurate indicators of tissue vitamin C levels, but they are more difficult to assess and the results are not always reliable [4,9,13].


## Vitamin C Deficiency

Acute vitamin C deficiency leads to scurvy [7,8,11]. The timeline for the development of scurvy varies, depending on vitamin C body stores, but signs can appear within 1 month of little or no vitamin C intake (below 10 mg/day) [6,7,21,22]. Initial symptoms can include fatigue (probably the result of impaired carnitine biosynthesis), malaise, and inflammation of the gums [4,11]. As vitamin C deficiency progresses, collagen synthesis becomes impaired and connective tissues become

USCA Case #13-1060   Document #1488635   Filed 03/12/2014   Page 266 of 387

corkscrew and uncoiled hair, dry or damage, ecchymoses, bleeding into body cavities, poor wound healing, corkscrew hairs [1,2,4,6-8]. Additional signs of scurvy include depression as well as swollen, bleeding gums and loosening or loss of teeth due to tissue and capillary fragility [6,8,9]. Iron deficiency anemia can also occur due to increased bleeding and decreased nonheme iron absorption secondary to low vitamin C intake [6,11]. In children, bone disease can be present [6]. Left untreated, scurvy is fatal [6,9].

Until the end of the 18th century, many sailors who ventured on long ocean voyages, with little or no vitamin C intake, contracted or died from scurvy. During the mid-1700s, Sir James Lind, a British Navy surgeon, conducted experiments and determined that eating citrus fruits or juices could cure scurvy, although scientists did not prove that ascorbic acid was the active component until 1932 [23-25].

Today, vitamin C deficiency and scurvy are rare in developed countries [8]. Overt deficiency symptoms occur only if vitamin C intake falls below approximately 10 mg/day for many weeks [5-8,21,22]. Vitamin C deficiency is uncommon in developed countries but can still occur in people with limited food variety.

## Groups at Risk of Vitamin C Inadequacy

Vitamin C *inadequacy* can occur with intakes that fall below the RDA but are above the amount required to prevent overt deficiency (approximately 10 mg/day). The following groups are more likely than others to be at risk of obtaining insufficient amounts of vitamin C.

*Smokers and passive "smokers"*
Studies consistently show that smokers have lower plasma and leukocyte vitamin C levels than nonsmokers, due in part to increased oxidative stress [8]. For this reason, the IOM concluded that smokers need 35 mg more vitamin C per day than nonsmokers [8]. Exposure to secondhand smoke also decreases vitamin C levels. Although the IOM was unable to establish a specific vitamin C requirement for nonsmokers who are regularly exposed to secondhand smoke, these individuals should ensure that they meet the RDA for vitamin C [4,8].

*Infants fed evaporated or boiled milk*
Most infants in developed countries are fed breastmilk and/or infant formula, both of which supply adequate amounts of vitamin C [8,13]. For many reasons, feeding infants evaporated or boiled cow's milk is not recommended. This practice can cause vitamin C deficiency because cow's milk naturally has very little vitamin C and heat can destroy vitamin C [6,12].

*Individuals with limited food variety*
Although fruits and vegetables are the best sources of vitamin C, many other foods have small amounts of this nutrient. Thus, through a varied diet, most people should be able to meet the vitamin C RDA or at least obtain enough to prevent scurvy. People who have limited food variety—including some elderly, indigent individuals who prepare their own food; people who abuse alcohol or drugs; food faddists; people with mental illness; and, occasionally, children—might not obtain sufficient vitamin C [4,6-9,11].

*People with malabsorption and certain chronic diseases*
Some medical conditions can reduce the absorption of vitamin C and/or increase the amount needed by the body. People with severe intestinal malabsorption or cachexia and some cancer patients might be at increased risk of vitamin C inadequacy [26]. Low vitamin C concentrations can also occur in patients with end-stage renal disease on chronic hemodialysis [27].

## Vitamin C and Health

Due to its function as an antioxidant and its role in immune function, vitamin C has been promoted as a means to help prevent and/or treat numerous health conditions. This section focuses on four diseases and disorders in which vitamin C might play a role: cancer (including prevention and treatment), cardiovascular disease, age-related macular degeneration (AMD) and cataracts, and the common cold.

*Cancer prevention*
Epidemiologic evidence suggests that higher consumption of fruits and vegetables is associated with lower risk of most types of cancer, perhaps, in part, due to their high vitamin C content [1,2]. Vitamin C can limit the formation of carcinogens, such as nitrosamines [2,28], in vivo; modulate immune response [2,4]; and, through its antioxidant function, possibly attenuate oxidative damage that can lead to cancer [1].

Most case-control studies have found an inverse association between dietary vitamin C intake and

USCA Case #13-1060    Document #1483686    Filed: 03/12/2014    Page 267 of 387

cancer of the mouth, colon or rectum, stomach, and larynx, as well as esophagus [2,4]. Plasma concentrations of vitamin C are also lower in people with cancer than controls [2].

However, evidence from prospective cohort studies is inconsistent, possibly due to varying intakes of vitamin C among studies. In a cohort of 82,234 women aged 33-60 years from the Nurses' Health Study, consumption of an average of 205 mg/day of vitamin C from food (highest quintile of intake) compared with an average of 70 mg/day (lowest quintile of intake) was associated with a 63% lower risk of breast cancer among premenopausal women with a family history of breast cancer [29]. Conversely, Kushi and colleagues did not observe a significantly lower risk of breast cancer among postmenopausal women consuming at least 198 mg/day (highest quintile of intake) of vitamin C from food compared with those consuming less than 87 mg/day (lowest quintile of intake) [30]. A review by Carr and Frei concluded that in the majority of prospective cohort studies not reporting a significantly lower cancer risk, most participants had relatively high vitamin C intakes, with intakes higher than 86 mg/day in the lowest quintiles [2]. Studies reporting significantly lower cancer risk found these associations in individuals with vitamin C intakes of at least 80-110 mg/day, a range associated with close to vitamin C tissue saturation [2,21,31].

Evidence from most randomized clinical trials suggests that vitamin C supplementation, usually in combination with other micronutrients, does not affect cancer risk. In the Supplémentation en Vitamines et Minéraux Antioxydants (SU.VI.MAX) study, a randomized, double-blind, placebo-controlled clinical trial,13,017 healthy French adults received antioxidant supplementation with 120 mg ascorbic acid, 30 mg vitamin E, 6 mg beta-carotene, 100 mcg selenium, and 20 mg zinc, or placebo [32]. After a median follow-up time of 7.5 years, antioxidant supplementation lowered total cancer incidence in men, but not in women. In addition, baseline antioxidant status was related to cancer risk in men, but not in women [33]. Supplements of 500 mg/day vitamin C plus 400 IU vitamin E every other day for a mean follow-up period of 8 years failed to reduce the risk of prostate or total cancer compared with placebo in middle-aged and older men participating in the Physicians' Health Study II [34]. Similar findings were reported in women participating in the Women's Antioxidant Cardiovascular Study [35]. Compared with placebo, supplementation with vitamin C (500 mg/day) for an average of 9.4 years had no significant effect on total cancer incidence or cancer mortality. In a large intervention trial conducted in Linxian, China, daily supplements of vitamin C (120 mg) plus molybdenum (30 mcg) for 5-6 years did not significantly affect the risk of developing esophageal or gastric cancer [36]. Moreover, during 10 years of follow-up, this supplementation regimen failed to significantly affect total morbidity or mortality from esophageal, gastric, or other cancers [37]. A 2008 review of vitamin C and other antioxidant supplements for the prevention of gastrointestinal cancers found no convincing evidence that vitamin C (or beta-carotene, vitamin A, or vitamin E) prevents gastrointestinal cancers [38]. A similar review by Coulter and colleagues found that vitamin C supplementation, in combination with vitamin E, had no significant effect on death risk due to cancer in healthy individuals [39].

At this time, the evidence is inconsistent on whether dietary vitamin C intake affects cancer risk. Results from most clinical trials suggest that modest vitamin C *supplementation* alone or with other nutrients offers no benefit in the prevention of cancer.

A substantial limitation in interpreting many of these studies is that investigators did not measure vitamin C concentrations before or after supplementation. Plasma and tissue concentrations of vitamin C are tightly controlled in humans. At daily intakes of 100 mg or higher, cells appear to be saturated and at intakes of at least 200 mg, plasma concentrations increase only marginally [2,10,21,30,36]. If subjects' vitamin C levels were already close to saturation at study entry, supplementation would be expected to have made little or no difference on measured outcomes [21,22,40,41].

*Cancer treatment*

During the 1970s, studies by Cameron, Campbell, and Pauling suggested that high-dose vitamin C has beneficial effects on quality of life and survival time in patients with terminal cancer [42,43]. However, some subsequent studies—including a randomized, double-blind, placebo-controlled clinical trial by Moertel and colleagues at the Mayo Clinic [44]—did not support these findings. In the Moertel study, patients with advanced colorectal cancer who received 10 g/day vitamin C fared no better than those receiving a placebo. The authors of a 2003 review assessing the effects of vitamin C in patients with advanced cancer concluded that vitamin C confers no significant mortality benefit [39].

Emerging research suggests that the route of vitamin C administration (intravenous vs. oral) could explain the conflicting findings [1,45,46]. Most intervention trials, including the one conducted by Moertel and colleagues, used only oral administration, whereas Cameron used a combination of oral and intravenous (IV) administration. Oral administration of vitamin C, even of very large doses, can raise plasma vitamin C concentrations to a maximum of only 220 micromol/L, whereas IV administration can produce plasma concentrations as high as 26,000 micromol/L [46,47]. Concentrations of this magnitude are selectively cytotoxic to tumor cells in vitro [1,66]. Research in

JA-0836

USCA Case #13-1060      Document #1488686      Filed: 03/12/2014      Page 268 of 387

mice suggests that pharmacologic doses of IV vitamin C might show promise in treating otherwise difficult-to-treat tumors [48]. A high concentration of vitamin C may act as a pro-oxidant and generate hydrogen peroxide that has selective toxicity toward cancer cells [48-50]. Based on these findings and a few case reports of patients with advanced cancers who had remarkably long survival times following administration of high-dose IV vitamin C, some researchers support reassessment of the use of high-dose IV vitamin C as a drug to treat cancer [3,46,48,51].

As discussed below, it is uncertain whether supplemental vitamin C and other antioxidants might interact with chemotherapy and/or radiation [52]. Therefore, individuals undergoing these procedures should consult with their oncologist prior to taking vitamin C or other antioxidant supplements, especially in high doses [53].

*Cardiovascular disease*
Evidence from many epidemiological studies suggests that high intakes of fruits and vegetables are associated with a reduced risk of cardiovascular disease [1,54,55]. This association might be partly attributable to the antioxidant content of these foods because oxidative damage, including oxidative modification of low-density lipoproteins, is a major cause of cardiovascular disease [1,4,55]. In addition to its antioxidant properties, vitamin C has been shown to reduce monocyte adherence to the endothelium, improve endothelium-dependent nitric oxide production and vasodilation, and reduce vascular smooth-muscle-cell apoptosis, which prevents plaque instability in atherosclerosis [2,56].

Results from prospective studies examining associations between vitamin C intake and cardiovascular disease risk are conflicting [55]. In the Nurses' Health Study, a 16-year prospective study involving 85,118 female nurses, total intake of vitamin C from both dietary and supplemental sources was inversely associated with coronary heart disease risk [57]. However, intake of vitamin C from diet alone showed no significant associations, suggesting that vitamin C supplement users might be at lower risk of coronary heart disease. A much smaller study indicated that postmenopausal women with diabetes who took at least 300 mg/day vitamin C supplements had increased cardiovascular disease mortality [58].

A prospective study in 20,649 British adults found that those in the top quartile of baseline plasma vitamin C concentrations had a 42% lower risk of stroke than those in the bottom quartile [59]. In male physicians participating in the Physicians' Health Study, use of vitamin C supplements for a mean of 5.5 years was not associated with a significant decrease in total cardiovascular disease mortality or coronary heart disease mortality [60]. A pooled analysis of nine prospective studies that included 293,172 subjects free of coronary heart disease at baseline found that people who took ≥700 mg/day of supplemental vitamin C had a 25% lower risk of coronary heart disease incidence than those who took no supplemental vitamin C [61]. The authors of a 2008 meta-analysis of prospective cohort studies, including 14 studies reporting on vitamin C for a median follow-up of 10 years, concluded that dietary, but not supplemental, intake of vitamin C is inversely associated with coronary heart disease risk [54].

Results from most clinical intervention trials have failed to show a beneficial effect of vitamin C supplementation on the primary or secondary prevention of cardiovascular disease. In the Women's Antioxidant Cardiovascular Study, a secondary prevention trial involving 8,171 women aged 40 years or older with a history of cardiovascular disease, supplementation with 500 mg/day vitamin C for a mean of 9.4 years showed no overall effect on cardiovascular events [62]. Similarly, vitamin C supplementation (500 mg/day) for a mean follow-up of 8 years had no effect on major cardiovascular events in male physicians enrolled in the Physicians' Health Study II [63].

Other clinical trials have generally examined the effects on cardiovascular disease of supplements combining vitamin C with other antioxidants, such as vitamin E and beta-carotene, making it more difficult to isolate the potential contribution of vitamin C. The SU.VI.MAX study examined the effects of a combination of vitamin C (120 mg/day), vitamin E (30 mg/day), beta-carotene (6 mg/day), selenium (100 mcg/day), and zinc (20 mg/day) in 13,017 French adults from the general population [32]. After a median follow-up time of 7.5 years, the combined supplements had no effect on ischemic cardiovascular disease in either men or women. In the Women's Angiographic Vitamin and Estrogen (WAVE) study, involving 423 postmenopausal women with at least one coronary stenosis of 15%-75%, supplements of 500 mg vitamin C plus 400 IU vitamin E twice per day provided no cardiovascular benefit, but significantly increased all-cause mortality compared with placebo [64].

The authors of a 2006 meta-analysis of randomized controlled trials concluded that antioxidant supplements (vitamins C and E and beta-carotene or selenium) do not affect the progression of atherosclerosis [65]. Similarly, a systematic review of vitamin C's effects on the prevention and treatment of cardiovascular disease found that vitamin C did not have favorable effects on cardiovascular disease prevention [66]. Since then, researchers have published follow-up data from the Linxian trial, a population nutrition intervention trial conducted in China [37]. In this trial, daily vitamin C supplements (120 mg) plus molybdenum (30 mcg) for 5-6 years significantly reduced the

risk of cerebrovascular deaths by 8% during 10 years of follow-up after the end of the active intervention.

Although the Linxian trial data suggest a possible benefit, overall, the findings from most intervention trials do not provide convincing evidence that vitamin C supplements provide protection against cardiovascular disease or reduce its morbidity or mortality. However, as discussed in the cancer prevention section, clinical trial data for vitamin C are limited by the fact that plasma and tissue concentrations of vitamin C are tightly controlled in humans. If subjects' vitamin C levels were already close to saturation at study entry, supplementation would be expected to have made little or no difference on measured outcomes [21,22,40,41].

*Age-related macular degeneration (AMD) and cataracts*
AMD and cataracts are two of the leading causes of vision loss in older individuals. Oxidative stress might contribute to the etiology of both conditions. Thus, researchers have hypothesized that vitamin C and other antioxidants play a role in the development and/or treatment of these diseases.

A population-based cohort study in the Netherlands found that adults aged 55 years or older who had high dietary intakes of vitamin C as well as beta-carotene, zinc, and vitamin E had a reduced risk of AMD [67]. However, most prospective studies do not support these findings [68]. The authors of a 2007 systematic review and meta-analysis of prospective cohort studies and randomized clinical trials concluded that the current evidence does not support a role for vitamin C and other antioxidants, including antioxidant supplements, in the primary prevention of early AMD [69].

Although research has not shown that antioxidants play a role in AMD development, some evidence suggests that they might help slow AMD progression [70]. The Age-Related Eye Disease Study (AREDS), a large, randomized, placebo-controlled clinical trial, evaluated the effect of high doses of selected antioxidants (500 mg vitamin C, 400 IU vitamin E, 15 mg beta-carotene, 80 mg zinc, and 2 mg copper) on the development of advanced AMD in 3,597 older individuals with varying degrees of AMD [71]. After an average follow-up period of 6.3 years, participants with intermediate AMD who received antioxidant supplements had a 28% lower risk of progression to advanced AMD than participants who received a placebo. A follow-up AREDS2 study confirmed the value of this and similar supplement formulations in reducing the progression of AMD over a median follow-up period of 5 years [72].

High dietary intakes of vitamin C and higher plasma ascorbate concentrations have been associated with a lower risk of cataract formation in some studies [2,4]. In a 5-year prospective cohort study conducted in Japan, higher dietary vitamin C intake was associated with a reduced risk of developing cataracts in a cohort of more than 30,000 adults aged 45-64 years [73]. Results from two case-control studies indicate that vitamin C intakes greater than 300 mg/day reduce the risk of cataract formation by 70%-75% [2,4]. Use of vitamin C supplements, on the other hand, was associated with a 25% higher risk of age-related cataract extraction among a cohort of 24,593 Swedish women aged 49-83 years [74]. These findings applied to study participants who took relatively high-dose vitamin C supplements (approximately 1,000 mg/day) and not to those who took multivitamins containing substantially less vitamin C (approximately 60 mg/day).

Data from clinical trials are limited. In one study, Chinese adults who took daily supplements of 120 mg vitamin C plus 30 mcg molybdenum for 5 years did not have a significantly lower cataract risk [75]. However, adults aged 65-74 years who received 180 mg vitamin C plus 30 mcg molybdenum combined with other nutrients in a multivitamin/mineral supplement had a 43% significantly lower risk of developing nuclear cataracts than those who received a placebo [75]. In the AREDS study, older individuals who received supplements of 500 mg vitamin C, 400 IU vitamin E, and 15 mg beta-carotene for an average of 6.3 years did not have a significantly lower risk of developing cataracts or of cataract progression than those who received a placebo [76]. The AREDS2 study, which also tested formulations containing 500 mg vitamin C, confirmed these findings [77].

Overall, the currently available evidence does not indicate that vitamin C, taken alone or with other antioxidants, affects the risk of developing AMD, although some evidence indicates that the AREDS formulations might slow AMD progression.

*The common cold*
In the 1970s Linus Pauling suggested that vitamin C could successfully treat and/or prevent the common cold [78]. Results of subsequent controlled studies have been inconsistent, resulting in confusion and controversy, although public interest in the subject remains high [79,80].

A 2007 Cochrane review examined placebo-controlled trials involving the use of at least 200 mg/day vitamin C taken either continuously as a prophylactic treatment or after the onset of cold symptoms [80]. Prophylactic use of vitamin C did not significantly reduce the risk of developing a cold in the general population. However, in trials involving marathon runners, skiers, and soldiers exposed to extreme physical exercise and/or cold environments, prophylactic use of vitamin C in doses ranging from 250 mg/day to 1 g/day reduced cold incidence by 50%. In the general population, use of

JA-0838

USCA Case #13-1060    Document #1485685    Filed: 03/12/2014    Page 270 of 387

prophylactic vitamin C modestly reduced cold duration by 8% in adults and 14% in children. When taken after the onset of cold symptoms, vitamin C did not affect cold duration or symptom severity.

Overall, the evidence to date suggests that regular intakes of vitamin C at doses of at least 200 mg/day do not reduce the incidence of the common cold in the general population, but such intakes might be helpful in people exposed to extreme physical exercise or cold environments and those with marginal vitamin C status, such as the elderly and chronic smokers [80-82]. The use of vitamin C supplements might shorten the duration of the common cold and ameliorate symptom severity in the general population [79,82], possibly due to the anti-histamine effect of high-dose vitamin C [83]. However, taking vitamin C after the onset of cold symptoms does not appear to be beneficial [80].

## Health Risks from Excessive Vitamin C

Vitamin C has low toxicity and is not believed to cause serious adverse effects at high intakes [8]. The most common complaints are diarrhea, nausea, abdominal cramps, and other gastrointestinal disturbances due to the osmotic effect of unabsorbed vitamin C in the gastrointestinal tract [4,8].

In postmenopausal women with diabetes who participated in the Iowa Women's Health Study, supplemental (but not dietary) vitamin C intake (at least 300 mg/day) was significantly associated with an increased risk of cardiovascular disease mortality [58]. The mechanism for this effect, if real, is not clear and this finding is from a subgroup of patients in an epidemiological study. No such association has been observed in any other epidemiological study, so the significance of this finding is uncertain. High vitamin C intakes also have the potential to increase urinary oxalate and uric acid excretion, which could contribute to the formation of kidney stones, especially in individuals with renal disorders [8]. However, studies evaluating the effects on urinary oxalate excretion of vitamin C intakes ranging from 30 mg to 10 g/day have had conflicting results, so it is not clear whether vitamin C actually plays a role in the development of kidney stones [8,84-86]. The best evidence that vitamin C contributes to kidney stone formation is in patients with pre-existing hyperoxaluria [22].

Due to the enhancement of nonheme iron absorption by vitamin C, a theoretical concern is that high vitamin C intakes might cause excess iron absorption. In healthy individuals, this does not appear to be a concern [8]. However, in individuals with hereditary hemochromatosis, chronic consumption of high doses of vitamin C could exacerbate iron overload and result in tissue damage [4,8].

Under certain conditions, vitamin C can act as a pro-oxidant, potentially contributing to oxidative damage [8]. A few studies in vitro have suggested that by acting as a pro-oxidant, supplemental oral vitamin C could cause chromosomal and/or DNA damage and possibly contribute to the development of cancer [8,87,88]. However, other studies have not shown increased oxidative damage or increased cancer risk with high intakes of vitamin C [8,89].

Other reported effects of high intakes of vitamin C include reduced vitamin B12 and copper levels, accelerated metabolism or excretion of ascorbic acid, erosion of dental enamel, and allergic responses [8]. However, at least some of these conclusions were a consequence of assay artifact, and additional studies have not confirmed these observations [8].

The FNB has established ULs for vitamin C that apply to both food and supplement intakes (Table 3) [8]. Long-term intakes of vitamin C above the UL may increase the risk of adverse health effects. The ULs do not apply to individuals receiving vitamin C for medical treatment, but such individuals should be under the care of a physician [8].

Table 3: Tolerable Upper Intake Levels (ULs) for Vitamin C [8]

| Age | Male | Female | Pregnancy | Lactation |
|---|---|---|---|---|
| 0-12 months | Not possible to establish* | Not possible to establish* | | |
| 1-3 years | 400 mg | 400 mg | | |
| 4-8 years | 650 mg | 650 mg | | |
| 9-13 years | 1,200 mg | 1,200 mg | | |
| 14-18 years | 1,800 mg | 1,800 mg | 1,800 mg | 1,800 mg |
| 19+ years | 2,000 mg | 2,000 mg | 2,000 mg | 2,000 mg |

*Formula and food should be the only sources of vitamin C for infants.

## Interactions with Medications

Vitamin C supplements have the potential to interact with several types of medications. A few examples are provided below. Individuals taking these medications on a regular basis should discuss

JA-0839

their vitamin C intakes with their health care providers.

*Chemotherapy and radiation*

The safety and efficacy of the use of vitamin C and other antioxidants during cancer treatment is controversial [52,90,91]. Some data indicate that antioxidants might protect tumor cells from the action of radiation therapy and chemotherapeutic agents, such as cyclophosphamide, chlorambucil, carmustine, busulfan, thiotepa, and doxorubicin [53,90,92,93]. At least some of these data have been criticized because of poor study design [51]. Other data suggest that antioxidants might protect normal tissues from chemotherapy- and radiation-induced damage [90,92] and/or enhance the effectiveness of conventional cancer treatment [94]. However, due to the physiologically tight control of vitamin C, it is unclear whether oral vitamin C supplements could alter vitamin C concentrations enough to produce the suggested effects. Individuals undergoing chemotherapy or radiation should consult with their oncologist prior to taking vitamin C or other antioxidant supplements, especially in high doses [53].

*3-hydroxy-3-methylglutaryl coenzyme A reductase inhibitors (statins)*

Vitamin C, in combination with other antioxidants, may attenuate the increase in high-density lipoprotein levels resulting from combination niacin-simvastatin (Zocor®) therapy [95,96]. It is not known whether this interaction occurs with other lipid-altering regimens [53]. Health care providers should monitor lipid levels in individuals taking both statins and antioxidant supplements [53].

## Vitamin C and Healthful Diets

The federal government's 2010 *Dietary Guidelines for Americans* notes that "nutrients should come primarily from foods. Foods in nutrient-dense, mostly intact forms contain not only the essential vitamins and minerals that are often contained in nutrient supplements, but also dietary fiber and other naturally occurring substances that may have positive health effects. ...Dietary supplements... may be advantageous in specific situations to increase intake of a specific vitamin or mineral."

For more information about building a healthful diet, refer to the *Dietary Guidelines for Americans* and the U.S. Department of Agriculture's food guidance system, MyPlate.

The *Dietary Guidelines for Americans* describes a healthful diet as one that:

- Emphasizes a variety of fruits, vegetables, whole grains, and fat-free or low-fat milk and milk products.

  Fruits, particularly citrus fruits, fruit juices, and many vegetables are excellent sources of vitamin C. Some ready-to-eat breakfast cereals are fortified with vitamin C.

- Includes lean meats, poultry, fish, beans, eggs, and nuts.
- Is low in saturated fats, *trans* fats, cholesterol, salt (sodium), and added sugars.
- Stays within your daily calorie needs.

## References

1. Li Y, Schellhorn HE. New developments and novel therapeutic perspectives for vitamin C. J Nutr 2007;137:2171-84. [PubMed abstract]
2. Carr AC, Frei B. Toward a new recommended dietary allowance for vitamin C based on antioxidant and health effects in humans. Am J Clin Nutr 1999;69:1086-107. [PubMed abstract]
3. Frei B, England L, Ames BN. Ascorbate is an outstanding antioxidant in human blood plasma. Proc Natl Acad Sci U S A 1989;86:6377-81. [PubMed abstract]
4. Jacob RA, Sotoudeh G. Vitamin C function and status in chronic disease. Nutr Clin Care 2002;5:66-74. [PubMed abstract]
5. Gershoff SN. Vitamin C (ascorbic acid): new roles, new requirements? Nutr Rev 1993;51:313-26. [PubMed abstract]
6. Weinstein M, Babyn P, Zlotkin S. An orange a day keeps the doctor away: scurvy in the year 2000. Pediatrics 2001;108:E55. [PubMed abstract]
7. Wang AH, Still C. Old world meets modern: a case report of scurvy. Nutr Clin Pract 2007;22:445-8. [PubMed abstract]
8. Institute of Medicine. Food and Nutrition Board. Dietary Reference Intakes for Vitamin C, Vitamin E, Selenium, and Carotenoids. Washington, DC: National Academy Press, 2000.
9. Stephen R, Utecht T. Scurvy identified in the emergency department: a case report. J Emerg Med 2001;21:235-7. [PubMed abstract]
10. Padayatty SJ, Sun H, Wang Y, Riordan HD, Hewitt SM, Katz A, Wesley RA, Levine M. Vitamin C pharmacokinetics: implications for oral and intravenous use. Ann Intern Med 2004;140:533-7.

JA-0840

11. Francescone MA, Levitt J. Scurvy masquerading as leukocytoclastic vasculitis: a case report and review of the literature. Cutis 2005;76:261-6. [PubMed abstract]

12. U.S. Department of Agriculture, Agricultural Research Service. 2011. USDA National Nutrient Database for Standard Reference, Release 24. Nutrient Data Laboratory Home Page, http://www.ars.usda.gov/ba/bhnrc/ndl.

13. Bates CJ. Bioavailability of vitamin C. Eur J Clin Nutr 1997;51 (Suppl 1):S28-33. [PubMed abstract]

14. Mangels AR, Block G, Frey CM, Patterson BH, Taylor PR, Norkus EP, et al. The bioavailability to humans of ascorbic acid from oranges, orange juice and cooked broccoli is similar to that of synthetic ascorbic acid. J Nutr 1993;123:1054-61. [PubMed abstract]

15. Gregory JF 3rd. Ascorbic acid bioavailability in foods and supplements. Nutr Rev 1993;51:301-3. [PubMed abstract]

16. Johnston CS, Luo B. Comparison of the absorption and excretion of three commercially available sources of vitamin C. J Am Diet Assoc 1994;94:779-81. [PubMed abstract]

17. Moyad MA, Combs MA, Vrablic AS, Velasquez J, Turner B, Bernal S. Vitamin C metabolites, independent of smoking status, significantly enhance leukocyte, but not plasma ascorbate concentrations. Adv Ther 2008;25:995-1009. [PubMed abstract]

18. Moshfegh A, Goldman J, Cleveland L. What We Eat in America, NHANES 2001-2002: Usual Nutrient Intakes from Food Compared to Dietary Reference Intakes. Washington, DC: U.S. Department of Agriculture, Agricultural Research Service, 2005.

19. Radimer K, Bindewald B, Hughes J, Ervin B, Swanson C, Picciano MF. Dietary supplement use by US adults: data from the National Health and Nutrition Examination Survey, 1999-2000. Am J Epidemiol 2004;160:339-49. [PubMed abstract]

20. Picciano MF, Dwyer JT, Radimer KL, Wilson DH, Fisher KD, Thomas PR, et al. Dietary supplement use among infants, children, and adolescents in the United States, 1999-2002. Arch Pediatr Adolesc Med 2007;161:978-85. [PubMed abstract]

21. Levine M, Conry-Cantilena C, Wang Y, Welch RW, Washko PW, Dhariwal KR, et al. Vitamin C pharmacokinetics in healthy volunteers: evidence for a recommended dietary allowance. Proc Natl Acad Sci U S A 1996;93:3704-9. [PubMed abstract]

22. Levine M, Rumsey SC, Daruwala R, Park JB, Wang Y. Criteria and recommendations for vitamin C intake. JAMA 1999;281:1415-23. [PubMed abstract]

23. King, CG, Waugh, WA. The chemical nature of vitamin C. Science 1932;75:357-358.

24. Svirbely J, Szent-Györgyi A. Hexuronic acid as the antiscorbutic factor. Nature 1932;129: 576.

25. Svirbely J, Szent-Györgyi A. Hexuronic acid as the antiscorbutic factor. Nature 1932;129: 690.

26. Hoffman FA. Micronutrient requirements of cancer patients. Cancer. 1985;55 (1 Suppl):295-300. [PubMed abstract]

27. Deicher R, Hörl WH. Vitamin C in chronic kidney disease and hemodialysis patients. Kidney Blood Press Res 2003;26:100-6. [PubMed abstract]

28. Hecht SS. Approaches to cancer prevention based on an understanding of N-nitrosamine carcinogenesis. Proc Soc Exp Biol Med 1997;216:181-91. [PubMed abstract]

29. Zhang S, Hunter DJ, Forman MR, Rosner BA, Speizer FE, Colditz GA, et al. Dietary carotenoids and vitamins A, C, and E and risk of breast cancer. J Natl Cancer Inst 1999;91:547-56. [PubMed abstract]

30. Kushi LH, Fee RM, Sellers TA, Zheng W, Folsom AR. Intake of vitamins A, C, and E and postmenopausal breast cancer. The Iowa Women's Health Study. Am J Epidemiol 1996;144:165-74. [PubMed abstract]

31. Levine M, Wang Y, Padayatty SJ, Morrow J. A new recommended dietary allowance of vitamin C for healthy young men. Proc Natl Acad Sci U S A 2001;98:9842-6. [PubMed abstract]

32. Hercberg S, Galan P, Preziosi P, Bertrais S, Mennen L, Malvy D, et al. The SU.VI.MAX Study: a randomized, placebo-controlled trial of the health effects of antioxidant vitamins and minerals. Arch Intern Med 2004;164:2335-42. [PubMed abstract]

33. Galan P, Briançon S, Favier A, Bertrais S, Preziosi P, Faure H, et al. Antioxidant status and risk of cancer in the SU.VI.MAX study: is the effect of supplementation dependent on baseline levels? Br J Nutr 2005;94:125-32. [PubMed abstract]

34. Gaziano JM, Glynn RJ, Christen WG, Kurth T, Belanger C, MacFadyen J, et al. Vitamins E and C in the prevention of prostate and total cancer in men: the Physicians' Health Study II randomized controlled trial. JAMA 2009;301:52-62. [PubMed abstract]

35. Lin J, Cook NR, Albert C, Zaharris E, Gaziano JM, Van Denburgh M, et al. Vitamins C and E and beta carotene supplementation and cancer risk: a randomized controlled trial. J Natl Cancer Inst 2009;101:14-23. [PubMed abstract]

36. Taylor PR, Li B, Dawsey SM, Li JY, Yang CS, Guo W, et al. Prevention of esophageal cancer: the nutrition intervention trials in Linxian, China. Linxian Nutrition Intervention Trials Study Group. Cancer Res 1994;54(7 Suppl):2029s-31s. [PubMed abstract]

37. Qiao YL, Dawsey SM, Kamangar F, Fan JH, Abnet CC, Sun XD, et al. Total and cancer mortality after supplementation with vitamins and minerals: follow-up of the Linxian General

JA-0841

USCA Case #13-1060    Document #1483686    Filed: 03/12/2014    Page 273 of 387

Population Nutrition Intervention Trial. J Natl Cancer Inst 2009;101:507-18. [PubMed abstract]

38. Bjelakovic G, Nikolova D, Simonetti RG, Gluud C. Antioxidant supplements for preventing gastrointestinal cancers. Cochrane Database Syst Rev 2008;(3):CD004183. [PubMed abstract]

39. Coulter I, Hardy M, Shekelle P, Udani J, Spar M, Oda K, et al. Effect of the supplemental use of antioxidants vitamin C, vitamin E, and coenzyme Q10 for the prevention and treatment of cancer. Evidence Report/Technology Assessment Number 75. AHRQ Publication No. 04-E003. Rockville, MD: Agency for Healthcare Research and Quality, 2003. [PubMed abstract]

40. Padayatty SJ, Levine M. Vitamins C and E and the prevention of preeclampsia. N Engl J Med 2006;355:1065. [PubMed abstract]

41. Padayatty SJ, Levine M. Antioxidant supplements and cardiovascular disease in men. JAMA 2009;301:1336. [PubMed abstract]

42. Cameron E, Campbell A. The orthomolecular treatment of cancer. II. Clinical trial of high-dose ascorbic acid supplements in advanced human cancer. Chem Biol Interact 1974;9:285-315. [PubMed abstract]

43. Cameron E, Pauling L. Supplemental ascorbate in the supportive treatment of cancer: prolongation of survival times in terminal human cancer. Proc Natl Acad Sci U S A 1976;73:3685-9. [PubMed abstract]

44. Moertel CG, Fleming TR, Creagan ET, Rubin J, O'Connell MJ, Ames MM. High-dose vitamin C versus placebo in the treatment of patients with advanced cancer who have had no prior chemotherapy. A randomized double-blind comparison. N Engl J Med 1985;312:137-41. [PubMed abstract]

45. Bruno EJ Jr, Ziegenfuss TN, Landis J. Vitamin C: research update. Curr Sports Med Rep 2006;5:177-81. [PubMed abstract]

46. Padayatty SJ, Riordan HD, Hewitt SM, Katz A, Hoffer LJ, Levine M. Intravenously administered vitamin C as cancer therapy: three cases. CMAJ 2006;174:937-42. [PubMed abstract]

47. Hoffer LJ, Levine M, Assouline S, Melnychuk D, Padayatty SJ, Rosadiuk K, et al. Phase I clinical trial of i.v. ascorbic acid in advanced malignancy. Ann Oncol 2008;19:1969-74. [PubMed abstract]

48. Chen Q, Espey MG, Sun AY, Pooput C, Kirk KL, Krishna MC, et al. Pharmacologic doses of ascorbate act as a prooxidant and decrease growth of aggressive tumor xenografts in mice. Proc Natl Acad Sci U S A 2008;105:11105-9. [PubMed abstract]

49. Chen Q, Espey MG, Krishna MC, Mitchell JB, Corpe CP, Buettner GR, et al. Pharmacologic ascorbic acid concentrations selectively kill cancer cells: action as a pro-drug to deliver hydrogen peroxide to tissues. Proc Natl Acad Sci U S A 2005;102:13604-9. [PubMed abstract]

50. Chen Q, Espey MG, Sun AY, Lee JH, Krishna MC, Shacter E, et al. Ascorbate in pharmacologic concentrations selectively generates ascorbate radical and hydrogen peroxide in extracellular fluid in vivo. Proc Natl Acad Sci U S A 2007;104:8749-54. [PubMed abstract]

51. Levine M, Espey MG, Chen Q. Losing and finding a way at C: new promise for pharmacologic ascorbate in cancer treatment. Free Radic Biol Med 2009;47:27-9. [PubMed abstract]

52. Seifried HE, Anderson DE, Sorkin BC, Costello RB. Free radicals: the pros and cons of antioxidants. Executive summary report. J Nutr 2004;134:3143S-63S. [PubMed abstract]

53. Natural Medicines Comprehensive Database ⧉. Vitamin C.

54. Ye Z, Song H. Antioxidant vitamins intake and the risk of coronary heart disease: meta-analysis of cohort studies. Eur J Cardiovasc Prev Rehabil 2008;15:26-34. [PubMed abstract]

55. Willcox BJ, Curb JD, Rodriguez BL. Antioxidants in cardiovascular health and disease: key lessons from epidemiologic studies. Am J Cardiol 2008;101:75D-86D. [PubMed abstract]

56. Honarbakhsh S, Schachter M. Vitamins and cardiovascular disease. Br J Nutr 2008:1-19. [PubMed abstract]

57. Osganian SK, Stampfer MJ, Rimm E, Spiegelman D, Hu FB, Manson JE, et al. Vitamin C and risk of coronary heart disease in women. J Am Coll Cardiol 2003;42:246-52. [PubMed abstract]

58. Lee DH, Folsom AR, Harnack L, Halliwell B, Jacobs DR Jr. Does supplemental vitamin C increase cardiovascular disease risk in women with diabetes? Am J Clin Nutr 2004;80:1194-200. [PubMed abstract]

59. Myint PK, Luben RN, Welch AA, Bingham SA, Wareham NJ, Khaw KT. Plasma vitamin C concentrations predict risk of incident stroke over 10 y in 20 649 participants of the European Prospective Investigation into Cancer Norfolk prospective population study. Am J Clin Nutr 2008;87:64-9. [PubMed abstract]

60. Muntwyler J, Hennekens CH, Manson JE, Buring JE, Gaziano JM. Vitamin supplement use in a low-risk population of US male physicians and subsequent cardiovascular mortality. Arch Intern Med 2002;162:1472-6. [PubMed abstract]

61. Knekt P, Ritz J, Pereira MA, O'Reilly EJ, Augustsson K, Fraser GE, et al. Antioxidant vitamins and coronary heart disease risk: a pooled analysis of 9 cohorts. Am J Clin Nutr 2004;80:1508-20. [PubMed abstract]

62. Cook NR, Albert CM, Gaziano JM, Zaharris E, MacFadyen J, Danielson E, et al. A randomized factorial trial of vitamins C and E and beta carotene in the secondary prevention of cardiovascular events in women: results from the Women's Antioxidant Cardiovascular Study.

Arch Intern Med 2007;167:1610-8. [PubMed abstract]

63. Sesso HD, Buring JE, Christen WG, Kurth T, Belanger C, MacFadyen J, et al. Vitamins E and C in the prevention of cardiovascular disease in men: the Physicians' Health Study II randomized controlled trial. JAMA 2008;300:2123-33. [PubMed abstract]

64. Waters DD, Alderman EL, Hsia J, Howard BV, Cobb FR, Rogers WJ, et al. Effects of hormone replacement therapy and antioxidant vitamin supplements on coronary atherosclerosis in postmenopausal women: a randomized controlled trial. JAMA 2002;288:2432-40. [PubMed abstract]

65. Bleys J, Miller ER 3rd, Pastor-Barriuso R, Appel LJ, Guallar E. Vitamin-mineral supplementation and the progression of atherosclerosis: a meta-analysis of randomized controlled trials. Am J Clin Nutr 2006;84:880-7. [PubMed abstract]

66. Shekelle P, Morton S, Hardy M. Effect of supplemental antioxidants vitamin C, vitamin E, and coenzyme Q10 for the prevention and treatment of cardiovascular disease. Evidence Report/Technology Assessment No. 83 AHRQ Publication No. 03-E043. Rockville, MD: Agency for Healthcare Research and Quality, 2003. [PubMed abstract]

67. van Leeuwen R, Boekhoorn S, Vingerling JR, Witteman JC, Klaver CC, Hofman A, et al. Dietary intake of antioxidants and risk of age-related macular degeneration. JAMA 2005;294:3101-7. [PubMed abstract]

68. Evans J. Primary prevention of age related macular degeneration. BMJ 2007;335:729. [PubMed abstract]

69. Chong EW, Wong TY, Kreis AJ, Simpson JA, Guymer RH. Dietary antioxidants and primary prevention of age related macular degeneration: systematic review and meta-analysis. BMJ 2007;335:755. [PubMed abstract]

70. Evans JR. Antioxidant vitamin and mineral supplements for slowing the progression of age-related macular degeneration. Cochrane Database Syst Rev 2006;(2):CD000254. [PubMed abstract]

71. Age-Related Eye Disease Study Research Group. A randomized, placebo-controlled, clinical trial of high-dose supplementation with vitamins C and E, beta carotene, and zinc for age-related macular degeneration and vision loss: AREDS report no. 8. Arch Ophthalmol 2001;119:1417-36. [PubMed abstract]

72. The Age-Related Eye Disease Study 2 (AREDS2) Research Group. Lutein + zeaxanthin and omega-3 fatty acids for age-related macular degeneration: the Age-Related Eye Disease Study 2 (AREDS2) randomized clinical trial. JAMA 2013;309:2005-15. [PubMed abstract]

73. Yoshida M, Takashima Y, Inoue M, Iwasaki M, Otani T, Sasaki S; JPHC Study Group. Prospective study showing that dietary vitamin C reduced the risk of age-related cataracts in a middle-aged Japanese population. Eur J Nutr 2007;46:118-24. [PubMed abstract]

74. Rautiainen S, Lindblad BE, Morgenstern R, Wolk A. Vitamin C supplements and the risk of age-related cataract: a population-based prospective cohort study in women. Am J Clin Nutr. 2010 Feb;91(2):487-93. [PubMed abstract]

75. Sperduto RD, Hu TS, Milton RC, Zhao JL, Everett DF, Cheng QF, et al. The Linxian cataract studies. Two nutrition intervention trials. Arch Ophthalmol 1993;111:1246-53. [PubMed abstract]

76. Age-Related Eye Disease Study Research Group. A randomized, placebo-controlled, clinical trial of high-dose supplementation with vitamins C and E and beta carotene for age-related cataract and vision loss: AREDS report no. 9. Arch Ophthalmol 2001;119:1439-52. [PubMed abstract]

77. The Age-Related Eye Disease Study 2 (AREDS2) Research Group. Lutein/zeaxanthin for the treatment of age-related cataract: AREDS2 randomized trial report no. 4. JAMA Ophthalmol 2013. Online May 5. [PubMed abstract]

78. Pauling L. The significance of the evidence about ascorbic acid and the common cold. Proc Natl Acad Sci U S A 1971;68:2678-81. [PubMed abstract]

79. Douglas RM, Hemilä H. Vitamin C for preventing and treating the common cold. PLoS Med 2005;2:e168. [PubMed abstract]

80. Douglas RM, Hemilä H, Chalker E, Treacy B. Vitamin C for preventing and treating the common cold. Cochrane Database Syst Rev 2007;(3):CD000980. [PubMed abstract]

81. Wintergerst ES, Maggini S, Hornig DH. Immune-enhancing role of vitamin C and zinc and effect on clinical conditions. Ann Nutr Metab 2006;50:85-94. [PubMed abstract]

82. Hemilä H. The role of vitamin C in the treatment of the common cold. Am Fam Physician 2007;76:1111, 1115. [PubMed abstract]

83. Johnston CS. The antihistamine action of ascorbic acid. Subcell Biochem 1996;25:189-213. [PubMed abstract]

84. Curhan GC, Willett WC, Rimm EB, Stampfer MJ. A prospective study of the intake of vitamins C and B6, and the risk of kidney stones in men. J Urol 1996;155:1847-51. [PubMed abstract]

85. Curhan GC, Willett WC, Speizer FE, Stampfer MJ. Intake of vitamins B6 and C and the risk of kidney stones in women. J Am Soc Nephrol 1999;10:840-5. [PubMed abstract]

86. Taylor EN, Stampfer MJ, Curhan GC. Dietary factors and the risk of incident kidney stones in

JA-0843

USCA Case #13-1060     Document #1483688     Filed: 03/12/2014     Page 275 of 387

open new insights after 14 years of follow up. J Am Soc Nephrol 2004;15:3225-32. [PubMed abstract]

87. Lee SH, Oe T, Blair IA. Vitamin C-induced decomposition of lipid hydroperoxides to endogenous genotoxins. Science 2001;292:2083-6. [PubMed abstract]

88. Podmore ID, Griffiths HR, Herbert KE, Mistry N, Mistry P, Lunec J. Vitamin C exhibits pro-oxidant properties. Nature 1998;392:559. [PubMed abstract]

89. Carr A, Frei B. Does vitamin C act as a pro-oxidant under physiological conditions? FASEB J 1999 Jun;13:1007-24. [PubMed abstract]

90. Lawenda BD, Kelly KM, Ladas EJ, Sagar SM, Vickers A, Blumberg JB. Should supplemental antioxidant administration be avoided during chemotherapy and radiation therapy? J Natl Cancer Inst 2008;100:773-83. [PubMed abstract]

91. Ladas EJ, Jacobson JS, Kennedy DD, Teel K, Fleischauer A, Kelly KM. Antioxidants and cancer therapy: a systematic review. J Clin Oncol 2004;22:517-28. [PubMed abstract]

92. Block KI, Koch AC, Mead MN, Tothy PK, Newman RA, Gyllenhaal C. Impact of antioxidant supplementation on chemotherapeutic efficacy: a systematic review of the evidence from randomized controlled trials. Cancer Treat Rev 2007;33:407-18. [PubMed abstract]

93. Heaney ML, Gardner JR, Karasavvas N, Golde DW, Scheinberg DA, Smith EA, et al. Vitamin C antagonizes the cytotoxic effects of antineoplastic drugs. Cancer Res 2008;68:8031-8. [PubMed abstract]

94. Prasad KN. Rationale for using high-dose multiple dietary antioxidants as an adjunct to radiation therapy and chemotherapy. J Nutr 2004;134:3182S-3S. [PubMed abstract]

95. Brown BG, Zhao XQ, Chait A, Fisher LD, Cheung MC, Morse JS, et al. Simvastatin and niacin, antioxidant vitamins, or the combination for the prevention of coronary disease. N Engl J Med 2001;345:1583-92. [PubMed abstract]

96. Cheung MC, Zhao XQ, Chait A, Albers JJ, Brown BG. Antioxidant supplements block the response of HDL to simvastatin-niacin therapy in patients with coronary artery disease and low HDL. Arterioscler Thromb Vasc Biol 2001;21:1320-6. [PubMed abstract]

## Disclaimer

This fact sheet by the Office of Dietary Supplements provides information that should not take the place of medical advice. We encourage you to talk to your health care providers (doctor, registered dietitian, pharmacist, etc.) about your interest in, questions about, or use of dietary supplements and what may be best for your overall health. Any mention in this publication of a specific brand name is not an endorsement of the product.

Reviewed: June 05, 2013


JA-0844

U.S. Department of Health & Human Services  National Institutes of Health  Filed: 03/12/2014    Page 276 of 387



Font Size ⊖ ⊕

**NIH** National Institutes of Health
*Office of Dietary Supplements*

Strengthening Knowledge and
Understanding of Dietary Supplements

| Health Information | News & Events | Research & Funding | About ODS | | Search |
| --- | --- | --- | --- | --- | --- |

## Health Information

print | view as pdf | share 🔲

| Other Resources | Health Professional | Datos en español | QuickFacts |
| --- | --- | --- | --- |

### Making Decisions

- Dietary Supplement Fact Sheets
- Frequently Asked Questions
- Dietary Supplements: What You Need to Know
- My Dietary Supplements (MyDS) Mobile App
- The Savvy Supplement User (FDA)
- Tips for Older Supplement Users (FDA)
- Human Performance Resource Center: Dietary Supplements (DoD)
- How To Evaluate Health Information on the Internet: Questions and Answers
- Información en español

### Consumer Protection

- FDA: Consumer Updates on Dietary Supplements
- FDA: Warnings and Safety Information
- FDA: How to Spot Health Fraud
- FTC: Drugs & Dietary Supplements
- FTC: Weight Loss & Fitness

### Nutrient Recommendations

- Dietary Reference Intake (DRI) Reports and Tables
- Online DRI Tool
- Daily Value (DV) Tables

# Vitamin E

Fact Sheet for Health Professionals



See **QuickFacts** for easy-to-read facts about Vitamin E.

### Introduction

Vitamin E is found naturally in some foods, added to others, and available as a dietary supplement. "Vitamin E" is the collective name for a group of fat-soluble compounds with distinctive antioxidant activities [1].

Naturally occurring vitamin E exists in eight chemical forms (alpha-, beta-, gamma-, and delta-tocopherol and alpha-, beta-, gamma-, and delta-tocotrienol) that have varying levels of biological activity [1]. Alpha- (or α-) tocopherol is the only form that is recognized to meet human requirements.

**Table of Contents**

- Introduction
- Recommended Intakes
- Sources of Vitamin E
- Vitamin E Intakes and Status
- Vitamin E Deficiency
- Vitamin E and Health
- Health Risks from Excessive Vitamin E
- Interactions with Medications
- Vitamin E and Healthful Diets
- References
- Disclaimer

Serum concentrations of vitamin E (alpha-tocopherol) depend on the liver, which takes up the nutrient after the various forms are absorbed from the small intestine. The liver preferentially resecretes only alpha-tocopherol via the hepatic alpha-tocopherol transfer protein [1]; the liver metabolizes and excretes the other vitamin E forms [2]. As a result, blood and cellular concentrations of other forms of vitamin E are lower than those of alpha-tocopherol and have been the subjects of less research [3,4].

Antioxidants protect cells from the damaging effects of free radicals, which are molecules that contain an unshared electron. Free radicals damage cells and might contribute to the development of cardiovascular disease and cancer [5]. Unshared electrons are highly energetic and react rapidly with oxygen to form reactive oxygen species (ROS). The body forms ROS endogenously when it converts food to energy, and antioxidants might protect cells from the damaging effects of ROS. The body is also exposed to free radicals from environmental exposures, such as cigarette smoke, air pollution, and ultraviolet radiation from the sun. ROS are part of signaling mechanisms among cells.

Vitamin E is a fat-soluble antioxidant that stops the production of ROS formed when fat undergoes oxidation. Scientists are investigating whether, by limiting free-radical production and possibly through other mechanisms, vitamin E might help prevent or delay the chronic diseases associated with free radicals.

In addition to its activities as an antioxidant, vitamin E is involved in immune function and, as shown primarily by *in vitro* studies of cells, cell signaling, regulation of gene expression, and other metabolic processes [1]. Alpha-tocopherol inhibits the activity of protein kinase C, an enzyme involved in cell proliferation and differentiation in smooth muscle cells, platelets, and monocytes [6]. Vitamin-E-replete endothelial cells lining the interior surface of blood vessels are better able to

**JA-0845**

USCA Case #13-1060    Document #1483685    Filed: 03/11/2014    Page 277 of 387

current blood clots adhering to it. Vitamin E also increases the expression of two enzymes that suppress arachidonic acid metabolism, thereby increasing the release of prostacyclin from the endothelium, which, in turn, dilates blood vessels and inhibits platelet aggregation [6].

## Recommended Intakes

Intake recommendations for vitamin E and other nutrients are provided in the Dietary Reference Intakes (DRIs) developed by the Food and Nutrition Board (FNB) at the Institute of Medicine of The National Academies (formerly National Academy of Sciences) [6]. DRI is the general term for a set of reference values used to plan and assess nutrient intakes of healthy people. These values, which vary by age and gender, include:

- Recommended Dietary Allowance (RDA): average daily level of intake sufficient to meet the nutrient requirements of nearly all (97%-98%) healthy people.
- Adequate Intake (AI): established when evidence is insufficient to develop an RDA and is set at a level assumed to ensure nutritional adequacy.
- Tolerable Upper Intake Level (UL): maximum daily intake unlikely to cause adverse health effects [6].

The FNB's vitamin E recommendations are for alpha-tocopherol alone, the only form maintained in plasma. The FNB based these recommendations primarily on serum levels of the nutrient that provide adequate protection in a test measuring the survival of erythrocytes when exposed to hydrogen peroxide, a free radical [6]. Acknowledging "great uncertainties" in these data, the FNB has called for research to identify other biomarkers for assessing vitamin E requirements.

RDAs for vitamin E are provided in milligrams (mg) and are listed in Table 1. Because insufficient data are available to develop RDAs for infants, AIs were developed based on the amount of vitamin E consumed by healthy breastfed babies.

At present, the vitamin E content of foods and dietary supplements is listed on labels in international units (IUs), a measure of biological activity rather than quantity. Naturally sourced vitamin E is called d-alpha-tocopherol; the synthetically produced form is dl-alpha-tocopherol. Conversion rules are as follows:

- To convert from mg to IU: 1 mg of alpha-tocopherol is equivalent to 1.49 IU of the natural form or 2.22 IU of the synthetic form.
- To convert from IU to mg: 1 IU of alpha-tocopherol is equivalent to 0.67 mg of the natural form or 0.45 mg of the synthetic form.

Table 1 lists the RDAs for alpha-tocopherol in both mg and IU of the natural form; for example, 15 mg x 1.49 IU/mg = 22.4 IU. The corresponding value for synthetic alpha-tocopherol would be 33.3 IU (15 mg x 2.22 IU/mg).

Table 1: Recommended Dietary Allowances (RDAs) for Vitamin E (Alpha-Tocopherol) [6]

| Age | Males | Females | Pregnancy | Lactation |
|---|---|---|---|---|
| 0-6 months* | 4 mg (6 IU) | 4 mg (6 IU) | | |
| 7-12 months* | 5 mg (7.5 IU) | 5 mg (7.5 IU) | | |
| 1-3 years | 6 mg (9 IU) | 6 mg (9 IU) | | |
| 4-8 years | 7 mg (10.4 IU) | 7 mg (10.4 IU) | | |
| 9-13 years | 11 mg (16.4 IU) | 11 mg (16.4 IU) | | |
| 14+ years | 15 mg (22.4 IU) | 15 mg (22.4 IU) | 15 mg (22.4 IU) | 19 mg (28.4 IU) |

*Adequate Intake (AI)

## Sources of Vitamin E

### Food
Numerous foods provide vitamin E. Nuts, seeds, and vegetable oils are among the best sources of alpha-tocopherol, and significant amounts are available in green leafy vegetables and fortified

JA-0846

USCA Case #13-1060    Document #1483080    Filed: 03/12/2014    Page 278 of 387

cereals (see Table 2 for more detailed list) [7]. Most vitamin E in American diets is in the form of gamma-tocopherol from soybean, canola, corn, and other vegetable oils and food products [4].

**Table 2: Selected Food Sources of Vitamin E (Alpha-Tocopherol) [7]**

| Food | Milligrams (mg) per serving | Percent DV* |
|---|---|---|
| Wheat germ oil, 1 tablespoon | 20.3 | 100 |
| Sunflower seeds, dry roasted, 1 ounce | 7.4 | 37 |
| Almonds, dry roasted, 1 ounce | 6.8 | 34 |
| Sunflower oil, 1 tablespoon | 5.6 | 28 |
| Safflower oil, 1 tablespoon | 4.6 | 25 |
| Hazelnuts, dry roasted, 1 ounce | 4.3 | 22 |
| Peanut butter, 2 tablespoons | 2.9 | 15 |
| Peanuts, dry roasted, 1 ounce | 2.2 | 11 |
| Corn oil, 1 tablespoon | 1.9 | 10 |
| Spinach, boiled, ½ cup | 1.9 | 10 |
| Broccoli, chopped, boiled, ½ cup | 1.2 | 6 |
| Soybean oil, 1 tablespoon | 1.1 | 6 |
| Kiwifruit, 1 medium | 1.1 | 6 |
| Mango, sliced, ½ cup | 0.7 | 4 |
| Tomato, raw, 1 medium | 0.7 | 4 |
| Spinach, raw, 1 cup | 0.6 | 3 |

*DV = Daily Value. DVs were developed by the U.S. Food and Drug Administration (FDA) to help consumers compare the nutrient content of different foods within the context of a total diet. The DV for vitamin E is 30 IU (approximately 20 mg of natural alpha-tocopherol) for adults and children age 4 and older. However, the FDA does not require food labels to list vitamin E content unless a food has been fortified with this nutrient. Foods providing 20% or more of the DV are considered to be high sources of a nutrient, but foods providing lower percentages of the DV also contribute to a healthful diet.

The U.S. Department of Agriculture's (USDA's) Nutrient Database Web site lists the nutrient content of many foods, including, in some cases, the amounts of alpha-, beta-, gamma-, and delta-tocopherol. The USDA also provides a comprehensive list of foods containing vitamin E.

*Dietary supplements*

Supplements of vitamin E typically provide only alpha-tocopherol, although "mixed" products containing other tocopherols and even tocotrienols are available. Naturally occurring alpha-tocopherol exists in one stereoisomeric form. In contrast, synthetically produced alpha-tocopherol contains equal amounts of its eight possible stereoisomers; serum and tissues maintain only four of these stereoisomers [6]. A given amount of synthetic alpha-tocopherol (listed on labels as "DL" or "dl") is therefore only half as active as the same amount (by weight in mg) of the natural form (labeled as "D" or "d"). People need approximately 50% more IU of synthetic alpha tocopherol from dietary supplements and fortified foods to obtain the same amount of the nutrient as from the natural form.

Most vitamin-E-only supplements provide ≥100 IU of the nutrient. These amounts are substantially higher than the RDAs. The 1999-2000 National Health and Nutrition Examination Survey (NHANES) found that 11.3% of adults took vitamin E supplements containing at least 400 IU [8].

Alpha-tocopherol in dietary supplements and fortified foods is often esterified to prolong its shelf life while protecting its antioxidant properties. The body hydrolyzes and absorbs these esters (alpha-tocopheryl acetate and succinate) as efficiently as alpha-tocopherol [6].

## Vitamin E Intakes and Status

Three national surveys—the 2001-2002 NHANES [9], NHANES III (1988-1994) [9], and the Continuing Survey of Food Intakes by Individuals (1994-1996) [10]—have found that the diets of most Americans provide less than the RDA levels of vitamin E. These intake estimates might be low, however, because the amounts and types of fat added during cooking are often unknown and not accounted for [6].

The FNB suggests that mean intakes of vitamin E among healthy adults are probably higher than the RDA but cautions that low-fat diets might provide insufficient amounts unless people make their food choices carefully by, for example, increasing their intakes of nuts, seeds, fruits, and vegetables

## Vitamin E Deficiency

Frank vitamin E deficiency is rare and overt deficiency symptoms have not been found in healthy people who obtain little vitamin E from their diets [6]. Premature babies of very low birth weight (<1,500 grams) might be deficient in vitamin E. Vitamin E supplementation in these infants might reduce the risk of some complications, such as those affecting the retina, but they can also increase the risk of infections [11].

Because the digestive tract requires fat to absorb vitamin E, people with fat-malabsorption disorders are more likely to become deficient than people without such disorders. Deficiency symptoms include peripheral neuropathy, ataxia, skeletal myopathy, retinopathy, and impairment of the immune response [6,12]. People with Crohn's disease, cystic fibrosis, or an inability to secrete bile from the liver into the digestive tract, for example, often pass greasy stools or have chronic diarrhea; as a result, they sometimes require water-soluble forms of vitamin E, such as tocopheryl polyethylene glycol-1000 succinate [1].

Some people with abetalipoproteinemia, a rare inherited disorder resulting in poor absorption of dietary fat, require enormous doses of supplemental vitamin E (approximately 100 mg/kg or 5-10 g/day) [1]. Vitamin E deficiency secondary to abetalipoproteinemia causes such problems as poor transmission of nerve impulses, muscle weakness, and retinal degeneration that leads to blindness [13]. Ataxia and vitamin E deficiency (AVED) is another rare, inherited disorder in which the liver's alpha-tocopherol transfer protein is defective or absent. People with AVED have such severe vitamin E deficiency that they develop nerve damage and lose the ability to walk unless they take large doses of supplemental vitamin E [14].

## Vitamin E and Health

Many claims have been made about vitamin E's potential to promote health and prevent and treat disease. The mechanisms by which vitamin E might provide this protection include its function as an antioxidant and its roles in anti-inflammatory processes, inhibition of platelet aggregation, and immune enhancement.

A primary barrier to characterizing the roles of vitamin E in health is the lack of validated biomarkers for vitamin E intake and status to help relate intakes to valid predictors of clinical outcomes [6]. This section focuses on four diseases and disorders in which vitamin E might be involved: heart disease, cancer, eye disorders, and cognitive decline.

*Coronary heart disease*
Evidence that vitamin E could help prevent or delay coronary heart disease (CHD) comes from several sources. *In vitro* studies have found that the nutrient inhibits oxidation of low-density lipoprotein (LDL) cholesterol, thought to be a crucial initiating step for atherosclerosis [6]. Vitamin E might also help prevent the formation of blood clots that could lead to a heart attack or venous thromboembolism [15].

Several observational studies have associated lower rates of heart disease with higher vitamin E intakes. One study of approximately 90,000 nurses found that the incidence of heart disease was 30% to 40% lower in those with the highest intakes of vitamin E, primarily from supplements [16]. Among a group of 5,133 Finnish men and women followed for a mean of 14 years, higher vitamin E intakes from food were associated with decreased mortality from CHD [17].

However, randomized clinical trials cast doubt on the efficacy of vitamin E supplements to prevent CHD [18]. For example, the Heart Outcomes Prevention Evaluation (HOPE) study, which followed almost 10,000 patients at high risk of heart attack or stroke for 4.5 years [19], found that participants taking 400 IU/day of natural vitamin E experienced no fewer cardiovascular events or hospitalizations for heart failure or chest pain than participants taking a placebo. In the HOPE-TOO followup study, almost 4,000 of the original participants continued to take vitamin E or placebo for an additional 2.5 years [20]. HOPE-TOO found that vitamin E provided no significant protection against heart attacks, strokes, unstable angina, or deaths from cardiovascular disease or other causes after 7 years of treatment. Participants taking vitamin E, however, were 13% more likely to experience, and 21% more likely to be hospitalized for, heart failure, a statistically significant but unexpected finding not reported in other large studies.

The HOPE and HOPE-TOO trials provide compelling evidence that moderately high doses of vitamin E supplements do not reduce the risk of serious cardiovascular events among men and women >50 years of age with established heart disease or diabetes [21]. These findings are supported by

## JA-0848

USCA Case #13-1060     Document #1483680     Filed: 03/11/2014     Page 280 of 387

evidence from the Women's Angiographic Vitamin and Estrogen study, in which 423 postmenopausal women with some degree of coronary stenosis took supplements with 400 IU vitamin E (type not specified) and 500 mg vitamin C twice a day or placebo for >4 years [22]. Not only did the supplements provide no cardiovascular benefits, but all-cause mortality was significantly higher in the women taking the supplements.

The latest published clinical trial of vitamin E's effects on the heart and blood vessels of women included almost 40,000 healthy women ≥45 years of age who were randomly assigned to receive either 600 IU of natural vitamin E on alternate days or placebo and who were followed for an average of 10 years [23]. The investigators found no significant differences in rates of overall cardiovascular events (combined nonfatal heart attacks, strokes, and cardiovascular deaths) or all-cause mortality between the groups. However, the study did find two positive and significant results for women taking vitamin E: they had a 24% reduction in cardiovascular death rates, and those ≥65 years of age had a 26% decrease in nonfatal heart attack and a 49% decrease in cardiovascular death rates.

The most recent published clinical trial of vitamin E and men's cardiovascular health included almost 15,000 healthy physicians ≥50 years of age who were randomly assigned to receive 400 IU synthetic alpha-tocopherol every other day, 500 mg vitamin C daily, both vitamins, or placebo [24]. During a mean followup period of 8 years, intake of vitamin E (and/or vitamin C) had no effect on the incidence of major cardiovascular events, myocardial infarction, stroke, or cardiovascular morality. Furthermore, use of vitamin E was associated with a significantly increased risk of hemorrhagic stroke.

In general, clinical trials have not provided evidence that routine use of vitamin E supplements prevents cardiovascular disease or reduces its morbidity and mortality. However, participants in these studies have been largely middle-aged or elderly individuals with demonstrated heart disease or risk factors for heart disease. Some researchers have suggested that understanding the potential utility of vitamin E in preventing CHD might require longer studies in younger participants taking higher doses of the supplement [25]. Further research is needed to determine whether supplemental vitamin E has any protective value for younger, healthier people at no obvious risk of CHD.

*Cancer*

Antioxidant nutrients like vitamin E protect cell constituents from the damaging effects of free radicals that, if unchecked, might contribute to cancer development [7]. Vitamin E might also block the formation of carcinogenic nitrosamines formed in the stomach from nitrites in foods and protect against cancer by enhancing immune function [26]. Unfortunately, human trials and surveys that have attempted to associate vitamin E intake with cancer incidence have found that vitamin E is not beneficial in most cases.

Both the HOPE-TOO Trial and Women's Health Study evaluated whether vitamin E supplements might protect people from cancer. HOPE-TOO, which followed men and women ≥55 years of age with heart disease or diabetes for 7 years, found no significant differences in the number of new cancers or cancer deaths between individuals randomly assigned to take 400 IU/day vitamin E or a placebo [20]. In the Women's Health Study, in which healthy women ≥45 years of age received either 600 IU vitamin E every other day or a placebo for 10 years, the supplement did not reduce the risk of developing any form of cancer [23].

Several studies have examined whether vitamin E intake and/or supplemental vitamin E affects the risk of developing prostate cancer. A prospective cohort study of >29,000 men found no association between dietary or supplemental vitamin E intake and prostate cancer risk [27]. However, among current smokers and men who had quit, vitamin E intakes of more than 400 IU/day were associated with a statistically significant 71% reduction in the risk of advanced prostate cancer. In a clinical trial involving 29,133 male smokers, men randomly assigned to take daily supplements of 50 IU synthetic vitamin E for 5-8 years had 32% fewer prostate cancers compared to subjects who did not take the supplements [28]. Based in part on the promising results of this study, a large randomized clinical trial, called the SELECT trial, began in 2001 to determine whether 7-12 years of daily supplementation with synthetic vitamin E (400 IU, as dl-alpha-tocopheryl acetate), with or without selenium (200 mcg, as L-selenomethionine), reduced the number of new prostate cancers in 35,533 healthy men age 50 and older. The trial was discontinued in October 2008 when an analysis found that the supplements, taken alone or together for about 5.5 years, did not prevent prostate cancer [29]. Results from an additional 1.5 years of follow-up from this trial (during which the subjects no longer received vitamin E or selenium), showed that the men who had taken the vitamin E had a 17 percent increased risk of prostate cancer compared to men only taking placebos, a statistically significant difference [30]. The risk of developing prostate cancer was also slightly increased in subjects taking vitamin E plus selenium or selenium alone, but the differences were not statistically significant. No differences were found among groups in the incidence of lung or colorectal cancers or all cancers combined. Study staff members will continue to monitor participants' health for up to 5 more years. The National Cancer Institute web site provides additional information on the SELECT

One study of women in Iowa provides evidence that higher intakes of vitamin E from foods and supplements could decrease the risk of colon cancer, especially in women <65 years of age [31]. The overall relative risk for the highest quintile of intake (>35.7 IU/day) compared to the lowest quintile (<5.7 IU/day) was 0.32. However, prospective cohort studies of 87,998 women in the Nurses' Health Study and 47,344 men in the Health Professionals Follow-up Study failed to replicate these results [32]. Although some research links higher intakes of vitamin E with decreased incidence of breast cancer, an examination of the impact of dietary factors, including vitamin E, on the incidence of postmenopausal breast cancer in >18,000 women found no benefit from the vitamin [33].

The American Cancer Society conducted an epidemiologic study examining the association between use of vitamin C and vitamin E supplements and bladder cancer mortality. Of the almost one million adults followed between 1982 and 1998, adults who took supplemental vitamin E for 10 years or longer had a reduced risk of death from bladder cancer [34]; vitamin C supplementation provided no protection.

Evidence to date is insufficient to support taking vitamin E to prevent cancer. In fact, daily use of large-dose vitamin E supplements (400 IU) may increase the risk of prostate cancer.

*Eye disorders*
Age-related macular degeneration (AMD) and cataracts are among the most common causes of significant vision loss in older people. Their etiologies are usually unknown, but the cumulative effects of oxidative stress have been postulated to play a role. If so, nutrients with antioxidant functions, such as vitamin E, could be used to prevent or treat these conditions.

Prospective cohort studies have found that people with relatively high dietary intakes of vitamin E (e.g., 30 IU/day) have an approximately 20% lower risk of developing AMD than people with low intakes (e.g., <15 IU/day) [35,36]. However, two randomized controlled trials in which participants took supplements of vitamin E (500 IU/day d-alpha-tocopherol in one study [37] and 111 IU/day dl-alpha-tocopheryl acetate combined with 20 mg/day beta-carotene in the other [38]) or a placebo failed to show a protective effect for vitamin E on AMD. The Age-Related Eye Disease Study (AREDS), a large randomized clinical trial, found that participants with some degree of AMD reduced their risk of developing advanced AMD by 25% by taking a daily supplement containing vitamin E (400 IU dl-alpha-tocopheryl acetate), beta-carotene (15 mg), vitamin C (500 mg), zinc (80 mg), and copper (2 mg) compared to participants taking a placebo over 5 years [39]. A follow-up AREDS2 study confirmed the value of this and similar supplement formulations in reducing the progression of AMD over a median follow-up period of 5 years" [40].

Several observational studies have revealed a potential relationship between vitamin E supplements and the risk of cataract formation. One prospective cohort study found that lens clarity was superior in participants who took vitamin E supplements and those with higher blood levels of the vitamin [41]. In another study, long-term use of vitamin E supplements was associated with slower progression of age-related lens opacification [42]. However, in the AREDS trial, the use of a vitamin E-containing formulation had no apparent effect on the development or progression of cataracts over an average of 6.3 years [43]. The AREDS2 study, which also tested formulations containing 400 IU vitamin E, confirmed these findings" [44].

Overall, the available evidence is inconsistent with respect to whether vitamin E supplements, taken alone or in combination with other antioxidants, can reduce the risk of developing AMD or cataracts. However, the formulations of vitamin E, other antioxidants, zinc, and copper used in AREDS holds promise for slowing the progression of AMD in people with early-stage disease.

*Cognitive decline*
The brain has a high oxygen consumption rate and abundant polyunsaturated fatty acids in the neuronal cell membranes. Researchers hypothesize that if cumulative free-radical damage to neurons over time contributes to cognitive decline and neurodegenerative diseases, such as Alzheimer's disease, then ingestion of sufficient or supplemental antioxidants (such as vitamin E) might provide some protection [45]. This hypothesis was supported by the results of a clinical trial in 341 patients with Alzheimer's disease of moderate severity who were randomly assigned to receive a placebo, vitamin E (2,000 IU/day dl-alpha-tocopherol), a monoamine oxidase inhibitor (selegiline), or vitamin E and selegiline [45]. Over 2 years, treatment with vitamin E and selegiline, separately or together, significantly delayed functional deterioration and the need for institutionalization compared to placebo. However, participants taking vitamin E experienced significantly more falls.

Vitamin E consumption from foods or supplements was associated with less cognitive decline over 3 years in a prospective cohort study of elderly, free-living individuals aged 65-102 years [46]. However, a clinical trial in primarily healthy older women who were randomly assigned to receive 600 IU d-alpha-tocopherol every other day or a placebo for ≤4 years found that the supplements provided no apparent cognitive benefits [47]. Another trial in which 769 men and women with mild

USCA Case #13-1060    Document #1483686    Filed: 05/12/2014    Page 282 of 387

cognitive impairment were randomly assigned to receive 2,000 IU/day vitamin E (form not specified), a cholinesterase inhibitor (donepezil), or placebo found no significant differences in the progression rate of Alzheimer's disease between the vitamin E and placebo groups [48].

In summary, most research results do not support the use of vitamin E supplements by healthy or mildly impaired individuals to maintain cognitive performance or slow its decline with normal aging [49]. More research is needed to identify the role of vitamin E, if any, in the management of cognitive impairment [50].

## Health Risks from Excessive Vitamin E

Research has not found any adverse effects from consuming vitamin E in food [6]. However, high doses of alpha-tocopherol supplements can cause hemorrhage and interrupt blood coagulation in animals, and *in vitro* data suggest that high doses inhibit platelet aggregation. Two clinical trials have found an increased risk of hemorrhagic stroke in participants taking alpha-tocopherol; one trial included Finnish male smokers who consumed 50 mg/day for an average of 6 years [51] and the other trial involved a large group of male physicians in the United States who consumed 400 IU every other day for 8 years [24]. Because the majority of physicians in the latter study were also taking aspirin, this finding could indicate that vitamin E has a tendency to cause bleeding.

The FNB has established ULs for vitamin E based on the potential for hemorrhagic effects (see Table 3). The ULs apply to all forms of supplemental alpha-tocopherol, including the eight stereoisomers present in synthetic vitamin E. Doses of up to 1,000 mg/day (1,500 IU/day of the natural form or 1,100 IU/day of the synthetic form) in adults appear to be safe, although the data are limited and based on small groups of people taking at least 2,000 IU for a few weeks or months. Long-term intakes above the UL increase the risk of adverse health effects [6]. Vitamin E ULs for infants have not been established.

Table 3: Tolerable Upper Intake Levels (ULs) for Vitamin E [6]

| Age | Male | Female | Pregnancy | Lactation |
|---|---|---|---|---|
| 1-3 years | 200 mg (300 IU) | 200 mg (300 IU) | | |
| 4-8 years | 300 mg (450 IU) | 300 mg (450 IU) | | |
| 9-13 years | 600 mg (900 IU) | 600 mg (900 IU) | | |
| 14-18 years | 800 mg (1,200 IU) | 800 mg (1,200 IU) | 800 mg (1,200 IU) | 800 mg (1,200 IU) |
| 19+ years | 1,000 mg (1,500 IU) | 1,000 mg (1,500 IU) | 1,000 mg (1,500 IU) | 1,000 mg (1,500 IU) |

Two meta-analyses of randomized trials have also raised questions about the safety of large doses of vitamin E, including doses lower than the UL. These meta-analyses linked supplementation to small but statistically significant increases in all-cause mortality. One analysis found an increased risk of death at doses of 400 IU/day, although the risk began to increase at 150 IU [52]. In the other analysis of studies of antioxidant supplements for disease prevention, the highest quality trials revealed that vitamin E, administered singly (dose range 10 IU-5,000 IU/day; mean 569 IU) or combined with up to four other antioxidants, significantly increased mortality risk [53].

The implications of these analyses for the potential adverse effects of high-dose vitamin E supplements are unclear [54-57]. Participants in the studies included in these analyses were typically middle-aged or older and had chronic diseases or related risk factors. Some of these participants often consumed other supplements in addition to vitamin E. Some of the studies analyzed took place in developing countries in which nutritional deficiencies are common. A review of the subset of studies in which vitamin E supplements were given to healthy individuals for the primary prevention of chronic disease found no convincing evidence that the supplements increased mortality [58].

However, results from the recently published, large SELECT trial show that vitamin E supplements (400 IU/day) may harm adult men in the general population by increasing their risk of prostate cancer [30]. Follow-up studies are assessing whether the cancer risk was associated with baseline blood levels of vitamin E and selenium prior to supplementation as well as whether changes in one or more genes might increase a man's risk of developing prostate cancer while taking vitamin E.

## Interactions with Medications

JA-0851

USCA Case #13-1060      Document #1483680      Filed: 03/12/2014      Page 283 of 387

Vitamin E supplements have the potential to interact with several types of medications. A few examples are provided below. People taking these and other medications on a regular basis should discuss their vitamin E intakes with their healthcare providers.

*Anticoagulant and antiplatelet medications*

Vitamin E can inhibit platelet aggregation and antagonize vitamin K-dependent clotting factors. As a result, taking large doses with anticoagulant or antiplatelet medications, such as warfarin (Coumadin®), can increase the risk of bleeding, especially in conjunction with low vitamin K intake. The amounts of supplemental vitamin E needed to produce clinically significant effects are unknown but probably exceed 400 IU/day [59].

*Simvastatin and niacin*

Some people take vitamin E supplements with other antioxidants, such as vitamin C, selenium, and beta-carotene. This collection of antioxidant ingredients blunted the rise in high-density lipoprotein (HDL) cholesterol levels, especially levels of HDL2, the most cardioprotective HDL component, among people treated with a combination of simvastatin (brand name Zocor®) and niacin [60,61].

*Chemotherapy and radiotherapy*

Oncologists generally advise against the use of antioxidant supplements during cancer chemotherapy or radiotherapy because they might reduce the effectiveness of these therapies by inhibiting cellular oxidative damage in cancerous cells [62,63]. Although a systematic review of randomized controlled trials has called this concern into question [64], further research is needed to evaluate the potential risks and benefits of concurrent antioxidant supplementation with conventional therapies for cancer.

## Vitamin E and Healthful Diets

The federal government's 2010 Dietary Guidelines for Americans notes that "nutrients should come primarily from foods. Foods in nutrient-dense, mostly intact forms contain not only the essential vitamins and minerals that are often contained in nutrient supplements, but also dietary fiber and other naturally occurring substances that may have positive health effects. …Dietary supplements… may be advantageous in specific situations to increase intake of a specific vitamin or mineral."

For more information about building a healthful diet, refer to the Dietary Guidelines for Americans and the U.S. Department of Agriculture's food guidance system, MyPlate.

The *Dietary Guidelines for Americans* describes a healthy diet as one that:

- Emphasizes a variety of fruits, vegetables, whole grains, and fat-free or low-fat milk and milk products.

  Vitamin E is found in green leafy vegetables, whole grains, and fortified cereals.

- Includes lean meats, poultry, fish, beans, eggs, and nuts.

  Nuts are good sources of vitamin E.

- Is low in saturated fats, *trans* fats, cholesterol, salt (sodium), and added sugars.

  Vitamin E is commonly found in vegetable oils.

- Stays within your daily calorie needs.

## References

1. Traber MG. Vitamin E. In: Shils ME, Shike M, Ross AC, Caballero B, Cousins R, eds. Modern Nutrition in Health and Disease. 10th ed. Baltimore, MD: Lippincott Williams & Wilkins, 2006;396-411.
2. Traber MG. Vitamin E regulatory mechanisms. Annu Rev Nutr 2007;27:347-62. [PubMed abstract]
3. Sen CK, Khanna S, Roy S. Tocotrienols: vitamin E beyond tocopherols. Life Sci 2006;78:2088-98. [PubMed abstract]
4. Dietrich M, Traber MG, Jacques PF, Cross CE, Hu Y, Block G. Does γ-tocopherol play a role in the primary prevention of heart disease and cancer? A review. Am J Coll Nutr 2006;25:292-9. [PubMed abstract]
5. Verhagen H, Buijsse B, Jansen E, Bueno-de-Mesquita B. The state of antioxidant affairs. Nutr Today 2006;41:244-50.
6. Institute of Medicine. Food and Nutrition Board. Dietary Reference Intakes: Vitamin C, Vitamin E, Selenium, and Carotenoids ⧉. Washington, DC: National Academy Press, 2000.
7. U.S. Department of Agriculture, Agricultural Research Service. 2011. USDA National Nutrient

Database, Standard Reference, Release 23. Nutrient Data Laboratory Home Page,
http://www.ars.usda.gov/ba/bhnrc/ndl.

8. Ford ES, Ajani UA, Mokdad AH. Brief communication: the prevalence of high intake of vitamin E from the use of supplements among U.S. adults. Ann Intern Med 2005;143:116-20. [PubMed abstract]

9. Gao X, Wilde PE, Lichtenstein AH, Bermudez OI, Tucker KL. The maximal amount of dietary á-tocopherol intake in U.S. adults (NHANES 2001-2002). J Nutr 2006;136:1021-6. [PubMed abstract]

10. Interagency Board for Nutrition Monitoring and Related Research. Third Report on Nutrition Monitoring in the United States. Washington, DC: U.S. Government Printing Office, 1995.

11. Brion LP, Bell EF, Raghuveer TS. Vitamin E supplementation for prevention of morbidity and mortality in preterm infants. Cochrane Database Syst Rev;4:CD003665. [PubMed abstract]

12. Kowdley KV, Mason JB, Meydani SN, Cornwall S, Grand RJ. Vitamin E deficiency and impaired cellular immunity related to intestinal fat malabsorption. Gastroenterology 1992;102:2139-42. [PubMed abstract]

13. Tanyel MC, Mancano LD. Neurologic findings in vitamin E deficiency. Am Fam Physician 1997;55:197-201. [PubMed abstract]

14. Cavalier L, Ouahchi K, Kayden H, Donato S, Reutenaucer L, Mandel JL, et al. Ataxia with isolated vitamin E deficiency: heterogeneity of mutations and phenotypic variability in a large number of families. Am J Hum Genet 1998;62:301-10. [PubMed abstract]

15. Glynn RJ, Ridker PM, Goldhaber SZ, Zee RY, Buring JE. Effects of random allocation to vitamin E supplementation on the occurrence of venous thromboembolism: report from the Women's Health Study. Circulation 2007;116:1497-1503. [PubMed abstract]

16. Stampfer MJ, Hennekens CH, Manson JE, Colditz GA, Rosner B, Willett WC. Vitamin E consumption and the risk of coronary disease in women. N Engl J Med 1993;328:1444-9. [PubMed abstract]

17. Knekt P, Reunanen A, Jarvinen R, Seppanen R, Heliovaara M, Aromaa A. Antioxidant vitamin intake and coronary mortality in a longitudinal population study. Am J Epidemiol 1994;139:1180-9. [PubMed abstract]

18. Traber MG. Heart disease and single-vitamin supplementation. Am J Clin Nutr 2007;85:293S-9S. [PubMed abstract]

19. Jialal I, Devaraj S. Vitamin E supplementation and cardiovascular events in high-risk patients. N Engl J Med 2000;342:154-60. [PubMed abstract]

20. Lonn E, Bosch J, Yusuf S, Sheridan P, Pogue J, Arnold JM, et al.; HOPE and HOPE-TOO Trial Investigators. Effects of long-term vitamin E supplementation on cardiovascular events and cancer: a randomized controlled trial. JAMA 2005;293:1338-47. [PubMed abstract]

21. Brown BG, Crowley J. Is there any hope for vitamin E? JAMA 2005;293:1387-90. [PubMed abstract]

22. Waters DD, Alderman EL, Hsia J, Howard BV, Cobb FR, Rogers WJ, et al. Effects of hormone replacement therapy and antioxidant vitamin supplements on coronary atherosclerosis in postmenopausal women: a randomized controlled trial. J Am Med Assoc 2002;288:2432-40. [PubMed abstract]

23. Lee I-M, Cook NR, Gaziano JM, Gordon D, Ridker PM, Manson JE, et al. Vitamin E in the primary prevention of cardiovascular disease and cancer: the Women's Health Study: a randomized controlled trial. JAMA 2005;294:56-65. [PubMed abstract]

24. Sesso HD, Buring JE, Christen WG, Kurth T, Belanger C, MacFadyen J, et al. Vitamins E and C in the prevention of cardiovascular disease in men: the Physicians' Health Study II randomized controlled trial. JAMA 2008;300:2123-33. [PubMed abstract]

25. Blumberg JB, Frei B. Why clinical trials of vitamin E and cardiovascular diseases may be fatally flawed. Commentary on "The relationship between dose of vitamin E and suppression of oxidative stress in humans." Free Radic Biol Med 2007;43:1374-6. [PubMed abstract]

26. Weitberg AB, Corvese D. Effect of vitamin E and beta-carotene on DNA strand breakage induced by tobacco-specific nitrosamines and stimulated human phagocytes. J Exp Clin Cancer Res 1997;16:11-4. [PubMed abstract]

27. Kirsh VA, Hayes RB, Mayne ST, Chatterjee N, Subar AF, Dixon LB, et al. Supplemental and dietary vitamin E, B-carotene, and vitamin C intakes and prostate cancer risk. J Natl Cancer Inst 2006;98:245-54. [PubMed abstract]

28. Heinonen OP, Albanes D, Virtamo J, Taylor PR, Huttunen JK, Hartman AM, Haapakoski J, Malila N, Rautalahti M, Ripatti S, Mäenpää H, Teerenhovi L, Koss L, Virolainen M, Edwards BK. Prostate cancer and supplementation with alpha-tocopherol and beta-carotene: incidence and mortality in a controlled trial. J Natl Cancer Inst. 1998 Mar 18;90(6):440-6. [PubMed abstract]

29. National Cancer Institute. Questions and Answers: Selenium and Vitamin E Cancer Prevention Trial (SELECT).

30. Klein EA, Thompson Jr. IM, Tangen CM, Crowley JJ, Lucia MS, Goodman PJ, et al. Vitamin E and the risk of prostate cancer: the Selenium and Vitamin E Cancer Prevention Trial (SELECT). JAMA 2011;306:1549-1556. [PubMed abstract]

JA-0853

31. Bostick RM, Potter JD, McKenzie DR, Sellers TA, Kushi LH, Steinmetz KA, et al. Reduced risk of colon cancer with high intakes of vitamin E: the Iowa Women's Health Study. Cancer Res 1993;15:4230-17. [PubMed abstract]

32. Wu K, Willett WC, Chan JM, Fuchs CS, Colditz GA, Rimm EB, et al. A prospective study on supplemental vitamin E intake and risk of colon cancer in women and men. Cancer Epidemiol Biomarkers Prev 2002;11:1298-304. [PubMed abstract]

33. Graham S, Sielezny M, Marshall J, Priore R, Freudenheim J, Brasure J, et al. Diet in the epidemiology of postmenopausal breast cancer in the New York State Cohort. Am J Epidemiol 1992;136:3127-37. [PubMed abstract]

34. Jacobs EJ, Henion AK, Briggs PJ, Connell CJ, McCullough ML, Jonas CR, et al. Vitamin C and vitamin E supplement use and bladder cancer mortality in a large cohort of US men and women. Am J Epidemiol 2002;156:1002-10. [PubMed abstract]

35. Chong EW-T, Wong TY, Kreis AJ, Simpson JA, Guymer RH. Dietary antioxidants and primary prevention of age-related macular degeneration: systematic review and meta-analysis. BMJ 2007;335:755. [PubMed abstract]

36. Evans J. Primary prevention of age related macular degeneration. BMJ 2007;335:729. [PubMed abstract]

37. Taylor HR, Tikellis G, Robman LD, McCarty CA, McNeil JJ. Vitamin E supplementation and macular degeneration: randomized controlled trial. BMJ 2002;325:11. [PubMed abstract]

38. Teikari JM, Virtamo J, Rautalahti M, Palmgren J, Liesto K, Heinonen OP. Long-term supplementation with alpha-tocopherol and beta-carotene and age-related cataract. Acta Ophthalmol Scand 1997;75:634-40. [PubMed abstract]

39. Age-Related Eye Disease Study Research Group. A randomized, placebo-controlled, clinical trial of high-dose supplementation with vitamins C and E, beta carotene, and zinc for age-related macular degeneration and vision loss: AREDS report no. 8. Arch Ophthalmol 2001;119:1417-36. [PubMed abstract]

40. The Age-Related Eye Disease Study 2 (AREDS2) Research Group. Lutein + zeaxanthin and omega-3 fatty acids for age-related macular degeneration: the Age-Related Eye Disease Study 2 (AREDS2) randomized clinical trial. JAMA 2013;309:2005-15. [PubMed abstract]

41. Leske MC, Chylack LT Jr, He Q, Wu SY, Schoenfeld E, Friend J, et al. Antioxidant vitamins and nuclear opacities: the longitudinal study of cataract. Ophthalmology 1998;105:831-6. [PubMed abstract]

42. Jacques PF, Taylor A, Moeller S, Hankinson SE, Rogers G, Tung W, et al. Long-term nutrient intake and 5-year change in nuclear lens opacities. Arch Ophthalmol 2005;123:517-26. [PubMed abstract]

43. Age-Related Eye Disease Study Research Group. A randomized, placebo-controlled, clinical trial of high-dose supplementation with vitamins C and E and beta carotene for age-related cataract and vision loss: AREDS report no. 9. Arch Opthalmol 2001;119:1439-52. [PubMed abstract]

44. The Age-Related Eye Disease Study 2 (AREDS2) Research Group. Lutein/zeaxanthin for the treatment of age-related cataract: AREDS2 randomized trial report no. 4. JAMA Ophthalmol 2013. Online May 5. [PubMed abstract]

45. Sano M, Ernesto C, Thomas RG, Klauber MR, Schafer K, Grundman M, et al. A controlled trial of selegiline, alpha-tocopherol, or both as treatment for Alzheimer's disease. N Engl J Med 1997;336:1216-22. [PubMed abstract]

46. Morris MC, Evand DA, Bienias JL, Tangney CC, Wilson RS. Vitamin E and cognitive decline in older persons. Arch Neurol 2002;59:1125-32. [PubMed abstract]

47. Kang JH, Cook N, Manson J, Buring J, Grodstein F. A randomized trial of vitamin E supplementation and cognitive function in women. Arch Intern Med 2006;166:2462-8. [PubMed abstract]

48. Petersen RC, Thomas RG, Grundman M, Bennett D, Doody R, Ferris S, et al. Vitamin E and donepezil for the treatment of mild cognitive impairment. N Engl J Med 2005;352:2379-88. [PubMed abstract]

49. Espeland MA. Preventing cognitive decline in usual aging. Arch Intern Med 2006;166:2433-4. [PubMed abstract]

50. Isaac MGEKN, Quinn R, Tabet N. Vitamin E for Alzheimer's disease and mild cognitive impairment (review). Cochrane Database Syst Rev 2008;(3):CD002854. [PubMed abstract]

51. Alpha-Tocopherol, Beta Carotene Cancer Prevention Study Group. The effect of vitamin E and beta carotene on the incidence of lung cancer and other cancers in male smokers. N Engl J Med 1994;330:1029-35. [PubMed abstract]

52. Miller ER 3rd, Pastor-Barriuso R, Dalal D, Riemersma RA, Appel LJ, Guallar E. Meta-analysis: high-dosage vitamin E supplementation may increase all-cause mortality. Ann Intern Med 2005;142:37-46. [PubMed abstract]

53. Bjelakovic G, Nikolova D, Gluud LL, Simonetti RG, Gluud C. Mortality in randomized trials of antioxidant supplements for primary and secondary prevention: systematic review and meta-analysis. JAMA 2007;297:842-57. [PubMed abstract]

JA-0854

USCA Case #13-1060     Document #1483688     Filed: 03/12/2014     Page 286 of 387

54. Comments and responses: high dosage vitamin E supplementation and all-cause mortality. Ann Intern Med 2005;143:150-7.

55. Greenberg ER. Vitamin E supplements: good in theory, but is the theory good? Ann Intern Med 2005;142:75-6. [PubMed abstract]

56. Hathcock JN, Azzi A, Blumberg J, Bray T, Dickinson A, Frei B, et al. Vitamins E and C are safe across a broad range of intakes. Am J Clin Nutr 2005;81:367-45. [PubMed abstract]

57. Various authors. Letters: antioxidant supplements and mortality. JAMA 2007;298:400-3.

58. Huang HY, Caballero B, Chang S, Alberg A, Semba R, Schneyer C, et al. Multivitamin/Mineral Supplements and Prevention of Chronic Disease. Evidence Report/Technology Assessment No. 139. (Prepared by The Johns Hopkins University Evidence-based Practice Center under Contract No. 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). AHRQ Publication No. 06-E012. Rockville, MD: Agency for Healthcare Research and Quality. May 2008.

59. Natural Medicines Comprehensive Database . Vitamin E.

60. Brown BG, Zhao X-Q, Chait A, Fisher LD, Cheung MC, Morse JS, et al. Simvastatin and niacin, antioxidant vitamins, or the combination for the prevention of coronary disease. N Engl J Med 2001;345:1583-92. [PubMed abstract]

61. Cheung MC, Zhao X-Q, Chait A, Albers JJ, Brown BG. Antioxidant supplements block the response of HDL to simvastatin-niacin therapy in patients with coronary artery disease and low HDL. Arterioscler Thromb Vasc Biol 2001;21:1320-6. [PubMed abstract]

62. Doyle C, Kushi LH, Byers T, Courneya KS, Demark-Wahnefried W, Grant B, et al., for the 2006 Nutrition, Physical Activity and Cancer Survivorship Advisory Committee. Nutrition and physical activity during and after cancer treatment: an American Cancer Society guide for informed choices. CA Cancer J Clin 2006;56:323-53. [PubMed abstract]

63. Lawenda BD, Kelly KM, Ladas EJ, Sagar SM, Vickers A, Blumberg JB. Should supplemental antioxidant administration be avoided during chemotherapy and radiation therapy? J Natl Cancer Inst 2008;100:773-83. [PubMed abstract]

64. Block KI, Koch AC, Mead MN, Tothy PK, Newman RA, Gyllenhaal C. Impact of antioxidant supplementation on chemotherapeutic efficacy: a systematic review of the evidence from randomized controlled trials. Cancer Treat Rev 2007;33:407-18. [PubMed abstract]

## Disclaimer

This fact sheet by the Office of Dietary Supplements provides information that should not take the place of medical advice. We encourage you to talk to your health care providers (doctor, registered dietitian, pharmacist, etc.) about your interest in, questions about, or use of dietary supplements and what may be best for your overall health. Any mention in this publication of a specific brand name is not an endorsement of the product.

Reviewed: June 05, 2013

USA.gov
Government Made Easy

JA-0855

REVIEW

www.nature.com/clinicalpractice/uro

# Prostate-specific antigen doubling time as a prognostic marker in prostate cancer

James A Eastham

## SUMMARY

Prostate cancer has a varied natural history. Men with similar serum prostate-specific antigen (PSA) levels, clinical stages, and histologic features in their tissue specimens can have markedly different outcomes. While prostate cancer is lethal in some patients, most men die with cancer rather than because of it. Moreover, histologically apparent cancer can be found in the prostate glands of approximately 42% of men over 50 years of age who die from other causes, but the lifetime risk that a man in the US will be diagnosed with prostate cancer is estimated to be 11% and the risk of dying from the disease is only 3.1%. Consequently, appropriate disease management requires risk assessment. How likely is it that a given man's cancer will progress or metastasize over his remaining lifetime? What is the probability of successful treatment? What are the risks of adverse effects and complications of each treatment? Physicians use a variety of clinical and pathologic parameters to assess the risk that a given cancer poses to an individual patient. In addition to the accepted parameters of serum PSA level, clinical staging, and pathologic grading and staging, PSA doubling time has emerged as an important factor in the evaluation of men with newly diagnosed prostate cancer or prostate cancer that recurs after treatment. PSA doubling time can also be used as a surrogate marker for prostate cancer-specific death. This review summarizes current knowledge regarding the role of PSA doubling time as a prognostic marker in men with prostate cancer.

KEYWORDS prostate, prostate-specific antigen, prostate-specific antigen doubling time, prostatic neoplasms

### REVIEW CRITERIA

PubMed and MEDLINE were searched for papers published from January 1998 to June 2005, under the terms "prostate specific antigen doubling time", "prostatic neoplasms", and/or "prostate-specific antigen". Of the citations identified by the searches, papers were selected on the basis of their relationship to predicting outcomes in men with prostate cancer. Only papers published in English have been cited in this review.

JA Eastham is a surgeon in the Department of Urology at Memorial Sloan–Kettering Cancer Center, New York, NY, USA.

**Correspondence**
353 East 68th Street, Suite 527, New York, NY 10021, USA
easthamj@mskcc.org

**Received** 28 May 2005  **Accepted** 3 August 2005
www.nature.com/clinicalpractice
doi:10.1038/ncpuro0321

## INTRODUCTION

Considerable progress has been made in the development of models, or 'nomograms', to predict outcomes in men diagnosed with prostate cancer. These tools can help both patients and clinicians define the risk posed by a given cancer. A variety of prediction models are currently available, including nomograms that have the following functions: prediction of the probability that a newly diagnosed cancer is clinically insignificant (indolent);[1] estimation of the pathologic extent of disease at the time of radical prostatectomy ('Partin tables');[2] assessment of the probability of biochemical recurrence after surgery,[3] external-beam radiation therapy,[4] or brachytherapy;[5] and evaluation of the probability of progression to bone metastasis and death after surgical failure.[6] Nomograms are useful risk-assessment and decision-making tools for all stages of prostate cancer.

Despite the widespread use of nomograms and their reasonable predictive accuracy, better tools are needed to predict the probability of disease recurrence or progression before or after treatment. The use of additional clinical parameters, quantifying the multitude of histologic variables rather than just Gleason score, and integrating additional molecular biomarker information as well as total prostate-specific antigen (PSA) levels is expected to improve the predictive power of these tools significantly, enhancing the ability of physicians and patients to make important clinical decisions. PSA doubling time (PSADT) has emerged as a useful variable for predicting progression in men with various stages of prostate cancer.

## CALCULATING PSA DOUBLING TIME

After definitive local therapy, changes in serum PSA level over time are believed to reflect tumor growth. Hence, a rapidly increasing serum PSA level is thought to represent aggressive disease, and can be used to stratify a patient's risk of clinical disease progression and prostate-cancer-specific

JA-0856
©2005 Nature Publishing Group
PX0178-0001

REVIEW

www.nature.com/clinicalpractice/uro

death. PSADT, calculated as the natural log of 2 divided by the slope of the natural log of PSA values, is a mathematical estimate of the rate of tumor growth. PSADT is an example of a more general concept: the 'PSA slope'. If PSA values are distributed on the y-axis of a scatter plot and time on the x-axis, the PSA slope is the change in PSA value divided by the interval of time in which the change occurred. It is a line function that fits the PSA values over time.

For two PSA values, the slope can be calculated exactly. For three or more data points, the PSA slope is calculated using least-squared regression. In order for regression calculations to be valid, PSA values must have a normal distribution, no selection bias, and a linear pattern over time. In other words, before calculating the PSA slope using regression, a straight line, or function, should describe the relationship between PSA values and time. Because PSA values tend to follow an exponential distribution as they increase, the PSA values must be transformed before calculating the slope. Many researchers have used the natural-log transformation (taking the natural log) of PSA values to make the kinetic pattern more linear, because PSA values plotted over time on a scatter plot appear to increase exponentially after post-treatment recurrence of cancer. These log transformations, however, do not follow a purely linear PSA kinetic pattern. In most cases, even after the natural-log transformation of PSA values, there is a nonlinear pattern of increasing log PSA values over time. This nonlinear pattern could be due to either biological changes in the disease or a poorly fitting mathematical model. Although many investigators have assumed that PSADT is an appropriate technique and concluded that the observed changes in PSADT over time indicate biological changes, a poorly-fitting mathematical model must be considered as a possible factor before making such conclusions.

There are several issues relating to the time interval that must be considered when calculating the PSA slope, including PSA data-point exclusion rules, PSA value transformations other than the natural log, definitions of biochemical recurrence, and rules for selecting specific PSA values within a time interval. If an assumption is made that the 'true' PSA slope is strongly associated with the true tumor growth rate, the 'true' PSA slope must be estimated from given PSA measurements over time.

If the serum PSA level is measured at regular intervals in an untreated patient with prostate cancer, the kinetics should follow an uninterrupted mathematical function of growth over time from the time of the first detectable PSA value to the time of death. Life-threatening disease should follow a rate of growth that is sharper than indolent disease. In treated patients, over time, the PSA level typically falls for a period after successful treatment, to a nadir level, and then rises again with disease recurrence. Because of this discontinuous kinetic pattern, the only way to estimate the true PSA slope is to calculate the slope over the interval of time following the effects of treatment and preceding the effects of subsequent treatment on the PSA level. Within these time intervals, the number of possible confounding factors should be minimal. For example, to calculate the PSA slope after radical prostatectomy and before subsequent androgen-deprivation therapy, the time interval should start after the postsurgery PSA nadir level is reached and stop at the moment hormone therapy is initiated. The time interval used for calculation of the PSA slope starts after a post-treatment PSA nadir level is achieved and ends when the next treatment begins. Any event in a patient's clinical history that interferes with their PSA level, by affecting either the cancer or the tumor's ability to produce PSA, should reset any ongoing estimation of the PSA slope.

Taking the natural log of PSA values before calculating the PSA slope over time seems to be a better fit than no transformation whatsoever. All of the published PSADT calculations use the natural-log transformation for PSA values. However, analysis of the PSA values of thousands of individual cases indicates that the slopes calculated using the natural-log transformation progressively increase during a time interval (segment). This finding indicates either that there are progressive biological changes in the underlying cancer during the time interval or, more likely, that the natural log is not a perfect transformation for PSA values. A perfect transformation would make the PSA slope appear constant within the time interval. A problem with using natural-log transformation is the conclusion that the slope is truly changing, when in reality the underlying disease is following a mathematical pattern and has merely reached an inflection point in an equation. Because PSA values appear to increase exponentially over

JA-0857
©2005 Nature Publishing Group

PX0178-0002

REVIEW

www.nature.com/clinicalpractice/uro

time rather than linearly, the cube root, square root, and different log-base transformations should be explored to assess whether a better fitting mathematical model of PSA slope over time can fit the observed data points.

Comparison of the different reported methods of calculating PSADT is critical when determining the appropriate methodology for the data under consideration. A more common method of calculating PSADT is that reported by D'Amico *et al.*, in which a minimum of three PSA values are considered: the first PSA value must be >0.2 ng/ml, all PSA value measurements must be separated by a minimum of 3 months, and consecutive PSA values must rise by a minimum of 0.2 ng/ml.[7] This is an attempt to have evenly spaced values so that an outlier cannot disproportionately affect the regression slope, and small differences in PSA values measured over shortened time intervals are not used in slope calculations. This definition also includes the technique of subtracting the nadir value from postradiation therapy PSA values before calculating the PSA slope. While these restrictions might introduce a slight variation by only choosing one PSA measurement for every 3 months (rather than averaging clusters of PSA values in smaller time intervals), this method provides a reasonable technique to estimate PSADT.

The PSA slope is best calculated using least-squared regression and, therefore, hand-picking certain values to use within the time interval modeled, such as including only the peaks, values rising by a specified amount or percentage, or values separated by a certain amount of time, is discouraged. All of these methods of arbitrarily selecting PSA measurements within an interval of time risk introducing a systematic bias into the resulting slope calculation. The only PSA values that should be excluded are those that bias a regression model, such as one outlying value that influences the slope too heavily. PSADT calculations can easily be performed with a computer program.[8]

## PSA DOUBLING TIME IN ACTIVE SURVEILLANCE

Epidemiologic data demonstrate a marked increase in the number of men diagnosed with prostate cancer and a profound shift towards diagnosis at earlier stages of the disease. Large-scale PSA-screening programs and more extensive biopsies are largely responsible for the increase in the diagnosis rate. Prostate cancer is relatively slow growing, with doubling times for local tumors estimated at between 2 and 4 years. Some prostate cancers are so small, noninvasive, and of such a low grade that they appear to pose little risk to the life or health of the patient. Recent studies suggest that the prostate specimens of 20–30% of men who undergo radical prostatectomy are consistent with organ-confined cancer, with tumor volumes <0.5 cm³ and no Gleason grade 4 or 5 component.[1,9] Conservative management might be appropriate for many patients with low-risk cancer, and identifying such cancers before treatment would be a significant benefit to these patients.

The goal of active surveillance, with selectively delayed definitive therapy, is to distinguish clinically insignificant cancers from life-threatening cancers while they are still localized to the prostate. This approach assumes that the biologic potential of a given cancer can be assessed with some degree of certainty and that delayed treatment can be as curative as immediate treatment. The aim of this approach is to avoid overtreatment in the majority of patients while administering curative therapy to selected individuals. Patients on active surveillance are, therefore, given careful follow-up, typically including repeated prostate biopsy, PSA level measurement, and digital rectal examination.

The majority of investigators who have examined the role of PSADT in men on active surveillance have identified it as a predictor of progression. Choo *et al.* followed 206 men with clinically localized prostate cancer who were managed with active surveillance for a median of 29 months.[10] The median PSADT in these patients was 7 years, and 42% had a PSADT of ≥10 years. The investigators suggested that the definition of cancer progression for men on active surveillance included a PSADT of <2 years, based on at least three measurements over a minimum of 6 months. A longer PSADT, however, might define progression better, because six of the nine men who underwent radical prostatectomy based on this definition of progression had extraprostatic disease. Klotz recently added to the available data, which now includes 299 men followed by active surveillance with selectively delayed intervention.[11] Patients had a serum PSA level of <15 ng/ml, biopsy Gleason score of ≤7, and clinical stage of ≤T2b. Of these men, 80% had a PSA level of <10 ng/ml and the same percentage had a biopsy Gleason

JA-0858
©2005 Nature Publishing Group

score of ≤6. The median PSADT was 7 years; 21% of patients had a PSADT of <3 years and 42% of patients had a PSADT of >10 years. Radical prostatectomy was performed in 24 men because they had a PSADT of <2 years. Final pathology demonstrated that 10 of the men (42%) had a tumor stage of pT2, 14 men (58%) had a stage of pT3, and 2 men (8%) had positive pelvic lymph nodes. The author concluded that a PSADT of <2 years is often associated with locally advanced disease and that a more appropriate threshold for intervention to be considered in the active surveillance population is probably <3 years.[11]

Another study that examined PSADT before radical prostatectomy found that men with a PSADT of ≤3 years were more likely to have a stage pT3 cancer at surgery and three of 19 men with a PSADT of >6 years had pT3 cancer, two of them with positive nodes.[12]

These studies indicate that, while PSADT predicts cancer progression for men on active surveillance, the exact point at which treatment should be recommended requires further investigation.

## PSA DOUBLING TIME AFTER FAILURE OF DEFINTIVE LOCAL THERAPY

One of the most perplexing problems faced by urologists and oncologists is the management of patients with a rising serum PSA level after definitive local therapy. Following radical prostatectomy, the serum PSA level should be undetectable. Although the exact definition of PSA (biochemical) recurrence after radical prostatectomy is unclear, a rising PSA level of >0.2 ng/ml usually indicates persistent disease.

In 1997, the American Society for Therapeutic Radiology and Oncology (ASTRO) defined guidelines for PSA recurrence after radiation therapy.[13] While the panel agreed that biochemical failure did not necessarily predict clinical progression, they did consider biochemical failure an appropriate endpoint for clinical trials. The ASTRO definition of biochemical failure after radiation therapy is three consecutive increases in serum PSA level that are at least 6 months apart. The date of biochemical failure is the midpoint between the postirradiation serum PSA nadir level and the first of three consecutive increases in the serum PSA level. The panel also concluded that, while the serum PSA nadir level is an important prognostic variable, no absolute value was defined to

separate successful from unsuccessful treatments. Although this definition has high specificity, meaning that most men with three consecutive rises in serum PSA level over an 18-month period have cancer recurrence or persistence, it lacks sensitivity. Many men with prostate cancer that has not been cured with local radiation therapy will not manifest three consecutive rises in serum PSA level until the cancer has advanced beyond the point where additional local therapy might still be curative. In addition, the concept of 'PSA-bounce', a temporary rise in serum PSA level within the first 2–3 years after radiation therapy (which can occur in up to 15% of patients), and the difficulty of interpreting the expected rise in serum PSA level in men who receive temporary neoadjuvant/adjuvant androgen-deprivation therapy can make interpretation of the serum PSA level after radiation therapy even more difficult.

A detectable and rising serum PSA level after radical prostatectomy, external-beam radiation therapy, or brachytherapy usually signifies failure of the primary treatment, although, as mentioned above, a rising PSA level after brachytherapy and/or external-beam radiation therapy can be difficult to interpret. As such, investigators have attempted to use a rising PSA level to identify patients at a high risk of recurrence with nomograms[3–5] or a risk-group strategy.[14] Biochemical failure certainly causes patient anxiety and often results in initiating additional therapies. It is, however, difficult to select men for salvage therapy or to determine the time course from biochemical failure to a more significant endpoint, such as metastatic disease or prostate-cancer-specific death.

### Predicting response to salvage therapy

Several investigators have examined clinical predictors of response to local salvage therapy.[15,16] Ward et al. examined 211 men with biochemical failure after radical prostatectomy who were treated with salvage radiotherapy.[16] The median follow-up period after salvage treatment was 4.2 years, and 90% of the patients achieved a PSA level of ≤0.4 ng/ml after radiotherapy. The median follow-up period after salvage treatment was 4.2 years, and 90% of the patients achieved a PSA level of ≤0.4 ng/ml after radiotherapy. HAZARD RATIOS (HRs) generated by multivariable analysis demonstrated that a PSADT of <12 months (HR 3.88), seminal vesicle invasion (HR 3.22), pathologic Gleason score (HR 1.58), and PSA level at the initiation of salvage therapy (HR 1.29) predicted clinical recurrence after salvage radiotherapy. Within 5 years of radiotherapy, biochemical failure

### GLOSSARY
**HAZARD RATIO**
The relative likelihood of experiencing a particular event; an HR of 0.5 indicates that one group has half the risk of the other group

USCA Case #13-1060     Document #1483686        Filed: 03/12/2014      Page 291 of 387
REVIEW

www.nature.com/clinicalpractice/uro



**Figure 1** Four-year actuarial progression-free probability after salvage radiotherapy. The algorithm can be used to counsel men with a rising prostate-specific antigen (PSA) level after radical prostatectomy about the probability of their being free of PSA recurrence 4 years after salvage radiotherapy. The Gleason score in the radical prostatectomy specimen is the first decision point, followed by the current serum PSA level, the status of the surgical margins (positive or negative), and finally the PSA doubling time. The percentages (with confidence intervals) reflect the probability of being free of PSA recurrence 4 years after salvage radiotherapy. This figure has been reproduced with permission from reference 15 © (2004) American Medical Association. ADT, androgen-deprivation therapy; PFP, progression-free probability; PSADT, prostate-specific antigen doubling time; RT, radiotherapy.

was observed in 66% of patients with a PSADT of <12 months compared with 48% of those with a PSADT of ≥12 months. A PSADT of <12 months was also associated with a greater probability of progression to clinical metastasis.[16]

In an effort to identify which patients are most likely to benefit from salvage radiotherapy, Stephenson *et al.* retrospectively reviewed the medical histories of 501 patients who had received salvage radiotherapy for a detectable PSA level after radical prostatectomy.[15] Disease progression after salvage radiotherapy was defined as a rising PSA level, initiation of androgen-deprivation therapy, or a serum PSA level ≥0.1 ng/ml above the postradiotherapy nadir level. The median follow-up period

JA-0860
©2005 Nature Publishing Group
PX0178-0005

USCA Case #13-1060    Document #1483686    Filed: 03/12/2014    Page 292 of 387

was 45 months. The cancer of 250 patients (50%) progressed after salvage radiotherapy, 49 patients (10%) developed distant metastases, and 20 patients (4%) died from prostate cancer. Multivariable analysis revealed that a radical prostatectomy Gleason score of 8–10 (HR 2.6), a preradiotherapy PSA level of >2.0 ng/ml (HR 2.3), negative surgical margins (HR 1.9), a PSADT of ≤10 months (HR 1.7), and seminal vesicle invasion (HR 1.4) predicted treatment failure.[15] Figure 1 demonstrates the 4-year progression-free probabilities after salvage radiotherapy based on these prognostic factors. Patients with none of these adverse features had a progression-free probability of 77%. This study further highlights that, while individual variables such as PSADT can be used to assess prognosis, combining multiple factors results in a more useful predictive tool.

## Predicting progression to metastatic disease

Many investigators have examined the role of PSADT in predicting progression to metastatic disease after primary local therapy.[6,17–26] In an effort to characterize factors associated with postsurgical clinical progression, Roberts *et al.* reviewed the medical histories of 879 men with rising PSA level after radical prostatectomy.[24] Only PSADT was a significant predictor of either systemic progression or local recurrence according to their multivariable analysis. The 5-year freedom from local recurrence and systemic progression based on the PSADT is summarized in Table 1. The authors emphasized that many men with biochemical failure after radical prostatectomy will remain free of clinical disease for several years, but that a short PSADT identifies patients at a higher risk for local recurrence or systemic progression.

Ward *et al.* examined biochemical and clinical progression in 3,903 men treated with radical prostatectomy.[21] There were 1,288 (33%) biochemical failures, of which 27% failed more than 5 years after surgery. Regardless of the time from surgery to biochemical failure, the PSADT was the strongest predictor of eventual clinical recurrence (Figure 2).

Pound *et al.* characterized the course of disease progression in men with biochemical recurrence after radical prostatectomy.[6] Median follow-up time was 5 years (range 0.5–15 years). A total of 315 of the 1,997 men

**Table 1** Five-year freedom from local recurrence and systemic progression according to PSADT.[22]

| PSADT (years) | Local recurrence (%) | Systemic progression (%) |
|---|---|---|
| ≥10 | 87 | 99 |
| 1.0–9.9 | 62 | 95 |
| 0.5–0.9 | 46 | 93 |
| <0.5 | 38 | 64 |

PSADT, prostate-specific antigen doubling time.



**Figure 2** Actuarial probability of survival that is free of clinical recurrence following a prostate-specific antigen (PSA) event, determined by calculating the PSA doubling time and timing of the event. There was no significant difference between early and late biochemical groups (PSA event before or 5 years after radical prostatectomy) among patients with a PSA doubling time of <1 year and those with a PSA doubling time of ≥1 year. This figure has been reproduced with permission from reference 21 © (2003) Lippincott Williams and Wilkins. CI, confidence interval; PSA, prostate-specific antigen; PSADT, prostate-specific antigen doubling time.

who underwent radical prostatectomy developed biochemical recurrence (defined as a PSA level of ≥0.2 ng/ml). Distant metastases were identified in 103 (34%) of those with biochemical recurrence. The median actuarial time to metastases was 8 years from the time of biochemical recurrence. Time to biochemical recurrence, radical prostatectomy Gleason score, and PSADT predicted metastatic disease and the time of its development. A PSADT of <10 months provided the most statistically significant predictor of the time to development of distant metastases after biochemical failure. The investigators constructed an algorithm combining these parameters to stratify men into risk groups (Figure 3). Once metastatic disease was identified, the median ACTUARIAL TIME TO DEATH was 5 years.

**GLOSSARY**
**ACTUARIAL TIME TO DEATH**
Mathematical calculation of the survival time which properly considers that not all of the patients in the sample have died

JA-0861
©2005 Nature Publishing Group

PX0178-0006

REVIEW
www.nature.com/clinicalpractice/uro



**Figure 3** Algorithm for estimating the probability of remaining free of metastatic disease after biochemical recurrence following radical prostatectomy. The first box reflects the probability of being free from metastatic disease 3, 5, and 7 years after biochemical recurrence, for all patients. The algorithm then subclassifies risk according to prostatectomy Gleason score, time from surgery until biochemical recurrence, and prostate-specific antigen doubling time. This figure has been reproduced with permission from reference 6 © (1999) American Medical Association. CI, confidence interval; PSA, prostate-specific antigen; PSADT, prostate-specific antigen doubling time.

Pound *et al.* also examined various methods of calculating PSADT after radical prostatectomy (Table 2).[6] They found that using all of the PSA values within the first 2 years after documented biochemical recurrence to calculate PSADT provided the optimal combination of statistical significance and numbers of evaluable patients in this study.

JA-0862
©2005 Nature Publishing Group
PX0178-0007

USCA Case #13-1060    Document #1483686    Filed: 03/12/2014    Page 294 of 387

**Table 2** Methods of calculating prostate-specific antigen doubling time.

| PSADT calculation | Number of patients | Cox regression coefficient | 95% confidence intervals | Z | $\chi^2$ P value |
|---|---|---|---|---|---|
| All PSA values | 228 | −0.09 | −0.11 to −0.05 | −5.3 | <0.001 |
| First 2 PSA values | 212 | −0.04 | −0.06 to −0.02 | −3.2 | <0.001 |
| First 2 PSA values after 0.2 mg/ml[a] | 201 | −0.03 | −0.06 to −0.01 | −2.6 | 0.002 |
| All PSA values within 2 years of recurrence | 131 | −0.06 | −0.09 to −0.03 | −3.3 | <0.001 |
| All PSA values within 3 years of recurrence | 91 | −0.12 | −0.17 to −0.07 | −4.4 | <0.001 |
| All PSA values within 5 years of recurrence | 64 | −0.04 | −0.08 to −0.005 | −1.7 | 0.05 |

[a]0.2 mg/ml is the PSA recurrence value.
The Cox proportional hazards regression was used to test the predictive power of each PSADT calculation method. The time interval used for Cox regression was the time from PSA recurrence to the development of distant progression. This table has been reproduced with permission from reference 6 © (1991) American Medical Association. PSA, prostate-specific antigen; PSADT, prostate-specific antigen doubling time; Z, the z statistic value from the Cox model.

### Predicting prostate-cancer-specific death

Investigators have also examined the role of PSADT in predicting prostate-cancer-specific death. D'Amico et al. examined 381 patients with clinically localized prostate cancer treated with external-beam radiation therapy.[17] They analyzed post-treatment factors in 94 patients with biochemical failure and found that a short PSADT and delayed use of hormonal therapy could be used to predict the length of time to prostate-cancer-specific death. The cause of death in patients with a PSADT of ≤12 months was nearly always prostate cancer. The authors suggest that PSADT might serve as a possible surrogate for prostate-cancer-specific death.

Expanding on this analysis, D'Amico et al. analyzed two multi-institutional databases to evaluate whether a short post-treatment PSADT after surgery or radiation therapy was a surrogate endpoint for prostate-cancer-specific mortality.[7] Baseline, treatment, and follow-up information was compiled on a cohort of 8,669 men with prostate cancer who were treated with either radical prostatectomy (5,918 men) or radiation (2,751 men). The investigators determined that a post-treatment PSADT of <3 months was more strongly associated with an increased prostate-cancer-specific mortality than a PSADT of ≥3 months. Among men with biochemical recurrence, 12% of patients treated surgically and 20% treated with radiation therapy had a PSADT of <3 months. Although patients with a PSADT of <3 months were in the minority of this study population, this is a high-risk group for prostate-cancer-specific mortality and should be considered for early systemic therapy.



**Figure 4** Incidence of distant metastases stratified by prostate-specific antigen doubling time in men failing radiotherapy. This figure has been reproduced with permission from reference 19 © (2005) American Society of Clinical Oncology.

Zelefsky et al. performed a similar analysis to identify predictors of distant metastases among 381 patients who experienced biochemical failure after three-dimensional conformal radiotherapy.[19] Multivariable analysis suggested that PSADT, clinical stage, and Gleason score on biopsy predicted progression to distant metastases after biochemical failure. The 3-year incidence of distant metastases for patients with a PSADT of 0–3, 3–6, 6–12, and >12 months was 49%, 41%, 20%, and 7%, respectively (Figure 4). Patients with a PSADT of 0–3 and 3–6 months had a 7.0 and 6.6 increase, respectively, in risk of developing metastases compared with men with a PSADT of >12 months. The authors suggest that men with biochemical failure

JA-0863
©2005 Nature Publishing Group

PX0178-0008

USCA Case #13-1060    Document #1483686    Filed: 03/12/2014    Page 295 of 387



Number at risk

| 537 | 509 | 433 | 358 | 282 | 206 | 144 | 95 | 52 | 26 | 12 |
| 668 | 635 | 536 | 430 | 306 | 200 | 130 | 65 | 34 | 18 | 8 |
| 74 | 62 | 49 | 41 | 33 | 22 | 15 | 10 | 6 | 2 | 1 |
| 172 | 154 | 127 | 99 | 75 | 54 | 33 | 18 | 10 | 4 | 1 |

**Figure 5** Prostate-cancer-specific survival after biochemical failure by treatment received and prostate-specific antigen doubling time. This figure has been reproduced with permission from reference 22 © (2004) Oxford University Press. PSA, prostate-specific antigen; PSADT, prostate-specific antigen doubling time.

after radiotherapy and a PSADT of ≤6 months should consider systemic therapy because of the high probability of progression to metastatic disease.

To further investigate the relationship between biochemical failure, PSADT, and prostate-cancer-specific death, D'Amico *et al.* retrospectively reviewed information from two multi-institutional databases about 8,669 men treated with either radical prostatectomy ($n = 5,918$) or radiation therapy ($n = 2,751$) for clinical stage T1c–T4 Nx or N0M0 prostate cancer.[22] Regardless of primary treatment, a PSADT of <3 months was a significant predictor of prostate-cancer-specific death (Figure 5). A PSADT of <3 months was reported in 12% of men with biochemical failure after surgery compared with 20% of men with biochemical failure after radiotherapy. Men with a post-treatment PSADT of <3 months had a nearly 20-fold increased risk of dying from prostate cancer compared

with men with a longer PSADT. According to the investigators, physicians should consider prompt systemic therapy—including investigational treatments—in this high-risk group of men.

## CONCLUSION

The PSADT is an important prognostic marker in men with biochemical failure after local therapy for prostate cancer, and it predicts the probable response to salvage radiotherapy, progression to metastatic disease, and prostate-cancer-specific death. Combined with other known clinical and pathologic parameters, the PSADT is an effective tool to assess the risk after biochemical failure and to counsel men regarding the probability of clinical progression. Patients who are at a high risk of metastatic progression should strongly consider early initiation of systemic therapy or enrollment in a clinical trial.

**References**
1 Kattan MW *et al.* (2003) Counseling men with prostate cancer: a nomogram for predicting the presence of small, moderately differentiated, confined tumors. *J Urol* **170:** 1792–1797
2 Partin AW *et al.* (1997) Combination of prostate-specific antigen, clinical stage, and Gleason score to predict pathological stage of localized prostate cancer. A multi-institutional update. *JAMA* **277:** 1445–1451
3 Kattan MW *et al.* (1998) A preoperative nomogram for disease recurrence following radical prostatectomy for prostate cancer. *J Natl Cancer Inst* **90:** 766–771
4 Kattan MW *et al.* (2000) Pretreatment nomogram for predicting the outcome of three-dimensional conformal radiotherapy in prostate cancer. *J Clin Oncol* **18:** 3352–3359
5 Kattan MW *et al.* (2001) Pretreatment nomogram for predicting freedom from recurrence after permanent prostate brachytherapy in prostate cancer. *Urology* **58:** 393–399
6 Pound CR *et al.* (1999) Natural history of progression after PSA elevation following radical prostatectomy. *JAMA* **281:** 1591–1597
7 D'Amico AV *et al.* (2003) Surrogate end point for prostate cancer-specific mortality after radical prostatectomy or radiation therapy. *J Natl Cancer Inst* **95:** 1376–1383
8 Memorial Sloan-Kettering Cancer Center predication tools [http://www.mskcc.org/predictiontools]
9 Epstein JI *et al.* (1998) Nonpalpable stage T1c prostate cancer: prediction of insignificant disease using free/total prostate specific antigen levels and needle biopsy findings. *J Urol* **160:** 2407–2411
10 Choo R *et al.* (2002) Feasibility study: watchful waiting for localized low to intermediate grade prostate carcinoma with selective delayed intervention based on prostate specific antigen, histological and/or clinical progression. *J Urol* **167:** 1664–1669
11 Klotz L (2005) Active surveillance with selective delayed intervention using PSA doubling time for good risk prostate cancer. *Europ Urol* **47:** 16–21

JA-0864
©2005 Nature Publishing Group

PX0178-0009

www.nature.com/clinicalpractice/uro

12 Egawa S *et al.* (2000) Use of pretreatment prostate-specific antigen doubling time to predict outcome after radical prostatectomy. *Prostate Cancer Prostatic Dis* 3: 269–274

13 American Society for Therapeutic Radiology and Oncology Consensus Panel (1997) Consensus statement: guidelines for PSA following radiation therapy. *Int J Radiat Oncol Biol Phys* 37: 1035–1041

14 D'Amico AV *et al.* (2002) Biochemical outcome after radical prostatectomy or external beam radiation therapy for patients with clinically localized prostate carcinoma in the prostate specific antigen era. *Cancer* 95: 281–286

15 Stephenson AJ *et al.* (2004) Salvage radiotherapy for recurrent prostate cancer after radical prostatectomy. *JAMA* 291: 1325–1332

16 Ward JF *et al.* (2004) Prostate specific antigen doubling time subsequent to radical prostatectomy as a prognosticator of outcome following salvage radiotherapy. *J Urol* 172: 2244–2248

17 D'Amico AV *et al.* (2002) Determinants of prostate cancer-specific survival after radiation therapy for patients with clinically localized prostate cancer. *J Clin Oncol* 20: 4567–4573

18 D'Amico AV and Hanks GE (1993) Linear regressive analysis using prostate-specific antigen doubling time for predicting tumor biology and clinical outcome in prostate cancer. *Cancer* 72: 2638–2643

19 Zelefsky MJ *et al.* (2005) Outcome predictors for the increasing PSA state after definitive external-beam radiotherapy for prostate cancer. *J Clin Oncol* 23: 826–831

20 Pollack A *et al.* (1994) Prostate specific antigen doubling time and disease relapse after radiotherapy for prostate cancer. *Cancer* 74: 670–678

21 Ward JF *et al.* (2003) The long-term clinical impact of biochemical recurrence of prostate cancer 5 or more years after radical prostatectomy. *J Urol* 170: 1872–1876

22 D'Amico AV *et al.* (2003) Surrogate end point for prostate cancer-specific mortality after radical prostatectomy or radiation therapy. *J Natl Cancer Inst* 95: 1376–1383

23 D'Amico AV *et al.* (2004) Prostate specific antigen doubling time as a surrogate end point for prostate cancer specific mortality following radical prostatectomy or radiation therapy. *J Urol* 172: S42–S46

24 Roberts SG *et al.* (2001) PSA doubling time as a predictor of clinical progression after biochemical failure following radical prostatectomy for prostate cancer. *Mayo Clin Proc* 76: 576–581

25 Rabbani F *et al.* (1999) Prostate specific antigen doubling time after radical prostatectomy: effect of neoadjuvant androgen deprivation therapy. *J Urol* 161: 847–852

26 Trapasso JG *et al.* (1994) The incidence and significance of detectable levels of serum prostate specific antigen after radical prostatectomy. *J Urol* 152: 1821–1825

**Competing interests**
The author declared he has no competing interests.

JA-0865
©2005 Nature Publishing Group
PX0178-0010



**Contact:** Fiona Posell (310) 966 5810
fposell@pomwonderful.com

*Note to Editors: Interviews with medical researchers quoted are available upon request.*

## POMx, a Highly Concentrated Form of Healthy Pomegranate Antioxidants, Becomes Available to Consumers for the First Time

**LOS ANGELES** (July 10 - 2006) –   Three years after introducing consumers to the health benefits and delicious taste of the world's first refrigerated, super-premium pomegranate juice, POM Wonderful® announced today that it has developed a concentrated form of pomegranate antioxidants known as POMx.  POMx, already being noted by medical researchers as an important natural ingredient, is so concentrated that only a small amount is needed to obtain an optimal level of daily antioxidants.  For consumers who are not seeking additional calories and sugars, this is an important product benefit.  POMx comes from the same Wonderful variety of pomegranates that are used to make POM Wonderful's healthy pomegranate juices.  It also has a similar biochemical profile to pomegranate juice since both contain a diverse range of phytochemicals, of which polyphenols make up a large proportion.  POMx is currently an active ingredient in POM Tea (http://pomtea.com), a refreshing, healthy, ready-to-drink iced tea that is available in retail stores nationally.

According to Michael Aviram, DSc, Professor of Biochemistry and Head Lipid Research Laboratory, Technion Faculty of Medicine and Rambam Medical Center, Haifa, Israel, who was at the forefront of the initial research on pomegranates, the research on POMx looks very promising.  In 2006, Aviram led a study on POMx which was recently published (*Journal of Agriculture and Food Chemistry*, 2006 54:1928-1935).  Commenting on this research, Professor Aviram remarks, "The results showed that POMx is as potent an antioxidant as pomegranate juice and just like pomegranate juice may protect against cardiovascular as well as other diseases."

Δ π EXHIBIT
Staci Filorsky
Deponent
1-12-11
Date        Rptr
WWW.DEPOBOOK.COM

1 of 4 pgs

CONFIDENTIAL

POM_Q9-0004664

CX0065

Page 2 of 2, POMx available to consumers for the first time

The POMx research comes as the benefits derived from the Wonderful variety of pomegranate are, once again, being noted by the worldwide medical community. Recently, the American Association for Cancer Research published research that indicates that a daily pomegranate regimen has a positive effect for men with prostate cancer. Specifically, drinking 8 ounces of POM Wonderful pomegranate juice daily prolonged post-prostate surgery PSA doubling time from 15 to 54 months (*Clinical Cancer Research,* July 1, 2006). PSA is a protein marker for prostate cancer and the faster PSA levels increase in the blood of men after treatment, the greater their potential for dying of prostate cancer.

David Heber, MD, PhD, Professor of Medicine and Director, UCLA Center for Human Nutrition, provided additional commentary on POMx as it relates to prostate cancer. "Basic studies indicate that the effects of POMx and POM Wonderful pomegranate juice on prostate cancer are the same. The most abundant and most active ingredients in pomegranate juice are also found in POMx."

The Wonderful variety of pomegranate is a type of pomegranate rather than a brand. Just as there are different varieties of apples, oranges and grapes, there are several different varieties of pomegranates grown in the United States and in other countries. POM Wonderful's products only use extractions from the Wonderful variety of pomegranate. Of the many published peer-reviewed medical papers that speak to the health benefits of the pomegranate, most were conducted using juice or pomegranate extract from this variety of pomegranate.

### About POM Wonderful

POM Wonderful is the largest grower of the Wonderful variety of pomegranate. The company exclusively grows and sells this variety because of its exquisite sweet flavor, health benefits, large size and plentiful juice. POM Wonderful's pomegranates are grown in Central California, in the sunny San Joaquin Valley. Fresh pomegranates are in season from October through January and November is National Pomegranate Month. In addition to selling the fresh fruit, the company also juices its fresh pomegranates to make POM Wonderful pomegranate juice and POMx. To learn more, visit http://www.pomwonderful.com.

###

6-2

CONFIDENTIAL

POM_Q9-0004665

CX0065

**POM**
**WONDERFUL**

**Contact:** Fiona Posell (310) 966 5810
fposell@pomwonderful.com

## POMx, a Highly Concentrated Form of Healthy Pomegranate Antioxidants, Becomes Available to Consumers for the First Time

**LOS ANGELES** (July 10 - 2006) –  Three years after introducing consumers to the health benefits and delicious taste of the world's first refrigerated, super-premium pomegranate juice, **POM** Wonderful® announced today that it has developed a concentrated form of pomegranate antioxidants known as **POM**x. **POM**x, already being noted by medical researchers as an important natural ingredient, is so concentrated that only a small amount is needed to obtain an optimal level of daily antioxidants.  For consumers who are not seeking additional calories and sugars, this is an important product benefit.  **POM**x comes from the same Wonderful variety of pomegranates that are used to make **POM** Wonderful's healthy pomegranate juices.  It also has a similar biochemical profile to pomegranate juice since both contain a diverse range of phytochemicals, of which polyphenols make up a large proportion.  **POM**x is currently an active ingredient in **POM** Tea (http://pomtea.com), a refreshing, healthy, ready-to-drink iced tea that is available in retail stores nationally.

According to Michael Aviram, DSc, Professor of Biochemistry and Head Lipid Research Laboratory, Technion Faculty of Medicine and Rambam Medical Center, Haifa, Israel, who was at the forefront of the initial research on pomegranates, the research on **POM**x looks very promising.  In 2006, Aviram led a study on **POM**x which was recently published (*Journal of Agriculture and Food Chemistry*, 2006 54:1928-1935).  Commenting on this research, Professor Aviram remarks, "The results showed that **POM**x is as potent an antioxidant as pomegranate juice and just like pomegranate juice may protect against cardiovascular as well as other diseases."

It's EXHIBIT 7
1-19-2011
Posell

7

GOLDENCOM-0006620

CX0065

The POMx research comes as the benefits derived from the Wonderful variety of pomegranate are, once again, being noted by the worldwide medical community. Recently, the American Association for Cancer Research published research that indicates that a daily pomegranate regimen has a positive effect for men with prostate cancer. Specifically, drinking 8 ounces of POM Wonderful pomegranate juice daily prolonged post-prostate surgery PSA doubling time from 15 to 54 months (*Clinical Cancer Research,* July 1, 2006). PSA is a protein marker for prostate cancer and the faster PSA levels increase in the blood of men after treatment, the greater their potential for dying of prostate cancer.

David Heber, MD, PhD, Professor of Medicine and Director, UCLA Center for Human Nutrition, provided additional commentary on POMx as it relates to prostate cancer. "Basic studies indicate that the effects of POMx and POM Wonderful pomegranate juice on prostate cancer are the same. The most abundant and most active ingredients in pomegranate juice are also found in POMx."

The Wonderful variety of pomegranate is a type of pomegranate rather than a brand. Just as there are different varieties of apples, oranges and grapes, there are several different varieties of pomegranates grown in the United States and in other countries. POM Wonderful's products only use extractions from the Wonderful variety of pomegranate. Of the many published peer-reviewed medical papers that speak to the health benefits of the pomegranate, most were conducted using juice or pomegranate extract from this variety of pomegranate.

### About POM Wonderful

POM Wonderful is the largest grower of the Wonderful variety of pomegranate. The company exclusively grows and sells this variety because of its exquisite sweet flavor, health benefits, large size and plentiful juice. POM Wonderful's pomegranates are grown in Central California, in the sunny San Joaquin Valley. Fresh pomegranates are in season from October through January and November is National Pomegranate Month. In addition to selling the fresh fruit, the company also juices its fresh pomegranates to make POM Wonderful pomegranate juice and POMx. To learn more, visit http://www.pomwonderful.com.

###

GOLDENCOM-0006621

CX0065



# Science, not fiction.

## Made from the only pomegranates backed by $20 million in medical research.

Introducing POMx™– a highly concentrated, incredibly powerful blend of all-natural polyphenol antioxidants made from the very same pomegranates in **POM Wonderful 100% Pomegranate Juice**. Our method of harnessing astonishing levels of antioxidants is so extraordinary, it's patent-pending. So now you can get all the antioxidant power of an 8oz glass of juice in the convenience of a calorie-free pill.

Ready to take on free radicals? Put up your POMx and fight them with a mighty 1000mg capsule – that's more concentrated pomegranate polyphenol antioxidants than any other 100% pomegranate supplement. An initial UCLA medical study on POM Wonderful 100% Pomegranate Juice showed hopeful results for men with prostate cancer.[1,3] And preliminary human research suggests that our California-grown pomegranate juice also promotes heart health.[2,3] Take your antioxidants into your own hands. **Call 1-888-POM-PILL now, or visit pompills.com/dvr and get your first monthly shipment for just ~~$29.95~~ $24.95 with coupon.**

## POM IN A PILL™

### CALL 1-888-POM-PILL now, or visit pompills.com/dvr

### Not available in stores | 100% money-back guarantee



**SAVE $5 ON YOUR FIRST ORDER.**
Call 1-888-POM-PILL or visit pompills.com/dvr and mention or enter code DVR5 at checkout. To pay by check, call 1-888-POM-PILL for instructions. Hurry, offer expires July 31, 2007.

CONSUMER: This offer expires July 31, 2007. This coupon can only be used on POMx products. One coupon redemption per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents will be given. We reserve the right to modify or discontinue this promotion at any time. Coupon code valid only at pompills.com/dvr or 1-888-POM-PILL.



[1] pomwonderful.com/cancer.html  [2] pomwonderful.com/heart_health.html  [3] These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease.

© 2007 PomWonderful LLC. All rights reserved. POM Wonderful, POMx and "POM in a pill" are trademarks of PomWonderful LLC.

**VMS-0000247**

CX0122_0001



Product      POM Wonderful
Media:       Print
Ad Title:    SCIENCE, NOT FICTION.
VMS Ad ID:   070620248
Date Range:

| Run Date | Market | Rank | Media Vehicle | Media Type | Unit | Cost |
|---|---|---|---|---|---|---|
| 06/01/2007 | NATIONAL | 0 | DISCOVER | Magazine | Full Page | $38,240 |
| 06/01/2007 | NATIONAL | 0 | SCIENTIFIC AMERICAN | Magazine | Full Page | $45,520 |
| Total 2 Occurrence(s) | | | | | | $83,760 |

VMS-0000546
CX0122_0002

JA-0871



# One small pill for mankind.

## "Findings from a small study suggest that pomegranate juice may one day prove an effective weapon against prostate cancer."

### *The New York Times* (July 4, 2006).

Introducing POMx™– a highly concentrated, incredibly powerful blend of all-natural polyphenol antioxidants made from the very same pomegranates in **POM Wonderful 100% Pomegranate Juice**. Our method of harnessing astonishing levels of antioxidants is so extraordinary, it's patent-pending. So now you can get all the antioxidant power of an 8oz glass of juice in the convenience of a calorie-free capsule.

Ready to take on free radicals? Put up your POMx and fight them with a mighty 1000mg capsule – that's more concentrated pomegranate polyphenol antioxidants than any other 100% pomegranate supplement. An initial UCLA medical study on POM Wonderful 100% Pomegranate Juice showed hopeful results for men with prostate cancer.[1,3] And preliminary human research suggests that our California-grown pomegranate juice also promotes heart health.[2,3] Take your antioxidants into your own hands. **Call 1-888-POM-PILL now, or visit pompills.com/fort and get your first monthly shipment for just $29.95 $24.95 with coupon.**

## POM IN A PILL™

### CALL 1-888-POM-PILL now, or visit pompills.com/fort
### Not available in stores | 100% money-back guarantee



**SAVE $5** ON YOUR FIRST ORDER.
Call 1-888-POM-PILL or visit pompills.com/fort and mention or enter code **FORT5** at checkout. To pay by check, call 1-888-POM-PILL for instructions. Hurry, offer expires July 31, 2007.

CONSUMER: This offer expires July 31, 2007. Mention or enter coupon code FORT5 at checkout. This coupon can only be used on POMx products. One coupon redemption per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents will be given. We reserve the right to modify or discontinue this promotion at any time. Coupon code valid only at pompills.com/fort or 1-888-POM-PILL.



[1] pomwonderful.com/cancer.html  [2] pomwonderful.com/heart_health.html  [3] These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease.

© 2007 PomWonderful LLC. All rights reserved. POM Wonderful, POMx and "POM in a pill" are trademarks of PomWonderful LLC.

**VMS-0000246**

CX0120_0001

**vms**
KNOW BETTER.™

Product: POM Wonderful
Media: Print
Ad Title: ONE SMALL PILL FOR MANKIND.
VMS Ad ID: 070522924
Date Range:

| Run Date | Market | Rank | Media Vehicle | Media Type | Unit | Cost |
|----------|--------|------|---------------|------------|------|------|
| 05/28/2007 | NATIONAL | 0 | FORTUNE | Magazine | Full Page | $74,000 |
| | Total 1 Occurrence(s) | | | | | $74,000 |

VMS-0000545
CX0120_0002

JA-0873

| From: | Holmgren, Pamela |
|-------|------------------|
| Sent: | Wednesday, June 27, 2007 9:08 PM |
| To: | All PomWonderful <allpw@paramount agribusiness.com> |
| Cc: | Resnick, Lynda <lresnick@paramount agribusiness.com>; Posell, Fiona <fposell@paramount agribusiness.com> |
| Subject: | POM ED Press Release |
| Attach: | ED press release 6-25-07final.doc |

Attached is a press release about the study released by the *International Journal of Impotence Research* that found drinking 8 oz. of POM Wonderful 100% Pomegranate Juice a day may help the management of erectile dysfunction. We distributed this to the media today and will update you with the resulting press coverage. Please forward this on as appropriate.

Thank you,

Pam

TC'S EXHIBIT 12
1-19-2011
Posell

CONFIDENTIAL 16 C.F.R. 4.10(a)(8)

12

POM-RPFEFFER00013

00010804

**JA-0874**

CX0128

**POM**
WONDERFUL.

**Contact:** Pam Holmgren (310) 966 5894
pholmgren@pomwonderful.com

*Note to Editors: Interviews with medical researcher quoted are available upon request.*

## POM Wonderful 100% Pomegranate Juice May Improve Mild to Moderate Cases of Erectile Dysfunction, Study Finds

*Research shows 8 ounces a day of POM Wonderful 100% Pomegranate Juice
may help the management of erectile dysfunction*

**LOS ANGELES** (June 27 - 2007) –   According to a pilot study released in the
*International Journal of Impotence Research* (http://www.nature.com/ijir), POM
Wonderful 100% Pomegranate Juice was found to have beneficial effects on erectile
dysfunction (ED), a disorder that affects 1 in 10 men worldwide and 10 to 30 million men
in the United States alone.[1, 2]  ED can be caused by several factors, including arterial
plaque, high blood pressure, heart disease, diabetes, nerve damage, endocrine imbalance
or depression.  Ultimately, ED is a condition that affects the blood flow to the penis
during sexual stimulation.

This randomized, placebo-controlled, double-blind, crossover pilot study examined the
efficacy of pomegranate juice versus placebo in improving erections in 61 male subjects.
To qualify, participants had to experience mild to moderate ED for at least 3 months; be
in a stable, monogamous relationship with a consenting female partner; and be willing to
attempt sexual intercourse on at least one occasion per week during each study period.

Mild ED is defined as the mildly decreased ability to get and keep an erection, while
moderate ED is the moderately decreased ability to get and keep an erection.  The
majority of men with ED have moderate ED.

For the first four weeks of the study, the subjects were assigned to drink either 8 oz. of
POM Wonderful Pomegranate Juice or 8 oz. of placebo beverage daily with their evening

POM-RPFEFFER00014

00010805

CX0128

meal or shortly after. After a two-week washout period during which the subjects did not consume any study beverage nor utilize any ED treatment, they were assigned to drink 8 oz. of the opposite study beverage every evening for another four weeks. At the end of the each four week period, efficacy was assessed using the International Index of Erectile Function (IIEF) and Global Assessment Questionnaires (GAQ). The IIEF is a validated questionnaire that has been demonstrated to correlate with ED intensity. The GAQ elicits the patient's self-evaluation of the study beverages' effect on erectile activity.

Forty seven percent of the subjects reported that their erections improved with POM Wonderful Pomegranate Juice, while only 32% reported improved erections with the placebo (p=0.058). These results compare favorably to a recent 24-week study using a PDE5 inhibitor (such as Cialis), in which roughly 73% of subjects reported a benefit from the PDE5 inhibitor and 26% reported a "placebo effect" (i.e. experiencing improvement while on the placebo).[3]

Although the study did not achieve overall statistical significance, the authors conclude that additional studies with more patients and longer treatment periods may in fact reach statistical significance. The strong directional results of this pilot study are encouraging because almost half of the test subjects experienced a benefit simply by adding pomegranate juice to their daily diet, without the use of ED drugs.

Researchers believe that the results might be due to the potent antioxidant content of pomegranate juice, which can prevent free radical molecules from disrupting proper circulatory function. In several previously published medical studies, pomegranate juice has been shown to enhance blood flow and to slow or reverse arterial plaque growth.[4, 5, 6] Because an erection requires significant blood flow, these potent pomegranate antioxidants may provide benefit by mitigating arterial plaque and promoting blood vessel dilation.

According to study co-author Harin Padma-Nathan, MD, FACS, FRCS, Clinical Professor of Urology at the Keck School of Medicine, University of Southern California, "These findings are very encouraging as they suggest there is a non-invasive, non-drug way to potentially alleviate this quality of life issue that affects so many men. For men with ED, it is important to

CONFIDENTIAL 16 C.F.R. 4.10(a)(8)

POM-RPFEFFER00015

00010806

CX0128

maintain a healthy diet and exercise. Drinking pomegranate juice daily could be an important addition to the diet in the management of this condition."

## About POM Wonderful

POM Wonderful is the largest producer of California Wonderful pomegranates and the company exclusively grows and sells this variety. POM Wonderful's pomegranates grow in central California, in the sunny San Joaquin Valley. Fresh pomegranates are in season from October through January and November is National Pomegranate Month.

The company also uses its fresh pomegranates to make its delicious, all-natural, POM Wonderful Pomegranate Juice and POMx, a highly-concentrated blend of all-natural polyphenol antioxidants harnessed from the pomegranate by a patent-pending process. POMx is found exclusively in POM Tea, POMx Pills and POMx Liquid.

POM Wonderful Pomegranate Juice and POM Tea are available year-round at retail and are found in the refrigerated section of supermarkets nationwide. POMx Pills and POMx liquid are available at http://www.pompills.com. To learn more, visit http://www.pomwonderful.com.

###

References

1  Furlow WL. Prevalence of impotence in the United States. *Med Aspects Hum Sex* 1985, 19: 13-16.

2  Kaiser FE. Erectile dysfunction in the aging man. *Med Clin North Am* 1999; 83: 1267-1278.

3  Rajfer J, Aliotta PJ, Steidle CP, Fitch III WP, Zhao Y, and Yu A. Tadalafil dosed once a day in men with erectile dysfunction: a randomized, double-blind, placebo-controlled study in the US. *International Journal of Impotence Research* 2007, 19: 95-103.

4  Ignarro LJ, Byrns RE, Sumi D, de Nigris F, Napoli C. Pomegranate juice protects nitric oxide against oxidative destruction and enhances the biological actions of nitric oxide. *Nitric Oxide* 2006; 15: 93–102.

5  Aviram M, Rosenblat M, Gaitini D, Nitecki S, Hoffman A, Dornfeld L, Volkova N, Presser D, Attias J, Liker H, and Liker H. Pomegranate juice consumption for 3 years with patients with carotoid artery stenosis reduces common carotid intima-media thickness, blood pressure and LDL oxidation. *Clinical Nutrition,* 2004, 23: 423-433.

6  Summer MD, Elliot-Eller M, Weidner G, Daubenmier JJ, Chew MH, Marlin R, Raisin CJ and Ornish, D. Effects of pomegranate juice consumption on myocardial perfusion in patients with coronary heart disease. *American Journal of Cardiology* 2005, 96: 810-814.

POM-RPFEFFER00016

00010807

**JA-0877**

CX0128

VMS ID: 080106753
RUN DATE: 01/06/2008

# The power of POMx, in one little pill.



The easy, portable, calorie-free way to get your daily antioxidants.

**Antioxidant Superpill.**™ Not all antioxidants are created equal. POMx™ fights free radicals with a mighty 1000mg in every pill. That's more concentrated antioxidants than any other pomegranate antioxidant supplement. There are antioxidants, and then there are POMx antioxidants.

**Peace of Mind in a Pill.** POMx is a highly concentrated, powerful blend of polyphenol antioxidants made from the very same pomegranates as POM Wonderful® 100% Pomegranate Juice. The same pomegranates we grow exclusively in California, where they're hand-picked on site.

**Safe and Natural.** POMx is made from pure pomegranates. So there are no added sugars, preservatives or any other ingredients – just 100% pomegranate polyphenol antioxidants. So naturally, POMx is absorbed safely into your body. In fact, POMx is the first and only antioxidant supplement reviewed for safety by the FDA.

**Backed by Science.** POMx is made from the only pomegranates supported by $23 million in medical research. Emerging science suggests that free radicals aggressively destroy healthy cells in your body – contributing to premature aging and even disease. The good news is POM Wonderful pomegranate antioxidants neutralize free radicals. An initial UCLA MEDICAL STUDY on POM Wonderful 100% Pomegranate Juice found *hopeful results for prostate health.* "Pomegranate juice delays PSA doubling time in humans," according to AJ Pantuck, et al, in Clinical Cancer Research, 2006.[1,3] Two additional preliminary studies on our juice showed *promising results for heart health.* "Pomegranate juice improves myocardial perfusion in coronary heart patients," per D. Ornish, et al, in



California-grown.

the American Journal of Cardiology, 2005.[2,4] "Pomegranate juice pilot research suggests anti-atherosclerosis benefits," according to M. Aviram, et al, in Clinical Nutrition, 2004.[2,5]

**One a Day, For Life.** Ready to take on free radicals? A daily POMx pill is all you need. Invest in your health and order your 30-day supply today. Call now to get your first monthly shipment.

## Call 1-888-POM-PILL (766-7455) or visit pompills.com/nb and enter NB30 at checkout.



The antioxidant power of our 8 oz. juice.



Reviewed for Safety by the FDA.



100% Natural Pomegranate Extract.

### Try POMx for one month – FREE!
**We'll even pay for the shipping.** Visit pompills.com/nb or call 1-888-POM-PILL. Use discount code: NB30

SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires April 15, 2008. The first month free plus free shipping offer applies only to the purchase price for the first month of POMx Monthly. Following months will be $29.95 per bottle. This discount can only be used on POMx products. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents will be given. We reserve the right to modify or discontinue this promotion at any time. We reserve the right to change product price or shipping charge at any time. Offer valid only at pompills.com/nb or 1-888-POM-PILL. Discount code is not valid on POMx trial.

[1] pompills.com/research [2] These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. [3] 45 men with rising PSA after surgery or radiotherapy drank 8 oz. 100% pomegranate juice daily for two years. [4] 45 patients with coronary heart disease and myocardial ischemia drank 8 oz. 100% pomegranate juice daily for three months. [5] 19 patients aged 65-75 years with severe atherosclerosis drank 8 oz. 100% pomegranate juice daily for one year. ©2008 PomWonderful LLC. All rights reserved. POM Wonderful, POMx and "Antioxidant Superpill" are trademarks of PomWonderful LLC.



**VMS-0000255**



Product       POM Wonderful
Media:        Print
Ad Title:     THE POWER OF POM IN ONE LITTLE PILL. TRY POM FOR ONE MONTH - FREE POM WONDERFUL
VMS Ad ID:    080106753
Date Range:

| Run Date | Market | Rank | Media Vehicle | Media Type | Unit | Cost |
|---|---|---|---|---|---|---|
| 01/06/2008 | New York | 1 | New York Times | Local Newspaper | 5 X 11 | $60,571 |
| | Total 1 Occurrence(s) | | | | | $60,571 |

VMS-0000555
CX0169_0002

JA-0879



VMS ID: 080203607
RUN DATE: 02/03/2008

# The antioxidant superpill.™

## 1000 milligrams. 0 calories.

Ready to take your antioxidants into your own hands? Introducing POMx™ – a highly concentrated, incredibly powerful blend of all-natural polyphenol antioxidants made from the same pomegranates as **POM Wonderful**® **100% Pomegranate Juice**.

POMx fights free radicals with a powerful 1000 milligrams. That's more concentrated polyphenol antioxidants than any other pomegranate supplement. And POMx is the first and only antioxidant supplement reviewed for safety by the FDA.



100% All-natural.



The antioxidant power of our 8 oz. juice.

POMx is made from the only pomegranates backed by $23 million in medical research, the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice. An initial UCLA MEDICAL STUDY on POM Wonderful 100% Pomegranate Juice found *hopeful results for prostate health.* The study reports "statistically significant prolongation of PSA doubling times," according to Dr. Allen J. Pantuck in Clinical Cancer Research, 2006.[1,33] Two additional preliminary studies on our juice showed *promising results for heart health.* "Stress-induced ischemia decreased in the pomegranate group," Dr. Dean Ornish reported in the American Journal of Cardiology, 2005.[1,2,4] "Pomegranate juice consumption resulted in a significant IMT[1] reduction by up to 30% after one year," said Dr. Michael Aviram, referring to reduced arterial plaque in Clinical Nutrition, 2004.[1,2,4]

## CALL 1-888-POM-PILL (766-7455) now or visit pompills.com/la

### Try POMx for one month – FREE!
**We'll even pay for the shipping. Visit pompills.com/la or call 1-888-POM-PILL. Use discount code: LA30**

SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires April 15, 2008. The first month free plus free shipping offer applies only to the purchase price for the first month of POMx Monthly. Following months will be $29.95 per bottle. This discount can only be used on POMx products. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents will be given. We reserve the right to modify or discontinue this promotion at any time. We reserve the right to change product price or shipping charge at any time. Offer valid only at pompills.com/la or 1-888-POM-PILL. Discount code is not valid on POMx trial.



[1] pompills.com/research [2] These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. [3] 45 men with rising PSA after surgery or radiotherapy drank 8 oz. 100% pomegranate juice daily for two years. [4] 45 patients with coronary heart disease and myocardial ischemia drank 8 oz. 100% pomegranate juice daily for three months. [5] Study measured intima-media thickness (IMT). [6] 19 patients aged 65-75 years with severe atherosclerosis drank 8 oz. 100% pomegranate juice daily for one year. ©2008 PomWonderful LLC. All rights reserved. POM Wonderful, POMx and "antioxidant superpill" are trademarks of PomWonderful LLC.



**VMS-0000261**

CX0180_0001

**vms**
KNOW BETTER.

Product: POM X
Media: Print
Ad Title: THE ANTIOXIDANT SUPERPILL
VMS Ad ID: 080203607
Date Range:

| Run Date | Market | Rank | Media Vehicle | Media Type | Unit | Cost |
|---|---|---|---|---|---|---|
| 02/03/2008 | Los Angeles | 2 | Los Angeles Times | Local Newspaper | 5 X 10.5 | $39,455 |
| | Total 1 Occurrence(s) | | | | | $39,455 |

VMS-0000560
CX0180_0002

**JA-0881**



VMS-0000276

JA-0882

CX0260_0001

**Product** POM Wonderful
**Media:** Print
**Ad Title:** Drink to prostate health.
**VMS Ad ID:** 081200704
**Date Range:**

| Run Date | Market | Rank | Media Vehicle | Media Type | Unit | Cost |
|---|---|---|---|---|---|---|
| 12/01/2008 | NATIONAL | 0 | Men's Health Magazine | Magazine | Full Page | $127,060 |
| 12/01/2008 | NATIONAL | 0 | Prevention | Magazine | Full Page | $108,960 |
| Total 2 Occurrence(s) | | | | | | $236,020 |

VMS-0000575
CX0260_0002

JA-0883

# Effects of Consumption of Pomegranate Juice on Carotid Intima–Media Thickness in Men and Women at Moderate Risk for Coronary Heart Disease

Michael H. Davidson, MD[a,*], Kevin C. Maki, PhD[b], Mary R. Dicklin, PhD[b],
Steven B. Feinstein, MD[c], MarySue Witchger, RD[b], Marjorie Bell[b], Darren K. McGuire, MD[d],
Jean-Claude Provost, MD[e], Harley Liker, MD[f], and Michael Aviram, DSc[g]

This randomized, double-blind, parallel trial assessed the influence of pomegranate juice consumption on anterior and posterior carotid intima–media thickness (CIMT) progression rates in subjects at moderate risk for coronary heart disease. Subjects were men (45 to 74 years old) and women (55 to 74 years old) with $\geq 1$ major coronary heart disease risk factor and baseline posterior wall CIMT 0.7 to 2.0 mm, without significant stenosis. Participants consumed 240 ml/day of pomegranate juice (n = 146) or a control beverage (n = 143) for up to 18 months. No significant difference in overall CIMT progression rate was observed between pomegranate juice and control treatments. In exploratory analyses, in subjects in the most adverse tertiles for baseline serum lipid peroxides, triglycerides (TGs), high-density lipoprotein (HDL) cholesterol, TGs/HDL cholesterol, total cholesterol/HDL cholesterol, and apolipoprotein-B100, those in the pomegranate juice group had significantly less anterior wall and/or composite CIMT progression versus control subjects. In conclusion, these results suggest that in subjects at moderate coronary heart disease risk, pomegranate juice consumption had no significant effect on overall CIMT progression rate but may have slowed CIMT progression in subjects with increased oxidative stress and disturbances in the TG-rich lipoprotein/HDL axis.    © 2009 Elsevier Inc. All rights reserved. (Am J Cardiol 2009;104:936–942)

Pomegranate juice is a naturally rich source of polyphenols and other antioxidants including tannins and anthocyanidins.[1] In vitro and in vivo studies have supported the ability of pomegranate juice to scavenge free radicals and inhibit low-density lipoprotein oxidation.[2–8] Consumption of pomegranate juice for 2 weeks by hypertensive subjects significantly decreased systolic blood pressure.[3] Pomegranate juice also has been reported to decrease the amount of stress-induced myocardial ischemia in subjects with coronary heart disease after 3 months of consumption.[6] A small pilot study has shown that consumption of pomegranate juice for 1 year by subjects with carotid artery stenosis is associated with decreased low-density lipoprotein susceptibility to oxidation and a significant decrease in carotid intima–media thickness (CIMT).[3] The present trial was designed to further evaluate the effects of pomegranate juice



Figure 1. Schematic showing the intima–media thickness region of interest on the common carotid artery.

consumption on CIMT progression in subjects at moderate coronary heart disease risk.

## Methods

The trial was conducted at 2 clinical research sites in the United States (Radiant Research, Chicago, Illinois, and University of Texas Southwestern Medical Center, Dallas, Texas) in accordance with good clinical practice guidelines. The protocol was approved by an institutional review board (Quorum Review, Inc., Seattle, Washington), and all subjects provided written informed consent. To be eligible for participation, men (45 to 74 years old) and women (55 to 74 years old) were required to have $\geq 1$ of the following risk factors: low-density lipoprotein cholesterol ($\geq 130$ and $<190$ mg/dl), low high-density lipoprotein (HDL) cholesterol ($<40$ mg/dl), increased blood pressure ($\geq 140/90$ mm

[a]Radiant Research and University of Chicago, and [c]Rush Medical College, Chicago; [b]Provident Clinical Research, Glen Ellyn, Illinois; [d]University of Texas Southwestern Medical Center, Dallas, Texas; [e]Synarc Imaging, Paris, France; [f]David Geffen School of Medicine, University of California, Los Angeles, California; and [g]Lipid Research Laboratory, Technion Faculty of Medicine and Rambam Medical Center, Haifa, Israel. Manuscript received February 9, 2009; revised manuscript received and accepted May 13, 2009.

This study was funded by Roll International Corporation, Los Angeles, California.

*Corresponding author: Tel: 312-494-2220; fax: 312-494-2217.

*E-mail address:* michaeldavidson@radiantresearch.com (M.H. Davidson).

0002-9149/09/$ – see front matter © 2009 Elsevier Inc. All rights reserved.
doi:10.1016/j.amjcard.2009.05.037

www.AJConline.org

PX0014-0001

*Preventive Cardiology/Pomegranate Juice and CIMT*    937



Figure 2. Subject disposition.

Table 1

Baseline characteristics of intent-to-treat sample by treatment group

| Parameter | Pomegranate Juice (n = 146) | Control (n = 143) |
|---|---|---|
| Men | 85 (58%) | 79 (55%) |
| White | 108 (74%) | 94 (66%) |
| Black | 24 (16%) | 34 (24%) |
| Asian | 6 (4.1%) | 9 (6.3%) |
| Hispanic/Latino | 5 (3.4%) | 4 (2.8%) |
| Hypertension | 70 (48%) | 69 (48%) |
| Angina pectoris | 2 (1.4%) | 1 (0.7%) |
| Arrhythmia | 5 (3.4%) | 5 (3.5%) |
| Heart failure | 1 (0.7%) | 0 (0.0%) |
| Smoker | 23 (16%) | 29 (20%) |
| Blood pressure ≥140/90 mm Hg or antihypertensive agent(s) use | 69 (47%) | 70 (49%) |
| HDL cholesterol <40 mg/dl | 23 (16%) | 9 (6.3%) |
| Family history of premature coronary heart disease | 7 (4.8%) | 6 (4.2%) |
| Age ≥45 years (men) or ≥55 years (women) | 146 (100%) | 142 (99%) |
| Medication use | | |
| Antihypertensive agent(s) | 47 (32%) | 41 (29%) |
| Calcium channel blocker | 18 (12%) | 20 (14%) |
| Angiotensin-converting enzyme inhibitor or angiotensin II receptor blocker | 34 (23%) | 18 (13%) |
| β blocker | 7 (4.8%) | 5 (3.5%) |
| Diuretic | 14 (10%) | 16 (11%) |
| α-adrenergic blocker | 2 (1.4%) | 2 (1.4%) |
| Lipid-altering agent(s) | 32 (22%) | 25 (18%) |
| Statin therapy | 24 (16%) | 21 (15%) |
| Aspirin | 27 (19%) | 28 (20%) |
| Age (years) | 60.8 ± 7.3 | 60.5 ± 7.8 |
| Body mass index (kg/m$^2$) | 28.6 ± 4.8 | 28.7 ± 4.5 |
| Systolic blood pressure (mm Hg) | 127.7 ± 18.7 | 129.3 ± 18.4 |
| Diastolic blood pressure (mm Hg) | 70.9 ± 10.5 | 71.5 ± 11.0 |
| Fasting glucose (mg/dl) | 94.6 ± 10.0 | 94.7 ± 8.9 |
| Total cholesterol (mg/dl) | 224.3 ± 37.8 | 227.2 ± 35.7 |
| Low-density lipoprotein cholesterol (mg/dl) | 138.8 ± 33.5 | 142.3 ± 29.6 |
| HDL cholesterol (mg/dl) | 55.1 ± 15.4 | 56.1 ± 13.9 |
| TGs (mg/dl) | 152.8 ± 75.4 | 144.3 ± 65.4 |
| Apolipoprotein-B100 (mg/dl) | 109.2 ± 2.0 | 110.1 ± 2.1 |
| Apolipoprotein-AI (mg/dl) | 153.2 ± 2.2 | 152.9 ± 2.2 |

Values are numbers of subjects (percentages) or means ± SEMs.

Hg) or medication to treat hypertension, or current cigarette smoking (any cigarette smoking within previous month). They were also required to have a baseline posterior wall common CIMT measurement >0.7 and <2.0 mm on ≥1 side (right or left). Evidence of carotid stenosis ≥50% was exclusionary.

Subjects with coronary heart disease or a risk equivalent, including diabetes,[9] were not enrolled. Also excluded were subjects with a body mass index >40 kg/m$^2$, hepatic disease or dysfunction, cancer in the previous 2 years (except non-melanoma skin cancer), human immunodeficiency virus, hepatitis B or C, uncontrolled hypertension, or untreated or unstable hypothyroidism. Use of β-adrenergic blockers, immunosuppressants, or estrogen or progestin therapy was prohibited during the study. Concomitant statin therapy was allowed, but use of any other drug or nondrug lipid-altering agents within 6 weeks before screening was exclusionary. Any subject with a known allergy to pomegranates or who had a history of eating pomegranates or drinking pomegranate juice within the previous 6 months was excluded from the study.

Subjects visited the clinic at screening; weeks 0, 13, 26, 38, 52, and 65; and 1 time between weeks 78 and 90 (end of treatment). At baseline, subjects were randomly assigned to consume pomegranate juice 240 ml/day providing 140 kcal, fat 0 g, protein 1 g, and total carbohydrates 35 g (Wonderful variety, Pom; supplied by Roll International Corporation, Los Angeles, California) or a control beverage of similar color and energy content (150 cal, fat 0 g, protein 0 g, and total carbohydrates 37 g) for 18 months. The study product was packaged in single-serving bottles labeled so that neither subjects nor staff members were aware of treatment assignment. Subjects were instructed that the study product should replace a food or beverage in their diet with approximately the same amount of energy. Adherence to study product consumption was assessed at each visit by reviewing a daily consumption diary maintained by the subject.

Carotid ultrasound measurements were performed at baseline, 12 months, and end of treatment according to methods described previously.[10] Carotid arteries were imaged by high-resolution B-mode carotid artery ultrasound using an HDI 5000 ultrasound system with a linear-array 7.5-MHz transducer (Phillips Medical Systems NA, Both-

Table 2
Indicators of inflammation and oxidative stress at baseline and changes from baseline by time point and treatment group in intent-to-treat sample

| Variable | Pomegranate Juice | Control | p Value |
|---|---|---|---|
| High sensitivity C-reactive protein (mg/L) | | | |
| Subjects | 143 | 143 | |
| Baseline | $3.10 \pm 0.24$ | $3.19 \pm 0.27$ | 0.960 |
| Change from baseline to 3 months | $-0.16 \pm 0.18$ | $0.40 \pm 0.34$ | 0.231 |
| Change from baseline to 12 months | $-0.39 \pm 0.21$ | $0.06 \pm 0.37$ | 0.298 |
| Change from baseline to end of treatment | $-0.50 \pm 0.23$ | $-0.44 \pm 0.22$ | 0.547 |
| Ferric reducing ability of plasma ($\mu M$ Fe$^{2+}$) | | | |
| Subjects | 146 | 143 | |
| Baseline | $112.9 \pm 2.1$ | $112.8 \pm 2.0$ | 0.965 |
| Change from baseline to 3 months | $5.9 \pm 1.4$ | $6.9 \pm 1.4$ | 0.984 |
| Change from baseline to 12 months | $8.5 \pm 1.8$ | $11.1 \pm 1.9$ | 0.318 |
| Change from baseline to end of treatment | $10.8 \pm 1.9$ | $11.6 \pm 1.9$ | 0.749 |
| Paraoxonase-1 (U/ml) | | | |
| Subjects | 144 | 139 | |
| Baseline | $112.7 \pm 1.9$ | $111.2 \pm 2.03$ | 0.688 |
| Change from baseline to 3 months | $0.8 \pm 1.25$ | $0.4 \pm 1.06$ | 0.816 |
| Change from baseline to 12 months | $-3.7 \pm 1.74$ | $-2.1 \pm 1.85$ | 0.677 |
| Change from baseline to end of treatment | $-0.7 \pm 1.81$ | $0.1 \pm 1.61$ | 0.728 |
| PD − AAPH (nmol/ml) | | | |
| Subjects | 139 | 135 | |
| Baseline | $26.4 \pm 1.2$ | $24.7 \pm 1.1$ | 0.362 |
| Change from baseline to 3 months | $-0.3 \pm 0.9$ | $-0.9 \pm 1.0$ | 0.251 |
| Change from baseline to 12 months | $-7.8 \pm 1.3$ | $-2.6 \pm 1.4$ | 0.010 |
| Change from baseline to end of treatment | $-5.3 \pm 1.3$ | $-3.0 \pm 1.2$ | 0.159 |
| PD + AAPH (nmol/ml) | | | |
| Subjects | 146 | 143 | |
| Baseline | $702.5 \pm 7.5$ | $696.1 \pm 7.9$ | 0.561 |
| Change from baseline to 3 months | $-15.3 \pm 5.6$ | $-10.1 \pm 4.6$ | 0.480 |
| Change from baseline to 12 months | $19.7 \pm 8.6$ | $25.7 \pm 9.0$ | 0.628 |
| Change from baseline to end of treatment | $18.2 \pm 9.0$ | $28.6 \pm 9.4$ | 0.296 |
| Thiobarbituric acid-reactive substances − AAPH (nmol/ml) | | | |
| Subjects | 146 | 143 | |
| Baseline | $3.45 \pm 0.13$ | $3.63 \pm 0.15$ | 0.530 |
| Change from baseline to 3 months | $-0.04 \pm 0.07$ | $0.11 \pm 0.07$ | 0.075 |
| Change from baseline to 12 months | $-0.56 \pm 0.16$ | $-0.76 \pm 0.17$ | 0.363 |
| Change from baseline to end of treatment | $-0.57 \pm 0.15$ | $-0.79 \pm 0.16$ | 0.335 |
| Thiobarbituric acid-reactive substances + AAPH (nmol/ml) | | | |
| Subjects | 146 | 143 | |
| Baseline | $16.1 \pm 0.3$ | $16.0 \pm 0.3$ | 0.943 |
| Change from baseline to 3 months | $-0.1 \pm 0.2$ | $-0.2 \pm 0.2$ | 0.546 |
| Change from baseline to 12 months | $-0.8 \pm 0.3$ | $-1.0 \pm 0.3$ | 0.600 |
| Change from baseline to end of treatment | $-1.1 \pm 0.3$ | $-1.1 \pm 0.3$ | 0.895 |

Values are numbers of subjects or means ± SEMs.

ell, Washington). All scanning throughout the study was conducted by a single ultrasonographer at each of the testing sites using the same equipment. All measurements were taken in the same artery region throughout the study. After baseline ultrasound examination, masking software (Io-Mask; Synarc, Paris, France) was used to match follow-up scans to optimize alignment with the baseline scan. Longitudinal scans of the blood–intima and media–adventitia interfaces of the posterior wall of the right and left common carotid arteries were performed. A sequence of images was digitally recorded using end-diastolic electrocardiographic gating, i.e., recording for ≥1 second along with the electrocardiographic tracing to allow for end-diastolic image identification. Digital images were electronically transmitted to a central imaging laboratory (Synarc) that was respon-

sible for quality control, maintaining a database, and prereading (selecting the highest-quality end-diastolic images).

Images were blinded according to visit and treatment group and forwarded to an expert reviewer. A nongain-dependent software program (Io-QIMT, Synarc-IoDP Medical Imaging Research) was used to analyze images and calculate CIMT using automated edge detection to locate the lumen–intima and media–adventitia echocardiographic boundaries at subpixel resolution.[11,12] CIMT was averaged over 70 to 100 individual measurements taken along a 1-cm segment of the common carotid artery proximal to the bifurcation (Figure 1).

Subjects were given the option of being intravenously injected with microbubble contrast agent 0.5 ml (Optison, GE Healthcare, Inc., Princeton, New Jersey), which increases

PX0014-0003

*Preventive Cardiology/Pomegranate Juice and CIMT*    939

Table 3

Common carotid intima–media thickness and progression in carotid intima–media thickness by time point, measurement site, and treatment group in intent-to-treat sample

| Variable | Pomegranate Juice | Control | p Value |
|---|---|---|---|
| Anterior* | | | |
| Subjects | 69 | 82 | |
| Baseline (mm) | $0.84 \pm 0.02$ | $0.85 \pm 0.02$ | 0.591 |
| 12 mos (mm) | $0.82 \pm 0.02$ | $0.84 \pm 0.02$ | 0.204 |
| End of treatment (mm) | $0.80 \pm 0.02$ | $0.83 \pm 0.02$ | 0.222 |
| Progression at end of treatment (mm/year) | $-0.022 \pm 0.014$ | $-0.011 \pm 0.012$ | 0.570 |
| Posterior | | | |
| Subjects | 146 | 143 | |
| Baseline (mm) | $0.77 \pm 0.01$ | $0.77 \pm 0.01$ | 0.888 |
| 12 mos (mm) | $0.78 \pm 0.01$ | $0.79 \pm 0.01$ | 0.128 |
| End of treatment (mm) | $0.79 \pm 0.01$ | $0.78 \pm 0.01$ | 0.945 |
| Progression at end of treatment (mm/year) | $0.013 \pm 0.003$ | $0.009 \pm 0.003$ | 0.587 |
| Composite | | | |
| Subjects | 146 | 143 | |
| Baseline (mm) | $0.78 \pm 0.01$ | $0.79 \pm 0.01$ | 0.336 |
| 12 mos (mm) | $0.79 \pm 0.01$ | $0.81 \pm 0.01$ | 0.022 |
| End of treatment (mm) | $0.79 \pm 0.01$ | $0.80 \pm 0.01$ | 0.168 |
| Progression at end of treatment (mm/year) | $0.005 \pm 0.004$ | $0.005 \pm 0.004$ | 0.654 |

Values are numbers of subjects or means ± SEMs.

* Anterior wall measurements were available only for subjects who agreed to the use of intravenous contrast.

visibility of the anterior wall of the common carotid.[13] In subjects who received the injection, the anterior wall was measured using the same analysis techniques used for the posterior wall.

Analyses of fasting lipids, serum chemistry, hematology, and urinalysis at screening and/or baseline and at week 13, 12 months, and end of treatment were performed by PPD Laboratory (Highland Heights, Kentucky). Frozen blood samples were also sent to the Lipid Research Laboratory (Haifa, Israel) for analyses of apolipoprotein-AI, apolipoprotein-B100, high-sensitivity C-reactive protein, ferric reducing ability of plasma, paraoxonase-1, and serum susceptibility to oxidation. Concentrations of apolipoprotein-AI and apolipoprotein-B100 were determined turbidimetrically after agglutination with antisera using a Cobas Integra analyzer (Roche Diagnostics GmbH, Mannheim, Germany). Analysis of high-sensitivity C-reactive protein was performed on a Modular Analytics P800 system (Roche Diagnostics, Indianapolis, Indiana) using Tina Quant CRP high sensitive (Roche Diagnostics GmbH).[14] Ferric reducing ability of plasma was measured spectrophotometrically.[15] Analysis of paraoxonase-1 arylesterase activity toward phenyl acetate was determined as previously described.[16] Susceptibility to oxidation was determined (with and without the free radical generator 2.2′ azo bis [2-amidopropane] dihydrochloride [AAPH])[17] by analyzing the formation of lipid peroxides (PDs)[18] and by thiobarbituric acid-reactive substances assay.[19]

Statistical analyses were generated using SAS 9.1.3 (SAS Institute, Cary, North Carolina). An evaluable sample of 113 subjects per group was expected to provide 80% power to detect a difference in CIMT progression of 0.015

mm/year (pooled SD 0.04). All tests of statistical significance were completed at alpha = 0.05, 2-sided. Assumptions of normality of residuals were investigated for each response measurement. Where it was determined that the distribution was not approximated by a normal curve, values were ranked before final analysis.

Baseline comparability of treatment groups was assessed by chi-square tests (categorical variables) and analysis of variance (continuous variables). Possible differences between treatments in response variables were evaluated by analysis of variance. The primary end point was rate of CIMT progression, which was evaluated in an intent-to-treat population including all subjects with baseline and $\geq 1$ postrandomization CIMT measurement for a given CIMT wall. For subjects who had a value available after 1 year but not at the end of the treatment period, the method of last observation carried forward was used to impute an end-of-treatment value. Baseline, 12-month, and end-of-treatment CIMT values were used in a linear regression model for each subject to determine the slope (progression rate) of the best-fit line. Progression rates were calculated separately for the right and left side anterior and posterior walls (mean for right and left when the 2 were available) and then all available walls were used to calculate the mean composite CIMT value for each subject, which included anterior wall measurements in a subset of the study sample. All CIMT readings were performed by a single reader and variability was assessed by the Bland-Altman method.[20] Mean ± SD for the difference in CIMT values for duplicate readings (all available walls) was $0.007 \pm 0.046$ mm.

CIMT variables were also evaluated in selected subgroups in exploratory analyses designed to generate hypotheses for future examination. No correction for multiple comparisons was applied for exploratory analyses to minimize the risk of a type II statistical error.

## Results

A complete description of subject disposition is shown in Figure 2. Of the 876 subjects screened, 383 were randomized and 289 completed $\geq 1$ postrandomization CIMT measurement. Percentages of randomized subjects included in the intent-to-treat analysis were similar in the pomegranate juice (76%) and control (75%) groups. Table 1 presents baseline characteristics of subjects in the intent-to-treat sample. With the exception of the percentage of smokers (16% of completers and 38% of noncompleters, p = 0.013), there were no significant differences in baseline characteristics between subjects who did and did not complete the study. Treatment groups were well matched and no significant differences at baseline were noted for any variables except the use of angiotensin-converting enzyme inhibitors and/or angiotensin II receptor blockers, which was more common (p = 0.027) in the pomegranate juice group (23%) compared to the control group (13%).

Baseline values and changes from baseline by group and time point for indicators of inflammation and oxidative stress are listed in Table 2. No significant differences in baseline values were present. The pomegranate juice group showed a significantly larger decrease in serum PD − AAPH (levels of PDs measured without adding the free

940    *The American Journal of Cardiology (www.AJConline.org)*



Figure 3. Mean ± SE for anterior wall *(A)*, posterior wall *(B)*, and composite *(C)* CIMT progression at end of treatment in selected subgroups. Number of subjects for anterior wall measurement: total population (control, n = 82; pomegranate juice, n = 69); excluding statin users (control, n = 72; pomegranate juice, n = 56); metabolic syndrome (control, n = 34; pomegranate juice, n = 30); smokers (control, n = 16; pomegranate juice, n = 11); HDL cholesterol (HDL-C), first tertile (control, n = 23; pomegranate juice, n = 33); low-density lipoprotein cholesterol (LDL-C), third tertile (control, n = 23; pomegranate juice, n = 22); apolipoprotein-B, third tertile (control, n = 27; pomegranate juice, n = 25); total cholesterol (Total-C)/HDL cholesterol, third tertile (control, n = 28; pomegranate juice, n = 31); PD − AAPH, third tertile (control, n = 24; pomegranate juice, n = 30); TG, third tertile (control, n = 25; pomegranate juice, n =

radical generator AAPH, p = 0.01) at 12 months and a trend toward a greater decrease in thiobarbituric acid-reactive substances − AAPH (levels of thiobarbituric acid-reactive substances measured without adding AAPH, p = 0.075) at 3 months. No other significant differences were present.

With the exception of apolipoprotein-B100, which decreased more with pomegranate juice than with control (−12.0 vs −9.0 mg/dl), there were no differences between treatment groups for changes from baseline in traditional cardiovascular risk markers, including fasting lipoprotein lipids, blood pressures, or smoking status (data not shown). Body weight increased slightly during treatment and to a similar degree (1 to 2 kg) in the 2 groups (data not shown).

Results for CIMT values by treatment group and time point and progression rates during treatment are listed in Table 3. Of the 152 subjects (52%) agreeing to the optional administration of intravenous contrast agent for anterior wall imaging, as expected, baseline values for the anterior wall of the common carotid artery were larger than for the posterior wall. Anterior and posterior wall CIMT values and progression rates did not differ significantly between treatment groups at any time point. The composite measurement of CIMT showed a significantly smaller value at 12 months in the pomegranate juice group compared to the control group (0.79 vs 0.81 mm, p = 0.022). However, this difference was no longer significant at the end of the treatment period (0.79 vs 0.80 mm, p = 0.168).

Exploratory analyses of several subgroups indicated significantly lower values for pomegranate juice versus control after treatment for anterior wall and/or composite CIMT values: subjects in the top tertiles for baseline triglycerides (TGs; anterior, p = 0.007; composite, p = 0.061), total cholesterol/HDL cholesterol ratio (anterior, p <0.001; composite, p = 0.006), TG/HDL cholesterol ratio (anterior, p = 0.005; composite, p = 0.073), and apolipoprotein-B100 (anterior, p = 0.062; composite, p = 0.033) and the lowest tertile for HDL cholesterol (anterior, p = 0.009; composite, p = 0.018). No differences for anterior wall or composite CIMT values were found in smokers or for the top tertiles of low-density lipoprotein cholesterol or PD − AAPH. There were no significant differences between treatments in any of these subgroups at baseline for any CIMT measurements or after treatment in posterior wall CIMT values.

Figure 3 shows progression rates for anterior wall, posterior wall, and composite CIMT measurements by treatment group for the entire intent-to-treat sample and selected subgroups. Results are arranged in ascending order by pro-

30); and TG/HDL cholesterol, third tertile (control, n = 23; pomegranate juice, n = 31). Number of subjects for posterior wall and composite measurements: total population (control, n = 143; pomegranate juice, n = 146); excluding statin users (control, n = 122; pomegranate juice, n = 122); metabolic syndrome (control, n = 52; pomegranate juice, n = 59); smokers (control, n = 29; pomegranate juice, n = 23); HDL cholesterol, first tertile (control, n = 41; pomegranate juice, n = 56); low-density lipoprotein cholesterol, third tertile (control, n = 47; pomegranate juice, n = 48); apolipoprotein-B, third tertile (control, n = 49; pomegranate juice, n = 45); total cholesterol/HDL cholesterol, third tertile (control, n = 44; pomegranate juice, n = 52); PD − AAPH, third tertile (control, n = 40; pomegranate juice, n = 46); TGs, third tertile (control, n = 41; pomegranate juice, n = 55); and TG/HDL cholesterol, third tertile (control, n = 40; pomegranate juice, n = 56).

PX0014-0005

gression rate for anterior wall CIMT in the control group. Results suggest that pomegranate juice consumption may have retarded CIMT progression in those subgroups with substantial progression in the control group, while having little or no effect on progression rates in the remainder of subjects. An evaluation of cardiovascular risk factors among subgroups with significant responses shown in Figure 3 suggested a possible pattern for 2 variables, high-sensitivity C-reactive protein and thiobarbituric acid-reactive substances plus AAPH. The level of high-sensitivity C-reactive protein was significantly decreased with pomegranate juice versus control in the top tertiles for TGs (p = 0.039), total cholesterol/HDL cholesterol ratio (p = 0.012), and apolipoprotein-B100 (p = 0.014). Levels of thiobarbituric acid-reactive substances plus AAPH also significantly decreased with pomegranate juice versus control in the top tertiles for TGs (p = 0.018), TG/HDL cholesterol ratio (p = 0.010), and PD − AAPH (p = 0.022).

## Discussion

Results of the present study showed no significant influence of ~18 months of pomegranate juice consumption on CIMT progression in the overall study sample. However, results from post hoc exploratory analyses, which should be interpreted with caution, suggest that the rate of CIMT progression may have been slowed in subgroups characterized by more rapid CIMT progression, including those with increased levels of TG-rich lipoproteins, low levels of HDL cholesterol, and greater oxidative stress. Notably, differences were most evident in rate of progression in the anterior wall, which was thicker than the posterior wall at baseline. Because the decrease in CIMT progression in these subgroups was based on analyses that were not preplanned and had no correction for multiple comparisons (increasing the possibility of type 1 errors), these findings will need to be confirmed in future investigations. However, consumption of pomegranate juice is very safe; thus demonstration of a benefit on atherosclerotic disease progression, even in a subset of the population, would have important public health implications. Greater CIMT is a risk factor for coronary artery disease, stroke, and myocardial infarction and correlates with increased levels of serum oxidized low-density lipoprotein.[21,22]

Results from previous trials have suggested that therapies that are effective for decreasing CIMT progression may not produce evidence of benefit when the baseline CIMT value is low.[23–27] Recent advancements in the use of contrast enhancements have improved the ability to evaluate the anterior wall of the carotid artery.[13,28] In a review of the literature, Macioch et al[13] concluded that the anterior wall is the site of maximum CIMT and is likely to be the location of greatest change after therapeutic intervention. Use of a contrast agent is required to satisfactorily image the anterior CIMT,[13] which increases the cost and invasiveness of the test. However, these trade-offs may prove to be justifiable if the sensitivity for detecting changes is sufficiently increased. Results from the present study are consistent with this possibility.

At the time this study was designed, the greater apparent sensitivity of the anterior wall for demonstrating differences

in response was not known. Each subject was given the option of receiving contrast agent due to a concern that an intravenous injection would deter subject participation. Subjects chose whether to undergo contrast agent administration before randomization and those who consented were equally distributed between treatment groups. Furthermore, posterior wall progression rates in either group did not differ between those who did and did not undergo contrast agent injection. Therefore, it is unlikely that inclusion of a contrast agent in a subset of the study sample biased the study findings.

The hypothesized mechanisms through which pomegranate juice consumption might favorably influence atherosclerosis development and progression relate mainly to effects of its antioxidant components (polyphenols, tannins, and anthocyanidins).[1,2] Of the serum indicators of oxidation measured, only PD − AAPH at 12 months decreased to a significantly larger extent with pomegranate juice than with control. Greater changes in oxidative stress markers were expected given the previously demonstrated antioxidant effects of pomegranate juice consumption.[1,2,4,5,7,8] Whether possible benefits of pomegranate juice consumption on CIMT progression in some subgroups relate to antioxidant activity is uncertain. A lack of significant improvements in most markers of oxidative stress argues against an important role for antioxidant activity. However, specific reactive oxygen/nitrogen species may be scavenged by pomegranate-unique polyphenolic hydrolysable tannins. Indeed, a subgroup for whom there was an apparent benefit was the top tertile for baseline PD − AAPH, suggesting that antioxidant effects may have played a role in the protection against CIMT progression by pomegranate juice consumption.

One potential mechanism through which the antioxidant components in pomegranate juice may influence atherosclerosis involves modulation of paraoxonase-1, an HDL-associated esterase that can hydrolyze and decrease lipid peroxides in arterial cells and atherosclerotic lesions.[29] Several in vitro and in vivo studies have demonstrated increased paraoxonase-1 with pomegranate juice consumption,[2,5,29] but in the present study, there were no significant differences in serum concentrations of paraoxonase-1 between the pomegranate and control groups at any time point. This may be due to relatively high baseline levels of paraoxonase-1 (~112 U/ml) suggestive of adequate antioxidant status at baseline compared to previous studies. Aviram et al[5] reported significant increase in paraoxonase-1 levels in subjects with carotid atherosclerosis consuming pomegranate juice. However, baseline paraoxonase-1 was substantially lower in those subjects[5] than those in the present study. Pomegranate juice and/or polyphenol consumption might favorably influence CIMT progression through effects on platelet activity, endothelial function, or shifts in the production of prostacyclin production.[2,30] However, because none of these variables were measured in the present trial, their potential roles here are unknown.

1. Gil MI, Tomás-Barberán FA, Hess-Pierce B, Holcroft DM, Kader AA. Antioxidant activity of pomegranate juice and its relationship with phenolic composition and processing. *J Agric Food Chem* 2000;48: 4581–4589.

*The American Journal of Cardiology (www.AJConline.org)*

2. Aviram M, Dornfeld L, Rosenblat M, Volkova N, Kaplan M, Coleman R, Hayek T, Presser D, Fuhrman B. Pomegranate juice consumption reduces oxidative stress, atherogenic modifications to LDL, and platelet aggregation: studies in humans and in atherosclerotic apolipoprotein E-deficient mice. *Am J Clin Nutr* 2000;71:1062–1076.

3. Aviram M, Dornfeld L. Pomegranate juice consumption inhibits serum angiotensin converting enzyme activity and reduces systolic blood pressure. *Atherosclerosis* 2001;158:195–198.

4. Kaplan M, Hayek T, Raz A, Coleman R, Dornfeld L, Vaya J, Aviram M. Pomegranate juice supplementation to atherosclerotic mice reduces macrophage lipid peroxidation, cellular cholesterol accumulation and development of atherosclerosis. *J Nutr* 2001;131:2082–2089.

5. Aviram M, Rosenblat M, Gaitini D, Nitecki S, Hoffman A, Dornfeld L, Volkova N, Presser D, Attias J, Liker H, Hayek T. Pomegranate juice consumption for 3 years by patients with carotid artery stenosis reduces common carotid intima-media thickness, blood pressure and LDL oxidation. *Clin Nutr* 2004;23:423–433.

6. Sumner MD, Elliott-Eller M, Weidner G, Daubenmier JJ, Chew MH, Marlin R, Raisin CJ, Ornish D. Effects of pomegranate juice consumption on myocardial perfusion in patients with coronary heart disease. *Am J Cardiol* 2005;96:810–814.

7. Ignarro LJ, Byrns RE, Sumi D, de Nigris F, Napoli C. Pomegranate juice protects nitric oxide against oxidative destruction and enhances the biological actions of nitric oxide. *Nitric Oxide* 2006;15:93–102.

8. Rosenblat M, Hayek T, Aviram M. Anti-oxidative effects of pomegranate juice (PJ) consumption by diabetic patients on serum and on macrophages. *Atherosclerosis* 2006;187:363–371.

9. Expert Panel on Detection, Evaluation, and Treatment of High Blood Cholesterol in Adults. Executive summary of the Third Report of the National Cholesterol Education Program (NCEP) expert panel on detection, evaluation, and treatment of high blood cholesterol in adults (Adult Treatment Panel III). *JAMA* 2001;285:2486–2497.

10. Mazzone T, Meyer PM, Feinstein SB, Davidson MH, Kondos GT, D'Agostino RB Sr, Perez A, Provost JC, Haffner SM. Effect of pioglitazone compared with glimepiride on carotid intima-media thickness in type 2 diabetes: a randomized trial. *JAMA* 2006;296:2572–2581.

11. Gariepy J, Salomon J, Denarié N, Laskri F, Megnien JL, Levenson J, Simon A. Sex and topographic differences in associations between large-artery wall thickness and coronary risk profile in a French working cohort: the AXA study. *Arterioscler Thromb Vasc Biol* 1998;18:584–590.

12. Simon A, Gariepy J, Moyse D, Levenson J. Differential effects of nifedipine and co-amilozide on progression of early carotid wall changes. *Circulation* 2001;103:2949–2954.

13. Macioch JE, Katsamakis CD, Robin J, Liebson PR, Meyer PM, Geohas C, Raichlen JS, Davidson MH, Feinstein SB. Effect of contrast enhancement on measurement of carotid artery intimal medial thickness. *Vasc Med* 2004;9:7–12.

14. Ledue TB, Rifai N. High sensitivity immunoassays for C-reactive protein: promises and pitfalls. *Clin Chem Lab Med* 2001;39:1171–1176.

15. Benzie IF, Strain JJ. The ferric reducing ability of plasma (FRAP) as a measure of "antioxidant power": the FRAP assay. *Anal Biochem* 1996;239:70–76.

16. Gan K, Smole A, Eckerson HW, La Du BN. Purification of human serum paraoxonase/arylesterase: evidence for one esterase catalyzing both activities. *Drug Metab Dispos* 1991;19:100–106.

17. Frei B, Stocker R, Ames BN. Antioxidant defenses and lipid peroxidation in human blood plasma. *Proc Natl Acad Sci U S A* 1988;85:9748–9752.

18. El-Saadani M, Esterbauer N, El-Sayed M, Goher M, Nassar AY, Jurgens G. Spectrophotometric assay for lipid peroxides in serum lipoproteins using commercially available reagent. *J Lipid Res* 1989;30:627–630.

19. Buege JA, Aust SD. Microsomal lipid peroxidation. *Methods Enzymol* 1978;52:302–310.

20. Bland JM, Altman DG. Measuring agreement in method comparison studies. *Stat Methods Med Res* 1999;8:135–160.

21. Liu ML, Ylitalo K, Salonen R, Salonen JT, Taskinen MR. Circulating oxidized low-density lipoprotein and its association with carotid intima-media thickness in asymptomatic members of familial combined hyperlipidemia. *Arterioscler Thromb Vasc Biol* 2004;24:1492–1497.

22. Wallenfeldt K, Fagerberg B, Wikstrand J, Hulthe J. Oxidized low-density lipoprotein in plasma is a prognostic marker of subclinical atherosclerosis development in clinically healthy men. *J Intern Med* 2004;256:413–420.

23. Carotid atorvastatin study in hyperlipidemic post-menopausal women: a randomized evaluation of atorvastatin versus placebo (CASHMERE). Available at: http://www.clinicalstudyresults.org/drugdetails/?drug_name_id=156&sort=c.company_name&page=2&drug_id=2902. Accessed November 16, 2008.

24. Brown BG, Taylor AJ. Does ENHANCE diminish confidence in lowering LDL or in ezetimibe. *N Engl J Med* 2008;358:1504–1507.

25. Drazen JM, Jarcho JA, Morrissey S, Curfman GD. Cholesterol lowering and ezetimibe. *N Engl J Med* 2008;358:1507–1508.

26. Kastelein JJP, Akdim F, Stroes ES, Zwinderman AH, Bots ML, Stalenhoef AF, Visseren FL, Slijbrands EJ, Trip MD, Stein EA, Gaudet D, Duivenvoorden R, Veltri EP, Marais AD, de Groot E, ENHANCE Investigators. Simvastatin with or without ezetimibe in familial hypercholesterolemia. *N Engl J Med* 2008;358:1431–1443.

27. Stein EA. Additional lipid lowering trials using surrogate measurements of atherosclerosis by carotid intima-media thickness: More clarity or confusion? *J Am Coll Cardiol* 2008;52:2206–2209.

28. Poredos P. Intima-media thickness: indicator of cardiovascular risk and measure of the extent of atherosclerosis. *Vasc Med* 2004;9:46–54.

29. Aviram M. Dietary antioxidants stimulate the expression of paraoxonases which provides protection against atherosclerosis development. *Curr Top Nutraceutical Res* 2003;3:161–169.

30. Polagruto JA, Schramm DD, Wang-Polagruto JF, Lee L, Keen CL. Effects of flavonoids-rich beverages on prostacyclin synthesis in humans and human aortic endothelial cells: association with ex vivo platelet function. *J Med Food* 2003;6:301–308.

PX0014-0007

VMS ID: 090200523
RUN DATE: 02/01/2009



VMS-0000281

JA-0891

CX0274_0001

Product       POM Wonderful
Media:        Print
Ad Title:     i'm off to save prostates
VMS Ad ID:    090200523
Date Range:

| Run Date | Market | Rank | Media Vehicle | Media Type | Unit | Cost |
|----------|--------|------|---------------|------------|------|------|
| 03/01/2009 | NATIONAL | 0 | Advocate | Magazine | Full Page | $964 |
| 02/01/2009 | NATIONAL | 0 | Men's Fitness | Magazine | Full Page | $65,330 |
| 03/01/2009 | NATIONAL | 0 | Men's Journal | Magazine | Full Page | $81,980 |

Total 3 Occurrence(s)                                                     $148,274

VMS-0000579
CX0274_0002

JA-0892



VMS ID: 090300701
RUN DATE: 03/01/2009

# Science, not fiction.

## Made from the only pomegranates backed by $25 million in medical research.

Ready to take your antioxidants into your own hands? Introducing POMx™ – a highly concentrated, incredibly powerful blend of all-natural polyphenol antioxidants made from the same pomegranates as **POM Wonderful® 100% Pomegranate Juice.**

POMx fights free radicals with a powerful 1000 milligrams. That's more concentrated polyphenol antioxidants than any other pomegranate supplement. And POMx is the first and only antioxidant supplement reviewed for safety by the FDA.



100% All-natural.



The antioxidant power of our 8oz juice.

POMx is made from the only pomegranates backed by $25 million in medical research, the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice. An initial UCLA MEDICAL STUDY on POM Wonderful 100% Pomegranate Juice found *hopeful results for prostate health.* The study reports "statistically significant prolongation of PSA doubling times," according to Dr. Allen J. Pantuck in Clinical Cancer Research, 2006.[1,2,3] Two additional preliminary studies on our juice showed *promising results for heart health.* "Stress-induced ischemia decreased in the pomegranate group," Dr. Dean Ornish reported in the American Journal of Cardiology, 2005.[1,2,4] "Pomegranate juice consumption resulted in a significant IMT[5] reduction by up to 30% after one year," said Dr. Michael Aviram, referring to reduced arterial plaque in Clinical Nutrition, 2004.[1,2,6]

### ORDER NOW: 1-888-POM-PILL (766-7455) or pompills.com/pop

---

## Try POMx for one month – FREE!

**We'll even pay for the shipping.** Visit pompills.com/pop or call 1-888-POM-PILL. Use discount code: POP30

SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires June 30, 2009. The first month free plus free shipping offer applies only to the purchase price for the first month of POMx Monthly, following months will be $29.95 per bottle. This discount can only be used on POMx products. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents will be given. We reserve the right to modify or discontinue this promotion at any time. We reserve the right to change product price or shipping charge at any time. Offer valid only at pompills.com or 1-888-POM-PILL. Discount code is not valid on POMx trial.



pompills.com/research [1] These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. [2] 45 men with rising PSA after surgery or radiotherapy drank 8oz 100% pomegranate juice daily for two years. [3] 45 patients with coronary heart disease and myocardial ischemia drank 8oz 100% pomegranate juice daily for three months. [4] Study measured intima-media thickness (IMT). [5] 19 patients aged 65-75 years with severe atherosclerosis drank 8oz 100% pomegranate juice daily for one year. ©2009 PomWonderful LLC. All rights reserved. POM Wonderful and POMx are trademarks of PomWonderful LLC.



WONDERFUL®

**VMS-0000291**

**vms**
KNOW BETTER.™

Product: POM X
Media: Print
Ad Title: Science not Fiction
VMS Ad ID: 090300701
Date Range:

| Run Date | Market | Rank | Media Vehicle | Media Type | Unit | Cost |
|---|---|---|---|---|---|---|
| 03/01/2009 | NATIONAL | 0 | Popular Science | Magazine | Full Page | $87,453 |
| | Total 1 Occurrence(s) | | | | | $87,453 |

VMS-0000584
CX0279_0002

**JA-0894**

# LIVE LONG ENOUGH TO WATCH YOUR 401(k) RECOVER.

## Antioxidants are a necessity. Not a luxury.

Emerging science suggests that antioxidants are critically important to maintaining good health because they protect you from free radicals, which can damage your body. Taking one POMx pill a day will help protect you from free radicals and keep you at your healthy best. Even when you're going through the worst.

## Recession-proof your health with POMx.

POMx — an ultra-potent antioxidant extract made from the same



The antioxidant power of our 8oz juice.

pomegranates as POM Wonderful® 100% Pomegranate Juice — is the most potent natural antioxidant supplement

available. Each 1000mg POMx pill has the antioxidant power of a full glass of POM Wonderful 100% Pomegranate Juice.



**The Antioxidant Superpill.™**

## $25 million in medical research. A sound investment.

POMx is made from the only pomegranates backed by $25 million in medical research at the world's leading universities.



Not only has this research documented the unique and superior antioxidant power of pomegranates, it has revealed promising results for prostate and cardiovascular health.

## Hope for the future. Yours.

Our POMx pills are made from the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice, on which each of the following medical studies was conducted.

An initial UCLA study on our juice found hopeful results for prostate health, reporting "statistically significant prolongation of PSA doubling times," according to Dr. Allen J. Pantuck in *Clinical Cancer Research*, '06.[1,2,3]

Two additional preliminary studies on our juice showed promising results for heart health. "Stress-induced ischemia (restricted blood flow to the heart) decreased in the pomegranate group," Dr. Dean Ornish reported in the *American Journal of Cardiology*, '05.[1,2,4]

"Pomegranate juice consumption resulted in significant reduction in IMT[5] (thickness of arterial plaque) by up to 30% after one year," said Dr. Michael Aviram in *Clinical Nutrition*, '04.[1,2,5,6]

---

## Try POMx Monthly
# FREE for ONE MONTH.
We'll even pay for the shipping.*



### Order Now: 888-766-7455 or pompills.com/n3
### Use discount code: N330

*SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires 5/30/09 and applies only to the purchase price for the first bottle of POMx Monthly. Following months will be $29.95 per bottle. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents. We reserve the right to discontinue this promotion, change product price or shipping charge at any time. Valid only at pompills.com or 1-888-766-7455. Not valid on POMx Trial or other POM products.

**POM WONDERFUL®**

pompills.com/research. [2]These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. [3]46 men with rising PSA after surgery or radiotherapy drank 8oz 100% pomegranate juice daily for two years. [4]45 patients with coronary heart disease and myocardial ischemia drank 8oz 100% pomegranate juice daily for three months. [5]Study measured intima media thickness (IMT). [6]19 patients aged 65-75 years with severe atherosclerosis drank 8oz 100% pomegranate juice daily for one year. ©2009 PomWonderful LLC. All rights reserved. POM Wonderful, POMx and 'antioxidant superpill' are trademarks of PomWonderful LLC. PP100

VMS-0000293

JA-0895

CX0280_0001



Product: POM X
Media: Print
Ad Title: Live Long Enough to Watch...
VMS Ad ID: 090312940
Date Range:

| Run Date | Market | Rank | Media Vehicle | Media Type | Unit | Cost |
|---|---|---|---|---|---|---|
| 08/01/2009 | NATIONAL | 0 | Advocate | Magazine | Full Page | $964 |
| 11/01/2009 | NATIONAL | 0 | Men's Health Magazine | Magazine | Full Page | $142,240 |
| 06/01/2009 | NATIONAL | 0 | Men's Health Magazine | Magazine | Full Page | $127,060 |
| 10/25/2009 | Albany GA | 147 | A bany Herald | Magazine / Local | 4 X 10 | $2,073 |
| 07/17/2009 | Albuquerque/Santa Fe | 46 | A buquerque Journal | Newspaper / Local | 5 X 11.5 | $7,020 |
| 03/22/2009 | Albuquerque/Santa Fe | 46 | A buquerque Journal | Newspaper / Local | 5 X 10.5 | $6,410 |
| 07/19/2009 | Alexandria LA | 178 | Alexandria Town Talk | Newspaper / Local | 3.75 X 11.5 | $1,743 |
| 07/19/2009 | Amarillo | 131 | Amarillo Globe-News | Newspaper / Local | 5 X 10.5 | $2,697 |
| 03/22/2009 | Austin | 44 | Austin American-Statesman | Newspaper | 5 X 10.5 | $11,011 |
| 03/22/2009 | Bakersfield | 125 | Bakersfield Californian | Magazine / Local | 5 X 10.5 | $3,824 |
| 05/27/2009 | Boston | 7 | Quincy Patriot Ledger | Newspaper / Local | 4 X 10 | $2,109 |
| 03/22/2009 | Buffalo | 51 | Buffalo News | Newspaper / Local | 5 X 10.5 | $12,662 |
| 08/02/2009 | Cedar Rapids/Waterloo/D ubuque | 88 | Dubuque Telegraph-Herald | Local / Newspaper | 5 X 10 | $1,681 |
| 05/11/2009 | Cedar Rapids/Waterloo/D ubuque | 88 | Dubuque Telegraph-Herald | Local / Newspaper | 5 X 11 | $1,849 |
| 05/15/2009 | Chicago | 3 | Addison Press | Newspaper / Local | 4.5 X 11.5 | $490 |
| 07/12/2009 | Cincinnati | 33 | Cincinnati Enquirer | Newspaper / Local | 4.166667 X 11 | $17,174 |
| 05/08/2009 | Colorado Springs/Pueblo | 92 | Colorado Springs Gazette | Newspaper / Local | 5 X 10 | $4,899 |
| 07/12/2009 | Columbus OH | 34 | Columbus Dispatch | Newspaper / Local | 5 X 11 | $12,185 |
| 03/22/2009 | Dallas/Ft. Worth | 5 | Dallas Morning News | Newspaper | 5 X 11.5 | $38,820 |

VMS-0000585
CX0280_0002

| Date | City | Number | Publication | Type | Size | Price |
|---|---|---|---|---|---|---|
| 07/12/2009 | Detroit | 11 | Detroit News & Free Press Weekend | Local Newspaper | 4 X 9.5 | $21,073 |
| 07/19/2009 | El Paso | 97 | El Paso Times | Local Newspaper | 5 X 10.5 | $6,241 |
| 10/25/2009 | Fort Myers/Naples | 65 | Ft. Myers News-Press | Local Newspaper | 4 X 9.5 | $3,980 |
| 07/12/2009 | Fort Myers/Naples | 65 | Ft. Myers News-Press | Local Newspaper | 4 X 10<br>4.166667 X 10.5 | $4,322 |
| 03/22/2009 | Fresno/Visalia | 55 | Fresno Bee | Local Newspaper | 4 X 10 | $10,316 |
| 10/25/2009 | Greenville/Spartanburg | 36 | Greenville News | Local Newspaper | 5 X 9.5 | $5,635 |
| 07/12/2009 | Greenville/Spartanburg | 36 | Greenville News-Piedmont Company | Local Newspaper | 5 X 11.5 | $6,904 |
| 03/22/2009 | Houston | 10 | Houston Chronicle | Local Newspaper | 4 X 9.5 | $34,312 |
| 10/25/2009 | Jacksonville/Brunswick | 49 | Jacksonville Florida Times Union | Local Newspaper | 4.5 X 9.5 | $7,948 |
| 07/12/2009 | Jacksonville/Brunswick | 49 | Jacksonville Florida Times Union | Local Newspaper | 5 X 10 | $9,282 |
| 07/11/2009 | Lafayette IN | 188 | Lafayette Journal and Courier | Local Newspaper | 5 X 9.5 | $2,394 |
| 07/19/2009 | Los Angeles | 2 | La Opinion | Local Newspaper | 5 X 10.5 | $3,889 |
| 03/22/2009 | Los Angeles | 2 | Los Angeles Times | Local Newspaper | 5 X 10.5 | $40,098 |
| 03/22/2009 | Los Angeles | 2 | Riverside Press Enterprise | Local Newspaper | 4 X 9.5 | $7,262 |
| 08/09/2009 | Los Angeles | 2 | San Bernardino Sun | Local Newspaper | 5 X 9.5 | $2,341 |
| 07/19/2009 | Louisville | 50 | Louisville Courier-Journal | Local Newspaper | 4.5 X 8.5 | $13,150 |
| 07/12/2009 | Milwaukee | 35 | Milwaukee Journal Sentinel | Local Newspaper | 5 X 10 | $11,866 |
| 05/12/2009 | Milwaukee | 35 | Milwaukee Journal Sentinel | Local Newspaper | 5 X 10.5 | $15,511 |
| 08/02/2009 | Minneapolis/St. Paul | 15 | Minneapolis Star Tribune | Local Newspaper | 4 X 9 | $14,982 |
| 07/26/2009 | Minneapolis/St. Paul | 15 | St. Cloud Times | Local Newspaper | 5 X 10 | $1,895 |
| 07/12/2009 | Mobile/Pensacola | 60 | Pensacola News Journal | Local Newspaper | 5 X 10.5 | $8,035 |
| 07/19/2009 | Nashville | 29 | Nashville Tennessean | Local Newspaper | 5 X 10.5 | $16,531 |
| 03/22/2009 | New York | 1 | Bergen Record | Local Newspaper | 4.5 X 9.5 | $11,638 |
| 07/26/2009 | New York | 1 | Long Island Newsday | Local Newspaper | 4 X 9.5 | $25,375 |
| 07/26/2009 | New York | 1 | New York Daily News | Local Newspaper | 4.5 X 11.5 | $25,834 |
| 03/15/2009 | New York | 1 | New York Times | Local Newspaper | 4 X 9.5 | $60,014 |
| 10/25/2009 | Panama City | 156 | Panama City News-Herald | Magazine | | $1,647 |

VMS-0000585
CX0280_0003

JA-0897

| Date | City | | Publication | Type | Size | Amount |
|---|---|---|---|---|---|---|
| 07/12/2009 | Panama City | 156 | Panama City News-Herald | Magazine Local | 4.5 X 11.5 | $2,480 |
| 07/26/2009 | Philadelphia | 4 | Camden Courier-Post | Newspaper Local | 4 X 9.5 | $5,795 |
| 07/19/2009 | Phoenix | 12 | Phoenix Arizona Republic | Newspaper Local | 5 X 10 | $21,310 |
| 03/22/2009 | Portland OR | 22 | Portland Oregonian | Newspaper Local | 4.5 X 11.5 | $12,934 |
| 07/26/2009 | Rochester NY | 81 | Rochester Democrat & Chronicle | Newspaper Local | 4.5 X 9.5 | $16,635 |
| 03/22/2009 | Sacramento/Stockton/Modesto | 20 | Sacramento Bee | Newspaper Local | 5 X 10.5 | $14,080 |
| 03/22/2009 | Salt Lake City | 32 | Salt Lake Tribune | Newspaper Local | 5 X 10 | $11,332 |
| 03/22/2009 | San Antonio | 37 | San Antonio Express News | Newspaper Local | 5 X 11.5 | $17,079 |
| 03/22/2009 | San Diego | 28 | San Diego Union-Tribune | Newspaper Local | 5 X 10.5 | $21,465 |
| 03/22/2009 | San Francisco/Oakland | 6 | San Francisco Chronicle | Local Newspaper | 5 X 10.5 | $28,211 |
| 08/01/2009 | San Francisco/Oakland | 6 | San Jose Mercury News | Local Newspaper | 5 X 10 | $26,001 |
| 08/09/2009 | Santa Barbara/Santa Maria | 122 | Santa Barbara News Press | Newspaper Local | 5 X 9.5 | $2,337 |
| 03/22/2009 | Seattle/Tacoma | 13 | Tacoma News Tribune | Newspaper Local | 5 X 11 | $7,594 |
| 07/19/2009 | Shreveport/Texarkana | 83 | Shreveport Times | Newspaper | 4.5 X 11.5 | $6,477 |
| 08/02/2009 | Sioux City | 149 | Sioux City Journal | Magazine | 5 X 10 | $2,404 |
| 05/13/2009 | Sioux City | 149 | Sioux City Journal | Magazine | 5 X 11 | $2,644 |
| 08/02/2009 | Sioux Falls/Mitchell | 112 | Sioux Falls Argus Leader | Magazine Local | 5 X 10 | $3,038 |
| 08/02/2009 | Springfield MO | 74 | Springfield News-Leade | Newspaper | 5 X 10.5 | $4,891 |
| 10/25/2009 | Tallahassee/Thomasville | 105 | Tallahassee Democrat | Magazine | 4 X 9.5 | $3,445 |
| 07/12/2009 | Tallahassee/Thomasville | 105 | Tallahassee Democrat | Magazine Local | 4.5 X 11.5 | $4,841 |
| 07/19/2009 | Tucson | 67 | Tucson Arizona Daily Star | Newspaper Local | 4 X 9.5 | $4,159 |
| 03/22/2009 | Tucson | 67 | Tucson Arizona Daily Star | Newspaper Local | 5 X 11 | $6,020 |
| 03/22/2009 | Waco/Temple/Bryan | 89 | Waco Tribune-Herald | Newspaper Local | 5 X 10.5 | $3,964 |
| 03/22/2009 | Yakima | 126 | Yakima Herald-Republic | Magazine | 5 X 11 | $1,941 |
| | Total 70 Occurrence(s) | | | | | $1,000,463 |

VMS-0000585
CX0280_0004

JA-0898

## Microsoft Office

| | |
|---|---|
| **From:** | Hernandez, Andrea |
| **Sent:** | Tuesday, June 02, 2009 10:24 AM |
| **To:** | Nelson, Claire |
| **Subject:** | Re: Need some images |
| **Attachments:** | US_Comic_Risk.jpg; PJ0225_TIME-Wrap_Dec08_F_hr.pdf; PJ9745_POM time wrap_Final_LR.pdf |

**Importance:**    High

Claire,

Attached is the jpeg for Risk your health ad.
For the TIME wrap, we ran two versions (attached). Let me know whichone you want to I can make you jpegs out of the hi-res art.

Thanks,
Andrea


On 6/2/09 9:49 AM, "Nelson, Claire" <CNelson@PomWonderful.com> wrote:

Hi Andrea-

Would you please provide a JPEG of these images:

 Risk your health in this economy ad
Trust in POM TIME magazine cover wraps (from last fall)

Thanks,
Claire

**From:** Kuyoomjian, Diane
**Sent:** Tuesday, June 02, 2009 9:35 AM
**To:** Flynn, Molly; Nelson, Claire; Green, Kelly
**Subject:** Need some images
**Importance:** High

Guys

Can you help me find the following – Matt/Sarah want to include these in the President's Meeting presentation:

- a photo of the UK bus ads (Cheat Death I think was the only execution we did)
- The Time Mag cover wrap from last year (pre-Comic Book) - just need the first/cover page. Don't remember if there were different versions; if so, let me know what the headline options are
- Print ad – Risk your health in this economy? Never.

Can I get these asap today?

CONFIDENTIAL, SUBJECT TO A PROTECTIVE ORDER    POM-OS00001564

EXHIBIT 31
Witness Flynn
Date 9 30.10 Total pgs. 10
Elizabeth Borrelli CSR 7844 RPR

CONFIDENTIAL-FTC Docket NO. 9344    RESP024719
JA-0899    CX0314

Thanks
Diane

2

CONFIDENTIAL, SUBJECT TO A PROTECTIVE ORDER

POM-OS00001565

**CONFIDENTIAL-FTC Docket NO. 9344**

**JA-0900**

**RESP024720**

CX0314

| JOB NO.: PJ9745 | TRIM: 7.875"x10.5" | COLORS: 4/C PROS | DATE IN: 08-25-08 |
| PROJECT: NY Times Magazine Wrap | LIVE: 7.125" x 9.75" | FINAL BLEED: 100 DOT PRINTS | DATE OUT: 09-09-08 |
| SCALE: 1 : 1 | BLEED: 8.375" x 11" | PRINT OUT SIZE: 100% | PRINT NUMBER: F |

CONFIDENTIAL, SUBJECT TO A PROTECTIVE ORDER

POM-OS00001566

JA-0901

RESP024721

CX0314

## POM Wonderful and Prostate Health 

**A recently published medical study involving POM Wonderful 100% Pomegranate Juice followed 46 men previously treated for prostate cancer either with surgery or radiation.**

After drinking eight ounces of POM Wonderful 100% Pomegranate Juice daily for at least two years, these men experienced significantly slower PSA doubling times. PSA (Prostate-Specific Antigen) is a biomarker that indicates the presence of prostate cancer. "PSA doubling time" is a measure of how long it takes for PSA levels to double. A longer doubling time may indicate slower progression of the disease.

At the beginning of the study, PSA levels doubled on average every 15 months. By the end of the study, doubling time had slowed to 54 months – nearly a four-fold improvement.

*"This is a big increase. I was surprised when I saw such an improvement in PSA numbers,"* said Dr. Allan Pantuck, lead author of the UCLA Study.

In addition, in-vitro testing using blood serum from the patients who drank pomegranate juice showed a 17% increase in prostate cancer cell death and a 12% decrease in cancer cell growth.

*One important note:* All patients drank the same POM Wonderful 100% Pomegranate Juice which is available in your supermarket produce section.

*Prostate Cancer is the most commonly diagnosed cancer in men in the United States. After lung cancer, it's the second leading cause of cancer death in men. However, emerging science suggests that diet and lifestyle may be able to significantly improve prostate health.*

The Research Continues  Results from this study were so promising that many of the original patients continued to drink pomegranate juice daily, and their PSA doubling times remained suppressed. Three more clinical studies are now underway to further investigate the effects of POM on prostate health.

Learn why POM Wonderful is the only pomegranate juice you can trust. *(See inside back cover of this wrap.)*

 pomwonderful.com

PJ9745_POMtime wrap_F.indd 2    8/10/08  5:24:12 AM

| JOB NO.: PJ9745 | TRIM: 7.875"x10.5" | COLOR: 4/C PROS | DATE IN: 08-25-08 |
|---|---|---|---|
| PROJECT: NY Times Magazine Wrap | LIVE: 7.125" x 9.75" | INK: TRIM, BLEED (DO NOT PRINT) | DATE OUT: 09-09-08 |
| SCALE: 1 : 1 | BLEED: 8.375" x 11" | PRINTOUT SIZE: 100% | PROOF ROUND: F |

CONFIDENTIAL, SUBJECT TO A PROTECTIVE ORDER

POM-OS00001567

# The proof is in the POM

### 100% Authentic
POM is the only brand guaranteed to contain 100% real pomegranate juice. We wish other brands were as honest. In fact, according to recent independent tests, nine out of ten so-called "pomegranate" juices were found to have added sugar, colorants and other low-grade fruit juices.

### Tree to Bottle
POM is the only brand that controls its juice from tree to bottle, batch to batch, year to year. We only grow "Wonderful" variety pomegranates, renowned for their superior antioxidants and delicious taste. And every 16oz bottle contains the juice of five whole pomegranates.

### The Antioxidant Superpower™
With uniquely high levels of powerful antioxidants, POM Wonderful 100% Pomegranate Juice has demonstrated superior ability to neutralize harmful free radicals and to inhibit excess inflammation.

### Backed by Science
Only POM is backed by $25 million in medical research conducted at the world's leading universities. Clinical studies have documented the benefits of drinking POM Wonderful 100% Pomegranate Juice, including improved cardiovascular and prostate health.

### More Antioxidants
Sip for sip, POM Wonderful 100% Pomegranate Juice has more polyphenol antioxidants than red wine, green tea and other juices.



## POM
WONDERFUL   pomwonderful.com

*Index combines results from four leading antioxidant tests (ORAC, DPPH, FRAP, TEAC). N. Seeram, et al., "Comparison of Antioxidant Potency of Commonly Consumed Polyphenol-Rich Beverages in the United States," Journal of Agricultural Food and Chemistry (2008).*

PJ9745_POMtime wrap_F.indd 3        9/10/08 8:24:12 AM

| JOB NO.: PJ9745 | TRIM: 7.875"x10.5" | COLOR: 4/C PROS | DATE IN: 08-25-08 |
|---|---|---|---|
| PROJECT: NY Times Magazine Wrap | LIVE: 7.125" x 9.75" | NOTE: TRIM, BLEED (DO NOT PRINT) | DATE OUT: 09-09-08 |
| SCALE: 1 : 1 | BLEED: 8.375" x 11" | PRINTOUT SIZE: 100% | PROOF ROUND: F |

CONFIDENTIAL, SUBJECT TO A PROTECTIVE ORDER        POM-OS00001568

**CONFIDENTIAL-FTC Docket NO. 9344**      JA-0903      **RESP024723**

CX0314



# The Antioxidant Superpower.™

What's it like to have a personal superhero? Find out by drinking delicious and refreshing POM Wonderful® 100% Pomegranate Juice. It has more naturally occurring antioxidants than other drinks. Antioxidants fight free radicals, villainous little molecules that may cause premature aging, heart disease, stroke, Alzheimer's, even cancer. All you need is eight ounces to save the day. Every day.

The Antioxidant Superpower. 100% Pure Pomegranate Juice.

©2008 PomWonderful LLC. All rights reserved. POM Wonderful and The Antioxidant Superpower are trademarks of PomWonderful LLC.

pomwonderful.com

PJ9745_POM time wrap_F.indd   4                                                                8/10/08  8:24:13 AM

| JOB NO.: PJ9745 | TRIM: 7.875"x10.5" | COLOR: 4/C PROS | DATE IN: 08-25-08 |
| PROJECT: NY Times Magazine Wrap | LIVE: 7.125" x 9.75" | LIVE, TRIM, BLEED (DO NOT PRINT) | DATE OUT: 09-09-08 |
| SCALE: 1 : 1 | BLEED: 8.375" x 11" | PRINTOUT SIZE: 100% | PROOF ROUND: F |

CONFIDENTIAL, SUBJECT TO A PROTECTIVE ORDER

POM-OS00001569

CONFIDENTIAL-FTC Docket NO. 9344

JA-0904

RESP024724

CX0314



CONFIDENTIAL, SUBJECT TO A PROTECTIVE ORDER

POM-OS00001570

CONFIDENTIAL-FTC Docket NO. 9344

RESP024725

CX0314

# POM Wonderful and Prostate Health



**A recently published medical study involving POM Wonderful 100% Pomegranate Juice followed 46 men previously treated for prostate cancer either with surgery or radiation.**

After drinking eight ounces of POM Wonderful 100% Pomegranate Juice daily for at least two years, these men experienced significantly slower PSA doubling times. PSA (Prostate-Specific Antigen) is a biomarker that indicates the presence of prostate cancer. "PSA doubling time" is a measure of how long it takes for PSA levels to double. A longer doubling time may indicate slower progression of the disease.

At the beginning of the study, PSA levels doubled on average every 15 months. By the end of the study, doubling time had slowed to 54 months – nearly a four-fold improvement.

*"This is a big increase. I was surprised when I saw such an improvement in PSA numbers,"* said Dr. Allan Pantuck, lead author of the UCLA Study.

In addition, in-vitro testing using blood serum from the patients who drank pomegranate juice showed a 17% increase in prostate cancer cell death and a 12% decrease in cancer cell growth.

*One important note:* All patients drank the same POM Wonderful 100% Pomegranate Juice which is available in your supermarket produce section.

---

*Prostate Cancer is the most commonly diagnosed cancer in men in the United States. After lung cancer, it's the second leading cause of cancer death in men. However, emerging science suggests that diet and lifestyle may be able to significantly improve prostate health.*

---

**The Research Continues** Results from this study were so promising that many of the original patients continued to drink pomegranate juice daily, and their PSA doubling times remained suppressed. Three more clinical studies are now underway to further investigate the effects of POM on prostate health.

Learn why POM Wonderful is the only pomegranate juice you can trust. *(See inside back cover of this wrap.)*

POM WONDERFUL   **pomwonderful.com**

PJ0225_TIME-Wrap_Dec08_F.indd 2

10/23/08 5:33:02 PM

CONFIDENTIAL, SUBJECT TO A PROTECTIVE ORDER

POM-OS00001571

# The proof is in the POM

## 100% Authentic
POM is the only brand guaranteed to contain 100% real pomegranate juice. We wish other brands were as honest. In fact, according to recent independent tests, nine out of ten so-called "pomegranate" juices were found to have added sugar, colorants and other low-grade fruit juices.

## Tree to Bottle
POM is the only brand that controls its juice from tree to bottle, batch to batch, year to year. We only grow "Wonderful" variety pomegranates, renowned for their superior antioxidants and delicious taste. And every 16oz bottle contains the juice of five whole pomegranates.

## The Antioxidant Superpower·
With uniquely high levels of powerful antioxidants, POM Wonderful 100% Pomegranate Juice has demonstrated superior ability to neutralize harmful free radicals and to inhibit excess inflammation.

## Backed by Science
Only POM is backed by $25 million in medical research conducted at the world's leading universities. Clinical studies have documented the benefits of drinking POM Wonderful 100% Pomegranate Juice, including improved cardiovascular and prostate health.

## More Antioxidants
Sip for sip, POM Wonderful 100% Pomegranate Juice has more polyphenol antioxidants than red wine, green tea and other juices.



 **pomwonderful.com**

*Index combines results from four leading antioxidant tests (ORAC, DPPH, FRAP, TEAC). N. Seeram, et al., "Comparison of Antioxidant Potency of Commonly Consumed Polyphenol-Rich Beverages in the United States." Journal of Agricultural Food and Chemistry (2008).

CONFIDENTIAL, SUBJECT TO A PROTECTIVE ORDER

POM-OS00001572

**CONFIDENTIAL-FTC Docket NO. 9344**

JA-0907

**RESP024727**

CX0314



# Ingredients: pomegranates, $25 million in medical research.



What goes into our POM Wonderful bottle goes into you—100% authentic Wonderful variety pomegranate juice, your daily dose of free-radical-fighting antioxidants, $25 million in published medical research and proven health benefits. Nothing else. That means no cheap filler juices. No sweeteners. And no added colorants. So read the label. And drink to your health. **Trust in POM.**

pomwonderful.com

CONFIDENTIAL, SUBJECT TO A PROTECTIVE ORDER          POM-OS00001573

**CONFIDENTIAL-FTC Docket NO. 9344**       **JA-0908**       **RESP024728**

CX0314



| JOB NO.: PJ2005 | TRIM: 7.875"x10.5" | COLOR: 4/C PROCESS | DATE IN: 7-22-09 |
|---|---|---|---|
| PROJECT: TimeWrap Oct09 | LIVE: 7.125" x 9.75" | LIVE, TRIM, BLEED (DO NOT PRINT) | DATE OUT: 8-20-09 |
| SCALE: 1 : 1 | BLEED: 8.375" x 11" | PRINTOUT SIZE: 100% | PROOF ROUND: F2 |

CONFIDENTIAL-FTC Docket NO. 9344　　JA-0909　　RESP023813

CX0379





$32 million in medical research.

**A recently published pilot study* involving POM Wonderful 100% Pomegranate Juice followed 46 men previously treated for prostate cancer either with surgery or radiation.**

After drinking eight ounces of POM Wonderful 100% Pomegranate Juice daily for at least two years, these men experienced significantly slower average PSA doubling times. PSA (Prostate-Specific Antigen) is a biomarker that indicates the presence of prostate cancer. PSA doubling time is a measure of how long it takes for PSA levels to double. A longer doubling time may indicate slower progression of the disease.

At the beginning of the study, PSA levels doubled on average every 15 months. By the end of the study, doubling time had slowed to 54 months — nearly a four-fold improvement. *"This is a big increase. I was surprised when I saw such an improvement in PSA numbers,"* said Dr. Allan Pantuck, lead author of the UCLA Study.

*One important note:* All of the patients drank the same POM Wonderful 100% Pomegranate Juice which is available in your supermarket produce section.

*Prostate cancer is the most commonly diagnosed cancer in men in the United States. After lung cancer, it's the second leading cause of cancer death in men. However, emerging science suggests that diet and lifestyle may be able to significantly improve prostate health.*

**The Research Continues.** Results from this study were so promising that many of the original patients continued to drink pomegranate juice daily, and their PSA doubling times remained suppressed. Three more clinical studies are now underway to further investigate the effects of POM on prostate health.

Learn why POM Wonderful is the only pomegranate juice you can trust. *(See inside back cover of this wrap.)*

**pomwonderful.com**

POM WONDERFUL

* Pantuck et al., Phase II study of pomegranate juice for men with rising prostate specific antigen following surgery or radiation for prostate cancer. Clinical Cancer Research (2006). Visit pomwonderful.com/health/research to review this and other published studies.

PJ2005_TimeWrapOct09_F2.indd  2                                                                                              9/29/09  3:47:27 PM

| JOB NO.: PJ2005 | TRIM: 7.875"x10.5" | COLOR: 4/C PROCESS | DATE IN: 7-22-09 |
|---|---|---|---|
| PROJECT: TimeWrap Oct09 | LIVE: 7.125" x 9.75" | LIVE, TRIM, BLEED (DO NOT PRINT) | DATE OUT: 8-20-09 |
| SCALE: 1 : 1 | BLEED: 8.375" x 11" | PRINTOUT SIZE: 100% | PROOF ROUND: F2 |

**CONFIDENTIAL-FTC Docket NO. 9344** JA-0910                    **RESP023814**

CX0379





## 100% Authentic
POM is the only brand guaranteed to contain 100% real pomegranate juice. We wish other brands were as honest. In fact, according to recent independent tests, nine out of ten so-called "pomegranate" juices were found to have added sugar, colorants and other low-grade fruit juices.

## Tree to Bottle
POM is the only brand that controls its juice from tree to bottle, batch to batch, year to year. We only grow "Wonderful" variety pomegranates, renowned for their superior antioxidants and delicious taste. And every 16oz bottle contains the juice of five whole pomegranates.

## The Antioxidant Superpower*
With uniquely high levels of powerful antioxidants, POM Wonderful 100% Pomegranate Juice has demonstrated superior ability to neutralize harmful free radicals and to inhibit excess inflammation.

## Backed by Science
Only POM products are backed by $32 million in medical research conducted at the world's leading universities, primarily in the areas of cardiovascular, prostate and erectile function.

## More Antioxidants
Sip for sip, POM Wonderful 100% Pomegranate Juice has more polyphenol antioxidants than red wine, green tea and other juices.



 pomwonderful.com

*Index combines results from four leading antioxidant tests (ORAC, DPPH, FRAP, TEAC). N. Seeram, et al., Comparison of Antioxidant Potency of Commonly Consumed Polyphenol-Rich Beverages in the United States. Journal of Agricultural and Food Chemistry (2008). Study found at pomwonderful.com /cbsroom.

PJ2005_TimeWrapOct09_F2.indd  3                                                     8/20/09  3:47:28 PM

| JOB NO.: PJ2005 | TRIM: 7.875"x10.5" | COLOR: 4/C PROCESS | DATE IN: 7-22-09 |
| PROJECT: TimeWrap Oct09 | LIVE: 7.125" x 9.75" | LIVE, TRIM, BLEED (DO NOT PRINT) | DATE OUT: 8-20-09 |
| SCALE: 1 : 1 | BLEED: 8.375" x 11" | PRINTOUT SIZE: 100% | PROOF ROUND: F2 |

CONFIDENTIAL-FTC Docket NO. 9344   JA-0911        RESP023815

CX0379



CONFIDENTIAL-FTC Docket NO. 9344     JA-0912     RESP023816

CX0379



| JOB NO.: PJ2007 | TRIM: 7.875" x 10.5" | COLOR: 4/C PROS | DATE IN: 9-02-09 | CREATIVE: CJ |
| PROJECT: Time Magazine Wrap - Dec 09 | LIVE: 7.125" x 9.75" | LMT. TRIM, BLEED (DO NOT PRINT): | CLIENT SIGN OFF: 00-00-00 | PRODUCTION: MS |
| SCALE: 1 : 1 | BLEED: 8.375" x 11.0" | PRINTOUT SIZE: 100% | RELEASE DATE: 9-10-09 | PROOF: F |

•PLEASE MARK ALL CHANGES ON INSITE DOCUMENT  •NO CHANGES ON PRINTED FLAT WILL BE MADE

CONFIDENTIAL-FTC Docket NO. 9344   JA-0913                RESP023828

CX0372



**A recently published pilot study[*] involving POM Wonderful 100% Pomegranate Juice followed 46 men previously treated for prostate cancer either with surgery or radiation.**

After drinking eight ounces of POM Wonderful 100% Pomegranate Juice daily for at least two years, these men experienced significantly slower average PSA doubling times. PSA (Prostate-Specific Antigen) is a biomarker that indicates the presence of prostate cancer. PSA doubling time is a measure of how long it takes for PSA levels to double. A longer doubling time may indicate slower progression of the disease.

At the beginning of the study, PSA levels doubled on average every 15 months. By the end of the study, doubling time had slowed to 54 months – nearly a four-fold improvement. *"This is a big increase. I was surprised when I saw such an improvement in PSA numbers,"* said Dr. Allan Pantuck, lead author of the UCLA Study.

One important note: All of the patients drank the same POM Wonderful 100% Pomegranate Juice which is available in your supermarket produce section.

*Prostate cancer is the most commonly diagnosed cancer in men in the United States. After lung cancer, it's the second leading cause of cancer death in men. However, emerging science suggests that diet and lifestyle may be able to significantly improve prostate health.*

**The Research Continues** Results from this study were so promising that many of the original patients continued to drink pomegranate juice daily, and their PSA doubling times remained suppressed. Three more clinical studies are now underway to further investigate the effects of POM on prostate health.

Learn why POM Wonderful is the only pomegranate juice you can trust. *(See inside back cover of this wrap.)*

**pomwonderful.com**



[*] *Published pilot study—Pomegranate juice status, PSA doubling time in humans, Clinical Cancer Research (2006). Visit pomwonderful.com/HealthyGreens to review this and other published studies.*

*POM Wonderful © 2007 POM00 222 1570*

| JOB NO.: PJ2007 | TRIM: 7.875" x 10.5" | COLOR: 4/C PROS | DATE IN: 6-02-08 | CREATIVE: CJ |
|---|---|---|---|---|
| PROJECT: Time Magazine Wrap - Dec 08 | LIVE: 7.125" x 9.75" | | CLIENT SIGN-OFF: 00-00-00 | PRODUCTION: MS |
| SCALE: 1 : 1 | BLEED: 8.375" x 11.0" | PRINTOUT SIZE: 100% | RELEASE DATE: 5-10-08 | PROOF: 1 |

*PLEASE MARK ALL CHANGES ON INSITE DOCUMENT  *NO CHANGES ON PRINTED FLAT WILL BE MADE

**CONFIDENTIAL-FTC Docket NO. 9344**          **RESP023829**

JA-0914

CX0372



**100% Authentic**
POM is the only brand guaranteed to contain 100% real pomegranate juice. We wish other brands were as honest. In fact, according to recent independent tests, nine out of ten so-called "pomegranate" juices were found to have added sugar, colorants and other low-grade fruit juices.

**Tree to Bottle**
POM is the only brand that controls its juice from tree to bottle, batch to batch, year to year. We only grow "Wonderful" variety pomegranates, renowned for their superior antioxidants and delicious taste. And every 16oz bottle contains the juice of five whole pomegranates.

**The Antioxidant Superpower**
With uniquely high levels of powerful antioxidants, POM Wonderful 100% Pomegranate Juice has demonstrated superior ability to neutralize harmful free radicals and to inhibit excess inflammation.

**Backed by Science**
Only POM products are backed by $32 million in medical research conducted at the world's leading universities, primarily in the areas of cardiovascular, prostate and erectile function.

**More Antioxidants**
Sip for sip, POM Wonderful 100% Pomegranate Juice has more polyphenol antioxidants than red wine, green tea and other juices.

pomwonderful.com

CX0372



CONFIDENTIAL-FTC Docket NO. 9344    JA-0916    RESP023831

CX0372





CX0380



CONFIDENTIAL-FTC Docket NO. 9344    JA-0919    RESP023823

CX0380



CONFIDENTIAL-FTC Docket NO. 9344

JA-0920

RESP023824

CX0380



CONFIDENTIAL-FTC Docket NO. 9344    JA-0922    RESP023826

CX0380

USCA Case #13-1060    Document #1483085    Filed: 03/12/2014    Page 354 of 387



CX0380

VMS ID: 090921830
RUN DATE: 09/27/2009

# HEALTHY. ~~WEALTHY.~~ AND WISE.
## ( 2 OUT OF 3 IN THIS ECONOMY AIN'T BAD. )



**The Antioxidant Superpill.**

### Antioxidants are a necessity. Not a luxury.

Emerging science suggests that antioxidants are critically important to maintaining good health because they protect you from free radicals, which can damage your body. Taking one POMx pill a day will help protect you from free radicals and keep you at your healthy best. Even when you're going through the worst.



The antioxidant power of our 8oz Juice.

### Recession-proof your health with POMx.

POMx is an all-natural, ultra-potent antioxidant extract. Containing a full spectrum of pomegranate polyphenols, POMx is so concentrated that a single capsule has the antioxidant power of a full glass of POM Wonderful® 100% Pomegranate Juice.

### $32 million in medical research. A sound investment.

POMx is made from the only pomegranates backed by $32 million in medical research at the world's leading universities.



Not only has this research documented the unique and superior antioxidant power of pomegranates, it has revealed promising results for prostate and cardiovascular health.

### Hope for the future. Yours.

Our POMx pills are made from the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice, on which each of the following medical studies was conducted.

An initial UCLA study on our juice found hopeful results for prostate health, reporting "statistically significant prolongation of PSA doubling times," according to Dr. Allen J. Pantuck in *Clinical Cancer Research*, '06.[1,2,3]

Two additional preliminary studies on our juice showed promising results for heart health. "Stress-induced ischemia (restricted blood flow to the heart) decreased in the pomegranate group," Dr. Dean Ornish reported in the *American Journal of Cardiology*, '05.[1,3,4]

"Pomegranate juice consumption resulted in significant reduction in IMT[6] (thickness of arterial plaque) by up to 30% after one year," said Dr. Michael Aviram in *Clinical Nutrition*, '04.[1,3,5,6]

### Try POMx Monthly FREE for ONE MONTH.
We'll even pay for the shipping.



### Order Now: 888-766-7455 or pompills.com/ph
#### Use discount code: PH30

"SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS OF $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires 12/31/09 and applies only to the purchase price for the first bottle of POMx Monthly. Following months will be $29.95 per bottle. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents. We reserve the right to discontinue this promotion, change product price or shipping charge at any time. Valid only at pompills.com/ph or 1-888-766-7455. Not valid on POMx Trial or other POM products.

**POM WONDERFUL®**

pompills.com/research ²These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. ³46 men with rising PSA after surgery or radiotherapy drank 8oz 100% pomegranate juice daily for two years. ⁴45 patients with coronary heart disease and myocardial ischemia drank 8oz 100% pomegranate juice daily for three months. ⁵Study measured intima-media thickness (IMT). ⁶19 patients aged 65-75 years with severe atherosclerosis drank 8oz 100% pomegranate juice daily for one year. ©2009 PomWonderful LLC. All rights reserved. POM Wonderful, POMx and Antioxidant Superpill are trademarks of PomWonderful LLC. PP1122

**VMS-0000299**

CX0331_0001



**Product:** POM X
**Media:** Print
**Ad Title:** Healthy. And wise.
**VMS Ad ID:** 090921830
**Date Range:**

| Run Date | Market | Rank | Media Vehicle | Media Type | Unit | Cost |
|---|---|---|---|---|---|---|
| 09/27/2009 | Albany/Schenectady/Troy | 58 | Albany Times-Union | Local Newspaper | 4 X 10 | $10,579 |
| 09/27/2009 | Albuquerque/Santa Fe | 46 | Albuquerque Journal | Local Newspaper | 4 X 10 | $4,680 |
| 10/08/2009 | Amarillo | 131 | Amarillo Globe-News | Local Newspaper | 5 X 10.5 | $2,613 |
| 09/27/2009 | Anchorage | 150 | Anchorage Daily News | Local Magazine | 4 X 10.5 | $4,367 |
| 09/27/2009 | Austin | 44 | Austin American-Statesman | Local Newspaper | 5 X 10.5 | $9,983 |
| 09/27/2009 | Baltimore | 26 | Baltimore Sun | Local Newspaper | 5 X 9.5 | $13,755 |
| 09/27/2009 | Beaumont/Port Arthur | 141 | Beaumont Enterprise | Local Newspaper | 5 X 9.5 | $1,705 |
| 09/27/2009 | Billings | 170 | Billings Gazette | Local Magazine | 4 X 10.5 | $2,772 |
| 09/27/2009 | Birmingham | 40 | Birmingham News | Local Newspaper | 4 X 9.5 | $6,025 |
| 09/27/2009 | Birmingham | 40 | Tuscalosa News | Local Newspaper | 4 X 10.5 | $2,067 |
| 09/27/2009 | Boise | 113 | Boise Idaho Statesman | Local Newspaper | 4 X 9.5 | $3,304 |
| 09/27/2009 | Boston | 7 | Boston Globe | Local Newspaper | 5 X 10 | $25,398 |
| 09/27/2009 | Boston | 7 | New Hampshire Union Leader Sunday | Local Newspaper | 4 X 9.5 | $1,708 |
| 10/28/2009 | Boston | 7 | Quincy Patriot Ledger | Local Newspaper | 4 X 10 | $2,204 |
| 09/27/2009 | Boston | 7 | Worcester Telegram & Gazette | Local Newspaper | 4 X 9.5 | $3,977 |
| 09/27/2009 | Bowling Green | 181 | Bowling Green Daily News | Local Newspaper | 5 X 9.5 | $946 |
| 09/27/2009 | Buffalo | 51 | Buffalo News | Local Newspaper | 4 X 10.5 | $10,368 |
| 09/27/2009 | Cedar Rapids/Waterloo/Dubuque | 88 | Cedar Rapids Gazette | Local Newspaper | 5 X 9.5 | $2,530 |

VMS-0000589
CX0331_0002

JA-0925

| Date | Market/Area | No. | Publication | Type | Size | Cost |
|---|---|---|---|---|---|---|
| 10/12/2009 | Cedar Rapids/Waterloo/Dubuque | 88 | Dubuque Telegraph-Heral | Local / Newspaper | 4 X 10 | $1,351 |
| 09/26/2009 | Champaign/Springfield/Decatur | 84 | Champaign News-Gazette | Local / Newspaper | 4 X 10.5 | $1,748 |
| 09/27/2009 | Champaign/Springfield/Decatur | 84 | Springfield State Journal-Registe | Local / Newspaper | 4 X 9.5 | $2,680 |
| 09/27/2009 | Charleston SC | 98 | Charleston Post-Courie | Local / Newspaper | 4 X 10 | $5,122 |
| 09/27/2009 | Charleston/Huntington | 64 | Charleston Gazette/Ma | Local / Newspaper | 4 X 10.5 | $3,437 |
| 09/27/2009 | Charlotte | 23 | Charlotte Observe | Local / Newspaper | 5 X 9.5 | $14,771 |
| 09/27/2009 | Chattanooga | 86 | Chattanooga Times Free Pres: | Local / Newspaper | 4 X 9.5 | $2,646 |
| 09/27/2009 | Cleveland | 18 | Akron Beacon Journa | Local / Newspaper | 4 X 10 | $4,380 |
| 09/27/2009 | Cleveland | 18 | Canton Repositon | Magazine | 4 X 10 | $2,478 |
| 09/27/2009 | Cleveland | 18 | Cleveland Plain Deale | Local / Newspaper | 4 X 10 | $16,101 |
| 10/09/2009 | Colorado Springs/Pueblo | 92 | Colorado Springs Gazett | Local / Newspaper | 4 X 10 | $3,919 |
| 09/27/2009 | Colorado Springs/Pueblo | 92 | Colorado Springs Gazett | Newspaper | 5 X 9.5 | $4,654 |
| 09/27/2009 | Columbus/Tupelo | 133 | Columbus Commercial Dispatch | Magazine | 4 X 10 | $525 |
| 09/27/2009 | Corpus Christi | 129 | Corpus Christi Caller-Times | Local / Newspaper | 5 X 9.5 | $3,594 |
| 09/27/2009 | Dallas/Ft. Worth | 5 | Dallas Morning News | Local / Newspaper | 5 X 10 | $29,204 |
| 09/27/2009 | Dallas/Ft. Worth | 5 | Fort Worth Star-Telegram | Local / Newspaper | 5 X 10.5 | $19,432 |
| 09/27/2009 | Denver | 17 | Denver Post | Local / Newspaper | 5 X 9.5 | $17,078 |
| 09/27/2009 | Eugene | 118 | Eugene Register-Guard | Magazine | 4 X 10.5 | $2,726 |
| 09/27/2009 | Fargo | 120 | Fargo-Moorhead Forun | Local / Newspaper | 4 X 9.5 | $1,813 |
| 09/27/2009 | Flint/Saginaw/Bay City | 69 | Bay City Times | Local / Newspaper | 4 X 10 | $1,253 |
| 09/27/2009 | Fort Myers/Naples | 65 | Naples Daily News | Local / Newspaper | 4 X 10 | $2,891 |
|  | Grand Rapids/Kalamazoo | 41 | Grand Rapids Press | Local / Newspaper | 5 X 10 | $4,170 |
| 09/27/2009 | Grand Rapids/Kalamazoo | 41 | Kalamazoo Gazett | Magazine | 4 X 10.5 | $1,578 |
| 09/27/2009 | Greensboro/HighPt/W Salem | 47 | Greensboro News & Recorc | Local / Newspaper | 5 X 9.5 | $5,310 |
| 09/27/2009 | Greensboro/HighPt/W Salem | 47 | Winston-Salem Journa | Local / Newspaper | 4 X 9.5 | $3,934 |
| 09/27/2009 | Harrisburg/Lancaster/York | 39 | Harrisburg Patriot-News | Local / Newspaper | 4 X 9.5 | $2,809 |

VMS-0000589
CX0331_0003

JA-0926

| Date | Market | No. | Publication | Type | Size | Cost |
|---|---|---|---|---|---|---|
| 09/27/2009 | Houston | 10 | Houston Chronicle | Local / Newspaper | 5 X 10.5 | $30,364 |
| 09/27/2009 | Huntsville/Decatur/ Florence | 79 | Florence Times Dail | Local / Newspaper | 4 X 10.5 | $2,083 |
| 09/27/2009 | Johnstown/Altoona | 102 | Johnstown Tribune-Democra | Magazine | 4 X 10.5 | $1,845 |
| 09/27/2009 | Joplin/Pittsburg | 148 | Joplin Globe | Magazine | 5 X 10 | $1,884 |
| 09/27/2009 | Kansas City | 31 | Kansas City Star | Local / Newspaper | 5 X 10 | $22,918 |
| 09/27/2009 | Knoxville | 59 | Knoxville News-Sentine | Local / Newspaper | 4 X 10 | $5,770 |
| 09/26/2009 | La Crosse/Eau Claire | 128 | La Crosse Tribune | Local / Newspaper | 4 X 9.5 | $1,285 |
| 09/27/2009 | Lexington | 63 | Lexington Herald-Leade | Local / Newspaper | 5 X 9.5 | $4,369 |
| 09/27/2009 | Lincoln/Hastings/Kearney | 106 | Lincoln Journal Sta | Local / Newspaper | 4 X 10 | $2,741 |
| 09/27/2009 | Little Rock | 56 | Arkansas Democrat-Gazett | Local / Newspaper | 5 X 9.5 | $9,498 |
| 09/27/2009 | Los Angeles | 2 | Los Angeles Times | Local / Newspaper | 5 X 9.5 | $40,345 |
| 09/27/2009 | Los Angeles | 2 | Orange County Registe | Local / Newspaper | 4 X 9.5 | $11,725 |
| 09/27/2009 | Los Angeles | 2 | Riverside Press Enterprise | Newspaper | 4 X 9.5 | $3,928 |
| 09/27/2009 | Macon | 121 | Macon Telegraph | Magazine / Local | 4 X 10.5 | $3,074 |
| 09/27/2009 | Madison | 85 | Madison Wisconsin State Journa | Local / Newspaper | 4 X 9.5 | $3,463 |
| 09/27/2009 | Memphis | 48 | Memphis Commercial Appea | Local / Newspaper | 4 X 9.5 | $12,854 |
| 09/27/2009 | Miami/Ft. Lauderdale | 16 | El Nuevo Herald | Local / Newspaper | 5 X 10 | $4,890 |
| 09/27/2009 | Miami/Ft. Lauderdale | 16 | Miami Heral | Local / Newspaper | 4 X 10 | $9,709 |
| 10/13/2009 | Milwaukee | 35 | Milwaukee Journal Sentine | Local / Newspaper | 4 X 9.5 | $10,688 |
| 09/27/2009 | Minneapolis/St. Pau | 15 | Minneapolis Star Tribun | Local / Newspaper | 5 X 9.5 | $13,695 |
| 09/27/2009 | Minneapolis/St. Pau | 15 | St. Paul Pioneer Press | Local / Newspaper | 4 X 10.5 | $8,707 |
| 10/11/2009 | New York | 1 | New York Daily News | Local / Newspaper | 4 X 10 | $29,854 |
| 09/27/2009 | Norfolk/Portsmouth /Newport News | 43 | Norfolk Virginian-Pilo | Local / Newspaper | 4 X 10 | $7,558 |
| 09/27/2009 | Oklahoma City | 45 | Oklahoma City The Oklahoma | Local / Newspaper | 5 X 10 | $16,814 |
| 09/27/2009 | Omaha | 76 | Omaha World Heral | Local / Newspaper | 4 X 9.5 | $5,687 |
| 09/27/2009 | Orlando/Daytona Beach | 19 | Orlando Sentine | Local / Newspaper | 4 X 10 | $11,231 |
| 09/27/2009 | Panama City | 156 | Panama City News-Heral | Newspaper / Magazine | 4 X 9.5 | $1,647 |
| 09/27/2009 | Peoria/Bloomington | 116 | Bloomington Pantagrap | Magazine | 4 X 10.5 | $2,565 |

VMS-0000589
CX0331_0004

JA-0927

| Date | Market | No. | Publication | Type | Size | Cost |
|---|---|---|---|---|---|---|
| 09/27/2009 | Peoria/Bloomington | 116 | Peoria Journal-Star | Magazine Local | 4 X 9.5 | $2,720 |
| 09/27/2009 | Philadelphia | 4 | Philadelphia Inquirer | Newspaper Local | 4 X 10.5 | $25,120 |
| 09/26/2009 | Pittsburgh | 24 | Oil City Derrick | Newspaper Local | 4 X 10.5 | $1,107 |
| 09/27/2009 | Pittsburgh | 24 | Pittsburgh Post Gazette | Newspaper Local | 4 X 10.5 | $11,449 |
| 09/27/2009 | Portland OR | 22 | Portland Oregonian | Newspaper Local | 4 X 10 | $9,747 |
| 09/27/2009 | Portland/Auburn | 77 | Portland Maine Sunday Telegram | Newspaper Local | 4 X 10 | $4,045 |
| 09/27/2009 | Raleigh/Durham | 25 | Raleigh News & Observer | Newspaper Local | 5 X 10 | $9,883 |
| 09/27/2009 | Richmond/Petersburg | 57 | Richmond Times-Dispatch | Newspaper Local | 4 X 10.5 | $7,341 |
| 09/27/2009 | Roanoke/Lynchburg | 66 | Roanoke Times | Newspaper Local | 5 X 9.5 | $2,503 |
| 09/27/2009 | Sacramento/Stockton/Modesto | 20 | Sacramento Bee | Newspaper Local | 5 X 9.5 | $13,482 |
| 09/27/2009 | Salt Lake City | 32 | Salt Lake Tribune | Newspaper Local | 4 X 9 | $6,282 |
| 09/27/2009 | San Antonio | 37 | San Antonio Express News | Newspaper Local | 5 X 9.5 | $13,674 |
| 09/27/2009 | San Francisco/Oakland | 6 | San Francisco Chronicle | Local Newspaper Local | 5 X 9.5 | $24,737 |
| 09/27/2009 | Seattle/Tacoma | 13 | Tacoma News Tribune | Newspaper Local | 4 X 9.5 | $5,603 |
| 09/27/2009 | Sioux City | 149 | Sioux City Journal | Magazine Local | 5 X 9.5 | $2,325 |
| 09/27/2009 | Springfield/Holyoke MA | 110 | Springfield Republican | Newspaper Local | 4 X 9.5 | $2,646 |
| 09/27/2009 | St. Louis | 21 | St. Louis Post Dispatch | Newspaper Local | 5 X 10 | $25,651 |
| 09/27/2009 | Syracuse | 82 | Syracuse Post-Standard | Newspaper Local | 4 X 10 | $6,279 |
| 09/27/2009 | Tampa/St. Petersburg | 14 | Tampa Tribune | Newspaper Local | 4 X 9.5 | $13,741 |
| 09/27/2009 | Toledo | 70 | Toledo Blade | Newspaper Local | 3.333333 X 10 | $3,996 |
| 10/10/2009 | Topeka | 136 | Topeka Capital-Journal | Newspaper Local | 4 X 10 | $2,870 |
| 09/27/2009 | Tulsa | 61 | Tulsa World | Newspaper Local | 5 X 9.5 | $4,614 |
| 09/27/2009 | Waco/Temple/Bryan | 89 | Waco Tribune-Herald | Newspaper Local | 5 X 10.5 | $4,104 |
| 09/27/2009 | Washington DC | 9 | Washington Post | Newspaper Local | 4 X 10 | $29,287 |
| 10/05/2009 | Wichita/Hutchinson | 68 | Hutchinson News | Newspaper Local | 3.333333 X 10 | $850 |
| 09/27/2009 | Yakima | 126 | Yakima Herald-Republic | Magazine Local | 4 X 9.5 | $1,300 |
| 09/27/2009 | Youngstown | 111 | Youngstown Vindicator | Newspaper Local | 4 X 10 | $2,618 |

VMS-0000589
CX0331_0005

JA-0928

$787,750

Total 99 Occurrence(s)

VMS-0000589
CX0331_0006

**JA-0929**

 **Federal Trade Commission**

---

**Council for Responsible Nutrition**
**Annual Symposium for the Dietary Supplement Industry**
**Rancho Palos Verdes, CA**

**Priorities for Dietary Supplement Advertising Enforcement**

**Remarks by David C. Vladeck,[1] Director FTC Bureau of Consumer Protection**

**October 22, 2009**

## I.  Introduction

I appreciate the opportunity to be here today to discuss my priorities for advertising enforcement in the dietary supplement area.  I want to thank the Council for Responsible Nutrition for inviting me to speak.

We live in a time where medical advances and research breakthroughs are reported in the news on a daily basis, and science appears to be on the brink of providing us with a solution to every problem.  Meanwhile, consumers are becoming more health conscious and they are pro-actively seeking out both information and products to address their health concerns and improve the quality of life for themselves and their families.  The FTC wants consumers to have truthful information so they can make well-informed decisions for themselves, but we also want to

---

[1]  The views expressed here are my own and do not necessarily represent the views of the Federal Trade Commission or any Commissioner.

1

ensure that advertisers don't make promises that aren't backed by solid science.

As science advances, so does the nature of advertising substantiation. Advertising substantiation itself has become an industry, with experts, labs, and consultants for hire – some legitimate, some less so – offering substantiation services to advertisers.  For the FTC, having to keep up with current research and cutting-edge science can make analysis of substantiation a more complex task, sometimes requiring the assistance of multiple experts.

Nonetheless, while science evolves, one thing stays the same.  There have always been – and there will always be – marketers who advertise pills that claim to be able to provide us with health, beauty, longevity, and a cure for whatever ails us.  Investigations of unsubstantiated efficacy claims for health products and dietary supplements will continue to be an active area for enforcement.

Today, I want to highlight a few areas of our enforcement agenda for dietary supplements: products posing safety concerns, actions involving retailers, suppliers and manufacturers, and our collaborative enforcement efforts with the FDA.  I also want to talk about our recently revised endorsement guides, and an effort to clarify the substantiation requirement in our orders.

## II.    Products posing safety concerns

The FTC makes it a priority to investigate products that pose serious health concerns for consumers, either because they promise a cure for a serious disease that requires medical treatment, or because the product itself may present undisclosed risks to some consumers.

Some marketers of dietary supplements make disease treatment and prevention claims that far exceed the bounds of the structure/function claims that are permitted under the 1994 Dietary Supplement Health and Education Act (DSHEA).  Such disease claims may deter

2

consumers from seeking necessary medical treatment for serious conditions such as cancer, diabetes, and HIV.

In a major law enforcement initiative targeting bogus cancer cures, the FTC announced 11 actions last year charging a number of companies and individuals with making false or unsubstantiated claims that their products – including laetrile, black salve, essiac tea and other herbal mixtures, coral calcium, and shark cartilage – cure or treat cancer, and, in some cases, that clinical or scientific evidence proves the products work.[2] One seller also was charged with deceptive use of a consumer testimonial about the product's efficacy because the ad failed to disclose the connection between the endorser and the company: the "consumer" endorser was, in fact, the owner of the company.[3]   Most of these actions have been resolved through settlements that bar future false or unsubstantiated claims and require notification to purchasers that little or no scientific evidence exists to demonstrate product effectiveness and urging them to consult with their doctors.  Four of the settlements also required a monetary payment.  As of this date, one case remains, which is currently pending on appeal to Commission after the ALJ found that the respondents cancer-related claims violated the FTC Act.  The cancer cure cases were the result of an Internet surf coordinated among the FTC, the U.S. Food and Drug Administration (FDA), and the Canadian Competition Bureau.  The FTC and the FDA also issued a significant number of warning letters in connection with the surf.

As an important adjunct to the cancer sweep law enforcement initiative, the Commission launched *Cure-ious? Ask*, a consumer education campaign to raise awareness about bogus cancer

---

[2] *See* Press release, FTC Sweep Stops Peddlers of Bogus Cancer Cures (Sept. 18, 2008), available at http://www2.ftc.gov/opa/2008/09/boguscures.shtm.

[3] *Holly A. Bacon d/b/a Cleansing Time Pro.*, Docket No. C-4238 (Oct. 22, 2008).

3

treatment claims and to encourage consumers to discuss treatment options with their doctors. The Commission's partners in this effort were the American Society of Clinical Oncology, the Cleveland Clinic, and the National Association of Free Clinics, all of whom are disseminating campaign information to both patients and medical care practitioners.

Earlier this year the Commission accepted a settlement that included $3 million in consumer redress to resolve charges of false and deceptive claims that various nutritional supplements could treat, reduce the risk of, or prevent diseases including cancer, HIV/AIDS, diabetes, Alzheimer's disease, Parkinson's disease, strokes and heart attacks, multiple sclerosis, herpes, asthma and glaucoma.[4]  The defendants also falsely claimed that one of their products was scientifically proven to be an effective treatment for AIDS.  The products were sold on the Internet and through print media, but the primary marketing vehicle was a nationally broadcast, live, hour-long radio call-in program called "The Truth About Nutrition."

Consumers suffering from serious health ailments are particularly vulnerable and sometimes desperate.  The marketing of unfounded treatments to such people offers a type of false hope that is particularly cruel.  When a seriously ill patient forgoes medically established treatment for an unproven remedy, the damage can be irreparable.  Supplements that purport to provide cures or treatments for serious diseases will continue to be a top priority for our enforcement efforts.

The FTC is also concerned about the risks posed by dietary supplements that are intentionally spiked with prescription medications, controlled substances, or other undisclosed

---

[4] *See* Press release, Marketers of Dietary Supplements and Devices Agree to Pay $3 Million to Settle FTC Charges of Deceptive Advertising (Mar. 6, 2009), available at http://www.ftc.gov/opa/2009/03/roex.shtm.

ingredients that may be potentially dangerous to some or all users.  Despite consumers' growing

concerns over the source and purity of supplements and the FDA's establishment of good

manufacturing practices (GMP) for dietary supplements, there are still some manufacturers who

spike supplements with pharmaceutical ingredients or their chemical analogues.  Such

adulteration can occur in any type of product but has most commonly been reported in weight

loss, athletic performance, and sexual enhancement products.

The danger to consumers is potentially grave.  The failure to disclose the presence of

such intentionally added ingredients is both deceptive and dangerous.  We are currently in

discussions with FDA on how the agencies can work together to pursue unscrupulous marketers

who sell such products.

### III.     Cases involving retailers, manufacturers, and ingredient suppliers

We aim to stop deceptive health claims at their source, which is usually the advertiser.

But this is not always the case.   Sometimes, unsubstantiated claims originate with a retailer,

manufacturer, or ingredient supplier.  When this occurs, we want to pursue cases against the

responsible parties, no matter where they fall in the manufacturing and distribution chain.

Last year, the Commission settled charges that Airborne Health, Inc. disseminated false

and unsubstantiated claims that Airborne effervescent tablets prevent or treat colds, protect

against exposure to germs in crowded environments, and offer a clinically proven cold remedy.[5]

The nation-wide Airborne advertising campaign – and you may recall those ads where the

original owner of the company claimed she developed the product because she was sick of

---

[5]  *See* Press release, Makers of Airborne Settle FTC Charges of Deceptive Advertising;
Agreement Brings Total Settlement Funds to $30 Million (Aug. 14, 2008), available at
www.ftc.gov/opa/2008/08/airborne.shtm.

catching colds from the second-graders she taught – was so successful that national retail chains replicated the supplement, used similar package claims, and placed the product next to Airborne on the shelf.  This year, the Commission brought cases against Rite Aid[6] and CVS,[7] with both retailers agreeing to pay consumer redress to settle charges that they made unsubstantiated claims for their Airborne knock-off products.

In a related matter, the Commission also has an action pending against Improvita Health Products, Inc., the contract manufacturer that supplied several retailers with their Airborne knock-off products.[8]  The complaint alleges that Improvita provided retailers such as Rite Aid with advertising, packaging, and promotional materials containing unsubstantiated claims.

These cases should send a clear message that the Commission will hold retailers and contract manufacturers accountable for the claims they make – especially the health benefit claims – about their store-brand products.  Capitalizing upon another company's successful marketing campaign does not absolve a seller or competing manufacturer from the responsibility to gather its own research and ensure that all of its claims – whether express or implied – are fully substantiated.

This year the Commission also filed a case against an ingredient supplier who sold what was purported to be Hoodia – a substance derived from a rare South African plant that appears to

---

[6]  *See* Press release, Rite Aid to Pay $500,000 in Consumer Refunds to Settle FTC Charges of False and Deceptive Advertising (July 13, 2009), available at http://www.ftc.gov/opa/2009/07/riteaide.shtm.

[7]  *See* Press release, CVS to Pay Nearly $2.8 Million in Consumer Refunds to Settle FTC Charges of Unsubstantiated Advertising of AirShield 'Immune Boosting' Supplement (Sept. 8, 2009), available at http://www.ftc.gov/opa/2009/09/cvs.shtm.

[8] *See* Press release, Rite Aid to Pay $500,000 in Consumer Refunds to Settle FTC Charges of False and Deceptive Advertising, *supra* note 6.

be the hot weight-less ingredient of the moment – to trade customers for use in finished diet pills.[9]  The complaint alleges false and deceptive claims that were made to trade customers, including that hoodia is scientifically proven to reduce caloric intake by 1,000 to 2,000 calories a day, and representations that the product in question was genuine Hoodia gordonii, when in fact, it was not.  Importantly, the complaint alleges that by providing their trade customers with advertising and promotional materials containing false and deceptive claims, the defendants provided the trade customers with the means to deceive consumers.

We want ingredient suppliers to be aware that they are responsible for false and unsubstantiated claims they make to trade customers, not only because they may be deceiving their trade customers, but also because these problematic claims may be passed further on down the line to consumers.  We will continue to pursue cases against the parties responsible for making unsubstantiated claims, from wherever they originate.

## IV.    Collaborative efforts with the FDA

We have renewed efforts to work closely with the Food and Drug Administration by establishing three working groups to share information regarding conventional foods, dietary supplements, and over-the-counter drugs.  Staff from the FTC, FDA, and the Office of Consumer Litigation of the Justice Department are conducting regular telephone conferences to increase coordination with respect to strategic planning and case selection.  These areas of overlapping jurisdiction include some of the most important FTC advertising program areas.  I believe the increased cooperation will enhance the enforcement efforts of both agencies.

---

[9] *See* Press release, FTC charges marketers of 'Hoodia' Weight Loss Supplements with Deceptive Advertising (Apr. 27, 2009), available at http://www2.ftc.gov/opa/2009/04/nutraceuticals.shtm.

7

We are actively seeking out opportunities where it would be appropriate and effective for the FTC and FDA to undertake joint enforcement efforts.  Earlier, I mentioned the cancer cures sweep which involved participation from both the FTC and FDA, as well as the anticipated collaboration between the agencies to address the problem of dietary supplements contaminated with prescription drugs and other potentially dangerous pharmaceuticals.  In addition, last week the FTC and FDA issued a joint warning letter to a website selling a dietary supplement purporting to protect against cold and flu.  We intend to follow-up with additional joint warning letters to other web sites selling products purporting to prevent or treat H1N1 flu virus.  These sites were identified earlier in an Internet surf conducted by FTC staff.  Unfortunately, whenever a new health concern is in the news headlines – whether it's bird flu, SARS, or swine flu – some marketers rush in to exploit the situation and offer all sorts of cure-all products.  We will continue to work with FDA to address these scams.

### V.    The endorsement guides

I know there has been a lot of press coverage on the revisions to the Commission's Endorsement Guides.  The Commission announced several proposed revisions to the Guides in November 2008 and invited public comments on the proposals.  The Commission gave careful consideration to all of the comments received during the comment period and announced earlier this month that it had approved final revisions to the Guides.

The Guides define endorsements and testimonials and provide guidelines for consumer and expert endorsements and for the disclosure of material connections.[10]  The Commission adopted the Guides in 1980, in an effort to assist advertisers in using this advertising technique

---

[10] Guides Concerning the Use of Endorsements and Testimonials in Advertising, 16 C.F.R. Part 255.

in a lawful and non-misleading way.  The basic principles underlying the Guides are unchanged. Endorsements should not contain express or implied representations that would be deceptive, or could not be substantiated, if made directly by the advertiser.  Endorsements themselves are not competent and reliable scientific evidence.  Experts must have the qualifications they are purported to have, and material connections between endorsers and sellers should be disclosed if they might affect the weight or credibility of the endorsement.

Obviously, the Guides were formulated in a world quite different from the one in which advertisers and marketers promote their goods and services today.  This is the first time that the Guides have been revised since their adoption almost 30 years ago.  While the basic principles that underlie the Guides remain valid, the specific applications and examples were not developed within a context of program-length infomercials, Internet advertising, word of-mouth or viral marketing, and consumer blogs.  In 1980, the advertiser always disseminated the advertisement. With the advent of advertiser-promoted consumer blogging, the advertiser is not always disseminating the endorsement, although it certainly expects to profit from the message.

Moreover, the Commission's enforcement history with false or deceptive advertising using consumer endorsements, as well as its own research on consumer perception of such ads, has made it increasingly clear that in one key aspect – disclaimers of typicality – the Guides were not working as intended to prevent deception.  Such disclaimers simply are not effective. Consumers interpret the results depicted in testimonials to be representative of what consumers can expect to achieve, even where testimonials are accompanied by the statement, "Results not typical."  The Commission's consumer research found that even where testimonials were accompanied by the strong statement: "These testimonials are based on the experiences of a few people and you are not likely to have similar results," consumers still believed that the results in

9

the testimonial were representative of what would generally be achieved.

The misuse of testimonials and endorsements has been particularly prevalent in the promotion of weight-loss products, as described in the FTC staff's 2002 report, *Weight-Loss Advertising: An Analysis of Current Trends*.[11]  A review of 300 weight-loss ads revealed that two-thirds used consumer testimonials, and those testimonials rarely described realistic achievements, instead proclaiming extraordinary weight loss results that, in all likelihood, are not achievable.  Disclosures regarding atypicality of the advertised results – when they appeared – often were buried in a fine-print footnote or a video superscript flashed too quickly to be read. The typical disclaimers – such as, "results may not be typical" or "results may vary" – did not adequately inform consumers that the reported weight losses were, at best, outliers or extreme cases.  Endorsements and testimonials too often convey results that most consumers can never achieve and, in doing so, they make claims that cannot be substantiated.

Clearly, it was time for a change.  The Commission has removed the so-called "safe harbor" for disclaimers of typicality from the guidelines.  It is no longer a shield from liability to simply use the "Results not typical" language with testimonials.  The revised Guides do not bar the use of atypical or best-case testimonials.  But where the net impression from an ad is that the experiences of the testimonialists in ad are representative of what consumers can generally expect to achieve, that is, that they are "typical" results, the advertiser should clearly and conspicuously disclose the generally expected result in the depicted circumstances.  The Commission's consumer research has found that this is the most effective way to counter the otherwise common consumer perception that testimonials portray typical results.  We expect that

---

[11]  The Report is available at http://www.ftc.gov/bcp/reports/weightloss.pdf.

advertisers who have competent and reliable scientific evidence to support a health claim also

have reliable information as to what results consumers can generally expect with their products.

While this change in the Guides has garnered quite a bit of attention, the most

fundamental principle underlying FTC advertising law remains the same.  Advertisers who use

testimonials are held to the exact same standard as those who do not.  All advertisers are

responsible for ensuring that their ads are truthful and not misleading.

We understand that it will require some adjustment for the industry to adopt the new

guidelines regarding the use of testimonials.  While we will allow a reasonable period of time for

people to come into compliance, we want you to know that this change to the Guides is

important and we intend to aggressively enforce the revised requirements for testimonials.

**VI.    Clarifying the substantiation standard in FTC orders**

Our experience in bringing enforcement and contempt actions in federal courts suggests

that we need to take steps to make our standard injunctive language that prohibits particular

kinds of claims unless the defendant "possesses and relies upon competent and reliable scientific

evidence that substantiates the representation" more exact.  For instance, you may be aware of

the recent decision in the *Lane Labs* case, where a district court judge denied the FTC's motion

to find the defendants in contempt of a prior FTC order requiring them to have "competent and

reliable scientific evidence" substantiating health claims.  The Commission is disappointed with

this result and intends to appeal.

We will be looking for more precise injunctive language in future orders that will provide

clearer guidance to defendants and courts alike as to the amount and type of scientific evidence

that will be required in future advertising.  In addition to achieving greater precision, we will

also seek orders that harmonize with laws and regulations administered by the FDA.  A third

11

goal will be to address those situations where a given piece of research, though it may have been conducted according to established protocols, achieved results inconsistent with the weight of scientific evidence in the relevant field.  One outlier study should not be the sole basis of support for a claim that a product will confer a benefit – particularly a health benefit.  We need to ensure that our orders are enforceable and do not permit deceptive claims, and I am seeking changes to make that happen.

## VII.  Conclusions

Before I close, I would like to acknowledge the constructive role that CRN has played in this industry.  In particular, CRN's self-regulatory program, which I'm told by my staff that the FTC had a role in fostering, provides an important resource for resolving  problematic advertising claims for dietary supplements without the necessity of expending scarce law enforcement resources.  We were please to hear that CRN has extended its agreement with NAD to continue this program to 2014.

Consumer protection in the 21st century is a daunting task – confronting challenges that were not imagined even ten years ago.  In addition to battling long-standing deceptive practices, the FTC has adapted with the times, and we continue to do so.  I look forward to working with you as our regulatory and enforcement programs evolve to meet the challenges.

12

10/22/09

# The FTC's Advertising Priorities

**Mary K. Engle**
**Associate Director for Advertising Practices**
**U.S. Federal Trade Commission**

**Arnold & Porter Roundtable Breakfast Series**
**McLean, VA**
**October 22, 2009**

1

# Current Priorities

➢ **National advertising**
  ▪ **Health claims**
  ▪ **Functional foods**
➢ **Updating order substantiation requirements in health-related cases**
➢ **Green marketing**
➢ **Endorsements and testimonials**

2

## National Advertising, Especially Advertising Making Health Claims

➤ **Health claims are becoming more prevalent in food advertising – so we are giving increased scrutiny to food advertising**

3



4

## Health Claims Cases

- **Kellogg** (Mini Wheats) (consent order 2009)
  - Advertisers must be careful when transforming research findings into advertising claims
- **Airborne** (consent judgment 2008)
  - Implied claims, including claims made through visual depictions, can be misleading
- **Rite Aid and CVS** (consent judgments 2009)
  - Retailers are liable for the claims they make – especially the health benefit claims – about their store-brand products

5

## Kellogg's Frosted Mini-Wheats



6

3



## Frosted Mini-Wheats

- ➤ Kelloggs' ads claimed that the cereal was "clinically shown to improve kids' attentiveness by nearly 20%"
- ➤ Only half of the kids in the study showed any improvement in attentiveness; only 1 in 7 improved by 18% or more and only 1 in 9 im̦ roved b̦ 20% or more
- ➤ Kids who ate Frosted Mini-Wheats were compared against kids who only had water







- ➤ **Earlier ads made express cold prevention claims**
- ➤ **Later ads made the same claims through implication**
- ➤ **Order included up to $30 million in refund program, including private class action settlement**

*FTC v. Airborne Health, Inc. et al. (Stipulated Final Order 2008)*

11

---

## Dissenting Statement

- ➤ **Commissioner Rosch issued a dissenting statement in the Airborne case**
- ➤ **Did not support permitting the run-out of product labeling for several months**
- ➤ **Believed that the Complaint and Order should have addressed assertions of the product's "immune-boosting" qualities**
- ➤ **Believed that corrective advertising was necessary to remove lingering misperceptions about the product**

12

## Improvita, Rite Aid, CVS

➢ **FTC sued Improvita, manufacturer of Airborne knock-off product sold by Rite Aid and other retailers**

➢ **FTC settled with Rite Aid (Germ Defense) ($500,000 in consumer redress) and CVS (AirShield) ($2.8 million in consumer redress)**

➢ **Complaints included allegations as to immunity-boosting claims; no run-out provisions in orders**

13

## Functional Foods

➢ **Health benefit claims for foods – "functional foods"**

➢ **Claims such as boost the immune system, assist with memory and brain function, boost metabolism, protect the heart, etc.**

➢ **Claims must be supported by strong science**

➢ **Ads should not overstate what the research shows**

➢ **We have concerns with disease prevention or treatment claims not approved by FDA**

14

## Order Provisions: Substantiation of Health-Related Claims

➢ **Standard FTC injunctive provision prohibits particular kinds of claims unless the defendant:**

  ▪ **"possesses and relies upon competent and reliable scientific evidence that substantiates the representation"**

➢ **This language is not sufficiently precise; we will be crafting new injunctive language in future orders**

15

## Order Provisions: Substantiation for Health-Related Claims

➢ **New provision will achieve several goals:**

  ▪ **Easier to enforce**
  ▪ **Better harmonize with laws and regulations administered by sister agencies (e.g., FDA)**
  ▪ **Address situations where a single piece of research, although conducted according to established protocols, achieved results inconsistent with the weight of scientific evidence in the relevant field**

16

## "Green" Marketing

➢ **FTC recently conducted consumer researc... to help determine how to update the Guides for the Use of Environmental Marketing Claims a/k/a Green Guides**

➢ **Last year, FTC held a series of workshops on developing issues: carbon offsets and Renewable Energy Certificates; green building and textile issues; green packaging issues**

➢ **Expect to issue revised Green Guides for comment in 2010**

17

## "Green" Marketing Cases

➢ **Clothing/sheet sellers (Jonani, MadMod, Pure Bamboo, Bamboosa) deceptively labeled and advertised products as made of natural bamboo fiber, when they were made of man-made rayon (from bamboo)**

➢ **Cases also included Textile Fiber Act rule counts**

➢ **Cases challenged claims the products were manufactured using an "environmentally friendly" process, and were biodegradable**

18



## "Green" Marketing Cases

➤ Law enforcement actions alleging false and unsubstantiated biodegradability claims: Kmart, Tender Corp., and Dyna-E Corp.

➤ Same issue as cases from early 1990s: modern sanitary landfills are designed to prevent biodegradation, so even paper products won't biodegrade there

20

## Guides for Use of Endorsements & Testimonials in Advertising

➢ **On October 5, FTC announced revisions to its 30-year-old Endorsement Guides**

➢ **Principal changes:**
  ▪ **Requiring disclosure when advertiser paid for study touted in ad**
  ▪ **Deletion of "results not typical" safe harbor**
  ▪ **Addition of examples of disclosing material connections in social media marketing**

21

## Sponsorship of Studies

➢ **Old Guides:  no need to disclose when advertiser paid for study cited in ad (on theory that substantiation requirements would be sufficient to prevent deception)**

➢ **Revised Guides:  knowing advertiser paid for study may affect weight consumers give to study results, so study sponsorship should be disclosed**

22

JA-0952

11



**Consumer Endorsements: Typicality**

> An advertisement em_lo_in_ an endorsement reflecting the experience of an individual or a group of consumers on a central or key attribute of the product or service will be interpreted as representing that the endorser's experience is representative of what consumers will generally achieve with the advertised product in actual, albeit variable, conditions of use.

24

## Consumer Endorsements:
## Results Not Typical

- Therefore, unless the advertiser possesses and relies upon adequate substantiation for this representation, the advertisement should either [A] clearly and conspicuously disclose what the generally expected performance would be in the depicted circumstances or [B] clearly and conspicuously disclose the limited applicability of the endorser's experience to what consumers may generally expect to achieve.
- Revised Guides eliminate option B
- Net impression controls

25



26

## Disclosure of Material Connections

➢ **Endorsement Guides require disclosure of "material connection" between a seller and an endorser**

➢ **A material connection is one that might affect the weight or credibility of the endorsement, i.e., isn't reasonably expected by the audience**

➢ **Examples of such connections include:**
  ▪ **Seller is compensating endorser**
  ▪ **Endorser is employee or business associate of seller**
  ▪ **Endorser is related to seller**

27

## When Does a Consumer Become an Endorser?

➢ **Answer:  When – viewed ob̦ectivel̦  – the consumer is being sponsored by the marketer**

➢ **Consider:  Is speaker acting solely independently (in which case there's no endorsement); or is speaker acting on behalf of advertiser/agent such that speaker's statement is an "endorsement" that's part of an overall marketing campaign?**

28

JA-0955

14

## When Does a Consumer Become an Endorser?

➢ **Some factors to consider:**

- ▪ **Did advertiser compensate speaker?**
- ▪ **Did advertiser provide product for free?**
- ▪ **What are terms of any agreement b/t advertiser/speaker?**
- ▪ **What is length of relationship b/t advertiser/speaker?**
- ▪ **Did speaker previously receive free products?**
- ▪ **What is value of free products received?**

29

## For More Information

➢ **www.ftc.gov**

➢ **mengle@ftc.gov**

➢ **Thank you!**

30

JA-0956

15