ORAL ARGUMENT NOT YET SCHEDULED

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

### Case No. 13-1060

POM WONDERFUL, LLC, ET AL

*Petitioner,*

v.

FEDERAL TRADE COMMISSION,

*Respondent.*

ON APPEAL FROM THE FEDERAL TRADE COMMISSION
CASE NO. 9344

## JOINT APPENDIX
## VOLUME III of III

Thomas C. Goldstein
Eric Citron
GOLDSTEIN & RUSSELL, P.C.
5225 Wisconsin Ave. N.W.
Suite 404
Washington, D.C. 20015
Telephone: (202) 362-0636
Facsimile: (866) 574-2033
tg@goldsteinrussell.com

Kristina Diaz
Johnny Traboulsi
Brooke Hammond
ROLL LAW GROUP P.C.
11444 West Olympic Blvd
10th Floor
Los Angeles, CA 90064
Telephone: (310) 966-8400

Erik S. Jaffe
ERIK S. JAFFE, P.C.
5104 34th Street, NW
Washington, DC 20008
(202) 237-8165
jaffe@esjpc.com

*Counsel for Petitioner*

Bertram Fields
GREENBERG, GLUSKER
FIELDS CLAMAN &
MACHTINGER LLP
1900 Avenue of the Stars
21st Floor
Los Angeles, CA 90067

John Graubert
Megan L. Rodgers
COVINGTON & BURLING LLP
1201 Pennsylvania Ave., NW
Washington, DC 20004
(202) 662-5938

Jonathan E. Nuechterlein
Joel Marcus
Jessica Rich
Imad D. Abyad
FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., N.W.
Washington, DC 20580
(202) 326-2375

*Counsel for Respondent*

March 12, 2014

# JOINT APPENDIX TABLE OF CONTENTS

**Document Description**                                                     **Page**

## Volume I
## JA-0001 - 577

Case Timeline, POM Wonderful LLC and Roll Global LLC,
FTC Docket No. 9344 ................................................................ JA-0001

Administrative Complaint with Exhibits
(FTC Sept. 24, 2010)..................................................... JA-0015

Order of Chief Administrative Law Judge D. Michael Chappell
(FTC May 17, 2012)...................................................... JA-0065

Initial Decision by Chief Administrative Law Judge D. Michael
Chappell (FTC May 17, 2012) ....................................... JA-0070

Appendix to Initial Decision by Chief Administrative Law Judge D.
Michael Chappell (FTC May 17, 2012) ......................... JA-0415

Answering Brief of Respondents (FTC Jul. 18, 2012) ................. JA-0524

**Document Description (cont.)**                              **Page**

<div align="center">

**Volume II**
**JA-0578 – 956**

</div>

Final Order of Commission (FTC Jan. 10, 2013).......................... JA-0578

Opinion of the Commission (FTC Jan. 10, 2013).......................... JA-0584

Claims Appendix A to Opinion of Commission
(FTC Jan. 10, 2013) ....................................................................... JA-0638

Figures Appendix B to Opinion of Commission
(FTC Jan. 10, 2013) ....................................................................... JA-0652

Summary Table of Commission Findings
Regarding POM Exhibits (FTC Jan. 10, 2013)............................. JA-0765

Concurring Statement of Commissioner Ohlhausen
(FTC Jan. 10, 2013) ....................................................................... JA-0768

Concurring Statement of Commissioner Rosch
(FTC Jan. 10, 2013) ....................................................................... JA-0775

Letter from Donald S. Clark to Jonathan W. Emord, Denying Petition
for Rulemaking (Nov. 30, 2000) ................................................... JA-0778

Fed. Trade Comm'n Bureau of Consumer Protection, Dietary
Supplements: An Advertising Guide for Industry (2001) ........... JA-0791

Exhibit CX0016 POM Wonderful Advertisement "Drink and be healthy"
(Oct. 12, 2003) ............................................................................... JA-0823

Exhibit CX0029 POM Wonderful Advertisement "Studies Show that 10
out of 10 People Don't Want to Die"
(Nov. 11, 2004).............................................................................. JA-0825

## Document Description (cont.)                                    Page

Exhibit CX0034 POM Wonderful Advertisement "Amaze your
cardiologist." (Feb. 1, 2005) ........................................................... JA-0828

Exhibit CX0036 POM Wonderful Advertisement "Cheat death."
(Mar. 10, 2005) ............................................................................ JA-0830

Office of Dietary Supplements, National Institutes of Health, Dietary
Supplement Fact Sheet: Vitamin C (Jun. 6, 2005) ....................... JA-0832

Office of Dietary Supplements, National Institutes of Health, Dietary
Supplement Fact Sheet: Vitamin E (Jun. 6, 2005) ....................... JA-0845

Exhibit PX0178, Eastham, James A., *Prostate-Specific Antigen
Doubling Time as a Prognostic Marker in Prostate Cancer*, Natural
Clinical Practice, Vol 2 No. 10 (Oct. 2005) .................................. JA-0856

Exhibit CX0065 POM Wonderful, POMx Press Release
(Jun. 10, 2006) ............................................................................. JA-0866

Exhibit CX0122 POM Wonderful Advertisement "Science, not fiction."
(May 1, 2007) ............................................................................... JA-0870

Exhibit CX0120 POM Wonderful Advertisement "One small pill for
mankind." (May 28, 2007) ............................................................ JA-0872

Exhibit CX0128 Email from P. Holmgren to POM Wonderful Re: Press
Release with Attachment (Jun. 27, 2007) .................................... JA-0874

Exhibit CX0169 POM Wonderful Advertisement "The power of POM, in
one little pill." (Jan. 6, 2008) ...................................................... JA-0878

Exhibit CX0180 POM Wonderful Advertisement "The antioxidant
superpill." (Feb. 3, 2008) ............................................................. JA-0880

Exhibit CX0260 POM Wonderful Advertisement "Drink to prostate
health." (Dec. 1, 2008) ................................................................. JA-0882

**Document Description (cont.)**                                    **Page**

Exhibit PX0014, Davidson, Michael H. et al, *Effects of Consumption of Pomegranate Juice on Carotid Intima-Media Thickness in Men and Women at Moderate Risk for Coronary Heart Disease*, Amer. Journal of Cardiology (2009) ........................................................................ JA-0884

Exhibit CX0274 POM Wonderful Advertisement "I'm off to save PROSTATES!" (Feb. 1, 2009)......................................................... JA-0891

Exhibit CX0279 POM Wonderful Advertisement "Science, not fiction." (Mar. 1, 2009) ................................................................ JA-0893

Exhibit CX0280 POM Wonderful Advertisement "Live Long Enough to Watch Your 401(k) Recover." (Mar. 21, 2009) .............................. JA-0895

Exhibit CX0314 Email from A. Hernandez to C. Nelson Re: Need some images, with attachment (Jun. 2, 2009) ...................................... JA-0899

Exhibit CX0379 POM Wonderful Advertisement "Lucky I Have Super Health Powers!" (Jul. 21, 2009) ..................................................... JA-0909

Exhibit CX0372 POM Wonderful Advertisement "Lucky I Have Super Health Powers!" (Sept. 2, 2009) .................................................... JA-0913

Exhibit CX0380 POM Wonderful Advertisement "Lucky I Have Super Health Powers!" (Sept. 10, 2009) .................................................. JA-0917

Exhibit CX0331 POM Wonderful Advertisement "Healthy. ~~Wealthy~~. And Wise." (Sept. 27, 2009)........................................................... JA-0924

David C. Vladeck, Remarks at the Council for Responsible Nutrition Annual Symposium for the Dietary Supplement Industry: Priorities for Dietary Supplement Advertising Enforcement (Oct. 22, 2009)................................................................. JA-0930

Mary K. Engle, The FTC's Advertising Priorities (Oct. 22, 2009) ................................................................ JA-0942

**Document Description (cont.)**                **Page**

## Volume III
## JA-0957 – 1315

Exhibit CX0328 POM Wonderful Advertisement "Your New Health Care Plan." (Nov. 8, 2009) ............................................................ JA-0957

Exhibit CX0337 POM Wonderful Advertisement "The First Bottle You Should Open in 2010." (Jan. 3, 2010) ........................................... JA-0959

Exhibit CX0342 POM Wonderful Advertisement "Take Out A Life Insurance Supplement." (Feb. 22, 2010) ...................................... JA-0961

Exhibit CX0344 Letter from FDA to M. Tupper Re: Inspections and Compliance (Feb. 23, 2010) .......................................................... JA-0963

Exhibit CX0348 POM Wonderful Advertisement "24 Scientific Studies Now in One Easy-To-Swallow Pill." (Apr. 1, 2010) ...................... JA-0967

Exhibit CX0350 POM Wonderful Advertisement "24 Scientific Studies Now in One Easy-To-Swallow Pill." (Apr. 26, 2010) .................... JA-0970

Exhibit CX0351 POM Wonderful Advertisement "The Only Antioxidant Supplement Rated X." (May 1, 2010) ........................................... JA-0972

Exhibit CX0353 POM Wonderful Advertisement "Take Out A Life Insurance Supplement." (Jun. 14, 2010) ..................................... JA-0974

Exhibit CX0355 POM Wonderful Advertisement "The Only Antioxidant Supplement Rated X." (Jul. 1, 2010) ........................................... JA-0976

The Organic Center, Elevating Antioxidant Intakes (Aug. 2010) ..................................................................................... JA-0978

Exhibit CX1336, Deposition Transcript Excerpt of Michael H. Davidson (Dec. 3, 2010) ............................................................... JA-0980

## Document Description (cont.)      Page

Exhibit CX1341, Deposition Transcript Excerpt of Allan Pantuck
(Dec. 15, 2010) ................................................................... JA-0994

Exhibit CX1352, Deposition Transcript Excerpt of David Heber
(Jan. 28, 2011) ................................................................... JA-1003

Exhibit CX1287, Expert Report of James A. Eastham
(Mar. 3, 2011) .................................................................... JA-1013

Exhibit CX1291, Expert Report of Frank M. Sacks
(Mar. 3, 2011) .................................................................... JA-1039

Exhibit CX1289, Expert Report of Arnold Melman
(Mar. 4, 2011) .................................................................... JA-1078

Exhibit CX1293, Expert Report of Meir Jonathan Stampfer
(Mar. 4, 2011) .................................................................... JA-1096

Exhibit PX0206, Expert Report of Denis R. Miller
(Mar. 18, 2011) .................................................................. JA-1126

Exhibit PX0025, Expert Report of Dean Ornish
(Mar. 4, 2011) .................................................................... JA-1146

Exhibit PX0149, Expert Report of Arthur Burnett ...................... JA-1173

Exhibit PX0192, Expert Report of David Heber
(Mar. 18, 2011) .................................................................. JA-1180

Exhibit PX0362, Deposition Transcript Excerpt of Meir Jonathan
Stampfer (Apr. 6, 2011) ...................................................... JA-1187

Exhibit PX0361, Deposition Transcript Excerpt of Frank Sacks
(Apr. 12, 2011) .................................................................. JA-1193

## Document Description (cont.)                                      Page

Hearing Transcript Excerpts *In The Matter Of POM Wonderful, et al* (May 24 - Oct. 12, 2011) ............................................................. JA-1206

Statement of Commissioner Ohlhausen Dissenting In Part, *In the Matter of GeneLink, Inc. and foru International Corporation,* FTC File No. 112 3095 (Jan. 7, 2014) ........................................................ JA-1295

Memorial Sloan-Kettering Cancer Center, Integrative Medicine: Pomegranate Information, available at http://www.mskcc.org/cancercare/herb/pomegranate (last visited Mar. 10, 2014). ................................................................. JA-1298

Academy of Nutrition & Dietetics, *What Are Antioxidants?*, available at http://www.eatright.org/public/content.aspx?id=6792 (last visited Mar. 10, 2014) .......................................................... JA-1304

The University of Chicago Medicine, Profile of Michael H. Davidson, MD, available at http://www.uchospitals.edu/physicians/michael-davidson.html (last visited Mar. 10, 2014). .................................. JA-1306

Stanford Medicine Cancer Institute, *Nutrition to Reduce Cancer Risk*, available at http://cancer.stanford.edu/information/nutritionAndCancer/reduceRisk/ (last visited Mar. 10, 2014) .......................................................... JA-1308

Medicare Prostate Cancer Screening Information, available at http://www.medicare.gov/coverage/prostate-cancer-screenings.html (last visited Mar. 10, 2014) .......................................................... JA-1313

VMS ID: 091107449
RUN DATE: 11/08/2009

# YOUR NEW HEALTH CARE PLAN.
## (NO TOWN HALL MEETING REQUIRED.)



**The Antioxidant Superpill.™**

### Antioxidant Health Insurance.

Emerging science suggests that antioxidants are critically important to maintaining good health because they protect you from free radicals, which can damage your body. Taking one POMx pill a day will help protect you from free radicals and keep you at your healthy best. Better yet, it's a health plan that's open to everyone.



= 

The antioxidant power of our 8oz juice.

### All-natural. Non-political.

POMx is an all-natural, ultra-potent antioxidant extract. Containing a full spectrum of pomegranate polyphenols, POMx is so concentrated that a single capsule has the antioxidant power of a full glass of POM Wonderful® 100% Pomegranate Juice.

### $32 million in medical research. Zero deductible.

POMx is made from the only pomegranates backed by $32 million in medical research at the world's leading universities. Not only has this research documented the unique and superior antioxidant power of pomegranates, it has revealed promising results for prostate and cardiovascular health.

### A health care plan for a healthy future.

Our POMx pills are made from the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice, on which each of the following medical studies was conducted.

An initial UCLA study on our juice found hopeful results for prostate health, reporting "statistically significant prolongation of PSA doubling times," according to Dr. Allen J. Pantuck in *Clinical Cancer Research*, '06.[1,2,3]

Two additional preliminary studies on our juice showed promising results for heart health. "Stress-induced ischemia (restricted blood flow to the heart) decreased in the pomegranate group," Dr. Dean Ornish reported in the *American Journal of Cardiology*, '05.[1,2,4]

"Pomegranate juice consumption resulted in significant reduction in IMT[6] (thickness of arterial plaque) by up to 30% after one year," said Dr. Michael Aviram, in *Clinical Nutrition*, '04.[1,2,5,6]

### Try POMx Monthly FREE for ONE MONTH.
We'll even pay for the shipping.[*]



### Order Now: 888-766-7455 or pompills.com/wp
### Use discount code: WP30

[*]SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires 4/30/10 and applies only to the purchase price for the first bottle of POMx Monthly. Following months will be $29.95 per bottle. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents. We reserve the right to discontinue this promotion, change product price or shipping charge at any time. Valid only at pompills.com or 1-888-766-7455. Not valid on POMx Trial or other POM products.

**POM WONDERFUL®**



[1]pompills.com/research [2]These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. [3]46 men with rising PSA after surgery or radiotherapy drank 8oz 100% pomegranate juice daily for two years. [4]45 patients with coronary heart disease and myocardial ischemia drank 8oz 100% pomegranate juice daily for three months. [5]Study measured intima-media thickness (IMT)[6] in patients aged 65-75 years with severe atherosclerosis drank 8oz 100% pomegranate juice daily for one year. ©2009 PomWonderful LLC. All rights reserved. POM Wonderful, Antioxidant Superpill and POMx are trademarks of PomWonderful LLC. PP2601

**VMS-0000303**

CX0328_0001



Product      POM X
Media:       Print
Ad Title:    Your new health care plan.
VMS Ad ID:   091107449
Date Range:

| Run Date | Market | Rank | Media Vehicle | Media Type | Unit | Cost |
|----------|--------|------|---------------|------------|------|------|
| | | | | Local | | |
| 11/08/2009 | Washington DC | 9 | Washington Post | Newspaper | 3.5 X 10 | $25,626 |
| | Total 1 Occurrence(s) | | | | | $25,626 |

VMS-0000593
CX0328_0002

# THE FIRST BOTTLE YOU SHOULD OPEN IN 2010.

VMS ID: 100101214
RUN DATE: 01/03/2010



**The Antioxidant Superpill.™**

## 2010, Year of the Antioxidant.

Emerging science suggests that antioxidants are critically important to maintaining good health because they protect you from free radicals, which can damage your body. Taking one POMx pill a day will help protect you from free radicals and keep you at your healthy best. Make it your first New Year's resolution.



The antioxidant power of our 8oz juice.

## POMx: Ultra-potent. Hangover-free.

POMx is an all-natural, ultra-potent antioxidant extract. Containing a full spectrum of pomegranate polyphenols, POMx is so concentrated that a single capsule has the antioxidant power of a full glass of POM Wonderful® 100% Pomegranate Juice.

## $32 million in medical research. Cheers.

POMx is made from the only pomegranates backed by $32 million in medical research at the world's leading universities.



Not only has this research documented the unique and superior antioxidant power of pomegranates, it has revealed promising results for prostate and cardiovascular health.

## Our bottle. Your health.

Our POMx pills are made from the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice, on which each of the following medical studies was conducted.

An initial UCLA study on our juice found hopeful results for prostate health, reporting "statistically significant prolongation of PSA doubling times," according to Dr. Allen J. Pantuck in *Clinical Cancer Research*, '06.[1,2,3]

Two additional preliminary studies on our juice showed promising results for heart health. "Stress-induced ischemia (restricted blood flow to the heart) decreased in the pomegranate group," Dr. Dean Ornish reported in the *American Journal of Cardiology*, '05.[1,2,4]

"Pomegranate juice consumption resulted in significant reduction in IMT[6] (thickness of arterial plaque) by up to 30% after one year," said Dr. Michael Aviram, in *Clinical Nutrition*, '04.[1,2,5,6]

## Try POMx Monthly FREE for ONE MONTH.

We'll even pay for the shipping.⁺



## Order Now: 888-766-7455 or pompills.com/n3
Use discount code: N330

*SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires 3/31/10 and applies only to the purchase price for the first bottle of POMx Monthly. Following months will be $29.95 per bottle. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents. We reserve the right to discontinue this promotion, change product price or shipping charge at any time. Valid only at pompills.com or 1-888-766-7455. Not valid on POMx Trial or other POM products.

POM WONDERFUL®

⁺pompills.com/research ²These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. ³46 men with rising PSA after surgery or radiotherapy drank 8oz 100% pomegranate juice daily for two years. ⁴45 patients with coronary heart disease and myocardial ischemia drank 8oz 100% pomegranate juice daily for three months. ⁵Study measured intima-media thickness (IMT). ⁶19 patients aged 65-75 years with severe atherosclerosis drank 8oz 100% pomegranate juice for one year. ©2010 PomWonderful LLC. All rights reserved. POM Wonderful, POMx and Antioxidant Superpower are trademarks of PomWonderful LLC. PP2939

**VMS-0000304**

CX0337_0001



| Product | POM X |
|---|---|
| Media: | Print |
| Ad Title: | THE FIRST BOTTLE YOU SHOULD OPEN IN 2010. |
| VMS Ad ID: | 100101214 |
| Date Range: | |

| Run Date | Market | Rank | Media Vehicle | Media Type | Unit | Cost |
|---|---|---|---|---|---|---|
| | | | | Local | | |
| 01/03/2010 | New York | 1 | New York Times | Newspaper | 4 X 11 | $51,026 |
| | Total 1 Occurrence(s) | | | | | $51,026 |

VMS-0000594
CX0337_0002

VMS ID: 100208568
RUN DATE: 02/22/2010

# TAKE OUT A LIFE INSURANCE SUPPLEMENT.



**The Antioxidant Superpill.™**

*TRY POMx MONTHLY FREE!*

### Antioxidants? We've got you covered.

Emerging science suggests that antioxidants are critically important to maintaining good health because they protect you from free radicals, which can damage your body. Taking one POMx pill a day will help protect you from free radicals and keep you at your healthy best. (Just the way insurers like you to be.)



The antioxidant power of our 8oz juice.

### POMx. Now that's a plan.

POMx is an all-natural, ultra-potent antioxidant extract. Containing a full spectrum of pomegranate polyphenols, POMx is so concentrated that a single capsule has the anti-oxidant power of a full glass of POM Wonderful® 100% Pomegranate Juice.

### $32 million in medical research. No deductible.

POMx is made from the only pomegranates backed by $32 million in medical research at the world's leading universities. Not only has this research documented the unique and superior antioxidant power of pomegranates, it has revealed promising results for prostate and cardiovascular health.

### Get the maximum benefits.

Our POMx pills are made from the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice, on which each of the following medical studies was conducted.

An initial UCLA study on our juice found hopeful results for prostate health, reporting "statistically significant prolongation of PSA doubling times," according to Dr. Allen J. Pantuck in *Clinical Cancer Research*, 2006.[1,2,3]

Additional preliminary study on our juice showed promising results for heart health. "Stress-induced ischemia (restricted blood flow to the heart) decreased in the pomegranate group," Dr. Dean Ornish reported in the *American Journal of Cardiology*, 2005.[1,2,4]

---

## FREE ONE MONTH TRIAL
### We'll even pay for the shipping.*



**Order Now: 888-766-7455** or pompills.com/t Use discount code: T30

*SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires 6/30/10 and applies only to the purchase price for the first bottle of POMx Monthly. Following months will be $29.95 per bottle. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents. We reserve the right to discontinue this promotion, change product price or shipping charge at any time. Valid only at pompills.com or 1-888-766-7455. Not valid on POMx Trial or other POM products. **POM WONDERFUL®**

[1]pompills.com/research [2]These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. [3]46 men with rising PSA after surgery or radiotherapy drank 8oz 100% pomegranate juice daily for two years. [4]45 patients with coronary heart disease and myocardial ischemia drank 8oz 100% pomegranate juice daily for three months. ©2010 POM Wonderful LLC. All rights reserved. POM Wonderful, POMx and Antioxidant Superpill are trademarks of POMWonderful LLC. PP5219

**VMS-0000306**

**JA-0961**

CX0342_0001



| Product | POM Pills |
| Media: | Print |
| Ad Title: | Take out a Life Insurance Supplement |
| VMS Ad ID: | 100208568 |
| Date Range: | |

| Run Date | Market | Rank | Media Vehicle | Media Type | Unit | Cost |
|---|---|---|---|---|---|---|
| 02/22/2010 | NATIONAL Albuquerque/Santa | 0 | Time Magazine | Magazine Local | Full Page | $204,672 |
| 03/12/2010 | Fe | 46 | Albuquerque Journal | Newspaper Local | 4 X 9.5 | $4,639 |
| 03/14/2010 | Louisville | 50 | Louisville Courier-Journal | Newspaper | 3 X 10 | $8,305 |
| | Total 3 Occurrence(s) | | | | | $217,616 |

VMS-0000596
CX0342_0002

**JA-0962**



**U.S. Department of Health & Human Services**



## U.S. Food and Drug Administration

Home > Inspections, Compliance, Enforcement, and Criminal Investigations > Enforcement Actions > Warning Letters

## Inspections, Compliance, Enforcement, and Criminal Investigations
## Pom Wonderful



**Department of Health and Human Services**

Public Health Service
Food and Drug Administration
College Park, MD 20740

FEB 23 2010

**WARNING LETTER**

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Matt Tupper, President
POM Wonderful
11444 West Olympic Blvd.
Los Angeles, California 90064

Re: CFSAN-OC-10-20

Dear Mr. Tupper:

The Food and Drug Administration (FDA) reviewed your websites at the Internet addresses http://www.pomwonderful.com and http://www.pompills.com in January 2010. FDA's review found serious violations of the Federal Food, Drug, and Cosmetic Act (the Act) and the applicable regulations in Title 21, Code of Federal Regulations (21 CFR). You can find copies of the Act and related regulations through links in FDA's home page at http://www.fda.gov.

**Unapproved New Drugs**

The label of your POM Wonderful 100% Pomegranate Juice product includes the Internet address of your website, www.pomwonderful.com. Based on claims made in the labeling for this product on your website, we have determined that your POM Wonderful 100% Pomegranate Juice product is promoted for conditions that cause the product to be a drug under section 201 (g)(1)(B) of the Act [21 U.S.C. 321(g)(1)(B)]. The therapeutic claims on your website establish that the product is a drug because it is intended for use in the cure, mitigation, treatment, or prevention of disease. The marketing of this product with these claims violates the Act.

Examples of some of the claims observed on your website include:

From a webpage titled "Featured Scientific Studies":

- "Atherosclerosis: ... In a pilot study of 19 subjects with carotid artery stenosis (plaque buildup), patients who consumed 8 ounces of POM Wonderful 100% Pomegranate Juice daily for a one-year period experienced a 30% reduction in intima-media thickness of the carotid artery vs, a 9% increase for the placebo group."
- "Blood Flow/Pressure: ... In a pilot study of 10 subjects with hypertension ... a slight decrease in systolic blood pressure was experienced after consuming POM Wonderful 100% Pomegranate Juice daily for two weeks."
- "Prostate Cancer: In a clinical study involving 46 men with rising PSA after prostate cancer treatment (surgery or radiation) who consumed 8 ounces of POM

EXHIBIT 149
Witness _Besnik_
Date 10.26.10 Total pgs. 5
Elizabeth Borrelli CSR 7844 RPR

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm202785.htm         3/3/2010

**CONFIDENTIAL-FTC Docket NO. 9344**                    **RESP025324**

Wonderful 100% Pomegranate Juice daily over two years, PSA doubling time increased from 15 to 54 months .... PSA doubling time is an indicator of prostate cancer progression."
• "Erectile Function: A randomized, placebo-controlled crossover pilot study of 55 men with mild to moderate erectile dysfunction evaluated the efficacy of consuming POM Wonderful variety pomegranate juice .... After consuming POM daily for 4 weeks, the men reported 50% greater likelihood of experiencing improved erections as compared to placebo."

From a webpage titled "10 Ways to Help Your Heart in 2010":

• "6) Drink POM Juice: Reducing LDL cholesterol helps improve blood flow and artery stress. One study with 13 healthy male volunteers who drank POM Wonderful 100% Pomegranate Juice for 2 weeks, (found) the amount of LDL cholesterol oxidation decreased by 20% and antioxidant activity in the blood increased by 9%."

From a webpage titled "Final POM tour round up: Fun moments:)":

• "Wonderful pomegranates [the variety of pomegranate used in your product] contain:

    o Polyphenol Antioxidants - help the body against 'free radicals' molecules that cause damage to our bodies over time. Free-radical damage is a major factor in aging and chronic diseases such as heart disease and cancer. Scientific research has shown that a daily amount of polyphenol antioxidants may help promote a healthy heart and prostate by minimizing factors that lead to atherosclerosis, or plaque in the arteries, and prostate cancer....
    o Vitamin C - ... may also reduce the length and severity of colds....
    o Fiber - ... may reduce LDL cholesterol, which may help lower the risk of heart disease."

From a webpage titled "Nature's Rainbow":

• "[R]ed-purple foods - such as pomegranates ... are rich in anthocyanins . Anthocyanins are strong antioxidants, and research suggests that they may . reduce the risk of certain types of cancer."

From a webpage titled "Other Antioxidant Benefits":

• "Pomegranate juice has a superior ability to prevent LDL cholesterol from being oxidized by free radicals. Emerging science suggests that LDL oxidation may be a precursor to atherosclerosis or arterial plaque."
Page 3-POM Wonderful, Los Angeles, California 90064

From a webpage titled "What Can Antioxidants Do For You?":

• "Hey guys, want to protect your prostate? Start by sipping on some POM Wonderful 100% Pomegranate Juice. . .. POM 100% Pomegranate Juice has been shown to slow prostate tumor growth ...."

From a webpage titled "POM: Sweet - And Safe for Diabetics":

• "There have actually been several studies published about diabetic patients who consume 8 ounces of POM juice every day over an extended period.... [T]he patients' state of oxidative stress ... actually decreased. Diabetes is a very complicated disease, with many potential side effects. Diabetics are at risk for heart disease, kidney disease, and other complications, many of which are fundamentally a result of oxidative stress. Since diabetics often experience higher levels of oxidative stress, the uniquely strong natural antioxidants that make POM so healthy are particularly beneficial."

Your website also contains disease claims in the form of personal testimonials, including:

• "I have been drinking POM for about a month, daily ... I can tell you that I feel much better!! My cholesterol and blood pressure are slightly lower ...."
• "I have recently been having a lot of problems with unusual lumps on my body and they are very sore and uncomfortable I have found the only thing that gets rid of the lumps is POM Wonderful. Since drinking the POM every time I feel a lump they have amazingly gone down! Basically I use POM as a kind of medicine."

*149.2*

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm202785.htm          3/3/2010

- "I am so thankful for POM! It saved my boyfriend's life. The man of my dreams was diagnosed with Prostate Cancer .... Upon being diagnosed, he has been drinking two glasses of POM Juice [daily] .... We both believe that POM Juice has been the crucial factor in keeping his PSA levels at an undetectable level. The powerful antioxidants contained in this fluid have also helped keep him healthy enough to fight the side effects of his treatments and give him energy to improve his health ...."
- "I'm writing to tell you what POM wonderful [sic] has done for my mother suffering from a severe heart infection.... [A]n infection blossomed in a valve of her heart and traveled to the bones in her face.... I started bringing her POM and showed her all of the health benefits for her heart and blood function.... Soon she was admitted into Reston Hospital in Northern VA and ... returned home with a ... line that administers IV antibiotics twice a day. . .. Through her recovery she ... loyally consumes her POM juice like clock work, almost as if it is a part of her medical routine [S]he swears that the pomegranate juice has helped her keep her immunity up and is also what has kept her infection from getting worse due to keeping her heart functions strong and the blood flowing more efficiently.... She has received peace of mind knowing she is taking part in keeping her system healthy through the antibiotic process by drinking POM."

In addition, when scientific publications are used commercially by the seller of a product to promote the product to consumers, such publications may become evidence of the product's intended use. For example, under 21 CFR 101.93(g)(2)(iv)(C), a citation of a publication or reference in the labeling of a dietary supplement is considered to be a claim about disease treatment or prevention if the citation refers to a disease use and if, in the context of the labeling as a whole, the citation implies treatment or prevention of a disease. The following are examples of publications that are used to market your product for disease treatment and prevention on your website and are thus evidence of your product's intended use as a drug:

- Aviram, M., et al., Pomegranate juice consumption reduces oxidative stress, artherogenic modifications to LDL, and platelet aggregation: studies in humans and in artherosclerotic apolipoprotein E-deficient mice. *American Journal of Clinical Nutrition 2000;71:1062-76.*
- Pantuck, A.J., et al., Phase II Study of Pomegranate Juice for Men with Rising Prostate-Specific Antigen following Surgery or Radiation for Prostate Cancer. *Clin Cancer Res 2006;12(13).*
- Rosenblat, M., et al., Anti-oxidative effects of pomegranate juice (PJ) consumption by diabetic patients on serum and on macrophages. *Atherosclerosis 187 (2006) 363-371.*
- Forest, C.P., et AL., Efficacy and safety of pomegranate juice on improvement of erectile dysfunction in male patients with mild to moderate erectile dysfunction: a randomized, placebo-controlled, double-blind, cross-over study. *International Journal of Impotence Research (2007), 1-4.*

We also reviewed your website www.pompills.com. which offers for sale your POMx Pills and POMx Liquid products. Based on claims made in the labeling for these products on this website, we have determined that your POMx products are promoted for conditions that cause the products to be drugs under section 201 (g)(1)(B) of the Act. The therapeutic claims on your website establish that these products are drugs because they are intended for use in the cure, mitigation, treatment, or prevention of disease. The marketing of these products with these claims violates the Act. For example:

From a webpage titled "Medical Research":

- "We have researched the effects of pomegranate juice on cardiovascular health for almost 10 years, and findings suggest that pomegranate juice may help counteract factors leading to arterial plaque build-up, as well as inhibit a number of factors associated with heart disease. Initial preclinical tests have shown that POMx has equivalent cardiovascular benefits to POM Wonderful Juice."
- "A preliminary UCLA medical study on POM Wonderful 100% Pomegranate Juice showed hopeful results for men with prostate cancer who drank an 8oz glass of pomegranate juice daily. And every POMx capsule provides the antioxidant

*149.3*

CONFIDENTIAL-FTC Docket NO. 9344                                    RESP025326

CX0344

power of an 8oz glass of POM Wonderful 100% Pomegranate Juice."

From a webpage titled "Pomegranates and Prostate Health":

- "A preliminary UCLA medical study involving POM Wonderful 100% Pomegranate Juice revealed promising news. Men who had been treated surgically or with radiation for prostate cancer were given 8oz of POM Wonderful 100% Pomegranate Juice. A majority of the 46 men participating in the study experienced a significantly extended PSA doubling time. PSA (prostate-specific antigen) is a marker that is thought to be associated with the progression of prostate cancer; a slower PSA doubling time may reflect slower progression of the disease.... According to Dr. David Heber, Director of UCLA's Center for Human Nutrition, *'The most abundant and most active ingredients in Pomegranate Juice are also found in POMx. Basic studies in our laboratory so far indicate that POMx and Pomegranate Juice have the same effect on prostate health.'"*
- "Findings from a small study suggest that pomegranate juice may one day prove an effective weapon against prostate cancer." [quoting The New York Times]

From a webpage titled "The Heart of the Matter":

- "POMx is made from the only pomegranates supported by $32 million of initial scientific research from leading universities [t]he very same pomegranates in POM Wonderful 100% Pomegranate Juice One pilot study on 19 patients with atherosclerosis (clogged arteries) at the Technion Institute in Israel demonstrated a reduction in arterial plaque growth. After one year, arterial plaque decreased 30% for those patients who consumed 8oz of POM Wonderful 100% Pomegranate Juice daily, compared to a 9% worsening for patients who drank a placebo."
- "A recently published study at the University of California, San Francisco (UCSF) included 45 patients with impaired blood flow to the heart. Patients who consumed 8oz of POM Wonderful 100% Pomegranate Juice daily for 3 months experienced 17% improved blood flow; those who drank a placebo experienced an 18% decline."

Your POM Wonderful 100% Pomegranate Juice and POMx products are not generally recognized as safe and effective for the above referenced uses and, therefore, the products are new drugs as defined in section 201(P) of the Act [21 U.S.C. 321(P)]. Under section 505(a) of the Act [21 U.S.C. 355(a)], a new drug may not be legally marketed in the United States without an approved New Drug Application (NDA). FDA approves a new drug on the basis of scientific data submitted by a drug sponsor to demonstrate that the drug is safe and effective.

**Misbranded Drugs**

Your POM Wonderful 100% Pomegranate Juice and POMx products are offered for conditions that are not amenable to self-diagnosis and treatment by individuals who are not medical practitioners; therefore, adequate directions for use cannot be written so that a layperson can use these drugs safely for their intended purposes. Thus, your products are misbranded under section 502(f)(1) of the Act, in that the labeling for these drugs fails to bear adequate directions for use [21 U.S.C. 352(f)(1)].

**Misbranded Food**

Your POM Wonderful 100% Pomegranate Juice is also a misbranded food within the meaning of section 403(r)(1)(A) of the Act [21 U.S.C. 343(r)(1)(A)] because the product label bears a nutrient content claim but does not meet the requirements to make the claim. Characterizing the level of a nutrient in food labeling of a product without complying with the requirements pertaining to nutrient content claims for that nutrient misbrands the product under section 403(r)(1)(A) of the Act. The following violative nutrient content claims for POM Wonderful 100% Pomegranate Juice were found at http://www.pomwonderful.com:

- "[U]niquely high levels of powerful antioxidants ...."
- "POM Wonderful 100% Pomegranate Juice ... full of antioxidants called phytochemicals."

*149.4*

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm202785.htm        3/3/2010

CONFIDENTIAL-FTC Docket NO. 9344                                            RESP025327

CX0344

Under 21 CFR 101.54(g), a nutrient content claim that characterizes the level of antioxidant nutrients present in a food may be used on a label or in the labeling of that food when, among other requirements, a reference daily intake (RDI) has been established for each of the nutrients (21 CFR 101.54(g)(1)), and the names of the antioxidant nutrients that are the subject of the claim are included either (1) as part of the claim or (2) elsewhere on the same panel of the product label, provided that the nutrient names are linked by a symbol to the claim (21 CFR 101.54(g)(4)). The nutrient content claim "[U]niquely high levels of powerful antioxidants ... " fails to declare the name of the antioxidant nutrients that are the subject of the claim, as required by 21 CFR 101.54(g)(4). The nutrient content claim "[F]ull of antioxidants called phytochemicals" characterizes the level of the antioxidant nutrient "phytochemicals"; however, no RDI has been established for phytochemicals. Accordingly, this claim does not meet the requirements of 21 CFR 101.54(g)(1).

The above violations are not meant to be an all-inclusive list of deficiencies in your products or their labeling. It is your responsibility to ensure that all of your products and labeling are in compliance with the laws and regulations enforced by FDA. You should take prompt action to correct the violations. Failure to promptly correct these violations may result in regulatory action without further notice, such as seizure and/or injunction. Please notify this office in writing within fifteen (15) working days from your receipt of this letter as to the specific steps you have taken to correct the violations noted above and to assure that similar violations do not occur.

Your response should include any documentation necessary to show that correction has been achieved. If you cannot complete all corrections before you respond, please explain the reason for the delay and the date by which each such item will be corrected.

Please send your reply to the attention of Kathleen M. Lewis, Compliance Officer, Food and Drug Administration, Center for Food Safety and Applied Nutrition, Office of Compliance, Division of Enforcement, 5100 Paint Branch Parkway (HFS-608), College Park, Maryland 20740.

If you have any questions regarding any issue in this letter, please contact Ms. Lewis at (301) 436-2148.

Sincerely,
/S/
Roberta C. Wagner
Director
Office of Compliance
Center for Food Safety
and Applied Nutrition


cc: Food and Drug Administration
Los Angeles District Office

---

**Links on this page:**

149.5

http://www.fda.gov/ICECI/EnforcementActions/WarningLetters/ucm202785.htm          3/3/2010

CONFIDENTIAL-FTC Docket NO. 9344                                    RESP025328

VMS ID: 100400591
RUN DATE: 04/01/2010

# 24 SCIENTIFIC STUDIES
## NOW IN ONE EASY-TO-SWALLOW PILL.

**FREE SHIPPING!**

### Antioxidants 101.

Emerging science suggests that antioxidants are critically important to maintaining good health because they protect you from free radicals, which can damage your body. Taking one POMx pill a day will help protect you from free radicals. It's just that simple.



The antioxidant power of our 8oz juice.

### POMx is powerful. Naturally.

POMx is an all-natural, ultra-potent antioxidant extract. Containing a full spectrum of pomegranate polyphenols, POMx is so concentrated that a single capsule has the anti-oxidant power of a full glass of POM Wonderful® 100% Pomegranate Juice.



**The Antioxidant Superpill.™**

### $32 million in medical research. Science. Not fiction.

POMx is made from the only pomegranates backed by $32 million in medical research at the world's leading universities. Not only has this research documented the unique and superior antioxidant power of pomegranates, it has revealed promising results for prostate and cardiovascular health.

### Complicated studies. Simplified.

Our POMx pills are made from the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice, on which each of the following medical studies was conducted.

An initial UCLA study on our juice found hopeful results for prostate health, reporting "statistically significant prolongation of PSA doubling times," according to Dr. Allen J. Pantuck in *Clinical Cancer Research*, 2006.[1,2,3]

Additional preliminary study on our juice showed promising results for heart health. "Stress-induced ischemia (restricted blood flow to the heart) decreased in the pomegranate group," Dr. Dean Ornish reported in the *American Journal of Cardiology*, 2005.[1,2,4]

## Try POMx Monthly
# FREE for ONE MONTH.
We'll even pay for the shipping.*

## Order Now: 888-766-7455
### or pompills.com/mh Use discount code: MH30

*SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires 8/31/10 and applies only to the purchase price for the first bottle of POMx Monthly. Following months will be $29.95 per bottle. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents. We reserve the right to discontinue this promotion, change product price or shipping charge at any time. Valid only at pompills.com or 1-888-766-7455. Not valid on POMx Trial or other POM products.

**POM WONDERFUL®**

[1]pompills.com/research [2]These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. [3]46 men with rising PSA after surgery or radiotherapy drank 8oz 100% pomegranate juice daily for two years. [4]45 patients with coronary heart disease and myocardial ischemia drank 8oz 100% pomegranate juice daily for three months. ©2010 PomWonderful LLC. All rights reserved. POM Wonderful, POMx and Antioxidant Superpill are trademarks of PomWonderful LLC. PP3273

VMS-0000312

JA-0968

CX0348_0001



| Product | POM Pills |
|---|---|
| Media: | Print |
| Ad Title: | 24 scientific studies now in one easy-to-swallow pill. antioxidents 101. |
| VMS Ad ID: | 100400591 |
| Date Range: | |

| Run Date | Market | Rank | Media Vehicle | Media Type | Unit | Cost |
|---|---|---|---|---|---|---|
| 04/01/2010 | NATIONAL | 0 | Men's Health Magazine | Magazine | Full Page | $142,060 |
| 04/01/2010 | NATIONAL | 0 | Popular Science | Magazine | Full Page | $99,308 |
| | Total 2 Occurrence(s) | | | | | $241,368 |

VMS-0000601
CX0348_0002

VMS ID: 100411090
RUN DATE: 04/26/2010

# 24 SCIENTIFIC STUDIES.
## NOW IN ONE EASY-TO-SWALLOW PILL.

FREE SHIPPING!

The Antioxidant Superpill.™

### Antioxidants 101.

Emerging science suggests that antioxidants are critically important to maintaining good health because they protect you from free radicals, which can damage your body. Taking one POMx pill a day will help protect you from free radicals. It's just that simple.

The antioxidant power of our 8oz juice.

### POMx is powerful. Naturally.

POMx is an all-natural, ultra-potent antioxidant extract. Containing a full spectrum of pomegranate polyphenols, POMx is so concentrated that a single capsule has the antioxidant power of a full glass of POM Wonderful® 100% Pomegranate Juice.

### $34 million in medical research. Science. Not fiction.

POMx is made from the only pomegranates backed by $34 million in medical research at the world's leading universities. Not only has this research documented the unique and superior antioxidant power of pomegranates, it has revealed promising results for prostate and cardiovascular health.

### Complicated studies. Simplified.

Our POMx pills are made from the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice, on which each of the following medical studies was conducted.

An initial UCLA study on our juice found hopeful results for prostate health, reporting "statistically significant prolongation of PSA doubling times," according to Dr. Allen J. Pantuck in *Clinical Cancer Research*, 2006.[1,2,3]

Additional preliminary study on our juice showed promising results for heart health. "Stress-induced ischemia (restricted blood flow to the heart) decreased in the pomegranate group," Dr. Dean Ornish reported in the *American Journal of Cardiology*, 2005.[1,2,4]

**Try POMx Pills FREE FOR ONE MONTH when you sign up for POMx Monthly delivery.***

Cancel Anytime.

**Order Now: 888-766-7455 or pompills.com/t** Use discount code: T30

*SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires 7/31/10 and applies only to the purchase price for the first bottle of POMx Monthly. Following months will be $29.95 per bottle. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents. We reserve the right to modify or discontinue this promotion, change the product price or change the shipping charge at any time. Valid only at pompills.com or 1-888-766-7455. Not valid on POMx Trial or other POM products. Credit or debit card required.

POM WONDERFUL®

[1]pompills.com/research [2]These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. [3]46 men with rising PSA after surgery or radiotherapy drank 8oz 100% pomegranate juice daily for two years. [4]45 patients with coronary heart disease and myocardial ischemia drank 8oz 100% pomegranate juice daily for three months. ©2010 Pom Wonderful LLC. All rights reserved. POM Wonderful, POMx and Antioxidant Superpill are trademarks of PomWonderful LLC. PP3654



Product      POM Pills
Media:       Print
Ad Title:    24 scientific Studies, now in one easy to Swallow Pill
VMS Ad ID:   100411090
Date Range:

| Run Date | Market | Rank | Media Vehicle | Media Type | Unit | Cost |
|---|---|---|---|---|---|---|
| 04/26/2010 | NATIONAL | 0 | Time Magazine | Magazine | Full Page | $229,952 |
| | Total 1 Occurrence(s) | | | | | $229,952 |

VMS-0000603
CX0350_0002

VMS ID: 100600955
RUN DATE: 06/01/2010

# THE ONLY ANTIOXIDANT SUPPLEMENT RATED X.

**FREE SHIPPING!**



**The Antioxidant Superpill.™**

### Always use protection.

Emerging science suggests that antioxidants are critically important to maintaining good health because they protect you from free radicals, which can damage your body. Taking one POMx pill a day will help protect you from free radicals and keep you at your healthy best.



The antioxidant power of our 8oz juice.

### POMx. Super-potent. Like you.

POMx is an all-natural, ultra-potent antioxidant extract. Containing a full spectrum of pomegranate polyphenols, POMx is so concentrated that a single capsule has the antioxidant power of a full glass of POM Wonderful® 100% Pomegranate Juice.

### $32 million in research. We're not just playing doctor.

POMx is made from the only pomegranates backed by $32 million in medical research at the world's leading universities. Not only has this research documented the unique and superior antioxidant power of pomegranates, it has revealed promising results for erectile, prostate and cardiovascular health.

### Is that POMx in your pocket?

Our POMx pills are made from the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice, on which each of the following medical studies was conducted.

In a preliminary study on erectile function, men who consumed POM Juice reported a 50% greater likelihood of improved erections as compared to placebo. "As a powerful antioxidant, enhancing the actions of nitric oxide in vascular endothelial cells, POM has potential in the management of ED... further studies are warranted." *International Journal of Impotence Research*, '07. [1,2,3]

An initial UCLA study on our juice found hopeful results for prostate health, reporting "statistically significant prolongation of PSA doubling times." *Clinical Cancer Research*, '06. [1,2,4]

A preliminary study on our juice showed promising results for heart health. "Stress-induced ischemia (restricted blood flow to the heart) decreased in the pomegranate group." *American Journal of Cardiology*, '05. [1,2,5]

## Try POMx Pills FREE FOR ONE MONTH

when you sign up for POMx Monthly delivery.*
(cancel anytime)

## Order Now: 888-766-7455
or pompills.com/adv Use discount code: ADV30

*SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires 9/30/10 and applies only to the purchase price for the first bottle of POMx Monthly. Following months will be $29.95 per bottle. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents. We reserve the right to modify or discontinue this promotion, change the product price or change the shipping charge at any time. Valid only at pompills.com or 1-888-766-7455. Not valid on POMx Trial or other POM products. Credit or debit card required.

POM WONDERFUL®

[1] pompills.com/research  [2] These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease.  [3] 53 men with mild/moderate erectile dysfunction drank 8oz 100% pomegranate juice daily for one month.  [4] 46 men with rising PSA after surgery or radiotherapy drank 8oz 100% pomegranate juice daily for two years.  [5] 45 patients with coronary heart disease and myocardial ischemia drank 8oz 100% pomegranate juice daily for three months. ©2010 PomWonderful LLC. All rights reserved. POM Wonderful, POMx and Antioxidant Superpill are trademarks of PomWonderful LLC. PP3423

**VMS-0000319**

CX0351_0001



Product        POM X
Media:         Print
Ad Title:      The only antioxident supplement rated x.
VMS Ad ID:     100600955
Date Range:

| Run Date | Market | Rank | Media Vehicle | Media Type | Unit | Cost |
|----------|--------|------|---------------|------------|------|------|
| 06/01/2010 | NATIONAL | 0 | Advocate | Magazine | Full Page | $964 |
| | Total 1 Occurrence(s) | | | | | $964 |

VMS-0000608
CX0351_0002

VMS ID: 100608485
RUN DATE: 06/14/2010

# TAKE OUT A LIFE INSURANCE SUPPLEMENT.

*TRY POMx MONTHLY FREE!*



**The Antioxidant Superpill.™**

### Antioxidants? We've got you covered.

Emerging science suggests that antioxidants are critically important to maintaining good health because they protect you from free radicals, which can damage your body. Taking one POMx pill a day will help protect you from free radicals and keep you at your healthy best. (Just the way insurers like you to be.)



The antioxidant power of our 8oz juice.

### POMx. Now that's a plan.

POMx is an all-natural, ultra-potent antioxidant extract. Containing a full spectrum of pomegranate polyphenols, POMx is so concentrated that a single capsule has the antioxidant power of a full glass of POM Wonderful® 100% Pomegranate Juice.

### $34 million in medical research. No deductible.

POMx is made from the only pomegranates backed by $34 million in medical research at the world's leading universities. Not only has this research documented the unique and superior antioxidant power of pomegranates, it has revealed promising results for prostate and cardiovascular health.

### Get the maximum benefits.

Our POMx pills are made from the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice, on which each of the following medical studies was conducted.

An initial UCLA study on our juice found hopeful results for prostate health, reporting "statistically significant prolongation of PSA doubling times," according to Dr. Allen J. Pantuck in *Clinical Cancer Research*, 2006.[1,2,3]

An additional preliminary study on our juice showed promising results for heart health. "Stress-induced ischemia (restricted blood flow to the heart) decreased in the pomegranate group," Dr. Dean Ornish reported in the *American Journal of Cardiology*, 2005.[1,2,4]

---

## Try POMx Monthly FREE for ONE MONTH.

We'll even pay for the shipping.*



## Order Now: 888-766-7455
### or pompills.com/sm Use discount code: SM30

*SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires 10/31/10 and applies only to the purchase price for the first bottle of POMx Monthly. Following months will be $29.95 per bottle. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents. We reserve the right to modify or discontinue this promotion, change the product price or change the shipping charge at any time. Valid only at pompills.com or 1-888-766-7455. Not valid on POMx Trial or other POM products. Credit or debit card required. POM WONDERFUL®

1pompills.com/research 2These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. 346 men with rising PSA after surgery or radiotherapy drank 8oz 100% pomegranate juice daily for two years. 445 patients with coronary heart disease and myocardial ischemia drank 8oz 100% pomegranate juice daily for three months. ©2010 PomWonderful LLC. All rights reserved. POM Wonderful, POMx and Antioxidant Superpill are trademarks of PomWonderful LLC. PP3930

---

**VMS-0000320**

CX0353_0001



Product       POM X
Media:        Print
Ad Title:     Take out a life insurance supplement.
VMS Ad ID:    100608485
Date Range:

| Run Date | Market | Rank | Media Vehicle | Media Type | Unit | Cost |
|----------|--------|------|---------------|------------|------|------|
| 09/01/2010 | NATIONAL | 0 | Men's Health Magazine | Magazine Local | Full Page | $142,060 |
| 06/13/2010 | Fort Myers/Naples | 65 | Ft. Myers News-Press | Newspaper Local | 4 X 9.5 | $4,106 |
| 06/13/2010 | Greenville/Spartanb urg | 36 | Greenville News | Newspaper | 4 X 9.5 | $5,524 |
| 06/14/2010 | New York | 1 | New York Magazine | Magazine Local | Full Page | $54,160 |
| 06/20/2010 | New York | 1 | New York Times | Newspaper Local | 4 X 11 | $51,026 |
| 06/13/2010 | Raleigh/Durham | 25 | Durham Herald-Sun | Newspaper | 4 X 9.5 | $2,387 |
| | Total 6 Occurrence(s) | | | | | $259,263 |

VMS-0000609
CX0353_0002

VMS ID: 100700683
RUN DATE: 07/01/2010

# THE ONLY ANTIOXIDANT SUPPLEMENT RATED X.

FREE SHIPPING!



**The Antioxidant Superpill.™**

## Always use protection.

Emerging science suggests that antioxidants are critically important to maintaining good health because they protect you from free radicals, which can damage your body. Taking one POMx pill a day will help protect you from free radicals and keep you at your healthy best.



The antioxidant power of our 8oz juice.

## POMx. Super-potent. Like you.

POMx is an all-natural, ultra-potent antioxidant extract. Containing a full spectrum of pomegranate polyphenols, POMx is so concentrated that a single capsule has the anti-oxidant power of a full glass of POM Wonderful® 100% Pomegranate Juice.

## $34 million in research. We're not just playing doctor.

POMx is made from the only pomegranates backed by $34 million in medical research at the world's leading universities. Not only has this research documented the unique and superior antioxidant power of pomegranates, it has revealed promising results for erectile, prostate and cardiovascular health.

## Is that POMx in your pocket?

Our POMx pills are made from the same pomegranates we use to make our POM Wonderful 100% Pomegranate Juice, on which each of the following medical studies was conducted.

In a preliminary study on erectile function, men who consumed POM Juice reported a 50% greater likelihood of improved erections as compared to placebo. "As a powerful antioxidant, enhancing the actions of nitric oxide in vascular endothelial cells, POM has potential in the management of ED... further studies are warranted." *International Journal of Impotence Research*, '07. [1,2,3]

An initial UCLA study on our juice found hopeful results for prostate health, reporting "statistically significant prolongation of PSA doubling times." *Clinical Cancer Research*, '06. [1,2,4]

A preliminary study on our juice showed promising results for heart health. "Stress-induced ischemia (restricted blood flow to the heart) decreased in the pomegranate group." *American Journal of Cardiology*, '05. [1,2,5]

---

## Try POMx Monthly
# FREE for ONE MONTH
We'll even pay for the shipping.*

## Order Now: 888-766-7455
or pompills.com/ga Use discount code: GA30

*SIGN UP FOR POMx MONTHLY, AND WE'LL SEND YOUR FIRST BOTTLE FREE. AFTER THAT, YOU'LL CONTINUE TO RECEIVE MONTHLY SHIPMENTS FOR $29.95 WITH COMPLIMENTARY SHIPPING. Offer expires 9/30/10 and applies only to the purchase price for the first bottle of POMx Monthly. Following months will be $29.95 per bottle. One discount per customer. Cannot be combined with other offers. No substitutions, transfer rights or cash equivalents. We reserve the right to modify or discontinue this promotion, change the product price or change the shipping charge at any time. Valid only at pompills.com or 1-888-766-7455. Not valid on POMx Trial or other POM products. Credit or debit card required.

POM WONDERFUL®

[1] pompills.com/research. [2] These statements have not been evaluated by the Food and Drug Administration. This product is not intended to diagnose, treat, cure or prevent any disease. [3] 53 men with mild/moderate erectile dysfunction drank 8oz 100% pomegranate juice daily for one month. [4] 46 men with rising PSA after surgery or radiotherapy drank 8oz 100% pomegranate juice daily for two years. [5] 45 patients with coronary heart disease and myocardial ischemia drank 8oz 100% pomegranate juice daily for three months. ©2010 PomWonderful LLC. All rights reserved. POM Wonderful, POMx and Antioxidant Superpill are trademarks of PomWonderful LLC. PP5749

**VMS-0000323**

CX0355_0001



Product       POM X
Media:        Print
Ad Title:     The only antioxidant supplement rated X.
VMS Ad ID:    100700683
Date Range:

| Run Date | Market | Rank | Media Vehicle | Media Type | Unit | Cost |
|---|---|---|---|---|---|---|
| 07/01/2010 | NATIONAL | 0 | Playboy Magazine | Magazine | 1 1/2 Pages | $113,064 |
| | Total 1 Occurrence(s) | | | | | $113,064 |

VMS-0000612
CX0355_0002



**The organic Center**

What are antioxidants?  Why are they important?
Which foods contain the most antioxidants?  What is
the antioxidant premium in organic foods?

# ELEVATING ANTIOXIDANT INTAKES

## NATURALLY OCCURING ANTIOXIDANTS PROVIDE HEALTH BENEFITS

Antioxidants are powerful allies in combating inflammation and lowering heart disease and cancer risk. They promote strong immune systems and help tip the odds toward graceful aging. Some antioxidants are manufactured in our bodies but our innate capacity to

*The U.S. government released dietary guidelines doubling the recommended number of servings of fruits and vegetables from "Five-a-Day" to 9-13 servings.  The goal - improving public health by, in part, increasing average antioxidant intakes.*

synthesize antioxidants becomes less efficient as we age, and our bodies are dependent on food for some critical antioxidants, including vitamins C and E.

Antioxidants are naturally-occurring compounds in fruits, vegetables and whole grains. The benefits of antioxidants arise from their impacts on "free radicals," which are unstable molecules produced in our cells as a result of breaking down food, normal metabolism, vigorous exercise, and exposure to chemicals. "Free radicals" can erode the integrity of cell walls, disrupt cellular processes, and damage the DNA in cells.

Antioxidants neutralize the reactivity of free radicals, diminishing their capacity to disrupt and damage cells. The more antioxidants circulating in your body, the more free radicals will be deactivated. But the life-cycle of most antioxidants in the human body is short-lived.  Most of the antioxidants  in those blueberries you had for breakfast have moved into your body and worked their magic by dinner.  This is why we all need to consume antioxidant-rich fruits and vegetables at least a couple of times a day,  every day.  And also why the vast majority of Americans do not get enough antioxidants in their food.  Most of us need to double our antioxidant intake to take full advantage of their health promoting potential.



### Proven Strategies

Consume at least one more serving of fruit or vegetable at each meal, and a couple more as snacks.  Pick ripe, fresh and brightly colored produce whenever possible.

Hand-squeeze fruit juice yourself whenever you can. Commercial squeezing (plus pasteurizing) depletes about 20 percent more of the antioxidants in raw fruit.

When selecting oils and juices in the store, look for organic brands that are not processed at high temperatures or under extremely high pressures.

Enjoy those processed tomato products that help liven up many favorite dishes.  Cooked tomatoes, tomato soup and tomato sauce all have higher concentrations of antioxidants than raw tomatoes, because in the case of tomatoes, heat processing significantly increases antioxidant content.  A recent study also concluded that organic ketchup has 50 percent higher levels of antioxidants than a group of major national brands.





## PRIORITY NUMBER ONE

Eat at least nine  or more servings of fruits and vegetables throughout the day, every day.

Higher antioxidant intakes are within reach of all Americans.  The single most reliable way to assure no shortage of "free radical" fighting antioxidants is to eat multiple servings daily of brightly colored, relatively unprocessed fruits and vegetables.  Buying fresh organic produce and organic processed fruit and vegetable products will further leverage – by almost a third – the health benefits triggered by eating more fruits and vegetables.

Printed on recycled paper with soy and vegetable inks
(30% recycled; 10% post consumer waste)

# ELEVATING ANTIOXIDANT INTAKES

## Maximizing Antioxidant Intake

Organic farming systems increase antioxidant concentrations in fruits and vegetables by, on average, about 30 percent, compared to food grown on otherwise similar conventional farms. The greater density of antioxidants per ounce – or calorie – of food consumed reinforces other health benefits linked to organic food and farming. These include higher levels of some essential vitamins and minerals and lower levels of pesticide residues in food and drinking water.

You might wonder why and how organic farming elevates antioxidant concentrations.

One explanation is linked to pest pressure and other sources of stress. When plants are under stress from pests or sunlight, they produce a diverse array of natural chemicals called secondary plant metabolites (SPMs), many of which are antioxidants. SPMs also are responsible for giving fruit and vegetables their bright coloring and distinctive flavors. Plants on organic farms typically have to deal with higher levels of pests than plants on nearby conventional farms, where pesticides are routinely applied. For this reason, plants on organic farms more fully engage their innate defense mechanisms, and in the course of doing so, elevate antioxidant concentrations.

A second explanation arises from the fact that antioxidant levels tend to be higher in organic fruit and vegetables because plants on organic farms tend to grow slower and mature at a smaller size than fast growing, heavily fertilized conventional produce. This explanation has its roots in the "dilution effect," the tendency for vitamins, minerals and antioxidant levels to be reduced – or diluted – in large, fast growing and high yielding crops.



## FOODS WITH THE HIGHEST OVERALL ANTIOXIDANT CAPACITY PER SERVING

- Blueberries
- Cranberries
- Blackberries
- Raspberries
- Strawberries
- Red grapes
- Apples
- Plums
- Potatoes
- Red grapes
- Sweet cherries
- Kidney beans
- Pinto beans
- Prunes
- Asparagus
- Grapefruit
- Peaches
- Yellow pepper
- Green grapes
- Blackeye peas
- Cooked tomatoes
- Cooked artichoke
- Red Cabbage
- Red-leaf lettuce
- Broccoli raab
- Beets



## Did You Know?

- Organic farming methods can increase concentrations of antioxidants in vegetables, fruits, grains, and dairy products, and in this way help people elevate their daily antioxidant intake without a proportional rise in calories.

- There are likely far more than 50,000 secondary plant metabolites and some 4,000 flavonoids, many of which are antioxidants.





- Tufts scientists estimate that on an average day most Americans consume less than a third of the dietary antioxidants needed to take full advantage of the health promoting benefits of antioxidants.

- Organic vegetables had 30 percent to 10-times higher levels of flavonoids compared to conventionally grown produce in a study carried out in Japan.

Access more information on *antioxidants and the State of Science Review*, "**Evaluating Antioxidant Levels in Food Through Organic Farming and Food Processing**" at www.organic-center.org under TOC Reports, or contact Dr. Charles Benbrook, at cbenbrook@organic-center.org.



DIRT • WATER • SUN

sometimes the greatest ideas are the simplest.

**The Organic Center**

JA-0979

**The Organic Center**
P.O. Box 20513
Boulder, CO 80308
(303) 499-1840

www.organic-center.org

# In the Matter of: POM Wonderful, et al.

December 3, 2010

Deposition Transcript of Michael H, Davidson, M.D.

List of Deposition Transcript Excerpts

pp. 3-5, 57-58, 221-222, 227-231

# In the Matter of:

# In the Matter of: POM Wonderful

*December 3, 2010*
*Michael H. Davidson, M.D.*

**Condensed Transcript with Word Index**



**For The Record, Inc.**
**(301) 870-8025 - www.ftrinc.net - (800) 921-5555**

CX1336

Page 3

```
 1                  UNITED STATES OF AMERICA

 2                  FEDERAL TRADE COMMISSION

 3          OFFICE OF ADMINISTRATIVE LAW JUDGES

 4

 5     In the Matter of:                 )

 6     POM WONDERFUL, LLC, and ROLL      )

 7     INTERNATIONAL CORPORATION,        )

 8          Companies,                   )

 9       and                             )   Docket No. 9344

10     STEWART A. RESNICK, LYNDA RAE     )

11     RESNICK, and MATTHEW TUPPER,      )

12     individually and as officers of   )

13     the companies,                    )

14          Respondents.                 )

15     --------------------------------)

16                         Friday, December 3, 2010

17

18                         Suite 1825

19                         Federal Trade Commission

20                         55 West Monroe Street

21                         Chicago, Illinois

22

23          The above-entitled matter came on for

24     deposition, pursuant to notice, at 10:13 a.m.

25
```

2fabe485-ea71-4c2b-9246-6ecc38558b81
CX1336

In the Matter of:  POM Wonderful  Davidson, M.D.                    12/3/2010

Page 4

```
1    APPEARANCES:

2    ON BEHALF OF THE FEDERAL TRADE COMMISSION:

3            JANET M. EVANS, ESQ.

4            THEODORE HOPPOCK, ESQ.

5            Federal Trade Commission

6            Division of Advertising Practices

7            601 New Jersey Avenue, N.W.

8            Washington, D.C.  20580

9            202-326-2125

10           E-mail:  jevans@ftc.gov

11                    thoppock@ftc.gov

12   ON BEHALF OF THE RESPONDENTS:

13           KRISTINA DIAZ, ESQ.

14           Roll Law Group

15           11444 West Olympic Boulevard

16           Los Angeles, California  90049

17           (310) 966-8775

18           E-mail:  kdiaz@roll.com

19

20           JOHN D. GRAUBERT, ESQ.

21           Covington & Burling, LLP

22           1201 Pennsylvania Avenue, N.W.

23           Washington, D.C. 20004-2401

24           (202) 662-5938  Fax:  (202) 778-5938

25           E-mail:  jgraubert@cov.com
```

CX1336

In the Matter of:  POM Wonderful  Davidson, M.D.                    12/3/2010

```
 1              P R O C E E D I N G S
 2                  -   -   -   -   -
 3    Whereupon--
 4              MICHAEL H. DAVIDSON, M.D.,
 5    a witness, called for examination, having been first
 6    duly sworn, was examined and testified as follows:
 7              E X A M I N A T I O N
 8         BY MS. EVANS:
 9         Q.  Dr. Davidson, could you please state and spell
10    your full name for the record.
11         A.  Yes.  Dr. Michael H. Davidson; M-i-c-h-a-e-l
12    Davidson, D-a-v-i-d-s-o-n.
13         Q.  And what is your business address?
14         A.  That's a complicated question.
15         Q.  Pick one.
16         A.  Pick one?  515 North State Street, Chicago,
17    Illinois, Suite 2700, 60654.
18         Q.  And what business is that?
19         A.  That's Radiant Research.
20         Q.  Okay.  And are you represented by counsel here
21    today?
22         A.  Yes.
23         Q.  And who's representing you?
24         A.  Krista --
25              MS. DIAZ:  Kristina.
```

2fabe485-ea71-4c2b-9246-6ecc38558b81
CX1336

 1      Q.  Yes.  Yeah -- no, I'm going to get to that.

 2          Now, you also did some exploratory analysis;

 3   correct?

 4      A.  Yes.

 5      Q.  And this exploratory analysis that you did, it

 6   was not called for by the protocol?

 7      A.  That's correct, yes.

 8      Q.  Okay.  So it's a post hoc analysis.  Are

 9   post hoc analyses commonly done in the studies that you

10   conduct?

11      A.  Yes.

12      Q.  And what was the result of your post hoc

13   analysis?

14      A.  That in a subgroup of patients that had

15   increased progression of their carotid IMT, there was a

16   benefit for the pomegranate juice versus the control.

17      Q.  Was it a subset that had increased progression

18   of carotid IMT, or was it subgroups of patients who had

19   certain risk factors?

20          MS. DIAZ:  Objection as to form, vagueness.

21          You can answer.

22      A.  Both, ones that had certain risk factors -- but

23   we ranked -- we ranked the progression rates and looked

24   at what those groups were.  And ones that had those risk

25   factors had the greatest progression rates, and that's

2fabe485-ea71-4c2b-9246-6ecc38558b81
CX1336

Page 58

 1    where the -- that upper tertile is where we saw a

 2    potential benefit of POM juice compared to the control.

 3              BY MS. EVANS:

 4         Q.  Now, looking at Figure 3, just to clarify --

 5    because it took me a long time.  I think I understand

 6    this, but I really want to make sure --

 7              MS. DIAZ:  Figure 3 or Table 3?

 8              MS. EVANS:  Figure 3.  So this is on page 940.

 9              MS. DIAZ:  Okay.

10              BY MS. EVANS:

11         Q.  And it has three graphs; correct?

12         A.  Yes.

13         Q.  Okay.  Now, the first graph is Graph A, and

14    that's the top graph, and that's the results of the

15    anterior measurements?

16         A.  Yes.

17         Q.  Okay.

18         A.  Wait, wait, wait, wait.  I'm sorry.

19              Yes.

20         Q.  Okay.  And so that graph, Graph A of the

21    anterior measurements, that shows that, for the total

22    population of the study -- is this on average that all

23    of the -- both the control and the pomegranate juice,

24    IMT progression went down during this study?

25         A.  Yes.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

2fabe485-ea71-4c2b-9246-6ecc38558b81
CX1336

In the Matter of:  POM Wonderful Davidson, M.D.                12/3/2010

Page 221

1        You testified earlier today that you have --

2    you -- I think -- and you can correct me if I'm wrong --

3    that you commonly perform subgroup analyses in your --

4    in the studies that you are the lead investigator in or

5    participate in some way.  Is that correct?

6        A.  Yes.

7        Q.  Okay.  Why is that?

8        A.  Well, my view as a clinician is that it is

9    always important -- important information that might be

10   available in subgroup analyses that could be -- that

11   could ultimately be very clinically beneficial to

12   patients.

13       Q.  Do you have any idea in about what percentage of

14   your studies or your -- let's say your larger clinical

15   studies -- you actually perform a subgroup analysis?

16       I don't want you to guess --

17       A.  No.  I mean -- yeah, we -- it's commonly done,

18   commonly done.

19       Q.  Does -- the post hoc analysis in this study

20   that's the subject of today's deposition, does -- did

21   that have clinical relevance to you?

22       A.  Yes.

23       Q.  Why?

24       A.  In my view, it was consistent with the potential

25   benefits of antioxidant treatment with pomegranate

2fabe485-ea71-4c2b-9246-6ecc38558b81
CX1336

Page 222

1    juice.  The group that there was a benefit is a group
2    that we now recognize as having more oxidative stress,
3    so there was more likely to see a benefit in that
4    subgroup.  And the benefits were not just on IMT.  They
5    occurred at a composite endpoint, but they also looked
6    like they were directionally in the same way for both
7    the anterior and the posterior wall, which means there
8    are two artery walls showing the same consistent effect,
9    number one.
10        And, number two, in that same subgroup that had
11   a benefit on carotid IMT, there also was a benefit on
12   the inflammatory marker CRP, which is also a surrogate
13   for cardiovascular risk.
14        So we had -- we had two independent biomarkers
15   showing an effect in the same -- in these same
16   subgroups, which leads me to believe that the benefit in
17   these subgroups are real and need to be verified with
18   further research.
19   Q.  Okay.  Let me -- I hear you.  But I think I
20   was . . . why do -- why did the results in the subgroup
21   analysis make sense to you?  Why do you think they're
22   reliable?
23   A.  They made sense because --
24        MS. EVANS:  Objection; foundation.
25   A.  (Continuing.)  They made sense as a -- as a

2fabe485-ea71-4c2b-9246-6ecc38558b81
CX1336

In the Matter of:  POM Wonderful  Davidson, M.D.                12/3/2010

Page 227

1    accurate presentation of the data.

2        Q.  Okay.  Was the study conducted and evaluated in

3    an objective manner?

4        A.  Yes.

5        Q.  By persons qualified to do so?

6        A.  Yes.

7        Q.  What measures were taken to ensure that the

8    study was as reliable as it could be?

9        A.  I'm not sure what you mean.  We had -- we had

10   standard clinical trial procedures in place that made

11   sure that the data was handled properly and evaluated

12   according to, you know, proper study conduct.

13       Q.  Okay.  On the first page of your report -- and I

14   don't know if you remember this and I can bring out your

15   report -- the first paragraph, first page of your

16   report, you cite -- in a footnote you cite to several --

17   well, actually, in the text you cite to several basic

18   science studies, and the science -- those studies are

19   identified in Footnotes 1 through 8.

20           And the studies include studies by Dr. Aviram,

21   Dr. Sumner, Ignarro, Dr. Kaplan, and Dr. Rosenblat.

22   Do you recall what studies I'm referring to?

23       A.  Yes.

24       Q.  Why were those studies referenced in your

25   report?

2fabe485-ea71-4c2b-9246-6ecc38558b81

CX1336

In the Matter of:  POM Wonderful Davidson, M.D.                    12/3/2010

Page 228

1      A.   Because they involved the effect of pomegranate

2   juice on either oxidative stress or measurements of

3   atherosclerosis.

4      Q.   Okay.  I take it you've read those studies,

5   you've evaluated those studies.

6      A.   Yes.

7      Q.   All right.  And you understand and believe them

8   to be accurate and reliable studies?

9      A.   Yes.

10      MS. EVANS:  Objection.  You're asking for

11   opinion evidence from a fact witness.

12      BY MS. DIAZ:

13      Q.   Is there anything in your study that you

14   conducted that, in your view, contradicts the results of

15   those studies?

16      A.   No.

17      Q.   Is there anything in your study that you view to

18   be consistent with any of those studies?

19      MS. EVANS:  Again, objection; asks for opinion

20   evidence from a fact witness.

21      A.   I think the findings are consistent.

22      BY MS. DIAZ:

23      Q.   How so?

24      A.   That -- to see an effect of an antioxidant

25   therapy like pomegranate, you need to use it in the

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

JA-0990

2fabe485-ea71-4c2b-9246-6ecc38558b81
CX1336

USCA Case #13-1060    Document #1483685    Filed: 03/12/2014    Page 43 of 367
In the Matter of:  POM Wonderful  Davidson, M.D.                      12/3/2010

Page 229

1    population that has high oxidative stress, and the more

2    oxidative stress that you have, the more likely you're

3    going to see a benefit with the treatment.

4         That's the general theme of our findings, and

5    it's consistent with other research.

6         Q.  I've heard some language today about endpoints.

7    And let me ask, if an endpoint is not reached or if an

8    outcome is deemed to be not -- not possible, does that

9    mean that the opposite position has been proven true or

10   even suggested that -- or in some way suggested that the

11   opposite is true?

12        A.  I'm not sure -- I mean, I . . . I'm not sure

13   what you're asking.

14        Q.  Okay.  Let me be more specific.

15        Does this study, your study, in any way suggest

16   that pomegranate juice affirmatively does not benefit

17   the heart in some way?

18        A.  No.

19        Q.  Okay.  You said that there was some, quote,

20   "bewilderment" about the final 18-month results on the

21   part of POM; is that true?

22        A.  Yes.

23        Q.  Okay.  Why was that?

24        If you know.

25        A.  Well, I think it -- it was related to the 12- to

2fabe485-ea71-4c2b-9246-6ecc38558b81
CX1336

1    18-month period -- you know, why did the placebo group

2    have this unusual blunting of progression over that

3    period of time?

4        Q.  And in your view, does -- that bewilderment, is

5    that -- was that reasonable?

6        A.  Yes.  I mean, I -- we're all -- all involved in

7    the study were -- felt that it wasn't a normal type of

8    response that you'd see over time in a control group.

9        Q.  Okay.  Did anyone at POM or Roll ever suggest

10   anything to you regarding this study that you thought

11   was scientifically unsound or inappropriate?

12       A.  No.

13       Q.  You spoke with Ms. Evans about some of the

14   reviewers' comments on your manuscript when it was

15   submitted for publication.  Now, the manuscript was

16   approved and published; correct?

17       A.  Yes.

18       Q.  And is this a reputable journal that it was

19   published in?

20       A.  Yes.

21       Q.  And does that mean that the editors were

22   satisfied with your responses to the reviewers'

23   comments?

24       A.  Yes.

25       Q.  Regarding the provision that the sponsor has the

2fabe485-ea71-4c2b-9246-6ecc38558b81

CX1336

In the Matter of:  POM Wonderful Davidson, M.D.                    12/3/2010

Page 231

1    right to approve publication of results that you

2    discussed with Ms. Evans earlier, have you seen this

3    with other research sponsors before?

4        A.  Yes.

5        Q.  What are some of the usual reasons for this kind

6    of provision?

7        A.  Well, it's actually --

8        Q.  In your experience.

9        A.  Yeah.  It's more common with -- more common with

10   food and nutrition companies because of -- they're

11   concerned about proprietary information and, you know,

12   potentially patents that they could -- ultimately may be

13   getting from the data.

14       Q.  Ms. Evans asked you earlier about whether you

15   preferred placebo-controlled, double-blind studies.  Do

16   you remember that?

17       A.  Yes.

18       Q.  Are those the only kinds of studies that are

19   considered valid?

20       A.  No.

21       Q.  They're not the only kind of studies that are

22   considered scientific or having sufficient scientific

23   rigor to --

24           MS. EVANS:  You're -- objection.  You're asking

25   for opinion evidence from a fact witness.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

2fabe485-ea71-4c2b-9246-6ecc38558b81
CX1336

# In the Matter of: POM Wonderful, et al.

December 12, 2010

Deposition Transcript of Allan Pantuck, M.D.

<u>List of Deposition Transcript Excerpts</u>

pp. 1-3, 10, 109-111

# In the Matter of:

# POM Wonderful

*December 15, 2010*
*Allan Pantuck, M.D.*

**Condensed Transcript with Word Index**



**For The Record, Inc.**
**(301) 870-8025 - www.ftrinc.net - (800) 921-5555**

CX1341

POM Wonderful          Pantuck, M.D.          12/15/2010

UNITED STATES OF AMERICA

FEDERAL TRADE COMMISSION

OFFICE OF ADMINISTRATIVE LAW JUDGES


| | |
|---|---|
| In the Matter of, | ) |
| | ) |
| POM WONDERFUL LLC and | ) |
| ROLL INTERNATIONAL CORP., | ) |
| companies, and | ) |
| | ) DOCKET NO. 9344 |
| STEWART A. RESNICK, | ) |
| LYNDA RAE RESNICK, and | ) |
| MATTHEW TUPPER, individually | ) |
| and as officers of the | ) |
| companies | ) |
| | ) |
| | ) |
| Respondents. | ) |
| | ) |



DEPOSITION OF ALLAN PANTUCK, M.D.




DATE & TIME:     Wednesday, December 15, 2010
                 9:29 a.m. – 6:30 p.m.


LOCATION:        10877 Wilshire Boulevard
                 Suite 700
                 Los Angeles, California


REPORTER:        Christina Kim-Campos, CSR
                 Certificate No. 12598



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

db08f7c0-8004-4a20-b725-892eb7f08e96
CX1341

POM Wonderful              Pantuck, M.D.              12/15/2010

Page 2

 1                 UNITED STATES OF AMERICA
 2                FEDERAL TRADE COMMISSION
 3           OFFICE OF ADMINISTRATIVE LAW JUDGES
 4
 5   In the Matter of,              )
                                    )
 6   POM WONDERFUL LLC and          )
     ROLL INTERNATIONAL CORP.,      )
 7   companies, and                 )
                                    )   DOCKET NO. 9344
 8   STEWART A. RESNICK,            )
     LYNDA RAE RESNICK, and         )
 9   MATTHEW TUPPER, individually   )
     and as officers of the         )
10   companies                      )
                                    )
11                                  )
                 Respondents.       )
12   _____)
13
14
15
16        DEPOSITION OF ALLAN PANTUCK, M.D., taken on
17   behalf of the Plaintiff, at 10877 Wilshire
18   Boulevard, Suite 700, Los Angeles, California,
19   commencing at 9:29 a.m., and concluding at
20   6:30 p.m., on Wednesday, December 15, 2010, pursuant
21   to Notice, before CHRISTINA KIM-CAMPOS,
22   CSR No. 12598, a Certified Shorthand Reporter, in
23   and for the State of California.
24                         ***
25

db08f7c0-8004-4a20-b725-892eb7f08e96
CX1341

POM Wonderful              Pantuck, M.D.              12/15/2010

Page 3

```
 1    APPEARANCES:
 2            For the Plaintiff:
 3                FEDERAL TRADE COMMISSION
                  BY:  TAWANA DAVIS, ESQ.
 4                  - & -
                  BY:  THEODORE H. HOPPOCK, ESQ.
 5                601 New Jersey Avenue, NW
                  NJ-3212
 6                Washington, DC  20580
                  (202) 326-2934
 7

            For the Respondents:
 8
                  UCLA HEALTH SYSTEM
 9                BY:  JANE BOUBELIK, ESQ.
                    - & -
10                BY:  SHARI FARIS GRONQUIST, ESQ.
                  10920 Wilshire Boulevard
11                Suite 420
                  Los Angeles, California  90024
12                (310) 794-3138
13
                  ROLL LAW GROUP
14                BY:  KRISTINA DIAZ, ESQ.
                    - & -
15                BY:  CHRISTINE K. SON, ESQ.
                  11444 West Olympic Boulevard
16                Los Angeles, California  90064
                  (310) 966-8775
17                kdiaz@roll.com
                  cson@roll.com
18
19
20
21
22
23
24
25
```

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

db08f7c0-8004-4a20-b725-892eb7f08e96

CX1341

POM Wonderful                Pantuck, M.D.                12/15/2010

Page 10

1                  LOS ANGELES, CALIFORNIA

2              WEDNESDAY, DECEMBER 15, 2010

3                       9:29 A.M.

4

5                  ALLAN PANTUCK, M.D.,

6          called as a witness by and on behalf of

7          the Plaintiff, being first duly sworn,

8          was examined and testified as follows:

9

10                      EXAMINATION

11   BY MS. DAVIS:

12      Q.   Good morning.  Could you please state and

13   spell your full name for the record.

14      A.   It's Allan Pantuck.  A-l-l-a-n

15   P-a-n-t-u-c-k.

16      Q.   Good morning.  My name is Tawana Davis.  Let

17   the record show that this proceeding convened at

18   approximately 9:30 a.m., on December 15th, 2010, at

19   the offices of the Federal Trade Commission in

20   Los Angeles, California.

21          Appearing for the Federal -- the court

22   reporter will note for the record the appearance of

23   counsel.  Appearing for the Federal Trade Commission

24   are attorneys myself, Tawana Davis, and Ted Hoppock,

25   and I'll let everybody else state their appearance

POM Wonderful                Pantuck, M.D.                12/15/2010

Page 109

1          (Plaintiff's Exhibit 215 was marked
2          for identification by the court
3          reporter and is attached hereto.)
4    BY MS. DAVIS:
5         Q.   Okay.  Dr. Pantuck, I've handed you what's
6    been marked as Exhibit 215.  Take a minute to look
7    at that and let me know when you're done.
8         A.   Okay.
9         Q.   Dr. Pantuck, is Exhibit 215 a letter from
10   you to James Abbruzzese, Deputy Editor, Clinical
11   Cancer Research, dated February 16, 2006?
12        A.   Yes.
13        Q.   It's not signed, but is this -- was this
14   letter sent to Mr. Abbruzzese?
15        A.   So this is the copy that I kept for myself,
16   of the letter that I sent to him.
17        Q.   Okay.  On page AJPANTUCK-0000077, in the
18   second paragraph near the bottom third, you state:
19             "We have been careful not to
20             overstate the significance of these
21             results, and in the Conclusions make
22             it clear what some of the weaknesses
23             of the current study are, and how
24             these will be addressed in the
25             upcoming randomized study."

POM Wonderful                Pantuck, M.D.                12/15/2010

                                                    Page 110

1          Is that correct?

2          MS. SON:  Counsel, where are you reading?

3          MS. DAVIS:  Page 0000077, paragraph number

4    two.

5          THE WITNESS:  Yes, I think that's correct.

6          MS. DAVIS:  One, two -- sorry -- about seven

7    lines up from the bottom.

8          THE WITNESS:  Yes.

9    BY MS. DAVIS:

10     Q.   Is that correct?

11     A.   Correct.

12     Q.   And how would you characterize the

13   weaknesses of the Phase II study?

14     A.   Well -- well, I don't know if I would -- I

15   don't know if "weakness" is the correct word, but I

16   guess "limitations" is a better word, which is --

17   you know, I think the study was designed -- well, it

18   was conducted well.  I think the data speaks for

19   itself, and I guess the limitations of any single

20   arm Phase II study is that there doesn't -- there's

21   not a blinded control, and I think that's the

22   greatest limitation of -- of this study.

23          And that's essentially the point I was

24   making, that that is the limitation we would address

25   in a follow-up study.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**JA-1001**

db08f7c0-8004-4a20-b725-892eb7f08e96
CX1341

USCA Case #13-1060     Document #1483685     Filed: 03/12/2014     Page 54 of 367

1          (Plaintiff's Exhibit 216 was marked

2          for identification by the court

3          reporter and is attached hereto.)

4     BY MS. DAVIS:

5          Q.   Dr. Pantuck, I've handed you what's marked

6     as Deposition Exhibit 216.  If you could take a

7     minute to look at it and let me know when you're

8     done.

9          A.   Okay.

10          Q.   Dr. Pantuck, is Exhibit 216 a copy of a

11     letter that you sent to James Abbruzzese on

12     March 28, 2006?

13          A.   Yes.

14          Q.   Okay.  And James Abbruzzese is Deputy Editor

15     of Clinical Cancer Research; correct?

16          A.   Correct.

17          Q.   Just to step back a bit.  When you submit an

18     article to a journal, is it usual for the journal to

19     come back with certain comments, or write back with

20     certain comments or questions?

21          MS. SON:  Objection to form.

22          THE WITNESS:  In my experience, no paper

23     ever gets accepted without some revisions and

24     modifications that are requested by the reviewers.

25     ///

db08f7c0-8004-4a20-b725-892eb7f08e96
CX1341

# In the Matter of: POM Wonderful, et al.

January 28, 2011

Deposition Transcript of David Heber, M.D., Ph.D.

<u>List of Deposition Transcript Excerpts</u>

pp. 1-3, 11, 197-200

# In the Matter of:

# POM Wonderful

*January 28, 2011*
*David Heber, M.D., Ph.D.*

**Condensed Transcript with Word Index**



**For The Record, Inc.**
**(301) 870-8025 - www.ftrinc.net - (800) 921-5555**

CX1352

Page 1

UNITED STATES OF AMERICA

FEDERAL TRADE COMMISSION

OFFICE OF ADMINISTRATIVE LAW JUDGES


In the Matter of,              )
                               )
POM WONDERFUL LLC and          )
ROLL INTERNATIONAL CORP.,      )
companies, and                 )
                               )  DOCKET NO. 9344
STEWART A. RESNICK,            )
LYNDA RAE RESNICK, and         )
MATTHEW TUPPER, individually   )
and as officers of the         )
companies                      )
                               )
                               )
          Respondents.         )
_____ )




CONFIDENTIAL VIDEOTAPED DEPOSITION OF

DAVID HEBER, M.D., Ph.D.




DATE & TIME:    Friday, January 28, 2011
                9:05 a.m. - 6:02 p.m.


LOCATION:       10877 Wilshire Boulevard
                Suite 700
                Los Angeles, California


REPORTER:       Christina Kim-Campos, CSR
                Certificate No. 12598




For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

POM Wonderful          Heber, M.D., Ph.D.          1/28/2011

Page 2

1                  UNITED STATES OF AMERICA

2                  FEDERAL TRADE COMMISSION

3            OFFICE OF ADMINISTRATIVE LAW JUDGES

4

5    In the Matter of,              )
                                    )
6    POM WONDERFUL LLC and          )
     ROLL INTERNATIONAL CORP.,      )
7    companies, and                 )
                                    )   DOCKET NO. 9344
8    STEWART A. RESNICK,            )
     LYNDA RAE RESNICK, and         )
9    MATTHEW TUPPER, individually   )
     and as officers of the         )
10   companies                      )
                                    )
11                                  )
              Respondents.          )
12   _____)

13

14

15          CONFIDENTIAL VIDEOTAPED DEPOSITION OF

16   DAVID HEBER, M.D., Ph.D., taken on behalf of the

17   Plaintiff, at 10877 Wilshire Boulevard, Suite 700,

18   Los Angeles, California, commencing at 9:05 a.m.,

19   and concluding at 6:02 p.m., on Friday,

20   January 28, 2011, pursuant to Notice, before

21   CHRISTINA KIM-CAMPOS, CSR No. 12598, a Certified

22   Shorthand Reporter, in and for the State of

23   California.

24                                  ***

25

689c7f1e-1395-4e0c-8576-24c49de59294
CX1352

POM Wonderful          Heber, M.D., Ph.D.          1/28/2011

Page 3

```
 1     APPEARANCES:
 2             For the Plaintiff:
 3                 FEDERAL TRADE COMMISSION
                   BY:  JANET M. EVANS, ESQ.
 4                  - & -
                   BY:  THEODORE HOPPOCK, ESQ.
 5                 601 New Jersey Avenue, NW
                   Washington, DC  20580
 6                 (202) 326-2125
 7             For the Respondents:
 8                 ROLL LAW GROUP
                   BY:  DAN SILVERMAN, ESQ.
 9                 11444 West Olympic Boulevard
                   Los Angeles, California  90064
10                 (310) 966-8775
11             Also Present:
12                 Terry Taylor, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

689c7f1e-1395-4e0c-8576-24c49de59294
CX1352

Page 11

1          MR. SILVERMAN:  Dan Silverman on behalf of

2     Defendants.

3          MR. HOPPOCK:  Ted Hoppock, Complaint Counsel

4     for the FTC.

5          MS. EVANS:  Janet Evans, Complaint Counsel

6     for the FTC, also.

7          THE VIDEOGRAPHER:  Thank you.

8          The court reporter will now administer the

9     oath.

10

11          DAVID HEBER M.D., Ph.D.,

12          called as a witness by and on behalf of

13          the Plaintiff, being first duly sworn,

14          was examined and testified as follows:

15

16               EXAMINATION

17     BY MS. EVANS:

18     Q.   Thank you, Dr. Heber.

19          I would ask you to state your full name for

20     the record.

21     A.   David Heber.

22     Q.   And what is your business address?

23     A.   900 Veteran Avenue, Los Angeles, California

24     90095-1742.

25     Q.   And is that at UCLA?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

689c7f1e-1395-4e0c-8576-24c49de59294
CX1352

Page 197

1      the text.

2          So the text that's attached here, is this

3      the various studies that you were showing -- sending

4      to Mark?

5      A.    Yes.

6      Q.    Okay.  So why was it that you -- what --

7      what was Stewart's question where -- when he says --

8      you know, you say:

9              Dear Mark, we talked -- we

10             discussed the study on cardiovascular

11             disease.  We have evidence from Dean

12             Ornish on blood flow.  However,

13             Stewart's question on IMT begs the

14             question of multifactorial risks of

15             heart disease and how well IMT

16             reflects them.

17             What does -- what did that mean?

18     A.    It just meant that IMT is a biomarker.

19     Q.    Mm-hmm.

20     A.    I mean, no biomarker is perfect --

21     Q.    Mm-hmm.

22     A.    -- not even cholesterol.

23     Q.    Mm-hmm.

24     A.    But IMT is a biomarker of risk for heart

25     disease that is influenced by other factors.

689c7f1e-1395-4e0c-8576-24c49de59294
CX1352

Page 198

1    Q.    Mm-hmm.

2    A.    So all I wanted to do for the discussion, in

3    preparation for the discussion of the pros and cons

4    of this particular study, was to point out what I

5    had found in my research on the Internet, which was

6    that blood sugar control and body fat could affect

7    IMT.

8    Q.    Okay.

9    A.    And that, obviously, would be a variable if

10   you had a large group of subjects.

11   Q.    Mm-hmm.

12   A.    And it could be something that could affect

13   the data.

14   Q.    Okay.  And, I mean, were you trying to

15   suggest that they should look through the data

16   and -- and try to -- try to evaluate the IMT data,

17   based on these other factors?

18   A.    Well, you know, when you do exploratory

19   analysis, you take those things -- just like I did

20   on the antioxidant -- you might take into

21   consideration do you have people that have any

22   evidence --

23   Q.    Mm-hmm.

24   A.    -- of Type 2 diabetes or prediabetes or body

25   fat excess and things like that --

689c7f1e-1395-4e0c-8576-24c49de59294
CX1352

Page 199

1    Q.    Okay.

2    A.    -- which might then point you in another

3    direction.

4          So a lot of times, an overall study may have

5    a statistically insignificant result --

6    Q.    Mm-hmm.

7    A.    -- but then you do kind of exploratory

8    analyses within the database, and it gives you

9    direction for future study.

10   Q.    Okay.  And so you were -- so -- and then

11   you -- you subsequently did have that meeting, or

12   you did have some kind of meeting with regard --

13   A.    Right.

14   Q.    -- after March 27?

15         And do you know what the upshot of that

16   meeting was?

17   A.    The upshot of the meeting, we had a

18   discussion.  We had sev- -- I think we had maybe, I

19   would say, one or two discussions around this study.

20   Q.    Mm-hmm.

21   A.    And ultimately, the ultimate decision was to

22   send it for peer review and let the peer review

23   process handle it.

24   Q.    Mm-hmm.

25   A.    If the peer review people felt that the data

689c7f1e-1395-4e0c-8576-24c49de59294
CX1352

POM Wonderful            Heber, M.D., Ph.D.            1/28/2011

Page 200

1    was worth publishing and was significant, then they

2    would do that.

3            You know, in the case of my data that I

4    showed you earlier --

5        Q.    Mm-hmm.

6        A.    -- I was able to decide on my own that the

7    standard air bars are bigger than the variable,

8    there's no point in submitting it anywhere.

9        Q.    Gotcha.

10       A.    However, the IMT study, which I was not a

11   participant in the IMT study, but I was a

12   participant in the discussions about it --

13       Q.    Mm-hmm.

14       A.    -- the decision was this kind of a

15   borderline situation --

16       Q.    Mm-hmm.

17       A.    -- let's send it to peer review and see if

18   it's worthy of publication.

19       Q.    Mm-hmm.

20       A.    Let the peer review process decide.

21       Q.    Okay.  Well, was -- was Stewart Resnick

22   concerned about publishing the data because it had

23   a -- a non-result and a main population at 18

24   months?

25            MR. SILVERMAN:  Objection.  Calls for

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**JA-1012**

689c7f1e-1395-4e0c-8576-24c49de59294
CX1352

**EXPERT REPORT OF JAMES A. EASTHAM, M.D.**

## I.    CREDENTIALS AND QUALIFICATIONS

I am the Chief of Urology, Department of Surgery at Memorial Sloan-Kettering Cancer Center.  My clinical and research interests center on the diagnosis, risk-assessment and management of prostate cancer.  I serve as the Director of Clinical Research, Urology and chair the protocol review committee for clinical trials in the Department of Surgery.

I received Bachelor of Science degrees in Biology and Chemistry from the University of California, Irvine.  I obtained my medical degree from the University of Southern California, Los Angeles in 1987.  Thereafter, I completed my residency in Urology at the University of Southern California-Los Angeles County Medical Center in 1993 and a fellowship in Urologic Oncology at Baylor College of Medicine in 1995.  My curriculum vitae is attached hereto as Exhibit A.

Prior to joining Memorial Sloan-Kettering Cancer Center in 2000, I was Director of Urologic Oncology at Louisiana State University Health Science Center and Chief of Urology at Overton Brooks Veterans Administration Medical Center, both in Shreveport, Louisiana.  My academic appointments have included serving as an Assistant and Associate Professor of Urology at Louisiana State University in Shreveport from 1995 to 2000.  Since 2001, I have served as Associate Professor and Professor of Urology at Weill Cornell Medical College in New York.  I was appointed Chief of the Urology Service in 2009.

*Confidential*-FTC Docket No. 9344

CX1287_0001

I am a board-certified urologic surgeon who specializes in nerve-sparing radical prostatectomy and salvage prostatectomy for patients whose prostate cancer is not responsive to radiation therapy. Currently, I perform approximately 200 surgeries each year for prostate cancer. During my career, I have treated more than 2000 patients with prostate cancer, some of whom experienced a rise in prostate-specific antigen ("PSA") after receiving initial therapy. I have guided numerous patients diagnosed with prostate cancer through the various treatment options.

As Director of Clinical Research at Memorial Sloan-Kettering Cancer Center, I have extensive experience in designing and developing protocols for clinical trials studying prostate cancer. My clinical research focuses on improving outcomes such as cancer control, urinary continence, and sexual function. I have been the principal investigator of clinical trials examining quality of life after radical prostatectomy, clinical factors associated with risk of recurrence after surgery, neoadjuvant chemohormonal therapy in conjunction with prostate cancer, and various minimally-invasive options for the treatment of prostate cancer.

I am a member of the Data Safety Monitoring Board for the Selenium and Vitamin E Cancer Prevention Trial ("SELECT").[1] As a member of the Data Safety Monitoring Board ("DSMB"), I review clinical data to determine if the trial carries excessive risk for enrollees and whether or not the study is meeting its primary endpoint. The trial was stopped by the DSMB for futility, but data acquisition and review continue.

---

[1] SELECT is a clinical trial which was designed to determine whether selenium or vitamin E supplements, taken alone or together, prevent prostate cancer. An initial review of the data showed that neither supplement prevented cancer and that there were slightly more cases of prostate cancer in men taking Vitamin E.

In that capacity, I am familiar with the design and performance of the largest prevention trials studying antioxidants and prostate cancer.

I am a member of the National Comprehensive Cancer Network ("NCCN") Prostate Cancer Guidelines Committee. NCCN is an alliance of 21 of the world's leading cancer centers dedicated to improving the quality and effectiveness of the care provided to patients with cancer. As a member of the Prostate Cancer Guidelines Committee, I review data from the treatment of prostate cancer and make recommendations for the management of the disease based on risk.

I am also a member of the American Urological Association, the Society of Urologic Oncology, and the American Association of Genitourinary Surgeons, and a fellow in the American College of Surgeons. I regularly attend and speak at national and international meetings of professional societies that specialize in urology and prostate cancer.

I am a reviewer for a number of medical journals including *Urology, The Journal of Urology, Journal of Clinical Oncology, European Urology, Clinical Genitourinary Cancer*, and *Nature Clinical Practice Urology.* Over the past 15 years, I have peer-reviewed numerous papers submitted for publication to scientific and medical journals. Some of these papers involved randomized, double-blind, placebo-controlled studies. In reviewing these submissions, I evaluate, among other things, the adequacy of the design and conduct of the clinical research, and the adequacy and accuracy of the statistical analysis.

As detailed in my curriculum vitae, I have engaged in scholarly research and writing related to urology, including treatments for prostate cancer. I have authored or

coauthored more than 200 articles that have been published in peer-reviewed scientific journals, as well as dozens of book chapters or reviews pertaining to urology and the treatment of prostate cancer.

Based upon my education, training, and experience, as summarized above, I consider myself to be an expert in the following fields: 1) urology, including the prevention and treatment of prostate cancer; and 2) clinical testing related to the prevention and treatment of prostate cancer.

In the past four years, I have not testified as an expert witness in either a deposition or a trial. I am being compensated by the FTC at $250 per hour for my work in this litigation.

## II.     SCOPE OF THE REPORT AND MATERIALS REVIEWED

The FTC has requested that I evaluate, from my perspective as an expert in urology, including the prevention and treatment of prostate cancer, and in clinical testing related to the treatment and prevention of prostate cancer, whether the following claims are supported scientifically by the materials provided by the Respondents:

(1) Drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily prevents or reduces the risk of prostate cancer, including by prolonging prostate-specific antigen doubling time ("PSADT");

(2) Drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily is effective in treating prostate cancer, including by prolonging PSADT;

CX1287_0004

(3) Tests prove that drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily prevents prostate cancer, including by prolonging PSADT; and

(4) Tests prove that drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid treats prostate cancer, including by prolonging PSADT.

Attached to this report as Exhibit B is a disc containing the materials that I relied upon in evaluating the claims for POM Juice, POMx Pills, and POMx Liquid. This disc includes the materials that I have been advised were submitted by the Respondents in support of their claims for the POM products, which I reviewed and evaluated at the request of FTC counsel. In addition, I conducted a literature search to find published articles on studies evaluating the efficacy of POM Juice, POMx Pill, and POMx Liquid for preventing or treating prostate cancer. I am also generally familiar with the body of studies regarding the prevention and treatment of prostate cancer, PSA, and PSADT published in English-language scientific journals as a reviewer of manuscripts for several journals, including the *Urology*, *The Journal of Urology*, and the *Journal of Clinical Oncology*. In developing this Expert Report, I have relied extensively upon my education, experience, and my knowledge of developments in the field of urology, including the prevention and treatment of prostate cancer, and clinical testing relating to the prevention and treatment of prostate cancer.

In addition, I understand that the Respondents have designated several experts whose reports have not been produced yet. If these reports raise additional issues which fall within my area of expertise, I may be asked to address these issues as well.

**JA-1017**

CX1287_0005

III.    **SUMMARY OF CONCLUSIONS**

In brief, it is my opinion that the materials provided by the Respondents do not provide reliable scientific evidence that POM Juice, POMx Pills, or POMx Liquid effectively prevents, reduces the risk of, or treats prostate cancer. In my opinion, qualified experts in the field of urology, including the prevention and treatment of prostate cancer, and clinical testing relating to the prevention and treatment of prostate cancer, would require that Respondents' claims be supported by at least one well-conducted, randomized, double-blind, placebo-controlled clinical trial with an appropriate endpoint. To my knowledge, there are no clinical trials of POM Juice, POMx Pills or POMx Liquid testing their effectiveness in preventing prostate cancer in healthy men. Therefore, there is no reliable scientific support for the Respondents' prevention claims.

At the time the Respondents made the claims for POM Juice, POMx Pills, and POMx Liquid, only one clinical trial had been conducted studying the effect of POM Juice in men treated for prostate cancer. The study was an unblinded, uncontrolled pilot study of 46 men using an unproven measure as its primary endpoint. It is my opinion that this study does not provide competent and reliable scientific evidence to support the conclusion that POM Juice, POMx Pills, and POMx Liquid is effective in treating prostate cancer or clinically proven to treat prostate cancer.

IV.    **OVERVIEW OF PROSTATE CANCER, PSA, AND PSADT**

The prostate is a gland of the male reproductive system that makes and stores seminal fluid which nourishes sperm. More than 200,000 men in the United States are diagnosed with prostate cancer each year. Not all prostate cancers are alike. Some are

CX1287_0006

aggressive and require treatment, while others are slow-growing and unlikely to cause problems.

Localized prostate cancer generally causes no symptoms. Therefore, early detection tests have been developed to diagnose cancer while it remains confined to the prostate. The two most commonly used tests are the serum PSA (prostate-specific antigen) level and digital rectal examination ("DRE"). PSA is a protein produced by cells within the prostate which can be measured in a man's blood. PSA screening became commonplace in the late 1980s. Men receiving treatment for prostate cancer today are likely to have undergone several PSA screenings and be very familiar with their PSA history. Because of early detection, the number of men diagnosed with prostate cancer has increased dramatically.

More importantly, there has been a marked stage-shift in the disease, meaning that the vast majority of men are diagnosed with clinically-localized cancer. As a result, there has been a recent reduction in mortality from prostate cancer. While the reasons for this are multifactorial, prostate cancer screening with PSA testing is likely to have contributed. Although routine PSA screening is controversial, most American men undergo prostate cancer screening. The American Urological Association recommends that all men undergo baseline testing at age 40.

An elevated PSA level does not mean that a man has prostate cancer. PSA levels can be indicative of a number of things, including benign growth and inflammation. However, the higher the PSA value, the greater likelihood of the presence of cancer. If a man has a high PSA level, or an abnormal DRE, he is likely to undergo a prostate biopsy. If the prostate biopsy confirms the presence of cancer, he may opt to receive a variety of

treatments ranging from active surveillance (watchful surveillance), radiation therapy, brachytherapy (implantation of radioactive seeds), cryotherapy (freezing prostate tissue), or radical prostatectomy (surgical removal of prostate). If a man undergoes a radical prostatectomy, his PSA level should fall to zero within several weeks after surgery. Other therapies would similarly reduce a man's PSA to near zero.

However, many men will experience biochemical recurrence after receiving initial treatment. This means that their PSA levels will begin to rise, indicating that initial treatment failed to eradicate all the prostate cells in the body. At low levels of PSA when recurrence is detected, it is unlikely that imaging studies can detect the site(s) of persistent disease. Treating physicians carefully monitor PSA levels to determine the appropriate course of treatment. A rising PSA post-initial therapy constitutes evidence of a cancer recurrence, but not necessarily metastatic disease.[2] Some men with PSA recurrence may eventually develop metastatic disease resulting in death. Others may not.

PSA doubling time ("PSADT") is the time it takes for the PSA to double. It is used to assess the risk posed by prostate cancer in men who have experienced PSA-recurrence after treatment. In general, the shorter the PSADT, the higher the risk posed by the cancer. To date, a post-treatment PSADT of less than three months has been correlated with prostate cancer-specific mortality.[3] Doubling times of greater than three months have not been correlated with prostate cancer-specific mortality. This means that men with a PSADT of greater than three months are just as likely to die from some cause other than prostate cancer.

---

[2] Metastatic disease means the spread of disease from one organ to another, non-adjacent organ.
[3] D'Amico AV, et al., Surrogate end point for prostate cancer-specific mortality after radical prostatectomy or radiation therapy, J. Natl Cancer Inst. 2003 Sep17;95(18):1376-83.

*Confidential*-FTC Docket No. 9344              8

CX1287_0008

## V.    OVERVIEW OF CLINICAL TRIALS, ENDPOINTS, AND SURROGATE ENDPOINTS

A cancer prevention trial is a study of a large group of people to test new approaches, such as medicines, vitamins, minerals, or other supplements which may lower the risk of a certain type of cancer.  A prevention trial tries to find better ways to prevent cancer in people who have never had cancer or lower the chances that they will get it.  A cancer treatment trial studies people who already have cancer to find better ways to treat them.

Generally, preventative or therapeutic agents become standard of care after undergoing several phases of clinical testing.  Pre-clinical studies would include animal and *in vitro* studies in which a potential treatment is studied for safety.  Phase I trials test a treatment in a small number of patients to find a safe dose, to decide how a new treatment should be administered (orally or by injection), and to see how the treatment affects the human body.  Phase II trials test a treatment in a larger number of people to determine if the treatment has an effect on a certain cancer.  Phase III trials test a treatment in an even larger number of people to compare the new treatment with a standard treatment.  Phase IV trials test a treatment in several hundred to thousands of people to further assess the long-term safety and effectiveness of a treatment.

An endpoint is the outcome that researchers are trying to measure in a clinical trial.  In a prostate cancer prevention trial, prevalence or the incidence of prostate cancer in the population studied is the endpoint generally accepted by experts in the field.  In a prostate cancer treatment trial, overall survival or prostate cancer-specific mortality is the endpoint generally accepted by experts in the field.

A surrogate endpoint is a measurement or sign used as a substitute for a clinically meaningful endpoint which measures directly how a patient feels, functions, or survives. Changes in a surrogate are expected to reflect changes in a clinically meaningful endpoint. For example, reductions in blood pressure and LDL cholesterol are among the accepted surrogates for clinical benefit in heart disease studies. However, experts in the field of prostate cancer have not agreed upon either PSA or PSADT as a surrogate for clinically meaningful endpoints in prostate cancer treatment trials.[4]

There are several reasons why neither PSA nor PSADT have been accepted as surrogates. First, it is unclear whether there is a sufficient mechanistic link between PSA levels and prolonging survival. Lowering blood pressure and reducing LDL cholesterol are accepted surrogate endpoints in heart disease clinical studies. There is a clear physiological connection between reducing the amount of bad cholesterol flowing through a person's arteries and improving his or her chances of survival. A similar connection has not been established with PSA.

Second, PSA response to therapy is dependent on the mechanism of action of the treatment modality. Cytotoxic agents such as chemotherapy directly kill cancer cells and therefore can affect PSA levels. However, other targeted therapies can exert their effects on cancer cells via cytostatic, antiproliferative, or other nontoxic mechanisms, which may have less impact on PSA levels. Therefore, PSA levels do not always adequately reflect the clinical benefits of a potential therapy.

Third, clinical trials of novel targeted agents in which PSA has been used as a surrogate marker for disease progression and overall survival have reported inconsistent

---

[4] *See* FDA, Prostate Cancer Endpoints Workshop Summary (2005)
http://www.fda.gov/AboutFDA/CentersOffices/CDER/ucm117709.htm#prostate

*Confidential*-FTC Docket No. 9344                          10

CX1287_0010

PSA responses, even across trials of the same drug. For example, in the SWOG 99–16 study comparing treatments for advanced hormone-refractory prostate cancer, PSA was demonstrated to be a good surrogate marker for overall survival as the decline in PSA levels correlated with a significant improvement in overall survival.[5] In contrast, other studies of chemotherapeutic agents have reported PSA to be a poor surrogate marker for overall survival in patients with hormone-refractory prostate cancer. The ASCENT study comparing DN-101 plus docetaxel with docetaxel alone found that PSA levels were a poor surrogate endpoint for survival. DN-101 treatment was associated with a significant improvement in overall survival but not a significant decline of PSA levels, suggesting no relationship between PSA levels and survival.[6] Furthermore, in the TAX-327 study comparing weekly and three-weekly schedules of docetaxel plus prednisone with mitoxantrone plus prednisone, a similar decline of PSA was observed with both docetaxel regimens. However, this did not translate into an improvement in overall survival in the weekly docetaxel group.[7]

Finally, while PSADT has some prognostic value, only a PSADT of less than 3 months has been correlated with survival outcomes. Correlation between PSADT greater than 3 months and survival has not been established in clinical trials. Moreover, there have been no clinical studies demonstrating that therapies modulating PSADT affect survival. To date, no one knows whether a therapy which slows PSADT results in prolonged survival or any other clinical benefit for prostate cancer patients.

---

[5] Petrylak D, et al., Evaluation of prostate-specific antigen declines for surrogacy in patients treated on SWOG 99-16, J. Natl Cancer Inst. 2006 April 19;98(8):516-21.

[6] Beer TM, et al., Double-blinded randomized study of high-dose calcitriol plus docetaxel compared with placebo plus docetaxel in androgen-independent prostate cancer: a report from the ASCENT Investigators, J Clin Oncol. 2007 Feb 20;25(6):669-74.

[7] Berthold DR, et al., Treatment of hormone-refractory prostate cancer with docetaxel or mitoxantrone: relationships between prostate-specific antigen, pain, and quality of life response and survival in the TAX-327 study, Clin Cancer Res. 2008 May 1;14(9):2763-7.

*Confidential*-FTC Docket No. 9344          11

CX1287_0011

Because neither PSA nor PSADT has been consistently proven as useful surrogate endpoint in clinical trials, they are not generally accepted by experts in the field of prostate cancer as an appropriate measure to assess the potential of novel agents to prolong survival.

## VI.   TYPE OF EVIDENCE AND STUDIES THAT ARE REQUIRED TO DEMONSTRATE THE EFFICACY OF A PRODUCT TO PREVENT OR REDUCE THE RISK OF PROSTATE CANCER

The FTC staff has asked me what kind of evidence experts in the field of prostate cancer would require to support claims that POM Juice, POMx Pills, and POMx Liquid are effective in preventing or reducing the risk of prostate cancer. In my opinion, experts in the field of prostate cancer would require that such claims be supported by at least one well-designed, randomized, double-blind, placebo-controlled clinical trial involving an appropriate sample population. In a prostate cancer prevention trial, the appropriate sample population would involve more than 10,000 healthy men, ages 50 to 65, having no sign of prostate cancer. The total sample population must be large enough to produce clinically-significant results and a statistical significance of $p < 0.05$. For example, the Prostate Cancer Prevention Trial ("PCPT") comparing the ability of finasteride versus placebo to reduce the prevalence of prostate cancer included over 18,000 men. This sample size is necessary for 90% power to detect a 25% treatment arm difference in the proportion of positive biopsies after 7 years of study treatment.

Randomization refers to a method by which study participants are assigned, randomly, either to the active treatment group or to the placebo group. Randomization gives every participant entering a clinical trial the same chance of receiving any of the available treatments. A trial employing a secure simple randomization in its purest form

**JA-1024**

CX1287_0012

is not susceptible to any selection bias by the clinicians whether conscious or unconscious. Randomization reduces the likelihood that there will be differences in patients in the different arms of a study.

A study must be double-blinded, which means that neither the investigators nor the study participants know whether a participant is in the active or placebo group. Double-blind trials are thought to produce objective results, since the expectations of the researcher and the participant about the experimental treatment do not affect the outcome.

A study must use standardized, objective criteria for patient selection and for measuring treatment outcomes. Similar enrollment criteria and outcomes measures must be used for all treatment groups to assure that a valid comparison can be made and that any difference in outcomes can be attributed to the treatment under study.

A well-designed study must include a control group. A control group should be approximately the same size and include participants that meet the same criteria as the treatment group. Participants in the control group are given a placebo identical in appearance to the agent administered to the treatment group. A control group provides a standard by which the results observed in the treatment group can be evaluated.

A well-designed clinical trial on the prevention of prostate cancer would include standard enrollment criteria such as age-range, findings on DRE, and baseline PSA levels. For example, a prevention trial might be designed to evaluate men ages 50 to 65, all having a normal DRE and a PSA test less than 3 ng/mL (standard and objective enrollment criteria). Men would be randomly assigned to receive treatment or placebo, and neither the patient nor the physician would know whether the patient would take treatment agent or placebo (randomized double-blind study). Patients would all be

assessed periodically (*i.e.,* every six months) by PSA testing and a DRE. If the PSA reached a predetermined threshold (for example > 4.0 ng/mL) and/or the DRE became suspicious, a prostate biopsy would be performed (objective follow-up criteria). The endpoint would be the percentage of men diagnosed with prostate cancer (objective end point). A well-designed study should also include and describe measures for monitoring subject compliance (such as pill counts and/or a diary) and specify how subject drop-outs and withdrawals are to be handled.

After a clinical trial has been completed and all data have been collected, the data for the placebo and treatment groups must be compared through the use of an appropriate statistical analysis by a biostatistician or other qualified person. If appropriate, the biostatistician should be blinded to the treatment groups as well. The treatment can only be said to have an effect where the results obtained by the treatment group are statistically significant ($p<0.05$) from the results obtained by the placebo group using the pre-study definition of treatment success. However, any statistically significant results must be reviewed for clinical significance. A prostate cancer prevention study must be conducted over a long enough period of time to see an effect over time. Recent prostate cancer prevention trials such as the PCPT and the Reduction by Dutasteride of Prostate Cancer Events ("REDUCE"), have lasted from four to seven years. The primary endpoint in a prostate cancer prevention trial for measuring whether a product has been effective is the prevalence or incidence of prostate cancer between the treatment and placebo groups at the conclusion of the study.

Anecdotal evidence (*i.e.,* reports from patients) is insufficient to prove the efficacy of a potential treatment. In addition, animal studies cannot support claims that a

product works in men because a treatment agent may behave differently in different species.  Similarly, *in vitro* studies cannot support claims that a product works in men because the results in a test tube may yield different results in humans.  In addition, *in vitro* studies will not reveal the adverse reactions a human patient may experience from taking a product.

## VII.   TYPE OF EVIDENCE AND STUDIES THAT ARE REQUIRED TO DEMONSTRATE THE EFFICACY OF A PRODUCT TO TREAT PROSTATE CANCER

A prostate cancer treatment trial would include all of the features described above, namely, randomization, placebo-control, double-blinding, objective criteria for patient selection and measuring treatment outcomes, and appropriate statistical analysis. In a prostate cancer treatment trial, the appropriate sample population would depend on the stage of the disease targeted by the study (*i.e.*, treatment of hormone-sensitive or treatment of hormone-refractory prostate cancer) and the primary endpoint to be measured.  Such trials can involve hundreds to thousands of patients and last a minimum of several years.  A treatment study must be conducted over a long enough period of time to have a realistic chance of seeing differences in outcomes attributable to the treatment.

## VIII.   ANALYSIS OF THE AVAILABLE EVIDENCE REGARDING THE EFFECTIVENESS OF POM JUICE, POMx PILL, AND POMx LIQUID IN PREVENTING OR REDUCING THE RISK OF PROSTATE CANCER

As indicated above, the FTC staff asked whether the available evidence supports the conclusion that POM Juice, POMx Pills, and POMx Liquid are: (1) clinically proven to prevent or reduce the risk of prostate cancer, including by prolonging PSADT; and (2) is effective in preventing or reducing the risk of prostate cancer, including by prolonging PSADT.  I have reviewed the materials that I am informed were provided to the FTC by

the Respondents in this action as support for their claims for the POM products. Also, in addition to my general knowledge of the literature on treatments for prostate cancer, PSA, and PSADT, I conducted a literature search to identify any published reports of human studies evaluating the efficacy of POM Juice, POMx Pills, or POMx Liquid, to prevent or reduce the risk of prostate cancer.

Based on my review of the documents provided by the Respondents and the published literature, I am not aware of any prevention studies that have been conducted on POM Juice, POMx Pills, or POMx Liquid. As discussed above, experts in the field of prostate cancer would require that, prior to making a claim that a compound effectively prevents or reduces the risk of prostate cancer, the product was shown through well-designed, randomized, double-blind and placebo-controlled clinical tests on healthy men to be effective in preventing or reducing the risk of prostate cancer. To my knowledge, the only study the Respondents relied upon to support their claims was conducted on men who had already been treated for prostate cancer. In the absence of any clinical trials demonstrating the efficacy of POM Juice, POMx Pills, or POMx Liquid in preventing prostate cancer, it is my opinion that there is no competent and reliable scientific evidence supporting a claim that these products: 1) have been clinically proven to be effective in preventing or reducing the risk of prostate cancer, including by prolonging PSADT; or 2) are proven to be effective in preventing or reducing the risk of prostate cancer, including by prolonging PSADT.

*Confidential*-FTC Docket No. 9344                16

CX1287_0016

IX.    ANALYSIS OF THE AVAILABLE EVIDENCE REGARDING THE
EFFECTIVENESS OF POM JUICE, POMx PILLS, AND POMx LIQUID
IN TREATING PROSTATE CANCER

### A. Pantuck Phase II Study

At the request of the FTC staff, I reviewed the published report of a study

conducted by Dr. Allan Pantuck, a urologist at UCLA.[8]  The study was designed as an

unblinded, uncontrolled trial to evaluate the effect of drinking eight ounces of

pomegranate juice daily on PSA in men who had a rising PSA following treatment for

prostate cancer.  The study initially enrolled 48 patients.  Two patients withdrew before

their first evaluation, leaving 46 patients who could be evaluated for a treatment

response.  The majority of the patients (68%) had been previously treated for prostate

cancer by undergoing radical prostatectomy.  The remainder had been treated by

radiation (10%), brachytherapy (10%), a combination of surgery and radiation (7%), or

cryotherapy (5%).  Ninety-four percent of the patients had original Gleason scores in the

5 to 7 range and the rest had a Gleason score of 4.[9]  To be eligible for the study, patients

had to have a detectable PSA of greater than 0.2 and less than 5ng/mL that was

documented as rising, enough pretreatment PSA time points to calculate a baseline

PSADT, no hormonal therapy before entering the study, no evidence of metastatic

disease, and a Gleason score of $\leq 7$.

Patients were treated with eight ounces of pomegranate juice by mouth daily until

meeting disease progression endpoints.  Disease progression was defined as either a

greater than 100% increase in PSA (with a minimum value of 1.0 ng/mL) compared with

---

[8] Pantuck AJ, et al., Phase II study of pomegranate juice for men with rising prostate-specific antigen
following surgery or radiation for prostate cancer, Clin Cancer Res. 2006 July 1;12(13): 4018-26.
[9] Gleason score refers to a system assigns a grade (from two to ten) for each prostate cancer based upon the
characteristics of the tumor.

CX1287_0017

the best response observed or any documentation of metastatic or recurrent disease. Patients had their blood drawn every three months to have their PSA determined. The average pretreatment PSADT before intervention was approximately 15 months, and after 33 months, the average post-treatment PSADT was 54 months.

Based upon my review and analysis of the Pantuck Phase II study and my general expertise, I have concluded that the study does not provide competent and reliable scientific evidence to support claims that drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily is effective in treating prostate cancer, including by prolonging PSADT, or that tests prove that drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily is effective in treating prostate cancer, including by prolonging PSADT. This study fails to provide competent and reliable scientific evidence for several reasons.

First, the study lacked a placebo (control) group. Well-designed studies use a control group comprised of patients whose characteristics match the characteristics of those in the treatment group. The purpose of the control group is to isolate the cause of the effect the study is trying to prove. Without a control group, it is not possible to conclude that POM Juice alone had an effect on the patients' PSA. For example, in a randomized, placebo-controlled trial studying the effect of an approved treatment for diabetes in men with prostate cancer, both the treatment group and the placebo group experienced a lengthening of PSADT.[10] If the Pantuck study had included a control group, it is possible that no statistical difference between groups would have been observed.

---

[10] Smith MR, et al., Rosiglitazone versus placebo for men with prostate carcinoma and a rising serum prostate-specific antigen level after radical prostatectomy and/or radiation therapy. Cancer. 2004 Oct 1;101(7):1569-74.

Second, the study was not blinded. Both the researchers and the patients knew that POM Juice was the product being tested. This is a significant flaw because it allows for the introduction of bias on the part of the researchers and subjects.

Third, the primary endpoint for measuring efficacy was PSADT. PSADT is not recognized by experts in the field as a surrogate endpoint in prostate cancer clinical trials. PSADT measured at the time of biochemical recurrence after treatment has been associated with survival but only in men with a PSADT of less than three months. Of note, no patient in this study had a PSADT less than three months. Altering PSADT has not been shown to change the natural history of the disease by delaying the development of metastases or death from prostate cancer. The presence of PSA indicates that there are some prostate cells somewhere present in the body. It does not mean that those cells will ultimately compromise the survival or quality of life of the patient.

Fourth, the average pretreatment PSADT for the study participants was 15 months. These patients are considered to be at the lowest risk for prostate cancer progression.[11] There is no evidence that prolonging the PSADT in a group already considered to be "most favorable" is beneficial. Even if POM Juice prolonged PSADT, it is unclear whether that outcome is truly clinically significant.

Fifth, this was a small study of only 46 men. Six of the 24 patients studied in the first stage experienced disease progression as defined by the study. Only 16 (35%) of all the participants experienced a decline in PSA. Even the study authors acknowledged that a randomized, double-blind, placebo controlled test is needed to address the limitations of the study and confirm its results.

---

[11] *See* Zhou P, et al., Predictors of prostate cancer-specific mortality after radical prostatectomy or radiation therapy, J. Clin Oncol. 2005 Oct 1;23(28):6992-8 (finding that patients with a PSADT of greater than 12 months have the lowest risk of prostate cancer-specific mortality).

CX1287_0019

Finally, the results from the Pantuck study on POM Juice cannot be used to support claims for POMx Pills and POMx Liquid. The information the Respondents have provided indicates that POM Juice is not identical to POMx Pills and POMx Liquid. Even if the active ingredient is known and the alternate compound contains the same amount of active ingredient, the alternate compound may contain some other as yet unknown compound that might counter-act the benefit of the active agent. Therefore, an expert in prostate cancer would not rely upon the clinical testing of one product to support the efficacy of a non-identical product.

### B. Pantuck Phase II Follow-Up

At the request of the FTC staff, I also reviewed the follow-up results of the Phase II study.[12] The researchers compared the PSADT of those still on study (active) with those no longer on study (non-active). The baseline mean PSADT for the active and non-active groups were 13.9 and 17.6 months, respectively. The mean post-treatment PSADT increased in the active group to 68.57 months and in the non-active group to 51.2 months. Both groups experienced a statistically significant rise in PSADT from baseline. Post-treatment PSADT was greater and the decline in PSA slopes was larger in the active group as compared to the non-active group (p=0.003).

It is my opinion that these follow-up results do not provide competent and reliable scientific evidence to support claims that drinking eight ounces of POM Juice daily treats prostate cancer or that tests prove drinking eight ounces of POM Juice daily treats prostate cancer. These results flow from the original Pantuck Phase II study and thus suffer from the same flaws (*i.e.,* no placebo, no blinding) I described earlier. More

---

[12] Pantuck AJ, et al., Long term follow up of pomegranate juice for men with prostate cancer and rising PSA shows durable improvement in PSA doubling time, American Society of Clinical Oncology (2008 Genitourinary Cancers Symposium)(POM2 0526).

importantly, the follow-up results are based upon changes in PSADT, which is not an accepted surrogate endpoint for prostate cancer treatment trials. Both groups (active and non-active) experienced a rise from pretreatment PSADT baselines that were already favorable (greater than 12 months). To date, there is no evidence that such changes result in prolonged survival or any other clinically meaningful benefit.

### C. POM Preclinical studies

At the request of the FTC staff, I also reviewed the animal and *in vitro* studies the Respondents submitted as support for their claims. As I stated above, this type of evidence fails to provide reliable scientific evidence in support of their claims. Animal and *in vitro* studies are hypothesis-generating studies. Compounds that work in the test tube or in animals often behave differently in the human body. Results from such studies must be confirmed in randomized, double-blind, placebo-controlled trials.

### D. Post-Claim Substantiation

### 1. Carducci Dose Study

At the request of the FTC staff, I also reviewed the protocol *Safety and Efficacy of POMx in Men with Prostate Cancer: An 18-Month, Randomized, Double-Blind, Dose-Finding Study of the Effects of Two (2) Doses of Pomegranate Juice Extract Capsules (1 or 3 capsules/day) on Rising Prostate-Specific Antigen Levels in Men Following Initial Therapy for Prostate Cancer* (MCARDUCCI-004364 – 417), and the results (MCARDUCCI-012598 – 014133) of a clinical trial recently completed by Dr. Michael Carducci at Johns Hopkins University. This study was designed as a randomized, double-blind clinical trial to evaluate the effect of POMx Pills on PSA in men who had been treated for prostate cancer. One hundred and four men were treated with either one

or three doses of POMx Pills for 18 months or until progression. Median PSADT lengthened from a pretreatment baseline of 11.9 months to a post-treatment baseline of 18.5 months (p <0.001). There was no significant treatment difference in PSADT between the dose groups (p=0.920).

Based upon my review and analysis of the Carducci study and my general expertise, I have concluded that the study does not provide competent and reliable scientific evidence to support the Respondents' claims. This study fails to provide competent and reliable scientific evidence for several reasons.

First, this trial lacked a placebo control group. Without a placebo group, it is not possible to rule out that something other than POMx Pills caused the lengthening in PSADT. Interestingly, nearly 17% of the participants experienced disease progression, and the PSDAT for many patients shortened rather than lengthened. Second, the primary endpoint for this trial was PSADT. As I stated above, PSADT has not been validated as an appropriate surrogate endpoint in prostate cancer trials. Third, this clinical study only tested POMx Pills making the results inapplicable to claims for POM Juice or POMx Liquid. Therefore, it is my opinion that this study does not provide competent and reliable scientific evidence to support claims that drinking 8 ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily is effective in treating prostate cancer, including by prolonging PSADT, or that tests prove that drinking 8 ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily is effective in treating prostate cancer, including by prolonging PSADT.

## 2. Pantuck Phase III Study

At the request of the FTC staff, I also reviewed the protocol titled *A Randomized, Double-Blind, Placebo-Controlled Study of Pomegranate Extract on Rising Prostate-Specific Antigen Levels Following Primary Therapy for Prostate Cancer* (AJPANTUCK-0004051 – 114) for an ongoing multicenter clinical trial led by Dr. Allan Pantuck, UCLA.[13]  This study is a randomized, double-blind, placebo-controlled study of the effect of POMx Liquid on rising PSA in men who have been treated for prostate cancer. But again, the primary endpoint for this trial is the change in PSADT, which is not accepted by experts in the field as an appropriate endpoint for prostate cancer treatment trials.  Therefore, it is my opinion that the results of this study would not provide competent and reliable scientific evidence to support claims that drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily is effective in treating prostate cancer, including by prolonging PSADT, or that tests prove that drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily is effective in treating prostate cancer, including by prolonging PSADT.

## 3. Pre-Surgical Study

At the request of the FTC, I also reviewed the protocol titled *A Randomized, Placebo-Controlled, Pre-Surgical Study of the Effects of Pomegranate Pills in Men with Prostate Cancer Prior to Radical Prostatectomy* (MCARDUCCI-003527 – 72) for an ongoing clinical trial conducted by researchers at UCLA, Johns Hopkins University, and Duke University.  In this trial, men having a confirmed diagnosis of prostate cancer and having elected to undergo radical prostatectomy will be randomized into two groups.

---

[13] I also reviewed the protocols for the two extension studies which are similar in design except one of the studies is open label.

*Confidential*-FTC Docket No. 9344                  23

CX1287_0023

One group will receive two POMx Pills daily for four weeks prior to surgery. The other group will receive the placebo. After surgery, the subjects' prostate tissue will be analyzed for changes in biomarkers of prostate cancer inflammation. The protocol indicates that the results will provide a basis for the design and conduct of a larger prevention trial with definitive clinical outcomes.

This is a mechanistic study designed to examine the effect of POMx Pills on prostate tissue and provide information about the potential role of POMx Pills in preventing prostate cancer. This trial is not designed to test the efficacy of POMx Pills as a treatment for prostate cancer. Therefore, it is my opinion that this study does not provide competent and reliable scientific evidence to support claims that drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily is effective in treating prostate cancer, including by prolonging PSADT, or that tests prove that drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily is effective in treating prostate cancer, including by prolonging PSADT.

## X.    CONCLUSION

Based on my professional training, expertise, and experience in urology, including the prevention and the treatment of prostate cancer, and clinical testing relating to the prevention and the treatment of prostate cancer, it is my opinion that the materials I have reviewed do not provide competent and reliable scientific evidence to support claims that: 1) drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily will prevent or reduce the risk of prostate cancer, including by prolonging PSADT, or 2) that tests prove that drinking eight ounces of POM

*Confidential*-FTC Docket No. 9344                24

CX1287_0024

Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily will prevent or reduce the risk of prostate cancer, including by prolonging PSADT. Prevention trials are prospective trials in which a product is studied over a long period of time in healthy populations. To my knowledge, there have been no clinical trials conducted on POM Juice, POMx Pills, or POMx Liquid to determine whether these products are effective in preventing or reducing the risk of prostate cancer for healthy men. Therefore, there is no competent and reliable scientific evidence demonstrating that POM Juice, POMx Pills or POMx Liquid is effective in preventing or reducing the risk of prostate cancer.

The materials I have reviewed do not provide competent and reliable scientific evidence to support the conclusion that taking one POMx Pill or one teaspoon of POMx Liquid daily will treat prostate cancer, including by prolonging PSADT or tests prove that taking one POMx Pill or one teaspoon of POMx Liquid daily will treat prostate cancer, including by prolonging PSADT. To my knowledge, no clinical trials on POMx Pill or the POMx Liquid had been completed at the time Respondents made the claims challenged in the complaint. Although, the Respondents have since conducted clinical trials on POMx Pills and the POMx Liquid, to my knowledge, none of these trials are randomized, double-blind, placebo-controlled studies using accepted, clinically meaningful outcomes as a primary endpoint.

The materials I have reviewed do not provide competent and reliable scientific evidence to support the conclusion that drinking eight ounces of POM Juice daily will treat prostate cancer. To my knowledge, there have been no randomized, double-blind, placebo-controlled trials studying the effect of POM Juice using an appropriate endpoint. The respondents have relied upon a single, unblinded study with no placebo control

(Pantuck Phase II) as support for their claims. This pilot study uses changes in PSADT as its primary endpoint. To date, PSADT has not been accepted by experts in the field as a surrogate endpoint for survival. Therefore, there is insufficient competent and reliable scientific evidence to support the claims that drinking eight ounces of POM Juice daily treats prostate cancer, including by prolonging PSADT, or that tests prove that drinking eight ounces of POM Juice daily will treat prostate cancer, including by prolonging PSADT.

Dated: March 3, 2011

James A. Eastham, M.D.

CX1287_0026

# EXPERT REPORT OF FRANK M. SACKS

## I.    EDUCATION, EXPERIENCE, AND TRAINING

1.    As described in my *Curriculum Vitae*, attached hereto as Appendix 1, I am a Professor of Cardiovascular Disease Prevention, Department of Nutrition, Harvard School of Public Health; a Professor of Medicine at Harvard Medical School; and a Senior Physician at Channing Laboratory and Cardiology Division at Brigham and Women's Hospital.

2.    In 1970, I received a Bachelor of Science degree in Biology with an emphasis on Biochemistry from Brown University.  In 1977, I received a Doctor of Medicine degree from Columbia University College of Physicians and Surgeons.

3.    From 1977 to 1978, I was a Resident in Surgery at University Hospital in Madison, Wisconsin.  From 1978 to 1980, I was an emergency room physician at several hospitals in Wisconsin.  From 1980 to 1982, I served as a Postdoctoral Research Fellow in the Department of Medicine at Harvard Medical School and Brigham and Women's Hospital concentrating on nutrition in the prevention and treatment of heart disease and stroke.  From 1982 to 1993, I had faculty appointments at Harvard Medical School, was employed at Brigham and Women's Hospital, and also had hospital appointments at Children's Hospital, and Beth Israel Hospital, all in Boston.

4.    Since 1993, I have been employed by the Harvard School of Public Health and Brigham and Women's Hospital.  From 1993 to 2000, I was an Associate Professor in the Department of Nutrition at the Harvard School of Public Health.  In 2000, I assumed my present professorial position with University tenure at the Harvard School of Public Health.  From 1993 to 2004, I was also an Associate Professor of Medicine at Harvard Medical School.  In 2004, I assumed my present professorial position at Harvard Medical School.

*CONFIDENTIAL* – **FTC Docket No. 9344**      1

5.      At the Harvard School of Public Health, I have taught Nutritional Epidemiology (1986-1998); Nutritional Aspects of Human Disease (1986-1992); Cardiovascular Disease Epidemiology (1988-2011); Nutrition and Cardiovascular Disease (Course Director, 1997-2002); and The Science of Human Nutrition - Nutritional Biochemistry (Course Director, 1998-2011). At Harvard Medical School, I have taught Principles of Pharmacology, including cholesterol disorders (1990-2006); Clinical Epidemiology, including cardiovascular disease epidemiology and clinical trials (2000-2005); and Preventive Medicine and Nutrition (2000-2003).

6.      I have engaged in substantial scholarly research and writing related to cardiovascular disease (CVD) or coronary heart disease (CHD) and the relationship between nutrition and these diseases.  This includes research relating to risk factors for CVD and CHD, including lipid profiles, hypertension, obesity, and diabetes.  It further includes research into the effects on CVD, CHD, and their risks factors of consuming potential risk-modifying diets, foods, food components, and drugs, including sodium, macronutrients, various vitamins, sugars, fatty acids, fiber, statins, and estrogen replacement therapy.  I have authored or co-authored more than 160 articles, published in peer-reviewed scientific journals, on these subjects, including the following:

    a.      Carey VJ, Bishop L, Laranjo N, Harshfield BJ, Kwiat C, Sacks FM. *Contribution of high plasma triglycerides and low high-density lipoprotein cholesterol to residual risk of coronary heart disease after establishment of low-density lipoprotein cholesterol control.*  Am J Cardiol.  2010;106:757-63.

    b.      Furtado JD, Campos H, Sumner AE, Appel LJ, Carey VJ, Sacks FM. *Dietary interventions that lower lipoproteins containing apolipoprotein C-III are more*

*CONFIDENTIAL – FTC Docket No. 9344*      2

CX1291_0002

*effective in whites than in blacks: results of the OmniHeart trial.* Am J Clin Nutr. 2010;92:714-22.

c.   Zheng C, Furtado J, Khoo C, Sacks FM. *Apolipoprotein C-III and the metabolic basis for hypertriglyceridemia and the dense LDL phenotype.* Circulation 2010;121:1722-34.

d.   Sacks FM, Rudel L, Connor A, Akeefe H, Kostner G, Baki T, Rothblat R, Llera-Moya M, Asztalos B, Perlman T, Zheng C, Alaupovic P, Maltais J, Brewer HB. *Selective delipidation of plasma HDL enhances reverse cholesterol transport, in vivo.* J Lipid Res 2009;50:894-907.

e.   Sacks FM, Bray GA, Carey VJ, Smith SR, Ryan DH, Anton SD, McManus K, Champagne CM, Bishop LM, Laranjo N, Leboff MS, Rood JC, deJonge L, Greenway FL, Loria CM, Obarzanek E, Williamson DA. *Comparison of weight-loss diets with different compositions of fat, protein, and carbohydrates.* N Engl J Med 2009;360:859-73.

f.   DeSouza RJ, Swain JF, Appel LJ, Sacks FM. *Alternatives for macronutrient intake and chronic disease: a comparison of OmniHeart diets with popular diets and with dietary recommendations.* Am J Clin Nutr 2008;88:1-11.

g.   Lee SJ, Campos H, Moye LA, Sacks FM. *LDL particles containing apolipoprotein CIII are independent risk factors for coronary events in diabetic patients.* Arterioscl Thromb Vasc Biol 2003;23:853-8.

h.   Campos H, Moye LA, Glasser SP, Stampfer MJ, Sacks FM. *Low-density lipoprotein size, pravastatin treatment, and coronary events.* JAMA 2001; 286:1468-74.

*CONFIDENTIAL – FTC Docket No. 9344*     3

i.     Sacks FM, Svetkey LP, Vollmer WM, Appel LJ, Bray GA, Harsha D, Obarzanek E, Conlin PR, Miller ER, Simons-Morton D, Karanja N, Lin PH. *Effects on blood pressure of reduced dietary sodium and the Dietary Approaches to Stop Hypertension (DASH) diet.* N Engl J Med 2001;344:3-10.

j.     Brown L, Rosner B, Willett WC, Sacks FM. *Cholesterol lowering effects of dietary fiber: a meta-analysis.* Am J Clin Nutr 1999;69:30-42.

k.     Sacks FM, Willett WC, Smith A, Brown LE, Rosner B, Moore TJ. *Effect on blood pressure of potassium, calcium, magnesium in women with low habitual intake.* Hypertension 1998;31:131-8.

l.     Sacks FM, Pfeffer MA, Moye LA, Rouleau JL, Rutherford JD, Cole T, Brown L, Theroux P, Warnica JW, Arnold JM, Nash DT, Wun CC, Davis BR, Hawkins CM, Braunwald E. *The effect of pravastatin on coronary events after myocardial infarction in patients with average cholesterol levels.* N Engl J Med 1996;335:1001-9.

m.     Sacks FM, Obarzanek E, Windhauser MM, Svetkey LP, Vollmer WM, McCullough M, Karanja N, Lin PH, Steele P, Proschan MA, Evans MA, Appel LJ, Bray GA, Vogt TM, and Moore TJ for the DASH Investigators. *Rationale and design of the dietary approaches to stop hypertension trial (DASH): A multicenter controlled feeding study of dietary patterns to lower blood pressure.* Ann Epidemiol 1995;5:108-18.

7.     In addition, I have authored or co-authored over 60 reviews, reports, editorials and book chapters, as well as chapters in three books, addressing CVD, CHD, and the relationship between nutrition and these diseases or their risk factors. Examples include:

*CONFIDENTIAL – FTC Docket No. 9344*     4

CX1291_0004

a.    Johnson RK, Appel LJ, Brand M, Howard BV, Lefebre M, Lustig RH, Sacks F, Steffen LM, Wylie-Rosett J; on behalf of the American Heart Association Nutrition Committee on Nutrition, Physical Activity, and Metabolism and the Council on Epidemiology and Prevention. *Dietary sugars intake and cardiovascular health: A scientific statement from the American Heart Association.* Circulation 2009;120:1011-20.

b.    Harris WS, Mozaffarian D, Rimm E, Kris-Etherton P, Rudel LL, Appel LJ, Engler MM, Engler MB, Sacks F. *Omega-6 fatty acids and risk for cardiovascular disease: a science advisory from the American Heart Association Nutrition Subcommittee of the Council on Nutrition, Physical Activity, and Metabolism; Council on Cardiovascular Nursing; and Counsel on Epidemiology and Prevention.* Circulation 2009;119:902-07.

c.    Sacks FM. *Dietary patterns and blood pressure.* In: Izzo JL, Sica DA, Black HR, editors. Hypertension Primer, Fourth Edition. From the Council on High Blood Pressure Research, American Heart Association. Philadelphia, Lippincott, 2008, pp. 297-300.

d.    Sacks FM, Lichtenstein A, Van Horn L, Harris W, Kris-Etherton P, Winston M for the American Heart Association Nutrition Committee. *Soy protein, isoflavones, and cardiovascular health. An American Heart Association Science Advisory for Professionals from the Nutrition Committee.* Circulation 2006:113:1034-44.

8.    I have served or am serving as principal investigator in several federally-funded studies relating to nutrition and cardiovascular or coronary heart disease, including risk factors thereof. Recent examples include:

***CONFIDENTIAL* – FTC Docket No. 9344**    5

CX1291_0005

    a.    2003-2009, NIH.  Dietary macronutrients and weight loss.

    b.    2007-2012, NIH.  Carbohydrate amount and type affecting risk of CVD and diabetes.

    c.    2010-2015, NIH.  Dietary fat and HDL metabolism in humans.

9.    Through my professional memberships and activities, I keep current on new developments and research in the areas of nutrition, cardiovascular disease, cholesterol disorders, and hypertension.  From 2007-2010, I was Associate Editor of *The American Journal of Clinical Nutrition*, the leading journal publishing research and commentary on nutrition and human disease.  This position involved evaluating the quality and determining the acceptability of over 200 research manuscripts each year.  I am also an Associate Editor of the *Journal of Clinical Lipidology.*  I am also a member of the Editorial Board of *Nutrition Journal (BioMed Central)*, and *The Journal of Lipid Research*.  Over the past ten years, I have peer-reviewed hundreds of papers submitted for publication to scientific journals.  Many involved randomized, double-blind, and placebo-controlled clinical studies or other less well designed clinical studies.  Nearly all involved the study of CVD or CHD or related matters, such as surrogate endpoints, side effects, complications, or causes thereof.  In reviewing these papers, among other things, I assessed the adequacy of the design and conduct of the clinical research, and appropriateness and accuracy of the statistical test methodology used, and I evaluated whether the analysis was sound.

10.    In addition to teaching, research, and my clinical practice activities, I serve as an advisor to federal and non-profit entities on issues relating to nutrition, CVD, and CHD.  Among other service, I chair the Nutrition Committee of the American Heart Association (AHA).  The Nutrition Committee advises the AHA on matters of science and public policy, and constructs

*CONFIDENTIAL – FTC Docket No. 9344*    6

guidelines and advisory statements to the government, health professionals, and the public on

nutrition.  I am a member of the Lifestyle Working Group and the Adult Treatment Panel IV of

the National Cholesterol Education Program of the National Heart, Lung, and Blood Institute of

NIH.  This panel is revising national guidelines for prevention and treatment of cardiovascular

disease.  The guidelines include screening and evaluation for cardiovascular disease risk

assessment, and diet and drug treatments.  I am a member of the cholesterol guidelines panel.  I

am also a member of the National Kidney Foundation's Kidney Disease Improving Global

Outcomes Guidelines Committee for treatment of dyslipidemia.  This committee is devising

guidelines for treatment of abnormal plasma levels of cholesterol, high-density lipoprotein

(HDL), low-density lipoprotein (LDL), and triglycerides (TG).  I am a member of the Endocrine

Society's committee to develop guidelines for treatment of hypertriglyceridemia.

11.      I am also a member of several professional societies relating to cardiovascular and

coronary health.  Since 1983, I have been a fellow with the AHA's Council on Arteriosclerosis,

Thrombosis, and Vascular Biology as well as the AHA's Council on Epidemiology.  Since 2000,

I have also been a fellow with the AHA's Council on Nutrition, Metabolism, and Physical

Activity, and I currently serve on its Leadership Council.  I regularly attend the professional

meetings of these organizations.  Since 1994, I have served as a fellow with the American

Society of Clinical Nutrition.

12.      I have also been a guest lecturer or panelist at over 60 regional, national, and

international symposiums and seminars since 2004, most of which have focused on topics

related to heart disease and cholesterol disorders.

*CONFIDENTIAL* – **FTC Docket No. 9344**      7

CX1291_0007

13.     Based upon my education, training, and experience, as summarized above, I consider myself to be an expert in the fields of nutrition, CVD, CHD, cholesterol disorders, hypertension, and analysis of clinical studies.

14.     I have testified as an expert by deposition in two other litigated matters in the past four years.  In January 2011, I was deposed in a patent case, *Pronova Biopharma Norge AS v. Par Pharmaceutical, Inc.*, Civ. No. 09-305-SLR-MPT (D. Del.).  On March 4, 2011, I was deposed in another patent case, *Abbott Labs. v. Lupin Ltd.*, Civ. No. 09-152-JJF-LPS (D. Del.).

15.     I am being compensated at the rate of $250 per hour for my work on the current matter.


## II.     SCOPE OF THE REPORT AND CONCLUSIONS

16.     The FTC staff has asked that I evaluate, from my perspective as an expert in the fields of nutrition, CVD, CHD, cholesterol disorders, hypertension, and analysis of clinical studies, whether the following claims for the products POM Wonderful 100% Pomegranate Juice (hereinafter "POM Juice"), and POMx Pills and POMx Liquid are supported by the materials I understand were submitted by the respondents, by individuals who conducted research for the respondents, or by any materials that I have reviewed independently:

    (1)     drinking eight ounces of POM Juice, or taking one POMx Pill or one teaspoon of POMx Liquid, daily, prevents or reduces the risk of heart disease, including by decreasing arterial plaque, lowering blood pressure and/or improving blood flow to the heart;

    (2)     drinking eight ounces of POM Juice, or taking one POMx Pill or one teaspoon of POMx Liquid, daily, treats heart disease, including by decreasing arterial plaque, lowering blood pressure and/or improving blood flow to the heart;

*CONFIDENTIAL – FTC Docket No. 9344*     8

CX1291_0008

(3)    clinical studies, research, and/or trials prove that drinking eight ounces of POM

Juice or taking one POMx Pill or one teaspoon of POMx Liquid, daily, prevents or

reduces the risk of heart disease; and

(4)    clinical studies, research, and/or trials prove that drinking eight ounces of POM

Juice or taking one POMx Pill or one teaspoon of POMx Liquid, daily, treats heart

disease.

17.    To facilitate these tasks, the FTC staff has furnished me with certain materials referring

or relating to POM Juice, POMx Pills and POMx Liquid, and the ingredients contained therein.

These include the following:

(1)    Materials, including published and unpublished study reports, protocols, data, and

data analysis that I understand were submitted by the respondents or by researchers who had

conducted studies for the respondents.  These materials are contained on the attached CD-ROMs

marked as Appendices 2 and 3.

(2)    Information about the ingredients contained in POM Juice, POMx Pills, and

POMx Liquid, which I understand were provided by the respondents in response to discovery

requests.  This information also is contained on Appendix 3.

(3)    Transcripts of deposition testimony by researchers who conducted studies for the

respondents, and the related deposition exhibits.  These materials are contained on the attached

CD-ROM marked as Appendix 4.

18.    In my review of all these materials, and in developing this Expert Report, I have

extensively relied on, and applied, my expertise and knowledge in the fields of nutrition, CVD,

CHD, cholesterol disorders, hypertension, and analysis of clinical studies.

*CONFIDENTIAL – FTC Docket No. 9344*     9

CX1291_0009

## III.    SUMMARY OF CONCLUSIONS

19.    In brief, the materials I have reviewed do not support claims that drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid, daily, prevents, reduces the risk of, or treats heart disease, including by decreasing arterial plaque, lowering blood pressure and/or improving blood flow to the heart.  Moreover, clinical studies, research, and/or trials do not prove that drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid, daily, prevents or reduces the risk of or treats heart disease, including by, decreasing arterial plaque, lowering blood pressure and/or improving blood flow to the heart.

## IV.    SHOWING THAT A PRODUCT PREVENTS, REDUCES THE RISK OF, OR TREATS HEART DISEASE: GENERAL REQUIREMENTS

20.    In my opinion, the type of evidence required to substantiate a claim that a product, including a conventional food or dietary supplement, can *prevent or reduce the risk* of heart disease would be the appropriately analyzed results of well-designed, well-conducted, randomized, double-blinded, controlled human clinical studies (referred to by experts in the field of clinical testing as "RCTs"), demonstrating significant changes in valid surrogate markers of cardiovascular health.  The population can be persons with or without established CVD or CHD.  The studies, research, and/or trials would need strong "p" values.  I should further note that, in my opinion, the same level of evidence is needed to show that *clinical studies, research, or trials prove* that a product prevents or reduces the risk of heart disease.

21.    Also in my opinion, the type of evidence required to substantiate a claim that a product, including a conventional food or dietary supplement, can *treat* heart disease would be the appropriately analyzed results of well-designed, well-conducted, randomized, double-blinded,

*CONFIDENTIAL – FTC Docket No. 9344*    10

**JA-1048**

controlled human clinical studies (RCTs), demonstrating significant changes in valid surrogate markers of cardiovascular health.  The study populations must consist of persons with established cardiovascular disease.  The studies, research, and/or trials would need strong "p" values.  I should further note that, in my opinion, the same level of evidence is needed to show that *clinical studies, research, or trials prove* that a product treats heart disease.  I will further discuss below the various elements of such studies, and the reasons why such studies are important.

22.     By a controlled clinical study, I mean one that includes not only a group of patients receiving the purported treatment (referred to as either the treatment group or the active group), but also a control group (referred to in some studies as a placebo group).  There are a few reasons for this.  First, when human subjects are treated by medical personnel or scientists, the mere act of being treated can cause a change or improvement in the condition being evaluated.  Second, factors such as the passage of time, other environmental changes, and methodological drift (*e.g.*, calibration changes in equipment, etc.) can result in changes in the endpoint being measured.  Inclusion of a control group allows the researcher to take these factors into account when evaluating a study's results.  The control group should receive the same attention from the researchers as the treatment group; receive the same measurements; receive a placebo treatment that does not have any effect; and that the appearance of the placebo should be identical in all ways possible, to the active treatment being studied.

23.     Randomization refers to a method by which study patients are assigned, randomly, to either the active product group or the control group.  One way to accomplish this is through a computer program available to clinical researchers or, in the past, the use of a random number table.  Random assignment is important to help eliminate the possibility that a researcher may

*CONFIDENTIAL – FTC Docket No. 9344*     11

CX1291_0011

consciously or subconsciously employ a selection bias, for example, assign healthier or less healthy people to the treatment group, as compared to the control group.  Randomization creates a likelihood that the make-up of the treatment and control groups will be similar on all relevant characteristics.  In studies of cardiovascular health, the relevant characteristics include, for example, baseline weight, blood pressure, and cholesterol, severity of disease, cardiac medications, and any other measurements that were used as study outcomes or endpoints.

24.    Blinding refers to efforts taken to ensure that neither the study participants nor the researchers conducting outcome measurements are aware of which group a particular patient is assigned to.  In a double-blind clinical trial, the patients are not told whether they are in the active or placebo group, although they are told, as part of giving informed consent to enter the study, that they could be placed in either.  This is important because awareness of group assignment can affect patient behavior and reaction to treatment.  In addition, the researchers who perform the outcome measurements are also blinded.  This is important because even the most objective researcher can subconsciously provide care for or measure a subject differently if he is aware of the patient's group assignment.  In some instances, where the treatment is different in appearance or taste from any possible placebo, double-blinding is not possible.  In those cases, the researchers, particularly those conducting measurements, *must* be blinded.

25.    Once a randomized controlled trial has been completed and all data has been collected, data for the placebo and active treatment groups must be compared through the use of appropriate statistical analyses.  The data-analysis plan should have been written in the protocol in advance of any data analysis and the data analysis must follow that plan. Only if the results of the treatment group are statistically significantly different from those of the placebo group at the end of the trial can it be concluded that the tested product has an effect on heart disease.  Such

*CONFIDENTIAL – FTC Docket No. 9344*    12

CX1291_0012

analysis is commonly termed as a "between group" analysis. Generally, statistical significance

is recognized as being attained if the statistical test for probability, referred to as a "p" value is

equal to or less than 0.05 (p≤0.05), which means that there is only a 5 percent or less chance that

the difference between the groups is due to chance. In addition, results must have clinical

significance, in other words, the magnitude of the treatment effect must have clinical

significance.

26.     In considering whether a study shows a benefit to cardiovascular disease, it is important

to look at what endpoints have been measured. There are two kinds of endpoints: direct

endpoints and surrogate markers. In the case of heart disease, direct endpoints are heart attack,

unstable angina, or the need for coronary artery bypass or angioplasty. Surrogate markers are

measurements that are closely linked to the disease process such that a change in a surrogate

marker can confidently be predictive of a change in the disease. In this way, a surrogate marker

is validated. Validated surrogate markers are used in clinical guidelines for prevention and

treatment and are specified by the FDA for product labeling and approval. Clinical guidelines

and the FDA recognize the following as valid surrogate markers of cardiovascular health: blood

pressure and LDL cholesterol. In addition, many qualified experts, including me, recognize C-

reactive protein (CRP), HDL cholesterol, and TG as valid surrogate markers, although other

experts may disagree on any of these.

27.     Further, in my opinion, measures of carotid[1] intima media thickness, or "CIMT," are

usually relevant to cardiovascular health. CIMT testing measures the combination of the vessel

muscle and atherosclerosis (arterial plaque); although the muscle width is a type of "noise" in

---

[1]     The carotid arteries are the large arteries on either side of the human head that
provide blood to the face and brain. They are common sites for atherosclerosis.

*CONFIDENTIAL – FTC Docket No. 9344*     13

CX1291_0013

the measure, the plaque is relevant. I believe that if CIMT measures show consistent improvement, this would be an indicator that a treatment may be beneficial. At the same time, I would be reluctant to rely on CIMT improvements, alone, if these were the only evidence that an intervention treated existing heart disease. A second imaging study (such as a coronary imaging study) is necessary confirming evidence. In fact, there is disagreement among experts on the prognostic value of CIMT. A recent research article published in a leading cardiology journal analyzed CIMT in relation to cardiovascular events. Among 41 randomized trials combined in a meta-analysis, the authors found that "there was no significant relationship between IMT regression and CHD [coronary heart disease] events…CBV [cerebrovascular] events…and for all-cause death." Costanzo P, Perrone-Filardi P, Vassalo E, Paolillo S, Cesarano P, Brevetti G, Chiarielllo M, *Does Carotid Intima-Media Thickness Regression Predict Reduction of Cardiovascular Events*, J. Amer. Coll. Cardiology, Vol. 56, No. 24, Dec. 7, 2010. For this reason, there is broad consensus that at least two types of imaging studies must be obtained to make inferences on benefit to cardiovascular disease when results from clinical trials of actual cardiovascular events are not available.

28.    Other factors also must be considered when evaluating the methodological soundness of a scientific study. For example, the number of tested subjects and their characteristics are important. It is necessary that there be a sufficient number and diversity of subjects tested to allow the conclusion that any measured effect can be generalized to a larger population. Similarly, the length of a study is important, as a study must be of sufficient duration to provide reliable scientific evidence that the effect will last.

29.    Even with the safeguards contained in an RCT, the results contained in any one study may be due to chance or may not be generalizable due to uniqueness of the study sample.

*CONFIDENTIAL – FTC Docket No. 9344*    14

CX1291_0014

Accordingly, most scientists and researchers, including myself, believe that at least two well-designed studies, conducted by different researchers, and each showing strong results, are needed to constitute reliable evidence. That is why it is important to see consistent results in independently-replicated studies before concluding that a tested product is effective in preventing, reducing the risk of, or treating heart disease.

## V.    ANALYSIS OF THE EVIDENCE

### A.    *In vitro* and animal data

30.    Included in the materials that I reviewed were a large number of articles reporting on *in vitro* and animal studies. These include Aviram M, Dornfeld L, Rosenblat M, Volkova N, Kaplan M, Coleman R, Hayek T, Presser D, and Fuhrman B, *Pomegranate juice consumption reduces oxidative stress, atherogenic modifications to LDL, and platelet aggregation: studies in humans and in atherosclerotic apolipoprotein E-deficient mice*. Am. J. Clin. Nutr. 2000: 71;1062-76 (BATES: POM-HC0001645-1659) (reporting on results of studies on mice and on changes in behavior of human plasma *in vitro*, before and after supplementation with pomegranate juice); Fuhrman B, Volkova N, Aviram M, *Pomegranate juice inhibits oxidized LDL uptake and cholesterol biosynthesis in macrophages*, J. Nutrit. Biochem. 16 (2005) 570-576 (BATES: POM-HC0001817-1823) (tests on cell lines).

31.    *In vitro* studies refer to tests looking at how human blood elements or cells act after extracted from the body or purchased from a biological supply company, placed in a controlled environment, such as a test tube or culture dish, and subjected to a product or nutritional compound. These types of studies do not provide reliable scientific evidence of what effects a treatment will have inside the human body. Such studies may generate hypotheses for studies in

*CONFIDENTIAL – FTC Docket No. 9344*    15

CX1291_0015

humans, but only the results of RCTs in humans can form the basis to support therapeutic

conclusions.  This is because many *in vitro* studies produce results that are not found when the

same compounds are tested in humans.  Accordingly, none of these *in vitro* studies are capable

of substantiating the kinds of heart disease benefit claims at issue in this case.

32.    Similarly, studies on animals do not provide reliable scientific support for claims that

POM Juice, POMx Pills, or POMx Liquid is effective in preventing, reducing the risk of, or

treating cardiovascular disease in humans.  Animal studies are relatively low-cost compared to

human clinical trials, and hence are used as preliminary tools for identifying potential

treatments, mechanisms of action, and side effects.  Nonetheless, results of animal studies cannot

be generalized to describe what effects a treatment has on human subjects.  Animals are not

sufficiently analogous to humans, either biologically or psychologically.  Many findings of

dietary or drug effects in animals are not confirmed in human testing.

###    B.    Human studies by Dr. Aviram and his colleagues

33.    Dr. Michael Aviram and his colleagues have conducted two human studies that warrant

discussion.  The first is Aviram M and Dornfeld L, *Pomegranate juice consumption inhibits*

*serum angiotensin converting enzyme activity and reduces systolic blood pressure*, 158

Atherosclerosis 195 (2001) (BATES: POM-AREJAEI00037-40).  In this study, ten elderly (62-

77 years old) patients with high blood pressure (on average, 155/83), including two with diabetes

and two with high cholesterol, drank 50 ml of a concentrated pomegranate juice product per day

for two weeks.  The source of the concentrated juice is not identified.  The article reports that a

subgroup of seven of the ten patients experienced a statistically significant 36% reduction in

serum angiotensin converting enzyme (ACE) activity, but it does not reveal what happened to

the ACE levels of the other three patients or conduct an analysis of the overall results in the

*CONFIDENTIAL – FTC Docket No. 9344*    16

CX1291_0016

entire study population.  The article also reports that the 10 patients experienced a statistically

significant 5% reduction in systolic blood pressure.  The article concludes that "pomegranate

juice consumption can offer a wide protection against cardiovascular diseases."  *Id.* at POM-

AREJAEI00039.

34.    Blood pressure reduction is a recognized and validated surrogate for heart disease.

Nonetheless, this study does not provide competent and reliable evidence in support of a heart

benefit claim.  It was neither blinded nor placebo-controlled.  In fact, it was not a controlled trial,

but rather a simple observational study of patients who were given a treatment.  As a result, it is

not possible to conclude what caused the reported improvements in the subjects' blood pressure

levels – whether it was due specifically to pomegranate juice consumption, whether it could have

been produced by any kind of fruit juice, or sugary drink; or whether the change could have been

produced by changes in their habits or environment, methodological drift, or unknown factors.

The sample size tested – ten persons – is too small to conclude that the observed effects would

be generally applicable to a larger population.  The short duration of this study (a two-week

period) is insufficient to provide reliable evidence that the observed effects on ACE and blood

pressure would be enduring.  Further, it is inappropriate to delete three of the ten subjects' ACE

data from study results.  The ACE level, in any event, is not a valid surrogate marker.  In sum,

this study does not provide reliable evidence of an improvement in ACE or blood pressure, let

alone heart disease, from consumption of pomegranate juice.

35.    A second study by this group is Aviram M, Rosenblat M, Gaitini M, Nitecki S, Hoffman

A, Dornfeld L, Volkova N, Presser D, Attias J, Liker H, and Hayek T,  *Pomegranate juice*

*consumption for 3 years by patients with carotid artery stenosis reduces common carotid intima-*

*media thickness, blood pressure and LDL oxidation*, 23 Clin. Nutr. 423 (2004) (BATES POM-

*CONFIDENTIAL – FTC Docket No. 9344*    17

CX1291_0017

MDREHER02580-2590).  This study, conducted in Israel, tested the effect of consuming 50 ml

of concentrated pomegranate juice per day on ten patients with severe carotid artery stenosis

("CAS").[2]  The source of the juice concentrate is not specified.  Ten of the active group patients

were tested for one year, and five of them continued for "up to three years."  The study also

included a "matched" group of nine patients, also with CAS, who did not consume pomegranate

juice.  The study was not randomized, blinded, or placebo-controlled.  The active group patients

were tested at baseline, 3, 6, 9, and 12 months (and additionally at 22, 28, and 35 months, in the

case of the five active group patients who continued in the study after one year).  The

comparison group of patients was tested only at baseline and 12 months.  Tests included blood

pressure, blood analysis, and ultrasound measurements of CIMT.  The article reports that, in the

active group, the patients' mean CIMT decreased by 35% over 12 months, as compared to

baseline values, but that no additional improvements were seen in patients who continued

drinking pomegranate juice concentrate for an additional two years; and that the active group

patients also experienced beneficial changes in blood velocity in the carotid arteries.  By

contrast, the article reports that the mean CIMT of the untreated comparison group members

increased by 9% over the course of one year, but it provides no information on blood velocity for

those patients.  It further reports that, in active group patients, systolic (but not diastolic) blood

pressure was significantly reduced by 12% after 12 months, but that blood pressure remained

unchanged over 12 months in the untreated comparison group members.  Finally, the report

discusses the results of various serum measurements in the active group patients, such as

measurements of serum paraoxonase (PON) and peroxidation.  No similar information is

---

[2]        CAS refers to the narrowing of the carotid arteries.

*CONFIDENTIAL – FTC Docket No. 9344*    18

CX1291_0018

provided with regard to the untreated comparison group members. Lacking control group data, no conclusion can be made about the effect of pomegranate juice on these serum measurements. The study concludes that "pomegranate juice consumption (by patients with carotid artery stenosis) possess anti-atherosclerotic properties, as it substantially decreased serum oxidative stress and, in parallel, reduced common carotid intima-media thickness." *Id.* at POM-MDREHER02588.

36.     As discussed in paragraph 27, I believe that a CIMT imaging test, considered in isolation, is not generally considered acceptable evidence of benefit for the heart. Furthermore, this study suffers from flaws in design and conduct, including the lack of a randomized control group, lack of placebo control, different treatment of active and placebo group patients, the small sample size, and no between-group statistical analysis. A qualified scientist would not be able to conclude with any credibility that the reported improvements in the test subjects was caused by their consumption of pomegranate concentrate and not some other factor.

### C.     Studies by Dr. Ornish and colleagues

37.     I also reviewed the documents relating to two studies on pomegranate juice conducted by Dr. Dean Ornish and his colleagues.

38.     The results of the first study were published as Sumner M, Elliott-Eller M, Weidner G, Daubenmier JJ, Chew MH, Marlin R, Raisin CJ, and Ornish D, *Effects of Pomegranate Juice Consumption on Myocardial Perfusion in Patients with Coronary Heart Disease*, 96 Am. J. Cardiology 810 (2005) (BATES: POM-HC0001878-1882). According to the publication, this was a randomized, double-blinded, placebo-controlled study to evaluate whether daily consumption of pomegranate juice for 3 months would affect myocardial perfusion (blood flow to the heart) in 45 patients with CHD and myocardial ischemia. Patients were randomized to

*CONFIDENTIAL – FTC Docket No. 9344*     19

CX1291_0019

take either 240 ml (about 8 ounces) of POM Juice or a placebo beverage.[3]  Measurements taken

at baseline and at the conclusion of the study included imaging of blood flow to the heart

(conducted after subjecting the patients to either a pharmacologic challenge or a treadmill

exercise challenge), plasma lipids (cholesterol, HDL, LDL, and TG), body weight, blood sugar,

and blood pressure.  The report provides data on three imaging measures at baseline and the end

of the study: the summed rest score, or "SRS" (imaging results before the pharmacologic or

exercise challenge), the summed stress score, or "SSS" (imaging results after the pharmacologic

or exercise challenge) and the summed difference score, "SDS" (calculated by subtracting the

SRS from the SSS).  According to the report, at the end of the trial there was a significant (p =

0.05) improvement in the SDS score in the pomegranate juice group, as compared to the control

group, at the end of the trial, but no significant changes in the SRS or SSS scores.  Further, the

article reports that there was an average improvement of 17% in myocardial perfusion in the

pomegranate juice and an average worsening of 18% in the control group, *i.e.* a 35% relative

between-group difference after 3 months.  There were no significant changes in lipids, blood

glucose, body weight, or blood pressure.  *Id.*, Table 3.  The study's authors appear to

acknowledge that a limitation of this study was its small size and short duration, concluding that

further studies are warranted "to determine the effects of pomegranate juice on myocardial

perfusion in a larger sample of patients over a longer period."  *Id.* at POM-HC0001881.

39.    On its face, this study suffers from several limitations.  Although it is interesting

mechanistically, change in myocardial perfusion, that is, blood flow to the heart, is not a

---

[3]    The study report describes the placebo as "a modified sports beverage of similar caloric content, amount, flavor, and color." *Effects of Pomegranate Juice Consumption on Myocardial Perfusion in Patients with Coronary Heart Disease*, at POM-HC0001879.  Dr. Ornish testified that the placebo was Gatorade.  Ornish Tr. 31.

*CONFIDENTIAL* – **FTC Docket No. 9344**    20

CX1291_0020

recognized surrogate marker of therapeutic effects on CHD. Even where blood flow is shown to be improved, it will not necessarily result in improved cardiovascular health, such as reductions in heart attack and stroke. Indeed, myocardial perfusion is a measurement that is not commonly used in studies of treatment efficacy. Further, the report shows significant changes in only one of the three measures at the end of the study – in summed difference score (SDS), but not in summed rest score (SRS) or summed stress score (SSS). The SDS is the difference between the primary measurements, SRS and SSS. The protocol for the study provides for measurement of perfusion using imaging technology, but it did not identify whether the primary endpoint would be SSS, SRS, or SDS or some other measurement calculated from the imaging data. See, Beverage Study I Protocol (LIKER00437-448).[4] A proper protocol identifies what the primary outcomes will be in advance. This is because, in any study involving a large number of variables, it is likely that some will be positive, simply due to chance. Identification of primary outcomes in the protocol is designed to prevent a researcher from cherry-picking positive results and ignoring negative ones. In this study, the "p" value of the reported improvement in SDS was only .05. When there are three possible outcomes (that is, changes in SSS, SRS, or SDS), .05 is not considered to be a statistically significant effect. In the leading text of cardiology, *Braunwald's Heart Disease* (9th edition, Chapter 17, Nuclear Cardiology, 2011), Udelson,

---

[4]    The protocol also describes another arm to the Beverage I Study. In this second arm, 17 patients received either pomegranate juice or placebo for 3 months, and were tested for changes in CIMT. According to a PowerPoint presentation regarding this data, there were no statistically significant differences between the experimental and placebo groups on any of the assessed outcomes. Weidner G and Elliott-Ellner M, *Can Pomegranate Juice Consumption Affect Coronary Heart Disease? Presentation at Pom Wonderful Research Summit*, June 16, 2004 (BATES: RSCHULMAN00902-949). The power point presentation and the protocol for the Beverage Study I protocol appear to describe the *Myocardial Perfusion* testing of Beverage I as the "cardiac arm."

*CONFIDENTIAL* – **FTC Docket No. 9344**    21

Dilsizian and Bonow state "… a substantial literature has validated these summed scores, particularly the SSS as predictors of natural history outcomes." In the study of Ornish and colleagues, the pomegrate juice treatment did not affect the SSS. It is not clear that the change in SDS would be clinically meaningful, because the authors did not show that the patients experienced improvement in their clinical symptoms.

40.    As further discussed in paragraph 42, there was a large discrepancy in the baseline values of SRS and SSS, the two components of the SDS. It could be predicted that the control group, having worse coronary perfusion than the pomegranate group at baseline, would have a more accelerated form of the disease and show worsening on follow-up. Statistical adjustment of the results for this large discrepancy in baseline values should have been attempted.

41.    Finally, although the publication indicates that 45 persons were enrolled in the study, and that four patients either dropped out or had unreadable data, the report (at Table 2) only provides data on 39 patients. The study appears to provide some rationale for removing four patients' data, but offers no explanation for why the remaining two original patients were not included in the final data analysis. Alterations in the original sample size may be critical when there is a borderline "p" value. Furthermore, the most valid analysis of a clinical trial includes all patients originally randomized to treatment or control, and data on dropouts are imputed. This is termed "intention-to-treat" and is the standard for clinical trial analysis. For these reasons, it is my opinion that experts in the field would not consider that the results of this study reliably support the proposition that pomegranate juice provides a heart disease benefit, either in terms of prevention or treatment.

42.    Other factors, not revealed in the published report, further undermine my confidence in the credibility of the study results:

*CONFIDENTIAL – FTC Docket No. 9344*    22

CX1291_0022

(1)    It appears that seven or eight of the patients in the placebo group were unblinded

before their three-month data was collected.  See Ornish Deposition Tr. 142-48; Ornish

Depo. Exh. 69 and 70.  Further, two other patients in the placebo group did not, in fact,

receive a placebo treatment.  Ornish Depo Tr. 167-70, Ornish Depo Exh. 77 .  This is

inconsistent with widely-accepted standards for conduct of clinical trials.

(2)    It is clear that the randomization in this case was not effective in producing an

active and placebo group that were similar on relevant characteristics.  The myocardial

perfusion data for active and placebo groups at baseline appear to be dissimilar, and with

large variability, at baseline.  For example, the baseline SRS for the pomegranate juice

group was $1.9 \pm 2.6$, whereas the baseline SRS for the placebo group was $3.8 \pm 4.7$; the

baseline SSS for the pomegranate juice group was $6.4 \pm 3.5$ and the baseline for the

control group was $9.6 \pm 6.5$.  See POM-HC0001880.  According to at least one document

there was a statistically significant difference in the baseline summed stress scores of the

two groups.  Sumner Depo Tr.  116-19; Sumner Depo Exh. 283.  If this were the case, the

dissimilarity should have been reported in the publication, and an adjustment made in the

statistical analysis.

(3)    The study originally was designed to last for twelve months, with measurements

at baseline, three months, and twelve months.  See Beverage Study I Protocol,

DORNISH 006945-47.  It was halted after three months, however, due to funding

shortfalls.  Ornish Tr. 178, 185.  In fact, nine of the patients did complete testing at

twelve months.  Ornish Tr. 139.  The study was terminated under unusual circumstances.

According to correspondence (DORNISH-00006477-6479; -00003856) the study was

terminated at the time when the p-value was considered significant rather than at the time

*CONFIDENTIAL – FTC Docket No. 9344*    23

**JA-1061**

CX1291_0023

the trial was originally set to end.  This is inconsistent with widely-accepted standards for conduct of clinical trials, and undermines any confidence in the findings.  In addition, the researchers' publication of the results of the three-month testing, without reporting the original duration of the study, is also inconsistent with widely-accepted standards for conduct of clinical trials.

(4)    Additionally, I reviewed correspondence showing that a study subject had been dropped from the final primary analysis.  Sumner Depo. Exh. 279.  In practice, a researcher should include all patients in the primary analysis and consider excluding them from the secondary analysis, but report both results in the research publication. This is yet another factor that renders unreliable the results of the myocardial perfusion study.

43.    In summary, problems in the design and conduct of the coronary perfusion study, and the descrepant results of the Bev I coronary perfusion study do not support a conclusion that the pomegranate products used had a favorable effect on coronary perfusion.  In addition, other factors, such as blood pressure, cholesterol, inflammatory biomarkers, and oxidative stress were not improved.  The interpretation of this study that is most consistent with principles of clinical study design and conduct is that the treatment had no effect on any measure of cardiac health.

44.    Dr. Ornish and his colleagues also conducted a second study involving pomegranate juice, the results of which were not published.  The protocol described it as a trial "to determine if pomegranate juice will affect the progression of early/subclinical carotid atherosclerosis.  The study will also measure mechanisms by which these effects could occur including: angiotensin converting enzyme (ACE) activity, oxidative stress, highly sensitive C reactive protein, and lipids and lipoproteins . . . ." *The Beverage Study Protocol II*, June 21, 2003 (BATES:

*CONFIDENTIAL – FTC Docket No. 9344*    24

CX1291_0024

LIKER00449-460, at 449).  It called for a double-blind study of 50 patients with at least one

cardiovascular risk factor (such as high cholesterol, high LDL, hypertension, or positive family

history), to be randomized to receive either pomegranate juice or placebo, for one year.  *Id.* at

453-457.  Testing, to be conducted at baseline, six months, and one year, included ultrasound

measurement of CIMT, blood pressure, weight, and lipids. *Id.* at 453-54.

45.    According to the final data report, 73 patients were actually enrolled in the study.

Ornish, D, *Bev 2 Summary*, June 16, 2005.  (BATES: POMJL-0001976-81).  The experimental

and control groups showed similar levels of CIMT and elasticity at baseline.  There were no

significant changes in the experimental group relative to the placebo for either carotid IMT

thickness or elastic properties.  There also were no significant differences in the experimental

group relative to the control group over time for any of the anthropometric or medical variables,

including body mass index, systolic and diastolic blood pressure, cholesterol, LDL, HDL, or TG.

See POMJL-0001977, 1979-80.

46.    I read Dr. Ornish's testimony to the effect that the results of the Beverage II study are not

relevant to the analysis of whether pomegranate juice offers benefits to the heart.  Ornish Tr.

102-04.  Noting that he originally expected to enroll 200 patients, but that he lost the funding to

accomplish this, he has argued that the study was underpowered, meaning that there were an

insufficient number of patients in the trial to produce a statistically significant effect.  Ornish Tr.

102-04.  He has hypothesized that if the 200 persons had been enrolled, a statistically significant

effect might have been demonstrated.  *Id.*

47.    In my opinion, this is not an appropriate treatment of these data.  The fact that the study

was smaller than originally hoped for does not mean that the data are irrelevant.  Having

conducted the study, the researcher and the sponsor must live with the results.  The Beverage

***CONFIDENTIAL – FTC Docket No. 9344***    25

CX1291_0025

Study II protocol calls for 50 patients and 75 were enrolled.  The study appears to have been generally well designed and well conducted.  In my opinion, the results of this study were convincingly null.  The pomegranate juice treatment did not improve IMT or the other tested parameters.  The results of this study must be considered as a part of the body of evidence relating to whether or not pomegranate juice has beneficial effects on heart health.  These results in 73 patients also confirm that the purportedly strongly positive results of Dr. Aviram's unrandomized, uncontrolled 19 patient CIMT study (see paragraph 35) lack credibility.

**D.    Studies by Dr. Davidson and colleagues at Radiant Development**

48.    I also reviewed results from two randomized, double-blind, placebo-controlled studies conducted by Dr. Michael Davidson and his colleagues at Radiant Development.  The reports for these studies are:

a.    Davidson MH, Maki KC, Dicklin MR, Feinstein SB, Witchger MS, Bell M, McGuire DK, Provost JC, Liker H, and Aviram M, *Effects of Consumption of Pomegranate Juice on Carotid Intima-Media Thickness in Men and Women at Moderate Risk for Coronary Heart Disease*, 104 Am. J. Cardiology 936 (2009) ("Davidson IMT Report") (BATES: MHDAVIDSON-0007770-7776); and

b.    Davidson M, The *Effects of Pomegranate Juice on Flow-Mediated Vasodilation*, (unpublished, 2004) (BATES: MHDAVIDSON-0000179-248) ("Davidson FMD Report").

These two studies were covered by a single protocol that appears to have been amended over time.  See Radiant Development, *Roll International Protocol #202528, The Effects of Consumption of Pomegranate Juice on Carotid Intima-Media Thickness, Amendment #3*, Mar. 16, 2005 (BATES: MHDAVIDSON-007334-7417) ("Radiant Protocol").

*CONFIDENTIAL – FTC Docket No. 9344*    26

49.     The Davidson IMT study was an 18-month, randomized, double-blinded, placebo-controlled study designed to test the effect of pomegranate juice on CIMT (see paragraph 27) progression rates.  Radiant Protocol at 7.  Subjects were men (45 to 74 years old) and women (55 to 74 years old) with one or more CHD risk factors (high LDL, low HDL, hypertension or use of medication to treat hypertension, or cigarette smoking) and baseline posterior wall CIMT of 0.2 to 2.0 mm without significant stenosis.  Davidson IMT Report at 936-37.  Exclusion criteria included actual CHD or diabetes. *Id.* at 937.  The protocol called for randomization of 320 subjects (Radiant Protocol at 7), but according to the Davidson IMT report, 383 subjects were randomized and 289 subjects completed at least one post randomization CIMT measurement (Davidson IMT Report at 939).  Subjects were randomized to receive either pomegranate juice or placebo and directed to consume 240 ml per day throughout the trial.  The placebo was purple Gatorade; nothing was put in it to make it approximate the taste of pomegranate juice.  Davidson Depo. Tr. 22.

50.     The study design called for ultrasound testing of the carotid artery at baseline, week 52, and week 78.  Radiant Protocol at 15-16.  Additional testing included blood pressure, lipids, and various measures of inflammation and oxidative stress.  *Id.* at 15.

51.     According to the protocol, the primary outcome variable was the difference between placebo and pomegranate juice in posterior wall common CIMT progression rate in mm/year, utilizing non-contrast images.  Secondary outcomes included other carotid measures.  Exploratory analysis included changes in inflammatory and antioxidant indicators and blood pressure changes.  Radiant Protocol at 7-8.  The protocol identified the statistical analyses to be used.  *Id.* at 9.  Adherence to study product consumption was assessed at each visit by reviewing a daily consumption diary maintained by the subject.  Davidson IMT Report at 937.

*CONFIDENTIAL – FTC Docket No. 9344*     27

CX1291_0027

52.     According to the Davidson IMT report, at the end of the study, there were no significant differences in CIMT progression rates between the subjects in the pomegranate juice and control groups.  Davidson IMT Report, Table 3.  The "composite rate" for all measured carotid artery walls had shown a significantly smaller value at 12 months in the pomegranate juice group, but this difference was no longer significant at the end of the study.  Further, the anterior wall values and rates, and the posterior wall values and progression rates did not differ significantly at any point in the trial.  *Id.* at 940.  There also were no statistically significant changes in the measured indicators of inflammation and oxidative stress, *Id.* at Table 2, or in fasting lipoprotein lipids or blood pressure.  *Id.* at 940.

53.     The report also includes a "post hoc" (that is, not planned for in the protocol) exploratory analysis of changes in certain subpopulations of the study.  According to that analysis, there were significantly lower CIMT progression rates for pomegranate versus control subjects at the end of the study in certain subpopulations with higher CVD risk factors, such as those in the highest tertiles for apolipoprotein B, TG, TG to HDL ratio, total cholesterol to HDL ratio, as well as a purported marker of antioxidant function, PD-AAPH.  The authors stated that, "Because the decrease in CIMT progression in these subgroups was based on analyses that were not preplanned and had no correction for multiple comparisons (increasing the possibility of type I errors[52]), these findings will need to be confirmed in future investigations."  *Id.* at 941.

54.     It should be noted that pomegranate juice subjects with metabolic syndrome were not among the subpopulations who had significantly lower IMT values after treatment.  *Id.* at Table 3.  Metabolic syndrome is composed of a group of at least three high-risk conditions among high

_____

[5]     A type I error, in layman's terms, is a "false positive."  It is the statistical term that refers to a finding that a change has occurred when in fact, it has not.

*CONFIDENTIAL – FTC Docket No. 9344*    28

CX1291_0028

TG, low HDL-C, high blood pressure, high blood sugar, and overweight or obesity. Patients who have metabolic syndrome experience higher risk of cardiovascular disease and diabetes than patients who have only one or two of its components. Thus, the finding that pomegranate juice did not significantly reduce the CIMT progression rate in patients in the Davidson study who had metabolic syndrome suggests that high-risk patients are not necessarily benefitted by the treatment.

55.    Another important consideration in evaluating the subgroup results is the change in outcome. The study specified in advance that posterior wall CIMT is the primary outcome. One reason to use posterior wall measurements as the primary outcome is that they do not require injection of a contrast agent like anterior wall measurements do. The posterior wall changes in the high-risk subgroups were all null. The researchers shifted their emphasis from the posterior wall to the anterior wall, a secondary outcome, which was measured on only 151 of the 289 patients. The more valid approach is to stick to the original outcome that also had nearly double the number of patients as the secondary outcome. No scientific reason was given for the switch.

56.    The Davidson IMT study is the largest of the heart studies conducted on pomegranate juice. In my opinion, the Davidson IMT study appears to have been carefully designed. The protocol identifies the endpoints to be measured, the procedures to be followed, inclusion and exclusion criteria, and the statistical analysis to be conducted. There is no evidence, of which I am aware, of critical problems in the conduct or analysis of the study except its over-emphasis on the subgroup results, as described above. It provides competent and reliable evidence that consumption of pomegranate juice did not improve CIMT in subjects with one or more cardiovascular risk factors.

57.    The subgroup analyses that is contained in the Davidson IMT study is "hypothesis

*CONFIDENTIAL – FTC Docket No. 9344*    29

CX1291_0029

generating" only, meaning that it must be evaluated *de novo* in a future study, as stated by the researchers. This is the appropriate treatment of any post hoc analysis of data. It is particularly important here, where the subgroup analysis was not corrected for multiple comparisons. When many subgroups are studied, a p-value of 0.05 (one out of twenty chance of false positive) is not reliable. As more subgroups are added to the analysis, the probability steadily increases that by chance one of them will have a p-value of 0.05. In such a case, it is likely that the apparent differences identified in the report were, in fact, due to chance. As discussed above, the subgroup results suffer from other serious problems including a null result for the more reliable primary outcome, and a null result for metabolic syndrome. Thus, a qualified scientist cannot rely upon such post hoc analyses as reliable scientific evidence to support claims that POM Juice or POMx prevents, reduces the risk of, or treats cardiovascular disease in the subpopulations identified in Figure 3 of the Davidson IMT Report.

58.     The Davidson FMD study enrolled 45 of the subjects who were enrolled in the Davidson IMT trial. It was a randomized, double-blind, placebo-controlled trial to evaluate the effect of consuming POM Juice or placebo on brachial artery[6] reactivity testing ("BART"). See Radiant Protocol (BATES: MHDAVIDSON-007410-7417). The subjects underwent the FMD protocol testing at baseline and 13 weeks. During the testing, a blood pressure cuff was placed on the arm and was increased to a pressure that occluded blood flow and then released. Davidson Depo. Tr. 34. According to the protocol, the primary endpoint of the study was ultrasound measurement of flow mediated dilation, which refers to the amount by which the brachial artery dilates (gets larger) after the blood pressure cuff is deflated. Other measurements were also taken, including

---

[6]     The brachial artery is the major blood vessel of the upper arm.

*CONFIDENTIAL – FTC Docket No. 9344*     30

CX1291_0030

blood flow through the brachial artery, blood pressure, and lipid parameters.

59.    The Davidson FMD Report (BATES: MHDAVIDSON-0000179-248) provides the results of this testing. It contains two analyses: the intent-to-treat analysis, which provides data for all 45 subjects who were enrolled in the BART study, and the per protocol analysis, which provides the data for the 40 subjects who completed the study according to the protocol. According to the Report, the results were the same in both the intent-to-treat and the per protocol populations. There were no statistically significant differences between the treatment and placebo groups in change in FMD from baseline to 13 weeks. Davidson FMD Report at Tables 1.2 and 2.2. In addition, there were no statistically significant differences between treatment groups in changes from baseline to week 13 in lipid parameters (*Id.*, Tables 1.3 and 2.3) and vital signs measurements, including blood pressure (*Id.*, Tables 1.6 and 2.6).

60.    According to the FMD protocol, the rationale for this testing was that brachial FMD is a noninvasive method to assess endothelial[7] dysfunction, which in turn is an early marker of cardiovascular disease. MHDAVIDSON-007411. FMD testing was invented because it is easy to do and because it originally was hoped, in the 1980's, that such testing would reflect reactivity in the coronary artery. After extensive testing, the responses of brachial artery reactivity to dietary supplements and drugs are not as predictive of changes in coronary heart disease as hoped. One possible contributor to this lack of correspondence is that the brachial artery is not afflicted by atherosclerosis, in contrast to the arteries that supply blood to the heart and brain. Thus, brachial artery reactivity, although of interest, is not a valid or generally recognized

---

[7]    The endothelium is the thin layer of cells that lines the interior surface of blood vessels.

*CONFIDENTIAL* – **FTC Docket No. 9344**    31

CX1291_0031

surrogate marker of coronary heart disease.

61.    In my opinion, the Davidson FMD study appears to have been carefully designed.  The protocol identifies the endpoints to be measured, the procedures to be followed, inclusion and exclusion criteria, and the statistical analysis to be conducted.  There is no evidence, of which I am aware, of critical problems in the conduct of the study.

62.    Although FMD is not a reliable surrogate marker for heart health, this study does provide information that is relevant to this case.  Reductions in blood pressure and lipids are valid surrogate markers for improvement in cardiovascular health.  As previously noted, this study showed that, at the end of the trial, there were no statistically significant differences in blood pressure between the treatment and placebo groups.  It also shows no statistically significant differences between the two groups in ACE (Tables 1.4 and 2.4), which is inconsistent with the results of Aviram's 2001 study (see paragraphs 33-34).

### E.    Overweight Studies On POMx

63.    I also reviewed documents relating to two related studies on persons with elevated waist circumference who took POMx Pills.  One study was unblinded and uncontrolled, and the other was double-blinded and placebo-controlled.

64.    Dr. Hill and his colleagues conducted the unblinded, uncontrolled study of POMx Pills in Denver, Colorado.  According to the study protocol, the study would enroll up to 50 subjects between the ages of 40-70 who have abdominal adiposity, and each subject would take a commercially available POMx capsule once a day for 28 days.  The study was designed to measure antioxidant, oxidative, and inflammatory markers in serum, as well as weight, waist circumference, blood pressure, and other factors.  Hill JO and Wyatt HR, *Protocol 06-0704, The Effect of POMx, a Nutritional Supplement Derived from Pomegranates, on Human Biomarkers*

*CONFIDENTIAL – FTC Docket No. 9344*    32

CX1291_0032

*Associated with Cardiovascular Health in Healthy, Overweight Adults* (Oct. 4, 2006), Hill

Deposition, Ex. 10 (BATES: JOHILL-0001541-1554). According to the study report prepared

by the principal investigator, Dr. Hill, 24 adults enrolled and took 2 POMx capsules one time per

day. Hill JO, *Preliminary Data Analysis* (Feb. 15, 2007) (BATES: POM_Q14-0000268-277).

The patients who participated in the study gained weight; Dr. Hill attributed this to the fact that

the study took place near the holidays. After adjusting the statistical analysis for the change in

weight, the data analysis states that only two significant results emerged: TBARS levels

(described as "a test that measures lipid peroxidation in the blood") decreased, and free fatty

acids increased. The study's biostatistician, however, stresses that the change in TBARS was of

only borderline significance and that the analysis was not adjusted for the number of

comparisons being made. *Id.* at POM_Q14-0000269. Other factors measured – including

diastolic and systolic blood pressure, TG, HDL, LDL, CRP, and PON – did not change during

the trial. The report also notes that the study attempted to measure three interleukins, but that the

commercially-available assays were not sensitive enough to detect levels of these biomarkers in

the test population. *Id.* at POM_Q14-0000270. The report concluded that "we did not detect

any effect of POMx on inflammation but identification of better biomarker assays for

inflammation is needed. . . . [T]his pilot project suggests that a larger trial is warranted in

abdominally obese subjects who may be at risk for development of metabolic diseases." *Id.*

65.    The protocol for the second study of persons with elevated waist circumference called for

70 subjects to be randomized to one of three treatment groups: 1 POMx and 1 placebo capsule

per day, 2 POMx per day, or 2 placebo capsules per day, for 4 weeks. See Accelovance, *A

Placebo Controlled, Randomized, Double Blind Study to Compare Antioxidant Levels in Normal

Subjects with Elevated Waist Circumference when Administered 1 or 2 Pomegranate Dietary*

**CONFIDENTIAL – FTC Docket No. 9344**    33

*Supplement Capsules for 4 Weeks, POM Wonderful Protocol Number: A001* (July 14, 2006),

Heber Deposition, Ex. 1050 at DHEBER-000959. The primary and secondary endpoints were to

measure the changes in antioxidant and anti-inflammatory levels from baseline to 4 weeks for

persons taking 1 POMx and 2 POMx, respectively. *Id.* at DHEBER-000969. Measurements

included oxidized phospholipids, oxidized LDL/HDL, serum nitric oxide, PON, and others. I

note that none of these is a valid surrogate marker of cardiovascular disease or response of

disease to treatment. The protocol set forth subject inclusion and exclusion criteria and

described how the statistical data should be analyzed. *Id.* at DHEBER-000971-980. The

Clinical Study Report described the results of a safety analysis, but not the antioxidant and anti-

inflammatory data. DeGroof, R, A *Placebo Controlled, Randomized, Double Blind Study to*

*Compare Antioxidant Levels in Normal Subjects with Elevated Waist Circumference when*

*Administered 1 or 2 Pomegranate Dietary Supplement Capsules for 4 Weeks, Clinical Study*

*Report* (Jan. 11, 2007), Heber Deposition, Ex. 1051 (BATES: POMJL-0000979-1038). It stated

that there were no apparent treatment related changes in weight, systolic blood pressure, or

diastolic blood pressure. *Id.* at POMJL-0000998. It also stated that there were no apparent

treatment related changes in any of the chemistry (including cholesterol, HDL, LDL, and TG),

hematology, or urinalysis laboratory results. *Id.* at POMJL-0001004-1024. The Clinical Study

Report concludes that "POMx . . .is safe when ingested by healthy human subjects . . . ."

66.    In 2007, Dr. Heber published a report on the results of the two studies described above.

Heber D, Seeram NP, Wyatt H, Henning SM, Zhang Y, Ogden LG, Dreher M, and Hill JO,

*Safety and Antioxidant Activity of a Pomegranate Ellagitannin-Enriched Polyphenol Dietary*

*Supplement in Overweight Individuals with Increased Waist Size,* J. Agric Food Chem., Vol. 55,

No. 24 (2007), Heber Deposition Ex. 1053 (BATES: POM-HC0001735-1739). This publication

*CONFIDENTIAL – FTC Docket No. 9344*    34

CX1291_0034

describes the Denver study conducted by Dr. Hill as the "Antioxidant Activity Study" and highlights the decrease in TBARS seen in that unblinded, uncontrolled trial. It describes the San Diego study conducted by Accelovance as a "Safety Study," and states that there were no serious adverse events reported at the San Diego site. It concludes that, "these pilot studies demonstrate both the safety and efficacy of POMx . . . . However, further studies need to be done to confirm the antioxidant properties of pomegranate ellagitannins administered as a dietary supplement."

67.    I have reviewed the unpublished analysis of the antioxidant and anti-inflammatory biomarker data from the San Diego study. See Heber Deposition Exhs. 1054, 1057. According to those data, there were no statistically significant changes in any of these markers – including CRP, oxidized phospholipids, lipoprotein a, nitric oxide, isoprostanes, interleukins – in the groups receiving one or two POMx capsules per day.

68.    The methodological shortfalls in the Denver study conducted by Dr. Hill – especially the lack of a control group – render its findings unreliable. Accordingly, I disagree with Dr. Heber's statement in his 2007 publication (cited above) that this study demonstrates efficacy of POMx.

69.    By contrast, the San Diego study appears to have been well-designed, and there is no evidence of problems with its conduct. POMx appears to have caused no changes in the biomarkers studied.

### F.    Diabetes Studies

70.    I have also reviewed several studies evaluating the effect of consuming pomegranate products on diabetic patients. Diabetic patients are at particularly high risk of heart disease, and there is significant interest in identifying nutritional approaches to reduce those risks. The studies I reviewed include:

*CONFIDENTIAL – FTC Docket No. 9344*    35

CX1291_0035

a.      Esmaillzadeh A, Tahbatz F, Gaieni I, Alvi-Majd H, and Azadbakht L, *Concentrated Pomegranate Juice Improves Lipid Profiles in Diabetic Patients with Hyperlipidemia*, 7 J. Med. Food 3 (2004) (BATES: POM_Q14-0006323-6326).  This study, described as "quasi-experimental," assessed the effects of concentrated pomegranate juice consumption (40 grams per day, or about 1 1/2 ounces; the source of the concentrate was not identified) on the lipid profiles of type 2 diabetic patients with high cholesterol or high TG.  The unblinded, unrandomized, uncontrolled 22-person study followed the patients for 8 weeks and found positive changes in lipid profiles, including reductions in cholesterol and LDL.  The abstract of this study also was published as Esmaillzadeh A, *et al.*, *Cholesterol-Lowering Effect of Concentrated Pomegranate Juice Consumption in Type II Diabetic Patients with Hyperlipidemia*, 76 Intl. J. Vitamin Nutr. Res. 3 (2006).

b.      Rock W, Rosenblat M, Miller-Lotan R, Levy AP, Elias M, and Aviram M, *Consumption of Wonderful Variety Pomegranate Juice and Extract by Diabetic Patients Increases Paraoxonase I Association with High-Density Lipoprotein and Stimulates Its Catalytic Activities*, 56 J. Agric. Food Chem. (2008) (BATES:  POM-BGILLESPIE00602-611):  This study was to investigate the effects of concentrated pomegranate juice and pomegranate polyphenol extract consumption on the association of PON with HDL in patients with type 2 diabetes.  In this unrandomized, unblinded, and uncontrolled study, ten male diabetes patients and ten female diabetes patients received concentrated POM Juice (50mL per day) for four weeks, while another group of ten male diabetes patients received POMx Liquid (5 mL per day) for six weeks.  Patients were tested at baseline, two weeks, four weeks, and then at eight weeks (that is, after a four-

***CONFIDENTIAL – FTC Docket No. 9344***    36

CX1291_0036

week "washout."). Measures included TBARS, and other testing designed to measure serum oxidative stress, as well as HDL-associated PON levels. According to the report, POM Juice and POMx Liquid consumption produced positive changes in PON association with HDL together with antioxidative effects in serum. It further reports that POM Wonderful Juice did not worsen parameters in diabetic patients despite its high sugar content.

      c.     Rosenblat M, Hayek T, and Aviram M, *Anti-oxidative Effect of Pomegranate Juice (PJ) Consumption by Diabetic Patients on Serum and on Macrophages*, 187 Artherosclerosis (2006) (BATES: POM-BGILLESPIE00592-600): This study investigated the effects of pomegranate juice consumption on oxidative stress in ten diabetic patients and ten healthy subjects (called "controls"). Both groups received 50 ml of pomegranate juice per day for three months. According to the publication, pomegranate juice consumption produced positive changes in serum oxidative status, including reduced TBARS and lipid peroxides, in the diabetic patients.

71.    These studies were not RCTs. As a result, the reported results are unreliable. A qualified scientist cannot conclude whether any changes in measured parameters resulted from pomegranate or pomegranate extract consumption, or from some other factor, such as the placebo effect. These studies also were too small, and of too limited duration, to prove that consumption of pomegranate juice, which is high in sugar, is safe for consumption by diabetics. Accordingly, none of these studies provides reliable scientific support for claims that POM Juice or POMx prevents, reduces the risk of, or treats heart disease.

CX1291_0037

### G.    Overall analysis of the relevant evidence

72.    In considering whether a product – whether it is a conventional food, drug, or dietary supplement – is likely to have an effect on the risk or treatment of a disease, it is important to look first at the individual items of evidence, to determine whether they are reliable and probative.  Then, it is important to look at the evidence as a whole.

73.    In this case, there are only three studies that, in my opinion, have sufficient evidence of reliability to warrant serious consideration, in light of the quality of the studies conducted and the endpoints measured.  These are the Davidson CIMT trial; the Ornish CIMT trial; and the Davidson BART trial.  These three studies showed that, in the populations identified in the protocol, the consumption of pomegranate juice provided no statistically or clinically significant benefit for heart disease prevention or treatment.  POM Juice has not been shown, in these trials, to produce statistically or clinically significant changes in direct endpoints related to heart disease or in appropriate surrogate markers of heart disease.  This provides strong evidence that, at the present time, there is no competent and reliable evidence to support the conclusion that consumption of POM Juice will prevent or reduce the risk of heart disease, or treat heart disease.

74.    Further, these studies provide no evidence that POMx Pills or POMx Liquid will prevent, reduce the risk of, or treat heart disease, through any mechanism.

75.    When my analysis is expanded to consideration of all of the evidence that I have reviewed, as summarized in this report, my conclusion is the same.  In my opinion, the evidence that I have reviewed is not sufficient to support the conclusion that consumption of POM Juice, POMx Pills, or POMx Liquid prevent or reduce the risk of heart disease, or treat heart disease.  Considered as a whole, for the reasons previously discussed, there is no reliable evidence that POM Juice, POMx Pills, or POMx Liquid reduce or delay the development of arterial plaque;

*CONFIDENTIAL – FTC Docket No. 9344*    38

CX1291_0038

improve blood flow to the heart (or other blood vessels); reduce blood pressure; or that they produce statistically significant reductions in LDL, HDL, TG, or cholesterol.

76.    I understand that the respondents plan to present numerous experts whose reports I have yet to see. I may be asked to address anything new in those reports within my expertise.

Dated: March 3, 2011

Frank M. Sacks, M.D.

*CONFIDENTIAL* ☒ FTC Docket No. 9344    39

CX1291_0039

## EXPERT REPORT OF ARNOLD MELMAN, M.D.

### I.    CREDENTIALS AND QUALIFICATIONS

1.      I am a Doctor of Medicine, and obtained my medical degree in 1966 from the University of Rochester School of Medicine in Rochester, New York.  From 1966 to 1968, I completed an internship and assistant year of residency in general surgery.  I did my residency in urology at UCLA Medical Center from 1970 to 1974.  I am board certified in urology.  I am a practicing urological surgeon and my areas of specialty include erectile dysfunction, Peyronie's disease, reconstructive surgery, and radical perineal prostatectomy.  My curriculum vitae and list of publications is attached hereto as Exhibit A.

2.      Currently, I am a Professor and Chairman of the Department of Urology at the Albert Einstein College/Montefiore Medical Center in Bronx, New York.  I am on the active staff at the Montefiore Medical Center as a practicing clinical urologist.  Prior to joining the faculty at Albert Einstein, I held full-time academic positions in urology at UCLA Medical Center, Indiana University Medical Center, Indianapolis Veterans Hospital, Beth Israel Medical Center, and Mount Sinai School of Medicine.  I have also held a number of visiting professor positions in urology.

3.      I am a member of the American Federation for Clinical Research, Society of University Urologists, American Urological Association, American Association of Clinical Urologists, International Society of Urology, New York State Urologic Association, International Academy of Sex Research, and American College of Surgeons.  I have also held many consulting positions in urology.  I was chairman of the Gastroenterology and Urology Devices Panel of the Medical Devices Advisory Committee at the U.S. Food and Drug Administration, and was a

member of the Urology Special Emphasis Panel at the National Institutes of Health. I have spoken at national and international meetings of professional societies that specialize in urology and erectile dysfunction.

    4.    I have served as an editor of *Sexuality and Disability*, editorial reviewer of *The Journal of Urology*, co-editor of *International Journal of Impotence Research*, and test question editor of *Urologic Clinics of North America*. I have also reviewed articles for *The New England Journal of Medicine* and *American Journal of Physiology*. As part of my duties in reviewing articles submitted for publication, I have evaluated the adequacy and accuracy of the design, data collection and reporting, and statistical analysis of numerous clinical studies. I have also authored and published over two hundred papers relating to urology in peer reviewed scientific journals, including *The Journal of Sexual Medicine*, *The Journal of Urology*, *British Journal of Urology International*, *Urologic Clinics of North America*, and *International Journal of Impotence Research*. Many of these papers are related to erectile dysfunction. I am also a former president of the North American Society for the Study of Impotence.

    5.    I have been the recipient of several research grants relating to erectile dysfunction. From 1989 to 2002, I was the principal investigator for a project, "Pharmacological Studies of Human Erectile Tissue," funded by the National Institutes of Health. From 2003 to 2008, I was the principal investigator for a project, "Smooth Muscle Differential Tissue Function & Diabetes," funded by the National Institutes of Health. I was the sponsor, through Ion Channel Innovations, LLC, of a phase I trial entitled "An Open-Label, Sequential Three-Arm, Phase I Clinical Trial Evaluating the Safety and Potential Activity of *h*Maxi-K Gene Transfers in Males with Moderate Erectile Dysfunction." Through my own clinical research, as well as my committee memberships and editorial review work, I am knowledgeable about the protocols and

procedures that are appropriate for well-designed clinical trials. Moreover, as a practicing

urologist, I have consulted with and provided medical care to thousands of patients affected by

erectile dysfunction.

6.    Based upon my professional training, knowledge, and experience, I am qualified

as an expert in the evaluation of whether a product prevents, reduces the risk of, or treats erectile

dysfunction, and in the design and conduct of clinical trials involving erectile dysfunction.

7.    In the past four years, I have testified at deposition or trial in the matters identified

in Exhibit B. I am being compensated at the rate of $250 per hour for my work in this litigation.

## II.    SCOPE OF THE REPORT AND CONCLUSIONS

8.    The Federal Trade Commission ("FTC") staff has requested that I evaluate, from

my perspective as an expert in erectile dysfunction, whether the following claims are supported

by the materials provided by the respondents: 1) drinking eight ounces of POM Wonderful

pomegranate juice daily prevents, reduces the risk of, or treats erectile dysfunction, and 2)

clinical studies, research, and/or trials prove that drinking eight ounces of POM Wonderful

pomegranate juice daily prevents, reduces the risk of, or treats erectile dysfunction. Attached to

this report as Exhibit C are materials that I relied upon in evaluating the claims for POM

Wonderful pomegranate juice. Exhibit C includes materials that I understand were submitted by

the respondents or third parties relating to Christopher Forest, et al., *Efficacy and Safety of*

*Pomegranate Juice on Improvement of Erectile Dysfunction in Male Patients with Mild to*

*Moderate Erectile Dysfunction: A Randomized, Placebo-Controlled, Double-Blind, Crossover*

*Study*, 19 Int'l J. of Impotence Res. 564 (2007) ("Forest Study"),[1] which I reviewed and

---

[1] The Forest Study was financially supported by POM Wonderful, LLC and used POM
Wonderful pomegranate juice.

CONFIDENTIAL – FTC Docket No. 9344

CX1289_0003

evaluated at the request of the FTC staff. I am also generally familiar with the body of studies on

erectile dysfunction and pomegranate products, including POM Wonderful pomegranate juice,

published in English-language scientific journals as a result of my position as professor and

chairman of the Department of Urology at Albert Einstein College/Montefiore Medical Center

and past editorships at *International Journal of Impotence Research*, *Sexuality and Disability*,

and *Urologic Clinics of North America*. In developing this expert report, I have extensively

relied upon my education, experience, and knowledge of developments in the field of urology,

including the treatment of erectile dysfunction.

       9.     My conclusions, which are set forth in full herein, are summarized as follows: To

constitute competent and reliable scientific evidence, experts in the field of erectile dysfunction

would require at least one clinical trial, involving several investigatory sites, that is well-

designed, randomized, placebo-controlled, and double-blinded. A clinical trial should use an

appropriate outcome measure and sample population, and have reliable data collected over an

appropriate period of time. Different clinical staff, including the principal investigator, should

conduct the study at each investigatory site. A clinical research organization or sponsor should

oversee all investigatory sites within the clinical trial. The total sample population must be large

enough to produce clinically significant results and a statistical significance of $p < 0.05$. It is my

opinion that: 1) the Forest Study fails to provide competent and reliable scientific evidence

showing that drinking eight ounces of POM Wonderful pomegranate juice daily prevents,

reduces the risk of, or treats erectile dysfunction, and 2) no clinical studies, research, and/or trials

prove that drinking eight ounces of POM Wonderful pomegranate juice daily prevents, reduces

the risk of, or treats erectile dysfunction. To my knowledge, there have been no other human

clinical trials conducted on POM Wonderful pomegranate juice, or any other pomegranate

product, demonstrating efficacy in preventing, reducing the risk of, or treating erectile dysfunction. Therefore, it is my opinion that POM Wonderful pomegranate juice has not been proven to prevent, reduce the risk of, or treat erectile dysfunction.

10.     I understand that the respondents have several experts whose reports I have not yet reviewed. I may be asked by the FTC staff to address anything new in the respondents' expert reports within my expertise.

## III.    OVERVIEW OF ERECTILE DYSFUNCTION AND TREATMENTS

11.     Erectile dysfunction is defined as "the inability to achieve or maintain an erection sufficient for satisfactory sexual performance." National Institutes of Health, *Consensus Statement on Impotence* (Dec. 1992). It is estimated that between fifteen and thirty million men in the United States suffer from erectile dysfunction. Physical disease accounts for approximately seventy percent of all erectile dysfunction cases in men over age forty.

12.     To understand the causes of erectile dysfunction, one must first know something about the anatomy of the penis. The organ's functions are to enable urine to exit the body and, when rigid, to help introduce sperm into the vaginal canal. An erection, however, is not absolutely necessary for impregnation of a female partner because orgasm and ejaculation can occur in either a flaccid or semirigid state. The penis contains three well-vascularized cylinders of spongy tissue: two corpora cavernosa and the corpus spongiosum. The latter has in its center the urethral channel, a tubular structure lined with specialized, flattened cells through which urine passes. The three cylinders act as draining pools for the penis' blood supply, producing an erection when they are engorged.

13.     Three primary types of cells live in the tissue of the penile corpora cavernosa: endothelial cells, smooth muscle cells, and neurons. Endothelial cells line blood vessels and the

CONFIDENTIAL – FTC Docket No. 9344

sinusoids, the spaces within the corpora cavernosa, and secrete substances that aid in the

relaxation and contraction of adjacent smooth muscle cells. The amount of blood entering the

penis is regulated by the tone of the smooth muscle cells that line the three spongy corpora.

When these smooth muscle cells contract, blood flows freely in and out of the penis. When the

cells relax, however, they press against the small veins that drain blood from the corpora. This

pressure compresses the vessels like a closing valve. Blood then pools in the spongy tissues, and

an erection occurs.

14.    An erection begins with a stimulus, which can be visual, tactile, auditory,

gustatory, or olfactory, or it may arise during dream-associated sleep. Conscious or unconscious

neurological signals are sent to the hypothalamus and relayed down the penis' neurons. The

nerve endings then release neurotransmitters that relax the smooth muscle cells lining the

corporal bodies and the arteries supplying blood to the penis. More blood enters than exits, and

the penis becomes rigid. The entire sequence of events, from stimulation to erection, can take

place in seconds.

15.    Many types of nerves and molecules participate in the signal transmission that

results in an erection. The primary pathway is through autonomic nerve fibers that release

molecules of nitric oxide near the smooth muscle cells of the penis. The nitric oxide diffuses

through cell membranes and begins a biochemical cascade of events that results in the relaxation

of the smooth cells of the corpora cavernosa. One of these biochemical events is the activation

of an enzyme called guanylyl cyclase, which leads to the production of the molecule cyclic

guanosine monophosphate ("cGMP"). Cyclic GMP, the last molecule in the biochemical

cascade that induces an erection, causes the smooth muscle cells of the corpora cavernosa to

relax. Another enzyme, type 5 phosphodiesterase ("PDE-5"), causes the breakdown of cGMP,
inhibiting the erectile process.

16.    Erectile dysfunction can manifest when the sequence of events necessary to
produce an erection is interrupted. For example, the relatively narrow blood vessels in the penis
are susceptible to blockage from various arterial-narrowing conditions such as hypertension and
atherosclerosis. The high incidence in our society of cardiovascular disease, which is
exacerbated by diabetes, hypertension, atherosclerosis, and smoking, makes diminished blood
flow to the penis the most common cause of organic erectile dysfunction. Diseases, such as
diabetes, kidney disease, chronic alcoholism, multiple sclerosis, atherosclerosis, vascular disease,
and neurologic disease, account for about seventy percent of erectile dysfunction causes.
Surgery, especially radical prostate and bladder surgery for cancer, can injure nerves and arteries
near the penis, causing erectile dysfunction. Injury to the penis, spinal cord, prostate, bladder, or
pelvis can lead to erectile dysfunction by harming nerves, smooth muscles, arteries, and fibrous
tissues of the corpora cavernosa. Approximately thirty-five to fifty percent of men with diabetes
experience erectile dysfunction. Psychological factors, such as stress, anxiety, guilt, depression,
low self-esteem, and fear of sexual failure, cause ten to twenty percent of erectile dysfunction
cases. Many common medicines, such as blood pressure drugs, antihistamines, antidepressants,
and tranquilizers, can produce erectile dysfunction as a side effect. Older men are more likely to
have erectile dysfunction caused by physiological problems while younger men are more likely to
have erectile dysfunction due to psychological reasons.

17.    Drugs like Viagra, Levitra, and Cialis act as PDE-5 inhibitors and prevent the
breakdown of cGMP. When these drugs inhibit the enzyme, cGMP remains active, and the
signal for smooth muscle relaxation is left in the "on" position. PDE-5 inhibitors have been

CONFIDENTIAL – FTC Docket No. 9344

CX1289_0007

found in clinical trials to be effective in inducing erections in sixty to seventy percent of patients. These drugs work as long as a person has healthy penile blood flow, intact nerves, and sufficient capacity to produce nitric oxide, a precursor to cGMP production. Because a PDE-5 inhibitor is dependent on nitric oxide release, which is the result of nerve signals to the penis, sexual stimulation must occur for an effect to be seen.

## IV.    TYPE OF EVIDENCE REQUIRED TO DEMONSTRATE THE EFFICACY OF A PRODUCT IN PREVENTING, REDUCING THE RISK OF, OR TREATING ERECTILE DYSFUNCTION

18.    The FTC staff has asked me what kind of evidence experts in the field of erectile dysfunction would require to support claims that drinking eight ounces of POM Wonderful pomegranate juice daily prevents, reduces the risk of, or treats erectile dysfunction. Based upon my professional training, knowledge, and experience, as discussed in paragraphs one through five, experts in the field of erectile dysfunction would require at least one clinical trial, involving several investigatory sites, in order to conclude that competent and reliable scientific evidence exists to support such claims. Experts in the field of erectile dysfunction would require that a clinical trial be well-designed, randomized, placebo-controlled, and double-blinded. A clinical trial should use an appropriate outcome measure and sample population, and have reliable data collected over an appropriate period of time on participants' abilities to maintain erections rigid enough and for a sufficient length of time to achieve sexual satisfaction. A total sample population must be large enough to produce a clinically significant result and a statistical significance of $p < 0.05$.

19.    In a multisite clinical trial, different clinical staff, including the principal investigator, should conduct the study at each investigatory site. A clinical research organization

CONFIDENTIAL – FTC Docket No. 9344

CX1289_0008

or sponsor should oversee all investigatory sites within the clinical trial. The primary data would be reviewed by those persons and authenticated.

20.     For a study to demonstrate that a treatment actually has an effect, a control group is needed. Participation in a clinical trial can by itself have an effect. Thus, the control group provides a basis for what otherwise would be happening to a population not receiving the treatment over the same time period. The control group should be approximately the same size and its members should meet the same criteria as members of the treatment group. The control group should receive a placebo that is identical in size, appearance, and taste to the treatment product.

21.     Randomization refers to a method by which study participants are assigned, randomly, either to the treatment group or to the placebo group. It is designed to ensure that participants' physical or other attributes do not influence the outcome of the study. The goal of randomization is to eliminate the possibility that a researcher may consciously or unconsciously employ a selection bias regarding the group to which individual participants were assigned, and to rely on the statistical likelihood that the members of the treatment and placebo groups will be statistically similar in all relevant characteristics.

22.     A study must be double-blinded, which means that neither the investigators nor the study participants know whether a participant is in the treatment or placebo group. Blinding ensures that the investigators do not subconsciously provide different care or information to participants as a result of knowing the group to which each participant is assigned. It also ensures that the study participants' responses are not influenced by knowing which treatment they received.

CONFIDENTIAL – FTC Docket No. 9344

-9-

CX1289_0009

23.     A study should detail the participant selection criteria used, data collection procedures, specific outcomes sought, and criteria for measuring those outcomes. A study uses selection criteria to determine whether a participant should be included or excluded. For example, a study could require that all participants be within a certain age range or exclude any participant who has a particular medical disease. A study must use standardized, objective criteria for participant selection and for measuring treatment outcomes. The use of standardized objective criteria is essential for obtaining meaningful data and for ensuring useful comparisons of research outcomes obtained by different investigators. Currently, the International Index of Erectile Function ("IIEF") is the accepted, validated instrument for measuring erectile function. The IIEF has the sensitivity and specificity to measure treatment-related changes in participants with erectile dysfunction. A well-designed clinical trial on a treatment for erectile dysfunction would also include verification from a participant's partner. A partner can provide verification of a participant's erectile function through instruments such as the Treatment Satisfaction Scale. The clinical study should also include and describe measures for monitoring subject compliance, and specify how subject withdrawals are to be handled.

24.     After a clinical trial has been completed and all data have been collected, the data for the placebo and treatment groups must be compared through an appropriate statistical analysis by a biostatistician or other qualified person. The treatment can only be said to have an effect when the results obtained by the treatment group have a statistically significant difference ($p < 0.05$) from the placebo group's results. In addition, any statistically significant results must be reviewed for clinical significance. For example, it is possible for the treatment group's mean score for a specific question on the IIEF to change from 2.9 to 3.5 and for this increase to be statistically significant if the number of participants in the study is large. However, the results

CONFIDENTIAL – FTC Docket No. 9344

-10-

CX1289_0010

would not be clinically significant because any score less then 4 points on the erectile function segment of the IIEF is abnormal. For results to be clinically significant, there must be a significant positive change above a score of 4 points on the IIEF.

25.    A study of a treatment for erectile dysfunction must be conducted over a long enough study period to see an effect over time. The primary endpoint for measuring whether a product has been effective for treating erectile dysfunction is whether the participant is able to maintain an erection rigid enough and for sufficient duration to result in sexual satisfaction. Even if a treatment provides improvement in the quality of the erection, the treatment is not efficacious when the participant is still unable to complete intercourse.

26.    Anecdotal evidence, such as reports from participants, is insufficient to prove a product's efficacy. In addition, animal studies cannot support claims that a product works in men. A product may behave differently in humans than in animals. Similarly, *in vitro* studies cannot support claims that a product works in men because the results in a test tube may not occur when tested in humans. Furthermore, *in vitro* studies will not reveal the adverse reactions a human participant may experience from taking a product.

## V.    ANALYSIS OF THE AVAILABLE EVIDENCE REGARDING THE EFFICACY OF POM WONDERFUL POMEGRANATE JUICE, OR ANY OTHER POMEGRANATE PRODUCT IN PREVENTING, REDUCING THE RISK OF, OR TREATING ERECTILE DYSFUNCTION

27.    As indicated above, the FTC staff has asked whether the available evidence supports the conclusion that drinking eight ounces of POM Wonderful pomegranate juice daily prevents, reduces the risk of, or treats erectile dysfunction. I have reviewed materials that I understand were provided to the FTC staff by the respondents or third parties relating to the Forest Study. In addition to my general knowledge of the literature on treatments for erectile

dysfunction, I conducted a literature search to identify any published reports of human studies evaluating the efficacy of POM Wonderful pomegranate juice, or any other pomegranate product to prevent, reduce the risk of, or treat erectile dysfunction.

28.    As discussed above, before making any claim, experts in the field of erectile dysfunction would require at least one well-designed, randomized, double-blinded, and placebo-controlled clinical trial with several investigatory sites, demonstrating that POM Wonderful pomegranate juice is effective in preventing, reducing the risk of, or treating erectile dysfunction. In a multisite clinical trial, different clinical staff, including the principal investigator, should conduct the study at each investigatory site. A clinical research organization or sponsor should oversee all investigatory sites within the clinical trial. A clinical trial should use an appropriate outcome measure and sample population, and have reliable data collected over an appropriate period of time. A total sample population must be large enough to produce a clinically significant result with a statistical significance of $p < 0.05$. Based upon my review of the documents provided by the respondents or third parties to the FTC staff and the published literature, it is my opinion that the Forest Study does not provide competent and reliable scientific evidence, and does not prove that POM Wonderful pomegranate juice prevents, reduces the risk of, or treats erectile dysfunction.

29.    I understand that the respondents rely upon the Forest Study's results as support for their claims. The Forest Study was a randomized, double-blinded, placebo-controlled pilot study that examined the efficacy of POM Wonderful pomegranate juice versus placebo in improving erections in participants with mild to moderate erectile dysfunction.[2] To measure

---

[2]  The Forest Study used a crossover design, incorporating two twenty-eight-day treatment periods and a fourteen-day washout period in between the treatment periods. The Global

efficacy in improving erectile function, the Forest Study used the GAQ and the erectile function

domain of the IIEF. Exhibit D attached hereto contains the GAQ and IIEF measures used by the

Forest Study.

      30.     The Forest Study does not provide scientific support for claims that POM

Wonderful pomegranate juice prevents, reduces the risk of, or treats erectile dysfunction for the

following reasons:

             A.     The Forest Study stated that statistical significance was "nearly achieved"

in the GAQ measure ($p = 0.058$). However, this result is not statistically

significant, and fails to demonstrate product efficacy. Moreover, the result of the

Forest Study's IIEF domain for erectile function is not statistically significant.[3]

             B.     Unlike the IIEF's erectile function domain, the Forest Study's GAQ is not

a validated questionnaire shown to be reliable or accurate in measuring change in

erectile function. The GAQ asked for a participant's "yes or no" response on

whether erections improved through the question: "While using the study

beverage, did you feel that your erections improved?" Comparatively, the IIEF

erectile function domain, shown in Exhibit D, has the necessary sensitivity and

specificity to measure treatment-related changes in participants with erectile

dysfunction. The IIEF uses a more specific response scale and asks participants

about their sex life and erection problems, including questions on desire,

satisfaction, intercourse, and stimulation. For example, IIEF questions three

---

Assessment Questionnaire ("GAQ") was administered after each treatment period. The IIEF was
administered at the start of the study and after each treatment period. Fifty-three participants in
two cohorts completed the Forest Study.
[3] The Forest Study also used other IIEF domains involving intercourse satisfaction, overall

("Over the last month, when you attempted sexual intercourse, how often were you able to penetrate (enter) your partner?") and four ("Over the last month, during sexual intercourse, how often were you able to maintain your erection after you had penetrated (entered) your partner?") ask about a participant's ability to penetrate and maintain an erection in the context of intercourse.

C.    In addition to failing to reach statistical significance, the Forest Study's GAQ measure does not show whether the improvement is clinically significant. The GAQ asked only whether participants felt that their erections improved. Improvement alone does not establish clinical significance. A treatment would not be efficacious if the participants were unable to complete intercourse. The GAQ neither measures the specific amount of improvement in erectile function nor shows that any such improvement is a meaningful change in erectile function.

D.    In the Forest Study, participants in the treatment phase received POM Wonderful pomegranate juice daily for four weeks. Four weeks may not be adequate time to show a sustained significant clinical effect on erectile function. A study on the treatment of erectile dysfunction must be conducted over a longer duration to measure effectiveness over time and allow for more incidents of sexual activity by participants.[4]

E.    As noted in the Forest Study, POM Wonderful pomegranate juice had a distinct taste and appearance when compared to the placebo. Differences between the placebo and treatment beverages' taste and appearance would have eliminated

---

satisfaction, orgasm, and desire. None of these IIEF domains had statistically significant results.
[4] The Forest Study required that participants attempt sexual intercourse at least once per week

the Forest Study's blinding because participants would know whether they had received the treatment or placebo beverage. This would have biased the Forest Study's outcomes. A placebo should be identical in taste and appearance to the treatment product.

F.    A well-designed clinical trial on a treatment for erectile dysfunction would also include verification by a partner about a participant's erectile function. The Forest Study did not obtain verifications from the participants' partners.

G.    The Forest Study used weak inclusion criteria regarding whether participants had previously taken any PDE-5 inhibitors. While participants who took at least three doses of PDE-5 inhibitors with little or no improvement were excluded, participants who had never taken PDE-5 inhibitors or had been successfully treated by PDE-5 inhibitors could enroll in the study. Differences among participants involving any past use of PDE-5 inhibitors could have influenced the Forest Study's outcomes. Because participants who previously benefited from taking PDE-5 inhibitors were more likely to have expectations about a treatment's efficacy, the Forest Study's results may have been skewed towards showing improvement.

H.    The mean age of participants in the Forest Study was forty-six years old, which is a relatively young mean age for an erectile dysfunction study. The younger mean age may have affected the Forest Study's outcomes because younger participants are more likely to respond to the placebo and improve for non-physiological reasons.

---

during the study.

CONFIDENTIAL – FTC Docket No. 9344

-15-

**JA-1092**

CX1289_0015

31.    Because the participants already had mild to moderate erectile dysfunction at the time of enrollment, the Forest Study fails to provide support for claims that POM Wonderful pomegranate juice prevents or reduces the risk of erectile dysfunction in healthy men.

32.    For the above reasons, the Forest Study fails to provide competent and reliable scientific evidence demonstrating that POM Wonderful pomegranate juice prevents, reduces the risk of, or treats erectile dysfunction in humans.

33.    Dr. Jacob Rajfer reviewed the Forest Study in *Pomegranate Juice: Is It the New, All-Natural Phosphodiesterase Type 5 Inhibitor?*, 10 Revs. in Urology 168 (2008). Dr. Rajfer described the Forest Study as a "negative" study, stating that "daily pomegranate juice for at least 28 days did not improve one's erection regardless of whether one was in the first or second treatment group. [The Forest Study] highlights the fact that not all bench findings prove clinically efficacious and demonstrates the necessity of randomized, double-blind, placebo-controlled studies."

34.    A survey of the available scientific literature did not result in any other human clinical studies on the efficacy of POM Wonderful pomegranate juice, or any other pomegranate product in preventing, reducing the risk of, or treating erectile dysfunction.

35.    The FTC staff also asked me to review the protocol and results of a randomized, double-blinded, placebo-controlled cardiovascular study by Dr. Michael Davidson et al., *The Effects of Consumption of Pomegranate Juice on Carotid Intima-Media Thickness*, Protocol 202528 ("Davidson Study").[5] The Davidson Study's primary purpose was to evaluate the effect of drinking eight ounces of POM Wonderful pomegranate juice daily on the progression of

---

[5] The Davidson Study was financially supported by Roll International Corporation and used POM Wonderful pomegranate juice.

CONFIDENTIAL – FTC Docket No. 9344

CX1289_0016

carotid intima-media thickness in humans.  However, fifty-two participants also completed

several domains of the IIEF, including the erectile function domain, before and after a thirteen-

week period.  When the IIEF's erectile function domain results of participants who received

POM Wonderful pomegranate juice were compared with those of participants who received the

placebo, there was no statistically significant difference between the groups. [6]  The Davidson

Study fails to provide competent and reliable scientific evidence demonstrating that POM

Wonderful pomegranate juice prevents, reduces the risk of, or treats erectile dysfunction in

humans.

      36.    The FTC staff also asked me to review the study by Kazem Azadzoi et al.,

*Oxidative Stress in Arteriogenic Erectile Dysfunction: Prophylactic Role of Antioxidants*, 174 J.

of Urology 386 (2005).[7]  For the reasons discussed above, this animal study fails to prove the

efficacy of POM Wonderful pomegranate juice, or any other pomegranate product in treating,

reducing the risk of, or preventing erectile dysfunction.  *In vitro* or animal studies do not provide

support that a product works in humans.

      37.    The FTC also asked me to review the *in vitro* study by Louis Ignarro et al.,

*Pomegranate Juice Protects Nitric Oxide Against Oxidative Destruction and Enhances the*

*Biological Actions of Nitric Oxide*, 15 Nitric Oxide 93 (2006) ("Ignarro Study").[8]  As discussed

above, nitric oxide has a role in erectile function.  Studies about antioxidants' effects on nitric

oxide levels relate to the biochemical processes involving erectile function.  However, studies on

---

[6] The other IIEF domains used in the Davidson Study did not have statistically significant results.
The Davidson Study's IIEF results were not published.

[7] Dr. Azadzoi's study was financially supported by Roll International Corporation and used POM
Wonderful pomegranate juice.

[8] Dr. Ignarro's study was financially supported by the Lynda and Stewart Resnick Revocable
Trust and used POM Wonderful pomegranate juice.

CONFIDENTIAL – FTC Docket No. 9344

CX1289_0017

the relationship between nitric oxide and antioxidants, including the Ignarro Study, do not directly involve the issue of erectile function in humans, and cannot alone prove that POM Wonderful pomegranate juice, or any other pomegranate product treats, reduces the risk of, or prevents erectile dysfunction in humans.

## VI.    CONCLUSION

38.    Based upon my professional training, knowledge, and experience in urology and the treatment of men with erectile dysfunction, it is my opinion that experts in the field of erectile dysfunction would require at least one well-designed, multisite clinical trial to conclude that competent and reliable scientific evidence exists to support any claims.  For the reasons set forth above, the Forest Study fails to provide competent and reliable scientific evidence demonstrating that POM Wonderful pomegranate juice prevents, reduces the risk of, or treats erectile dysfunction.  To my knowledge, there are no other clinical trials of POM Wonderful pomegranate juice, or any other pomegranate product, demonstrating this product's efficacy on erectile dysfunction.  Therefore, it is my opinion that the materials submitted by the respondents fail to provide competent and reliable evidence to support claims that: 1) drinking eight ounces of POM Wonderful pomegranate juice daily prevents, reduces the risk of, or treats erectile dysfunction, and 2) clinical studies, research, and/or trials prove that drinking eight ounces of POM Wonderful pomegranate juice daily prevents, reduces the risk of, or treats erectile dysfunction.

Dated: 3/4/11

Arnold Melman, M.D.

CX1289_0018

## EXPERT REPORT OF MEIR JONATHAN STAMPFER, M.D.

### I.     CREDENTIALS AND QUALIFICATIONS

As detailed in my curriculum vitae, attached as Exhibit A, I received an A.B. degree from Columbia University, a M.D. degree from New York University School of Medicine, and a M.P.H. degree and a Dr.P.H. degree in Epidemiology from the Harvard School of Public Health.

Since 1982, I have held academic appointments at Harvard Medical School, and, since 1988, I have held academic appointments at Harvard School of Public Health. I am currently Professor of Epidemiology and Nutrition, Harvard School of Public Health; Professor of Medicine, Harvard Medical School; a Faculty Member of the Division of Biological Sciences, Harvard School of Public Health; a Faculty Member of the Dana Farber Harvard Cancer Center; and Visiting Professor, Karolinska Institutet, Stockholm, Sweden.

Most of my teaching is at the Harvard School of Public Health, where I co-direct the course Practice of Epidemiology. I served as chair of the Department of Epidemiology 2000-2007. In addition, I contribute guest lectures in other courses. I advise several doctoral students and postdoctoral fellows, and devote considerable energy to helping junior faculty. At Harvard Medical School, I assist in the advanced epidemiology course and give lectures in the preventive medicine course.

My editorial board responsibilities to medical journals include the following: Technical Reviewer, *New England Journal of Medicine* (1987-96); Associate Editor, *American Journal of Epidemiology* (1991-92); Editor, *American Journal of Epidemiology* (1992-97); Editorial Board, *Journal of the American College of Nutrition* (1994 to date);

*Confidential*-FTC Docket No. 9344

CX1293_0001

Associate Editor, *American Journal of Epidemiology* (1997-98, 2001 to date); Editorial Board, *American Journal of Medicine* (1998 to date); Editorial Board, *Journal of Women's Health* (1998 to date); Editorial Board, *Epidemiology* (2004-08); Editorial Board, *American Journal of Clinical Nutrition* (2004-2010); and Editorial Board, *Clinical Chemistry* (2007 to date).

I have engaged in a significant amount of scholarly research and writing. In 2003, the Institute for Scientific Information in its Science Watch publication identified me as the most often cited researcher in clinical medicine in the world over the previous 20 years. I was also identified as the most often cited researcher in the field of Epidemiology during that same time period. In 2005, I was identified as the most often cited researcher in clinical medicine in the world over the previous decade.

I have authored or co-authored over 850 articles in the medical literature. Many of these articles pertain to case-control and cohort epidemiologic studies. These relate to cardiology, other cardiovascular disease, diet and nutrition, cancer, diabetes, arthritis, and kidney stones. More than 300 of the articles I have authored or co-authored relate specifically to cardiovascular disease or prostate cancer.

I have published articles in a variety of well-respected medical journals, including fifty-four articles in the *New England Journal of Medicine*, sixty-four articles in the *American Journal of Epidemiology*, sixteen articles in *Epidemiology*, nine articles in the *International Journal of Epidemiology*, and sixty-two articles in the *Journal of the American Medical Association* (JAMA).

I have received the following honors and awards: Jones Prize for Logic and Philosophy of Science (Columbia University) (1973); National Research Service Award,

National Institutes of Health (1979-82); Distinguished Alumnus Speaker, Maimonides

Hospital (1989); Senior Investigator Award in Antioxidant Research, Comité Francais de

Coordination des Recherches sur Athérosclérose et le Cholésterol (France) (1994);

Duphar Lecturer, British Menopause Society (United Kingdom) (1994); Frost Award,

American Public Health Association (2000); Dozor Visiting Professor, Ben Gurion

University (2004); and Honorary Doctor of Medicine, University of Athens (2006).

I became a Diplomate of the National Board of Medical Examiners in 1978, and I

am currently licensed to practice medicine in Massachusetts. I am currently a Physician

at Brigham and Women's Hospital and an Associate Director at the Channing Laboratory,

Department of Medicine, Brigham and Women's Hospital and Harvard Medical School.

I am a Member of the Society of Epidemiologic Research, the Federation of

Cardiology's Council of Epidemiology and Prevention, and the American Association of

Cancer Research. I am a Fellow in the American Heart Association's Council of

Epidemiology and the Council on Nutrition, Physical Activity, and Metabolism, and a

Fellow in the American College of Nutrition. I am an elected Member of the American

Epidemiological Society.

My research revolves primarily around four major studies. One is the Nurses'

Health Study, a cohort of 121,700 nurses followed since 1976 with biennial

questionnaires. The second is the Nurses' Health Study II for which I am a founding co-

investigator. This is a study of 116,680 nurses aged 25-42 in 1989 when the study began.

These studies are the most definitive long-term epidemiological studies conducted to date

on women's health. While the prevention of cancer is a primary focus, these studies have

*Confidential*-FTC Docket No. 9344        3

CX1293_0003

produced landmark data on cardiovascular disease, diabetes, and other major health problems. This study has resulted in the publication of several hundred research reports.

The third is the Physicians' Health Study, for which I am a founding co-investigator. The Physicians' Health Study, a randomized trial among 29,000 men, began in 1982 to test the benefits of aspirin and beta carotene in the primary prevention of cardiovascular disease and cancer, and now is testing the health effects of multivitamin supplements. The original randomized trial (Physicians' Health Study I) ended in 1995. Its finding that low-dose aspirin decreased the risk of a first myocardial infarction helped focus the role of aspirin in primary prevention of cardiovascular disease.

The fourth is the Health Professionals Follow-Up Study, for which I am also a founding co-investigator. The Health Professionals Follow-Up Study is a cohort of 51,529 men begun in 1986. The purpose of this study is to evaluate a series of hypotheses about men's health relating nutritional factors to the incidence of serious illness such as cancer, heart disease, and other vascular disease. This all-male study is designed as a complement to the all-female Nurses' Health Study. Since its inception, hundreds of research reports have been published by scientists on the data.

Although a wide range of topics is examined in these studies, the major focus is on nutrition. These large cohorts make use of a wide array of techniques to evaluate dietary intake. These include food frequency questionnaires, diet records, anthropometry, and biochemical analyses of serum, plasma, red cells, adipose tissue and toenails. These studies investigate a broad range of health outcomes including cancer, cardiovascular disease and their precursors such as polyps, benign breast disease, hypertension, high cholesterol, diabetes, and obesity.

*Confidential*-FTC Docket No. 9344        4

CX1293_0004

Based upon my education, training, and experience, as summarized above, I consider myself to be an expert in the following fields: 1) epidemiology; 2) nutrition, including its relation to the prevention and treatment of cardiovascular disease and prostate cancer; 3) clinical testing related to the prevention of prostate cancer and cardiovascular disease.

In the past four years, I have not testified as an expert witness in either a deposition or a trial. I am being compensated by the FTC at $250 per hour for my work in this litigation.

## II.    SCOPE OF THE REPORT AND CONCLUSIONS

The FTC staff has requested that I evaluate, from my perspective as an expert in the fields of epidemiology, nutrition, and clinical testing, whether the following claims are supported by the materials submitted by the Respondents:

(1) Drinking eight ounces of POM Juice, or taking one POMx Pill or one teaspoon of POMx Liquid daily prevents or reduces the risk of heart disease, including by decreasing arterial plaque, lowering blood pressure and/or improving blood flow to the heart;

(2) Drinking eight ounces of POM Juice, or taking one POMx Pill or one teaspoon of POMx Liquid daily treats heart disease, including by decreasing arterial plaque, lowering blood pressure and/or improving blood flow to the heart;

(3) Tests prove that drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily prevents or reduces the risk of heart disease, including by decreasing arterial plaque, lowering blood pressure and/or improving blood flow to the heart;

*Confidential*-FTC Docket No. 9344        5

CX1293_0005

(4) Tests prove that drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily treats heart disease, including by decreasing arterial plaque, lowering blood pressure and/or improving blood flow to the heart;

(5) Drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily prevents or reduces the risk of prostate cancer, including by prolonging prostate-specific antigen doubling time ("PSADT");

(6) Drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily is effective in treating prostate cancer, including by prolonging PSADT;

(7) Tests prove that drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily prevents or reduces the risk of prostate cancer, including by prolonging PSADT; and

(8) Tests prove that drinking 8 ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid treats prostate cancer, including by prolonging PSADT.

Attached to this report as Exhibit B is a disc containing the materials that I relied upon in evaluating the claims for POM Juice, POMx Pills, and POMx Liquid. This disc includes the materials that I have been advised were submitted by the respondents in support of their claims for the POM products, which I reviewed and evaluated at the request of FTC counsel. In addition, I conducted a literature search to find published articles on studies evaluating the efficacy of POM Juice, POMx Pill, and POMx Liquid for preventing or treating prostate cancer and heart disease. I am also generally familiar

with the body of studies on nutrition and the prevention and treatment of cardiovascular disease and prostate cancer through studies I have conducted, my review of the literature, and as a member of the editorial board for various peer-reviewed journals, including the *American Journal of Epidemiology*, *Epidemiology*, and the *American Journal of Clinical Nutrition*. In developing this Report, I have extensively relied upon my education, experience, and my knowledge of developments in the fields of epidemiology, nutrition, including its relation to the prevention and treatment of cardiovascular disease and prostate cancer, and clinical testing related to the prevention of prostate cancer and cardiovascular disease.

### III.    SUMMARY OF CONCLUSIONS

In brief, the materials I have reviewed do not provide competent and reliable scientific evidence to support claims that drinking eight ounces of POM Juice or taking a daily serving of POMx is clinically proven to treat, prevent, or reduce the risk of heart disease or prostate cancer. These materials do not provide competent and reliable scientific support for claims that a daily eight ounce serving of POM Juice or taking a serving of POMx treats, prevents, or reduces the risk of prostate cancer, including by prolonging PSADT. Moreover, these materials do not provide competent and reliable scientific support for claims that a daily eight ounce serving of POM Juice or serving of POMx treats, prevents, or reduces the risk of heart disease, including by decreasing arterial plaque, lowering blood pressure, and/or improving blood flow to the heart.

In addition, I understand that Respondents have designated several experts whose reports I have not yet seen. I also may be asked to address anything new in these reports within my expertise.

## IV.  OVERVIEW OF STUDY DESIGN AND ANTIOXIDANT THEORY

Before evaluating the evidence the Respondents have relied upon, it is necessary to have an understanding of basic epidemiologic study design, the hypothesis regarding antioxidants and their possible role in the prevention and treatment of chronic diseases such as cardiovascular disease (CVD) and prostate cancer, and the current state of research on antioxidants.

### A.  STUDY DESIGN

In general, one may consider four classes of study designs for examining the relation between a nutrient supplement and disease outcome: *in vitro* studies (laboratory studies performed in a controlled environment such as a test tube), animal studies, human observational studies, and clinical trials. *In vitro* and animal studies are useful for examining potential biologic mechanisms in highly controlled experimental settings; however, it is possible that the results of such studies do not correspond to what would occur in humans. Observational studies are studies in which the investigators measure the level of exposure in free-living participants and then ascertain disease outcomes. These studies enable investigators to conclude there is an association between the nutrient and disease of interest, but typically cannot confirm causality due to the potential, even in well-designed studies, for unidentified biases or inadequately controlled confounding. Confounding factors are other causes of the disease of interest that are associated with the nutrient, and could create a non-causal association of the nutrient with the disease.

*Confidential*-FTC Docket No. 9344          8

Clinical trials are studies in which the investigators assign the exposure level to participants. If the clinical trial is randomized, double blind, and placebo-controlled (each of which will be discussed below), and of sufficient size and with sufficient follow-up, with an appropriate dose of the treatment, it is possible to conclude a causal link between the nutrient and disease under study.

The best evidence of a causal relationship between a nutrient or drug (hereafter treatment) and a disease outcome in humans is a randomized, double blind, placebo-controlled, clinical trial. If the study is large enough, randomization provides substantial assurance that all baseline factors (*e.g.*, sex, age, body size, smoking habits) are balanced between the treatment and control group, and thus any difference in the outcome between the two groups can be attributed to the treatment. Double blinding is the term used when neither the investigator administering the intervention nor the participant knows whether the participant is receiving treatment or placebo. This reduces the possibility of any psychological effects that could modify the occurrence or recognition of the outcome. A placebo should be indistinguishable from the active treatment, but without containing the active ingredient. Administering a placebo to a control group is a mechanism for blinding participants to whether they are receiving treatment or not, which ensures that if an effect of the treatment is observed, it is not due to psychological effects, or a difference in seeking care or diagnosis, because of the knowledge that one is assigned to the active or control treatment.

Finally, and most importantly, a control group is necessary for the investigators to determine whether the incidence rate of the outcome observed in the treatment group was truly different from what would have been observed had the treatment group not been

CX1293_0009

treated (*i.e.* if the treatment under study actually changed the outcome). Due to the randomization procedure discussed above, the rate of the outcome in the control and treatment groups is expected to be the same under the null hypothesis that the treatment has no effect; thus investigators can compare the occurrence of the outcome between the groups after treatment to assess if the treatment had an effect on the outcome. With this study design, a causal relation between the treatment and the outcome of interest in humans can be ascertained. Thus, studies that compare changes from baseline within a treatment group without a true control group (*i.e.* before-and-after studies) are typically inadequate to permit a conclusion of a causal effect of the treatment on outcome.

## B.    ANTIOXIDANTS

Free radicals, atoms with one or more unpaired electrons, are formed throughout the body in response to normal physiologic processes (*e.g.*, energy metabolism, immune response), as well as in response to toxic exposures (*e.g.*, smoking, air pollution, radiation). These molecules can cause oxidation, and damage cellular components, including DNA, proteins, and cell membranes. The body has many mechanisms to prevent and repair free radical damage. It has been hypothesized that free radical damage plays an important role in the etiology of chronic diseases associated with aging, such as CVD and cancer. For example, free radical damage to DNA can lead to mutations and DNA strand breaks, which if not repaired, can lead to development of malignancies. Additionally, free radical damage to low-density lipoprotein (LDL) cholesterol is hypothesized to be an initial step in the formation of atherosclerotic plaques.

Dietary antioxidants are substances found in food or supplements that help neutralize free radicals; examples include vitamins A, C, and E, carotenoids (*e.g.* beta-

carotene, lycopene), zinc, copper, manganese, and selenium. Rich food sources of antioxidants include fruits, vegetables, grains, teas, legumes, and nuts. It has been hypothesized that diets high in these nutrients may prevent or treat chronic diseases, such as CVD or cancer, by neutralizing free radicals. Animal and *in vitro* studies have shown evidence of biologic activity of these nutrients, supporting this hypothesis.

However, while these studies provide evidence for biologic plausibility of a relation between dietary antioxidants and reduced CVD or cancer risk, it is not possible to extrapolate their findings to humans given the differences in biology between humans and animals, and the complexity of exposures that affect free-living humans. Moreover, antioxidant activity is only a single chemical property of the nutrients labeled as antioxidants, or the foods that contain them, and these nutrients or foods often have numerous other effects. Thus, it is not useful to refer to nutrient antioxidants as though they represented an interchangeable class of compounds. Instead, it is critical to focus specifically on nutrients or foods, rather than on just one dimension relating to their antioxidant properties.

### C.    CONFLICTING SCIENTIFIC DATA ON ANTIOXIDANTS

Currently, there is conflicting scientific evidence on the benefits of specific nutrients with antioxidant activity in preventing or treating diseases. Although observational and laboratory studies suggest that these nutrients have beneficial effects, several randomized controlled clinical trials have found no consistent benefit for specific nutrient antioxidants.

CX1293_0011

### 1.    Antioxidants and cardiovascular disease

The story of vitamin E is perhaps the best illustration of this conundrum.  Both observational and *in vitro* studies suggest that vitamin E can prevent or delay coronary heart disease ("CHD").  *In vitro* studies have found that vitamin E inhibits oxidation of LDL cholesterol, which is thought to be a crucial initiating step for atherosclerosis, and observational studies have correlated vitamin E with a lower risk of heart disease.  For example, the Nurses' Health Study, an observational study of approximately 90,000 nurses, reported that women in the highest quintile of vitamin E intake, primarily from supplements, had a 34% lower incidence of CHD compared to women in the lowest quintile of intake.[2]  Similarly, an observational study of more than 5,000 Finnish men and women found that higher dietary vitamin E intakes were associated with 32% and 65% decreased risks of CHD mortality in men and women, respectively.[3]

However, randomized clinical trials have failed to demonstrate the same association.  For example, the HOPE study, and its extension the HOPE-TOO study, conducted among nearly 10,000 participants at high risk of heart attack or stroke randomized to receive 400 IU/day of natural vitamin E or placebo, reported no association between the intervention and risk of major cardiovascular events after a median follow-up of seven years.[4]

---

[2] Stampfer MJ, et al., Vitamin E consumption and the risk of coronary disease in women, N Engl. J. Med 1993 May 20;328(20):1444-9.
[3] Knekt P, et al., Antioxidant vitamin intake and coronary mortality in longitudinal population study.  Am J Epidemiol 1994 Jun 15;139(12):1180-9.
[4] *See* Lonn E, et al., Effects of long-term vitamin E supplementation on cardiovascular events and cancer:a randomized controlled trial, JAMA 2005 Mar 16; 293(11): 1338-47; Jilal I, et al., Vitamin E supplementation and cardiovascular events in high-risk patients, N Engl Med J 200 Jun 22;342(25):1917-8.

*Confidential*-FTC Docket No. 9344        12

JA-1107

CX1293_0012

In the Women's Health Study, a randomized clinical trial of nearly 40,000 women 45 years of age or older, women were randomized to receive 600 IU of vitamin E every other day, aspirin, both, or placebo. After ten years, investigators found no significant difference in the rates of cardiovascular events or all-cause mortality. However, in contrast to the results of HOPE, women taking vitamin E had a 24% reduction in cardiovascular death, and women 65 years or older experienced a 26% decrease in nonfatal heart attack and 49% decrease in cardiovascular death.[5]

The Physicians' Health Study II examined the relationship between vitamin E and cardiovascular health among nearly 15,000 male physicians 50 years of age or older who were randomly assigned to receive either 400 IU of vitamin E every other day, 500 mg/d vitamin C, both, or placebo. After following the study participants for a mean of eight years, intake of vitamin E and/or vitamin C had no effect on the incidence of major cardiovascular events.[6]

### 2.    Antioxidants and cancer studies

#### a.    Beta-carotene and lung cancer

Research on beta-carotene has yielded similar inconsistent results between observational studies and randomized trials. Some observational data suggested that higher levels of consumption of foods rich in beta-carotene may lower risk of lung cancer, but this observation was not upheld in randomized clinical trials.[7] The Alpha-Tocopherol Beta-Carotene Cancer Prevention Study ("ATBC") measured the effects of

---

[5] Lee IM, et al., Vitamin E in the primary prevention of cardiovascular disease and cancer: the Women's Health Study: a randomized controlled trial, JAMA 2005 Jul 6;294(1):56-65.
[6] Sesso HD, et al., Vitamins E and C in the prevention of cardiovascular disease in men: the Physicians' Health Study II randomized controlled trial, JAMA 2008 Nov 12; 300(18):2123-33.
[7] Gallicchio L, et al., Carotenoids and risk of developing lung cancer: a systematic review., AM J Clin Nutr. 2008 Aug;88(2):372-83.

CX1293_0013

50 mg/d vitamin E, 20 mg/d beta-carotene, both, or placebo on cancer and CHD

incidence among approximately 30,000 male smokers for five to eight years. There was

no reduction in lung cancer found with any of the treatments. In fact, supplementation

with beta-carotene was associated with an increased risk of lung cancer and all-cause

mortality, and vitamin E was associated with increased mortality due to hemorrhagic

stroke.[8] This harmful effect of beta-carotene on lung cancer risk has been observed in

other studies,[9] particularly among smokers and persons exposed to asbestos, while others

reported no association. For example, the Physician Health Study (PHS) conducted

among more than 22,000 male physicians randomized to beta-carotene, aspirin, both, or

neither for 12 years reported no benefit or harm associated with beta-carotene

supplementation.[10]

   Some researchers believe that beta-carotene may be metabolized into pro-

oxidizing compounds in smokers when consumed at high levels, which may explain the

elevated risk observed in the ATBC and other trials conducted in smokers or asbestos

workers. For example, laboratory studies showed that animals exposed to smoke and

high doses of beta-carotene develop more precancerous lesions than animals exposed to

low doses of beta-carotene (like those in food).[11]

---

[8] The Alpha-Tocopherol, Beta Carotene Cancer Prevention Study Group. The effect of vitamin E and beta-carotene on the incidence of lung cancer and other cancers in male smokers, N Engl J Med. 1994 Apr 14; 330(15):1029-35.
[9] Omenn GS et al., Effects of a combination of beta carotene and vitamin A on lung cancer and cardiovascular disease, N Engl J Med. 1996 May 2;334(18):1150-5.
[10] Hennekens CH, et al., Lack of effect of long-term supplementation with beta carotene on the incidence of malignant neoplasms and cardiovascular disease, N Engl J Med. 1996 May 2; 334(18):1145-49.
[11] Liu C, et al., Effects of physiological versus pharmacological beta-carotene supplementation on cell proliferation and histopathological changes in the lungs of cigarette smoke-exposed ferrets, Carcinogenesis, 2000 Dec;21(12):2245-53.

*Confidential*-FTC Docket No. 9344      14

CX1293_0014

### b.    Vitamin E, Selenium, and Prostate Cancer

Several antioxidant nutrients have been associated with reduced risk of prostate cancer in *in vitro* and observational studies, including vitamin E, selenium, lycopene, and polyphenols.  The data from these studies, along with secondary analyses of randomized trials, was strongest for vitamin E and selenium, which prompted the Selenium and Vitamin E Cancer Prevention Trial ("SELECT").  In SELECT, more than 35,000 men were randomized to 200 mcg/d selenium, 400 IU/d vitamin E, both, or placebo for a minimum of 7 years and a maximum of 12 years.  The study was discontinued after a median follow-up of 5.5 years due to evidence of no benefit of either nutrient under study.[12]  However, it is likely this study did not have sufficient follow-up time to provide a definitive test of the hypothesis.

### 3.    Conclusion of antioxidant studies

Overall, it is apparent that the suggestive associations between some specific antioxidant nutrients and CVD or prostate cancer observed in observational studies, and the biologic plausibility established in *in vitro* and animal studies, has not translated to consistent protective effects in humans.  This demonstrates the importance of performing randomized, double blind, placebo-controlled trials before drawing firm conclusions regarding causality or making public health recommendations regarding nutrient supplementation.

---

[12] Lippman SM, et al., Effect of selenium and vitamin E on risk of prostate cancer and other cancers: the Selenium and Vitamin E Cancer Prevention Trial (SELECT), JAMA 2009 Jan 7;301(1):39-51.

CX1293_0015

V.    **ANALYSIS OF THE AVAILABLE PRECLINICAL EVIDENCE REGARDING THE EFFECTIVENESS OF POM JUICE, POMx PILL, AND POMx LIQUID IN TREATING, PREVENTING, AND REDUCING THE RISK OF HEART DISEASE**

At the request of the FTC, I reviewed several animal and *in vitro* studies submitted by the Respondents. Like other antioxidant research, several of POM's animal and *in vitro* studies appear to show some potential antioxidant effect in the test tube and laboratory setting. For example, studies conducted by Dr. Michael Aviram found that POM Juice, POMx Pills, and POMx Liquid appear to reduce the size of atherosclerotic lesions in mice.[13] A study by deNigris et al. examined the effect of POM juice *in vitro* and in mice, and found that it appeared to decrease LDL oxidation and the size of plaques.[14]

As I stated earlier, animal and *in vitro* studies are mechanistic studies that cannot directly be extrapolated to humans. Animal and *in vitro* studies alone cannot provide sufficient support for efficacy claims even when they appear to have positive results. Results from animal and *in vitro* studies must be confirmed by randomized clinical trials, since agents that work in the test tube or in mice often do not work the same way in humans. Therefore, it is my opinion that these materials provided by the Respondents fail to show that clinical studies, research and/or trials prove that drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily treats, prevents, or reduces the risk of heart disease. It is also my opinion that these animal and

---

[13] *See e.g.*, Aviram M, et al., Pomegranate juice consumption reduces oxidative stress, atherogenic modifications to LDL, and platelet aggregation: studies in humans and in atherosclerotic apolipoprotein E-deficient mice. Am J Clin. Nutr. 2000 May;71(5):1062-76 (POM2 0127- 41); Aviram M, et al., Pomegranate phenolics from the peels, arils, and flowers are antiatherogenic: studies in vivo in atherosclerotic apoliprotein E-deficient (EO) mice and in vitro in cultured macrophages and lipoproteins, J. Agric Food Chem. 2008 Feb 13;56(3):1148-57 (POM2 0222-231).

[14] deNigris F, et al., Beneficial effects of pomegranate juice on oxidation-sensitive genes and endothelial nitric oxide synthase activity at sites of perturbed shear stress, Proc Natl Acad Sci USA. 2005 Mar 29;102(13):4896-901(POM2 0142-47).

*Confidential*-FTC Docket No. 9344        16

CX1293_0016

*in vitro* studies do not provide reliable scientific evidence that drinking eight ounces of POM Juice, or taking one POMx Pill or one teaspoon of POMx Liquid daily treats, prevents or reduces the risk of heart disease, including by decreasing arterial plaque, lowering blood pressure and/or improving blood flow to the heart.

## VI.    ANALYSIS OF THE AVAILABLE HUMAN CLINICAL EVIDENCE REGARDING THE EFFECTIVENESS OF POM JUICE, POMx PILL, AND POMx LIQUID IN TREATING, PREVENTING, AND REDUCING THE RISK OF HEART DISEASE

At the request of the FTC, I reviewed several published and unpublished human clinical studies and data submitted by the Respondents as support for their heart disease prevention and treatment claims. Based upon my review of the information I was provided, it is my opinion that these studies do not provide reliable and competent evidence that drinking eight ounces of POM Juice, or taking one POMx Pill or one teaspoon of POMx Liquid daily treats, prevents or reduces the risk of heart disease, including by decreasing arterial plaque, lowering blood pressure and/or improving blood flow to the heart; or that tests prove that drinking eight ounces of POM Juice, or taking one POMx Pill or one teaspoon of POMx Liquid daily treats, prevents or reduces the risk of heart disease, including by decreasing arterial plaque, lowering blood pressure and/or improving blood flow to the heart.

### A.    Aviram Studies

The material I was provided and reviewed included two published articles by Dr. Michael Aviram and his colleagues: 1) Aviram M, et al., *Pomegranate juice consumption inhibits serum angiotensin converting enzyme activity and reduces systolic blood pressure*, 158 Atherosclerosis 195 (2001); and 2) Aviram M, et al., *Pomegranate Juice Consumption for 3 Years by Patients with Carotid Artery Stenosis Reduces*

CX1293_0017

*Common Carotid Intima-Media Thickness, Blood Pressure and LDL Oxidation*, 23 Clin. Nutr. 423 (2004).

The first article reported on a study of ten patients (62 to 77 years of age) with high blood pressure who drank 50 ml of concentrated pomegranate juice product per day for two weeks. According to the article, seven of the ten patients experienced a statistically significant reduction (36%) in serum angiotensin converting enzyme (ACE) activity and all ten patients experienced a statistically significant reduction (5%) in systolic blood pressure.

The second article reported on a study of ten patients with severe carotid stenosis who consumed 50 ml of concentrated pomegranate juice daily and a group of nine patients with carotid stenosis who did not drink pomegranate juice. This small pilot study reportedly was randomized and controlled. The article indicates that the mean carotid intima-media thickness (CIMT, a measure reflecting atherosclerosis) decreased by 35% and systolic blood pressure decreased by 12% over twelve months when compared with baseline. The untreated group apparently experienced a 9% increase in carotid stenosis and no reduction in blood pressure. While the data from these small pilot studies seem promising, they alone do not provide sufficient evidence to support Respondents' heart disease prevention and treatment claims, including any claim regarding lowering blood pressure for which the data is fairly weak.

**B.    Ornish Studies**

At the request of the FTC, I reviewed one published article and unpublished data reporting on two studies conducted by Dr. Dean Ornish et al. The first study is reported in Sumner MD, Elliott-Eller M, Weidner G, Daubenmier J, Chew MH, Martin R, Raisin

CX1293_0018

CJ, and Ornish D, *Effects of Pomegranate Juice Consumption on Myocardial Perfusion in Patients with Coronary Heart Disease*, 96 Am. J. Cardiology 810 (2005). The article reports that this was a randomized, double blind, placebo-controlled study to evaluate whether daily consumption of pomegranate juice for three months would affect myocardial perfusion (blood flow to the heart) in 45 patients with CHD and myocardial ischemia. The measurements included imaging of blood flow to the heart, plasma lipids, body weight, blood sugar, and blood pressure.

According to the report, there were no significant changes in lipids, blood glucose, body weight, or blood pressure. Of the three imaging measures of blood flow to the heart (SRS, SSS, and SDS) taken at baseline and the end of the trial, there was a statistically marginally significant improvement in only the SDS score in the treatment group when compared with the control group. It is of interest that although the baseline levels of the three scores were characterized as "similar", in fact the levels were consistently higher in the placebo group, suggesting that they had worse perfusion at baseline. At baseline, before any intervention, for the summed rest score, the mean was 1.9 in the POM group and 3.8 for placebo. For the stress score, the corresponding figures were 6.4 and 9.6, and for SDS, they were 4.5 and 5.9. Thus it appears that randomization was not successful in evenly distributing higher risk participants across the two groups. Also, internal documents show that this study was planned with measurements at three and 12 months, but this is not mentioned in the published report.

I also reviewed some unpublished data relating to a second 73 person randomized placebo-controlled trial by Dr. Ornish et al.[15] According to the report, the treatment and control groups showed similar levels of CIMT and elasticity at baseline. After one year

---

[15] Ornish, D, Bev 2 Summary, June 16, 2005 (POMJL-0001976-81)

CX1293_0019

of daily consumption of 240ml of pomegranate juice or placebo beverage, there were no significant differences in CIMT or elasticity between the two groups. There were also no significant differences in any of the other measures, including body mass index, systolic and diastolic blood pressure, cholesterol, LDL, HDL, or triglycerides.

### C.    Davidson Studies

At the request of the FTC, I reviewed one published article and unpublished data reporting on two studies conducted by Dr. Michael Davidson et al. The first study is reported in Davidson MH, et al., *Effects of Consumption of Pomegranate Juice on Carotid Intima-Media Thickness in Men and Women at Moderate Risk for Coronary Heart Disease*, 104 Am. J. Cardiology 936 (2009). This study was an 18-month, randomized, double blind, placebo-controlled trial among 383 subjects designed to evaluate the effect of pomegranate juice on CIMT progression rates. Participants were randomized to receive either pomegranate juice or placebo and directed to consume 240 ml per day. According to the published report, among the 289 subjects with baseline and one or more post-randomization measurement, there were no statistically significant differences in CIMT progression rates between the treatment and control groups. There were also no significant differences in blood pressure and the measures of inflammation and oxidative stress.

The article also reported results from some post hoc unplanned exploratory analysis of changes in certain subpopulations of the study. For certain subgroups with higher CVD risk factors, there were significantly lower CIMT progression rates for the treatment group. One typically can find subgroups post hoc in which results differ in either direction from the main result. At best, such exploratory analyses can guide

direction for future research, but the main null result from this large trial provides substantial evidence against the hypothesis that pomegranate juice can reduce progression of CIMT.

I also reviewed data from an unpublished study conducted by Dr. Davidson et al. of 45 patients who were enrolled in the Davidson IMT trial. This study evaluated the effect of drinking POM Juice or placebo for 13 weeks on brachial artery reactivity testing ("BART"). According to the data, there were no statistically significant difference in the measurement of flow mediated dilation (the amount by which the brachial artery expands) between the treatment and placebo groups. In addition, there were no statistically significant differences between the groups in lipid parameters and vital signs, including blood pressure.[16]

### D.    Other Biomarkers Studied

The FTC also asked me to review several other published and unpublished studies provided by the Respondents which examined the short term effects of POM products on changes in levels or activity of a wide range of biomarkers in human trials. These biomarkers include oxidized phospholipids/Apo B-100, oxidized LDL, nitric oxide, TEAC, paraoxonase, and others. Such data are useful in exploring potential effects of these products in humans, and demonstrate biological activity. However, even apparently positive studies of this kind are not sufficient to justify an efficacy claim without trials using clinical endpoints. None of the biomarkers for which a statistically significant change due to consumption of the POM products could be demonstrated can serve as an adequate surrogate for human disease. Thus, while interesting from a scientific

---

[16] Davidson, M., *The Effects of Pomegranate Juice on Flow-Mediated Vasodilation*, (unpublished, 2004) (MHDAVIDSON-0000179-248).

CX1293_0021

perspective, and in some ways promising enough to warrant further investigation, these studies do not provide reliable scientific evidence to prove the benefit of these products for human health.

In summary, similar to other antioxidant research, the Respondents' human clinical studies, including a large randomized clinical trial, failed to confirm the results of the animal and *in vitro* studies. Although some promising results appear in several of the smaller studies with important design limitations, the weight of the evidence strongly favors the null hypothesis of no effect. These results underscore the necessity for conducting controlled randomized trials of adequate size. The current data do not support the claims for heart disease prevention or treatment.

## VII. ANALYSIS OF THE AVAILABLE PRECLINICAL EVIDENCE REGARDING THE EFFECTIVENESS OF POM JUICE, POMx PILL, AND POMx LIQUID IN TREATING, PREVENTING, AND REDUCING THE RISK OF PROSTATE CANCER

At the request of the FTC, I reviewed several animal and *in vitro* studies submitted by the Respondents. Like other antioxidant research, POM's animal and *in vitro* studies appear to show some potential antioxidant effect in the test tube and laboratory setting. For example, the *Hong* study examined the effects of POMx pills and POM Juice on the expression of androgen receptors in prostate cancer cell lines.[17] Androgens are male sex hormones, such as testosterone, that regulate prostate cell growth and differentiation. The androgen receptor is a protein that regulates the tissues' response to androgen-stimulation, and thus may be important in regulating the growth of prostate cancer. Hong et al. reported that pomegranate polyphenols appear to inhibit gene

---

[17] Hong MY, et al., pomegranate polyphenols down-regulate expression of androgen-synthesizing genes in human prostate cancer cells overexpressing the androgen receptor, J Nut Biochem. 2008 Dec;19(12):848-55. (POM_Q14-000678-793).

CX1293_0022

expression of androgen-synthesizing enzymes and expression of the androgen receptor. In the *Sartippour* and *Seeram* studies, researchers found that POMx appears to inhibit prostate tumor growth in mice and the proliferation of human prostate cancer cells in the test tube.[18]

As I stated earlier, animal and *in vitro* studies are mechanistic studies, and the results cannot directly be extrapolated to humans, since agents that work in the test tube or in mice often do not work the same way in the humans. Animal and *in vitro* studies alone do not provide sufficient support for efficacy claims even when they appear to have positive results. Consequently, results from animal and *in vitro* studies must be confirmed by randomized clinical trials before drawing firm conclusions about the effectiveness of such agents in humans. Therefore, it is my opinion that the material provided by the Respondents do not show that clinical studies, research, and/or trials prove drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily treats, prevents or reduces the risk of prostate cancer, including by prolonging PSADT. It is also my opinion that these animal and *in vitro* studies do not provide competent and reliable scientific evidence that drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily treats, prevents or reduces the risk of prostate cancer, including by prolonging PSADT.

---

[18] Sartippour M, et al., Ellagitannin-rich pomegranate extract inhibits angiogenesis in prostate cancer in vitro and in vivo, Int J Oncol. 2008 Feb;32(2):475-80 (POM2 0579 – 84); Seeram NP et al., Pomegranate ellagitannin-derived metabolites inhibit prostate cancer growth and localize to the mouse prostate gland, J Agric Food Chem. 2007 Sep 19;55(19):7732-37. (POM2 0594-99)

*Confidential*-FTC Docket No. 9344       23

CX1293_0023

VIII. **ANALYSIS OF THE AVAILABLE HUMAN CLINICAL EVIDENCE REGARDING THE EFFECTIVENESS OF POM JUICE, POMx PILL, AND POMx LIQUID IN TREATING, PREVENTING, AND REDUCING THE RISK OF PROSTATE CANCER**

A. **Pantuck Phase II Study**

At the request of the FTC staff, I reviewed the published report of a study conducted by Dr. Allan Pantuck, a urologist at UCLA.[19] This study examined the association of drinking eight ounces of POM Juice daily with changes in the levels of prostate-specific antigen ("PSA") among 46 men diagnosed with localized or regional low-grade prostate cancer who had undergone initial therapy and had post-treatment PSA rises, with levels between 0.2-5 ng/mL at study entry. A rise in the PSA level after treatment can be an indication of potential early disease recurrence. The primary endpoints for the study were changes in PSADT, absolute changes in PSA value, and occurrence of metastatic disease. The researchers found that after 33 months, the study participants' PSADT lengthened from a pretreatment mean of 16 months to a post treatment mean of 55 months. In my opinion, this study does not provide reliable scientific evidence to support prostate cancer prevention or treatment claims for POM Juice, POMx Pills, or POMx Liquid for several reasons.

First and most important, the study lacked a control group. It is possible that the same change in PSADT would have been observed in this patient group if they had never received the POM Juice treatment, and without a control group it is impossible to distinguish between that possibility and that of a causal link between the POM Juice and change in PSADT. PSADT often change over time, so without a control group, no firm

---

[19] Pantuck AJ, et al., Phase II study of pomegranate juice for men with rising prostate-specific antigen following surgery or radiation for prostate cancer, Clin Cancer Res. 2006 Jul 1;12(13): 4018-26. (POM2 0148–56)

CX1293_0024

conclusions can be drawn.  Second, the study was not blinded, leaving open the possibility that both researchers and study participants were unconsciously biased by knowledge of the treatment.  Third, this clinical trial did not study POMx Pill or POMx Liquid.  Therefore, the results from this study on POM Juice cannot provide reliable evidence to support claims about POMx Pill or POMx Liquid.  Fourth, this clinical trial was designed as a treatment study (*e.g.*, this study was conducted in men with prostate cancer) and not a prevention study.  As a result, this study cannot be used to support any type of prevention claims.

Finally, the *Pantuck* Phase II study uses PSADT as a primary endpoint.  PSADT is not accepted by experts in the field of prostate cancer as an appropriate surrogate endpoint for overall survival in studies conducted among prostate cancer patients because it is an imperfect predictor of prostate cancer mortality.  PSA is a protein produced exclusively by the prostate gland that is used as a biomarker for detecting prostate cancer incidence and recurrence.  After initial therapy for prostate cancer, PSA values fall to zero or near zero.  If PSA is rising quickly after initial treatment, it is a sign that the cancer may not have sufficiently been eliminated by treatment or had spread to other organs prior to the surgical removal of the prostate.  PSADT reflects the rate at which the PSA value increases over time.  The equations used to estimate PSADT assume that the increase in PSA follows an exponential growth curve. However, change in PSA levels is not a stable process and can fluctuate for a variety of reasons, including differences in laboratory measures, infection or inflammation in the prostate gland (among men who did not have a prostatectomy) or random changes. Indeed, in some individuals, PSA levels remain stable or decline, leading to infinite doubling times.

CX1293_0025

Several other issues complicate the use of PSADT as a surrogate endpoint in clinical trials, including the fact that the equations are sensitive to the number of PSA values used, the length of time over which the PSA values are ascertained, the frequency of the PSA test during that interval, and whether PSADT should be examined as a continuous or categorical variable. Furthermore, not every man who experiences disease recurrence will have a rapid PSADT, since some recurring tumors do not produce PSA. In other cases, men may experience a PSA rise after treatment that is not due to increased tumor growth, since PSA may be elevated for reasons other than prostate cancer, such as infection or inflammation. Thus, many men with rising PSA never experience a clinically diagnosed metastasis.

Furthermore, it is unknown if PSADT predicts overall survival in prostate cancer patients throughout its range. For example, a PSADT of less than three months has been shown to be a strong indicator of metastatic cancer, but it is not clear whether there is a clinically significant difference in survival between men with a PSADT of 16 versus 54 months. Therefore, for reasons I stated above, it is my opinion that the *Pantuck* Phase II study does not provide competent and reliable scientific support for the Respondents' prostate cancer prevention and treatment claims.

### B.     Studies Conducted After Claims Made

The FTC also asked me to review the following materials submitted by the Respondents regarding ongoing or recently completed clinical studies on prostate cancer: 1) the protocol titled *Safety and Efficacy of POMx in Men with Prostate Cancer: An 18-Month, Randomized, Double-Blind, Dose-Finding Study of the Effects of Two (2) Doses of Pomegranate Juice Extract Capsules (1 or 3 capsules/day) on Rising Prostate Specific*

*Antigen Levels in Men Following Initial Therapy for Prostate Cancer* (MCARDUCCI-004364 – 417), and the results (MCARDUCCI-012598 – 014133) of a clinical trial recently completed by Dr. Michael Carducci at Johns Hopkins University; 2) the protocol titled *A Randomized, Double-Blind, Placebo-Controlled Study of Pomegranate Extract on Rising Prostate-Specific Antigen Levels Following Primary Therapy for Prostate Cancer* (AJPANTUCK-0004051 – 114) for an ongoing multicenter clinical trial led by Dr. Allan Pantuck, UCLA; and 3) the protocol titled *A Randomized, Placebo-Controlled, Pre-Surgical Study of the Effects of Pomegranate Pills in Men with Prostate Cancer Prior to Radical Prostatectomy* (MCARDUCCI-003527 – 72) for an ongoing clinical trial conducted by researchers at UCLA, Johns Hopkins University, and Duke University. Based upon my review of the materials, it is my opinion that results from these studies fail to provide competent and reliable scientific evidence that POM Juice, POMx Pills, or POMx Liquid treats, prevents, or reduces the risk of prostate cancer.

Carducci et al. performed an 18-month, randomized, double blind, clinical trial examining the association between two doses of pomegranate juice extract (one or three POMx Pills) in relation to change in PSADT among 101 men who had undergone definitive treatment for localized prostate cancer and had rising PSA post-treatment. The primary analysis compared pre- and post-treatment PSADT in both groups combined, and the secondary analysis compared the magnitude of change in PSADT between the two doses. In the intention-to-treat analysis with both doses combined, there was a statistically significant increase in PSADT post-treatment, with a pre-treatment mean PSADT of 15 months compared to a post-treatment mean PSADT of 247 months. When

CX1293_0027

examined individually, both doses of POMx were associated with a change in PSADT of a similar magnitude.

While interesting, this study does not provide evidence of a causal relation between POMx treatment and change in PSADT, because it lacked a control group (*i.e.*, a group that did not receive any active treatment). Thus, it is unknown whether the change in PSADT observed was due to the treatment or some other factor. Without a placebo control group, one cannot be sure that these changes would not have occurred even without treatment. In addition, the lack of a dose response despite a three-fold difference in dosage does not support a causal relationship between POMx and change in PSADT. Furthermore, as discussed previously, the endpoint of PSADT is not a surrogate for prostate cancer-specific or overall survival, and therefore this study does not provide evidence of a causal relation between pomegranate juice extract and survival in prostate cancer patients.

The Pantuck Phase III study on POMx Liquid extract also uses PSADT as its primary endpoint. For all the reasons I state above, PSADT is not an accepted surrogate endpoint for prostate cancer treatment trials. Finally, the UCLA/Johns Hopkins/Duke pre-surgical clinical trial is a study of changes in a biomarker for oxidative stress. By its design, it is not intended to be a prostate cancer treatment study and cannot be used to prove any prevention or treatment claims for POM products.

## IX.    CONCLUSION

Based on my professional training, expertise, and experience in epidemiology, nutrition and its relation to the prevention and treatment of heart disease and prostate cancer, and clinical testing relating to the prevention and treatment of heart disease and

CX1293_0028

prostate cancer, I offer the following opinions. First, it is my opinion that the materials provided by the Respondents fail to show that clinical studies, research, and/or trials prove that drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily treats, prevents, or reduces the risk of heart disease, including by (1) decreasing arterial plaque, (2) lowering blood pressure, and/or (3) improving blood flow to the heart. Second, it is my opinion that the materials provided by Respondents do not provide reliable scientific evidence proving that drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily treats, prevents, or reduces the risk of heart disease, including by (1) decreasing arterial plaque, (2) lowering blood pressure, and/or (3) improving blood flow to the heart.

Third, it is also my opinion that the materials provided by Respondents fail to show that clinical studies, research, and/or trials prove drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily treats, prevents or reduces the risk of prostate cancer, including by prolonging PSADT. Fourth, it is my opinion that the materials provided by Respondents do not provide competent and reliable scientific evidence proving that drinking eight ounces of POM Juice or taking one POMx Pill or one teaspoon of POMx Liquid daily treats, prevents or reduces the risk of prostate cancer, including by prolonging PSADT.

The Respondents' animal and *in vitro* studies have not been confirmed in randomized, double blind, placebo-controlled trials. Past research on antioxidants demonstrates the need to conduct such trials on nutrient supplements, particularly when they will be used as medical interventions to prevent or treat diseases. I believe that it may be appropriate to use evidence short of randomized clinical trials for crafting public

CX1293_0029

health recommendations regarding nutrient guidelines even when causality cannot be established, because everyone eats and the public should be given advice based on the best evidence available. This advice should distinguish recommendations based on good evidence of a causal relation from those that are based on evidence that is suggestive but falls short of a firm causal conclusion. Long term trials of diet and disease outcomes are often unfeasible due to the financial and participant burden required to perform such studies, but it is indisputable that the randomized clinical trial is the best study design that permits strong causal inference concerning the relationship between an administered agent (whether drug or nutrient) and any specific outcome. For products such as POM Juice, POM Pills and POM Liquid, claims of efficacy can be made only when a causal relation with human disease is established. The Respondents have failed to provide such evidence.

Dated: _3/4/11_

Meir J. Stampfer, M.D.

CX1293_0030

**REPORT OF DENIS R. MILLER, MD**

**Pursuant to Federal Trade Commission Complaint in the Matter of POM Wonderful, LLC et al.**

I am a board certified pediatrician and pediatric hematologist/oncologist and am licensed to practice medicine in the state of New Jersey.  Currently, I am the Global Therapeutic Area Leader of Oncology/Hematology at PAREXEL International, one of the world's leading contract research organizations ("CRO").  CROs, and PAREXEL in particular, manage clinical research trials for the pharmaceutical and biotechnology industries and provide them with scientific and medical consultative services and technical and regulatory guidance to facilitate the successful development of new products to treat patients with a wide variety of illnesses and to facilitate the regulatory approval and marketing authorization of these new medications.  I am a Clinical Professor of Pediatrics) at Robert Wood Johnson School of Medicine (New Brunswick, NJ).

## <u>QUALIFICATIONS</u>

1.      As detailed in my *Curriculum Vitae*, a true and correct copy of which is attached to this Expert Report (**Miller Attachment A)**, I received my AB and MD degrees from Cornell University.  I completed my residency in Pediatrics and my research fellowship in Pediatric Hematology/Oncology at the Children's Hospital and Harvard Medical School in Boston.  I was a Fulbright scholar and Exchange Registrar, St. Mary's Hospital Medical School and University of London, in London, England.

2.      For over 40 years, I have directed clinical care, education, laboratory and clinical research, and administration, and lead divisions or departments at University of Rochester Medical Center, New York Hospital-Cornell Medical Center, Memorial Sloan Kettering Cancer Center ("MSKCC"), and Northwestern University Medical School.  My major

area of clinical and laboratory research when I was in academic medicine was focused on

hematopoietic malignancies but clinically, I was directly involved in and cared for

patients with both solid tumors and blood cancers.  I was the recipient of research grants

from the National Cancer Institute, private foundations, and other organizations.  As

Chairman of the Department of Pediatrics at MSKCC, I directed one of the largest

pediatric oncology/hematology programs in the world and held an endowed chair.  We

were heavily engaged in the entire gamut of Phase I through Phase IV research and in

non-clinical studies of mechanisms of action of new agents and the biology and molecular

pathology of cancer.  Many of those investigational agents are now cornerstones of

anticancer therapy.

**3.**     During that period I served as Vice-Chairman of the Children's Cancer Group

(CCG, now COG), the world's first and largest cooperative group organized to treat

children with cancer and discover more effective and safer therapies for them.  The

marked improvement in the survival and cure of children with cancer is attributable in

part to the endeavors of CCG/COG and was accomplished with randomized clinical trials.

Randomized double-blind, placebo-controlled were not the standard, were not required by

the NCI or other regulatory agencies, and were not performed to establish that a new

regimen was superior to the old standard.  The success in treating children with cancer

was achieved without using double-blind, placebo controlled trials.

**4.**     From 1990 to 1996, I served as Associate Medical Director of Cancer Treatment

Centers of America ("CTCA") and, from 1993 to 1996 I was the Scientific Director of

CTCA's Cancer Treatment Research Foundation ("CTRF").  In both capacities, I was

involved actively in designing clinical research protocols for adults with a wide variety of

malignancies, including prostate, breast, colorectal, and lung cancer, the four most

PX0206-0002

common cancers in humans.  As Scientific Director, I supervised the clinical research

program, chaired the Scientific Advisory Committee of the Institutional Review Board,

and was principal investigator for a number of Phase I/II studies of cancer treatments,

including the common malignancies mentioned above.  These Phase I/II studies included

innovative treatment for a wide variety of solid tumors and hematologic malignancies,

including new combinations of chemotherapy, immunotherapy, targeted therapy,

supportive care to ameliorate the side effects of conventional anticancer therapy,

nutritional and psychosocial support, and alternative and complementary medicine.

5.      Since joining the pharmaceutical/biotechnology industry, one of my major

responsibilities and activities has been to be familiar with the process of regulatory

approval and post-approval fulfillment requirements.  I have participated in meetings with

the FDA and EMEA at each phase of the drug development process, including pre-IND

(Investigational New Drug), protocol submission and review, end Phase II meetings,

Special Protocol Assessment (SPA), submission of dossiers for approval of pivotal trials,

and presentations to ODAC (Oncology Drug Advisory Committee) that advises FDA

regarding the approval of a new anticancer agent.  I have presented progress reports and

have participated in special informational advisory meetings with national regulatory

authorities in the United Kingdom, Sweden, France, Denmark, and Germany at which

specific questions relating to a drug development strategy or a specific clinical trial are

posed by the sponsor and discussed with an expert panel of regulators.

6.      I have performed or managed numerous studies in early (Phase I) and later (Phase

II through Phase IV) clinical development of new agents for the treatment of cancer and

blood diseases.  For the past 10 years, I have been involved in the clinical development of

newer anticancer agents that we call "targeted therapies" because they are directed against

PX0206-0003

receptors, growth factors, or signal transduction pathways that drive the oncogenic genotype and cause cancer cells to behave abnormally and independent of control mechanisms that keep normal cells normal. Many of these targeted therapies that give cancer cells a survival advantage, increase their rates of proliferation, multiplication, local spread, and distant metastases, and render them resistant to anticancer therapy.

7.     I am now the Therapeutic Area Leader of Oncology/Hematology at PAREXEL International. In that capacity, I am involved in the entire process of testing and evaluating new agents designed to treat cancer and blood diseases. A large number of these clinical trials are focused on targeted therapy of prostate cancer, including men who have undergone prostatectomy or radiation therapy but who have "biochemical recurrence" with a rising PSA level. The objective of these studies is to delay the development of locally recurrent or metastatic disease, not necessarily to prolong survival.

8.     I am currently a member of the American Society of Clinical Oncology, the American Association for Cancer Research, and the American Society of Hematology. I was founding member and past president of the American Society of Pediatric Hematology/Oncology. I was elected to the Society for Pediatric Research, and the American Pediatric Society, societies that recognize one's contributions to pediatric research. I served on the editorial boards of the British Journal of Haematology, the American Journal of Clinical Oncology (Associate Editor, Pediatric Oncology), and the American Journal of Pediatric Hematology/Oncology (co-founder and Associate Editor). I still review submitted manuscripts for the British Journal of Haematology. I have authored or co-authored over 300 book chapters, peer-reviewed articles, and abstracts mostly on cancer and blood disorders. I was senior editor to four editions of a classic textbook, *Blood Diseases of Infancy and Childhood.*

9.    I am familiar with pharmacology (pharmacokinetics, pharmacodynamics), mechanisms of action, safety, and therapeutic efficacy, including clinical benefit, of most, if not all, agents used to treat or provide supportive care in cancer and blood diseases. This knowledge comes from a professional life devoted to patient care and involvement in the various processes, phases, and stages of clinical drug development. Thus, based on my training, experience, and ongoing clinical activities, I am well qualified to offer my expert opinion in this case.

10.    I have extensive experience giving testimony in depositions and trials regarding my expertise. **Miller Attachment B** lists the deposition and trial testimony that I have offered during the four-year period from January 1, 2006, to December 31, 2010.

11.    I offered testimony for the FDA and the FTC in the action of *FDA v Lane Laboratories, USA*. This case related to false claims about the alleged anticancer effects of a proprietary shark cartilage product known as Benefin. I have provided Declarations, Expert Reports, and Deposition and/or Trial testimony on behalf of FTC regarding false claims about the anticancer and cancer preventive effects of "health-food" products sold by an organization called Daniel Chapter One (DCO). Daniel Chapter One claimed that their products were not only healthy but were more efficacious and safer than conventional anticancer therapy, could and should be used in place of conventional therapy, and directly advised listeners of their radiobroadcasts to avoid proven therapies for a number of different cancers. They also claimed that DCO products would and could cure and prevent cancer. The basis for these claims came from patient testimonials, but not from any specific non-clinical or clinical studies of DCO. I testified that if a sponsor of a potentially new therapy wishes to claim that that their product is safe and effective in the treatment of a specific type and stage of cancer, a randomized controlled clinical trial

is mandatory, just as it would be for a new medicinal cancer therapy.   These issues will addressed in more detail below in discussing the differences between making beneficial health claims for a food or food substance and making claims about effective and safe anticancer treatment and its cure or prevention.  The regulatory requirements are much more rigorous when crossing the boundary between making a general health benefit claim ("low fat diets are healthier than high fat diets") and taking a general statement to the next level and claiming efficacy in the treatment of a specific type of cancer.

**12.**    I provided Expert Declarations for two other FTC complaints against companies or distributors of colon cleansing products (*FTC v "PureCleanse"*, *FTC v. ColoPure*). These companies claimed that their colon cleansing products (in effect, multiple ingredients with laxative properties) decreased the risk of developing colon cancer.  Not only are there no reliable and competent scientific or clinical data or controlled clinical trials to support that claim but these products have definite health risks.

**13.**    In summary, for the past 45 years I have been actively engaged in the design, implementation, completion, feasibility, analysis, presentation, publication, and, when appropriate, regulatory approval worldwide of many anticancer agents.

**14.    TRIAL AND DEPOSITION TESTIMONY**

A summary of my experience in providing medical-legal testimony during the past five years (March 1, 2006 through February 28, 2011) is provided in Appendix I of this report.

**15.    COMPENSATION**

My rate for work performed on this case is $500/hour.

**16.    SCOPE OF WORK**

I have been asked to define the appropriate standard or level of scientific data or substantiation that constitutes competent and reliable scientific evidence in connection

with POM Wonderful's claims regarding the health benefits of its products. Because of

my expertise in oncology, I will focus on these issues as they relate to prostate cancer for

purposes of illustrating the standard only. Other experts will examine the strength of the

science in the particular area at issue in this case (prostate, heart, etc.) regarding the health

benefits of POM Wonderful. I will conclude this report with a summary of what

constitutes reliable and competent substantiation for claims of health benefits of POM

Wonderful as a food as opposed to health claims required for a new drug that is being

developed and marketed for the treatment, cure, or prevention of certain diseases.


**17.    WHAT IS THE REASONABLE LEVEL OF SUBSTANTIATION REQUIRED BEFORE MAKING CLAIMS REGARDING THE HEALTH BENEFITS OF POM WONDERFUL JUICE AND ITS POMX PILL AND LIQUID PRODUCTS**

Before determining whether non-clinical and clinical studies on POM Wonderful are

sufficiently reliable and competent to support claims of health benefit, a standard that

defines what should be sufficient evidence needs to be established.   As both a treating

clinician (formerly) and researcher, several factors need to be considered.  At the outset,

the critical related issue is whether a pure food and its derivative require the same

standard as an anticancer drug, or biological agent.  The key question here is safety.  If

the product is a whole food, for example, or a derivative of a whole food and obviously

safe, then as a clinician I want to engage in a cost benefit analysis to determine whether it

makes sense to report possible, or probable benefits of consumption and to err on the side

of giving more information to the public and medical community, so long as the claim

does not suggest (by use of absolutes or in other ways) that an individual should forgo

conventional medical care or treatment based on the consumption of the product.  So the

type of product is critical to the determination of whether there exists sufficient science to

{050149.1}

PX0206-0007

support a claim, and is the first step in the analysis.  Thereafter, we should weigh several factors (including the risk of harm) with the desirability of getting the information to the public, the validity of the science, costs of the science and the nature of the claim.  This is a flexible standard that must include input by practicing clinicians in the specific area(s) of health at issue.  It is preferred, for example, that to accurately examine the desirability of getting information to the public, that input is given by practicing physicians in the relevant affected fields, who have firsthand knowledge regarding the  needs and risks faced by their patients and options (or lack thereof) that are available to their patients.

It is stipulated that any claim requires a reasonable scientific basis of support.  What constitutes a reasonable scientific basis of support will differ from product to product.  To illustrate this point, a new claim advocating the use of the new hypothetical chemotherapeutic agent, "shazamomycin" in the first line treatment of metastatic prostate cancer would require "competent and reliable" evidence clearly demonstrating safety and efficacy and would be derived from and would absolutely require one or more randomized clinical trials.  These clinical trials need not be double-blind, placebo-controlled clinical trials as many cancer agents now used in clinical practice in the US and around the world were approved in open-label randomized controlled trials without a placebo control arm.  The following table provides data on the anticancer agent, the indication, and the Phase III pivotal study design that led to regulatory approval in the US (FDA) and in Europe (EMEA) of a number of new agents.  The list could be much longer but is limited for sake of brevity.

{050149.1}

PX0206-0008

| Indication [subtype, line] | Agent (class of agent) | Randomized Study Design |
|---|---|---|
| NHL, [diffuse large B-cell, 1st] | Rituximab (anti-CD20 monoclonal antibody ) | R-CHOP vs CHOP |
| NHL, [follicular, 1st ] | Rituximab | R-CVP vs CVP |
| NHL [indolent, relapsed] | Rituximab | Monotherapy |
| CLL [1st] | Rituximab | FCR vs FC |
| Pancreatic cancer [1st] | Gemcitabine | Gemcitabine vs 5-FU |
| Prostate cancer [stage 4, HRPC, 1st line] | Docetaxel | Docetaxel + prednisone vs mitoxantrone + prednisone |
| Renal cell carcinoma [stage 4, 2nd line] | Sunitinib | Sunitinib vs IL-2 |
| NSCLC [2nd line, IIIb-IV] | Pemetrexed | Pemetrexed vs docetaxel |
| CRC [stage IV, 1st line] | Bevacizumab | Bevacizumab + FOLFOX vs FOLFOX |

NHL=non-Hodgkin lymphoma; CLL=chonic lymphocytic leukemia; HRPC=hormone refractory prostate cancer, NSCLC=non small cell lung cancer; CRC=colorectal cancer.

To reach Phase III, successful Phase I and Phase II studies are required to determine dose limiting toxicity, maximum tolerated dose, drug-drug interactions, and pharmacokinetics but rarely if ever are randomized, double-blind, placebo controlled clinical trials done in this early stage of drug development. It would be unethical and dangerous to conduct such a trial when evaluating a new agent whose toxicity is unknown. A less rigorous standard for food products compared to anticancer drugs relates to safety, tolerability, usage as food and not as a replacement or substitute for conventional anticancer therapy, benefit and risk considerations for not only offering health benefits but also, for having the potential to prevent disease. Each of these will be considered in determining the standard. In dealing with a food product, as opposed to a drug, flexibility should be the guiding principle in determining what is required to comply with the term "sufficient substantiation" of claims of any health benefits.

*Usage and Safety*

Pomegranate juice, (and its derivatives POMx, and POM pills) are whole food products (like broccoli or apples) consisting of pure pomegranate juice made from the pressing the

{050149.1}

PX0206-0009

whole pomegranate including the husk, flesh and the arils (seeds). POMx is an extract from the pomegranate. There are no biological or chemical components added to POMx.

Man has eaten pomegranates since Biblical times with no reports of serious adverse medical sequences. Pomegranate juice has been used uneventfully in Persian medicine for thousands of years. There is no reason to believe that there is any material risk involved in consuming POM Wonderful products. The lack of demonstrable health risk supports the appropriateness of a less rigorous requirement for substantiating claims that the products under discussion and at issue are healthy in some way.

Whereas there are essentially no risks in consuming POM Wonderful 100% Juice or POMx , virtually every anticancer agent causes adverse events, some of which are serious and life-threatening and require dose reduction or interruption which may cause disease recurrence or induce resistance to the therapy. This statement is made not to imply that POM Wonderful products can replace or be substitutes for conventional anticancer therapy but merely that the one size or standard does not fit all and that a less rigorous standard for making a health claim for a food is reasonable. However, once the claim is made that the food can replace a proven a therapy, that claim should be substantiated by conventional and standard clinical testing, including randomized controlled clinical trials and follow the same arduous pathway of any anticancer agent with similar attributes.

Given the obvious safety of pomegranate consumption, and so long as POM Wonderful's pomegranate products have never been claimed to be a substitute for conventional care or medical therapy, from both a clinical and research perspective, sound basic science is

enough to provide sufficient substantiation for a health claim for this natural food product or its derivatives (wherein the consumer is not getting more of some active agent or an additional active agent than what the consumer could find in the fruit). The science should be valid and peer reviewed, and whether clinical science is necessary to substantiate a particular claim would vary according to the strengths of the basic science and the particular claim.

For example, in the area of prostate cancer, an unqualified claim that the product has be shown to slow the progression of PSA doubling times should actually be supported by clinical evidence. A qualified claim that POM products may be effective for the treatment or prevention of prostate cancer (or reduce the risks of getting the disease) is reasonable if there is no suggestion that pomegranate alone can 1) absolutely prevent the disease; or 2) that it can serve as a replacement, as distinguished from an adjunct therapy (like exercise, vitamins, etc), in the treatment of a disease. A reasonable oncologist or urologist or any other treating physician would not use POM products instead of any approved drug, biological agent, or vaccine that has been approved to treat a given stage of prostate cancer (for those patients where drugs are an option) because the evidence for these specific indications is not available to support that level of claim or use of pomegranate. However, there may be some subcategory of patients, who do not have many or any alternatives, and for them a clinician may reasonably decide to recommend, among other things, the consumption of pomegranate. Based on the strength of the reported research, POM Wonderful products, for example, have demonstrable beneficial effects that are relevant to carcinogenesis and cancer prevention. Critically important would be the demonstration that POM Wonderful products did not enhance prostate

PX0206-0011

cancer cell growth and progression of disease.  Thus, POM Wonderful would meet the test of "primum non nocere" or first, do no harm.  And there is solid evidence that should meet any "reasonable" standard, and that the products may do good, especially in prostate cancer.  Again, however, I leave it to POM's designated expert on prostate health to discuss the strengths or merits of the prostate cancer research itself.


### *Benefit to the Public/Cost Benefit Analysis*

The public should be aware of potentially beneficial foods that have a salutary effect on health and cause no harm.  Informing the public empowers them to add a potentially beneficial, harmless food to their diet that may prevent prostate cancer (and other disorders).  Public health and other agencies and health- or disease-related societies urge the populace to eat fruits and vegetables because of their beneficial effects.  When a specific food like POM Wonderful has been subjected to rigorous testing and consistently demonstrates potent anticarcinogenic properties, what harm can result from recommending its use in men because it may prevent prostate cancer?   More likely than not, if POM Wonderful is effective in men with biochemical recurrence, it may prevent prostate cancer in an otherwise healthy but at risk individual.


Claiming that a fruit juice drink is good for prostate health or that it may reduce the risk of developing prostate cancer is much more limited in scope than suggesting that it should be used to treat active prostate cancer, or that it be used instead of conventional therapy.  Stating that eating 5 portions of fresh fruits and vegetables may prevent cancer is accepted without requiring controlled non-clinical or clinical trials and is highly recommended by health professionals, third party insurance carriers, and health related

PX0206-0012

agencies.  Health professionals are or should be strong advocates of healthy life style practices just as they are or should be to warn the public about unhealthy practices (cigarettes, alcohol, unprotected sex, obesity).  Claims publicizing general health benefits ("fish oils lower your cholesterol and may protect your heart") or even more specific health benefits ("broccoli may protect one from colorectal cancer")" are rarely, if ever based upon or substantiated by an equivalent body of basic science or non-clinical and clinical data that are available now and support the anticancer activity of POM Wonderful. If key pathways in the carcinogenic process are inhibited by POM Wonderful and drinking POM Wonderful juice or swallowing POMx is harmless, why shouldn't the public be advised that POM Wonderful protects the prostate from harmful, DNA-damaging oxidant effects, procarcinogenic inflammatory effects, and inhibits pathways, enzymes, and other factors that stimulate tumor cell proliferation, prevent tumor cells from going into programmed cell death, and increase the metastatic potential of the cancer?

Few scientists or clinicians would deny, if presented with the published data, that POM is beneficial because of its inhibitory effect on such important mechanisms as oxidative stress, inflammation, apoptosis, signal transduction, cell proliferation, and angiogenesis. Based on the solid nonclinical data, there should be no need to conduct two randomized well controlled trials to publicize that drinking POM Wonderful might decrease one's risk of developing prostate cancer.  Such a statement is in the public's best interest and empowers individuals to take control of their own health by drinking and eating healthful foods, engaging in healthy activities, and avoiding potentially or known harmful ones. Thus, the level and rigor of substantiation of a health claim is quite different for a food

PX0206-0013

than it is for the approval of a new drug designed for a specific disease indication such as metastatic prostate cancer. (Beals et al, 2010).

Is there any direct clinical evidence that POM Wonderful will prevent men from developing prostate cancer or that it prevents the progression from benign prostatic hypertrophy to proliferative inflammatory atrophy (PIA), prostate intraepithelial neoplasm (PIN), in situ prostate cancer, or overt adenocarcinoma? Prospective studies of other nutritional products (e.g. vitamin E and selenium) have been attempted but the follow-up was too short because of the latency of prostate cancer. Retrospective or prospective observational cohort or case-control studies are not feasible. A double-blind, placebo controlled trial evaluating POM Wonderful as a prostate cancer protective agent would take decades and thousands of patients and would have to control for other naturally occurring, dietary antioxidants, anti-inflammatory, and anticancer agents as well as life-style activities (e.g. exercise, smoking, alcohol use, just to mention a few), genetic predisposition, racial and ethnic factors, benign prostatic hypertrophy, and other factors that might have an effect on carcinogenesis of prostate cancer.

Yet few scientists or clinicians would deny, if presented with the published data, that POM is beneficial because of its inhibitory effect on key oncogenic mechanisms defined above. Based on the solid nonclinical data, there should be no need to conduct two randomized well controlled trials to publicize that drinking POM Wonderful might decrease one's risk of developing prostate cancer. Such a statement is in the public's best interest and empowers individuals to take control of their own health by drinking and eating healthful foods, engaging in healthy activities, and avoiding potentially or known

harmful ones.  Thus the level and rigor of substantiation of a health claim is quite different for a food than it is for the approval of a new drug designed for a specific disease indication such as metastatic prostate cancer.  (Beals et al, 2010).

## 18.    SUMMARY AND CONCLUSIONS

- Pomegranates are a food that have been eaten for thousands of years and its consumption as a food is without known risks.

- As a result, an appropriate level of scientific substantiation regarding the health benefit claims of pomegranates should be flexible, and consider several factors (including the risk of harm) with the desirability of getting the information to the public, the validity of the science, costs of the science and the nature of the claim.  This is a flexible standard that should include input by practicing clinicians in the specific area(s) of health at issue. If the product meets the test of "primum non nocere" or first, do no harm, and there is "reasonable" evidence based on valid, non-sham science that the product, by reasonably inference may do good, then deference should be given in favor of a claim, appropriately qualified.

- The standard for substantiating claims for pure foods, which are clearly safe, need not be as rigorous as that for a new drug or anticancer agent but should be based on reliable and competent scientific data that confirm its safety, and support a relevant and beneficial effect.  Valid, scientifically conducted basic science could be enough to support a claim, depending on the claim, so long as the product is not claimed to be a substitute for conventional drug therapies or medical care.

- POM Wonderful is not being put forth as a substitute or alternative to conventional and approved drug therapies or medical care.

PX0206-0015

- Double-blind, placebo-controlled clinical trials are not required for obtaining regulatory approval of all anticancer agents; many were approved after pivotal, randomized, open-label Phase III trials.

- Performing a double-blind, placebo controlled randomized trial to test, for example, the prostate-cancer benefit of POM Wonderful is not feasible, and will take decades, require thousands of patients, be prohibitively expensive, and have a huge likelihood of failure. Because a food is not patentable, it is not reasonable to require that a maker of a potentially beneficial foodstuff conduct such a trial to claim that it is beneficial to health.

- While I make no opinions regarding what POM Wonderful claims are, the health benefits of its products, the benefits of allowing the makers POM Wonderful to claim that their product is good for prostate health and that it may help prevent prostate cancer outweigh the risks which are minimal considering the substantial data supporting the health benefits obtained by consuming the products.

- Based on the solid nonclinical science of these benefits, qualified claims regarding the mitigation of disease or prevention and claims regarding general health benefits are supportable. A complete analysis regarding the risks and benefits of disclosure requires the opinions of clinicians in the field of health that are actually impacted by the claims, but deference should be given to the fact that the products are a natural food that are generally safe for consumption.

PX0206-0016

I reserve the right to modify and amend this report if additional relevant data are made available to me.


Respectfully submitted,


Denis R. Miller, MD

March 17, 2011

PX0206-0017

## APPENDIX I.  PRIOR TESTIMONY

The following table lists deposition and trial testimony that I have offered during the 5 year period March 1, 2006 to February 28, 2011.

### *Prior Medical-Legal Testimony: March 1, 2006-July 31, 2010*

| Lawsuit | Nature of Suit | Jurisdiction | Date (D-depo, T-trial) | Plaintiff Defense (P or De) |
|---|---|---|---|---|
| Brown v. US | Aplastic anemia 2° to HepB vaccine | Syracuse, NY | 3/30/06 (D) | P |
| Orabani v. Newman | Delayed diagnosis of MCRC | Toms River, NJ | 7/11/06 (T) | P |
| Carter (Burton) v. St Francis Health System | Delayed diagnosis of lung cancer | Peoria, IL | 7/24/06 (D) | P |
| Colicci v. | Delayed diagnosis of cancer | Syracuse, NY | 9/9/06 (T) | P |
| Sikoryak v. Valley Hosp | Delayed diagnosis of cancer | Chatham, NJ | 2/23/07 (D) | P |
| Anderson v. Gruber et al | Delayed diagnosis of skin cancer | Morris County, | 3/6/07 (D) | P |
| Caycho v. Mountainside Hospital | Delayed diagnosis of cancer | Essex County, N | 3/22/07 (D) | P |
| Lebrun v. St. Barnabas Medical Center | Treatment of TTP in child | Essex County, N | 5/3/07 (D) | De |
| Silander v. Howell | Treatment of TTP in adult | Jersey City, NJ | 4/16/07 (D) | De |
| Freitas v. Honeywell | Causation of mesothelioma | NY, NY | 6/20/07 (D) | De |
| Buttitta v. Honeywell | Mesothelioma | Essex County, N | 8/6/07 (D) | De |
| Doell v. Abex et al | Mesothelioma | Boston, MA | 10/9/07 (D) | De |
| Anderson v. Gruber | Delayed diagnosis of skin cancer | Elizabeth, NJ | 11/2/07 (T) | P |
| Hill v. Manning | Delayed diagnosis of lung cancer | New London, C | 4/11/08 (T) | P |
| Pahkomova v. Meyerfield | Delayed diagnosis of breast cancer | Chatham, NJ | 5/11/08 (D) | P |
| Wasserstrom v. Rosenberg et al | Delayed diagnosis of parotid gland cancer | Chatham, NJ | 7/7/08 (D) | P |
| FTC v. Daniel Chapter One (DCO) | False advertising re alleged health benefit and anticancer activity of various DCO products | New York, NY | 2/2/09 (D) | P |
| FTC v. DCO | False advertising re alleged health benefit and anticancer activity of various DCO products | Washington, DC | 4/22/09 (T) | P |
| Sanchez v. Apantaku | Delayed diagnosis of soft tissue sarcoma in child | Chicago, IL | 7/7/09 (D) | P |
| Moore v. Craddock | Delayed diagnosis of retinoblast-oma in infant | Coeur D'Alene, Idaho | 7/16/09 (D) | P |
| Moore v. Craddock | Delayed diagnosis of retinoblast-oma in infant | Coeur D'Alene, Id | 8/22/09 (T) | P |
| Sanchez v. Apantaku | Delayed diagnosis of soft tissue sarcoma in child | Chicago, IL | 1/8/10 (T) | P |
| Gritzan v. Mitterando | Delayed diagnosis of Ewing sarcoma in adolescent | Boston, MA | 2/17/10 (T) | P |

## References

Albrecht M, Jiang W, Kumi-Diaka J, et al. (2004). Pomegranate extracts potently suppress proliferation, xenograft growth, and invasion of human prostate cancer cells. J Med Food 7: 274-283, 2004

Armstrong AJ, Garrett-Mayer ES, Yang YC, et al (2007). A contemporary prognostic nomogram for men with hormone-refractory metastatic prostate cancer: a TAX327 study analysis. Clin Cancer Res 2007; 13: 6396-6403.

Beals JH, Muris TJ, Pitofsky R, In Defense of the *Pfizer* Factors, August 2010.

Freedland SJ, Humphreys EB, Mangold LA, et al. Death in patients with recurrent prostate cancer after radical prostatectomy: prostate-specific antigen doubling time subgroups and their associated contribution to all-cause mortality. J Clin Oncol 2007; 25: 1765-1771, 2007

Hafeez BB, Siddiqui IA, Asim M, et al. A dietary anthocyanidin delphinidin induces apoptosis of human prostate cancer PC3 cells: in vitro and in vivo involvement of nuclear factor-κB, Cancer Research 2008; 68: 8564-72.

Kahn N, Afaq F, Kweon M-H. Pomegranate juice ellagitannin metabolites are present in human plasma and some persist in urine for up to 48 hours. J Nutr 2006; 136: 2481-85.

Kahn N, Hadi N, Afaq F, et al. Pomegranate fruit extract inhibits prosurvival pathways in human A549 lung carcinoma cells and tumor growth in athymic nude mice. Carcinogenesis 2007; 28: 163-173.

Kahn N, Afaq F, Kweon M-H. Oral consumption of pomegranate fruit extract inhibits growth and progression of primary lung tumors in mice. Cancer Res 2007; 67: 3475-82.

Lansky EP, Jiang W, Mo H, et al. Possible synergistic CaP suppression by anatomically discrete pomegranate fractions. Invest New Drugs 2005; 23: 11-20.

Loeb S, Catalona WJ.What to do with an abnormal PSA test? Oncologist 2008;13:299-05.

Malik A, Afaq F, Sarfaras S, et al.   Pomegranate fruit juice for chemoprevention and chemotherapy of prostate cancer. PNAS 2005; 102: 14813-14818.

Miller DR, Anderson GT, Stark JJ, et al. Phase I/II trial of shark cartilage in the treatment of advanced cancer, J Clin Oncol 1998; 16: 3649-3655.

Rettig MB, Heber D, An J, et al. Pomegranate extract inhibits androgen-independent prostate cancer growth through a nuclear factor –kB-dependent mechanism. Molec Cancer Ther 2008; 7: 2662-71.

Roberts SG, Blute ML, Bergstrath EJ et al  PSA doubling time as a predictor of clinical progression after biochemical failure following radical prostatectomy for prostate cancer. Mayo Clin Proc 2001; 76: 571-72.

Scher HI, Halabi S, Tannock I, et al. Prostate cancer clinical trial endpoints: "RECIST"ing a step backwards. Clin Cancer Res 2005; 11: 5223-32.

Scher HI, Halabi S, Tannock I, et al. Design and endpoints of clinical trials for patients with progressive prostate cancer and castrate levels of testosterone: recommendations of the Prostate Cancer Clinical Trials Working Group. J Clin Oncol 2008; 26: 1148-59.

Seeram NP, Adams LS, Henning SM, et al. In vitro antiproliferative, apoptotic and antioxidant activities of punicalagin, ellagic acid and a total pomegranate tannin extract are enhanced in combination with other polyphenols as found in pomegranate juice. J Nutr Biochem 2005; 16: 360-367.

Senn HJ, Morant R. Chemoprevention of breast and prostate cancers: where do we stand? Ann Oncol 2006; 19: 4234-4247.

Singh RP, Agarwal R. Mechanism of action of novel agents for prostate cancer chemoprevention. Endocrine Related Cancer 2006; 13: 751-778.

Walczak JR, Carducci MA. Prostate cancer: a  practical approach in current management of recurrent disease. Mayo Clin Proc 2007; 82: 243-249.

PX0206-0020

<u>**EXPERT REPORT OF DEAN ORNISH, M.D.**</u>

March 18, 2011

## I.    <u>CREDENTIALS AND QUALIFICIATONS</u>

As described in my *curriculum vitae*, which is attached, I am the Founder and President of the non-profit Preventive Medicine Research Institute in Sausalito, California.  I also serve as a Clinical Professor of Medicine at the University of California, San Francisco.

In 1975, I received a Bachelor of Arts (B.A.) degree in Humanities *summa cum laude* from the University of Texas in Austin, where I gave the baccalaureate address.  In 1980, I received a Doctor of Medicine (M.D.) degree from the Baylor College of Medicine in Houston.

From 1981-1984, I was a Clinical Fellow in Medicine at Harvard Medical School and an Intern, Junior Assistant Resident in Medicine, and Senior Resident in Medicine at the Massachusetts General Hospital in Boston.

For over 34 years, I have directed clinical research demonstrating, for the first time, that comprehensive lifestyle changes may begin to reverse even severe coronary heart disease, without drugs or surgery.  In August 2010, Medicare agreed to provide coverage for this program, the first time that Medicare has covered a program of comprehensive lifestyle changes for reversing coronary heart disease.

I directed the first randomized controlled trial demonstrating that comprehensive lifestyle changes may affect the progression of early-stage prostate cancer.  This study was done in collaboration with the Chair of Urology at UCSF and the then-Chair of Urology and Urologic Oncology at Memorial Sloan-Kettering Cancer Center.

My current research showed that these comprehensive lifestyle changes affect gene expression, "turning on" disease-preventing genes and "turning off" genes that promote prostate cancer, breast cancer and heart disease, as well as increasing telomerase, an enzyme that lengthens telomeres, the ends of our chromosomes which control aging (in collaboration with Dr. Elizabeth Blackburn, who was awarded the Nobel Prize in Medicine in 2009).

The research that I and my colleagues conducted has been published in the *Journal of the American Medical Association, The Lancet, Proceedings of the National Academy of Sciences, Circulation*, the *American Journal of Cardiology, The Lancet Oncology, The New England Journal of Medicine*, and elsewhere.  A selection of these articles include:

1. Ornish DM, Scherwitz LW, Doody RS, Kesten D, McLanahan SM, Brown SE, DePuey G, Sonnemaker R, Haynes C, Lester J, McAllister GK, Hall RJ, Burdine JA, Gotto AM. Effects of stress management training and dietary changes in treating ischemic heart disease.  *JAMA*. 1983;249:54-59.
2. Sacks FM, Ornish DM, Rosner B, McLanahan S, Castelli WP, and Kass EH.  Dietary predictors of blood pressure and plasma lipoproteins in lactovegetarians.  *JAMA*. 1985;254:1337-1341.

3. Ornish DM, Brown SE, Scherwitz LW, et al.  Can lifestyle changes reverse coronary atherosclerosis?  The Lifestyle Heart Trial.  *The Lancet*.  1990; 336:129-133.  (Reprinted in *Yearbook of Medicine* and *Yearbook of Cardiology* (New York: C.V. Mosby, 1991).

4. Gould KL, Ornish D, Scherwitz L, Stuart Y, Buchi M, Billings J, Armstrong W, Ports T, Scherwitz L.  Changes in myocardial perfusion abnormalities by positron emission tomography after long-term, intense risk factor modification.  *JAMA*.  1995;274:894-901.

5. Ornish D, Scherwitz L, Billings J, Brown SE, Gould KL, Merritt TA, Sparler S, Armstrong WT, Ports TA, Kirkeeide RL, Hogeboom C, Brand RJ.  Intensive lifestyle changes for reversal of coronary heart disease  Five-year follow-up of the Lifestyle Heart Trial.  *JAMA*. 1998;280:2001-2007.

6. Ornish D.  Avoiding Revascularization with Lifestyle Changes: The Multicenter Lifestyle Demonstration Project.  *American Journal of Cardiology*.  1998;82:72T-76T.

7. Ornish DM, Weidner G, Fair WR, Marlin R, Pettengill EB, Raisin CJ, Dunn-Emke S, Crutchfield L, Jacobs NF, Barnard RJ, Aronson WJ, McCormac P, McKnight DJ, Fein JD, Dnistrian AM, Weinstein J, Ngo TH, Mendell NR, Carroll PR.  Intensive lifestyle changes may affect the progression of prostate cancer.  *Journal of Urology*. 2005;174:1065-1070.

8. Ornish D, Magbanua MJM, Weidner G, Weinberg V, Kemp C, Green C, et al. Changes in prostate gene expression in men undergoing an intensive nutrition and lifestyle intervention.  *Proc Nat Acad Sci USA* 2008; 105: 8369-8374.

9. Ornish D, Lin J, Daubenmier J, Weidner G, Epel E, Kemp C, Magbanua MJM, Marlin R, Yglecias L, Carroll P, Blackburn E.  Increased telomerase activity and comprehensive lifestyle changes: a pilot study.  *The Lancet Oncology*. 2008; 9: 1048–57.

10. Chainani-Wu N, Weidner G, Purnell DM, Frenda S, Merritt-Worden T, Kemp C, Kersh E, Ornish D.  Relation of B-type natriuretic peptide levels to body mass index after comprehensive lifestyle changes.  *Am J Cardiol*. 2010 Jun 1;105(11):1570-6. Epub 2010 Apr 10.

I have also published review articles in peer-reviewed journals and academic books.  A selection of these articles include:

1. Ornish D.  Concise Review:  Intensive lifestyle changes in the management of coronary heart disease.  In: *Harrison's Principles of Internal Medicine* (online), edited by Eugene Braunwald et al., 1999.

2. Ornish D.  "Can lifestyle changes reverse coronary heart disease?"  In:  *Multiple Risk Factors in Cardiovascular Disease, 2nd Symposium Proceedings.*  Tokyo: Churchill Livingstone Japan, 1994, p. 53-60

3. Ornish D, Hart J.  Intensive Risk Factor Modification.  In:  Hennekens C, Manson J, eds. *Clinical Trials in Cardiovascular Disease*.  Boston:  W.B. Saunders, 1998 (companion to *Heart Disease,* the Braunwald standard cardiology textbook).

4. Scher B, Guarneri EM, Hart JA, Ornish D.  Multiple Risk Factor Intervention Trials. In: Manson J, Buring JE, Ridker PM, Gaziano JM, eds.  *Clinical Trials in Cardiovascular Disease, Second Edition*.  Boston:  W.B. Saunders, 2004 (companion to *Heart Disease,* the Braunwald standard cardiology textbook).

5. Billings J, Scherwitz L, Sullivan R, Ornish D.  Group support therapy in the Lifestyle Heart Trial.  In: Scheidt S, Allan R, eds.  *Heart and Mind: The Emergence of Cardiac Psychology*.  Washington, DC: American Psychological Association; 1996:233-253.

6. Ornish D.  "The cost-effectiveness of consumer-driven lifestyle changes in the treatment of cardiac disease."  In: Herzlinger RE.  *Consumer-Driven Health Care*.  San Francisco: Wiley & Sons, 2004.

7. Ornish D.  "Intensive Lifestyle Changes in Management of Coronary Heart Disease. In: Braunwald E.  *Harrison's Advances in Cardiology*.  New York: McGraw Hill, 2002.

I have been a reviewer of scientific and medical articles for several of the leading peer-reviewed journals.

A one-hour documentary of our work was broadcast on *NOVA*, the PBS science series, and was featured on Bill Moyers' PBS series, *Healing & The Mind*.  Our work has been featured in all major media, including cover stories in *Newsweek, Time,* and *U.S. News & World Report*. I have written a monthly column for *Newsweek* and *Reader's Digest* magazines and I am currently Medical Editor of *The Huffington Post*.

I am a member of the boards of directors of the non-profit San Francisco Food Bank and the nonprofit J. Craig Venter Institute and previously served on the board of directors of the United Nations High Commission on Refugees.  I was appointed by President Clinton to the White House Commission on Complementary and Alternative Medicine Policy and elected to the California Academy of Medicine.  I have consulted with food companies to make more healthful foods.  I also chaired the Google Health Advisory Council 2007-2009.

I am the author of six best-selling books, including *Dr. Dean Ornish's Program for Reversing Heart Disease*; *Eat More, Weigh Less*; *Love & Survival;* and *The Spectrum*.

I have received several awards, including the 1994 Outstanding Young Alumnus Award from the University of Texas, Austin, the University of California, Berkeley, "National Public Health Hero" award, the Jan J. Kellermann Memorial Award for distinguished contribution in the field of cardiovascular disease prevention from the International Academy of Cardiology, a Presidential Citation from the American Psychological Association, the Beckmann Medal from the German Society for Prevention and Rehabilitation of Cardiovascular Diseases, the "Pioneer in Integrative Medicine" award from California Pacific Medical Center, the Golden Plate Award from the American Academy of Achievement, the Linus Pauling Award from the Institute for Functional Medicine, the Glenn Foundation Award for Research, the Bravewell Collaborative

Pioneer of Integrative Medicine award, and the Sheila Kar Health Foundation Humanitarian Award from Cedars-Sinai Medical Center (Los Angeles).

I was selected as one of the "*TIME* 100" in integrative medicine, honored as "one of the 125 most extraordinary University of Texas alumni in the past 125 years," chosen by *LIFE* magazine as "one of the fifty most influential members of his generation" and by *Forbes* magazine as "one of the seven most powerful teachers in the world."

I have been a physician consultant to President Clinton since 1993 and to several bipartisan members of the U.S. Congress, and I consulted with the chefs at The White House, Camp David, and Air Force One to cook more healthfully (1993-2000).

I have served or am serving as principal investigator in several federally-funded studies relating to nutrition and coronary heart disease, including support from the National Heart, Lung, and Blood Institute of the National Institutes of Health and from the Department of Defense.

I am frequently invited to lecture on the role of nutrition and lifestyle in preventing and reversing coronary heart disease and other chronic illnesses.  Recent lectures include Medical Grand Rounds at the Mayo Clinic, The Cleveland Clinic, UCSF, and the M.D. Anderson Cancer Center, and keynote presentations at the American College of Preventive Medicine and American College of Lifestyle Medicine annual meetings.  I have lectured on several occasions at the World Economic Forum in Davos and at the TED conferences and have given invited presentations at the annual scientific meetings of the American Heart Association, the American Dietetic Association, and the American College of Cardiology.  In 2009, I was invited to give a keynote speech reviewing the science of integrative medicine at the Institute of Medicine's *Summit on Integrative Medicine* at the National Academy of Sciences.

Based upon my professional training, knowledge, and experience, I am qualified as an expert in the evaluation of whether a food or product is beneficial in maintaining cardiovascular health and lessening the risk of cardiovascular disease, and also the analysis of clinical studies.

A copy of my curriculum vitae is attached as Appendix A to this report.

I have not testified as an expert in any type of litigation in the past thirty years, although I am often asked to do so.

I am being compensated at the rate of $1/hour for my work in this matter.

## II.     SCOPE OF THE REPORT AND MATERIALS REVIEWED

I have been asked to evaluate, from my perspective as an expert in the fields of cardiovascular disease, coronary heart disease, nutrition, and analysis of clinical studies, whether: (1) drinking eight ounces of POM Wonderful 100% Pomegranate Juice ("POM Juice") or taking one POMx Pill or one teaspoon of POMx Liquid may be beneficial in maintaining cardiovascular health and lessening the risk of cardiovascular disease; and (2) basic science, clinical studies, research, and/or trials show that the consumption of

{050057.1}

PX0025-0004

POM Juice, POMx Pill, or POMx Liquid may be beneficial in maintaining cardiovascular health and lessening the risk of cardiovascular disease.

I have further been asked to review the report entitled "Expert Report of Frank M. Sacks" and to evaluate the claims and statements made in that document. We have been friends for more than 25 years, and I respect his work and many accomplishments. We published a study together in the *Journal of the American Medical Association* in 1985.[1]

Attached to this report as Appendix B is a disc containing materials that I relied on in formulating my expert opinion.

In developing this report, I have also relied upon peer-reviewed published literature in the field including human studies as well as basic animal and *in vitro* evidence of the health benefits of pomegranate juice. In addition, I have relied extensively upon my education, experience, and my knowledge of developments in the fields of cardiovascular disease, coronary heart disease, cholesterol, hypertension, and analysis of clinical studies.

I also reviewed and relied upon the materials submitted in support of Dr. Sacks' expert report.

### III.   SUMMARY OF CONCLUSIONS

1. In science, especially in clinical research, it is important to acknowledge that no single study is perfect and virtually all studies have limitations. Therefore, it is important to examine the totality of evidence in determining whether or not pomegranate juice in its various forms is beneficial.

2. Taken as a whole, the scientific evidence from basic science studies, animal research, and clinical trials in humans indicates that pomegranate juice in its various forms (including POM Wonderful 100% Pomegranate Juice ("POM Juice"), POMx Pill, or POMx Liquid) is likely to be beneficial in maintaining cardiovascular health and is likely to help reduce the risk of cardiovascular disease. Also, I am not aware of any significant negative health effects from pomegranate juice.

In arriving at this conclusion, I relied upon my review and analysis of the following cardiovascular studies:

1)   Averill M, *Effects of Pomegranate Juice on Atherosclerosis: Studies in Early and Advanced Stages of Disease* (unpublished dissertation, 2005).
2)   Aviram M, Dornfeld L, Rosenblat M, Volkova N, Kaplan M, Coleman R, Hayek T, Presser D, and Fuhrman B, *Pomegranate juice consumption reduces oxidative stress, atherogenic modifications to LDL, and platelet aggregation: studies in humans and in atherosclerotic apolipoprotein E-deficient mice*. Am. J. Clin. Nutr. 2000: 71;1062-76
3)   Aviram M and Dornfled L, *Pomegranate juice consumption inhibits serum angiotensin converting enzyme activity and reduces systolic blood pressure*, Atherosclerosis 158 (2001) 195-198.

4)      Aviram M, Rosenblat M, Gaitini M, Nitecki S, Hoffman A, Dornfeld L, Volkova N, Presser D, Attias J, Liker H, and Hayek T, *Pomegranate juice consumption for 3 years by patients with carotid artery stenosis reduces common carotid intimamedia thickness, blood pressure and LDL oxidation*, 23 Clin. Nutr. 423 (2004).

5)      Shiner M, Fuhrman B, and Aviram M, *Macrophage paraoxonase 2 (PON2) expression is up-regulated by pomegranate juice phenolic anti-oxidants via PPARγ and AP-1 pathway activation*, Atherosclerosis 195 (2007) 313-321.

6)      Aviram M, Volkova N, Coleman R, Dreher M, Reddy MK, Ferreira D, Rosenblat M, *Pomegranate Phenolics from the Peels, Arils, and Flowers Are Antiatherogenic: Studies in Vivo and in Atherosclerotic Apolipoprotein E-deficient (E) Mice and in Vitro in Cultured Macrophages and Lipoproteins*, J. Agric. Food Chem. (2008), 56, 1148-1157.

7)      Fuhrman B, Volkova N, Aviram M, *Pomegranate juice polyphenols increase recombinant paroxonase 1 binding to HDL: studies in-vitro and in diabetic patients* (unpublished manuscript draft, 2009).

8)      Rosenblat M and Aviram M, *Pomegranate Juice Protects Macrophages from Triglyceride Accumulation: Inhibitory Effect on DGAT1 Activity and on Triglyceride Biosynthesis*, Ann. Nutr. Metab. (2011), 58:1-9.

9)      Broughton Pipkin F and Loughna P, *Confirmatory Pilot Studies of the Effect of Pomegranate Juice on Blood Pressure and Some Hormonal Parameters in Apparently Healthy Young Volunteers* (Abstract, 2008).

10)     Conway C, Carpenter L, Broughton Pipkin F, and Heptinstall S, *Report on the effect of two weeks' dietary supplementation with Pom Wonderful on P-selectin in young, healthy volunteers* (unpublished, 2009).

11)     Corder R, *Investigation of Pomegranate Polyphenol Interactions with Fructose* (proposal, 2008).

12)     Davidson MH, Maki KC, Dicklin MR, Feinstein SB, Witchger MS, Bell M, McGuire DK, Provost JC, Liker H, and Aviram M, *Effects of Consumption of Pomegranate Juice on Carotid Intima-Media Thickness in Men and Women at Moderate Risk for Coronary Heart Disease*, 104 Am. J. Cardiology 936 (2009).

13)     Fuhrman B, Volkova N, and Aviram M, *Pomegranate juice inhibits oxidized LDL uptake and cholesterol biosynthesis in macrophages*, Journal of Nutritional Biochemistry 16 (2005) 570-576.

14)     Kaplan M, Hayek T, Ayelet R, Coleman R, Dornfeld L, Vaya J, Aviram M, *Pomegranate Juice Supplementation to Atherosclerotic Mice Reduces Macrophage Lipid Peroxidation, Cellular Cholesterol Accumulation and Development of Atherosclerosis*, J. Nutr. 131: 2082-2089 (2001).

15)     Khateeb J, Gantman A, Kreitenberg A, Aviram M, Fuhrman B, *Paroxonase 1 (PON1) expression in hepatocytes in upregulated by pomegranate polyphenols: a role for PPAR-γ pathway* (unpublished manuscript, 2009)

16)     Mattiello T, Trifiro E, Jotti GS, Pulcinelli FM, *Effects of Pomegranate Juice and Extract Polyphenols on Platelet Function*, J. Medicinal Foods 12 (2) (2009).

17)     Ornish D, *Bev 2 Summary,* (unpublished, 2004)

18)     Davidson M, The *Effects of Pomegranate Juice on Flow-Mediated Vasodilation*, (unpublished, 2004)

{050057.1}

PX0025-0006

19)    Rosenblat M, Hayek T, Aviram M, *Anti-oxidative effects of pomegranate juice (PJ) consumption by diabetic patients on serum and on macrophages*, Atherosclerosis 187 (2006) 363-371.

20)    Rosenblat M, Volkova N, Attias J, Mahamid R, and Aviram M, *Consumption of polyphenolic-rich beverages (mostly pomegranate and black currant juices) by healthy subjects for a short term increased serum antioxidant status, and the serum's ability to attenuate macrophage cholesterol accumulation*, Food Funct. 2010, 1, 99-109.

21)    Rozenberg O, Howell A, Aviram M, *Pomegranate juice sugar fraction reduces macrophage oxidative state, whereas white grape juice sugar fraction increases it*, Atherosclerosis 188 (2006) 68-76.

22)    Sumner M, Elliott-Eller M, Weidner G, Daubenmier JJ, Chew MH, Marlin R, Raisin CJ, and Ornish D, *Effects of Pomegranate Juice Consumption on Myocardial Perfusion in Patients with Coronary Heart Disease*, 96 Am. J. Cardiology 810 (2005).

23)    Wiljund K, *Pomegranate Hemodialysis Study Proposal* (unpublished proposal, 2009).

## IV.    STANDARD FOR EVALUATING CARDIOVASCULAR RESEARCH

I agree with Dr. Sacks' statements that double-blind, placebo-controlled randomized controlled trials are considered by most scientists to be among the most rigorous forms of scientific evidence when examining therapeutic efficacy of both preventing and treating coronary heart disease. That is why we use this design in many of our studies, including the one showing that pomegranate juice may increase myocardial perfusion (blood flow) to the heart after only three months when compared to a randomized control group receiving a placebo.

However, it is a rather extreme position to state that *only* evidence from randomized controlled trials should be considered in evaluating therapeutic efficacy. It may be worth pointing out that most of Dr. Sacks' own research would not meet this standard and thus would not be clinically or scientifically relevant since most of his published studies have been epidemiological and observational rather than double-blind randomized controlled trials, and many of his studies include relatively small numbers of patients.

Indeed, much of what physicians provide patients in their clinical practices has not been proven to be beneficial in randomized controlled trials. Outside the ivory tower, there are other standards beyond randomized control trials. It seems unreasonable to require that pomegranate juice meet a standard that is not met by many of the drugs and surgical treatments used every day by physicians. For example, randomized controlled trials have shown that angioplasties and stents do not prevent heart attacks or prolong life, yet the number of these procedures performed is greater than ever. There are other considerations.

It is also an extreme position to state that evidence from animal studies and from in vitro studies should not be considered in determining the therapeutic value of an intervention. It is true, as Dr. Sacks points out, that there are limitations to extrapolating from animal studies and in vitro studies to human studies. However, it is equally false to say that these studies have no value in determining therapeutic value.

{050057.1}

PX0025-0007

Also, randomized controlled trials, even when conducted perfectly, do not control for all sources of bias and may inject new ones unique to randomized controlled trials.[2]

A more thoughtful way of analyzing therapeutic efficacy is to carefully examine the *totality* of scientific evidence. This includes but is not limited to randomized controlled trials that are perfectly conducted.

This common-sense approach has been affirmed by thoughtful people for many years. As the philosopher Voltaire wrote in 1772, "The perfect is the enemy of the good."

Also, it is an extreme position to state that the therapeutic efficacy of a fruit juice or extract of pomegranate juice should be held to the same standard of evidence as a new drug. The benefits of pomegranates have been described since Biblical times over thousands of years. I am not aware of any studies showing any harmful effects of consuming pomegranates or pomegranate juice. As such, this is very different than studying a new drug, in which harmful side-effects, both short-term and long-term, are the rule rather than the exception—just read the package insert from virtually any medication—and yet these prescription and nonprescription drugs are widely advertised in magazines, radio, and television.

I understand that no one is suggesting that pomegranates, pomegranate juice, or pomegranate extract be an alternative to conventional treatments of heart disease such as drugs and surgery. While I am giving no opinion on what POM's advertisements say, there is a world of difference between offering juice as a healthy lifestyle choice or as an *adjunct* to conventional treatments than offering it as a *replacement* for conventional medical care.

From a preventive standpoint, in cardiac studies since there is a preponderance of evidence from randomized controlled trials (even if not perfectly conducted) as well as other clinical trials, animal studies, and in vitro studies indicating that pomegranate juice is likely beneficial, it would be unfortunate to say that these benefits should not be communicated to the general public, including in advertising that is appropriately qualified, when the costs of pomegranate juice are relatively small (especially when compared to drugs) and the safety is clear.

## V.    OVERVIEW OF POM JUICE AND POMX ON CARDIOVASCULAR HEALTH SYSTEM.

Several studies have indicated that pomegranate juice has antioxidant and antiatherosclerotic properties due to the presence of multiple polyphenols such as tannins, flavonols, anthocyanins and ellagic acid. Punicalagin, an ellagitannin, is the most abundant polyphenol that accounts for >50% of the antioxidant activity. The evidence suggests that pomegranate juice may be effective in reducing heart disease risk factors, including LDL oxidation, macrophage oxidative status, and foam cell formation, all of which are steps in atherosclerosis and cardiovascular disease.

{050057.1}

PX0025-0008

## VI.    RESPONSE TO DR. SACKS' EXPERT REPORT

A.    **Aviram M and Dornfeld L, *Pomegranate juice consumption inhibits serum angiotensin converting enzyme activity and reduces systolic blood pressure*, 158 Atherosclerosis 195 (2001) (BATES: POM-AREJAEI00037-40).**

*34. Blood pressure reduction is a recognized and validated surrogate for heart disease. Nonetheless, this study does not provide competent and reliable evidence in support of a heart benefit claim. It was neither blinded nor placebo-controlled. In fact, it was not a controlled trial, but rather a simple observational study of patients who were given a treatment. As a result, it is not possible to conclude what caused the reported improvements in the subjects' blood pressure levels – whether it was due specifically to pomegranate juice consumption, whether it could have been produced by any kind of fruit juice, or sugary drink; or whether the change could have been produced by changes in their habits or environment, methodological drift, or unknown factors. The sample size tested – ten persons – is too small to conclude that the observed effects would be generally applicable to a larger population. The short duration of this study (a two-week period) is insufficient to provide reliable evidence that the observed effects on ACE and blood pressure would be enduring.*

I agree with Dr. Sacks that this study was limited in scope for the reasons he outlined. However, it should be viewed in the larger context of other studies in this area, as its findings are congruent with and supportive of other research.  For example, a review article last year stated:

"There was some evidence to suggest that fruits containing relatively high concentrations of flavonols, anthocyanins and procyanindins, such as pomegranate, purple grapes and berries, were effective at reducing CVD risk factors, particularly with respect to anti-hypertensive effects, inhibition of platelet aggregation and increasing endothelial-dependent vasodilation than other fruits investigated."[3]

Also, a randomized control trial of adolescents with metabolic syndrome found that flow-mediated dilation (a measure of vascular health) improved significantly at 4 hours and at 1 month.[4]

B.    **Aviram M, Rosenblat M, Gaitini M, Nitecki S, Hoffman A, Dornfeld L, Volkova N, Presser D, Attias J, Liker H, and Hayek T, *Pomegranate juice consumption for 3 years by patients with carotid artery stenosis reduces common carotid intimamedia thickness, blood pressure and LDL oxidation*, 23 Clin. Nutr. 423 (2004) (BATES POM-MDREHER02580-2590).**

*35. This study, conducted in Israel, tested the effect of consuming 50 ml of concentrated pomegranate juice per day on ten patients with severe carotid artery stenosis ("CAS").2 The source of the juice concentrate is not specified. Ten of the active group patients were tested for one year, and five of them continued for "up*

*to three years." The study also included a "matched" group of nine patients, also with CAS, who did not consume pomegranate juice. The study was not randomized, blinded, or placebo-controlled. The active group patients were tested at baseline, 3, 6, 9, and 12 months (and additionally at 22, 28, and 35 months, in the case of the five active group patients who continued in the study after one year). The comparison group of patients was tested only at baseline and 12 months. Tests included blood pressure, blood analysis, and ultrasound measurements of CIMT. The article reports that, in the active group, the patients' mean CIMT decreased by 35% over 12 months, as compared to baseline values, but that no additional improvements were seen in patients who continued drinking pomegranate juice concentrate for an additional two years; and that the active group patients also experienced beneficial changes in blood velocity in the carotid arteries. By contrast, the article reports that the mean CIMT of the untreated comparison group members increased by 9% over the course of one year, but it provides no information on blood velocity for those patients. It further reports that, in active group patients, systolic (but not diastolic) blood pressure was significantly reduced by 12% after 12 months, but that blood pressure remained unchanged over 12 months in the untreated comparison group members. Finally, the report discusses the results of various serum measurements in the active group patients, such as measurements of serum paraoxonase (PON) and peroxidation. No similar information is provided with regard to the untreated comparison group members. Lacking control group data, no conclusion can be made about the effect of pomegranate juice on these serum measurements. The study concludes that "pomegranate juice consumption (by patients with carotid artery stenosis) possess anti-atherosclerotic properties, as it substantially decreased serum oxidative stress and, in parallel, reduced common carotid intima-media thickness." Id. at POMMDREHER02588.*

*36. As discussed in paragraph 27, I believe that a CIMT imaging test, considered in isolation, is not generally considered acceptable evidence of benefit for the heart. Furthermore, this study suffers from flaws in design and conduct, including the lack of a randomized control group, lack of placebo control, different treatment of active and placebo group patients, the small sample size, and no between-group statistical analysis. A qualified scientist would not be able to conclude with any credibility that the reported improvements in the test subjects was caused by their consumption of pomegranate concentrate and not some other factor.*

I agree with many of the limitations of this study as outlined by Dr. Sacks, but not his conclusions. This was the first study ever published indicating that pomegranate juice may affect the progression of carotid atherosclerosis. Science usually progresses when someone publishes a study of a series of patients with a nonrandomized control group that shows an unprecedented finding which is then replicated by one or more subsequent randomized controlled trials, such as the one published by Davidson et al, described below.

As such, while the conclusions of this isolated study should be interpreted with caution due to the study's limitations, Dr. Sacks' statement that *no* conclusions can be drawn from it is extreme.

The study reported significant reductions in carotid IMT (CIMT), decreased systolic blood pressure, and a substantial inhibition of lipid peroxidation in serum and in LDL.  In contrast, carotid IMT increased in control group patients.

One of the innovative aspects of the study not commented upon by Dr. Sacks was the direct analysis of carotid lesions in a subgroup of patients who underwent carotid endartherectomy, in which the lesions were surgically removed from the carotid artery.

In two out of the ten patients on pomegranate juice (after 3 and 12 months) due to clinical deterioration, carotid endartherectomy operation was performed and their carotid lesions were analyzed and compared to lesions obtained from seven patients that did not consume pomegranate juice (not the patients of the placebo group). The cholesterol content in carotid lesions from the two patients that consumed pomegranate juice was lower by 58% and 20%, respectively, in comparison to lesions obtained from CAS patients that did not consume pomegranate juice.

Similarly, the lipid peroxides content in lesions obtained from the patients after pomegranate juice consumption for 3 or 12 months was significantly reduced by 61% or 44%, respectively, as compared to lesions from patients that did not consume pomegranate juice.  This suggests that oxidative stress, including oxidation of LDL to a form that makes it more likely to cause arterial blockages and cause foam cell production in macrophages (macrophage-derived foam cells play integral roles in all stages of atherosclerosis) may have been reduced by pomegranate juice consumption in these patients.

Thus, while not at all conclusive, the study suggests a benefit.  This study provided pioneering information that stimulated subsequent, more rigorous studies including but not limited to the research of Dr. Davidson et al described below.

C.    **Sumner M, Elliott-Eller M, Weidner G, Daubenmier JJ, Chew MH, Marlin R, Raisin CJ, and Ornish D, *Effects of Pomegranate Juice Consumption on Myocardial Perfusion in Patients with Coronary Heart Disease*, 96 Am. J. Cardiology 810 (2005) (BATES: POM-HC0001878-1882).**

38.    *The study's authors appear to acknowledge that a limitation of this study was its small size and short duration, concluding that further studies are warranted "to determine the effects of pomegranate juice on myocardial perfusion in a larger sample of patients over a longer period." Id. at POM-HC0001881.*

Please note that I am senior author on this study.

No study is perfect, and all studies benefit from being replicated, so this disclaimer is present at the end of most randomized controlled trials; it does not indicate any unique limitations of this study.

{050057.1}

PX0025-0011

39. *On its face, this study suffers from several limitations. Although it is interesting mechanistically, change in myocardial perfusion, that is, blood flow to the heart, is not a recognized surrogate marker of therapeutic effects on CHD. Even where blood flow is shown to be improved, it will not necessarily result in improved cardiovascular health, such as reductions in heart attack and stroke. Indeed, myocardial perfusion is a measurement that is not commonly used in studies of treatment efficacy.*

This is simply not true. For many years, it has been recognized that change in myocardial perfusion (blood flow to the heart) is actually a *better* predictor of cardiac events (thus a better surrogate marker) than coronary angiography. The reasons for this include the following:

First, how much blood flow the heart receives is really the "bottom line" in coronary heart disease (along with how well the heart is pumping blood, called the ejection fraction). Blood carries oxygen and nutrients that feed the heart. If the blood flow to the heart (perfusion) is reduced, then the heart is no longer receiving enough blood flow to maintain itself.

If this is temporary, then the person often experiences angina, or chest pain. If this reduction in blood to the heart lasts more than a few hours, then that portion of the heart that is underperfused may die and turn in to scar tissue—this is commonly referred to as a "heart attack." If this scar tissue is small, then the person may live; if this scar tissue is large or affects a critical part of the heart (e.g., the conduction system), then the person may die.

Coronary angiography measures how much blockage is in the coronary arteries that feed the heart. However, the degree of blockage is only one of several mechanisms that affect perfusion, or blood flow to the heart. These include changes in vasomotor tone (how dilated or constricted the coronary arteries are), platelet aggregation (how sticky the platelets are that can form blood clots which may partially or complete occlude the flow of blood to the heart), and collateral blood flow (the heart can grow new blood vessels that provide additional blood flow around partial or even completely blocked arteries if the blockage occurs slowly over time).

In addition, conventional coronary angiography (the most commonly performed type in clinical practice) provides only a two-dimensional view of the inside of the lumen of the coronary artery. However, Glagov and others demonstrated that the majority of the coronary atherosclerosis (blockage) is inside the vessel wall and cannot be visualized using conventional coronary angiography—somewhat analogous to only being able to view the tip of an iceberg but not the bulk of it below the surface of the ocean.[5]

For example, a major study directly compared the value of thallium 201-scintigraphy (the test we used in our study to measure the effects of pomegranate juice on blood flow to the heart) and coronary angiography. They found that measures of blood flow were more predictive of subsequent clinical events (e.g., heart attacks) than coronary angiography, and both were equivalent in predicting subsequent mortality. The authors wrote:[6]

"Scintigraphy predicted low-risk status better than exercise testing (p = .01) or angiography (p = .05). Each predicted mortality with equal accuracy. However, scintigraphy was more sensitive in detecting patients who experienced reinfarction or

{050057.1}

PX0025-0012

who developed class III or IV angina….the overall sensitivity of angiography was lower than that of scintigraphy (71% vs 94%; p < .01)."

This study was published in *Circulation*, the American Heart Association's lead scientific journal.

A more recent study that compared perfusion (blood flow) studies with an extensive variety of other cardiac measures, including coronary angiography, concluded:

> "Myocardial perfusion abnormalities at rest and after stress are still the best predictors of cardiac event–free survival in patients with known or suspected IHD, even when compared with an extensive diagnostic work-up."[7]

> *39. Further, the report shows significant changes in only one of the three measures at the end of the study – in summed difference score (SDS), but not in summed rest score (SRS) or summed stress score (SSS). The SDS is the difference between the primary measurements, SRS and SSS. The protocol for the study provides for measurement of perfusion using imaging technology, but it did not identify whether the primary endpoint would be SSS, SRS, or SDS or some other measurement calculated from the imaging data. See, Beverage Study I Protocol (LIKER00437-448).[4] A proper protocol identifies what the primary outcomes will be in advance. This is because, in any study involving a large number of variables, it is likely that some will be positive, simply due to chance. Identification of primary outcomes in the protocol is designed to prevent a researcher from cherry-picking positive results and ignoring negative ones. In this study, the "p" value of the reported improvement in SDS was only .05. When there are three possible outcomes (that is, changes in SSS, SRS, or SDS), .05 is not considered to be a statistically significant effect. In the leading text of cardiology, Braunwald's Heart Disease (9th edition, Chapter 17, Nuclear Cardiology, 2011), Udelson, Dilsizian and Bonow state "… a substantial literature has validated these summed scores, particularly the SSS as predictors of natural history outcomes." In the study of Ornish and colleagues, the pomegrate juice treatment did not affect the SSS. It is not clear that the change in SDS would be clinically meaningful, because the authors did not show that the patients experienced improvement in their clinical symptoms.*

The study protocol cited above made it clear that the primary endpoint measure of the Beverage 1 study was improvements in reversible ischemia as measured by exercise or pharmacologic perfusion studies (this is why one of the primary selection criteria for patients enrolled in this study was that they needed to have a reversible perfusion defect at baseline).

As described in the PowerPoint presentation cited by Dr. Sacks:

- Summed Stress Score (SSS)
  - Sum of the Segmental Scores at Stress
  - Amount of infarcted, ischemic, or jeopardized myocardium
- Summed Rest Score (SRS)
  - Sum of the Segmental Scores at Rest
  - Amount of infarcted or hibernating myocardium
- Summed Difference Score (SDS)

     –   Summed Stress Score minus Summed Rest Score
     –   Amount of ischemic or jeopardized myocardium

"Ischemia" and "jeopardized" mean that part of the heart muscle (myocardium) is not receiving enough blood flow. This may get better or worse, as there is not yet permanent damage to the heart.

"Infarcted" means part of the heart muscle has died and turned into scar tissue and is nonfunctioning. "Hibernating" means part of the heart muscle is also nonfunctioning and on the way to becoming infarcted.

In other words, the SDS measures what we stated *a priori* that we were most interested in: in plain English, would parts of the heart that were not receiving enough blood flow at baseline improve in patients who drank pomegranate juice compared to those in the randomized control group who drank a placebo?

While we did not specify that changes in SDS would be the primary endpoint measure, it was not necessary to do so since SDS is a measure of how much of the heart was not receiving enough blood flow. It is derived: SSS minus SRS = SDS. It is a way of factoring out the amount of infarcted or hibernating myocardium so we could focus on what we were most interested in—namely, SDS.

By analogy, let's say we wanted to study the total number of cars coming into a city in a three-month period. SSS measured the total number of cars and trains coming into a city, and SRS measured the total number of trains coming into a city. SSS minus SRS = the total number of cars coming into a city. If we said that we wanted to study the number of cars coming into a city at the beginning of the study, it wouldn't be necessary to specify that we were measuring SRS since that's how the number would be determined.

Thus, we did not cherry-pick the data, and we did not ignore the SSS and SRS measures which were reported in the *American Journal of Cardiology* manuscript.

Dr. Sacks is correct in citing Dr. Braunwald's text that SSS and SRS are also predictors of natural history outcomes, since the greater the amount of infarcted myocardium—i.e., the more of the heart muscle that is dead—the poorer the prognosis. But that's not what we were studying.

Dead heart muscle does not get better, so that was not going to improve from pomegranate juice or from any other intervention. Pomegranate juice improves blood flow to the heart but it does not bring dead tissue back to life. So, we did not expect to find any changes in either SSS or SRS, since these are measures of infarction, and that's just what we found.

As stated in my earlier response above, an improvement in myocardial perfusion is associated with decreased cardiac events (heart attacks, strokes, etc.) whether or not accompanied by improvements in angina or other clinical symptoms, which are much more subjective and less predictive than changes in myocardial perfusion.

{050057.1}

PX0025-0014

40. *As further discussed in paragraph 42, there was a large discrepancy in the baseline values of SRS and SSS, the two components of the SDS. It could be predicted that the control group, having worse coronary perfusion than the pomegranate group at baseline, would have a more accelerated form of the disease and show worsening on follow-up. Statistical adjustment of the results for this large discrepancy in baseline values should have been attempted.*

It could also be argued that the statistical phenomenon of "regression to the mean" would be more likely to narrow the differences between the groups. In other words, a group that is worse tends to show improvement and a group that is better tends to show worsening.

The control group did not have a significantly different baseline score in either SRS or SDS, but it was significantly different in baseline SSS. As Dr. Sacks pointed out, "in any study involving a large number of variables, it is likely that some will be positive, simply due to chance." In any event, we were most interested in the SDS score, which was not statistically significant different at baseline.

As we reported in the *American Journal of Cardiology:*

"To test for the effects of experimental condition and time (and their interaction) on medical characteristics, 2 (experimental vs placebo) _ 2 (baseline vs 3 months) analyses of variance for repeated measurements were run. Statistical analyses were performed using SPSS 12.0 (SPSS, Inc., Chicago, Illinois)."

Controlling for baseline differences is built into this analysis. In other words, it is concerned with whether the change over time is different between groups, so the groups don't have to start at the same place. Therefore, "statistical adjustment" is not necessary and could easily introduce bias.

41. *Finally, although the publication indicates that 45 persons were enrolled in the study, and that four patients either dropped out or had unreadable data, the report (at Table 2) only provides data on 39 patients. The study appears to provide some rationale for removing four patients' data, but offers no explanation for why the remaining two original patients were not included in the final data analysis. Alterations in the original sample size may be critical when there is a borderline "p" value. Furthermore, the most valid analysis of a clinical trial includes all patients originally randomized to treatment or control, and data on dropouts are imputed. This is termed "intention-to-treat" and is the standard for clinical trial analysis. For these reasons, it is my opinion that experts in the field would not consider that the results of this study reliably support the proposition that pomegranate juice provides a heart disease benefit, either in terms of prevention or treatment.*

It appears that a mistake was made in not reporting data on 41 patients. However, when data on all 41 patients were analyzed, the difference in SDS remained statistically significant. Therefore, the conclusions of the study remain valid.

The idea that clinical trials must use the intention to treat analysis or they are not valid is a rather extreme position, especially this is a randomized, double-blind, placebo-controlled trial,

which is considered to be the most rigorous experimental design.  Less than half of the randomized controlled trials published in *The New England Journal of Medicine*, the *Journal of the American Medical Association*, *The Lancet*, and the *BMJ* used the intention to treat analysis.[8]  As I mentioned earlier, most of Dr. Sacks' own research would not meet this standard.

The basic principle of intention to treat is that participants in the trials should be analyzed in the groups to which they were randomized, regardless of whether they received or adhered to the allocated intervention.  This was followed in our protocol.

However, the "last observation carried forward" analysis is not appropriate when only baseline measurements are available in dropouts, as imputing missing data may introduce its own set of biases.  As the abstract for one paper reported:

> "The topic of this paper was prompted by a study for which one of us was the statistician. It was submitted to Annals of Internal Medicine. The paper had positive reviewer comment; however, the statistical reviewer stated that for the analysis to be acceptable for publication, the missing data had to be accounted for in the analysis through the use of baseline in a last observation carried forward imputation. We discuss the issues associated with this form of imputation and recommend that it should not be undertaken as a primary analysis."[9]

*42. Other factors, not revealed in the published report, further undermine my confidence in the credibility of the study results:*

*(1) It appears that seven or eight of the patients in the placebo group were unblinded before their three-month data was collected. See Ornish Deposition Tr. 142-48; Ornish Depo. Exh. 69 and 70. Further, two other patients in the placebo group did not, in fact, receive a placebo treatment. Ornish Depo Tr. 167-70, Ornish Depo Exh. 77 . This is inconsistent with widely-accepted standards for conduct of clinical trials.*

As I indicated in my deposition, six patients discovered that there was a sticker beneath the label indicating that which beverage they were drinking when the POM Wonderful staff who were providing the beverage shipped it to them without having the labels blinded.  However, as I previously testified, at the time that the study was conducted there was not an awareness in the general population that pomegranate juice was beneficial or even that they were drinking pomegranate juice (the study was entitled a "beverage study").  The expectation that something is beneficial has the potential for confounding the outcome which is unlikely to have occurred here.  Clearly, these mistakes were not optimal but do not undermine the validity of the study or its conclusions.

*(2) It is clear that the randomization in this case was not effective in producing an active and placebo group that were similar on relevant characteristics. The myocardial perfusion data for active and placebo groups at baseline appear to be dissimilar, and with large variability, at baseline. For example, the baseline SRS for the pomegranate juice group was $1.9 \pm 2.6$, whereas the baseline SRS for the placebo group was $3.8 \pm 4.7$; the baseline SSS for the pomegranate juice group was $6.4 \pm 3.5$ and the baseline for the control group was $9.6 \pm 6.5$. See POM-HC0001880.*

{050057.1}

PX0025-0016

*According to at least one document there was a statistically significant difference in the baseline summed stress scores of the two groups. Sumner Depo Tr. 116-19; Sumner Depo Exh. 283. If this were the case, the dissimilarity should have been reported in the publication, and an adjustment made in the statistical analysis.*

This was already discussed in paragraph 40 above.

*(3) The study originally was designed to last for twelve months, with measurements at baseline, three months, and twelve months. See Beverage Study I Protocol, DORNISH 006945-47. It was halted after three months, however, due to funding shortfalls. Ornish Tr. 178, 185. In fact, nine of the patients did complete testing at twelve months. Ornish Tr. 139. The study was terminated under unusual circumstances. According to correspondence (DORNISH-00006477-6479; -00003856) the study was terminated at the time when the p-value was considered significant rather than at the time the trial was originally set to end. This is inconsistent with widely-accepted standards for conduct of clinical trials, and undermines any confidence in the findings. In addition, the researchers' publication of the results of the three-month testing, without reporting the original duration of the study, is also inconsistent with widely-accepted standards for conduct of clinical trials.*

The study was terminated after three months only because the Resnicks did not provide the funding that they had previously committed to this study, not because the p-value was statistically significant at three months. We originally planned to test these patients after three months and after twelve months. We were unable to do the twelve-month testing because there was not sufficient funding to do so after the funding was reduced. Clearly, we intended to do a twelve-month follow-up which is why nine of the patients completed their twelve-month testing before the funding was cut. The only reason we didn't test all of the patients at twelve months is that the funding was no longer available to do so for reasons beyond our control.

While it's unfortunate that we did not have twelve month follow-up data, this does not undermine the confidence in the three-month findings, which stand on their own. Bias is not an issue because outside factors precluded obtaining twelve-month data. As we noted at the end of the *American Journal of Cardiology* publication, "Further studies appear to be warranted to determine the effects of pomegranate juice on myocardial perfusion in a larger sample of patients over a longer period."

*43. In summary, problems in the design and conduct of the coronary perfusion study, and the descrepant results of the Bev I coronary perfusion study do not support a conclusion that the pomegranate products used had a favorable effect on coronary perfusion. In addition, other factors, such as blood pressure, cholesterol, inflammatory biomarkers, and oxidative stress were not improved. The interpretation of this study that is most consistent with principles of clinical study design and conduct is that the treatment had no effect on any measure of cardiac health.*

I do not agree with this conclusion, for reasons stated above. Also, the fact that other factors such as blood pressure and cholesterol did not improve does not in any way provide evidence

that pomegranate juice was not beneficial, as its effects may have been mediated via other pathways than these.

> **D.    *The Beverage Study Protocol II*, June 21, 2003 (BATES: LIKER00449-460, at 449) ("BEV II Coronary Perfusion Study")**

> *46. I read Dr. Ornish's testimony to the effect that the results of the Beverage II study are not relevant to the analysis of whether pomegranate juice offers benefits to the heart. Ornish Tr. 102-04. Noting that he originally expected to enroll 200 patients, but that he lost the funding to accomplish this, he has argued that the study was underpowered, meaning that there were an insufficient number of patients in the trial to produce a statistically significant effect. Ornish Tr. 102-04. He has hypothesized that if the 200 persons had been enrolled, a statistically significant effect might have been demonstrated. Id. 47. In my opinion, this is not an appropriate treatment of these data. The fact that the study was smaller than originally hoped for does not mean that the data are irrelevant. Having conducted the study, the researcher and the sponsor must live with the results. The Beverage Study II protocol calls for 50 patients and 75 were enrolled. The study appears to have been generally well designed and well conducted. In my opinion, the results of this study were convincingly null. The pomegranate juice treatment did not improve IMT or the other tested parameters. The results of this study must be considered as a part of the body of evidence relating to whether or not pomegranate juice has beneficial effects on heart health. These results in 73 patients also confirm that the purportedly strongly positive results of Dr. Aviram's unrandomized, uncontrolled 19 patient CIMT study (see paragraph 35) lack credibility.*

Dr. Sacks is incorrect.  Our *a priori* power calculations indicated that we would need at least 200 patients to show statistically significant differences given the expected changes from the earlier pilot study.  Our initial budget was for 200 patients, and our protocol submitted to the institutional review board was for 200 patients.

Unfortunately, because recruitment took longer than anticipated (since most patients with heart disease ended up having angioplasty, stents, and/or bypass surgery at a much higher rate than anticipated), the Resnicks significantly reduced our funding to pay for only 50 patients.  (In conducting research, my prime directive is to do it right even if it takes longer than originally planned.)  In retrospect, we should have not proceeded, since the likelihood of showing statistically significant differences was very small, but since the revised plan indicated that they might be able to pool our data with the Radiant group (which eventually turned out not to be the case since the Radiant group eventually used a different protocol than we used), we proceeded anyway.

Ultimately, we recruited 73 patients, 56 of whom completed one-year testing.  Even in this smaller group, we found improvements in right CIMT that approached statistically significance (p = 0.134).  *If these changes had been seen in a sample of 200 patients, then it would have been statistically significant.*  However, at the very least, the absence of a reliable result, certainly does not prove the negative.

Therefore, it would have been inaccurate to report that pomegranate juice did not affect the progression of carotid atherosclerosis, since the study was underpowered for this purpose, and it would have been what is known as a type II error: that there may have been a statistically significant difference but the sample size was not sufficiently large to detect it.  While Dr. Sacks states that our study proved that pomegranate juice had no effect on carotid IMT, it would be more accurate to see this study as a validation of the Aviram and Davidson studies since the differences in CIMT would have been statistically significant if the findings we measured in 73 patients were found in the 200 patients that we originally planned to enroll.

* * *

E.    **Davidson MH, Maki KC, Dicklin MR, Feinstein SB, Witchger MS, Bell M, McGuire DK, Provost JC, Liker H, and Aviram M,** *Effects of Consumption of Pomegranate Juice on Carotid Intima-Media Thickness in Men and Women at Moderate Risk for Coronary Heart Disease,* **104 Am. J. Cardiology 936 (2009) ("Davidson IMT Report") (BATES: MHDAVIDSON-0007770-7776).**

*52. According to the Davidson IMT report, at the end of the study, there were no significant differences in CIMT progression rates between the subjects in the pomegranate juice and control groups. Davidson IMT Report, Table 3. The "composite rate" for all measured carotid artery walls had shown a significantly smaller value at 12 months in the pomegranate juice group, but this difference was no longer significant at the end of the study. Further, the anterior wall values and rates, and the posterior wall values and progression rates did not differ significantly at any point in the trial. Id. at 940. There also were no statistically significant changes in the measured indicators of inflammation and oxidative stress, Id. at Table 2, or in fasting lipoprotein lipids or blood pressure. Id. at 940.*

*57. The subgroup analyses that is contained in the Davidson IMT study is "hypothesis generating" only, meaning that it must be evaluated de novo in a future study, as stated by the researchers. This is the appropriate treatment of any post hoc analysis of data. It is particularly important here, where the subgroup analysis was not corrected for multiple comparisons. When many subgroups are studied, a p-value of 0.05 (one out of twenty chance of false positive) is not reliable. As more subgroups are added to the analysis, the probability steadily increases that by chance one of them will have a p-value of 0.05. In such a case, it is likely that the apparent differences identified in the report were, in fact, due to chance. As discussed above, the subgroup results suffer from other serious problems including a null result for the more reliable primary outcome, and a null result for metabolic syndrome. Thus, a qualified scientist cannot rely upon such post hoc analyses as reliable scientific evidence to support claims that POM Juice or POMx prevents, reduces the risk of, or treats cardiovascular disease in the subpopulations identified in Figure 3 of the Davidson IMT Report.*

According to the protocol, the primary outcome variable was the difference between placebo and pomegranate juice in posterior wall common CIMT progression rate in mm/year, utilizing non-contrast images.  It is true, as Dr. Sacks points out, that "there

were no significant differences in CIMT progression rates between the subjects in the pomegranate juice and control groups."

He then acknowledges that "The 'composite rate' for all measured carotid artery walls had shown a significantly smaller value at 12 months in the pomegranate juice group, but he then discounts the importance of this finding because (a) it was not the primary endpoint measure, and (b) "this difference was no longer significant at the end of the study."

While it is true that the composite rate for all measured carotid artery walls was not the primary endpoint measure, I would argue that it should have been, as it includes all measurements of CIMT, not just the posterior wall. As such, it is not likely to be just a chance finding of having measured lots of different parameters; it is the most clinically meaningful. In this context, the post hoc analysis has validity.

Indeed, this composite measure *was* clearly stated a priori as a secondary hypothesis in the study protocol (MHDAVIDSON-0007361): "The secondary outcome variables will include the difference between placebo and Pom Wonderful juice groups in the composite measure, which combines the measurements of the common and internal carotid artery and the carotid bifurcation (Smilde 2001), in mm/year." As such, it is not valid for Dr. Sacks to conclude, "In such a case, it is likely that the apparent differences identified in the report were, in fact, due to chance."

As Dr. Sacks pointed out, the reason that the posterior wall CIMT was chosen was not because it was the best measure, but because it was easier to obtain. As he wrote, "One reason to use posterior wall measurements as the primary outcome is that they do not require injection of a contrast agent like anterior wall measurements do." Since the investigators were successful in obtaining anterior wall measurements on a larger group of patients than expected, it would be extreme to say that this finding was not important or clinically relevant simply because it was not stated as the primary endpoint measure a priori but was stated as a secondary endpoint measure a priori.

Also, the fact that these differences were not statistically significant at 18 months does not change the fact that these differences *were* statistically significant after 12 months. One explanation might be that pomegranate juice is only beneficial for 12 months but not 18 months, but this explanation would be difficult to fathom from a clinical standpoint. Why should pomegranate juice suddenly stop being beneficial six months later?

A more likely explanation is that compliance to drinking pomegranate juice declined significantly after the first year. I have directed a number of randomized controlled trials during the past 34 years, and it is very challenging to motivate patients to continue following any intervention for more than one year. For example, studies of compliance to statin drugs such as Lipitor and Zocor have shown that only two-thirds of patients are taking the medication after three months and less than 50% are taking it after one year.

Compliance rates were not described in this research publication. However, it is not unusual for patients to be less than honest in describing their compliance as patients often describe that it is embarrassing and even humiliating to report that they have not done

{050057.1}

JA-1165

PX0025-0020

what they were supposed to do unless great efforts are made, as in our studies, to repeatedly emphasize to patients the importance of being honest and accurate.

It is also possible that patients in the control group may have started drinking pomegranate juice after one year. It was around that time that Pom Wonderful began marketing pomegranate juice nationwide with ads describing its health benefits. Since it would be easy for study participants to distinguish between placebo and pomegranate juice once it became widely available, it is not unlikely that some control group patients may have started consuming it.

In summary, while these explanations are speculative, they are based in experience. The bottom line is that pomegranate juice *did* show a statistically significant improvement in CIMT after 12 months in the measure that was most clinically relevant.

> 53. *The report also includes a "post hoc" (that is, not planned for in the protocol) exploratory analysis of changes in certain subpopulations of the study. According to that analysis, there were significantly lower CIMT progression rates for pomegranate versus control subjects at the end of the study in certain subpopulations with higher CVD risk factors, such as those in the highest tertiles for apolipoprotein B, TG, TG to HDL ratio, total cholesterol to HDL ratio, as well as a purported marker of antioxidant function, PD-AAPH.*

While this is post hoc analysis, and thus not as rigorous as one stated a priori, it does provide supporting evidence that there was statistically significant lower CIMT progression rates for pomegranate versus control subjects in those with higher cardiovascular disease risk factors.

This is clinically important, as other randomized controlled trials and others using repeat quantitative coronary arteriography also showed that subpopulations of patients who are sicker often are more likely to show improvement. This finding was appropriately qualified in the paper, but it would be extreme to dismiss this finding as being irrelevant simply because it was not stated a priori.

The fact that "*There also were no statistically significant changes in the measured indicators of inflammation and oxidative stress, Id. at Table 2, or in fasting lipoprotein lipids or blood pressure*" does not change the fact that there were statistically significant improvements in both the composite CIMT as well as in the subgroup of patients who were at highest risk. It only indicates that the therapeutic benefit of pomegranate juice may not be mediated via these factors.

By analogy, the Lyon Study found a significant reduction in total mortality in those adhering to a Mediterranean diet that was not mediated via traditional risk factors such as those described above.[10] More recently, it was reported in *The New England Journal of Medicine* that high-protein "Atkins" type diets may increase atherosclerosis (arterial blockages) via mechanisms other than those described above.[11]

In summary, for all of the reasons stated above, I do not agree with Dr. Sacks' conclusion that the Davidson study "provides competent and reliable evidence that consumption of pomegranate juice did not improve CIMT in subjects with one or more cardiovascular risk factors."

> *54. It should be noted that pomegranate juice subjects with metabolic syndrome were not among the subpopulations who had significantly lower IMT values after treatment. Id. at Table 3. Metabolic syndrome is composed of a group of at least three high-risk conditions among high TG, low HDL-C, high blood pressure, high blood sugar, and overweight or obesity. Patients who have metabolic syndrome experience higher risk of cardiovascular disease and diabetes than patients who have only one or two of its components. Thus, the finding that pomegranate juice did not significantly reduce the CIMT progression rate in patients in the Davidson study who had metabolic syndrome suggests that high-risk patients are not necessarily benefitted by the treatment.*

After stating in paragraph 57 (above) that "a qualified scientist cannot rely upon such post hoc analyses as reliable scientific evidence," Dr. Sacks goes on to describe a post hoc analysis stating that patients with metabolic syndrome did not show improvement in IMT. Clearly, he must think that post hoc analyses have scientific value even if not at the same level of rigor as endpoint measures declared a priori, so he undercuts his earlier, more extreme argument that the statistically significant improvements in composite rate for all measured carotid artery walls should not be considered as valid evidence.

Also, the finding that pomegranate juice did not significantly reduce CIMT progression rate in patients who had metabolic syndrome does not take away from the fact that there were significantly lower CIMT progression rates for pomegranate versus control subjects at the end of the study in certain subpopulations with higher CVD risk factors, such as those in the highest tertiles for apolipoprotein B, TG, TG to HDL ratio, total cholesterol to HDL ratio, as well as a purported marker of antioxidant function, PD-AAPH. The fact that pomegranate juice did reduce carotid artery blockages in subgroups with these cardiac risk factors is not diminished by the fact that it did not reduce carotid artery blockages in *all* subgroups of risk factors, such as those with metabolic syndrome. These are of interest more from the standpoint of having a better understanding of the mechanisms by which pomegranate juice may be beneficial than on whether or not pomegranate juice is beneficial in reducing carotid artery blockages (atherosclerosis).

Again, the "bottom line" is improvements (reductions) in carotid artery blockages from drinking pomegranate juice, which were statistically significant in composite rate for all measured carotid artery walls in these patients.

**F.    The Effects of Pomegranate Juice on Flow-Mediated Vasodilation, (unpublished, 2004) (BATES: MHDAVIDSON-0000179-248) ("Davidson FMD Report").**

> *58. The Davidson FMD study enrolled 45 of the subjects who were enrolled in the Davidson IMT trial. It was a randomized, double-blind, placebo-controlled trial to evaluate the effect of consuming POM Juice or placebo on brachial artery reactivity testing ("BART"). See Radiant Protocol (BATES: MHDAVIDSON-007410-7417). The*

{050057.1}

PX0025-0022

subjects underwent the FMD protocol testing at baseline and 13 weeks. During the testing, a blood pressure cuff was placed on the arm and was increased to a pressure that occluded blood flow and then released. Davidson Depo. Tr. 34. According to the protocol, the primary endpoint of the study was ultrasound measurement of flow mediated dilation, which refers to the amount by which the brachial artery dilates (gets larger) after the blood pressure cuff is deflated. Other measurements were also taken, including blood flow through the brachial artery, blood pressure, and lipid parameters.

59. The Davidson FMD Report (BATES: MHDAVIDSON-0000179-248) provides the results of this testing. It contains two analyses: the intent-to-treat analysis, which provides data for all 45 subjects who were enrolled in the BART study, and the per protocol analysis, which provides the data for the 40 subjects who completed the study according to the protocol. According to the Report, the results were the same in both the intent-to-treat and the per protocol populations. There were no statistically significant differences between the treatment and placebo groups in change in FMD from baseline to 13 weeks. Davidson FMD Report at Tables 1.2 and 2.2. In addition, there were no statistically significant differences between treatment groups in changes from baseline to week 13 in lipid parameters (Id., Tables 1.3 and 2.3) and vital signs measurements, including blood pressure (Id., Tables 1.6 and 2.6).

60. According to the FMD protocol, the rationale for this testing was that brachial FMD is a noninvasive method to assess endothelial dysfunction, which in turn is an early marker of cardiovascular disease. MHDAVIDSON-007411. FMD testing was invented because it is easy to do and because it originally was hoped, in the 1980's, that such testing would reflect reactivity in the coronary artery. After extensive testing, the responses of brachial artery reactivity to dietary supplements and drugs are not as predictive of changes in coronary heart disease as hoped. One possible contributor to this lack of correspondence is that the brachial artery is not afflicted by atherosclerosis, in contrast to the arteries that supply blood to the heart and brain. Thus, brachial artery reactivity, although of interest, is not a valid or generally recognized surrogate marker of coronary heart disease.

61. In my opinion, the Davidson FMD study appears to have been carefully designed. The protocol identifies the endpoints to be measured, the procedures to be followed, inclusion and exclusion criteria, and the statistical analysis to be conducted. There is no evidence, of which I am aware, of critical problems in the conduct of the study.

62. Although FMD is not a reliable surrogate marker for heart health, this study does provide information that is relevant to this case. Reductions in blood pressure and lipids are valid surrogate markers for improvement in cardiovascular health. As previously noted, this study showed that, at the end of the trial, there were no statistically significant differences in blood pressure between the treatment and placebo groups. It also shows no statistically significant differences between the two groups in ACE (Tables 1.4 and 2.4), which is inconsistent with the results of Aviram's 2001 study (see paragraphs 33-34).

{050057.1}

PX0025-0023

If Dr. Sacks believes, as he states, that "brachial artery reactivity, although of interest, is not a valid or generally recognized surrogate marker of coronary heart disease," then the study's findings that there were no statistically significant differences between the groups is irrelevant.

### G.    Overweight Studies on POMx.

*64. Dr. Hill and his colleagues conducted the unblinded, uncontrolled study of POMx Pills in Denver, Colorado. According to the study protocol, the study would enroll up to 50 subjects between the ages of 40-70 who have abdominal adiposity, and each subject would take a commercially available POMx capsule once a day for 28 days. The study was designed to measure antioxidant, oxidative, and inflammatory markers in serum, as well as weight, waist circumference, blood pressure, and other factors. Hill JO and Wyatt HR, Protocol 06-0704, The Effect of POMx, a Nutritional Supplement Derived from Pomegranates, on Human Biomarkers Associated with Cardiovascular Health in Healthy, Overweight Adults (Oct. 4, 2006), Hill Deposition, Ex. 10 (BATES: JOHILL-0001541-1554). According to the study report prepared by the principal investigator, Dr. Hill, 24 adults enrolled and took 2 POMx capsules one time per day. Hill JO, Preliminary Data Analysis (Feb. 15, 2007) (BATES: POM_Q14-0000268-277). The patients who participated in the study gained weight; Dr. Hill attributed this to the fact that the study took place near the holidays. After adjusting the statistical analysis for the change in weight, the data analysis states that only two significant results emerged: TBARS levels (described as "a test that measures lipid peroxidation in the blood") decreased, and free fatty acids increased. The study's biostatistician, however, stresses that the change in TBARS was of only borderline significance and that the analysis was not adjusted for the number of comparisons being made. Id. at POM_Q14-0000269. Other factors measured – including diastolic and systolic blood pressure, TG, HDL, LDL, CRP, and PON – did not change during the trial. The report also notes that the study attempted to measure three interleukins, but that the commercially-available assays were not sensitive enough to detect levels of these biomarkers in the test population. Id. at POM_Q14-0000270. The report concluded that "we did not detect any effect of POMx on inflammation but identification of better biomarker assays for inflammation is needed. . . . [T]his pilot project suggests that a larger trial is warranted in abdominally obese subjects who may be at risk for development of metabolic diseases." Id.*

*68. The methodological shortfalls in the Denver study conducted by Dr. Hill – especially the lack of a control group – render its findings unreliable. Accordingly, I disagree with Dr. Heber's statement in his 2007 publication (cited above) that this study demonstrates efficacy of POMx.*

I agree with some of Dr. Sacks' critique of the limitations of this study. However, it was presented as a pilot study and show be viewed in that context. To say that "the lack of a control group render its findings unreliable" is to belie the premise of a pilot study, which is to generate preliminary findings that can be used to justify doing a larger, more expensive intervention with a control group. There is a logical progression in science which often beings with a pilot study that has no control group.

{050057.1}

PX0025-0024

In this context, Dr. Heber's comments about this study are appropriately qualified and accurate. As he wrote in the publication cited by Dr. Sacks (Heber D, Seeram NP, Wyatt H, Henning SM, Zhang Y, Ogden LG, Dreher M, and Hill JO, *Safety and Antioxidant Activity of a Pomegranate Ellagitannin-Enriched Polyphenol Dietary Supplement in Overweight Individuals with Increased Waist Size*, J. Agric Food Chem., Vol. 55, No. 24 (2007), Heber Deposition Ex. 1053 (BATES: POM-HC0001735-1739):

> "This study demonstrates in *preliminary* fashion (italics added) that a pomegranate ellagitannin-enriched polyphenol (POMx) dietary supplement is safe when ingested by healthy human subjects in amounts up to 1420 mg/day providing a total of 870 mg of GAEs/day for 28 days. No adverse events related to the dietary supplement consumption or changes in hematology, serum chemistry, or urinalyses were observed."

So, from a safety standpoint, these data are useful but not surprising, given the generally-accepted safety of pomegranate juice.

When Dr. Heber concluded that "these pilot studies demonstrate both the safety and efficacy of POMx," I imagine he was citing the Denver study regarding efficacy (given the statistically significant change in TBARS) and the San Diego study regarding safety. I agree with Dr. Sacks that the San Diego study did not demonstrate efficacy since there were no significant changes in biomarkers.

From an efficacy standpoint, Dr. Heber writes:

> "*Preliminary* evidence (italics added) of a reduction in TBARS was seen in the subjects who were studied at the Denver site. Further studies are underway to document the effects of this supplement in subjects with type 2 diabetes, known to have a more marked increase in oxidant stress. TBARS are an important biomarker of oxidative stress, measuring harmful products of lipid (fat) oxidation found in the blood. Lower levels of TBARS are seen in healthy and younger individuals. As people age, and in certain diseases such as coronary heart disease, the amount of TBARS circulating in the blood increases, indicating elevated oxidative stress levels.

Although Dr. Sacks writes, "Measurements included oxidized phospholipids, oxidized LDL/HDL, serum nitric oxide, PON, and others. I note that none of these is a valid surrogate marker of cardiovascular disease or response of disease to treatment," other well-respected scientists would not agree with that statement. As Dr. Heber noted in the above paper (BATES: POM-HC0001735-1739), "Serum levels of TBARS are strongly predictable of cardiovascular events in people with stable coronary artery disease, independent of traditional risk factors and inflammatory markers."[12]

* * *

In summary, taken as a whole, the scientific evidence from basic science studies, animal research, and clinical trials in humans indicates that pomegranate juice in its various forms (including POM Wonderful 100% Pomegranate Juice ("POM Juice"), POMx Pill, or POMx Liquid) is likely to be beneficial in maintaining cardiovascular health and is likely to help reduce the risk of cardiovascular disease.  Also, I am not aware of any significant negative health effects from pomegranate juice.

Dean Ornish, M.D.
Founder and President, Preventive Medicine Research Institute
Clinical Professor of Medicine, University of California, San Francisco
March 18, 2011

{050057.1}

PX0025-0026

## References:

[1] Sacks FM, Ornish DM, Rosner B, McLanahan S, Castelli WP, and Kass EH. Dietary predictors of blood pressure and plasma lipoproteins in lactovegetarians. *JAMA*. 1985;254:1337-1341.

[2] Block KI, Cohen AJ, Dobs AS, Ornish D, Tripathy D. The challenges of randomized trials in integrative cancer care. *Integr Cancer Ther*. 2004 Jun;3(2):112-27.

[3] Chong MF, Macdonald R, Lovegrove JA. Fruit polyphenols and CVD risk: a review of human intervention studies. Br J Nutr. 2010 Oct;104 Suppl 3:S28-39.

[4] Hashemi M et al. Acute and long-term effects of grape and pomegranate juice consumption on vascular reactivity in paediatric metabolic syndrome. Cardiol Young. 2010 Feb;20(1):73-7. Epub 2010 Feb 22.

[5] Glagov S et al. Compensatory enlargement of human atherosclerotic coronary arteries. N Engl J Med. 1987 May 28;316(22):1371-5.

[6] Gibson RS, Watson DD, Craddock GB, et al. Prediction of cardiac events after uncomplicated myocardial infarction: a prospective study comparing predischarge exercise thallium-201 scintigraphy and coronary angiography. Circulation. 1983;68(2):321-336.

[7] Gimelli A, Rossi G, Landi P, et al. Abnormalities by Gated SPECT: Still the Best Predictor of Cardiac Events in Stable Ischemic Heart Disease. J Nucl Med 2009; 50:546–553.

[8] Hollis S, Campbell F. What is meant by intention to treat analysis? Survey of published randomised controlled trials. BMJ 1999; 319 : 670.

[9] Julious SA, Mullee MA. Issues with using baseline in last observation carried forward analysis. Pharmaceut. Statist. 2008; 7: 142–146.

[10] Trichopoulou A, Costacou T, Bamia C, Trichopoulos D. Adherence to a Mediterranean diet and survival in a Greek population. N Engl J Med. 2003; 348:2595-2596,2599-2608.

[11] Smith SR. A look at the low-carbohydrate diet. N Engl J Med. 2009;361:23.

[12] Walter, M. F., Jacob, R. F., Jeffers, B., Ghadanfar, M. M., Preston, G. M., Buch, J., Mason, P. Serum levels of thiobarbituric acid reactive substances predict cardiovascular events in patients with stable coronary artery disease. *J. Am. College Cardiol*. **2004**, *44*, 1996–2002.

# EXPERT REPORT OF ARTHUR BURNETT, M.D.

## I.     CREDENTIALS AND QUALIFICATIONS

### A.     Credentials

1.     I am a Doctor of Medicine and obtained my medical degree in 1988 from the Johns Hopkins University School of Medicine in Baltimore, Maryland.  From 1988 to 1993, I completed an internship in general surgery and residencies in general surgery and urology at the Johns Hopkins Hospital.  From 1993 to 1996, I completed fellowships in urology and reconstructive urology & urodynamics also at the Johns Hopkins Hospital.  I also completed a master's degree in business administration with a concentration in medical services management in 2009 from the Johns Hopkins University Carey Business School.  I am board certified in urology (certified in 1998 and re-certified in 2006).  I am a practicing urological surgeon and specialize in sexual medicine, major pelvic reconstruction, voiding dysfunction, female urology and prostate cancer.  My curriculum vitae is attached to this report as Exhibit 1.

2.     Currently, I am the Patrick C. Walsh Professor of Urology serving on the faculty of the Department of Urology at the Johns Hopkins University School of Medicine/Johns Hopkins Hospital in Baltimore, Maryland.  I also hold a faculty appointment in the Cellular and Molecular Medicine Training Program of the Johns Hopkins University School of Medicine.  I am the Director of the Basic Science Laboratory in Neuro-urology of the James Buchanan Brady Urological Institute and Director of the Male Consultation Clinic/Sexual Medicine Division of the Department of Urology at Johns Hopkins.  I have also held many visiting professor positions in urology nationally and internationally.

CONFIDENTIAL – FTC DOCKET NO. 9344

PX0149-0001

3.    I have served in multiple professional capacities with medical organizations and advisory committees with participation that includes a host of chairperson and officer roles. Among professional societies, I am a member of the Society of University Urologists, Society of Urologic Prosthetic Surgeons, American Society for Peripheral Nerve, International Society for the Study of Women's Sexual Health, American College of Surgeons, Society of Genitourinary Reconstructive Surgeons, American Urogynecologic Society, Urodynamics Society, Society of Black Academic Surgeons, International Society for Sexual Medicine, Monumental City Medical Society, National Medical Association, Sexual Medicine Society of North America, American Society of Andrology, Society of Government Service Urologists, and American Urological Association.

4.    Among many advisory committees, I have served on the American Urological Association Research Council Strategic Workgroup, Advisory Committee for Reproductive Health Drugs of the U.S. Food and Drug Administration, American Board of Urology Examination Committee, Urologic and Kidney Development and Genitourinary Diseases Study Section of the National Institutes of Health Center for Scientific Review, and the Johns Hopkins Men's Health Advisory Board.

5.    I have served in many journal editorial capacities.  I have been an Assistant Editor of *The Journal of Urology*, Co-Editor-in-Chief of *The Journal of Andrology*, Reviews and Associate Editor of *The Journal of Sexual Medicine*, and Administrative Editor of *Practical Reviews in Urology.*  I have served roles as contributing editor, consultant and section editor for several journals.  I have served as a member of editorial boards of many journals.  I have served as a

peer reviewer for many journals, with responsibility for studying and evaluating the quality of basic scientific and clinical studies submitted for consideration of publication.

6.      I have received multiple investigator-initiated research awards at federal, foundation sponsored and industry-related levels.  Among such awards, I have been continuously funded by the National Institutes of Health since 1998 holding project titles such as "Nitric Oxide Regulatory System in the Penis" and "Endothelial Nitric Oxide Synthase Regulatory Mechanisms in Penile Vascular Function", which have enabled my research group to advance the science of erection disorders related to nitric oxide biology.

### B.      Publications

7.      I have authored and published over 180 original peer-reviewed articles and 40 book chapters, along with numerous additional editorials, books and reviews relating to my biomedical research and clinical activities.  My work has appeared in many prominent journals, including *Science*, *Nature Medicine*, *Proceedings of the National Academy of Sciences*, *The Journal of Urology*, *Urology*, *The Journal of Andrology*, and *The Journal of Sexual Medicine*.  A list of my publications can be found at pages 2-21 of my curriculum vitae (Exhibit 1 hereto).

### C.      Prior Testimony

8.      In the past four years, I have testified as an expert witness at deposition or trial in the matters listed on Exhibit 2 to this report.

### D.      Compensation

9.      I am being compensated at a rate of $500 per hour for my work in association with this litigation.

CONFIDENTIAL – FTC DOCKET NO. 9344    **JA-1175**    PX0149-0003

E.    **Materials Relied Upon**

10.    Attached to this report as Exhibit 3 are the publications upon which I have specifically relied in reaching the opinions I express in this report.  In addition to these publications, I have also extensively relied upon my education, experience, and knowledge of developments in the fields of urology and sexual medicine, including the promotion of erectile health and treatment of erectile dysfunction.

II.    **OPINIONS RE NITRIC OXIDE AND ERECTILE HEALTH**

A.    **Basic Research on Nitric Oxide in Penile Erection**

11.    Penile erection is a complex neurovascular process involving relaxation of the corpus cavernosal (erectile) tissue and vasodilation of blood vessels supplying the corpora cavernosa combined with both increased arterial inflow into and restricted venous outflow from the penis.  Compression of the dilated blood vessels against the semi-elastic tunica albuginea (veno-occlusion) restricts venous drainage, allowing penile rigidity and sustaining erection.  Detumescence (erection decline) occurs as a consequence of increased cavernous smooth muscle tone, contraction of the sinusoids, and a reduction in arterial inflow.

12.    Nitric oxide (NO) is the main mediator of penile erection, synthesized by neuronal NO synthase (nNOS; NOS 1) and endothelial NO synthase (eNOS; NOS3).  The sources of nNOS-containing (nitrergic) autonomic innervation of the penis include the bilateral major pelvic ganglia (pelvic plexus) and their terminations in the penis.  Penile vascular and sinusoidal endothelium contains eNOS.  Upon its synthesis and release from their cellular sources, NO diffuses to neighboring vascular and trabecular smooth muscle cells where it activates soluble guanylate cyclase to produce cyclic guanosine monophosphate (cGMP), an effector of smooth

muscle relaxation via protein kinase G (PKG) actions. NO/cGMP/PKG mediates the relaxation of the cavernous smooth muscle and vasodilation of blood vessels. cGMP is hydrolyzed by the phosphodiesterases, predominantly type 5 (PDE5), to inactive 5'-GMP, terminating penile erection. PDE5 inhibitors such as sildenafil (Viagra), vardenafil (Levitra) and tadalafil (Cialis) inhibit PDE5, thereby augmenting cGMP levels.

13.     My lab was instrumental in describing NO as a physiologic mediator of penile erection and the mechanism of NO-dependent penile erection. Our research work established neuronal NO as the physiologic initiator of penile erection and further clarified the molecular mechanisms involved in neurogenic stimulation of the erectile response. We further described blood flow endothelial NO-dependent forces in the penis, which promote and sustain the erectile response, and we described the new science of penile erections involving combined roles of neuronal and endothelial NO mechanisms. We have also refined the understanding of PDE5 function in the penis, which varies with different medical conditions (diabetes, cardiovascular diseases, aging, cigarette smoking, sickle cell disease) and accordingly accounts in varying ways for erectile dysfunction problems. We have also contributed research work that has clarified the interaction between NO and other major opposing regulatory mediators of penile erection including agents that cause penile vasoconstriction (anti-erectile mediators) and oxidative stress factors (reactive oxygen species/molecules that cause tissue damage).

**B.    The Basic Science Regarding Pomegranate Juice and Nitric Oxide**

14.     In my review of the literature, basic scientific evidence exists that establishes that pomegranate juice possesses potent anti-oxidative molecular effects and these effects operate by activating endothelial NO mechanisms in vasculature. These mechanisms serve

CONFIDENTIAL – FTC DOCKET NO. 9344

PX0149-0005

potential beneficial effects on vascular blood flow and promote vascular biologic health.  The

evidence supports the probable benefit of pomegranate juice on the vascular structures

involved in penile erection.

      **C.**    **The Clinical Trial Regarding Pomegranate Juice and Erectile Health**

      15.    The likelihood of the beneficial effect of pomegranate juice on erectile health

established by the basic science discussed in the preceding section is further supported by the

clinical trial conducted by Forest CP, Padma-Nathan H, and Liker H, "Efficacy and safety of

pomegranate juice on improvement of erectile dysfunction in male patients with mild to

moderate erectile dysfunction: a randomized, placebo-controlled, double-blind, crossover

study," published in the International Journal of Impotence Research (2007) (the "Forest

Study").

      16.    Although the Forest Study did not achieve statistical significance (by reason of a

small number of participants), it offers clinical weight to suggest a likely beneficial effect of

pomegranate juice on erectile tissue physiology and health.  The results are sufficient to

support the conclusion that there is a beneficial effect in using pomegranate juice for

promoting the health of erectile vascular tissues.

**III.**    **CONCLUSIONS**

      17.    For the reasons discussed above, I conclude that the basic scientific and clinical

evidence is sufficient to support the use of pomegranate juice as a potential benefit for vascular

blood flow and the vascular health of the penis.  Because pomegranate juice creates no

material risk of harm and assuming that drinking pomegranate juice is not advocated as an

alternative to following medical advice, it is my opinion that information of pomegranate juice's

CONFIDENTIAL – FTC DOCKET NO. 9344 **JA-1178**

PX0149-0006

likely benefit may be communicated to consumers.  It is also my opinion that further such

studies as double blinded, placebo-based tests are not required before permitting this

information to be given to the public.

*Arthur R Burnett*

Arthur Burnett, M.D.

CONFIDENTIAL – FTC DOCKET NO. 9344

PX0149-0007

# EXPERT REPORT OF DAVID HEBER

David Heber, MD, PhD, FACP, FACN, CNS
Professor of Medicine and Public Health
And Director, UCLA Center for Human Nutrition
David Geffen School of Medicine
University of California, Los Angeles
Los Angeles, California

## *In the Matter of Pom Wonderful LLC et al.*

## FTC Docket No. 9344

March 18, 2011

David Heber, MD, PhD, FACP, FACN, CNS
UCLA Center for Human Nutrition
900 Veteran Avenue
Los Angeles, CA 90095-1742
Tel: 310-206-1987
Fax: 310-206-5264
E-mail: dheber@mednet.ucla.edu

DAVID HEBER, MD, PhD, FACP, FACN, CNS

Date:

PX0192-0002

Schulman RN, Aviram M, Siroky MB. Oxidative stress in arteriogenic erectile dysfunction: prophylactic role of antioxidants. J Urol. 2005;174:386-93).

Based on these effects of PJ on erectile dysfunction due to arterial pathology, a randomized-controlled trial examined the efficacy of wonderful variety pomegranate juice versus placebo in improving erections in 53 completed subjects with mild to moderate erectile dysfunction. The crossover design consisted of two 4-week treatment periods separated by a 2-week washout. Efficacy was assessed using International Index of Erectile Function (IIEF) and Global Assessment Questionnaires (GAQ). Of the 42 subjects who demonstrated improvement in GAQ scores after beverage consumption, 25 reported improvement after drinking pomegranate juice. Further, 17 subjects showed preference of one beverage to the other. Subjects were more likely to have improved scores when pomegranate juice was consumed (P=0.058). Although overall statistical significance was not achieved, this pilot study suggests the possibility that larger cohorts and longer treatment periods may achieve statistical significance. In particular, it is important in future studies to define the subgroup with arteriosclerotic and not neuronal dysfunction as a cause of their erectile dysfunction. This type of study is difficult, as most is conducted using questionnaires, but the combination of a basic mechanistic demonstration in an animal model and the trend in a human study provide a scientific basis to communicate a potential benefit for erectile dysfunction. (Forest CP, Padma-Nathan H, Liker HR. Efficacy and safety of pomegranate juice on improvement of erectile dysfunction in male patients with mild to moderate erectile dysfunction: a randomized, placebo-controlled, double-blind, crossover study. Int J Impot Res. 2007;19:564-7.)

## V.    COMMENTS ON DR. STAMPFER'S OPINIONS IN HIS EXPERT REPORT

### I.    *Credentials and Qualifications*

By limiting his review largely to human studies and clinical trials, Dr. Stampfer has provided a narrowly focused set of opinions which do not fully reflect the nutritional science supporting the health benefits of pomegranate juice. In my opinion, the entire body of scientific

37

research, including mechanistic studies in cells and animals, and bioavailability and metabolism studies in humans, contributes to the body of evidence supporting the beneficial effects of pomegranate juice and pomegranate extract. These aspects are not adequately discussed in Dr. Stampfer's report, which is incomplete and faulty as a result.

Pomegranate juice is a food, and pomegranate extract is a dietary supplement providing constituents found in pomegranate juice within the nutritional range. Neither of these are drugs, which are typically highly purified single molecules with a single well-defined target and organ system. Unlike a drug, pomegranate juice does not have side effects, and has been safely consumed as a juice in the Middle East for centuries. Pomegranate is a complex fruit that contains many interacting and unique substances, including large hydrolyzable tannins with potent antioxidant activity. My laboratory and universities in Spain, England, Iran, and Israel have described the effects of pomegranate extract and pomegranate juice in both human and animal studies.

Only by considering the entire body of work, including mechanistic and preclinical studies for prostate cancer, heart disease, diabetes, and erectile dysfunction, can one get a coherent overview of the health benefits attributable to pomegranate juice and extract. These health benefits are further supported by understanding the underlying mechanisms, which can only be provided by mechanistic investigations in animals and cells. This biological rationale then establishes a scientific basis for making statements about the health benefits of pomegranate juice and extract.

Basic and clinical studies reinforce each other in nutritional research. Translational research is science that moves discovery from pre-clinical to clinical studies in humans. I disagree with Dr. Stampfer's contention that larger studies are always more definitive than smaller studies. While all studies can be criticized, smaller studies enable more careful selection and study of subjects, a key advantage. Problems with the operational difficulties of large studies, such as the Women's Health Initiative involving some 42,000 women, have led to

38

difficulties in making firm conclusions with regard to the hypotheses tested. In this study, which was the largest women's health study in history, there were difficulties with compliance including subjects who both "dropped in" and "dropped out". These studies could not be interpreted as disproving any hypotheses despite their large size. The failure to find effects of low fat diet on breast cancer or colon cancer in this particular study do not definitively exclude an effect of diet on these diseases, but rather may simply reflect weaknesses in the study design. The questions remain indeterminate, despite the expenditure of over 600 million dollars on the study.

Instead of a large prospective controlled study such as the Women's Health Initiative, dietary guidance can safely be based on data drawn from a combination of basic, animal, and human studies of nutrients. In fact, basic and clinical nutritional research investigates common mechanisms such as oxidant stress, metabolic stress, and inflammation, since these mechanisms have been found to be a common etiologic factor in diseases as diverse as heart disease, common forms of cancer including prostate cancer and breast cancer, and certain forms of erectile dysfunction which were previously thought to be totally separate and independent. For example, both heart disease and erectile dysfunction share common mechanisms involve dysfunction of the microvasculature related to reduced nitric oxide, oxidant stress, and sequelae of local inflammation. The examination of each disease separately using a drug-based model of prospectively randomized controlled studies exclusively  is artificial, and unjustifiably weakens the conclusions that can be drawn about the beneficial effects of pomegranate juice and pomegranate extract. For example, pomegranate juice constituents increase the half-life of nitric oxide. Nitric oxide is involved in both heart health and erectile dysfunction. However, the approach advocated in Dr. Stampfer's report would look separately at the two clinical studies, and would not consider the underlying biology that overlaps both conditions. In my opinion, that is a deficient approach. The study of any condition such as prostate cancer or heart disease has natural limitations due to the underlying biology of the disease, which can make clinical

39

investigations difficult or impossible. But the inability to conduct such studies does not reduce the scientific impact of knowledge about important biological mechanisms of action common to these diseases.

This artificially limited focus on clinical trials did not enable Dr. Stampfer to correctly interpret the findings of the clinical studies he did review in light of the significant biological background for these studies. Clinical studies can enlighten basic investigations, but both types of investigation have their own significant limitations. Dr. Stampfer's assertion that double-blind placebo controlled clinical studies are not only the highest but the only criteria for making public health recommendations about the health benefits of foods is erroneous. Small metabolic studies involving small numbers of people carefully studied have formed the basis of much of the research in clinical nutrition.

## II.    *Scope of Report and Conclusions*

As discussed above, Dr. Stampfer was asked to address questions that are too narrow to evaluate fairly the health benefits of pomegranate juice.

## III.    *Summary of Conclusions*

Dr. Stampfer assumes that the representations he was asked to review by the FTC are absolute, and does not question whether the FTC's description of those representations was accurate. To the extent Dr. Stampfer claims that pomegranate juice and extract have not been proven absolutely effective to treat, prevent, or reduce the risk of heart disease and prostate cancer based solely on evidence from large double-blind placebo-controlled trials, I agree. But the entire body of scientific evidence should be considered when evaluating nutritional science.

In my expert opinion, there is credible scientific evidence that pomegranate juice and pomegranate extracts have significant health benefits for human cardiovascular systems, including: 1) decreases in arterial plaque; 2) lowering of blood pressure; and 3) improvement of cardiac blood flow, based on the biological mechanism of prolonging the half-life of nitric oxide

40

in the vasculature. In my expert opinion, there is also credible scientific evidence that pomegranate juice and pomegranate extracts will have the following effects on prostate biology relevant to reducing the risk of prostate cancer : 1) inhibition of excess inflammation, which is a hallmark of prostate tumor growth based on studies of androgen-dependent and androgen-independent human tumors in immunodeficient mice drinking pomegranate extract in their drinking water; and 2) prolongation of PSADT, a significant clinical parameter of the progression of prostate cancer in patients who have undergone treatment in two separate human studies. The target protein Nuclear Factor-kappa B mediates many of the inflammatory effects in prostate tissue and prostate tumor cells, and there is evidence that pomegranate extract inhibits activation of this key inflammatory pathway, while also inhibiting the expression of genes mediating the synthesis of hormones.

## IV.    Overview of Study Design and Antioxidant Theory

Dr. Stampfer expresses the view that an understanding of "basic epidemiologic study design" is necessary. I disagree. There is an absence of epidemiological data on pomegranate consumption in the U.S., because this is a specialty fruit that is not yet widely consumed by the American public despite its strong history of consumption as a health food in many different cultures throughout history.

### A.    Study Design

I view Dr. Stampfer's description of study design as seriously flawed. The assumption that preclinical research in cells and animals provides no useful information because "it is possible that the results of such studies do not correspond to what would occur in humans" is not strictly true. For example, after the ATBC intervention trial, there was an unexpected finding of increased risk of lung cancer in smokers. Carefully controlled studies were subsequently conducted in ferrets exposed to cigarette smoke who were given either a low or high dose of beta carotene on squamous metaplasia in the lungs, a precancerous lesion. At high doses beta carotene was harmful whereas at lower doses it did not have the same effects (van Helden YG, Keijer J,

41

**In the Matter of: POM Wonderful, et al.**

April 6, 2011

Deposition Transcript of Meir Stampfer, M.D.

<u>List of Deposition Transcript Excerpts</u>

pp. 1-4, 73

```
1               Federal Trade Commission

2                      I N D E X

3

4

5   Witness      Direct Cross Redirect Recross
    Dr. Stampfer    4
6

7

8   Exhibits            Description           Page

9
    Ex. 1  Report of Dr. Stampfer          5
10  Ex. 2  Report of Dr. Heber             185

11

12

13

14

15

16

17

18

19

20

21

22
```

PX0362-0001

2

POM Wonderful            Stampfer, M.D.            4/6/2011

```
1                 IN THE UNITED STATES OF AMERICA

2                 FEDERAL TRADE COMMISSION

3                     Docket 9344

4
     In the Matter of POM WONDERFUL, LLC,
5    and ROLL INTERNATIONAL CORP COMPANIES,

6    and

7    STEWART A. RESNICK, LYNDA RAE RESNICK,
     MATTHEW TUPPER, Individually and as
8    OFFICERS OF THE COMPANIES,

9

10
                     Wednesday, April 6, 2011
11                   181 Longwood Avenue
                     Channing Laboratores
12                   Boston, MA 9:13 a.m.

13
           The testimony of Dr. Meir Stampfer, taken
14   in regard to the above-entitled matter, pursuant to
     notice, commenced at 9:13 a.m.
15

16

17

18

19

20

21

22
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**JA-1189**

PX0362-0002

3

POM Wonderful                  Stampfer, M.D.                  4/6/2011

```
 1        APPEARANCES:

 2
          ON BEHALF OF THE FEDERAL TRADE COMMISSION:
 3        JANET M. EVANS, ESQ., Federal Trade Commission,
          Division of Advertising Practices, 601 New Jersey
 4        Avenue, NW, Room 3213, Washington DC, 20580.

 5
          ON BEHALF OF ROLL INTERNATIONAL CORP COMPANIES:
 6        DANIEL A. BECK and CHRISTINE K. SON, ESQS, OF Roll
          Law Group, PC, 11444 W. Olympic Blvd., Los Angeles
 7        CA 90064.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX0362-0003

4

POM Wonderful               Stampfer, M.D.                  4/6/2011

```
 1                  P R O C E E D I N G S
 2                  MEIR STAMPFER, M.D., a witness called
 3      for examination, having been satisfactorily
 4      identified and duly sworn by me, a Notary Public in
 5      the Commonwealth of Massachusetts, was examined and
 6      testified as follows:
 7                       Direct Examination
 8        Q.   (By Mr. Beck) Good morning, Doctor
 9      Stampfer.
10        A.   Good morning.
11        Q.   Can you please say and spell your name for
12      the record?
13        A.   First name it Meir, M E I R, last name is
14      Stampfer, S T A M P F E R.
15        Q.   You currently hold a variety of teaching
16      appointments?
17        A.   Yes.
18        Q.   Most of your teaching is done at the
19      Harvard Public School of Health?
20        A.   Correct.
21        Q.   At that school you co-direct the course on
22      the practice of epidemiology?
```

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX0362-0004

POM Wonderful                Stampfer, M.D.                4/6/2011

1    and in conjunction with other evidence.  And a good

2    example of that is cigarette smoking where there is

3    no randomized trial data showing that it causes lung

4    cancer and yet I and others accept this as a causal

5    relation.

6        Q.   And similar to animal research there are

7    also types of causality that can be assessed with

8    observational studies that are so obvious or so

9    clear that you don't necessarily require a

10   controlled trial to determine that causality has

11   been confirmed?

12       A.   I wouldn't say it's types of causality, but

13   yes, there are situations where you would determine

14   causality in the absence of a randomized trial.

15       Q.   To use the example of throwing a monkey off

16   the building, you can reasonably determine that is

17   the cause of its death?

18       A.   Yes.

19       Q.   And you don't need a control group?

20       A.   Exactly.

21       Q.   So it depends again upon whether there is a

22   reasonable doubt in the context of the particular

PX0362-0073

# In the Matter of: POM Wonderful, et al.

April 12, 2011

Deposition Transcript of Frank M. Sacks, M.D.

List of Deposition Transcript Excerpts

pp. 1-4, 208-2011, 221-223

| 1 | Notice of Deposition | 6 |
| 2 | Expert report of Dr. Sacks | 9 |
| 3 | Curriculum Vitae | 20 |
| 4 | study | 150 |
| 5 | Study | 153 |
| 6 | Study | 165 |
| 7 | Study | 169 |
| 8 | Sumner/Ornish Study | 177 |
| 9 | Beverage Study I Protocol | 181 |
| 10 | Expert Report of Dr. Ornish | 187 |
| 11 | Beverage Study | 205 |
| 12 | Email | 206 |
| 13 | Davidson study | 211 |
| 14 | study | 229 |
| 15 | protocol 06-0704 Denver study | 233 |
| 16 | Preliminary Data Analysis | 233 |
| 17 | Protocol summary | 238 |
| 18 | POM protocol study | 238 |
| 19 | Safety and Antioxidant Activity | 244 |
| 20 | Study | 250 |
| 21 | Study | 250 |
| 22 | Study | 250 |
| 23 | Expert report of Dr. Heber | 257 |

PX0361-0001

POM Wonderful                Sacks, M.D.                4/12/2011

2

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX0361-0002

2

POM Wonderful                    Sacks, M.D.                    4/12/2011

IN THE UNITED STATES OF AMERICA
BEFORE THE FEDERAL TRADE COMMISSION

In the Matter of:

POM WONDERFUL, LLC,                    )
and ROLL INTERNATIONAL CORP            )
COMPANIES,                             ) Docket No. 9344
        and                            )
STEWART A. RESNICK, LYNDA RAE          )
RESNICK, MATTHEW TUPPER,               )
Individually and as OFFICERS           )
OF THE COMPANIES                       )

Tuesday, April 12, 2011
Bingham McCutchen LLP
One Federal Street
Boston, MA

The testimony of Dr. Sacks, taken in regard
to the above-entitled matter, pursuant to notice,
commenced at 9:00 a.m.

For The Record, Inc.

(301) 870-8025 - www.ftrinc.net - (800) 921-5555

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX0361-0003

3

POM Wonderful                Sacks, M.D.                4/12/2011

                APPEARANCES:

                ON BEHALF OF THE FEDERAL TRADE COMMISSION:

                JANET M. EVANS, ESQ.
                Federal Trade Commission
                Division of Advertising Practices
                601 New Jersey Avenue, NW, Room 3213
                Washington, DC  20580

                ON BEHALF OF ROLL INTERNATIONAL CORP COMPANIES:

                JOHNNY TRABOULSI, ESQ.
                ALICIA D. MEW, ESQ.
                Roll Law Group, PC
                11444 W. Olympic Boulevard
                Los Angeles, CA  90064

                        For The Record, Inc.

            (301) 870-8025 - www.ftrinc.net - (800) 921-5555

POM Wonderful                Sacks, M.D.                4/12/2011

```
 1                    FRANK M. SACKS, M.D. having been

 2       satisfactorily identified and duly sworn by me, a

 3       Notary Public in the Commonwealth of Massachusetts,

 4       was examined and testified as follows:

 5                         Direct Examination

 6            Q.   (By Mr. Traboulsi) Good morning,

 7       Doctor Sacks, my name is John Traboulsi.  I'm

 8       counsel at Roll Law Group, and I'm joined by my

 9       colleague Alicia Mew, and we're representing

10       respondents in this action.  Could you please state

11       your full name for the record?

12            A.   Frank M. Sacks.

13            Q.   Are you being represented at this

14       deposition by counsel?

15            A.   Yes.

16            Q.   And have you ever had your deposition taken

17       before?

18            A.   Yes.

19            Q.   Approximately how many times?

20            A.   Recently twice.  And I'll have to think way

21       back.  It's been a long time since.  Yes.  Then

22       there was a case I think in 1980 or '81.  Medical
```

PX0361-0005

208

POM Wonderful                Sacks, M.D.                4/12/2011

1       problem.  It was the measurements were read in a

2       good place, Howard Otis Center, so I would assume

3       that CIMT the outcome variable was measured well.

4       I'm just looking to refresh my memory on the number

5       of subjects who had finished.

6           Q.  I believe you referred to some of that

7       information in paragraph 45 in your expert report.

8           A.  So I have according to the final date

9       report 73 patients were actually enrolled in the

10      study.  Is this a study where he originally wanted

11      to enroll 200 and didn't get funding for that or the

12      funding was pulled and then he had to go to 50 and

13      because he felt he needed more patients he went up

14      to 73.  I'm remembering from his deposition.  Here

15      it goes.  Item 46 noting he expected to enroll 200

16      subjects and lost the funding, et cetera.  Well I

17      think he had the right idea to begin with to do 200

18      patients because that is usually what these studies

19      need.

20          Q.  Doctor Sacks, if you want to finish.

21          A.  No.  So unfortunately he ended up with a

22      study that was underpowered.  So that's just

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX0361-0209

209

POM Wonderful                Sacks, M.D.                4/12/2011

1    unfortunate.

2         Q.   Is it your opinion that the BEV II study

3    did not show effect on the carotid artery?

4         A.   Correct.

5         Q.   And that's because the study was

6    underpowered?

7         A.   No, no.  That's not true at all.  I mean we

8    have no idea if that's true.  It just didn't show an

9    effect.  Now we don't know whether, we don't know if

10   it would have an effect with a larger number of

11   subjects.  We don't know.

12        Q.   Do you agree that 56 participants who

13   completed 1 year of testing experienced improvements

14   in the CIMT?

15        A.   I would have to find where that is, but I

16   don't know if I agree with that.  Looking at the

17   results as stated in the Exhibit 12.  I don't see

18   that results.  My recollection of this, this is not

19   the only thing I've reviewed.  There are other

20   documents on the BEV II results, but my recollection

21   of the BEV II study was it showed no effect on CIMT.

22        Q.   Do you know, Doctor Sacks, that if the

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX0361-0210

POM Wonderful            Sacks, M.D.            4/12/2011

1     sample size had consisted of 200 subjects whether

2     statistical significance would have been achieved?

3                  MS. EVANS:  Asked and answered.

4          A.   I'm sorry.

5          Q.   Go ahead.

6          A.   Well, we don't know whether it would have

7     been.  I mean we can't assume that a nonsignificant

8     p value would become significant if the study was

9     enlarged because a nonsignificant p value in the

10    small sample might mean that there is just simply no

11    effect.  Might be a correct answer.

12         Q.   Is it possible that there are or there

13    would be statistically significant differences but

14    the sample size was not large enough to detect the

15    difference?

16         A.   It's certainly possible.

17         Q.   Do you have any other criticisms regarding

18    the BEV II study that are not contained in your

19    expert report of which we've not discussed?

20                  MS. EVANS:  Actually hold on one

21    second.  I object to the characterization of

22    problems with the BEV II study because I think

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

JA-1201

PX0361-0211

1    that's inconsistent with his prior testimony.

2        Q.   Do you understand what I mean by problem?

3        A.   No.  If you could restate it.

4        Q.   Do you have any expert testimony regarding

5    the BEV II study that is not contained here in your

6    expert report?

7        A.   Well, this is discussed a lot and Doctor

8    Ornish discussed this a lot in his deposition.  And

9    as I say, I haven't really, I haven't provided any

10   rebuttal on the expert report.  No.  He talked about

11   this in the expert report and I haven't been

12   provided rebuttal.  So I'm just saying, I stand by

13   what I said certainly here.  But if I work through

14   his expert report I might want to emphasize some

15   additional things.

16            MR. TRABOULSI:  Let's mark as

17   Exhibit 13.

18            (Exhibit No. 13 Davidson

19            study was marked for

20            Identification.)

21       Q.   Doctor Sacks, did you review Exhibit 13 in

22   connection with preparation of your expert report?

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX0361-0212

221

POM Wonderful                 Sacks, M.D.                 4/12/2011

1        Q.    And what is your opinion, Doctor Sacks, on

2    the post hoc analysis that was conducted?

3        A.    Well it's certainly fine to conduct a post

4    hoc analysis of some groups.  That I just completely

5    agree with Doctor Davidson that Davidson's

6    conclusions, he did the analysis.  It's absolutely

7    fine to do it.  And he considered the results sort

8    of exploratory, and he forthrightly stated and gave

9    credence to limitations, which in paragraph 53 that

10   you called my attention to at the last sentence it

11   has a quote.  So you know, Doctor Davidson clearly

12   wasn't terribly impressed with those subgroup

13   analyses, and he very appropriately put it in proper

14   context.

15       Q.    Doctor Sacks, don't most studies sort of

16   have that qualifier language toward the end that

17   further study is warranted?  Isn't that pretty

18   common in the scientific community?

19       A.    I mean this particular sentence, no.  It's

20   not sort of one of those standard throw-way lines.

21   No this is a very specific criticism of his, of the

22   subgroup analysis of his study.

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

JA-1203

PX0361-0222

222
POM Wonderful              Sacks, M.D.              4/12/2011

1       Q.   So do you believe that this post hoc

2   analysis has any important health implications?

3              MS. EVANS:  Objection.  Vague and

4   ambiguous.

5       A.   Well, I mean what I think is the subgroup

6   analysis is just what Doctor Davidson said.  It's a

7   worthwhile hypothesis generating analysis that needs

8   to be tested in a future study, before I would say

9   it has any health implications.

10      Q.   So your opinion is that a post hoc analysis

11  can never provide beneficial information?

12             MS. EVANS:  Objection.

13  Mischaracterizes his testimony.

14      A.   I don't agree with that.  Post hoc analysis

15  is worthwhile doing and I said that several times

16  recently.  So it's worthwhile doing but it needs to

17  be understood, its limitations need to be

18  understood.

19      Q.   Did you ever conduct a post hoc analysis in

20  any of your studies?

21      A.   Yes.

22      Q.   And why would you undertake such an

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

JA-1204

PX0361-0223

POM Wonderful                Sacks, M.D.                4/12/2011

1        analysis?

2             A.    Well probably for the same reason that

3        Doctor Davidson did.  We're interested in trying to

4        get some understanding of whether the treatment

5        affects all of the different patient groups or

6        subgroups in the study.  For example we want to know

7        whether a treatment works in women.  Women compared

8        to men, with blacks compared to whites, with older

9        compared to younger.  We like to get some idea, and

10       if there is evidence of nonuniformity we want to

11       look at that in future studies or go into the

12       literature and see whether there is a prior

13       precedent for it to try to interpret it.

14            Q.    Doctor Sacks, paragraph 52 you state at the

15       end of the last sentence, "there also were no

16       statistically significant changes in the measured

17       indicators of inflammation and oxidative stress or

18       in fasting lipoproteins lipids or blood pressure,"

19       is that right?

20            A.    Correct.

21            Q.    Does the absence, see how I can phrase

22       this.  Would the absence of any positive sort of

For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

PX0361-0224

## In the Matter of: POM Wonderful, et al.

May 24 - October 12, 2011

Public Record Vol. 1 - 17

List of Hearing Transcript Excerpts

Vol. 1 (May 24, 2011)
pp. 1-4, 65-72

Vol. 6 (June 7, 2011)
pp. 683- 686, 703-710, 715-722, 807-822, 827-834

Vol. 7 (June 8, 2011)
pp. 946-949, 1138-1161

Vol. 8 (June 9, 2011)
pp. 1200-1203, 1260-1263, 1324-1335

Vol. 9 (June 13, 2011)
pp. 1406-1409, 1414-1421, 1546-1549, 1558-1565, 1578-1581, 1606-1609, 1614-1617

Vol. 11 (August 30, 2011)
pp. 1796-1803, 1812-1823, 1948-1951, 1972-1987

Vol. 12 (August 31, 2011)
pp. 2062-2065, 2142-2149, 2178-2181, 2194-2213

Vol. 13 (September 1, 2011)
pp. 2236-2239, 2256-2259, 2264-2275, 2312-2331, 2352-2355, 2380-2383, 2456-2459

Vol. 14 (September 2, 2011)
pp. 2472-2475, 2596-2603, 2608-2619

Vol. 17 (October 12, 2011)
pp. 2968-2979, 2996-2999, 3060-3063

# In the Matter of:

# POM Wonderful, et al.

*May 24, 2011*
*Public Record*
*Vol. 1*

**Condensed Transcript with Word Index**



**For The Record, Inc.**
**(301) 870-8025 - www.ftrinc.net - (800) 921-5555**

1

```
1                    FEDERAL TRADE COMMISSION
2                         I N D E X
3                   IN RE POM WONDERFUL, ET AL.
4                        TRIAL VOLUME 1
5                        PUBLIC RECORD
6                        MAY 24, 2011
7
8     WITNESS:      DIRECT   CROSS   REDIRECT   RECROSS   VOIR
9     L. RESNICK          72
10
11
12    EXHIBITS   FOR ID  IN EVID  IN CAMERA  STRICKEN/REJECTED
13    CX
14    (none)
15
16    RX
17    (none)
18
19    JX
20    Number1              125
21    Number2                7
22
23    DX
24    (none)
25
```

3

APPEARANCES:

ON BEHALF OF THE FEDERAL TRADE COMMISSION:
    SERENA VISWANATHAN, ESQ.
    DEVIN WILLIS DOMOND, ESQ.
    HEATHER HIPPSLEY, ESQ.
    MARY L. JOHNSON, ESQ.
    Federal Trade Commission
    Bureau of Consumer Protection
    601 New Jersey Avenue, N.W.
    Washington, D.C.  20001
    (202) 326-6244
    sviswanathan@ftc.gov

ON BEHALF OF THE RESPONDENTS:
    JOHN D. GRAUBERT, ESQ.
    SKYE LYNN PERRYMAN, ESQ.
    Covington & Burling LLP
    1201 Pennsylvania Avenue, N.W.
    Washington, D.C.  20004-2401
    (202) 662-5938
    jgraubert@cov.com

2

```
1               UNITED STATES OF AMERICA
2          BEFORE THE FEDERAL TRADE COMMISSION
3
4     In the Matter of              )
                                    )
5     POM WONDERFUL LLC and         )
      ROLL GLOBAL LLC,              )
6     as successor in interest to   )
      Roll International Corporation,)
7     companies, and                ) Docket No. 9344
      STEWART A. RESNICK,           )
8     LYNDA RAE RESNICK, and        )
      MATTHEW TUPPER, individually  )
9     and as officers of the        )
      companies.                    )
10                                  )
      ------------------------------)
11
12              Tuesday, May 24, 2011
13                  10:03 a.m.
14              TRIAL VOLUME 1
15              PUBLIC RECORD
16
17
18    BEFORE THE HONORABLE D. MICHAEL CHAPPELL
19              Administrative Law Judge
20              Federal Trade Commission
21            600 Pennsylvania Avenue, N.W.
22                 Washington, D.C.
23
24
25       Reported by:  Josett F. Whalen, RMR-CRR
```

4

APPEARANCES:  (continued)

ON BEHALF OF THE RESPONDENTS:
    BERTRAM FIELDS, ESQ.
    Greenberg Glusker
    1900 Avenue of the Stars
    21st Floor
    Los Angeles, California  90067
    (310) 201-7454
        -and-
    KRISTINA M. DIAZ, ESQ.
    BROOKE HAMMOND, ESQ.
    JOHNNY TRABOULSI, ESQ.
    Roll Law Group P.C.
    11444 West Olympic Boulevard
    10th Floor
    Los Angeles, California  90064
    (310) 966-8775
    kdiaz@roll.com

ALSO PRESENT:
    VICTORIA ARTHAUD, ESQ.
    HILLARY SLOANE GEBLER, ESQ.

1 (Pages 1 to 4)

65

1    indicating that the marketing did not match the science.
2         We'll show that respondents, as you have just
3    seen in their science summary, had a keen understanding
4    of the level of science required to make disease
5    treatment and reduction of risk claims.
6         The respondents' awareness of the necessary
7    level of evidence and their continued disregard for
8    these standards is evident.
9         Respondents' health claims for POM juice have
10   been the subject of two NAD decisions. NAD is the
11   industry's self-regulatory body of the Council of
12   Better Business Bureaus.
13        In 2005, NAD recommended that POM Wonderful
14   modify its claims to avoid misleading consumers into
15   believing that drinking eight ounces of POM juice would
16   prevent arterial plaque buildup in healthy individuals.
17        In 2006, when Welch's Foods filed a claim with
18   NAD challenging POM Wonderful's various disease
19   prevention and treatment claims, again the NAD found
20   that the POM Wonderful studies did not support their
21   claims and again recommended that POM Wonderful modify
22   the claims.
23        However, the respondents' pattern of ignoring
24   these warning signals continued.
25        In May 2008, POM Wonderful sought clearance from

66

1    NBC for a television commercial which included copy
2    stating that POM juice's antioxidants promoted prostate
3    health. They wanted to run that ad. NBC's
4    advertisement reviewer found that POM Wonderful's
5    substantiation failed to meet the network's clinical
6    testing guidelines. NBC considered human studies only
7    for such a claim and noted that the prostate cancer
8    study relied on was neither randomized nor controlled,
9    and the study itself clearly stated that there was a
10   need for further research.
11        We will demonstrate that in May 2008 the
12   UCLA Institutional Review Board for scientific studies
13   conducted there that were sponsored by the respondents
14   expressed concern about respondents' advertising.
15        In response, Mark Dreher, their science
16   director for POM Wonderful, sent a letter along with a
17   copy of the FTC's dietary supplement guidelines to
18   Dr. Pantuck at UCLA, explaining that FDA governs,
19   quote, nondisease structure and function claims, that
20   the FTC oversees advertising claims and that, quote, "As
21   a policy, POM does not make drug-related disease claims
22   associated with treatment, cure, prevention or
23   diagnosis."
24        Despite this representation to UCLA's IRB
25   board, respondents continued their advertising of

67

1    disease treatment and prevention claims.
2         Moreover, regulatory agencies like the FDA and
3    the FTC have expressed concerns.
4         The commission sent its letter alerting the
5    company to concerns about advertising in January of
6    2008. Respondents did not make any attempt to change
7    the advertising.
8         In February 2010, the FDA issued a warning
9    letter to POM Wonderful finding POM made claims
10   involving the cure, mitigation, treatment or prevention
11   of diseases such as prostate cancer, erectile
12   dysfunction and heart disease.
13        In sum, respondents have knowledge of the
14   necessary level of substantiation for the claims they
15   were making, received numerous signals over the years
16   concerning their misleading and unsubstantiated claims
17   for POM juice and POMx, and persisted in discounting the
18   signals and continuing the advertising.
19        And to wrap up the preview of the evidence, I'd
20   like to end once again with two public relations
21   interviews by Mrs. Resnick and Mr. Tupper.
22        (Whereupon, a videotape was played.)
23        MS. HIPPSLEY: This is an interview that was
24   given by Mr. Tupper, the president of POM Wonderful and
25   a respondent.

68

1         JUDGE CHAPPELL: Let's back up to
2    Martha Stewart.
3         MS. HIPPSLEY: I'm sorry?
4         JUDGE CHAPPELL: Back up to Martha Stewart.
5    What was the date of that interview?
6         MS. HIPPSLEY: The Martha Stewart interview was
7    in 2008.
8         JUDGE CHAPPELL: The one you're preparing to
9    show, what was the date of the one you're preparing to
10   show?
11        MS. HIPPSLEY: I'm sorry?
12        JUDGE CHAPPELL: You're preparing to show
13   another video; is that correct?
14        MS. HIPPSLEY: Oh. When did we take the clip?
15        JUDGE CHAPPELL: No.
16        MS. HIPPSLEY: The show was aired in 2008, and
17   it was obtained by the Federal Trade Commission from
18   YouTube, YouTube in '09 I believe.
19        JUDGE CHAPPELL: So it aired in 2008.
20        MS. HIPPSLEY: Correct.
21        JUDGE CHAPPELL: Thank you.
22        MS. HIPPSLEY: And this interview with
23   Matt Tupper aired in 2009 that we're just about to see.
24        (Whereupon, a videotape was played.)
25        MS. HIPPSLEY: And to wrap up, these interviews

17 (Pages 65 to 68)

POM Wonderful, et al.        Record        5/24/2011

USCA Case #13-1060    Document #1483689    Filed: 03/12/2014    Page 262 of 367

69

1 as well as the compelling documentary and testimonial
2 evidence will clearly show that respondents made the
3 challenged claims that POM juice and POMx products
4 treat, prevent or reduce the risk of heart disease,
5 prostate cancer and erectile dysfunction and made claims
6 that they had the science to back up these
7 representations. We'll show that these claims were
8 material to consumers and that they were unsubstantiated
9 and false.
10     Thank you.
11     JUDGE CHAPPELL: So in summary, the government
12 is not saying that respondents are selling snake oil;
13 the government is saying respondents don't have the
14 proper research and studies to back up the claims made
15 about their products.
16     MS. HIPPSLEY: That's right. They don't have
17 the right science, and they don't have the level of
18 science that they themselves told consumers proved the
19 claims.
20     JUDGE CHAPPELL: Okay. Thank you.
21     Respondent, you're reserving your opening until
22 the government rests?
23     MR. FIELDS: Yes, Your Honor, with your
24 permission.
25     JUDGE CHAPPELL: That's fine. Thank you.

70

1     Are you ready to call your first witness?
2     MS. HIPPSLEY: Yes, we could do that, or do you
3 want to -- we'll need to set up our TrialDirector.
4     Do you want to take a lunch break now?
5     JUDGE CHAPPELL: Since it's going to take a
6 while to reconfigure the room, we'll go ahead and take a
7 break.
8     MS. HIPPSLEY: What time would you like us back,
9 Your Honor?
10     JUDGE CHAPPELL: We're going to take our lunch
11 break and reconvene at 1:00 p.m.
12     We're in recess.
13     (Whereupon, at 11:57 a.m., a lunch recess was
14 taken.)
15
16
17
18
19
20
21
22
23
24
25

71

1     A F T E R N O O N  S E S S I O N
2         (1:03 p.m.)
3     JUDGE CHAPPELL: Back on the record Docket 9344.
4     Government, are you ready to call your first
5 witness?
6     MS. HIPPSLEY: Yes, Your Honor.
7     And just to correct the record of the opening,
8 you had asked about the dates of the videos, and I
9 wanted to clarify the dates of those. We checked them
10 over lunch.
11     JUDGE CHAPPELL: Okay.
12     MS. HIPPSLEY: The Lynda Resnick interview with
13 the CBS Morning Show, which was the first video shown,
14 was in February 2009.
15     The interview on The Martha Stewart Show was
16 November 2008.
17     And the Fox News interview with Mr. Tupper was
18 in June 2008.
19     JUDGE CHAPPELL: Okay. Thank you.
20     MS. HIPPSLEY: Just so we have those straight.
21     JUDGE CHAPPELL: Where are we on JX 1, the
22 stipulation?
23     MS. VISWANATHAN: I believe we have it ready.
24     MS. HIPPSLEY: Do we have it ready to present?
25     JUDGE CHAPPELL: If not, we can do it after the

72

1 next break.
2     MS. HIPPSLEY: Okay. We'll get it after the
3 next break.
4     JUDGE CHAPPELL: All right.
5     MS. HIPPSLEY: All right.
6     So at this time I would like to call
7 Lynda Resnick to the stand, please.
8     - - - - -
9 Whereupon --
10     LYNDA RAE RESNICK
11 a witness, called for examination, having been first
12 duly sworn, was examined and testified as follows:
13     DIRECT EXAMINATION
14     BY MS. HIPPSLEY:
15     **Q. Good afternoon, Mrs. Resnick.**
16     **Could you please state and spell your full name**
17 **for the record.**
18     A. Certainly. Lynda, L-Y-N-D-A, Rae, R-A-E,
19 Resnick, R-E-S-N-I-C-K.
20     **Q. Thank you.**
21     **Now, Mrs. Resnick, you've described yourself in**
22 **your book Rubies in the Orchard as the marketer in the**
23 **family; is that right?**
24     A. Yes.
25     **Q. And your work for POM Wonderful and**

18 (Pages 69 to 72)

# In the Matter of:

# POM Wonderful, et al.

*June 7, 2011*
*Public Record*
*Trial Volume 6*

**Condensed Transcript with Word Index**



**For The Record, Inc.**
**(301) 870-8025 - www.ftrinc.net - (800) 921-5555**

683

```
 1                 FEDERAL TRADE COMMISSION
 2                      I N D E X
 3                   POM WONDERFUL LLC
 4                   TRIAL VOLUME 6
 5                PART 1, PUBLIC RECORD
 6                    JUNE 7, 2011
 7
 8   WITNESS:      DIRECT  CROSS   REDIRECT  RECROSS  VOIR
 9   STAMPFER       689     796      875
10   TUPPER         885
11
12
13   EXHIBITS   FOR ID  IN EVID  IN CAMERA  STRICKEN/REJECTED
14   CX
15   None
16
17   RX
18   Number5007            885
19
20   JX
21   None
22
23   DX
24   None
25
```

684

```
 1            UNITED STATES OF AMERICA
 2         BEFORE THE FEDERAL TRADE COMMISSION
 3
 4   In the Matter of            )
                                 )
 5   POM WONDERFUL LLC and       )
     ROLL GLOBAL LLC,            )
 6   as successor in interest to )
     Roll International Corporation, )
 7   companies, and             ) Docket No. 9344
     STEWART A. RESNICK,         )
 8   LYNDA RAE RESNICK, and      )
     MATTHEW TUPPER, individually )
 9   and as officers of the      )
     companies.                  )
10                               )
     ------------------------------)
11
12          TUESDAY, JUNE 7, 2011
13              9:30 a.m.
14            TRIAL VOLUME 6
15               PART 1
16            PUBLIC RECORD
17
18   BEFORE THE HONORABLE D. MICHAEL CHAPPELL
19          Administrative Law Judge
20          Federal Trade Commission
21        600 Pennsylvania Avenue, N.W.
22             Washington, D.C.
23
24
25   Reported by: Susanne Bergling, RMR-CRR-CLR
```

685

```
 1   APPEARANCES:
 2
 3   ON BEHALF OF THE FEDERAL TRADE COMMISSION:
 4       HEATHER HIPPSLEY, ESQ.
 5       MARY L. JOHNSON, ESQ.
 6       SERENA VISWANATHAN, ESQ.
 7       DEVIN WILLIS DOMOND, ESQ.
 8       JANET M. EVANS, ESQ.
 9       THEODORE H. HOPPOCK, ESQ.
10       Federal Trade Commission
11       Bureau of Consumer Protection
12       601 New Jersey Avenue, N.W.
13       Washington, D.C. 20001
14       (202) 326-3285
15       hhippsley@ftc.gov
16
17   ON BEHALF OF THE RESPONDENTS:
18       JOHN D. GRAUBERT, ESQ.
19       SKYE LYNN PERRYMAN, ESQ.
20       Covington & Burling LLP
21       1201 Pennsylvania Avenue, N.W.
22       Washington, D.C. 20004-2401
23       (202) 662-5938
24       jgraubert@cov.com
25
```

686

```
 1   APPEARANCES:  (continued)
 2
 3   ON BEHALF OF THE RESPONDENTS:
 4       BERTRAM FIELDS, ESQ.
 5       Greenberg Glusker
 6       1900 Avenue of the Stars
 7       21st Floor
 8       Los Angeles, California 90067
 9       (310) 201-7454
10           -and-
11       KRISTINA M. DIAZ, ESQ.
12       BROOKE HAMMOND, ESQ.
13       JOHNNY TRABOULSI, ESQ.
14       Roll Law Group P.C.
15       11444 West Olympic Boulevard
16       10th Floor
17       Los Angeles, California 90064
18       (310) 966-8775
19       kdiaz@roll.com
20
21   ALSO PRESENT:
22       Hillary Sloane Gebler, Attorney Advisor
23
24
25
```

1 (Pages 683 to 686)

703

1    Q. Okay. And do you also belong to any
2    professional organizations or societies relating to
3    cardiovascular disease?
4    A. Yes. As I mentioned, the American Heart
5    Association and the International Society and Federation
6    of Cardiology.
7    Q. And some of the organizations you belong to
8    relate to cancer?
9    A. Yes.
10   Q. Now, have you consulted for the Government
11   during your career?
12   A. I have.
13   Q. And can you give me some examples?
14   A. The -- the biggest one in terms of time and
15   energy was my service on the U.S. Dietary Guidelines, to
16   revise the 2000 guidelines.
17   Q. And that was looking at the overall nutritional
18   recommendations contained in the 2000 Dietary -- that
19   ultimately were contained in the 2000 Dietary Guidelines
20   when they were issued?
21   A. Yes.
22   Q. And who publishes the dietary guidelines?
23   A. It's joint between HHS and the Department of
24   Agriculture.
25   Q. Thank you.

704

1        In light of your education, training, and
2    experience, do you believe yourself to be qualified as
3    an expert in epidemiology?
4    A. I do.
5    Q. And in light of your education, training, and
6    experience, do you consider yourself to be qualified as
7    an expert in nutrition, including its relationship to
8    the prevention and treatment of cardiovascular disease
9    and prostate cancer?
10   A. Yes.
11   Q. And in light of your education, training, and
12   experience, do you consider yourself to be qualified as
13   an expert in clinical testing related to the prevention
14   and treatment of cardiovascular disease and prostate
15   cancer?
16   A. Yes. Sorry.
17       MS. EVANS: Now, based on Dr. Stampfer's
18   education, extensive training, and experience, Complaint
19   Counsel moves for Dr. Stampfer to be accepted as an
20   expert in epidemiology, nutrition, including its
21   relation to the prevention and treatment of
22   cardiovascular disease, and prostate cancer, and the
23   clinical testing relating to the progression of
24   cardiovascular disease and prostate cancer.
25       MR. FIELDS: No objection, Your Honor.

705

1        JUDGE CHAPPELL: To the extent any opinions
2    offered meet the proper legal standards, those opinions
3    will be considered.
4        MS. EVANS: Thank you.
5        BY MS. EVANS:
6    Q. Dr. Stampfer, on the table before you is a
7    document that's marked as CX 1293.
8    A. Yes.
9    Q. Can you identify this document?
10   A. Yes. This is my expert report.
11   Q. Does this document summarize the opinions that
12   you have provided in connection with this matter?
13   A. Yes.
14   Q. Now, does your testimony in this matter relate,
15   in part, to cardiovascular disease?
16   A. Yes.
17   Q. Can you briefly tell us what cardiovascular
18   disease is?
19   A. In a broad sense, it's -- it relates to all of
20   the diseases of the heart and blood vessels.
21   Q. Is coronary heart disease an aspect of
22   cardiovascular disease?
23   A. That's a big subset, yes.
24   Q. And what about -- what other conditions are
25   encompassed within that concept of cardiovascular

706

1    disease?
2    A. Well, in addition to coronary disease itself,
3    cardiovascular disease also includes other forms of
4    heart disease and other forms of vascular disease.
5    Q. Would stroke be included as a form of vascular
6    disease?
7    A. Yes.
8    Q. Now, does your testimony in this matter relate,
9    in part, to prostate cancer?
10   A. Yes.
11   Q. And can you tell us what prostate cancer is?
12   A. It's a malignant tumor that arises in the
13   prostate gland.
14   Q. Now, based on your experience, do you have an
15   opinion with regard to what kind of evidence is needed
16   to support a claim that a product, like pomegranate
17   juice or pomegranate extract, prevents, reduces the risk
18   of, or treats cardiovascular disease or prostate cancer?
19   A. Yes.
20   Q. And what is that opinion?
21   A. To support a claim for a product like that, you
22   need randomized trial data.
23   Q. Now, I would like to turn to page 9 -- I would
24   like you to turn to page 9 of your report. And if you
25   could bring up page 9 of the report.

6 (Pages 703 to 706)

707

1       On page 9, you say (as read), "The best evidence
2   of a causal relationship between a nutrient or drug and
3   a disease outcome in humans is a randomized,
4   double-blind, placebo-controlled trial."
5       Do you see that paragraph?
6       A.  Yes.
7       Q.  I'd like to ask you some questions about that
8   sentence.  Now, is a clinical trial also known among
9   researchers as a randomized clinical trial?
10      A.  Sometimes people perform clinical trials that
11  are not randomized, but they -- they shouldn't be.
12      Q.  Does a clinical trial usually involve two or
13  more groups of subjects?
14      A.  Yes.
15      Q.  Is one of these called the treatment group or
16  the intervention group?
17      A.  Typically.
18      Q.  Okay.  And is the other one typically called the
19  control group or the placebo group?
20      A.  Yes.
21      Q.  Now, how are subjects in a randomized clinical
22  trial assigned to one group or another?
23      A.  If it's randomized, the mechanism for
24  randomization nowadays would be a computer program for
25  randomization; or they could do a coin toss or a sealed

708

1   envelope.  There are various methods.
2       Q.  And in that sentence I quoted, what do you mean
3   by "placebo-controlled"?
4       A.  Placebo is an alternative form that doesn't
5   contain the active intervention.  So, if it's a study of
6   a pill, the placebo would be a pill that looks and seems
7   like the real intervention, but does not contain the
8   active ingredient.
9       Q.  Is it the norm to use a placebo in a clinical
10  trial?
11      A.  It's the norm, when possible.
12      Q.  And what's the purpose of the placebo?
13      A.  The purpose is to be sure, to the extent that
14  it's possible, that individuals don't know if they're
15  taking the active agent or -- or the -- or they're in
16  the control group.  So, they approach the trial with the
17  same mind-set and the same behavior.
18      Q.  And what do you mean by "double-blind"?
19      A.  Double-blind means that neither the participants
20  nor the investigators know which group assignment is --
21  applies to any given individual.
22      Q.  Now, if the subjects know what arm of a study
23  they're in, can that affect the results of the trial?
24      A.  Yes, that could, because this can alter their
25  behavior in a variety of ways.

709

1       Q.  For example, in a prostate cancer study, if you
2   know you're going to be in the active group, how could
3   that affect your behavior?
4       A.  Well, you could imagine that if you know you're
5   in the active group, you might relax your efforts to
6   reduce risk in other ways; maybe you might think, well,
7   I'm taking the active pill, so I won't bother with my
8   morning exercise.  It's hard to know in advance how that
9   knowledge might affect behavior.
10      Q.  If research -- excuse me.  And if the
11  researchers know what arm of a study they're in -- the
12  patients are in, how can that affect the results of the
13  trial?
14      A.  If the researchers know, then subtle biases can
15  creep in in terms of interpreting the endpoints.  If
16  they're -- if they want to see a positive result from
17  the trial, they might be biased.  So, to avoid that,
18  blinding is often employed.
19      Q.  Now, is there such a thing as a single-blinded
20  study?
21      A.  Yes.  You could have a single blinded study in
22  either direction where either the investigators don't
23  know or the participants don't know.
24      Q.  So, if the subjects are unblinded, is it
25  important that the investigator be blinded?

710

1       A.  If you can, it's a good practice.
2       Q.  Okay.  Now, turning to the bottom of page 9, if
3   you could focus on the paragraph or the sentence that
4   says, "A control group is necessary for the
5   investigators to determine whether the incidence rate of
6   the outcome observed in the treatment group was truly
7   different from what would have been observed had the
8   treatment group not been treated."
9       Do you see that sentence?
10      A.  Yes.
11      Q.  Now, in this sentence, what do you mean by
12  "truly different"?
13      A.  "Truly different" means -- in this sense, you're
14  comparing the -- you want to know if an intervention
15  works.  So, it has to have a -- to be able to say that
16  it works, you have to have an effect that's large enough
17  to be measurable, and that's what truly different refers
18  to.
19      So, that means that the effect has to be large
20  enough that you believe that other causes for the
21  difference are -- are implausible, such as -- such as
22  chance or other explanations.
23      Q.  And in clinical studies, is there an accepted
24  measure of difference?
25      A.  So, the -- in terms of the statistical testing,

7 (Pages 707 to 710)

715

1    Q. All other factors being equal, is a clinical
2    trial with a larger number of patients more persuasive
3    than a clinical trial with a smaller number?
4    A. All things being equal, absolutely. Just like
5    if you're tossing a coin and you've got one heads and
6    one tails, you wouldn't assume that that's a fair coin.
7    You would want to toss it 100 times and see something
8    close to 50/50.
9    Q. Now, does the study have to be large enough that
10   you can be confident that the results are broadly
11   applicable?
12   A. The applicability of the results depends first
13   on the validity. So, you need a large enough study to
14   rule out other explanations for a difference. And then
15   the applicability, once validity is established in
16   some -- in the situation, the group that you studied, is
17   that representative of the entire population?
18   Q. So, when you were talking about that coin toss
19   example, is there a risk that with a small number of
20   subjects, there's an increased possibility for chance
21   results due to unknown factors?
22   A. Yes.
23   Q. Now, is the persuasiveness of a study -- a
24   study's results also -- a clinical study's results also
25   dependent on the length of the study?

716

1    A. It can be. The length has to be appropriate for
2    the biology.
3    Q. Okay. So, does it depend what endpoint is being
4    measured?
5    A. Yes.
6    Q. So, do some things settle into a pattern faster
7    than other things?
8    A. It depends on the endpoint and the biologic
9    mechanism for the intervention.
10   Q. Okay. Now, if a random -- if a clinical trial
11   is randomized, double-blind, and placebo-controlled, and
12   of sufficient size and with sufficient follow-up, with
13   an appropriate dose of the treatment, is it possible to
14   conclude a causal link between the nutrient and the
15   disease under study?
16   A. Yes.
17   Q. Now, what do you mean by "causal"?
18   A. A causal link means a cause-and-effect relation,
19   that the intervention reliably would make a change in --
20   when given, that would not have otherwise occurred.
21   Q. Okay. So, it's a but-for relationship?
22   A. Yes.
23   Q. Okay. Now, can you give me examples of when it
24   would be appropriate to conclude that a study not
25   meeting the description we just -- I just provided --

717

1    that is, double-blind, randomized, placebo-controlled,
2    sufficient size, sufficient follow-up -- when would it
3    be appropriate to conclude that a study not meeting this
4    description -- excuse me -- can nonetheless demonstrate
5    a causal link between a nutrient and a disease?
6    A. There are many things we know with a high degree
7    of confidence that are not based on randomized trial
8    data, and the characteristics of those situations are
9    when the effect is very large and very uniform.
10   So, for example, you could -- you can have men
11   with scurvy, and you give them vitamin C, and the scurvy
12   will be treated, completely, and a cause-and-effect
13   relation there could be strongly supported by that kind
14   of observation.
15   Q. So, this applies to deficiency illnesses?
16   A. Either deficiency illnesses, or another example
17   not from nutrition would be, say, smoking and lung
18   cancer, where the effect is huge, and it's inconceivable
19   that any other explanation, apart from a causal
20   explanation, would be tenable.
21   Q. And in observational studies of the risk of lung
22   cancer in smokers, how much higher is their risk of lung
23   cancer than among nonsmokers?
24   A. For a heavy smoker, it would be 20-fold or more.
25   Q. Okay. Now, in contrast, when you're looking at

718

1    an outcome that often occurs in the presence or in the
2    absence of an intervention, and what you're looking for
3    is the level of that effect, then do you need more
4    evidence to come to a causal inference?
5    A. Yes. Those situations are more difficult, so
6    you need stronger evidence to --
7    Q. So, is this why you believe that randomized,
8    double-blind, placebo-controlled studies are needed to
9    show that products such as POM Juice, POMx Pills and
10   POMx Liquid can prevent, reduce the likelihood, or treat
11   cardiovascular disease and prostate cancer?
12   A. Yes.
13   Q. Now, do you believe that most scientists in the
14   field of clinical trials, epidemiology, and the
15   prevention of cardiovascular disease and prostate cancer
16   would agree that this is the evidence that is required
17   for products like these?
18   A. Yes.
19   Q. And why do you believe this?
20   A. This is -- this is what we teach in medical
21   school and schools of public health. This is what we
22   write about in journals. This is common -- common
23   practice, common judgment.
24   Q. Now, I'd like you to turn to your expert report
25   at page 8.

9 (Pages 715 to 718)

719

1    A.  Yes.
2        Q.  On that page, you discuss four different types
3    of study designs that are used to examine the
4    relationship between nutrition and health, correct?
5        A.  Yes.
6        Q.  Is one of these -- we just talked about the
7    clinical trial.  Can you tell me what an observational
8    study is?
9        A.  Observational studies are studies in humans
10    where investigators measure the exposure and ascertain
11    the outcome, but they don't assign the exposure.  So,
12    that's the difference between an observational study and
13    a trial.
14        Q.  So, in an observational study, for example,
15    could you, like, look at a group of people and say these
16    people have low vitamin C and these people have high
17    vitamin C and let's see what happens next?
18        A.  Yes.
19        Q.  Okay.  So, are there a couple of different ways
20    that observational studies can be set up to evaluate
21    potential relationships between diets or other factors
22    and disease?
23        A.  Yes.
24        Q.  Is one of these a case control study?
25        A.  Yes.

720

1        Q.  Can you describe a case control study?
2        A.  A case control study is a study where you start
3    with the disease, and so you identify individuals who
4    have the disease, and then you identify individuals,
5    appropriate individuals, who don't have the disease.
6    And then you go -- you ascertain their previous exposure
7    from the past.  If you're studying diet, you ask them,
8    "Well, what did you used to eat before the diagnosis of
9    the disease?"  And you compare that to the people
10    without disease to look at differences.
11        Q.  Okay.  And what are cohort studies?
12        A.  Cohort studies take the opposite approach.  They
13    start with individuals before the occurrence of disease,
14    so they ascertain, say, diet at some point in time, and
15    then follow the people forward to see who gets sick and
16    who doesn't and draw inferences based on their exposure.
17        Q.  Okay.  Now, can you generally conclude from an
18    observational study that there is a causal relationship
19    between nutrient intake and a health outcome?
20        A.  Not -- no.  You -- typically, it would not be
21    sufficient to, on its own, to draw a causal conclusion.
22        Q.  Is there a risk of any unidentified
23    biases in observational studies?
24        A.  Yes.  For example, say, in studies of diet, we
25    might say we studied broccoli, and the risk of prostate

721

1    cancer in people who eat broccoli often differ in other
2    respects from people who eat it seldom.  And sometimes
3    we can measure these differences and adjust for them,
4    but you're always concerned that there are differences
5    that we cannot adjust for, and so this would be
6    confounding.  So, that's the kind of issue that gives
7    people some hesitation about drawing a firm causal
8    conclusion.
9        Q.  And is there a risk of inadequate control
10    confounding?
11        A.  Yes.  That's exactly what that is.
12        Q.  Okay.  Now, for example, did it used to be
13    believed that coffee was a risk factor for heart
14    disease?
15        A.  Yes.  And this is a good example of confounding.
16    Many studies found that people who drank coffee heavily
17    had a higher risk of heart disease and were wondering
18    whether that was a causal relation, but as it happens,
19    in many populations, heavy coffee drinking goes along
20    with smoking.
21        And once -- once smoking was adjusted for, then
22    it was revealed that actually coffee is not related to
23    or does not -- has no adverse effect for risk of heart
24    disease.  That's an example of confounding where we were
25    able to adjust for the confounding factor.

722

1        Q.  Now, you said that an observational study
2    generally can't prove a causal relationship, but at the
3    same time, can a good observational study be better than
4    a poorly conducted randomized, controlled trial?
5        A.  Oh, yes.
6        Q.  But is a good randomized control trial better
7    than an good observational study?
8        A.  Yes.
9        Q.  Now, are there observational studies on
10    pomegranate juice?
11        A.  I'm not aware of any.
12        Q.  Okay.  Why is this?
13        A.  Well, the consumption of -- we study diet in
14    our cohorts, and consumption of pomegranate juice is
15    relatively infrequent compared to other fruit items.
16    So, there's just not enough out there to -- to -- to be
17    able to study a population cohort.
18        Q.  Okay.  Now, another kind of study that you
19    mention on page 8 of your report is animal studies.  How
20    are animal studies used to examine the relationship
21    between nutrients and disease?
22        A.  Animal studies can be very important to help
23    learn about the biology, learn about the metabolism,
24    biological pathways for the impact of a nutrient.
25    Obviously, you can control the animal situation fully in

10 (Pages 719 to 722)

807

1    A.  They were not presentations to the company.
2  They -- but the company organized them.
3    Q.  Okay.  And they paid your expenses, the
4  Anheuser-Busch people, right?
5    A.  Pardon?
6    Q.  They paid your expenses?
7    A.  Yes.
8    Q.  Okay.  Now, you felt that when you made these
9  statements about moderate alcohol consumption, the
10  causal link between moderate alcohol consumption and
11  these various diseases that you said had a reduced risk
12  had not been firmly established.  Isn't that correct?
13    A.  Yes.
14    Q.  You were relying strictly on observational
15  studies; you didn't have RCTs to back that up.
16    A.  Not for clinical endpoints.
17    Q.  I'm sorry?
18    A.  Not for clinical endpoints.
19    Q.  Okay.
20    JUDGE CHAPPELL:  Hold on.  Hold on a second.
21    Let's go back to these presentations.  You said
22  you received no money?
23    THE WITNESS:  Yes.
24    JUDGE CHAPPELL:  They were arranged and
25  everything was paid for by Anheuser-Busch?

808

1    THE WITNESS:  Yes.
2    JUDGE CHAPPELL:  At the time you were doing
3  these, were they on your spare time or were they on
4  Harvard time?
5    THE WITNESS:  On my -- my own time.
6    JUDGE CHAPPELL:  They weren't at any point when
7  you should have -- you were on a leave or vacation
8  status at the time?
9    THE WITNESS:  The -- well, we don't have formal
10  vacation status for professors, but it was on my own
11  time.
12    JUDGE CHAPPELL:  Okay.  And you're currently a
13  full-time employee of Harvard?
14    THE WITNESS:  Yes.  Well, Harvard and Brigham
15  and Women's.
16    JUDGE CHAPPELL:  And what do you consider your
17  status today while you're sitting here?
18    THE WITNESS:  Consultant to the Federal Trade
19  Commission.
20    JUDGE CHAPPELL:  Okay.  And you don't have to be
21  on vacation or anything for that?
22    THE WITNESS:  Well, professors don't have a
23  formal certain amount of vacation time, as long as --
24    JUDGE CHAPPELL:  Right, but my point is, are you
25  supposed to be lecturing students or teaching today?

809

1    THE WITNESS:  No, not today.  I'm on my own.
2    JUDGE CHAPPELL:  Okay.  Thank you.
3    BY MR. FIELDS:
4    Q.  All right, sir.  Now, is it correct that the
5  same standard of proof that you've applied in making
6  these statements about wine and beer apply to
7  pomegranate juice?
8    A.  The same standards, yes.
9    Q.  Okay.  So, it would be fair to say, without RCTs
10  and without a causal link being proven beyond a
11  reasonable doubt, that pomegranate juice may reduce the
12  risk of certain diseases, correct?
13    A.  Well, you used the -- you used the word "may,"
14  and if you use the word "may," then it would be correct,
15  because "may" implies that it's possible.  But if you
16  say "will," then it is not correct, because "will"
17  implies that a causal link has been established.
18    Q.  So, the -- well, but you said that a causal link
19  hadn't been established for moderate alcohol
20  consumption, and yet you made a -- on two occasions that
21  I cited to you, you made the statement that it lowered
22  the risk of all kinds of diseases, right?
23    A.  I think I answered that question previously,
24  that it was a poor choice of words, and I do not hold
25  the view that a causal link between moderate alcohol

810

1  consumption and reduced cognitive decline and reduced
2  heart disease has been established.
3    So, you have found a quotation that was made in
4  an interview setting that was incorrect, just as you
5  yourself have already misspoken a couple of times in
6  extemporaneous speech, and this is what happens with
7  extemporaneous speech.
8    Q.  Yes.  And so you feel that a more rigorous
9  standard should be applied to pomegranate juice than
10  you've applied to wine and beer?
11    A.  Absolutely not.
12    Q.  The same, correct?
13    A.  The same standard.
14    Q.  Okay.  Now, you've made a number of public
15  health recommendations based upon what you call
16  observational studies.  Isn't that correct?
17    A.  Yes.
18    Q.  You've said that a number of food products
19  result in a lowered risk of disease.  Haven't you done
20  that?
21    A.  Yes.
22    Q.  And also based on observational studies,
23  correct?
24    A.  Ah --
25    Q.  No?

32 (Pages 807 to 810)

811

1    A. -- I made public health recommendations for
2  various foods and diet in relation to risk of disease,
3  that is correct.
4    Q. Well, I didn't say -- I don't think I said "in
5  relation to."
6    A. Um-hum.
7    Q. Didn't you -- haven't you made statements to the
8  public that various food items reduce the risk of
9  certain diseases?
10   A. I -- I may have.
11   Q. You don't recall ever doing that, as we sit here
12 today?
13   A. I don't recall a specific instance, but it's
14 quite possible that it happened, as you pointed out for
15 moderate alcohol.
16   Q. And let's --
17   A. But I have -- I don't believe that I have made a
18 statement that a causal link has been established in the
19 absence of evidence that would support that.
20   Q. Well, whether or not a causal link was
21 established, you have said that various foods reduce the
22 risk of specific diseases. Haven't you told the public
23 that on a number of occasions?
24   A. That could well be.
25   Q. It could be -- well, isn't it?

812

1    A. Well, I don't recall a specific instance, but it
2  very likely has happened, and I'm sure you can pull up
3  some quotes.
4    Q. Let's take a look at page 31 of your deposition.
5  I think your memory was clearer then. All right, I'm
6  reading from line 19 at page 31.
7      JUDGE CHAPPELL: Hold on. Hold on. If you want
8  him to read along, make sure he's with you.
9      MR. FIELDS: Pardon me?
10     JUDGE CHAPPELL: Make sure he's with you on the
11 same page. I don't know that he --
12     MR. FIELDS: Okay.
13     BY MR. FIELDS:
14   Q. Do you have a copy of your deposition up there
15 with you, sir?
16   A. No.
17   Q. It should be on the screen there.
18   A. It's not showing up.
19   Q. Oh, I'm sorry.
20   A. There we go.
21   Q. Thank you, Your Honor.
22     For some reason, my screen is blank, but maybe
23 we can fix it at a recess.
24     All right. Now, the question at line 16, page
25 31, which I hope is on the screen:

813

1    "QUESTION: Now, you have made public
2  recommendations on the basis of epidemiological research
3  before?
4    "ANSWER: Yes.
5    "QUESTION: And you are aware that those
6  recommendations have been propounded in television, the
7  internet, magazines, and other forms of media?
8    "ANSWER: Yes.
9    "QUESTION: Those public health recommendations
10 have been based on primarily epidemiological research,
11 would you say?
12   "ANSWER: Yes.
13   "QUESTION: And those public health
14 recommendations are primarily based on observational
15 studies in particular?
16   "ANSWER: Most of them. Not all."
17   Now, sir, does that refresh your recollection
18 that, in fact, based upon observational studies, you
19 have made public health recommendations?
20   A. It's not a matter of refreshing my memory. Of
21 course, I have made public health recommendations for
22 nutrition, but you were asking specifically "result in."
23 Those were the words you -- that you used, and that
24 implies that I stated a causal link has been
25 established.

814

1    Of course, I've made public health
2  recommendations, and they're based in large part on
3  observational studies because that's in many cases the
4  best available evidence. That's not the same as stating
5  that a causal link has been established. You should
6  distinguish very clearly between recommendations that
7  are based on the best available evidence that falls
8  short of establishing a causal link.
9      So, yes, I've made -- I have made and continue
10 to make many public health recommendations of diet and
11 lifestyle, even when the data are not supported by
12 randomized clinical trials or where a causal link has
13 not been firmly established.
14   Q. Yes. I don't mean to suggest that you
15 established a causal link; quite the contrary.
16     In fact, let's take some examples. Didn't you
17 say, for example, that nuts lower the risk of heart
18 disease and diabetes, sir?
19   A. If I used that exact wording, it would have been
20 incorrect in implying that a causal link has been
21 established.
22   Q. Well, let's look at -- you wrote an article
23 called "Rebuilding the Food Pyramid." Do you remember
24 that?
25   A. Yes.

33 (Pages 811 to 814)

815

1    Q. Could we take a look at RX 5003? And if you
2    look at page 7 -- perhaps it's page 8. Let me take a
3    look. Yes.
4        You said here that "Controlled feeding studies
5    show that nuts improve blood cholesterol ratios, and
6    epidemiological studies indicate that they lower the
7    risk of heart disease and diabetes."
8        "They lower the risk of heart disease and
9    diabetes," sir, that's pretty much an efficacy claim,
10   isn't it?
11       A. No, it is absolutely not, because it's good to
12   look at the whole sentence, and they say "indicate."
13       Q. Oh.
14       A. If it was a cause-and-effect relation, a
15   stronger term would be used. An indication is a
16   point-to; it is not proof. So, I am trying to draw this
17   distinction between when a causal link is established
18   and when it's not.
19       So, the controlled feeding studies show that
20   because those are randomized trials, and they show that
21   cholesterol is improved, and this provides a strong
22   biologic rationale. And the epidemiologic studies
23   indicate, not prove.
24       Q. So, you're telling me that when you tell the
25   public that a study indicates that something lowers a

816

1    risk of disease, that's not an efficacy claim, correct?
2        A. It's -- it's not a proof of a causal link,
3    right.
4        Q. Well, can you answer my question?
5        A. Yes.
6        Q. Is that what you call an efficacy claim, where
7    somebody says that a study indicates that it lowers the
8    risk of heart disease and diabetes?
9        A. Well, the term "efficacy claim" is a term that
10   you're -- that you're using. I don't use that
11   terminology in the scientific judgment. But the
12   distinction I'm trying to make and continue to try to
13   make is whether or not a causal link is established.
14       Q. Yes, I understand that. There was no causal
15   link established for nuts --
16       A. That's right.
17       Q. -- lowering the risk of heart disease and
18   diabetes.
19       A. Right.
20       Q. And so you say when you just use the word
21   "indicate," that studies indicate, that is not -- that
22   you don't need a causal link for that.
23       A. Well, it doesn't -- my interpretation of it is
24   that I'm not claiming a causal link has been established
25   when I use the word "indicate."

817

1    Q. So, if the Respondents said that studies
2    indicate that pomegranate juice lowers the risk of
3    cardiovascular disease or prostate cancer, they don't
4    need a causal link for that in your view, right?
5        MS. EVANS: Objection.
6        JUDGE CHAPPELL: Legal basis?
7        MS. EVANS: It's beyond the --
8        JUDGE CHAPPELL: You need to stand up or I
9    cannot hear you, Madam.
10       MS. EVANS: Oh, I'm very sorry. It is beyond
11   the scope of his expertise. He has not claimed to be an
12   advertising expert.
13       JUDGE CHAPPELL: Overruled.
14       THE WITNESS: Can you repeat the question?
15       BY MR. FIELDS:
16       Q. Yes. Yes, yes, yes.
17       You said that a causal link does not need to be
18   established for statements that say that studies
19   indicate that a product lowers the risk of heart disease
20   and diabetes, right?
21       A. That that does not imply that a causal link is
22   established, correct.
23       Q. So, you don't need to establish a causal link to
24   say that, correct?
25       A. Correct.

818

1    Q. And therefore, sir, isn't it correct that if
2    Respondents said that their studies indicate that
3    drinking pomegranate juice -- indicate that drinking
4    pomegranate juice lowers the risk of diseases, such as
5    cardiovascular disease and prostate cancer, they don't
6    need to establish a causal link, in your opinion,
7    correct?
8        A. There's two parts to my answer. First, when you
9    say the Respondents would say, if you're referring to
10   the scientific literature, that's different from say in
11   advertising, where, of course, I have no expertise and
12   can't give an opinion.
13       But the other point is that the strength of the
14   evidence for pomegranate is not sufficient to say that
15   they indicate that -- a lower risk. For example, for
16   the carotid IMT thickness studies, the evidence shows
17   clearly that there's no benefit.
18       Q. Yes, we'll get to that.
19       A. So, they don't --
20       JUDGE CHAPPELL: Hold on a second.
21       All right, sir. Did I just hear you say that
22   all of your expert testimony is about the scientific
23   literature and testing and has nothing to do with
24   advertising?
25       THE WITNESS: Right.

34 (Pages 815 to 818)

819

1    JUDGE CHAPPELL:  Thank you.
2    Go ahead.
3    MR. FIELDS:  All right.
4    BY MR. FIELDS:
5    **Q.  So, your article called "Rebuilding the Food**
6    **Pyramid" is what you call scientific literature and**
7    **testing?**
8    A.  Yes.  It's a review.
9    **Q.  It's a what?**
10   A.  It's a review article.
11   **Q.  What do you mean by a "review article"?**
12   A.  It means that there's no new, original data that
13   are put forth in this article; that it summarizes
14   previous work.
15   **Q.  And where did this article appear?**
16   A.  I think that was in Scientific American.
17   **Q.  Yes.  And in your opinion, this is merely, what,**
18   **a review of your research and, therefore, it has a**
19   **different standard from advertising?  Is that your**
20   **testimony?**
21   A.  Ah, I don't know anything about the standards
22   required for advertising.  So, I can't answer that
23   question.
24   **Q.  Well, I understood you to answer the Court's**
25   **question by saying that there was some difference**

820

1    **between what you say in this magazine article and what**
2    **one might say in advertising.  Are you drawing that**
3    **distinction or did I misunderstand you?**
4    A.  I don't know anything about advertising, so I --
5    I can't -- this is not advertising.  I'm not selling a
6    product.  This is a -- an article in a -- in a
7    scientifically oriented magazine that I wrote.  It's not
8    advertising.  I don't know anything about advertising.
9    JUDGE CHAPPELL:  Also, for those that don't
10   understand, can you state for the record the difference
11   between a review article and a peer-reviewed article?
12   Because I heard you say this was a review article.
13   THE WITNESS:  Yes.  That's an important
14   distinction.  So -- and they are separate issues.  A
15   peer-review article is an article that's submitted to a
16   journal and it's sent out for review by other scientific
17   experts for vetting and comments, and that constitutes a
18   peer-review article.
19   A review article is an article that summarizes
20   previous scientific work and doesn't bring in new,
21   original work, and a review article either can be
22   peer-reviewed or not peer-reviewed.  So, the distinction
23   between -- there's two distinctions:  One is original
24   research versus review, and a separate distinction is
25   peer review versus not peer review.

821

1    JUDGE CHAPPELL:  Thank you.
2    MR. FIELDS:  All right.
3    BY MR. FIELDS:
4    **Q.  You've also made what you call public health**
5    **recommendations on television?**
6    A.  Yes.
7    **Q.  Correct?**
8    **And the one that we saw before about beer was on**
9    **radio -- one of them was on radio and one of them was in**
10   **a newspaper, as I recall, right?**
11   A.  Yes.
12   **Q.  And you don't call those review materials, do**
13   **you, sir?**
14   A.  No.  Those are news reports.
15   **Q.  Yeah.  And on television and in other media**
16   **statements, you have talked about foods lessening the**
17   **risk of diseases, haven't you?**
18   A.  Yes.
19   **Q.  And you did it based on observational studies,**
20   **not RCTs.**
21   A.  Correct.
22   **Q.  And you did it without the causality link being**
23   **established, correct?**
24   A.  Yes.
25   **Q.  Thank you.**

822

1    **I am about to move on to a new subject, Your**
2    **Honor.  Would this be a good time to take the noon**
3    **recess or should I go forward?**
4    JUDGE CHAPPELL:  No, it's just past 1:00.  Let's
5    go ahead and take a break.
6    MR. FIELDS:  Thank you, Your Honor.
7    JUDGE CHAPPELL:  We will reconvene at 2:05.
8    We're in recess.
9    (Whereupon, at 1:01 p.m., a lunch recess was
10   taken.)

35 (Pages 819 to 822)

827

1  reward you for undertaking that huge expense, correct?
2      A. That's correct.
3      Q. Okay. And I suppose the risk of harm is
4  something else that has to be considered in evaluating
5  the standard of evidence. Isn't that right?
6      A. The risk of harm, of course, has to be evaluated
7  in terms of recommendation and how the agent might be
8  used, but in terms of evaluating a causal link, it's
9  distinct. That issue is distinct from safety.
10     So, the overall recommendation or use of the
11 product obviously has to -- there has to be more benefit
12 than harm, but -- but to establish the causal link for
13 benefit is a separate issue from safety.
14     Q. Well, when you're evaluating what standard of
15 evidence should apply, what degree of evidence should be
16 required, isn't the risk of harm one of the factors you
17 consider?
18     A. You don't consider risk of harm in terms of
19 evaluating causality. You consider risk of harm in
20 whether it should actually be used.
21     Q. So, you -- I'm sorry. Finish your answer.
22     A. So, those are just -- the risk of harm is
23 terribly important, but it's different from evaluating a
24 causal link.
25     Q. I see. Now, haven't you said, in connection

828

1  with some of your public health recommendations, that
2  when the risk of harm is slight, you don't want to hold
3  up information from the public and you would err on the
4  side of giving them that information?
5      A. Yes, I have said that. I hold that view.
6      Q. Even without causality, right?
7      A. Right.
8      Q. Okay. So, the risk of harm is a factor that
9  weighs upon the decision of what standard of evidence is
10 required to support a claim, correct?
11     A. No, not correct. So, we will go through it one
12 more time.
13     The risk of harm is -- plays into a
14 recommendation whether or not to use the agent, but it
15 does not play into making that causal -- a judgment
16 about a causal link. So, those are two separate issues.
17     Q. Well, putting aside causal link for the moment,
18 in deciding whether you can give information to the
19 public about a product and its effect, doesn't the risk
20 of harm enter into that decision?
21     A. The decision of whether you can give information
22 to the public? I'm always in favor of giving
23 information.
24     Q. Yes.
25     A. I oppose withholding information.

829

1      Q. And --
2      A. Unless there's some very strong reason not to --
3  to withhold it.
4      Q. So, when you're talking about a product, if
5  there is a slight or a known risk of harm and a
6  potential benefit, you are a strong advocate of giving
7  that information to the public. Isn't -- isn't that
8  true?
9      A. Yes, that is true.
10     Q. Okay.
11     JUDGE CHAPPELL: Hang on a second.
12     You were talking about the risk of harm, and you
13 said whether to use the agent. Are you talking about
14 whether you're talking -- testing the effect of spring
15 water versus the risk of arsenic? Is that what you mean
16 by "the agent," what you're testing? What did you mean
17 by that?
18     THE WITNESS: What I meant by that is whatever
19 it is that you're recommending, the food or the drug or
20 the product, whatever it is you're recommending, you
21 have to take into account risk of harm.
22     JUDGE CHAPPELL: So, something that's generally
23 considered safe, like spring water, low risk.
24     THE WITNESS: Right.
25     JUDGE CHAPPELL: Okay.

830

1      BY MR. FIELDS:
2      Q. Okay, I think we understand each other.
3      Now, isn't it your opinion that generally, in
4  dealing with nutrition and food that bears nutrients,
5  that RCT trials are not and should not be required?
6      A. Required for what?
7      Q. To substantiate health claims based on those
8  products.
9      A. If -- if the health claim is -- presumes a
10 causal link, then in many instances, you would do a
11 randomized trial. If the -- if the claim is there's
12 some evidence to suggest the possibility that nuts may
13 reduce risk of diabetes, I would say that was -- would
14 support such a statement. But if you ask do -- is there
15 a causal link that has proven that if you eat nuts,
16 you'll lower your risk of diabetes, I would say not yet.
17     Q. Well, don't you consider it appropriate to rely
18 on evidence short of RCT trials --
19     A. Absolutely.
20     Q. -- for --
21     A. Oh, I'm sorry.
22     Q. -- for claims regarding nutrients in food, even
23 when causality cannot be established?
24     A. Well, it depends on what the claim is.
25     Q. You mean if it's an efficacy claim, like the one

37 (Pages 827 to 830)

831

1  you made about moderate alcohol use, then you have to
2  have causality?  Is that what you're now saying?
3      A. If the claim implies that a causal link has been
4  established, then you have to have evidence to back it
5  up.
6      Q. I see.  Well, when -- do you recall coauthoring
7  an article with Dr. Blumberg on evidence-based criteria?
8      A. I do.
9      Q. Yes.  And in that article, did you express the
10  opinion that the general principles of evidence-based
11  medicine can provide a sufficient foundation for
12  establishing dietary requirements and dietary guidelines
13  in the absence of RCTs?
14      A. Yes.
15      Q. Okay.  And, in fact, isn't it true that a
16  hypothesis about disease causation can rarely, if ever,
17  be directly tested in humans using the RCT design?
18      A. Can -- can -- well --
19      Q. Do you want me to read it again, if you didn't
20  follow?
21      A. Sure, please.
22      Q. The statement is, "A hypothesis about disease
23  causation can rarely, if ever, be directly tested in
24  humans using the RCT design."  Is that your opinion,
25  sir?

832

1      A. I believe this was in the context of nutritional
2  factors?
3      Q. Yes.  We're talking about nutrition, right,
4  pomegranate juice or beer and wine.
5      A. Yes. It's rare. It's rare to do that.  That
6  is -- that is the case.  Rare, but not -- not
7  impossible.
8      Q. I didn't ask you if it was rarely done.  I said,
9  isn't it correct that disease causation can rarely, if
10  ever, be directly tested using the RCT design?
11      A. Correct, yes.
12      Q. If ever.
13      A. Well, that's the statement.
14      Q. Those are your words, right?
15      A. Well, my words along with the coauthor's.
16      Q. Yeah.  All right.
17      You also agree, do you not, that there are very
18  striking differences between what's needed to test for
19  drugs and what's needed to test for nutrients?
20      A. Very striking -- I didn't catch that word.
21      Q. Pardon me?
22      A. Very striking -- I didn't catch the word that
23  you said.
24      Q. Differences.
25      A. Differences?  There's -- there's differences

833

1  between drugs and nutrients, yes.
2      Q. Well, and didn't you -- isn't it your opinion
3  that in testing drugs, we must apply the highest
4  standards, because they can be dangerous and they can
5  also tend to bring a high price in the marketplace and
6  they also have protection by way of intellectual
7  property?  Correct?
8      A. We need to have the high standards, and the
9  reasons that you gave apply, but that's not the reasons
10  for having the high standards.  We need to have high
11  standards because we want to know the truth, and as a --
12  an effect of those treatments is the possibility for
13  harm and the other -- and the high cost and the other
14  things that you mentioned.
15      Q. Wouldn't this be true:  That those same concerns
16  that we just mentioned are substantially less pressing
17  for nutrients.  Is that correct?
18      A. The concerns are, but the -- the necessity for
19  having the standards of evidence is similar.  So, the
20  concerns are different, but it's not that -- it's not
21  those concerns that drive the necessity to have a high
22  standard of evidence for causality.  The evidence for
23  causality remains, but the -- the worries about harm and
24  cost are different.
25      Q. Sir, wasn't it the entire thesis of your article

834

1  with Dr. Blumberg that for nutritional matters,
2  nutritional issues, we should not require RCT trials, as
3  we do with drugs?
4      A. I -- I'm -- I must have failed in the way I
5  wrote the article, because no, that was not the point of
6  the article.
7      Q. Oh, I see.  Okay.
8      Didn't you -- isn't it your opinion that in
9  dealing with nutrition and dietary claims, the evidence
10  will necessarily be based on observational studies,
11  rather than RCT trials?
12      A. Yes.
13      Q. So, you're saying it will necessarily be based
14  on observational studies rather than RCT trials, but at
15  the same time, you're saying RCT trials are necessary in
16  the case of Respondents and pomegranate juice?
17      A. They're necessary to establish a causal link.
18  What I'm saying in the article is that we have to
19  recognize that that high standard to which we should
20  aspire will, of necessity, because of feasibility
21  reasons, often not be reached for diet and nutritional
22  substances, but -- and this was the point of the
23  article -- but this doesn't mean that we should fail to
24  make recommendations based on the best possible
25  evidence.  We just need to distinguish the level of

38 (Pages 831 to 834)

# In the Matter of:

# POM Wonderful, et al.

*June 8, 2011*
*Public Record*
*Trial Volume 7*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

946

```
 1              FEDERAL TRADE COMMISSION
 2                  I N D E X
 3          IN RE POM WONDERFUL LLC, ET AL.
 4                 TRIAL VOLUME 7
 5                  PUBLIC RECORD
 6                  JUNE 8, 2011
 7
 8   WITNESS:      DIRECT  CROSS    REDIRECT   RECROSS   VOIR
 9   TUPPER         950    1068
10   MELMAN        1069    1134     1194
11
12
13   EXHIBITS   FOR ID  IN EVID  IN CAMERA  STRICKEN/REJECTED
14   CX
15   (none)
16   PX
17   (none)
18   RX
19   (none)
20   JX
21   (none)
22   DX
23   (none)
24
25
```

947

```
 1              UNITED STATES OF AMERICA
 2          BEFORE THE FEDERAL TRADE COMMISSION
 3
 4   In the Matter of            )
                                 )
 5   POM WONDERFUL LLC and       )
     ROLL GLOBAL LLC,            )
 6   as successor in interest to )
     Roll International Corporation, )
 7   companies, and           ) Docket No. 9344
     STEWART A. RESNICK,         )
 8   LYNDA RAE RESNICK, and      )
     MATTHEW TUPPER, individually )
 9   and as officers of the      )
     companies.                  )
10                               )
     ------------------------------)
11
12             Wednesday, June 8, 2011
13                  9:35 a.m.
14               TRIAL VOLUME 7
15                PUBLIC RECORD
16
17   BEFORE THE HONORABLE D. MICHAEL CHAPPELL
18            Administrative Law Judge
19            Federal Trade Commission
20          600 Pennsylvania Avenue, N.W.
21               Washington, D.C.
22
23       Reported by: Josett F. Whalen, RMR-CRR
24
25
```

948

```
 1   APPEARANCES:
 2
 3   ON BEHALF OF THE FEDERAL TRADE COMMISSION:
 4       HEATHER HIPPSLEY, ESQ.
 5       MARY L. JOHNSON, ESQ.
 6       SERENA VISWANATHAN, ESQ.
 7       DEVIN WILLIS DOMOND, ESQ.
 8       ANDREW D. WONE, ESQ.
 9       Federal Trade Commission
10       Bureau of Consumer Protection
11       601 New Jersey Avenue, N.W.
12       Washington, D.C.  20001
13       (202) 326-3285
14       hhippsley@ftc.gov
15
16
17   ON BEHALF OF THE RESPONDENTS:
18       JOHN D. GRAUBERT, ESQ.
19       Covington & Burling LLP
20       1201 Pennsylvania Avenue, N.W.
21       Washington, D.C.  20004-2401
22       (202) 662-5938
23       jgraubert@cov.com
24
25
```

949

```
 1   APPEARANCES:  (continued)
 2
 3   ON BEHALF OF THE RESPONDENTS:
 4       BERTRAM FIELDS, ESQ.
 5       Greenberg Glusker
 6       1900 Avenue of the Stars
 7       21st Floor
 8       Los Angeles, California  90067
 9       (310) 201-7454
10          -and-
11       KRISTINA M. DIAZ, ESQ.
12       BROOKE HAMMOND, ESQ.
13       JOHNNY TRABOULSI, ESQ.
14       Roll Law Group P.C.
15       11444 West Olympic Boulevard
16       10th Floor
17       Los Angeles, California  90064
18       (310) 966-8775
19       kdiaz@roll.com
20
21
22   ALSO PRESENT:
23       VICTORIA ARTHAUD, ESQ.
24       HILLARY SLOANE GEBLER, ESQ.
25
```

1 (Pages 946 to 949)

1138

1   you don't care, then you can do whatever you want to do,
2   which is in fact what you've done.
3        So the requirements in order to have something
4   approved by the government are what I said.
5        Q. When you say "the government," you're talking
6   about the FDA; correct?
7        A. I'm talking about the United States government,
8   a component of which is the FDA.
9        Q. Would you tell me the other government agencies
10  that have to approve health claims for a product.
11       A. Well, I think this is the
12  Federal Trade Commission here, not the FDA.
13       Q. Your understanding is the
14  Federal Trade Commission has to give approval in advance
15  to market a product?
16       A. Well, isn't that why we're here today?
17       Q. No.
18       A. Oh. I thought it was.
19       Q. Putting aside what government approvals might be
20  and the FDA -- I thought my question was clear. Let me
21  put it again.
22       You have said that in order to make a public
23  claim for benefit to erectile function one must have a
24  double-blind, placebo-based, randomized trial, and
25  you've also said it has to be a trial done in two

1139

1   separate institutions at least; correct?
2        A. It should be, yes.
3        Q. Well, you said it has to be; isn't that
4   correct?
5        A. Yes.
6        Q. Okay. And so my question was, if Dr. Burnett --
7   by the way, Dr. Burnett at Johns Hopkins is a very
8   distinguished man in the field, isn't he?
9        A. He is. He's a good friend of mine, so yes.
10       Q. And if he did this at Johns Hopkins, he ran the
11  double-blind, placebo-based, randomized test, and it
12  came out positive, you would say that's still not enough
13  to support making a public claim on behalf of this
14  product; right?
15       A. That's correct.
16       Q. Okay. And you say that in addition, this has to
17  be a very large group to make sense. It has to reach
18  statistical significance. Isn't that what you said?
19       A. Yes.
20       Q. And you also say that to be competent and
21  reliable evidence to support a public claim of benefit
22  to erectile dysfunction the wives have to confirm what
23  the husbands say.
24       A. See, the tendency today in clinical trials
25  looking at erectile dysfunction include not necessarily

1140

1   the wife but the sexual partner.
2        Q. Yes. You have said that the -- let's call it
3   the sexual partner -- must confirm what the male partner
4   says in this test in order to justify making a public
5   claim about helping --
6        A. Right.
7        Q. -- erectile function.
8        A. That gives the most reliable information.
9   That's correct.
10       Q. But you've said it's required, haven't you,
11  sir?
12       A. Yes. I used the word "required" for drugs that
13  are being submitted to Food and Drug Administration. If
14  you want to take a lesser standard -- I don't know what
15  standard you're looking for. I'm talking about the use
16  of drugs that are submitted to the Food and Drug
17  Administration so they can be marketed in the
18  United States.
19       JUDGE CHAPPELL: Hold on a second. I don't want
20  to derail the cross-exam, but you're like two ships
21  passing in the night.
22       Doctor, you keep talking about drugs. I'm not
23  sure he's talking about drugs.
24       THE WITNESS: He is talking about drugs,
25  Your Honor. This --

1141

1        JUDGE CHAPPELL: So you're only prepared to talk
2   about a drug the claim has made, not any other juice or
3   springwater or anything else?
4        THE WITNESS: Your Honor, water is water. It
5   has H2O, a product. The active ingredient of the
6   product is not water. Otherwise, they'd be selling
7   Evian springwater. They're selling a product that is
8   composed of drugs. In this case the drugs are
9   polyphenol agents that have a specific biologic effect,
10  or they claim that they do, so it's a product, even
11  though they're calling it a juice, but it's a product
12  with drugs in it.
13       JUDGE CHAPPELL: So let me make sure I
14  understand you.
15       In your opinion, pomegranate juice is a drug.
16       THE WITNESS: Correct.
17       JUDGE CHAPPELL: Thank you.
18       BY MR. FIELDS:
19       Q. I think that tells us a lot, Doctor.
20       Now, you also said that in order to satisfy your
21  test for what's required to make a public claim of
22  helping erectile dysfunction, the man's -- the man's
23  erection must allow him to complete intercourse; isn't
24  that correct?
25       A. It would allow him to complete it to sexual

49 (Pages 1138 to 1141)

1142

1  satisfaction.
2      Q. Yes.
3          And by that you mean he must have an orgasm;
4  right?
5      A. Well, that would be sexual -- for most people it
6  would be, yes.
7      Q. Well, that's what you've said, isn't it, that
8  what you meant by sexual satisfaction was having an
9  orgasm?
10         Right?
11     A. Yes.
12     Q. Okay. And not only must he have an orgasm in
13 order to allow this public claim, but his wife must
14 have -- oh, his sexual partner -- sorry -- must have an
15 orgasm; right?
16     A. I'm not sure that's true.
17     Q. Well, didn't you say that?
18     A. I don't remember saying that.
19     Q. Didn't you say that both must have sexual
20 satisfaction?
21     A. Yeah. But I don't know sexual satisfaction of
22 the female partner includes orgasm. Maybe it means that
23 for you in your relationship, but I'm not sure that's
24 true for the general population.
25     Q. I'm not talking about the general population,

1143

1  Doctor; I'm talking about what you testified to in your
2  deposition.
3      A. I didn't say that in my testimony.
4      Q. You did not say that the man must reach orgasm.
5      A. No. I think the definition of the NIH is sexual
6  satisfaction, and that includes orgasm. In the NIH
7  definition, that was not -- the female component was not
8  considered, just the male component.
9      Q. Well, what did you mean when you said the female
10 must reach sexual satisfaction?
11     A. That she should be satisfied with the sexual
12 event.
13     Q. So the man must reach orgasm, but the woman just
14 has to be somehow satisfied with the sexual event
15 whether she reaches orgasm or not; right?
16     A. That's correct.
17     Q. Okay. Now -- so you're saying that even if I
18 market a product and make public claims that that
19 product and I run a test and the test shows that a man's
20 erection -- having been unable to get an erection, let's
21 say, for five years, now he takes my product and he can
22 get an erection, he can penetrate his wife, he can bring
23 her to satisfaction, but he can't have an orgasm
24 himself, that doesn't count, does it?
25     A. I don't know. Is this some hypothetical

1144

1  question? This has nothing to do with the data. The
2  data didn't show and even in the published data that in
3  fact there was no statistical difference. I don't know
4  where you're -- where are you asking me this question
5  from?
6      Q. Sir, I'm asking you this question from your own
7  report and from your own deposition testimony. You said
8  that it doesn't really count as efficacious --
9          JUDGE CHAPPELL: Hold on a second. He's asking
10 you to clarify exactly where this is coming from. Is it
11 what he said today? Is it a deposition? Is it an
12 expert report? He deserves to know that.
13         MR. FIELDS: I'll be glad to do that,
14 Your Honor.
15         JUDGE CHAPPELL: Thank you.
16         MR. FIELDS: Yes. I thought he testified, that
17 he did say in his deposition that the man must reach
18 orgasm, but let's look and see.
19         Page -- I've got my glasses somewhere.
20 Thank you.
21         Mr. Graubert handed me my glasses.
22         BY MR. FIELDS:
23     Q. Page 53.
24         You have testified about the requirement of
25 sexual satisfaction, and you say -- the question

1145

1  (as read): I'll back up here because maybe I'm still
2  not understanding completion of intercourse. What point
3  is the completion of intercourse?
4          That was your term, Doctor, completion of
5  intercourse.
6          "Well, the normal standard of the completion of
7  intercourse is orgasm and ejaculation."
8      A. Well, that's --
9      Q. So you did say that.
10     A. No. I think you would agree with that. I think
11 that's the general standard of what completion of
12 intercourse is.
13     Q. Yes.
14         So my question that I asked you after that was:
15 Are you saying that if a man hasn't been able to have an
16 erection for five years, then he tries my product and he
17 now has an erection and he can penetrate his wife and
18 bring her to sexual satisfaction, but he doesn't have an
19 orgasm himself, that doesn't count, I can't tell the
20 public about what I've done?
21     A. Well, I don't know what you're basing your
22 question on. What are you asking me about? Are you
23 asking me about the results of the Davidson study? Are
24 you asking me the results of the Forest study? What is
25 the basis of your question?

50 (Pages 1142 to 1145)

1146

1  Q. The basis of my question is to test your
2  standard and what you've told this court.
3      A. I can't answer the question the way you're
4  asking me because it's not based on any reliable
5  information.
6      Q. I'll try to rephrase it again.
7      JUDGE CHAPPELL: Maybe you should ask him to
8  assume.
9      MR. FIELDS: Yes, I will, Your Honor.
10 Thank you.
11     THE WITNESS: Oh, a hypothetical question.
12     MR. FIELDS: We can do it that way.
13     THE WITNESS: Okay. And then I'll understand
14 what you mean.
15     MR. FIELDS: I see. Thank you.
16     JUDGE CHAPPELL: Do you want Josett to read the
17 question back as an assumption or do you want to --
18     MR. FIELDS: No. Read it back. And just make
19 it your assumption, Doctor.
20     Thank you, Your Honor.
21     (The record was read as follows:)
22     "QUESTION: So my question that I asked you
23 after that was: Are you saying that if a man hasn't
24 been able to have an erection for five years, then he
25 tries my product and he now has an erection and he can

1147

1  penetrate his wife and bring her to sexual
2  satisfaction, but he doesn't have an orgasm himself,
3  that doesn't count, I can't tell the public about what
4  I've done?"
5      THE WITNESS: No, he can't, he cannot.
6      BY MR. FIELDS:
7      Q. Okay. Now -- is this a good time to take our
8  recess, Your Honor? I'm about to go into a slightly
9  different subject, but I'll be glad to go on.
10     JUDGE CHAPPELL: No. Let's go ahead and break.
11     MR. FIELDS: Okay.
12     JUDGE CHAPPELL: We'll reconvene at 4:30.
13     (Recess)
14     JUDGE CHAPPELL: Back on the record Docket 9344.
15     MR. FIELDS: Thank you, Your Honor.
16     BY MR. FIELDS:
17     Q. You have -- you have the opinion that before you
18 make a claim of the ability to help erectile
19 dysfunction, your product, you have to prove it; isn't
20 that right?
21     A. Yes.
22     Q. And you have to prove it by going through these
23 various steps that you've told us were required; right?
24     A. Yes.
25     Q. Okay. But, Doctor, you don't apply that

1148

1  standard consistently, do you?
2      A. I don't know what the implication of your
3  question is.
4      Q. The implication is that you don't apply it
5  consistently. Correct me if I'm wrong.
6      A. I'm correcting you.
7      I'm correcting him. I don't know what he's
8  talking about.
9      Q. Okay. We'll get to it.
10     Are you the CEO and cofounder of a company
11 called Ion Channel Innovations?
12     A. Yes, I am.
13     Q. That company makes a therapy for erectile
14 dysfunction called hMaxi-K; is that correct?
15     A. That's correct.
16     Q. That's a form of gene transfer therapy for
17 erectile dysfunction.
18     A. Yes.
19     Q. Potentially a competitive product with
20 pomegranate juice; correct?
21     A. I don't know if it is or it isn't.
22     Q. By the way, isn't it correct that the standards
23 in your mind for substantiating a claim for fruit juice
24 are the same as for substantiating a claim for gene
25 transfer therapy?

1149

1      A. For what?
2      Q. Gene transfer therapy?
3      A. No, no. A claim for what?
4      Q. Oh. The claim to help erectile dysfunction.
5      A. It should be, yes.
6      Q. It should be the same. All right.
7      Do you recall, sir, an interview you gave with
8  somebody named Lizzy Ratner of The New York Observer, a
9  paper of general circulation in New York?
10     A. No.
11     Q. All right. Let me read you statements and see
12 if you recognize them.
13     By the way, I refer to what we have marked as
14 Exhibit RX 5010, which has a handsome picture of
15 Dr. Melman (indicating).
16     A. Thank you.
17     Q. Do you recall, without regard to the name of the
18 reporter, giving an interview about hMaxi-K, your ED
19 product, on July 30 --
20     JUDGE CHAPPELL: Do you have an objection?
21     MR. WONE: Yes, Your Honor.
22     Complaint counsel requests that respondents
23 provide a copy to --
24     MR. GRAUBERT: It's on your right-hand side.
25     MR. FIELDS: You can give it to the witness as

51 (Pages 1146 to 1149)

1150

1  far as I'm concerned, sure.
2       JUDGE CHAPPELL: Did you mean a copy to
3  complaint counsel or to the witness?
4       MR. WONE: A copy to the witness.
5       JUDGE CHAPPELL: Go ahead.
6       BY MR. FIELDS:
7       Q. All right. That's your picture on the cover,
8  sir?
9       A. It's not the cover, but it's my picture in the
10 article, yes.
11      Q. Okay. And does it now -- does this now refresh
12 your recollection that indeed you did have an interview
13 with Ms. Ratner?
14      A. If I did, it was a telephone interview. I
15 probably did.
16      Q. Okay. And in that interview about hMaxi-K you
17 told her that your product would not only help erectile
18 dysfunction, but it also conceivably could benefit
19 asthma, hypertension and diabetes.
20      A. Let me correct you, and that is that we do not
21 have a product. There's no product. There's nothing
22 being sold. This is in the testing phase.
23      So there's no product.
24      Q. Sir, you have something called hMaxi-K that you
25 hope to market; correct?

1151

1       A. I would like to if it goes through the testing
2  process of the FDA and it's proved to be successful,
3  that's correct, but there's no product.
4       Q. You hope to market hMaxi-K?
5       A. Yes.
6       Q. And you think the word "product" is incorrect
7  because it wasn't actually on the market; is that --
8       A. There's nothing on the market.
9       Q. I see.
10      A. No sales. This is in the testing process.
11      Q. Yes.
12      But in the testing process you made these public
13 statements about --
14      A. I didn't -- what public statements?
15      Q. Well, how about that the men who tried hMaxi-K
16 had spontaneous, normal erections? How about that they
17 were like young men again? How about calling your
18 product the fountain of youth?
19      Did you call your product the fountain of youth,
20 sir?
21      A. We did a phase I ED trial which was a
22 nonplacebo-controlled phase I safety trial, and during
23 the phase I safety trial, which was done on 20 men,
24 several of the men got erections. This is just the
25 response to a phase I trial. This trial -- this product

1152

1  now has to go through phase II and III, phase III
2  testing. hMaxi-K is not on the market. It's just gone
3  through phase I testing.
4       Q. But despite that, despite the no RCTs, no
5  double-blind, placebo-based, randomized tests, despite
6  the fact that the wives were not interrogated, despite
7  the fact --
8       A. Well, the wives were interrogated.
9       Q. Despite the fact --
10      A. And just --
11      JUDGE CHAPPELL: Hold it, hold it, both of you.
12 One at a time. Is that clear?
13      MR. FIELDS: Yes, sir.
14      JUDGE CHAPPELL: Is that clear to you, Doctor?
15      THE WITNESS: Yes.
16      JUDGE CHAPPELL: Proceed.
17      MR. FIELDS: I'm sorry, Your Honor.
18      BY MR. FIELDS:
19      Q. In any event, you felt in the absence of the
20 tests that told us were required to make a public
21 claim, you made these public claims; isn't that
22 correct?
23      A. No, no, no. Let me correct you. What you asked
24 me about is to market a product. You were asking about
25 marketing and selling a product, and I said that to sell

1153

1  a product you had to go through a testing process, and
2  this is not -- we're not selling a product. These are
3  the results of the phase I trial.
4       Q. I think, Doctor, if you go back to my questions,
5  you'll find that I asked you about making a public
6  claim --
7       A. I did not --
8       JUDGE CHAPPELL: Hold on. You need to let this
9  gentleman finish his question.
10      Go ahead.
11      BY MR. FIELDS:
12      Q. My questions were about making a public claim --
13 the record will show that -- not about selling a
14 product.
15      Now, without regard to whether we're selling a
16 product or not, you have a product you hope to market;
17 correct?
18      A. No. I have a gene transfer therapy which I
19 eventually would like to market, that's correct.
20      Q. You hope to market.
21      A. Yes.
22      Q. Okay. And indeed you have something like
23 17 patents on it; correct?
24      A. That's correct.
25      Q. And you hope to make money from it.

52 (Pages 1150 to 1153)

1154

1    A. I would like to, yes.
2    Q. And without having the tests you told us were
3  required, you made all of these statements to
4  The New York Observer, to the public; correct?
5    A. They called us and asked us the result of the
6  trial after a scientific presentation and publication.
7    Q. Sir, did you --
8    A. I didn't say anything -- anything to her that
9  was not published or given in a public presentation, the
10  same thing.
11    Q. Sir, did you tell The New York Observer that the
12  men that you had tested had spontaneous, normal
13  erections?
14    A. Correct.
15    Q. Did you tell them that it was like they were
16  young again?
17    A. Correct.
18    Q. Did you tell them that -- did you tell her that
19  you called your erectile dysfunction product the
20  fountain of youth?
21    A. I said that would be the equivalent. Yes.
22    Q. Well, you called it the fountain of youth,
23  didn't you?
24    A. I said it could be like that. That's correct.
25    Q. Did you say it was the fountain youth or it

1155

1  could be like the fountain of youth?
2    A. It could be -- it wasn't -- it could be like. I
3  don't know.
4    Q. You don't remember.
5    A. No.
6    Q. Okay. Did you say that you were talking about
7  modifying the aging process?
8    A. Yes. And that was based upon the result of an
9  animal study which we published.
10    Q. An animal study --
11    A. Yes.
12    Q. -- was the basis for your making this public
13  claim.
14    A. I gave the results of an animal study. That's
15  correct.
16    Q. The animal -- just the kind of animal study
17  that you say couldn't be the basis for this kind of
18  claim?
19    A. No. The question that was asked of me this
20  morning was could POM, your company, make the claim
21  that it corrected, precluded and improved or prevented
22  erectile dysfunction in humans based upon an animal
23  study, and the answer is it could not. And she asked me
24  about the results of an animal study, and I gave her the
25  results of an animal study. That's what we were talking

1156

1  about.
2    Q. Sir, you made the claim that --
3    A. I didn't make a claim.
4    Q. You didn't make a claim.
5    A. No.
6    Q. Well, you said to the public that these
7  gentlemen had spontaneous, normal erections, that they
8  were like being young again, that you were talking
9  about modifying the aging process, that it was the
10  fountain of youth, and you don't call that making a
11  public claim?
12    A. I didn't make a public claim.
13    Q. You didn't make a public claim.
14    A. No.
15    Q. I guess His Honor will have to decide.
16    Sir, in fact you only had 11 men in the study
17  you did; right?
18    A. No.
19    Q. That isn't true?
20    A. No, it's not true.
21    Q. How many men did you have?
22    A. Twenty.
23    Q. Twenty men in the study you told Ms. Ratner
24  about?
25    A. I couldn't hear what you said.

1157

1    Q. In the study you told Ms. Ratner that the --
2    A. She called me at a particular time before we had
3  done the second component of the phase I trial, so we've
4  now tested in phase I testing 20 men.
5    Q. Yes. But I'm not asking you what you have now
6  done. You've now tested the large number of 20 men.
7  I'm asking you about when you talked to Ms. Ratner and
8  made all of these claims.
9    A. I didn't make any claims. Ms. Ratner called me
10  and asked me about the results of the study.
11    Q. And that's --
12    A. I didn't call Ms. Ratner.
13    So I think you're mischaracterizing what this
14  interview was about. I know why you're
15  mischaracterizing it, but I didn't call her. She called
16  me.
17    Q. Okay. And that means you didn't make a claim
18  because she called you; is that what you want --
19    A. No. She called me and asked me about the result
20  of the phase I trial.
21    JUDGE CHAPPELL: Let's use a word other than
22  "claims" to reduce the blood pressure on both sides.
23    MR. FIELDS: My blood pressure is pretty low.
24    JUDGE CHAPPELL: Thank you.
25    MR. FIELDS: But I'll move on anyway.

53 (Pages 1154 to 1157)

1158

1   BY MR. FIELDS:
2   Q.  Isn't it a fact that gene transfer therapy is
3   considered by some in the science field to be risky?
4   A.  You have to explain to me the origin of your
5   question.
6   Q.  Well, isn't it true that people have died and
7   gotten very sick from gene transfer therapy?
8   A.  Yes.  The people who have been sick have all --
9   I'm sure that you know that the people who have died
10  have died using viral vectors as a means of inducing the
11  transfer, you do know that, and you know of course the
12  type of vector that we're using; is that correct?
13  Q.  I didn't understand anything you said, sir.
14  A.  That's correct.  I know you did not.
15  Q.  Let me read you a statement from the article and
16  see if you agree with it.
17      "Ever since an 18-year-old boy with a rare
18  metabolic disorder died in a gene therapy trial in 1999,
19  the bold new biotechnology has been tainted with the
20  risk of deadly, unintended consequences."
21      Is that true?
22  A.  When using viral vectors, that's correct.
23  Q.  All right.  Now, as far as you know, you know of
24  no instance of anybody reporting being harmed by eating
25  pomegranates or drinking pomegranate juice --

1159

1   A.  What does that have to do with gene transfer?
2   Q.  Well, my point is, gene transfer is risky and
3   pomegranate juice isn't.
4   A.  I'm sorry.  I can't -- you have to speak up.  I
5   can't hear you.
6   Q.  I'm very sorry.  I have a soft voice.
7       My point was that --
8       (Admonition by the court reporter.)
9   BY MR. FIELDS:
10  Q.  I think the reporter was having trouble hearing
11  you, but let me go ahead.
12      JUDGE CHAPPELL:  Let's start with a new
13  question.
14      MR. FIELDS:  Yes.
15      JUDGE CHAPPELL:  And I'm directing the
16  court reporter that the previous couple seconds of
17  banter need not be on the record since it's
18  unintelligible.
19      MR. FIELDS:  I'm sorry, Your Honor.
20      BY MR. FIELDS:
21  Q.  You induced a school teacher named John Otto to
22  invest in your product a million dollars; isn't that
23  correct?
24  A.  I'm sorry.  I don't know what the word "induced"
25  means.

1160

1   Q.  "Induced" means you talked him into it.
2   A.  I what?
3   Q.  You talked him into it.
4   A.  No.  That's not true.  That's not correct.
5   Q.  He just voluntarily gave you a million dollars;
6   you didn't tell him how good the product was?
7   A.  No.  This was at the onset of the company.  He
8   knew about the product, and he invested in the product.
9   Q.  How did he know about the product --
10  A.  Because I told him about it.
11  Q.  You told him about the product, and he gave you
12  a million dollars.  You told him --
13  A.  No, he didn't give me a million dollars.
14  Q.  Did he invest a million dollars?
15  A.  He invested a million dollars.
16  Q.  I see.
17      And that was based upon your telling him pretty
18  much the same things you told Ms. Ratner; isn't that
19  correct?
20  A.  You know, that's not correct because what
21  Ms. Ratner was told was after the trials were begun.
22  What Mr. Otto did was invest in the company before
23  anything was done, so that's absolutely not correct,
24  although your attempted mischaracterization is
25  well-taken.

1161

1   Q.  Sir, you got your medical education at the
2   Rochester School of Medicine and Dentistry?
3   A.  Yes.
4   Q.  And you've been involved with I think six
5   different institutions since you started; correct?
6   A.  I haven't counted them, but I'll accept your
7   number.
8   Q.  Thank you.
9       You testified as an expert witness for the FTC
10  in three or four previous cases; correct?
11  A.  Yes.
12  Q.  And each time you have testified for the FTC you
13  testified the respondents' claims were not
14  substantiated; isn't that correct?
15  A.  Probably.
16  Q.  Well, you don't recall ever coming into court
17  and saying they were substantiated.
18  A.  No.  One of -- the claims of some of the
19  products that were used were not only not substantiated
20  but also caused injury to the -- had the potential of
21  causing injury to people who took the drug, so it was
22  more than not being substantiated.
23  Q.  And this time you were actually hoping to
24  testify in this case; correct?
25  A.  Why would you say that?

54 (Pages 1158 to 1161)

# In the Matter of:

# POM Wonderful, et al.

*June 9, 2011*
*Public Record*
*Trial Volume 8*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1200

```
  1                    FEDERAL TRADE COMMISSION
  2                       I N D E X
  3               IN RE POM WONDERFUL LLC, ET AL.
  4                      TRIAL VOLUME 8
  5                      PUBLIC RECORD
  6                       JUNE 9, 2011
  7
  8   WITNESS:        DIRECT  CROSS   REDIRECT  RECROSS  VOIR
  9   EASTHAM          1204    1323     1346      1347
 10   RUSHTON          1352
 11
 12
 13   EXHIBITS    FOR ID  IN EVID  IN CAMERA  STRICKEN/REJECTED
 14   CX
 15   (none)
 16   PX
 17   (none)
 18   RX
 19   (none)
 20   JX
 21   (none)
 22   DX
 23   (none)
 24
 25
```

1202

```
  1   APPEARANCES:
  2
  3   ON BEHALF OF THE FEDERAL TRADE COMMISSION:
  4       HEATHER HIPPSLEY, ESQ.
  5       MARY L. JOHNSON, ESQ.
  6       SERENA VISWANATHAN, ESQ.
  7       DEVIN WILLIS DOMOND, ESQ.
  8       TAWANA E. DAVIS, ESQ.
  9       ANDREW D. WONE, ESQ.
 10       Federal Trade Commission
 11       Bureau of Consumer Protection
 12       601 New Jersey Avenue, N.W.
 13       Washington, D.C. 20001
 14       (202) 326-3285
 15       hhippsley@ftc.gov
 16
 17
 18   ON BEHALF OF THE RESPONDENTS:
 19       JOHN D. GRAUBERT, ESQ.
 20       Covington & Burling LLP
 21       1201 Pennsylvania Avenue, N.W.
 22       Washington, D.C. 20004-2401
 23       (202) 662-5938
 24       jgraubert@cov.com
 25
```

1201

```
  1            UNITED STATES OF AMERICA
  2       BEFORE THE FEDERAL TRADE COMMISSION
  3
  4   In the Matter of            )
                                  )
  5   POM WONDERFUL LLC and       )
      ROLL GLOBAL LLC,            )
  6   as successor in interest to )
      Roll International Corporation, )
  7   companies, and          ) Docket No. 9344
      STEWART A. RESNICK,         )
  8   LYNDA RAE RESNICK, and       )
      MATTHEW TUPPER, individually )
  9   and as officers of the       )
      companies.               )
 10                          )
      -------------------------------)
 11
 12          Thursday, June 9, 2011
 13              10:01 a.m.
 14           TRIAL VOLUME 8
 15           PUBLIC RECORD
 16
 17
 18   BEFORE THE HONORABLE D. MICHAEL CHAPPELL
 19          Administrative Law Judge
 20          Federal Trade Commission
 21          600 Pennsylvania Avenue, N.W.
 22             Washington, D.C.
 23
 24   Reported by: Josett F. Whalen, RMR-CRR
 25
```

1203

```
  1   APPEARANCES: (continued)
  2
  3   ON BEHALF OF THE RESPONDENTS:
  4       BERTRAM FIELDS, ESQ.
  5       Greenberg Glusker
  6       1900 Avenue of the Stars
  7       21st Floor
  8       Los Angeles, California 90067
  9       (310) 201-7454
 10           -and-
 11       KRISTINA M. DIAZ, ESQ.
 12       BROOKE HAMMOND, ESQ.
 13       JOHNNY TRABOULSI, ESQ.
 14       Roll Law Group P.C.
 15       11444 West Olympic Boulevard
 16       10th Floor
 17       Los Angeles, California 90064
 18       (310) 966-8775
 19       kdiaz@roll.com
 20
 21
 22   ALSO PRESENT:
 23       VICTORIA ARTHAUD, ESQ.
 24       HILLARY SLOANE GEBLER, ESQ.
 25
```

1 (Pages 1200 to 1203)

1260

1   Q. So how rapidly the PSA is doubling; is that --
2   A. Correct.
3   Q. And how is PSA doubling time used in clinical
4   practice?
5   A. It's used primarily to establish prognosis.
6      So if a man has, for example, recurrence after
7   radical prostatectomy, you can assess his likelihood of
8   then having a more rapid progression to clinical
9   disease or death from prostate cancer based on that
10  baseline or initial calculation of his PSA doubling
11  time.
12  Q. And establishing risk helps determine what
13  treatments should be administered; is that right?
14  A. Yes.
15  Q. Do clinicians use PSA doubling time to assess
16  risk in patients who have been diagnosed but have not
17  yet received initial treatment for prostate cancer?
18  A. There are some studies to suggest that that is
19  beneficial. Other studies suggest that at the time of
20  initial diagnosis, PSA doubling time is not prognostic,
21  so again there's some physician variability in that.
22     I don't use PSA doubling time prior to surgery,
23  for instance, to consider a man at higher risk just
24  based on the PSA doubling time.
25  Q. In what clinical situations is PSA doubling time

1261

1   most useful in?
2   A. It's most useful in establishing risk in
3   patients who have recurred after primary therapy.
4   Q. And when you say "recurred," are you talking
5   about biochemical recurrence?
6   A. Yes.
7   Q. Is PSA doubling time prognostic?
8   A. At baseline or at the time of recurrence it is.
9   Q. And so it's prognostic for predicting clinical
10  progression or death; is that right?
11  A. Yes.
12  Q. And you just said it's prognostic at baseline.
13  What do you mean? Is that just the time of the initial
14  biochemical recurrence? Is that right?
15  A. So baseline would be when the patient exhibits
16  biochemical failure, that's been confirmed because you
17  need at least two PSAs to calculate a PSA doubling time,
18  and typically while imaging studies are being obtained,
19  et cetera, you'll get a few more PSAs so that you can
20  get an assessment of what the PSA doubling time truly
21  represents.
22  Q. Is there any data, animal studies, in vitro
23  studies, clinical studies, showing that a therapy which
24  modulates PSA doubling time will impact survival?
25  A. Not that I'm aware of.

1262

1   Q. What cutpoints for PSA doubling time are
2   considered to be clinically meaningful?
3   A. The most meaningful value for PSA doubling time
4   is a very short PSA doubling time, which most would
5   agree would be less than three months. Men with a PSA
6   doubling time of less than three months after they
7   failed radiation, surgery, et cetera, they are at very
8   high risk; meaning, the vast majority of those men will
9   go on to subsequent clinical failure; meaning, they
10  develop metastatic disease or a positive scan and
11  ultimately die of prostate cancer.
12     So they're considered a -- men with a PSA
13  doubling time at the time of their recurrence that's
14  less than three months are considered a very high-risk
15  population.
16     PSA doubling times beyond three months, it's
17  controversial. I mean, the cutpoints for where we make
18  a -- you know, why is it three months, it's somewhat
19  artificial, because PSA doubling time is a continuum.
20  But in general, everyone, in quotations, agrees that a
21  short PSA doubling time, typically less than three
22  months, is a very high-risk population.
23     For men with a PSA doubling time above three
24  months, risk will vary. It's always better to have a
25  higher PSA doubling time at your baseline, meaning, at

1263

1   the time you're diagnosed with recurrence, because that
2   has less of an association or the man is less likely to
3   go on to clinical progression.
4   Q. So patients with a PSA doubling time of less
5   than three months at baseline have the lowest -- I'm
6   sorry -- have the highest risk of clinical progression
7   or dying from prostate cancer; is that correct?
8   A. Yes.
9   Q. What about patients with a PSA doubling time of
10  greater than 12 or 15 months at baseline? What would
11  their risk level be?
12  A. So as a PSA doubling time increases, that's a
13  more favorable situation at diagnosis. And for men with
14  a PSA doubling time of -- it varies in the literature --
15  either 12 months or 15 months or greater is considered
16  to be a better prognostic factor.
17  Q. Is PSA doubling time the only factor used to
18  establish the risk of clinical recurrence?
19  A. No.
20  Q. What other factors are used?
21  A. The patient's initial values at diagnosis, so
22  what his PSA was at diagnosis, what his findings on
23  digital rectal examination showed, what were the
24  features in the biopsy, how many of the biopsy
25  specimens -- typically we do a twelve -specimen biopsy,

16 (Pages 1260 to 1263)

1324

**answers.**
**Do you classify pure pomegranate juice as a supplement?**
A. Yes.
**Q. So you define "supplement" as anything in addition to the treatment that you prescribe?**
A. A supplement in terms of a dietary supplement is something that's not part of a regular diet. If someone includes POM and they've been drinking it for years, I don't tell them to stop, but if they're not on a dietary product, I certainly don't encourage them to start.
**Q. So it becomes a supplement if it isn't something they've been doing over a period of time.**
A. It becomes a supplement if it's proposed to do something beneficial for the patient.
**Q. Okay. Is it correct, sir, that your practice is primarily surgical?**
A. My practice is primarily in the early management of prostate cancer.
**Q. Is it primarily surgical, sir?**
A. Define "primarily."
**Q. Well, I meant it in the same way you meant it when you said, at page 72 of your deposition, "My practice is primarily surgical."**

1325

**What did you mean by that?**
A. It's more than 50 percent surgical.
**Q. Now, if I understand you correctly, sir, you say that in order to justify the claims that pomegranate juice could help men with prostate cancer there would have to be a double-blind, placebo-based, randomized trial; correct?**
A. Depending on what you're trying to help. If you're -- it depends on the endpoint you're looking at, so "help" is a fairly broad term, so I would need --
**Q. Sorry. If I'm trying to improve their risk of not dying.**
A. So if one is trying to prove that a substance prolongs survival, then survival has to be an endpoint.
**Q. Well, I'm -- we'll get to endpoints, but I'm talking about a claim, let's say, that improves -- a substance improves your chances of surviving after you have prostate cancer.**
A. If that claim is made, then survival has to be part of a study to support that claim.
**Q. I understand, but are you telling me that the only thing that could support that kind of claim would be a double-blinded, placebo-controlled, randomized trial?**
A. It depends on what you're comparing. Not all

1326

trials -- there should be a comparison arm. The comparison doesn't necessarily have to be a placebo.
So if there's a standard of care already in the community, you compare it to the standard of care. But it should be compared to what's considered routine medical practice.
So there should be a randomized trial supporting your contention.
**Q. Yes. A randomized trial, but it doesn't -- you say it doesn't have to be placebo-based because it can be based on what you call the standard of care, but I take it it has to be double-blinded?**
A. Not necessarily because it will depend upon the treatments. Some treatments you can't realistically double-blind.
So if the standard of care is to do nothing and the treatment you're comparing is chemotherapy, you can't blind it to the chemotherapy. They have to get an IV put in their arm and receive a toxic medication.
So in the design of the trial it depends on the substances you're trying to compare, so some substances it's very easy to come up with a placebo or a comparison arm.
**Q. So in saying that the claims that respondents are charged with making, that those claims could only**

1327

**be supported by certain kinds of trials, you're talking about it has to be randomized, it doesn't necessarily have to be placebo-based if there's what you call standard of care, and it doesn't necessarily have to be blinded; correct?**
A. For a medical treatment such as POM, that can be blinded. There's -- you can come up with a placebo or excuse me -- a comparison substance that's in a capsule form that's similar to the capsule. If there's a liquid they drink, you can come up with a liquid. That's something that should be able to be done.
**Q. Didn't you testify that you were not criticizing Dr. Pantuck's study by his lack of blinding?**
A. There was an impossibility of blind in that study because it was a single-arm study.
**Q. So you weren't criticizing it for not being blinded.**
A. For a phase II study, no. The Pantuck study is not criticized because it wasn't blinded. It couldn't be blinded.
**Q. Okay. Now, you require this test, and then when you say that it -- when the test is one that deals with people that haven't gotten prostate cancer yet that it should have I think you said 10,000 to 30,000 men in the**

1328

1  study?
2      A.  The chemoprevention studies which I believe
3  you're referring to in terms of prevention, yes, those
4  are the sizes of the trials that have been required to
5  show -- to evaluate the agent that you're using.
6      Q.  And that's what you would require of respondents
7  in this case to make a similar claim; isn't that what
8  you're saying?
9      A.  Depending upon the statistics of the study and
10  what claims in terms of benefit that are projected,
11  that's about the size of the study.
12      Q.  You would require 10,000 to 30,000 men I think
13  you testified.
14      A.  Yes.  That would be the standard study for a
15  chemoprevention trial.
16      Q.  And wouldn't that be a very expensive study,
17  Doctor?
18      A.  They typically are incredibly expensive, yes,
19  sir.
20      Q.  Yes.  I think the nurses health study it was
21  like $600 million, something like that.
22          Isn't that what the ballpark for that kind of
23  study is?
24      A.  It's in that range.
25          But cost shouldn't necessarily change the bar of

1329

1  the scientific effort.  I mean, just because something
2  is expensive and difficult to do doesn't mean that that
3  relieves someone from the burden of proof.
4      Q.  Yes.
5          And even though you might be talking about a
6  substance that potentially has a benefit and is, let's
7  say, harmless -- assume that -- and it might have a
8  benefit, something like fruit juice, you still would
9  require that kind of trial before you would allow the
10  claims to be made?
11      A.  Yes.
12      Q.  All right.
13      A.  And that's based on experience that we have
14  with vitamin E and selenium.  They're innocuous
15  substances.  They don't cause problems and they work.
16  When the studies were done, they didn't work and they
17  did cause problems, so it's -- it's not -- it's a leap
18  of faith to make a claim that something is innocuous
19  when it hasn't been very well-studied in the scientific
20  realm.
21      Q.  Well, I asked you to assume that the product
22  was harmless, is my question.
23          So make the assumption the product is harmless,
24  it might create a benefit, and you still would
25  require --

1330

1      A.  Those are two pretty big hypotheticals, but I'd
2  still require it.
3      Q.  You would still require the test you're talking
4  about, the very expensive kind of test; right?
5      A.  Yes.
6      Q.  Okay.  And the reason I think you gave for that
7  is it still costs money; isn't that the reason, that a
8  harmless product that might create a benefit, you would
9  not allow a claim to be made with respect to that
10  product unless you had this kind of test, and that's
11  because it will cost money?
12      A.  That's one of the reasons.  Yes, sir.
13      Q.  Would you state the other reason that -- other
14  than it costs money.  If you assume it's harmless and
15  you assume it might have a benefit, but you're not going
16  to let a claim be made to the public about it, what's
17  the other reason?
18      A.  With the caveat that those are incredibly
19  difficult assumptions to make or accept, you're
20  purporting that you're providing a benefit to the
21  patient when there might not be one.
22      Q.  I asked you to assume that there's a possible
23  benefit and no possible detriment, and you are saying,
24  as I understand it, that you still would require these
25  tests in order to make the claim, and I am asking you if

1331

1  there's any reason other than cost, which is the reason
2  you gave in your deposition.
3      A.  Cost is one of them.  You also don't want
4  patients to ignore other types of treatments.
5      Q.  Well, let's build that into the assumption, that
6  no one tells the patient to ignore proper medical care.
7  I don't think there's any evidence in this case of the
8  respondents telling anyone that they should ignore
9  medical care.
10          So build that into the assumption.  Nobody is
11  saying to ignore medical care.  On the contrary,
12  they're saying, See your doctor.  It's safe and it
13  might create a benefit.  And you're saying, I wouldn't
14  tell the public about it, I wouldn't tell anybody in
15  the public about it unless they have this hugely
16  expensive test.
17      A.  That is correct.
18      Q.  Thank you.
19          Now, Doctor, you said you perform about
20  200 radical prostatectomies per year?
21      A.  Yes.
22      Q.  You've been doing that for a number of years?
23      A.  Yes.
24      Q.  And you told us I think that that operation has
25  serious side effects.  Impotence, incontinence, those

33 (Pages 1328 to 1331)

1332

1  are the two you mentioned, but there's also danger of
2  bleeding, embolisms, infection, risks of general
3  anesthetic.
4       Those are all risks of your operation; correct?
5       A. Yes.
6       Q. And you did that operation for years before
7  there was any scientific evidence that it worked; isn't
8  that correct?
9       A. Not no scientific evidence, no randomized,
10 controlled trials that supported it.
11      Q. Yes. Not the randomized, controlled kind of
12 trial you've been saying is necessary for pomegranate
13 juice; right?
14      A. Yes.
15      Q. So you cut out hundreds of men's prostates,
16 taking all those risks, and you're telling us you would
17 not even consider pomegranate juice without this kind of
18 trial, the kind of trial you didn't have to take out
19 hundreds of men's prostate glands; right?
20      A. Yes.
21      Q. Thank you.
22      Doctor, you mentioned a p-factor and statistical
23 significance. Do you remember that?
24      A. Yes.
25      Q. You're not suggesting that Dr. Pantuck and

1333

1  Dr. Carducci's studies that show the benefit from
2  pomegranate juice didn't reach statistical significance,
3  are you?
4       A. The endpoint that they were looking at in the
5  study that they both performed did reach statistical
6  significance.
7       Q. So when you testified about the need for -- I
8  don't think you called it a need, but you testified
9  about what statistical significance was -- that didn't
10 have anything to do with Dr. Carducci and Dr. Pantuck;
11 correct?
12      A. It didn't have anything to do with their
13 studies, no.
14      Q. Okay. Let's talk a little bit about a placebo.
15      You said, sir, that the -- I think you called it
16 the standard of care could be substituted for a placebo;
17 right?
18      A. Yes.
19      Q. And the standard of care means what happened
20 before the intervention; is that correct?
21      A. No.
22      So if -- so in the setting up of biochemical
23 recurrence, if there was a drug that had already been
24 proven to be beneficial compared to placebo, that would
25 be the standard of care, so that's what you would

1334

1  compare it to.
2       Q. Yes. That's what I meant.
3       A. Okay. I misunderstood you then.
4       Q. What the patient had been doing before, what
5  drug the patient had been taking, is measured against
6  what new drug is given to the patient; isn't that
7  correct?
8       A. Typically, yes.
9       Q. And you're saying that's okay instead of a
10 placebo; right?
11      A. Because that other drug typically has already
12 been shown to be better than placebo.
13      Q. But the new drug taken without a placebo doesn't
14 enable you to know that it's because of the new drug
15 that these changes are occurring, does it?
16      A. You would have to compare it to what the
17 standard of care -- you have to have a comparison.
18      Q. I know, sir. But if the standard of care were
19 drug A and it got certain results and now we take drug B
20 and it gets a better result, without a placebo you don't
21 know that that better result is because of drug B, do
22 you?
23      A. Well, the scientific method would not be
24 required to compare drug B to placebo; it would be to
25 compare drug B to drug A.

1335

1       Q. Yes. But there are other factors that might be
2  causing the change other than switching drugs; right?
3       A. Not if the study has been randomized and
4  appropriately done because that will take into account
5  other biases that could happen during the study.
6       Q. How would you know, for example, that the people
7  taking drug B aren't exercising more and eating more
8  broccoli or taking some other drug?
9       A. So that's the importance of randomization and
10 blinding. And what randomization and blinding tries to
11 do is get you equivalent patients as closely as you can
12 match within the groups so that those who exercise
13 should be equally represented in those taking drug B and
14 drug A.
15      Q. Well, once they start taking drug B and you go
16 on for years or whatever it takes to do this
17 experiment, you don't know that they're not exercising,
18 do you?
19      A. That's what the randomization process is for.
20      Q. That's only at the beginning, sir; correct?
21      A. That's not true. You randomize patients taking
22 into account that some of them may start exercising,
23 some of them may start meditating, but the assumption is
24 that randomization will include the same numbers of
25 exercising people in each arm.

34 (Pages 1332 to 1335)

# In the Matter of:

# POM Wonderful, et al.

*June 13, 2011*
*Public Record*
*Trial Volume 9*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

1406

```
 1                    FEDERAL TRADE COMMISSION
 2                          I N D E X
 3                 IN RE POM WONDERFUL LLC, ET AL.
 4                        TRIAL VOLUME 9
 5                         PUBLIC RECORD
 6                         JUNE 13, 2011
 7
 8   WITNESS:      DIRECT   CROSS   REDIRECT   RECROSS   VOIR
 9   SACKS          1410    1530     1616
10   RESNICK        1628
11
12
13   EXHIBITS   FOR ID   IN EVID   IN CAMERA   STRICKEN/REJECTED
14   CX
15   (none)
16   PX
17   (none)
18   RX
19   (none)
20   JX
21   (none)
22   DX
23   (none)
24
25
```

1407

```
 1              UNITED STATES OF AMERICA
 2        BEFORE THE FEDERAL TRADE COMMISSION
 3
 4   In the Matter of            )
                                 )
 5   POM WONDERFUL LLC and       )
     ROLL GLOBAL LLC,            )
 6   as successor in interest to )
     Roll International Corporation, )
 7   companies, and          ) Docket No. 9344
     STEWART A. RESNICK,        )
 8   LYNDA RAE RESNICK, and     )
     MATTHEW TUPPER, individually )
 9   and as officers of the     )
     companies.                 )
10                              )
     --------------------------------)
11
12            Monday, June 13, 2011
13               9:33 a.m.
14            TRIAL VOLUME 9
15            PUBLIC RECORD
16
17
18   BEFORE THE HONORABLE D. MICHAEL CHAPPELL
19        Administrative Law Judge
20        Federal Trade Commission
21        600 Pennsylvania Avenue, N.W.
22           Washington, D.C.
23
24   Reported by:  Josett F. Whalen, RMR-CRR
25
```

1408

```
 1   APPEARANCES:
 2
 3   ON BEHALF OF THE FEDERAL TRADE COMMISSION:
 4       HEATHER HIPPSLEY, ESQ.
 5       MARY L. JOHNSON, ESQ.
 6       SERENA VISWANATHAN, ESQ.
 7       DEVIN WILLIS DOMOND, ESQ.
 8       JANET EVANS, ESQ.
 9       Federal Trade Commission
10       Bureau of Consumer Protection
11       601 New Jersey Avenue, N.W.
12       Washington, D.C.  20001
13       (202) 326-3285
14       hhippsley@ftc.gov
15
16   ON BEHALF OF THE RESPONDENTS:
17       JOHN D. GRAUBERT, ESQ.
18       Covington & Burling LLP
19       1201 Pennsylvania Avenue, N.W.
20       Washington, D.C.  20004-2401
21       (202) 662-5938
22       jgraubert@cov.com
23
24
25
```

1409

```
 1   APPEARANCES:  (continued)
 2
 3   ON BEHALF OF THE RESPONDENTS:
 4       BERTRAM FIELDS, ESQ.
 5       Greenberg Glusker
 6       1900 Avenue of the Stars
 7       21st Floor
 8       Los Angeles, California  90067
 9       (310) 201-7454
10            -and-
11       KRISTINA M. DIAZ, ESQ.
12       BROOKE HAMMOND, ESQ.
13       JOHNNY TRABOULSI, ESQ.
14       Roll Law Group P.C.
15       11444 West Olympic Boulevard
16       10th Floor
17       Los Angeles, California  90064
18       (310) 966-8775
19       kdiaz@roll.com
20
21
22   ALSO PRESENT:
23       VICTORIA ARTHAUD, ESQ.
24       HILLARY SLOANE GEBLER, ESQ.
25
```

1 (Pages 1406 to 1409)

1414

1   A. Yes. That's really where my research started.
2   It started in nutrition back when I was a medical
3   student in the '70s, and it's been a major theme of my
4   research career up to the present time.
5   **Q. And has your research also included the effects**
6   **on coronary heart disease or cardiovascular disease and**
7   **various risk factors of modifying diets, foods, food**
8   **components and drugs?**
9   A. Yes.
10  **Q. Has your research resulted in published**
11  **articles?**
12  A. Yes.
13  **Q. About how many published articles?**
14  A. Well -- okay. So research articles in the
15  peer-reviewed science literature certainly some -- about
16  170 of those. And then I've also written review
17  articles on topics such as the ones you mentioned, and
18  I've written editorials and position papers, and so
19  forth, and those also get published in major scientific
20  journals, and I have about 60 or 70 of those.
21  **Q. On the table before you is a document that's**
22  **been marked CX 1291. Could you identify that document.**
23  **It's in the left-hand side of your binder.**
24  A. Yes. That's my expert report.
25  **Q. Okay. Now, on pages 2 and 3 of this report you**

1415

1   **have listed some publications; is that correct?**
2   A. Correct.
3   **Q. Do those -- the articles listed there, do they**
4   **report on original research that you have conducted?**
5   A. Yes.
6   **Q. Okay. I want to ask you about the research**
7   **underlying some of these articles.**
8   **For example, could you talk about the study**
9   **that's identified in paragraph (e).**
10  A. Paragraph (e), yes.
11  Well, this was a randomized, controlled study.
12  It was a comparative effectiveness study of different
13  diets to promote weight loss in people who were
14  overweight or obese. It was a two-year study. It was
15  the largest of its kind. Eight hundred -- over
16  800 overweight or obese participants were randomized to
17  one of four weight loss diets, and the results over two
18  years were studied.
19  It was a study -- the research was sponsored by
20  the National Institutes of Health, actually the
21  National Heart, Lung and Blood Institute, and it was
22  published in the New England Journal of Medicine in
23  2009.
24  **Q. And is the New England Journal of Medicine a**
25  **high-end journal?**

1416

1   A. The New England Journal is considered to be the
2   top.
3   **Q. Could you describe the research that's listed in**
4   **paragraph -- I believe this is paragraph (l).**
5   A. (l), yes. Okay.
6   Well, this was a randomized, placebo-controlled
7   trial of a drug, pravastatin, which is a statin drug.
8   It lowers cholesterol levels. And it was a study to
9   determine whether pravastatin reduced heart disease in
10  patients who had average cholesterol levels.
11  And that was a big issue in the late '80s and
12  early '90s. The issue was whether an average
13  cholesterol level was really too high and should be
14  lowered via drug treatment.
15  This was a study in 4,159 patients, and the
16  duration was five years, and indeed we found that
17  pravastatin significantly reduced heart attacks,
18  strokes, related conditions in these patients.
19  **Q. And with regard to the study that's listed and**
20  **described in paragraph (j), could you discuss that.**
21  A. Yes. Okay. (j).
22  Now -- so this was a meta-analysis of
23  cholesterol-lowering effects of dietary fibers, meaning,
24  for example, oat bran or fruit pectin, guar gum that's
25  used in some -- in foods.

1417

1   So the issue at that point was that individual
2   studies were very inconsistent in results about whether
3   these fibers lowered cholesterol, some studies showing
4   yes and some studies saying no.
5   So when that happens, the standard procedure is
6   to combine all of these studies together in what's
7   called a meta-analysis to determine what the overall
8   impact of fiber is on cholesterol levels. And indeed,
9   there was a small real effect of fiber on cholesterol
10  levels that was identified by the meta-analysis
11  technique.
12  And that was published in the
13  American Journal of Clinical Nutrition. In fact when I
14  checked a few years ago, a couple of years ago, when I
15  was an associate editor of that journal, this paper was
16  the most widely cited of all the AJCN papers over the
17  years.
18  **Q. And turning to paragraph (m) of your expert**
19  **report, could you describe the research that underlie**
20  **that report.**
21  A. Yes. Okay. Well, this was the well-known
22  DASH diet. Now, DASH is a diet that was designed to
23  lower blood pressure, and it utilized all the evidence
24  available on foods and nutrients to lower blood
25  pressure. I led -- I was the chair of the study design

3 (Pages 1414 to 1417)

1418

1  committee that designed the DASH diet and the DASH
2  study.
3       This study -- so this study showed that diets
4  that are high in fruits and vegetables, high in whole
5  grains, fish, reduced in sugar and sugar-sweetened
6  beverages, reduced in refined carbohydrates and red
7  meats, that diet, the diet that is now called the
8  DASH diet, substantially lowered blood pressure compared
9  to the control diet, which was sort of what people eat,
10 what an average -- an average American diet.
11      And that study was published in New England
12 Journal of Medicine, and in fact the DASH diet and its
13 modified -- modifications or improvements over the years
14 is in fact the standard used for U.S. dietary goals and
15 the American Heart Association's nutrition guidelines,
16 and so forth.
17      Q. Thank you.
18      Now, during your career you've conducted both
19 observational research and randomized clinical trials;
20 correct?
21      A. Correct.
22      Q. Can you conclude from observational research
23 that there's a causal effect between an intervention and
24 reduction of heart disease?
25      A. No. That cannot be proven from an observational

1419

1  study.
2       Q. Does that mean that observational research is
3  bad?
4       A. Oh, no. Observational research is very, very
5  important. Particularly well-conducted, well-executed
6  observational research is very important. It's just one
7  important modality in the progress of evaluating foods,
8  nutrients or anything.
9       Q. Have you offered -- and you mentioned earlier
10 that you've also offered review articles relating to
11 cardiovascular disease, coronary heart disease and the
12 relationship between nutrition and these diseases or
13 other risk factors?
14      A. Yes.
15      Q. Are some of them identified on page 5 of your
16 report?
17      A. Yes.
18      Q. For example, could you describe what the
19 publication that's marked as -- on page 5 as
20 paragraph (a), could you identify the substance of that
21 article.
22      A. Yes, paragraph (a).
23      Well, paragraph (a) is a scientific statement
24 from the American Heart Association on dietary sugars
25 and cardiovascular health. I was a member of the

1420

1  writing group and participated in discussions and
2  editing, drafting of that, of that article.
3       So that article is published in Circulation.
4  It's the leading heart journal that's -- it's produced
5  by the American Heart Association, and it's where the
6  American Heart Association publishes its scientific
7  statements.
8       So we -- the -- you know, the bottom line was
9  that we certainly had concern about this high amount of
10 sugar intake causing obesity and other metabolic
11 problems.
12      And also that actually -- that statement came
13 out of the nutrition committee of the
14 American Heart Association of which I am currently the
15 chair.
16      Q. Could you describe what paragraph (b) is.
17      A. Okay. Paragraph (b) is also a scientific
18 statement from the American Heart Association. The
19 Heart Association was quite concerned that the
20 scientific discussion on polyunsaturated fatty acids
21 was getting skewed in a particular direction favoring
22 the omega-3 fatty acids, whereas the scientific evidence
23 was very strongly that both the omega-3 and the omega-6
24 polyunsaturated fats were beneficial.
25      We wanted to set the record straight, and we

1421

1  organized a writing group led by the first author,
2  Harris, William Harris, who has built his reputation on
3  omega-3 fatty acids, so here we had a top researcher in
4  omega-3 fatty acids writing a statement emphasizing that
5  omega-6 fatty acids are very beneficial. As you can
6  see, I was the senior author of that statement.
7       Q. With regard to the publication identified in
8  paragraph (d), could you discuss that document.
9       A. Yes. Okay. Now, that's a -- the
10 Heart Association wanted to have an update of effects
11 of soy protein, isoflavones, and cardiovascular health.
12      At that time I was a member of the nutrition
13 committee -- I was not in the leadership at that time --
14 and the leadership asked if I could study the evidence
15 and lead the writing group.
16      And in fact the evidence in fact was very much
17 balanced between benefit and no benefit of soy protein
18 and isoflavones with actually the potential that there
19 could be some harm on the cancer side.
20      So we felt that was extremely important to
21 summarize for the public because again the public was
22 getting in some ways a skewed concept of the benefits of
23 soy protein and the soy isoflavones. Particularly
24 women's health we felt the message was getting a little
25 bit away from the scientific evidence.

4 (Pages 1418 to 1421)

1546

1    Q. You agree.
2    A. Yes.
3    Q. Okay. Good.
4       And is it correct that this is because the DASH
5  diet has already included and tested fruit as a
6  category?
7    A. Correct. Fruits and vegetables.
8    Q. Yeah, fruit individually.
9    A. Yes.
10   Q. And is it correct, sir, that you include as a
11 fruit in that category we just discussed pomegranates?
12   A. Yes. I would include -- I would include
13 pomegranates.
14   Q. So they get a lower standard along with
15 pineapples and papayas and bananas, et cetera --
16   A. Yes.
17   Q. -- right?
18      You can --
19   A. I agree.
20   Q. Okay. Good. Good. All right.
21      Now, you appear to draw a line between
22 pomegranates and pomegranate juice, and if I understand
23 your testimony correctly, at your deposition you seemed
24 to say that although pomegranates get a lower standard,
25 they don't need two RCTs, pomegranate juice does; is

1547

1  that your position?
2    A. Correct.
3    Q. Okay. And sir, isn't it true that you testified
4  you were not offering any opinion as to any differences
5  between pomegranates and pomegranate juice? Do you
6  remember that?
7    A. I have not offered an opinion? I'm sorry. I
8  don't understand the question.
9    Q. Well, I understood you to testify in your
10 deposition that you were not offering any opinion as to
11 any differences between pomegranates and pomegranate
12 juice. That's at page 77 of your deposition you've got
13 there and you can look at it.
14   A. Okay.
15      JUDGE CHAPPELL: Why don't we see if he agrees
16 with you before he needs to look at the deposition.
17      MR. FIELDS: Okay. Yes.
18      BY MR. FIELDS:
19   Q. Do you agree with me that you're not offering
20 any opinion on the differences between pomegranates and
21 pomegranate juice?
22   A. Well, I certainly have my opinion.
23   Q. Well, but whether you have one is somewhat
24 different from whether you told us you were not
25 offering an opinion on that, because when you say

1548

1  you're not offering an opinion, we tend to rely on
2  that.
3       So can you tell us if in fact that is what you
4  said?
5       JUDGE CHAPPELL: Let me see if I can clarify
6  this. I think the witness may be confused.
7       Are you asking him if he's offering an opinion
8  in this case for the FTC or does he have an opinion?
9       MR. FIELDS: No, no. I'm asking him if he --
10      JUDGE CHAPPELL: Because I heard him say "I have
11 an opinion," but I'm not sure he understood what you
12 meant by "offering an opinion."
13      BY MR. FIELDS:
14   Q. I mean offering an opinion in this case.
15      Didn't you testify you were not offering an
16 opinion in this case on the differences, if any, between
17 pomegranates and pomegranate juice?
18   A. Oh, okay. Thank you. I just wasn't requested
19 to --
20   Q. Sure.
21   A. -- so I'm not.
22   Q. All right. And you're not offering any opinion
23 in this case on the physical properties of either
24 pomegranates or pomegranate juice; isn't that correct?
25   A. Correct.

1549

1    Q. Okay. Now, you said that pomegranates were
2  exempted from the two-RCT rule because they were part of
3  a category of fruit that had already been tested in the
4  DASH diet.
5       Isn't it correct, sir, that fruit juice was also
6  tested in the DASH diet as a category rather than
7  separate fruit juices?
8    A. Well, there was -- I mean, fruit juice was
9  included. That's correct.
10   Q. Well, fruit juice was treated exactly the same
11 as fruit in the DASH diet; isn't that true, sir?
12   A. Not really.
13   Q. Well, let's take a look at the DASH diet.
14      I'd like you to look at first Exhibit 5020,
15 5020.
16      And if my associate can approach the witness?
17      JUDGE CHAPPELL: Yes. Go ahead.
18      BY MR. FIELDS:
19   Q. If you look, sir, on page 6 of that exhibit, you
20 will see the DASH diet.
21      Now, it says, the third category, fruits, four
22 to five a day, three-quarters of a cup of fruit juice,
23 one medium fruit, one quarter cup dried fruit, one half
24 cup fresh, frozen or canned fruit.
25      Now, that is what has been tested and included

36 (Pages 1546 to 1549)

1558

1  continue, of necessity, to be derived from observational
2  studies?
3      A. Well, there are certainly some diseases that
4  that's probably right, yeah.
5      Q. Okay. And Dr. Stampfer points out, at page 481,
6  the importance of RCT trials in testing drugs, but he
7  says, and I quote, "These concerns are substantially
8  less pressing in nutrients."
9          Do you agree with that?
10     A. Well, in the -- I don't know what his context
11 is, but in my context in what I've been talking about
12 here, cardiovascular diseases, there's not so much of a
13 disparity between -- a disparity between what can be
14 done with a drug and what can be done with a nutrient or
15 food or extract.
16     Q. Except in the case of fruits and fruit juices,
17 which we've discussed; right?
18     A. Except in -- as we have discussed, granted.
19     Q. Now, Dr. Stampfer addresses the kind of decision
20 we face here, and he concludes there can be a sufficient
21 foundation for nutrient-related claims in the absence of
22 RCTs. That's at page 483.
23         Do you agree with that statement?
24         Sir?
25     A. Yes. I'm just trying to digest that question.

1559

1      Q. Oh, I'll read it again.
2          That there can be a sufficient foundation for
3  nutrient-related claims in the absence of RCTs.
4      A. Well, I don't -- I mean, we always need RCTs
5  on -- at least on surrogate markers in addition to the
6  observational studies that Dr. Stampfer conducts.
7      Q. All right. Dr. Stampfer adds -- we're getting
8  to the end of this -- that it's important, and I quote,
9  "to assess the balance between the potential harm of
10 making any given recommendation and the potential harm
11 of not making it."
12         Do you agree with Dr. Stampfer on that?
13     A. Fair enough in general.
14     Q. And that means that we have to weigh the risk
15 that the product will do harm against the potential harm
16 in keeping the information from the public; isn't that
17 what that means?
18     A. Correct.
19     Q. Okay. Now, is it true that there are common
20 clinical recommendations today that haven't been proven
21 by RCT trials?
22     A. Yes.
23     Q. And you yourself make public health claims that
24 you think will benefit the public even when you don't
25 have RCT trials to substantiate the results; isn't that

1560

1  correct as well?
2      A. I'm -- well, let's think of an example. I tell
3  people they should stop smoking, and we don't have, you
4  know, a 10,000-patient smoking cessation trial as far as
5  I know.
6          I'd say the nutrition-based advice I give,
7  recommendations, does have randomized clinical trial
8  basis for it.
9      Q. Well, how about your own DASH study on sodium
10 intake? Didn't you tell us that was not a blinded study
11 in reality?
12     A. Well, it was a single -- it was actually a
13 blinded study, but as I mentioned earlier in direct
14 testimony, something like sodium, the participants
15 get -- will certainly get some idea of whether
16 they're -- whether they're eating a high-sodium or a
17 low-sodium diet, but it is certainly a blinded study
18 with regard to the measurers, the investigators, which
19 is the critical thing. And it is a randomized,
20 controlled trial, the DASH sodium study.
21     Q. All right. Weren't you criticized by some
22 doctors because these were not major RCT trials
23 supporting what you said?
24     A. I don't know exactly what you refer to.
25     Q. Well, let's look at your article on sodium.

1561

1          I'll give you a number in a minute, and we'll
2  supply you with a copy, I hope.
3          Yes. It's called The Importance of
4  Population-Wide Reduction as a Means to Prevent
5  Cardiovascular Disease and Stroke.
6          JUDGE CHAPPELL: Go ahead.
7          BY MR. FIELDS:
8      Q. I refer you, with regard to my last question, to
9  page 3, and I quote:
10         "Some scientists still question the evidence
11 supporting population-wide sodium reduction. Common
12 arguments include the absence of a major trial with hard
13 clinical outcomes. It is well-known, however, that such
14 trials are not feasible because of logistic, financial,
15 and often ethical considerations."
16         Did you say that, sir?
17     A. Yes.
18     Q. Okay. And when you said they are not feasible
19 because of financial considerations, you were talking
20 about the cost of conducting that kind of major trial;
21 right?
22     A. Yes.
23     Q. Okay. Now, you claim that sodium reduction was
24 an integral component of preventing CVD, stroke and
25 kidney disease; isn't that correct?

39 (Pages 1558 to 1561)

1562

1    A. Preventing CVD and -- the last part? I'm sorry.
2    **Q. Stroke and kidney disease.**
3    A. Correct.
4    **Q. Now, let's look at some other examples.**
5        **You told the public that the intake of omega-6**
6    **reduces the risk of coronary heart disease; isn't that**
7    **correct?**
8    A. Correct.
9    **Q. And isn't it correct that that was based on what**
10   **you called flawed and unblinded studies with small**
11   **sample sizes plus observational studies on animals and**
12   **humans?**
13   A. I don't recall those words. I'd have to see the
14   context.
15   **Q. All right. Let's look at -- I'll give you the**
16   **number in a minute. It's the article that you wrote on**
17   **omega-6. It's Exhibit 5022.**
18   A. Okay. I'm familiar with this article.
19   **Q. All right. I'm looking for the page.**
20       **Did you say that the studies that had been done**
21   **on omega-6 had the inability to double-blind these**
22   **studies, that they had design limitations such as small**
23   **sample size, that they had soft endpoints, that they had**
24   **randomization of sites rather than individuals with open**
25   **enrollment, that they had a high turnover of subjects,**

1564

1    A. Oh, yes. There were lots of randomized clinical
2    trials.
3    **Q. You said they were unblinded.**
4    A. Some were; some weren't.
5    **Q. Pardon me?**
6    A. Some were; some weren't. Some were small; some
7    were big.
8    **Q. And you heavily criticized them, as I read to**
9    **you.**
10   A. We wanted to show, as good scientists should,
11   that we recognized the weaknesses as well as the
12   strengths of the studies we're evaluating.
13   **Q. So even though a weakened study with all the**
14   **problems that I just read to you, that would still**
15   **support a recommendation if you felt it was in the**
16   **interest of the public to give that recommendation;**
17   **isn't that true?**
18   A. Untrue.
19   **Q. Untrue.**
20       **You would --**
21   A. Untrue.
22   **Q. You would never recommend something based upon**
23   **the kind of studies that I read to you?**
24   A. The recommendation -- our decision to go forward
25   with those studies is not due to showing -- is not due

1563

1    **but nevertheless, based on those studies and some**
2    **observational trials, you strongly recommended omega-6**
3    **and said it reduces the risk of coronary heart disease;**
4    **right?**
5    A. Correct.
6    **Q. Okay. And your public recommendation of reduced**
7    **sugar intake was also based on observational studies;**
8    **isn't that correct?**
9    A. Well, it was based on observational studies and
10   also randomized, controlled trials and just like the
11   omega-6 was, observation and randomized, controlled
12   trials.
13       I mean, you know, just to go back, I mean, you
14   cited our honest -- our honest writing where we are
15   explaining the limitations of the studies. In
16   contrast, those studies have major strengths. If
17   they're a bunch of lousy studies, we aren't going to
18   use them to form recommendations. There were major
19   strengths to those studies, and that's why we came to
20   that conclusion.
21   **Q. Even if they were not RCTs.**
22   A. Well, I'm going back to the omega-6 --
23   **Q. Yeah.**
24   A. -- and --
25   **Q. Omega-6 --**

1565

1    to exposing the public to studies that had a bunch of
2    flaws; it was to expose the public to studies that had
3    major strengths.
4    **Q. But you referred to all those flaws in the**
5    **studies that you were relying upon, even though are you**
6    **now telling me with all those flaws they still had**
7    **major strengths?**
8    A. Well, we have -- we can sit down and discuss
9    all the strengths rather than just discussing the
10   flaws --
11   **Q. Well, is your --**
12   A. -- or the limitations. There are plenty of
13   strengths. Otherwise, we wouldn't be recommending
14   them.
15   **Q. But you'll agree with me I think that the fact**
16   **that a study has a number of flaws like those that you**
17   **referred to in this article doesn't disqualify it, it**
18   **may still have major strengths; correct?**
19   A. Correct.
20   **Q. Okay. Now, let's go back a little bit to what**
21   **we started this morning, that is, talking about safety.**
22       **And you told me that about RCT tests you**
23   **couldn't go on with saying that a product was safe;**
24   **right?**
25   A. We need RCTs to make -- we need RCTs to make a

40 (Pages 1562 to 1565)

1578

1   So it's essentially, like you said, Your Honor,
2   beneficial, a good thing, a protective mechanism that
3   just has just gotten out of control.
4      Q. Okay. So what Dr. Aviram showed was that
5   pomegranate juice inhibited the macrophagic uptake of
6   the LDL; isn't that correct?
7      A. Yes.
8      Q. And in vitro studies like Dr. Aviram's enable us
9   to understand the mechanism by which agents like
10  pomegranate juice have an effect; isn't that correct?
11     A. They're used to study -- they study actions of
12  agents like pomegranate.
13     Q. And isn't it correct that they can provide
14  competent and reliable evidence of such an agent's
15  effect on a particular mechanism?
16     A. Correct.
17     Q. Okay. Just to make it shorthand, some of
18  respondents' in vitro studies showed favorable effects
19  of pomegranate juice on the mechanisms involved in
20  cardiovascular disease; isn't that correct?
21     A. Correct.
22     Q. Now, Dr. Aviram also did animal studies on
23  pomegranate juice at the Technion Institute; isn't that
24  right?
25     A. Yes.

1579

1      Q. Okay. And those also showed some favorable
2   effects for the pomegranate juice on this process.
3      A. Correct.
4      Q. One such study, for example, showed that
5   pomegranate juice showed a marked decrease in the
6   oxidation of LDL; right?
7      A. Correct.
8      Q. And it also caused a significant reduction in
9   atherosclerotic vessels; isn't that right?
10     A. I think so. If I remember right.
11     Q. Okay. It's hard to remember all of these
12  studies I agree.
13     Now, of course animal studies, as you've pointed
14  out, can't always be replicated in humans, but sometimes
15  they can; isn't that true?
16     A. Well, sometimes they can.
17     Q. And sometimes we assume that they can, for
18  example, when we do safety studies, we make that
19  assumption, don't we?
20     A. Well, that's really not true. A safety study,
21  a toxicology study in animals must be done, and agents
22  must pass the tox test in animal studies, but then of
23  course the safety must be very carefully evaluated in
24  humans as well because humans don't have necessarily
25  the same sensitivity that animals do and sometimes they

1580

1   have sensitivities to agents that the animals don't
2   have.
3      Q. I understand.
4      But you've said that animal testing is essential
5   to safety; isn't that right?
6      A. Correct.
7      Q. And when we test an animal and the animal study
8   shows that it's safe, we tend to assume that it's safe.
9      That doesn't mean we're not going to do a human
10  study because, as you pointed out, it may not be the
11  same; is that right?
12     A. Incorrect. When it passes the animal safety
13  studies, all we say is we can advance it to phase I
14  human testing.
15     Q. Okay. Now, like in vitro studies, animal
16  studies are very useful; you'd agree with that?
17     A. Correct.
18     Q. Another of Dr. Aviram's human studies -- this
19  time it is a human study -- he did a human study on the
20  oxidation stress and atherogenic changes in LDL; isn't
21  that correct?
22     A. Correct.
23     Q. And that showed a marked decrease in those
24  factors that contribute ultimately to plaque and reduced
25  blood flow to the heart?

1581

1      A. Well, actually I'll have to look at that
2   specific study. You know, I don't put -- I mean, what
3   is the study? I have to look at that study to be able
4   to answer your question. I mean, which one of the many
5   Aviram studies are you asking me to opine on?
6      Q. Well, it's an observational study, so if you
7   were going to apply the RCT test, it flunks, but if
8   you're applying the fruit and fruit juice test, it may
9   be sufficient.
10     You don't recall whether it shows a marked
11  decrease in those factors that contribute ultimately to
12  plaque.
13     A. Well, if it's -- if it's uncontrolled, well,
14  then we don't know whether the pomegranate juice really
15  did anything or not. We just know that two events
16  occurred in a time sequence. That's all.
17     Q. Now, another of Dr. Aviram's human studies dealt
18  with ACE, as you called it, and I think that's serum
19  angiotensin converting enzyme; is that right?
20     A. Correct.
21     Q. And ACE contributes to the oxidation of LDL;
22  isn't that right?
23     A. Is that true? No, I don't know.
24     Q. You don't know.
25     A. No.

44 (Pages 1578 to 1581)

1606

1    is that what you mean?
2        A.  Well, we don't know if it's underpowered.
3        Q.  Well, didn't you say it was underpowered?
4        A.  It could have been; it couldn't have been.
5        Q.  Didn't you say it was underpowered sir?
6        A.  It could have been underpowered -- well, if I
7    said it in the deposition, that's a possibility.  It
8    could have been or it couldn't have been.
9        Q.  Well, I understand you to say that Dr. Ornish
10   was unreasonable in saying that it was underpowered, and
11   I'm asking you if you said the same thing.
12       A.  Okay.  Well, let's go -- then I'd like to see
13   what I said.
14           JUDGE CHAPPELL:  What about what you believe?
15   First of all, was it underpowered?
16           THE WITNESS:  Oh, thank you, Your Honor.
17           JUDGE CHAPPELL:  And then let's worry about what
18   you said.
19           THE WITNESS:  Okay.  What I believe is I -- I
20   don't know if the study is underpowered because, I mean,
21   it -- because I don't know what the potential -- what
22   the potential effect the researchers would expect to
23   find.
24       I mean, for example, some CIMT studies can show
25   significant effects with sample sizes in the seventies

1607

1    and some require sample sizes in the hundreds.  If it --
2    so I'm just not sure whether his study was truly
3    underpowered.
4           BY MR. FIELDS:
5        Q.  Well, let me read you from line 20 of page 208
6    of your deposition:
7            "Dr. Sacks, if you want to finish."  That's the
8    question.
9            And your answer is (as read):  "No.  So
10   unfortunately he ended up with a study that was
11   underpowered.  That's just unfortunate."
12       A.  Okay.  Fair enough.
13       I mean, my feeling is that at the time -- at
14   the time I -- I mean, my feeling at the moment is that
15   it, as I've gone through this case over and over again
16   since the deposition, is that it may have been
17   underpowered, it may not have been underpowered,
18   depending on the potential of the pomegranate juice to
19   cause the change.
20       If pomegranate juice is inert, then it wouldn't
21   matter how many subjects were studied.  A negative is a
22   negative.  If the pomegranate juice is capable of
23   producing a very small effect, then possibly this study
24   was underpowered.
25           JUDGE CHAPPELL:  This might not be a wise

1608

1    question, but what do you mean by "underpowered"?
2        THE WITNESS:  Well, "underpowered" means that
3    the study has -- does not have you might say the
4    ability or the -- the ability to detect an important
5    effect.  And the ability to detect an important effect
6    is governed by first the number of subjects in the
7    study, secondly is the precision in which the
8    measurement is made, and third is what is the
9    important -- an important difference.
10       So number of subjects is one component of a
11   power estimate.
12           JUDGE CHAPPELL:  Just one component.
13           THE WITNESS:  One of three components.
14           JUDGE CHAPPELL:  All right.
15           BY MR. FIELDS:
16       Q.  And you agree that it is possible that
17   statistically significant differences could have been
18   there if the sample size was larger?
19       A.  Oh, it is possible, yes.
20       Q.  Now, a moment ago I thought you said it had a
21   negative result, and you said something like that this
22   morning in your testimony I thought.  But isn't it true
23   that a lack of statistical significance or a positive
24   result is not proof of the negative?
25       A.  Well, that is correct.

1609

1        Q.  So it doesn't mean, for example, that
2    pomegranate juice doesn't work; it just means we didn't
3    prove that it worked in this experiment.
4        A.  Correct.
5        Q.  Let's go to Dr. Davidson's study.
6        This was another RCT trial; right?
7        A.  Correct.
8        Q.  And it is correct, is it not, that at 12 months
9    that the composite artery measurement showed
10   improvement?
11       A.  Incorrect.
12       Q.  It didn't show improvement?
13       A.  Incorrect.
14       Q.  You're sure.
15       A.  I am sure of that.  I explained it this morning
16   on direct.
17       Q.  Didn't the composite rate for all measured
18   carotid artery walls show a smaller value at 12 months?
19       A.  That is correct.
20       Q.  Isn't that an improvement?
21       A.  No.
22       Q.  You mean smaller artery walls are not better
23   than thick artery walls where they're occluding the
24   carotid artery?
25       A.  Well, Mr. Fields, I explained this in exquisite

51 (Pages 1606 to 1609)

1614

1      A.  Yes.
2      Q.  And you say this is a subgroup analysis that
3  would require further study, but you've done a number of
4  subgroup analyses; isn't that correct?
5      A.  Yes, I have.
6      Q.  You've even published them publicly, the
7  subgroup analyses?
8      A.  I do.
9      Q.  So we don't just disregard subgroup analyses,
10  and if we have one that could bring a major benefit to
11  millions of people throughout the United States, don't
12  we want to get that out to the public?
13      A.  Not unless it's validated by a proper study.
14      Q.  And if those proper studies will take three,
15  four, five, ten more years, you say we just -- we have
16  to wait because it's a post hoc analysis; right?
17      A.  Well, we have to wait until a second study
18  validates the finding in the first study.
19      Q.  So if I have a study that is designed to test
20  blood pressure and it turns out that after three, four
21  years that it doesn't do anything for blood pressure,
22  but it sure as heck reduces cancer, cancerous lesions, I
23  can't get that out.  I've got to do another study.
24      A.  Well, I mean, we're dealing with CI-- we're
25  dealing with CIMT here, so that's -- I mean, that's what

1615

1  I'm going to opine on.  I'm not going to opine on a
2  study that has shown that -- that looks at heart disease
3  and finds something with cancer.  That's a whole -- that
4  has happened to me in research, and that's a whole other
5  different thing.
6      Q.  Well, my point is, isn't it correct that when
7  the public health is at stake, you want to get
8  information out, even if it's based on a post hoc study,
9  if it can help millions of people.
10      A.  The results were in the public domain.
11  Dr. Davidson did publish the subgroup analysis.  The key
12  here is its interpretation.
13      Q.  But you're saying that we can't inform the
14  public, that my clients, for example, can't tell the
15  public about this result which could help millions of
16  people because it's a post hoc analysis.  Right?
17      A.  Well, I'm saying that the analysis is probably
18  not going to pan out to be true because most subgroup
19  analyses don't turn out to be true, and that's why they
20  have to be -- that's why they have to be confirmed.
21      So, you know, Dr. Davidson wrote about it in a
22  very honest way, and I agree with his opinion
23  completely.
24      Q.  Well, it might turn out to be true; isn't that
25  right?

1616

1      A.  It might, yes.
2      Q.  These figures are in his -- you said he's a very
3  reputable, excellent scientist, that he turned up these
4  figures for this very large subgroup and millions of
5  people, and it certainly could help them if he's right,
6  and you say he's got to wait until he does another study
7  before my clients can put that information out there;
8  right?
9      A.  Correct.
10      MR. FIELDS:  Okay.  That's all I have,
11  Your Honor.
12      JUDGE CHAPPELL:  Is there any redirect based on
13  the cross?
14      MS. EVANS:  Yes, sir.
15                - - - - -
16            REDIRECT EXAMINATION
17  BY MS. EVANS:
18      Q.  Dr. Sacks, we won't keep you much longer.
19      Now, what years was the DASH study data
20  collected?
21      A.  Let's see.  Wasn't it -- in the mid-'90s.
22      Q.  And if Mrs. Resnick testified that in 2001
23  American consumers had never heard of the pomegranate,
24  is there any reason to believe that there was
25  widespread consumption of pomegranates in the DASH

1617

1  study?
2      A.  No.  I don't think we used pomegranates in the
3  DASH study.
4      Q.  Have there been any observational studies on
5  the pomegranates or pomegranate juice, to your
6  knowledge?
7      A.  To my knowledge, no.
8      Q.  Doctor, could you --
9      JUDGE CHAPPELL:  Hold on a second.
10      Do you want to retrieve your realtime notebook?
11      MR. GRAUBERT:  I'd love to.  Thank you.
12      Excuse me.
13      MS. EVANS:  Sure.
14      JUDGE CHAPPELL:  I thought he was rising to
15  object and I realized he was manipulating equipment over
16  there.
17      MR. GRAUBERT:  Proceed.
18      MS. EVANS:  Sure.
19  BY MS. EVANS:
20      Q.  Mr. Fields used the term "Aviram's observational
21  study" --
22      JUDGE CHAPPELL:  Can you hold on until we're
23  ready.
24      (Pause in the proceedings.)
25      Go ahead.

53 (Pages 1614 to 1617)

# In the Matter of:

# POM Wonderful, et al.

*August 30, 2011*
*Public Record*
*Trial Vol. 11*

**Condensed Transcript with Word Index**



**For The Record, Inc.**
**(301) 870-8025 - www.ftrinc.net - (800) 921-5555**

POM Wonderful, et al.                    Public Record                    8/30/2011

USCA Case #13-1060      Document #1483683      Filed: 03/12/2014      Page 300 of 367

1796

```
 1              FEDERAL TRADE COMMISSION
 2                    I N D E X
 3           IN RE POM WONDERFUL LLC, ET AL.
 4                TRIAL VOLUME 11
 5                 PUBLIC RECORD
 6                AUGUST 30, 2011
 7
 8   WITNESS:     DIRECT  CROSS    REDIRECT  RECROSS  VOIR
 9   S. RESNICK    1852   1871
10   LIKER         1873   1906
11   HEBER         1936   2013
12
13   EXHIBITS   FOR ID  IN EVID  IN CAMERA  STRICKEN/REJECTED
14   CX
15   (none)
16
17   RX
18   (none)
19
20   JX
21   (none)
22
23   DX
24   (none)
25
```

1797

```
 1            UNITED STATES OF AMERICA
 2         BEFORE THE FEDERAL TRADE COMMISSION
 3
 4   In the Matter of              )
                                   )
 5   POM WONDERFUL LLC and         )
     ROLL GLOBAL LLC,              )
 6   as successor in interest to   )
     Roll International Corporation,)
 7   companies, and           ) Docket No. 9344
     STEWART A. RESNICK,          )
 8   LYNDA RAE RESNICK, and        )
     MATTHEW TUPPER, individually  )
 9   and as officers of the        )
     companies.                    )
10                                 )
     ------------------------------)
11
12           Tuesday, August 30, 2011
13                 9:34 a.m.
14             TRIAL VOLUME 11
15               PUBLIC RECORD
16
17
18   BEFORE THE HONORABLE D. MICHAEL CHAPPELL
19            Administrative Law Judge
20           Federal Trade Commission
21        600 Pennsylvania Avenue, N.W.
22              Washington, D.C.
23
24   Reported by:  Josett F. Whalen, RMR-CRR
25
```

1798

```
 1   APPEARANCES:
 2
 3   ON BEHALF OF THE FEDERAL TRADE COMMISSION:
 4      HEATHER HIPPSLEY, ESQ.
 5      MARY L. JOHNSON, ESQ.
 6      SERENA VISWANATHAN, ESQ.
 7      DEVIN WILLIS DOMOND, ESQ.
 8      TAWANA E. DAVIS, ESQ.
 9      JANET EVANS, ESQ.
10      Federal Trade Commission
11      Bureau of Consumer Protection
12      601 New Jersey Avenue, N.W.
13      Washington, D.C.  20001
14      (202) 326-3285
15      hhippsley@ftc.gov
16
17
18   ON BEHALF OF THE RESPONDENTS:
19      JOHN D. GRAUBERT, ESQ.
20      Covington & Burling LLP
21      1201 Pennsylvania Avenue, N.W.
22      Washington, D.C.  20004-2401
23      (202) 662-5938
24      jgraubert@cov.com
25
```

1799

```
 1   APPEARANCES:  (continued)
 2
 3   ON BEHALF OF THE RESPONDENTS:
 4      BERTRAM FIELDS, ESQ.
 5      Greenberg Glusker
 6      1900 Avenue of the Stars
 7      21st Floor
 8      Los Angeles, California  90067
 9      (310) 201-7454
10          -and-
11      KRISTINA M. DIAZ, ESQ.
12      BROOKE HAMMOND, ESQ.
13      JOHNNY TRABOULSI, ESQ.
14      Roll Law Group P.C.
15      11444 West Olympic Boulevard
16      10th Floor
17      Los Angeles, California  90064
18      (310) 966-8775
19      kdiaz@roll.com
20
21
22   ALSO PRESENT:
23      VICTORIA ARTHAUD, ESQ.
24      HILLARY SLOANE GEBLER, ESQ.
25
```

1 (Pages 1796 to 1799)

1800

```
 1        P R O C E E D I N G S
 2        - - - - -
 3        JUDGE CHAPPELL:  Back on the record Docket 9344.
 4   Good morning, everyone.
 5        MR. FIELDS:  Good morning, Your Honor.
 6        JUDGE CHAPPELL:  Are you ready to call your next
 7   witness?
 8        MR. FIELDS:  We have our opening statement that
 9   we reserved, Your Honor, if I may go ahead with that
10   with your permission.
11        JUDGE CHAPPELL:  Before you do, and I'm not sure
12   who is going to speak to this, but were the IT issues
13   resolved?
14        I'm talking about the flurry of e-mail coming in
15   last week about some exhibits that may or may not be
16   clear on the screens.
17        MR. GRAUBERT:  Right.  Yes.  Thank you,
18   Your Honor.  And I want to express our appreciation to
19   the FTC IT staff, who have substantially improved the
20   image, and I think it's as good as it's going to get.
21   And we have of course hard copy backups.
22        The main problem is, when the entire page is on
23   the screen, it's not really the highest quality, but
24   when the selections are blown up, they're perfectly
25   legible.  I don't think it's going to be a big problem.
```

1801

```
 1   Certainly, if it continues to be a problem, we can try
 2   to address it again.  But the staff has really done a
 3   terrific job in bringing it along.
 4        JUDGE CHAPPELL:  Has something changed from the
 5   last time we were here?  Because I thought everything
 6   was fine.
 7        MR. GRAUBERT:  We did have a little problem
 8   last time when the respondents were using the system.
 9   The FTC's staff for some reason has no problem.  But,
10   as you might recall, Your Honor, a few times when we
11   did in cross-examination or otherwise put up an image
12   of just one page on the screen, it was hard to figure
13   out what it was, and we've been trying to address that
14   problem.  As I said, we've made some improvements, and
15   I think it's as good as it's going to get.
16        But thank you for your consideration, sir.
17        JUDGE CHAPPELL:  Okay.  And one other issue, I
18   saw an e-mail that came in last night regarding
19   government operating status.  And the policy is, when
20   the status is liberal leave or what's called
21   unscheduled leave is in effect, we don't have a
22   hearing.  And that policy stays.  That's because the
23   people in this room are not the only people involved
24   when there's a crisis in the area, whether emergency or
25   other situation, so that the people in this room can't
```

1802

```
 1   really get together to agree to waive the rules of OPM.
 2        And the lights have to work.  The air condition
 3   has to work.  There's a lot involved beyond the people
 4   sitting around and standing here today.  That's why,
 5   when the status is unscheduled leave, even though the
 6   government is open, we have no hearing, so everybody
 7   knows, nobody has to worry about it, nobody has to try
 8   to get here in a dangerous or unsafe condition.
 9        Any questions on that?
10        MS. HIPPSLEY:  No, Your Honor.
11        MR. FIELDS:  No, Your Honor.
12        MR. GRAUBERT:  I appreciate that.
13        MR. FIELDS:  Okay.  Thank you, Your Honor.
14        I'm a little hoarse today, and if you can't hear
15   me -- I think you probably can, but let me know.
16        I don't think we'll have a big problem with
17   demonstratives because in opening statement I usually
18   don't use a lot of demonstratives, maybe one or two.
19   But let's get going.
20        Your Honor, when we first came into this
21   courtroom, the very first question was:  Are the
22   respondents snake oil salesmen?  And I think we're going
23   to show you that that's a resounding no, not even near
24   it.  I don't even think that complaint counsel really
25   thinks we're snake oil salesmen.
```

1803

```
 1        JUDGE CHAPPELL:  I think my question might have
 2   been if that's the allegation.
 3        MR. FIELDS:  Okay.
 4        JUDGE CHAPPELL:  Not whether they are.
 5        MR. FIELDS:  Okay.  In any event, we're not, and
 6   we're going to show you we're not.
 7        And this is about pure fruit juice.  It's not a
 8   drug.  It's pure fruit juice.
 9        We're not Daniel Chapter One either.  We're
10   going to bring before you, Your Honor, a group of
11   doctors distinguished in their field, not a bunch of
12   testimonials unsubstantiated but doctors.
13        We are talking about something that is safe.
14   There's not the slightest evidence that it's unsafe.
15   And we're talking about something that is not like, as
16   in Daniel Chapter One, a concoction of various herbs
17   that could be toxic.
18        JUDGE CHAPPELL:  Well, the record can reflect,
19   I'm in no way, shape or form comparing your client to
20   Daniel Chapter One.
21        MR. FIELDS:  Thank you, Your Honor.
22        We have never ever told anyone not to listen to
23   their doctor.  There's no evidence we've ever done
24   that.
25        We've never told anyone that they should drink
```

2 (Pages 1800 to 1803)

1812

1  exempt from this drug testing kind of standard.
2       And he even conceded on the stand that that
3  applied to pomegranates. Now, at first he said, Well,
4  but that doesn't apply to fruit juices, just fruit.
5  But it turned out that fruit juice was treated exactly
6  the same way as fruit in the DASH diet, which is what
7  he was talking about. We had that before the court.
8  And ultimately -- and the record will show this --
9  Dr. Sacks even conceded that fruit or fruit juice are
10  exceptions to the kind of testing required for a drug
11  by the FDA.
12       So when we get to policy, I think everybody
13  agrees on what the appropriate underlying standard is;
14  and that is, we balance the risk of harm against the
15  potential benefit to the public in releasing the
16  information. I don't think anybody disagreed with that.
17  Their experts, when I asked them that, went along with
18  that as an appropriate test.
19       And here, there is no risk of harm. There is
20  no evidence of any unsafety. This product --
21  pomegranates have been eaten for centuries without a
22  single report of anybody being harmed.
23       Respondents have done test after test after
24  test. I've already talked about the number of tests
25  they've done. Nobody was ever harmed in those tests,

1813

1  nobody. And all of those tests require safety. You've
2  got to stop a test if it starts to produce results that
3  indicate harm to anyone.
4       So this is a safe product.
5       Now, turning to the individual areas that are
6  the -- in issue before Your Honor, there are three that
7  are the basis of the ads in question, heart, prostate
8  and erectile function.
9       JUDGE CHAPPELL: Let me back up a second,
10  Counsel.
11       MR. FIELDS: Sure.
12       JUDGE CHAPPELL: Isn't an important issue in
13  this case not so much what's out there, what's
14  published, what's written, but what's used in connection
15  with marketing and advertising the product for sale to
16  the public?
17       MR. FIELDS: I agree with Your Honor that is
18  the issue. But in deciding that issue we have to look
19  to the science and to the testimony as to what are
20  appropriate tests of the science supporting those ads.
21  And the science supporting those ads, as our experts
22  will tell Your Honor and their experts said, when
23  you're testing a drug -- a pure fruit or fruit juice,
24  you have a different standard from when you're testing
25  a drug.

1814

1       Now, that applies whether you're talking about
2  an advertisement or a statement to the press. It's
3  what do we need to show that a product is safe and that
4  the risk of harm is outweighed by the public benefit,
5  what do we need to show that. It doesn't matter
6  whether it's an announcement to the press that we're
7  making or a hang tag on a bottle. The test is
8  logically the same.
9       What do we need to show Your Honor that there is
10  science sufficient to support these claims. These
11  claims are made in ads. I agree with that. But the
12  kind of science that supports it is determined by what
13  scientists believe is appropriate to support it. That's
14  my recollection of the cases.
15       JUDGE CHAPPELL: Well, you're talking about
16  safety, Counselor. What about going beyond mere safety
17  and making health benefit claims?
18       MR. FIELDS: Of course, Your Honor, we have to
19  support those. No question about it, we have to support
20  those. But what is the test? The test doesn't require
21  RCTs because the test is the test.
22       In Dr. Stampfer's article, in the comment of
23  Dr. Stampfer and in the opinions of our experts which
24  you will here say that you don't need to show that
25  there is, let's say, a lessening of plaque in the main

1815

1  coronary artery as a result of using POM via an RCT,
2  although we did. We do have an RCT. Most of our
3  science is based on RCTs, but not all of it. And you
4  don't have to have an RCT to show those things, and
5  that's -- that sets the standard by scientists of what
6  you need to show that.
7       Now, whether you're showing it in a public
8  speech or you're showing it in a written scientific
9  article or you're showing it on a hang tag, the amount
10  of science needed to support it is the same.
11       You're talking about pure fruit juice here, just
12  like blueberries or broccoli.
13       JUDGE CHAPPELL: Not broccoli juice I hope.
14       MR. FIELDS: Well, I'm not prepared to concede
15  that, Your Honor. It could be good. All right. Okay.
16       Now, turning to the science -- and I'm not going
17  to cover every study because there would be studies all
18  over the place -- let's talk about heart.
19       Well, first our experts are going to explain
20  how the basic science demonstrates that pomegranate
21  juice reduces oxidative stress.
22       Your Honor will recall that little kind of
23  oversimplified chart that I put up before about how LDL
24  cholesterol gets oxidized, and the oxidized LDL
25  cholesterol gets eaten by the macrophages, and the

5 (Pages 1812 to 1815)

1816

1 macrophages go on and they create plaque, and the
2 plaque either breaks off or clogs the artery and
3 reduces blood flow to the heart and you have a heart
4 attack or some other heart ailment.
5     Well, you'll hear the basic science that
6 pomegranate juice, by its antioxidant qualities, by its
7 enhancing nitric oxide, tends to eliminate the
8 oxidation of the LDL cholesterol or at least inhibit
9 it, if not eliminate it, and it tends to do a number of
10 other things, which our scientists will describe, that
11 stop that chain or at least inhibit it if they don't
12 stop it. They make it less likely that you're going to
13 get to that heart event.
14     Is it a miracle cure? Nobody says it's a
15 miracle cure. But what it does is make it less likely
16 that you're going to go down that disastrous chain, and
17 it improves your odds.
18     One of the early doctors who worked on this was
19 Dr. Louis Ignarro. Dr. Ignarro is the Nobel Prize
20 laureate. And he studied nitric oxide.
21     Nitric oxide is beneficial in that it improves
22 blood flow to almost every organ in the body that is
23 dependent upon blood flow. It is a really remarkable
24 thing.
25     And he found that pomegranate juice contains an

1817

1 extraordinary ability to enhance the effect of nitric
2 oxide. And that, of course, is what leads to
3 inhibiting the oxidative stress that I've been talking
4 about.
5     But that's just one of the studies that were
6 done.
7     Then Dr. Aviram -- you'll hear that Dr. Aviram
8 at the Technion Institute is a pioneer in this field,
9 kind of a well-recognized figure. Their experts
10 concede, or one of them, that he's a fine scientist at
11 an outstanding institution.
12     And he did something like 10 or 15 studies,
13 first in vitro studies, then animal studies, then
14 finally did a human study. We have been talking about
15 the human study, but there were about 15 studies before
16 that that he did studying the effect of pomegranate
17 juice and its ability to stop oxidation of LDL
18 cholesterol, stopping oxidative stress, generating
19 nitric oxide.
20     And then he did a human study. He recruited a
21 bunch of people with very significant plaque, what was
22 diagnosed as stenosis. That means their artery was
23 threatening to close because of the plaque. And what
24 he found -- and this was an RCT -- what he found was
25 that there there was a 30 percent reduction in plaque

1818

1 among the people who drank pomegranate juice. And along
2 with that, the people who didn't drink pomegranate
3 juice, the people in the placebo group, got a 9 percent
4 increase in plaque.
5     So you have a -- really a 39 percent comparative
6 benefit demonstrated in an RCT test, albeit a small
7 number of people. That's true. But you have a placebo
8 control group, and you had this 30 percent reduction and
9 a 9 -- versus a 9 percent increase.
10     Then you come to Dr. Ornish. Again, I'm not
11 going to go into all the studies but just look at these.
12 Dr. Ornish is, you will hear, an iconic figure. He's a
13 nationally known pathfinder in the field of the effect
14 of diet on the heart, on cardiovascular disease. He's
15 done landmark studies in the field -- even Dr. Sacks
16 said that -- and is well-known throughout the
17 United States for his work in this field. Dr. Ornish
18 will testify about his studies.
19     He did a study called myocardial perfusion.
20 That's the way doctors talk. That means blood flow to
21 the heart. And he found -- this was another RCT. He
22 found that blood flow to the heart was improved,
23 comparative improvement of 35 percent, by taking
24 pomegranate juice. He found that there was I think it
25 was an 18 percent improvement in the blood flow to the

1819

1 pomegranate part and a 17 percent worsening among the
2 people who didn't take pomegranate juice, who had the
3 placebo, so he had a 35 percent comparative study.
4     Now, Dr. Davidson -- I'm going to get to the
5 criticisms of these studies in a little bit.
6     Dr. Davidson came along, Dr. Davidson in
7 Chicago, again they say an excellent scientist.
8 Dr. Davidson did another RCT, studying a different
9 thing than Aviram or Ornish. Remember, Aviram's study
10 was people with stenosis, with very significant plaque
11 buildup. Dr. Davidson excluded people with stenosis,
12 significant stenosis or significant plaque buildup,
13 normal or near normal in the size of their arteries.
14     And he found that at 12 months there was a
15 benefit from pomegranate juice for the whole group, but
16 at 18 months, strangely, there was none, that it was
17 undetermined there was nothing better about the
18 pomegranate juice people than the placebo people for the
19 whole group. But -- and there was a really important
20 "but" -- for a subgroup of people who were at high risk
21 for heart condition because of their blood chemistry,
22 not because they had plaque, they didn't, but because of
23 their blood chemistry, for that subgroup there was a
24 definite benefit at both 12 and 18 months.
25     And that benefit, we heard testimony there are

6 (Pages 1816 to 1819)

1820

1  millions of people in the United States in that subgroup
2  who would be benefited if the study is correct.  And a
3  lesser percentage -- and we'll have a doctor talking
4  about what the real percentage is.  It's a little bit
5  higher than what complaint counsel said, but it is a
6  lower percentage of benefit than Dr. Aviram got and
7  Dr. Ornish got, but that's understandable.
8       Dr. Aviram is measuring people with big, thick
9  plaque in their vessels with stenosis.  And Dr. Davidson
10 is not studying plaque; he's studying the artery wall
11 itself.  The average person in his study didn't have any
12 plaque, and nobody had significant plaque, so he's not
13 studying it, and naturally it is predictable he's going
14 to get a lower percentage than the very dramatic
15 percentage that Dr. Aviram got.
16      There's no inconsistency between them.  All
17 three studies show a very definite benefit to heart
18 health from drinking pomegranate juice.
19      Now, there's a portfolio review, and complaint
20 counsel spent a lot of time on it, page by page by page.
21 I've forgotten the exhibit number, but we can get that
22 to Your Honor.  And it really attacks the heart studies
23 which include blood pressure on that page of that
24 exhibit.
25      And Your Honor may recall it said, well, we just

1821

1  get a 3 out of 10.  But, Your Honor, the uncontradicted
2  evidence was that that page was directed to FDA
3  requirements and was created in order to talk about
4  should we apply to the FDA for drug testing.
5       And there are at least a couple of good reasons
6  why the FDA and the FDA doctors would give a low score
7  because, A, that page included blood pressure, which is
8  something that respondents no longer advertise.
9  Originally they had had a blood pressure ad very early
10 in the years based on Dr. Aviram's experiment.  They
11 later, because later studies did not show that, they
12 stopped advertising.  This is many years ago.
13      But blood pressure is still on that page.  And
14 the FDA puts a lot of weight on blood pressure.  That's
15 very important to them.  And certainly they would lower
16 the score of anybody applying if blood pressure was not
17 decreased.
18      Secondly, the FDA would not like the surrogates
19 that were used in these experiments.  The FDA allows for
20 only -- or "validates" is the term they use -- only two
21 surrogates in the heart field.  One is cholesterol, and
22 we'll be talking with the experts about that.  And the
23 other is blood pressure.
24      Now, doctors in the field -- our experts will
25 talk about this; their experts said this -- accept far

1822

1  more surrogates as ways of predicting heart problems
2  than just those two.  Doctors in the field go way beyond
3  that.
4       We will show you why surrogates that we chose
5  are correct and very valid surrogates.  But because the
6  FDA would say, hey, we don't validate those surrogates
7  and because you've got blood pressure in there, and you
8  only had one study on blood pressure, you would get a
9  low score.  And that's why you have that very frank
10 assessment in the portfolio review.  But, again,
11 uncontradicted evidence, that was intended to apply FDA
12 standards.
13      JUDGE CHAPPELL:  But when a drug company does a
14 study, a clinical trial, if, for example, they have a
15 drug that supposedly lowers blood pressure, then they're
16 going to have a target group I believe with high blood
17 pressure to see whether it works or not.
18      MR. FIELDS:  I think that's generally right.
19      JUDGE CHAPPELL:  And you were talking earlier
20 about studies versus people with arterial sclerosis
21 versus those with no plaque, and of course you would
22 expect if there's any improvement it would be on the
23 people with a lot of plaque.
24      MR. FIELDS:  That's right.
25      JUDGE CHAPPELL:  What's your position on how do

1823

1  you prove the negative?  How do you run a test to show
2  this is generally beneficial to your health with healthy
3  people?
4       MR. FIELDS:  Well, Dr. Ornish had healthy
5  people.  Dr. Ornish had a cross-section of people in his
6  myocardial perfusion study, and they benefited.
7       Now, if you have somebody completely healthy,
8  it's going to be harder to show of course.  If you've
9  got somebody with a pristine artery that has no swelling
10 and no plaque and you want to show that a product helps
11 increase that, it's going to be difficult.  You can
12 theoretically do it, but the measurement is going to be
13 difficult, no question about it.
14      Dr. Davidson was encountering that, although his
15 people were not completely normal.  But in his subgroup,
16 for example, the people who were at high risk, even
17 though they didn't have significant plaque, they showed
18 a benefit.
19      So you can do it.  You can do it.  It's harder
20 to show than to show people with plaque.  But,
21 Your Honor, there are a heckuva lot of people out there
22 with plaque, and there are a heckuva lot of people out
23 there in the subgroup, in fact their experts said it
24 could be millions of people in the United States in that
25 subgroup who would have benefited, even though they

7 (Pages 1820 to 1823)

POM Wonderful, et al.          Public Record          8/30/2011

USCA Case #13-1060    Document #1483683    Filed: 03/12/2014    Page 305 of 367

1948

1    report of anybody ever being harmed by eating a
2    pomegranate or drinking its juice?
3       A. No. Like other fruits or the juice, taken in
4    nutritional amounts, there are no reports of toxicity.
5       Q. When did you begin research on pomegranate juice
6    that was sponsored by the Resnicks or Roll?
7       A. I would say somewhere around 2003 that we began
8    communicating with Stewart Resnick and other individuals
9    at POM Wonderful about pomegranate research
10   specifically.
11      And our first studies were directed at how the
12   pomegranate molecules are broken down, absorbed into the
13   body and then converted into other substances which
14   might express where the health benefits were coming
15   from.
16      Q. Okay. Now, before we get into the specific
17   studies, I want to ask you about your opinion on the
18   standard of scientific evidence needed to substantiate
19   the benefits of a pure fruit or juice like pomegranate.
20      In dealing with that kind of nutrient, with a
21   pure fruit or pure fruit juice like pomegranate juice,
22   as opposed to a drug, is it your opinion that only RCT
23   studies are the acceptable evidence of the juice's
24   ability to promote health?
25      A. No. Along with many other leaders in

1949

1   nutrition, it is my opinion that a randomized
2   controlled trial or RCT has some significant drawbacks
3   when it comes to the study of nutrient substances and
4   that what should be considered is the totality of
5   evidence from cellular mechanism studies, studies in
6   animals, as well as studies in humans, some of which
7   may not be clinical RCTs, that is, randomized
8   controlled trials.
9      Q. Just to be clear, are you saying that those --
10   that the totality of those studies need not necessarily
11   include RCTs?
12      A. That's correct.
13      They have their use, but there are also some
14   drawbacks to RCTs. They're much more appropriate for
15   registering a new drug where there is a target of
16   action, there's a single purified compound, there are
17   perhaps significant adverse events. And in registering
18   a drug one often does what are called phase I and
19   phase II studies in which you learn a lot about the
20   mechanism, you learn about the target, and you really
21   know how your study is supposed to come out.
22      So you set that study up with enough people in
23   it, and these are often very large, expensive studies
24   costing hundreds of millions of dollars, and they are
25   defined to reach a specific endpoint, and that's a

1950

1   randomized, placebo-controlled trial and usually with a
2   large number of subjects.
3      That model doesn't work well for nutrient
4   substances because when you look at the totality of
5   evidence you understand the mechanism of action, and
6   you're able to develop scientific information that can
7   lead to acceptance in the medical community of the
8   importance of these nutritional substances.
9      So for many nutritional substances, such as
10   broccoli, which was mentioned this morning, we don't
11   have randomized controlled trial evidence and probably
12   never will because that is much more appropriate for a
13   drug than it is for a nutrient.
14      Q. Now, Drs. Stampfer and Blumberg wrote an article
15   saying -- this is in evidence, this article -- saying
16   that in dealing with nutrients, RCT tests were often
17   infeasible and too expensive and that the drug standard
18   should not be applied.
19      Are you in agreement with that?
20      A. Yes, I am.
21      Q. Now, earlier this morning -- I think you were
22   here in the audience waiting to testify -- His Honor
23   asked Dr. Liker if there was somebody around who was I
24   think he said the be-all or know-all of all the studies
25   done on behalf of Roll.

1951

1      As close as anybody could come to that, are you
2   that guy?
3      A. In some extent I am. I think my combination
4   of my background in chemistry and the fact that we
5   have this phytochemical laboratory and the clinical
6   research unit and basic laboratories all at our
7   Center for Human Nutrition and my interrelationship
8   with many other specialists at UCLA in different
9   specialties as they relate to nutrition, I'm often
10   included in those leadership discussions because the
11   group wanted to be sure that it made sense that the
12   physiology and the chemistry of this particular thing
13   would make sense in terms of the mechanisms underlying
14   the actions of pomegranate.
15      So I would say I'm an expert in the mechanisms
16   of oxidation and inflammation, and these are now
17   mechanisms that cross organ specialties, so they affect
18   many different organs in the body. And I'm also -- also
19   very familiar with the work on nitric oxide and the
20   effects nitric oxide has on the blood vessels.
21      So I think that my role has been as a kind of a
22   scientific adviser to the group.
23      Q. All right. Let's turn to the specific studies
24   that you know about. I'm not going to cover every one.
25      JUDGE CHAPPELL: Let me ask a question about

39 (Pages 1948 to 1951)

1972

1  A. That's correct.
2  So I guess relatively, if you're going to
3  compare the two, the relative difference was
4  35 percent.
5  **Q. So it had a 35 percent benefit to --**
6  **comparatively to the placebo group from taking**
7  **pomegranate juice?**
8  A. That's correct.
9  **Q. And the benefit was improved blood flow to the**
10  **heart.**
11  A. Correct.
12  **Q. Okay. And of course -- well, I shouldn't say**
13  **"of course."**
14  **And is that something that indicates that**
15  **pomegranate juice would be likely to reduce the risk of**
16  **heart problems?**
17  A. It definitely would reduce the risk of a
18  problem, because if one had -- and you know, sometimes
19  people get a blockage of a minor blood vessel, for
20  example, for a heart attack, not a major blood vessel.
21  If you were to occlude one of the largest blood
22  vessels, it would still provide some increased chance of
23  recovery because you'd have better blood flow to the
24  rest of the hospital report.
25  In the case where a small one is blocked, it

1973

1  might provide the time you needed to have a stent put
2  into that artery at a hospital or allow you to survive
3  the ride in the ambulance.
4  So I think that anything you can do to increase
5  myocardial perfusion definitely would improve heart
6  health.
7  **Q. Okay. Now, there was some talk in the last**
8  **session we had here about the word "surrogate."**
9  **Is it correct that a surrogate is something that**
10  **is a predictor of the likelihood that you're going to**
11  **have a disease or that the disease will get worse or**
12  **death from a disease?**
13  A. Yes. A surrogate is either a sign or a symptom
14  that is associated along the pathway to a disease.
15  So while the FDA for the -- the Food and Drug
16  Administration for the purposes of drug registration and
17  testing only accepts a limited number of these surrogate
18  markers, and for heart disease they accept cholesterol
19  and blood pressure, the number of indicators that
20  physicians and scientists use are much greater and can
21  be at many points along the pathway of heart disease or
22  for that matter prostate cancer.
23  So clinical decisions are made, the health of
24  the patient is assessed and certain procedures are
25  undertaken based on things that are surrogate markers

1974

1  but may not be officially accepted by the
2  Food and Drug Administration.
3  **Q. And is it correct that you as doctors want a**
4  **surrogate marker to be something as closely related as**
5  **possible to the actual disease?**
6  A. That's correct.
7  For example, let's say we were to restrict
8  ourselves to cholesterol alone. There are many cases --
9  and I remember, we had one cantankerous faculty member
10  at UCLA who had a cholesterol of 312, and she was quite
11  independent and refused to do anything about it, never
12  had heart disease.
13  So there are people with very high cholesterol
14  who don't have heart disease, people with low
15  cholesterol who do. And about 50 percent of the people
16  who die with a heart attack actually have a cholesterol
17  in the normal range.
18  So when you have a biomarker like cholesterol
19  which increases your risk, that's very distal or far
20  away from the actual event of a heart attack which may
21  be affected by many other factors that we've discussed,
22  such as inflammation and oxidation.
23  **Q. We have a slight revision of the very**
24  **oversimplified chart that we had at the last session.**
25  **Could we have that chart number 2, James.**

1975

1  **It illustrates -- that's chart number 1. I want**
2  **chart number 2. Chart number 1 we had last session**
3  **and -- yeah, here we go.**
4  **It's the same chart as number 1, but it also**
5  **shows the surrogates in issue. And as you can see --**
6  **and this was explained and we went through this with the**
7  **experts for the FTC, looking down the chain, LDL**
8  **cholesterol oxidizes. Macrophages come in, as you've**
9  **testified. They eat the oxidized LDL. Plaque comes and**
10  **clogs the article -- artery, and as you said, either it**
11  **breaks off or it stops and reduces it, and then you have**
12  **a cardiovascular event.**
13  **Now, this illustrates the FDA-approved surrogate**
14  **over in the left, LDL cholesterol. And as you can see,**
15  **it's way down the chain from the actual event.**
16  **And as you've testified, Dr. Ornish and**
17  **Dr. Aviram used the CIMT measurement, that is, the**
18  **measurement of the carotid intima, and that is far**
19  **closer and more directly related to the cardiovascular**
20  **event than LDL cholesterol; isn't that correct?**
21  A. Yes.
22  I would clarify that Dr. Aviram in his study had
23  people with very significant amounts of plaque.
24  **Q. Yeah.**
25  A. And these individuals had thickened plaque,

45 (Pages 1972 to 1975)

POM Wonderful, et al.     Public Record     8/30/2011

USCA Case #13-1060   Document #1483683   Filed: 03/12/2014   Page 307 of 367

1976

1 whereas, in the study of -- by Dr. Davidson where he did
2 the IMT measures, these patients had less plaque to the
3 point where it was not significant. It didn't meet the
4 definition of plaque, which is 1.5 millimeters, excluded
5 anybody with a plaque above 2 millimeters.
6    **Q. Right.**
7    A. And so these two studies are really apples and
8 oranges. They're not comparable.
9    **Q. But they both used the same surrogate; isn't**
10 **that correct?**
11    A. They used the same surrogate in a different
12 group of patients. And of course, myocardial perfusion
13 is the closest to the actual event because that's what's
14 affected acutely in a heart attack.
15    **Q. Would it be fair to say then that if LDL**
16 **cholesterol is approved as a surrogate as the FDA**
17 **indicates that myocardial perfusion and CIMT measurement**
18 **would almost logically and necessarily be good**
19 **surrogates?**
20    A. They would definitely be perhaps even better
21 clinical surrogates because the LDL cholesterol is so
22 early in the process that it really is a risk
23 indicator. And many people who have normal cholesterol
24 may be at high risk of heart disease; people with high
25 cholesterol may not. They may have other issues going

1977

1 on.
2    So the conclusions of the FDA are valid for
3 cholesterol-lowering drugs where they've done studies in
4 thousands and thousands of patients and seen a
5 reduction, so I'm not advocating that no one take a
6 cholesterol-lowering drug that needs to. What I am
7 saying is that pomegranate may influence some of the
8 processes along this pathway and including some of the
9 processes very close to cardiovascular events.
10    **Q. Yeah.**
11    **Is it correct Dr. Ornish did another study**
12 **called Bev 2, I think it was called? Do you recall what**
13 **that study was?**
14    A. I only -- I had some very brief knowledge of
15 that just from some discussions that were undertaken,
16 but it was also an IMT study that was not completed, as
17 I recall.
18    **Q. Okay. What does the word "underpowered" mean?**
19    A. Underpowered is a study in which the number of
20 subjects in the study are inadequate prior to the study
21 to predict a positive result. That is, one can do a
22 theoretical calculation before starting a study based
23 on the size of the expected change in the primary
24 variable.
25    And let's say that you're looking for a

1978

1 5 percent change versus a 20 percent change. You're
2 going to need more people to see that 5 percent change,
3 so you have to properly power the study -- it's also
4 used as a verb -- to get the number of the people in
5 there to show that result.
6    And so many times, especially for a drug study
7 costing hundreds of millions of dollars, you're going to
8 power that study appropriately so that you can get an
9 answer of was it positive or not positive, and that is
10 going to be powered in advance.
11    **Q. And when you talk about the drug company**
12 **getting the result that it's seeking, you're talking**
13 **about it having statistical significance; is that**
14 **correct?**
15    A. That's correct.
16    **Q. And by that you mean it has a p-value of .05 or**
17 **less, which is -- is that the -- I didn't hear your**
18 **answer.**
19    A. That's correct.
20    **Q. Okay. And is that the equivalent of a**
21 **95 percent probability of validity as opposed to just**
22 **mere chance?**
23    A. That's correct.
24    **Q. So if I have -- and we'll -- there is one test**
25 **we'll be talking about later that got .058.**

1979

1    **Does that round off to about a 94 percent**
2 **probability of being valid?**
3    A. It does.
4    **Q. Okay. And in your opinion, in studying the**
5 **validity, the value of a study, do you disregard it if**
6 **it doesn't reach statistical significance?**
7    A. No. Absolutely not. There are many examples of
8 genetic studies, for example, this often happens where
9 we're looking at particular genes and we may not have
10 reached a statistical significance in a particular
11 study, but this would be very strong evidence to now go
12 pursue that lead in a future study with a larger number
13 of subjects.
14    **Q. Would it be fair to say that it may have very,**
15 **very important clinical significance even if it doesn't**
16 **have statistical significance?**
17    A. Yes, that would be fair to say.
18    **Q. Okay. Now, let's turn to Dr. Davidson.**
19    **Dr. Sacks testified that Dr. Davidson was an**
20 **excellent scientist.**
21    **Do you agree with that?**
22    A. I do.
23    **Q. Okay. Would you describe the study done by**
24 **Dr. Davidson on CIMT.**
25    A. Well, the intimal medial thickness is measured

46 (Pages 1976 to 1979)

POM Wonderful, et al.           Public Record          8/30/2011

USCA Case #13-1060    Document #1483683    Filed: 03/12/2014    Page 308 of 367

1980

1 by convention at a certain location in the carotid
2 artery, not the same place where the plaque occurs but
3 in a different spot, and has been used by a number of
4 drug companies in looking at the activities of
5 cholesterol-lowering drugs. And Dr. Davidson has a
6 great deal of experience for this, and it's a very
7 difficult measure.
8     And the patients in his study, they were at risk
9 of heart disease based on their blood cholesterol levels
10 and lipid levels, but they did not have carotid
11 stenosis, so he specifically excluded from his study
12 anyone with greater than 50 percent block of the carotid
13 artery or an intimal medial thickness of greater than
14 2 millimeters.
15 **Q. Did that mean that people with significant**
16 **plaque were excluded?**
17 A. Yes.
18 **Q. And what was the average thickness of his**
19 **patients in the study?**
20 A. It was .85 millimeters.
21 **Q. And is that about half of the minimum**
22 **requirement to say somebody has plaque?**
23 A. Yeah. The general definition of plaque is
24 1.5 millimeters.
25 **Q. Okay. Now, is it correct that Dr. Davidson's**

1981

1 **protocol called for measurements at both 12 and**
2 **18 months?**
3 A. Yes, it is.
4 **Q. And is it correct that there was a benefit at**
5 **12 months but not at 18 months?**
6 A. That's correct.
7 **Q. Okay. And as Dr. Sacks told us and -- well,**
8 **I'll ask you.**
9     **Is it correct that not reaching a positive**
10 **result on a study like that is not proof of the**
11 **negative?**
12 A. That's correct. I often tell my students that
13 absence of evidence is not evidence of absence, so
14 merely the fact that you haven't found something in a
15 particular study just means you haven't found it yet.
16 You may have to do more studies, but it doesn't prove
17 the opposite.
18 **Q. So if your hypothesis is not proved in a**
19 **particular study, it doesn't mean your hypothesis is**
20 **wrong; it just means you didn't prove it in that study.**
21 A. That's correct.
22 **Q. Okay. Now, you told us that there was a**
23 **subgroup of people who were at risk based on their blood**
24 **chemistry.**
25     **Was there a benefit shown by the study to that**

1982

1 **subgroup?**
2 A. Yes. In that subgroup, people had between a
3 4 and 9 percent improvement, depending on whether one
4 looked at the anterior or posterior wall of the artery
5 in terms of thickness. And this was a subgroup that had
6 high triglycerides and low HDL cholesterol. As I
7 mentioned earlier, the HDL cholesterol is the one that
8 carries this antioxidant enzyme, so these were
9 individuals with increased oxidant stress or exposed to
10 increased oxidative stress.
11     And it's a large number of people in the
12 United States. This is variously called metabolic
13 syndrome where people have high triglyceride and low HDL
14 and then they meet one other criteria like a large waist
15 circumference, a high blood sugar, an intermediate range
16 or high blood pressure.
17     But this group by having high triglyceride and
18 low HDL was an indicative subgroup of that metabolic
19 syndrome group that would be exposed to high oxidative
20 stress, so it made some sense that this subgroup might
21 have a benefit, so it was an interesting additional
22 analysis that was done.
23 **Q. Well, we had testimony in the last session that**
24 **millions of people in the United States could be in that**
25 **subgroup that got that recorded benefit.**

1983

1 A. I'd say that's an underestimate. I'd say it's
2 tens of millions of people --
3 **Q. Tens of millions.**
4 A. -- tens of millions of people in the
5 United States who would have that and be walking around
6 and not knowing it at all. And this is -- you know,
7 many people who have sudden death don't know that they
8 have abnormal risk of heart disease and often on the
9 basis of nutrition, given the status of our country's
10 nutrition.
11 **Q. Now, when you talk about 4 to 9 percent, that's**
12 **on a comparative basis?**
13 A. Yes.
14 **Q. By that you mean the --**
15 A. The placebo group worsened and the treatment
16 group got better. Correct.
17 **Q. Okay. Right. All right.**
18     **Is it a problem that Dr. Davidson's high-risk**
19 **group, the one you've just talked about with the tens of**
20 **millions of people in it, got a lower percentage of**
21 **benefit than Dr. Aviram's group that got a 30 percent**
22 **decrease in plaque?**
23 A. I think that they're two different studies, so
24 what you basically have are one group of patients who
25 were ready for surgery to have their -- have very

47 (Pages 1980 to 1983)

1984

1  significant disease and the other group where it was
2  just at risk, so they're very, very different, so
3  seeing a smaller result in the at-risk group than in
4  the carotid artery stenosis group is not that
5  surprising.
6      Q. And one was a plaque study and one was not;
7  is --
8      A. Right. Let's just say they're not
9  inconsistent, the two observations are not
10  inconsistent.
11      Q. Okay. Now, there's been some reference to
12  Dr. Davidson's subgroup as a post hoc analysis.
13      Does that disqualify it as scientific evidence?
14      A. No. That's actually pretty routine.
15      As a matter of fact, in the Women's Health
16  Initiative, many of the findings were so-called post hoc
17  analyses. And I believe that in many, many studies
18  people often go back and look at the data in the two
19  groups and try to find additional leads for future
20  studies, generate additional information to clarify the
21  findings of that study, so it's a thing that's routinely
22  done.
23      Q. Do you have to wait before a subsequent study is
24  done before you can publish or put out the information
25  that you learn by a post hoc analysis?

1985

1      A. No. Often the benefits to subgroups, both
2  beneficial and adverse -- as a matter of fact, I think
3  one is compelled to put in any adverse effects. Even if
4  they occur in a way that one would not interpret as
5  statistically significant, you would want to inform the
6  public about any adverse effects. Say if you were
7  studying a drug with an adverse effect and it occurred
8  in a small number of subjects, you would be compelled to
9  do that.
10      Similarly, if there's a potential benefit in
11  this study, and it may be some time until the next study
12  is done, you could definitely communicate that in your
13  publication. And you know, if it's too speculative,
14  then the reviewers will come back, the peer reviewers
15  will come back and say, well, that's too speculative,
16  you need to take out that language in your discussion.
17  But often subgroup analyses are discussed and put
18  forward.
19      JUDGE CHAPPELL: I have a question. I heard you
20  talking about a study showing -- you were talking about
21  variances in millimeters in arterial plaque.
22      What kind of technology or tests are being used
23  to determine that level of precision?
24      THE WITNESS: Oh, yeah. These are very tough
25  measures. It's actually an ultrasound that's -- and the

1986

1  data from it is digital and is managed by a computer, so
2  you're absolutely right. These are very, very tough
3  studies, and they have to be done in a center that has
4  significant experience.
5      When you look at these results, they come out
6  with little decimal points, so Davidson's lab -- and I
7  remember discussions at the NIH about using Davidson's
8  lab for these studies because he's one -- there are a
9  few labs, but he's one of the labs that's done a lot of
10  these studies. And it is a very tough measure. This is
11  a very tough one to do.
12      But the Aviram study was much more simple to
13  understand because he actually got a piece of tissue out
14  and looked at it; whereas, these things, you're looking
15  at a certain segment of the artery and the carotid
16  artery at a certain distance, and then you're taking a
17  picture of it with ultrasound and then having a computer
18  calculate for you what are the thicknesses between these
19  two surfaces of the wall, so you're right, it's a very
20  tough measurement.
21      BY MR. FIELDS:
22      Q. Is Dr. Ornish's myocardial perfusion that
23  difficult to measure?
24      A. It's a little -- it's easier because basically
25  what you're seeing there is flow of an indicator through

1987

1  the heart, and you can visually see that, and then that
2  image is put into a computer, so it's a lot simpler to
3  see that.
4      Q. So Dr. Aviram's and Dr. Ornish's are easier
5  than, for example, Dr. Davidson's.
6      A. Absolutely.
7      Q. Now, let's turn to the prostate.
8      How long have you been studying prostate
9  cancer?
10      A. I've been studying prostate cancer for about
11  17 years.
12      Q. And approximately what percentage of men
13  over 60 have prostate cancer?
14      A. Well, there are about 300,000 men diagnosed
15  with prostate cancer every year, and about 30,000 die
16  of the disease. It's the second leading cause of
17  cancer death among men, and so it's extremely common.
18  And many men in our society likely have microscopic
19  prostate cancer that they don't know about, just as men
20  might be walking around with cholesterol in their heart
21  that they don't know about in arteries, so this is a
22  very, very common disease.
23      Q. So men are walking around with microscopic
24  prostate cancer they don't even know about.
25      A. That's correct.

48 (Pages 1984 to 1987)

# In the Matter of:

# POM Wonderful, et al.

*August 31, 2011*
*Public Record*
*Trial Vol. 12*

**Condensed Transcript with Word Index**



**For The Record, Inc.**
**(301) 870-8025 - www.ftrinc.net - (800) 921-5555**

2062

```
              FEDERAL TRADE COMMISSION
                   I N D E X
          IN RE POM WONDERFUL LLC, ET AL.
                 TRIAL VOLUME 12
                  PUBLIC RECORD
                 AUGUST 31, 2011

WITNESS:      DIRECT  CROSS   REDIRECT  RECROSS  VOIR
HEBER                 2067    2178      2187
MILLER        2189    2195    2227      2229

EXHIBITS    FOR ID  IN EVID  IN CAMERA  STRICKEN/REJECTED
CX
(none)

RX
(none)

JX
(none)

DX
(none)
```

2063

```
              UNITED STATES OF AMERICA
           BEFORE THE FEDERAL TRADE COMMISSION

In the Matter of          )
                          )
POM WONDERFUL LLC and      )
ROLL GLOBAL LLC,           )
as successor in interest to )
Roll International Corporation, )
companies, and            ) Docket No. 9344
STEWART A. RESNICK,        )
LYNDA RAE RESNICK, and     )
MATTHEW TUPPER, individually )
and as officers of the     )
companies.                 )
------------------------------)

              Wednesday, August 31, 2011
                    9:34 a.m.
                 TRIAL VOLUME 12
                  PUBLIC RECORD


         BEFORE THE HONORABLE D. MICHAEL CHAPPELL
                Administrative Law Judge
                Federal Trade Commission
               600 Pennsylvania Avenue, N.W.
                    Washington, D.C.

         Reported by: Josett F. Whalen, RMR-CRR
```

2064

APPEARANCES:

ON BEHALF OF THE FEDERAL TRADE COMMISSION:
    HEATHER HIPPSLEY, ESQ.
    MARY L. JOHNSON, ESQ.
    SERENA VISWANATHAN, ESQ.
    DEVIN WILLIS DOMOND, ESQ.
    JANET EVANS, ESQ.
    Federal Trade Commission
    Bureau of Consumer Protection
    601 New Jersey Avenue, N.W.
    Washington, D.C. 20001
    (202) 326-3285
    hhippsley@ftc.gov

ON BEHALF OF THE RESPONDENTS:
    JOHN D. GRAUBERT, ESQ.
    Covington & Burling LLP
    1201 Pennsylvania Avenue, N.W.
    Washington, D.C. 20004-2401
    (202) 662-5938
    jgraubert@cov.com

2065

APPEARANCES: (continued)

ON BEHALF OF THE RESPONDENTS:
    BERTRAM FIELDS, ESQ.
    Greenberg Glusker
    1900 Avenue of the Stars
    21st Floor
    Los Angeles, California 90067
    (310) 201-7454
    -and-
    KRISTINA M. DIAZ, ESQ.
    BROOKE HAMMOND, ESQ.
    JOHNNY TRABOULSI, ESQ.
    Roll Law Group P.C.
    11444 West Olympic Boulevard
    10th Floor
    Los Angeles, California 90064
    (310) 966-8775
    kdiaz@roll.com

ALSO PRESENT:
    VICTORIA ARTHAUD, ESQ.
    HILLARY SLOANE GEBLER, ESQ.

1 (Pages 2062 to 2065)

2142

1  statistically significant change in blood flow;
2  correct?
3      A. That's correct.
4      Q. Okay. And you also measured nitric oxide in the
5  Accelovance study, CX 859?
6      A. Yes. There's no difference.
7      Q. Okay. You stated yesterday, if I could turn
8  you back to yesterday afternoon, that there is
9  competent and reliable evidence showing that POM and
10  POMx are likely to lessen, reduce, the risk of
11  cardiovascular disease; correct?
12      A. Correct.
13      Q. And you did not opine that competent and
14  reliable evidence supports a claim that pomegranate
15  juice actually prevents or reduces the risk of heart
16  disease, did you?
17      MR. FIELDS: Objection. Compound, Your Honor.
18  Could we break down between prevents and reduces the
19  risk of? They're very different.
20      BY MS. EVANS:
21      Q. Did you opine that competent and reliable
22  evidence supports a claim that pomegranate juice
23  actually prevents the risk of heart disease?
24      A. As I indicated yesterday, that question was not
25  the one I was asked or answered. The question was does

2143

1  it reduce the risk, and I did answer it does reduce the
2  risk.
3      Q. Well, actually I was rereading your testimony,
4  and I believe you said it would likely reduce risk?
5      A. I said that the scientific evidence supported
6  the fact that it reduces the risk. Now, in any given
7  individual, that risk is variable.
8      Q. When I asked you -- referring to CX 2007, which
9  is your expert deposition, I asked you about the
10  treatment claims, and I asked you whether or not the
11  treatment claims that were alleged in the complaint were
12  substantiated, and did you then say that -- and I can
13  refer to --
14      MR. FIELDS: Your Honor, could we please have a
15  page.
16      MS. EVANS: If I could finish the question, then
17  I could say what I was referring him to.
18      JUDGE CHAPPELL: Actually, you need to give him
19  a page and line number before you read it if you're
20  asking him whether you asked that question.
21      MS. EVANS: Okay.
22      JUDGE CHAPPELL: You need to be fair to the
23  witness and his counsel.
24      BY MS. EVANS:
25      Q. Turning to CX 2000 at page 80 -- excuse me --

2144

1  page 81, the first line -- do you have that before you?
2      A. What's the question? I'm sorry.
3      Q. Okay. Did you testify: I've already indicated
4  that nutrition is not a treatment for disease. It's not
5  a drug or surgical procedure. So therefore, since you
6  characterized it with the word "treatment," I'm not
7  agreeing with your statement?
8      A. That's correct.
9      Q. Okay. And the question I had asked you was,
10  turning to page 80 at line 20: Assuming for the
11  purposes of argument that respondents' advertising makes
12  the claim that competent and reliable scientific
13  evidence supports the conclusion that drinking eight
14  ounces of POM juice daily treats heart disease,
15  including by decreasing arterial plaque, is that
16  proposition supported in your opinion?
17      So that's the -- the answer on
18  line (sic) 81 lines 1 to 5 was to that question?
19      A. Yes.
20      MR. FIELDS: Could we have an answer read rather
21  than just the question.
22      BY MS. EVANS:
23      Q. And the answer again at line -- on page 81 at
24  line 1 is:
25      "ANSWER: I've already indicated that nutrition

2145

1  is not a treatment for disease. It's not a drug or
2  surgical procedure. So therefore, since you
3  characterized it with the word 'treatment,' I'm not
4  agreeing with your statement."
5      A. I'll stand by that.
6      Q. Thank you.
7      And so you disagree that competent and reliable
8  evidence supports the conclusion that pomegranate juice
9  or POMx treats cardiovascular disease because, in your
10  view, nutritional products don't treat disease.
11      A. Of course not.
12      Q. Okay. Yesterday you testified that there is
13  competent and reliable evidence that POM and POMx are
14  likely to lower the risk of prostate problems for men
15  who have not been diagnosed with prostate cancer;
16  correct?
17      A. That's correct.
18      Q. Now, you didn't actually opine that competent
19  and reliable evidence supports a claim that pomegranate
20  juice or POMx actually lowers the risk of prostate
21  cancer in that population, did you?
22      A. What was my statement again? Could you review
23  it.
24      Q. There is competent and reliable evidence that
25  POMx and POM are likely to lower the risk of prostate

21 (Pages 2142 to 2145)

2146

1  problems for men who have not yet been diagnosed for
2  prostate cancer.
3     A. Well, the difference between "likely" and
4  "actual" has to be defined, so I would say "in all
5  medical probability," if that helps you, I would say
6  that in all medical probability. The word "likely" is
7  rather ambiguous, and if I used it in my deposition, I
8  need to further clarify it. In all medical
9  probability.
10    Q. And so yesterday when you testified that it
11 likely reduced the risk that -- you didn't mean that
12 word "likely" then?
13    A. The word "likely" is, in my estimation -- it's
14 not a medical term. It's a probabilistic term.
15    So I would say that based on my review of all
16 the evidence, the totality of scientific evidence, of
17 which we have considerable evidence, which I'm very
18 familiar with, then I would say that in all medical
19 probability and in the general scientific community --
20 and this is well-supported -- that there is a reduction
21 in the risk of prostate cancer, yes.
22    Q. Okay. Do you disagree that competent and
23 reliable evidence supports the conclusion that
24 pomegranate juice or POMx treat prostate cancer because
25 nutritional products don't treat disease, just as you

2147

1  did for heart disease?
2     A. Again, I can't answer your question as stated
3  because you're misstating what I said yesterday, which
4  was it could help to treat. I never said and would
5  never opine that pomegranate juice should be
6  substituted for medical or surgical treatment of
7  prostate cancer.
8     Q. Turning to CX 2007 page 90.
9     MR. FIELDS: Again, Your Honor, we just can't
10 remember these numbers, if counsel would please just
11 tell us which deposition it is.
12    MS. EVANS: And that would be the deposition of
13 March 30, 2011.
14    MR. FIELDS: Thank you.
15    BY MS. EVANS:
16    Q. I'm sorry. It was page 92.
17    At line 5 I asked you the question: And last
18 but not least, assuming for the purposes of argument
19 that respondents' advertising makes the claim that
20 clinical studies, research and/or trials prove that --
21 excuse me. That's the wrong page. Oh, yes -- that POM
22 juice daily -- that eight ounces of POM juice daily
23 treats erectile dysfunction, is that proposition
24 supported?
25    And on line 13 you said: Once again, I would

2148

1  object to the term "treatment," and I would say that my
2  professional opinion is that the body of research on
3  pomegranate juice and extract revealing how they act in
4  the body provides support for potential health benefits
5  for prostate cancer.
6     And then I -- I asked the question: No.
7  Erectile --
8     But you had given the answer for prostate
9  cancer?
10    A. Correct.
11    Q. Okay.
12    A. You're reading the deposition correctly.
13    Q. Correct.
14    Now -- and have you refused to answer the
15 question whether you believe that respondents have
16 significant evidence to support an FDA health claim for
17 pomegranate juice in reducing the risk of prostate
18 cancer under the "significant scientific agreement"
19 standard?
20    MR. FIELDS: Your Honor, if I may voice an
21 objection, there was an objection to that question as
22 ambiguous, and that was not of course ruled upon at the
23 time of the deposition when the objection was made by
24 counsel.
25    It is ambiguous in that the word "treat" is

2149

1  ambiguous, as we talked about that in opening
2  statement. "Treat" can mean a medical kind of
3  treatment or it can mean help out. And I think without
4  a definition of "treat" the question is ambiguous, and
5  the objection made at the deposition should be
6  sustained.
7     JUDGE CHAPPELL: Do you understand the
8  question?
9     THE WITNESS: I think it's -- it's -- the way
10 it's configured, I can't answer it.
11    JUDGE CHAPPELL: Sustained.
12    BY MS. EVANS:
13    Q. In your expert report you stated, on page 23,
14 that it's your opinion that POM juice promotes prostate
15 health; correct?
16    A. Correct.
17    Q. Okay. And you base this conclusion on a review
18 of the Pantuck study and laboratory studies?
19    A. I base that opinion on the totality of evidence,
20 including the basic mechanistic and cellular studies as
21 well as the body of clinical evidence.
22    Q. Okay. Now, in the Pantuck study, there was only
23 a single arm; correct?
24    A. That's correct.
25    Q. Okay. And all the -- all of the patients in

22 (Pages 2146 to 2149)

2178

1    A F T E R N O O N   S E S S I O N
2              (1:49 p.m.)
3        JUDGE CHAPPELL:  Back on the record.
4    Redirect?
5        MR. FIELDS:  Thank you, Your Honor.
6        First I'd like to thank you for your courtesy at
7    the noon hour.
8        JUDGE CHAPPELL:  You're welcome.
9              -  -  -  -  -
10       REDIRECT EXAMINATION
11       BY MR. FIELDS:
12       Q.  Doctor, I'm going to kind of go in the order
13   that we did earlier or that you followed on cross.
14       You talked about a case in Los Angeles before
15   Judge Lett, a federal judge, and in that case you
16   testified about RCTs.
17       Were you talking in that case about pure fruit
18   juice or any other pure food?
19       A.  No.  It was a case about a dietary supplement.
20   It was a mixture of a number of ingredients or herbals,
21   and so forth.
22       Q.  That's what I thought.
23       You said that you had participated in a number
24   of RCTs over the years.
25       You're not against RCTs, are you?

2179

1        A.  No.  Not in any sense at all.
2        Q.  So what you're telling us is that they're not
3    necessary, but they're fine; is that correct?
4        A.  That's correct.
5        Q.  And sometimes they're not feasible; is that
6    correct?
7        A.  They're often not feasible for nutrients or
8    whole foods because of small changes that are seen, the
9    issue with the number of patients that would have to be
10   studied and the particular disease condition.
11       Q.  Now, in this case, in our three areas,
12   respondents had RCTs in two of those three areas.  Let's
13   review those.
14       In heart is it correct that they had three, at
15   least three RCTs?
16       A.  That's correct.
17       Q.  Now, counsel read to you from a deposition in
18   one of those cases -- I can't even remember which one,
19   but it doesn't matter -- where you said that you had
20   thought that Dr. Aviram's study, the CIMT study, did not
21   have a placebo group.
22       Were you just wrong about that?
23       A.  Yeah.  I was incorrect in my deposition and
24   didn't catch it.  It clearly says in the article right
25   on the face of it that there was a placebo group in the

2180

1    carotid artery stenosis study where they got the
2    tissue.  There was definitely a placebo group in that
3    study.
4        Q.  Have you rechecked that in the --
5        A.  I've rechecked it in the reprint, yes.
6        Q.  Very clearly it was a placebo-controlled study.
7        A.  Correct.
8        Q.  Okay.  Now, in the prostate area, neither
9    Dr. Carducci nor Dr. Pantuck you said had a placebo
10   group, but they had a control in that the -- each
11   patient's own prior doubling time, PSA doubling time,
12   was matched against what happened after they started
13   taking the pomegranate juice; is that correct?
14       A.  Yes.  Pomegranate juice or extract in the
15   Carducci case.
16       Q.  And in your opinion, is it more feasible and
17   efficient to use that kind of a control when studying
18   PSA doubling time than to try to recruit and assemble a
19   placebo group?
20       A.  Yes.  This is an accepted study design where
21   you determine the PSA doubling time beforehand and then
22   put patients on a treatment and then look at what
23   happens.
24       Two reasons why it's difficult.  One is that
25   it's hard to get patients with prostate cancer to agree

2181

1    to a placebo arm, as we found in a couple of the
2    long-term studies, and that had been delayed because of
3    that.  And secondly, the variability between subjects
4    would be significant.
5        Q.  When you say "the variability," you mean the
6    variability in their rate of doubling time going into
7    the operation.
8        A.  That's correct.  It would be almost impossible
9    to balance the two groups so that they have the same
10   doubling times.
11       Q.  And is it correct that they're encountering
12   delay in trying to do that with the present study?
13       A.  That's correct.
14       Q.  You spoke about studies that you have done and
15   studies that others have done sponsored by the
16   Resnicks.
17       Are there other studies on pomegranate juice
18   that are neither done by you or sponsored by the
19   Resnicks?
20       A.  Yes.  Certainly.  If one does a search on the
21   PubMed, which is where these studies are found, you'll
22   find studies on pomegranate and prostate
23   cancer.  You'll also find studies from many
24   laboratories around the United States, University of
25   Wisconsin, University of California at Davis, and then

30 (Pages 2178 to 2181)

2194

1    different herbals and other materials, had side effects
2    that were unsafe.
3        Q. Okay. Now, I'm going to ask you a hypothetical
4    question.
5        Assume that we're talking about pure fruit or
6    pure fruit juice and that it creates no material risk of
7    harm and that it is not urged as a substitute for proper
8    medical treatment. In that case, does the science to
9    substantiate health claims for that fruit or fruit juice
10   necessarily have to include RCT studies?
11       A. No, they don't have to include a randomized
12   clinical trial.
13       Q. Is that because of the fact that it is safe and
14   not urged as a substitute for proper medical treatment?
15       A. Yes.
16       Q. All right. Now, is it your opinion that the
17   consensus of competent and reliable and experienced
18   scientists would agree with the opinion you've just
19   given, that when you're talking about a safe pure fruit
20   juice that is not offered as a substitute for proper
21   medical treatment, you look to the totality of the
22   science and not require RCT tests?
23       A. Yes.
24       Q. All right. Dr. Miller, at the time you were
25   retained as an expert in this case, you had also been

2195

1    retained by the FTC to testify as an expert in still
2    another case; isn't that correct?
3        A. That's correct.
4        Q. Is it correct that when the FTC learned that you
5    were going to testify as an expert in this case, you got
6    fired?
7        A. That's correct.
8        Q. Did you try to explain there was a difference
9    between the two cases?
10       A. I did.
11       Q. All right. You got fired anyway?
12       A. Yes.
13       MR. FIELDS: All right. That's all I have.
14       JUDGE CHAPPELL: Any cross?
15       MS. VISWANATHAN: Yes.
16           - - - - -
17           CROSS-EXAMINATION
18       BY MS. VISWANATHAN:
19       Q. Good afternoon, Dr. Miller.
20       A. Good afternoon.
21       Q. Dr. Miller, you agree that the claim being made
22   about a product is relevant to the level of
23   substantiation required, don't you?
24       A. Yes.
25       Q. And as you just discussed with Mr. Fields, you

2196

1    prepared an expert report for the FTC in the
2    Daniel Chapter One case; correct?
3        A. Yes, I did.
4        Q. And in your report in the Daniel Chapter One
5    case, on page 7 -- that was January 28, 2009 -- didn't
6    you state, "It is my opinion that to constitute
7    competent and reliable scientific evidence, a product
8    that purports to treat, cure or prevent cancer must have
9    its efficacy and safety demonstrated through controlled
10   clinical studies"?
11       A. Yes. I said that the key thing is what is the
12   product.
13       Q. But you specifically said a product that
14   purports to treat, cure or prevent cancer must have its
15   efficacy and safety demonstrated through controlled
16   clinical studies, did you not?
17       A. And as it applied to the Daniel Chapter One
18   products, that statement is correct.
19       Q. Well, in that case didn't you also testify that
20   if a sponsor of a potentially new therapy wishes to
21   claim that their product is safe and effective in the
22   treatment of a specific type and stage of cancer, a
23   randomized, controlled clinical trial is mandatory, just
24   as it would be for a new medicinal cancer therapy?
25       A. Again, it depends on the product. And when I

2197

1    wrote that opinion, I wasn't discussing a food.
2        Q. You define treating cancer as causing a
3    regression of the disease, putting somebody in
4    remission, prolonging their disease-free remission or
5    prolonging their survival; is that correct?
6        A. Yes.
7        MR. FIELDS: Objection. Oh, I'm sorry.
8    Withdrawn.
9        BY MS. VISWANATHAN:
10       Q. And earlier when we were referring to RCTs,
11   randomized, control -- that refers to randomized,
12   controlled clinical trials; correct?
13       A. RCT means randomized clinical trial.
14       Q. Okay. And by "clinical trials" you mean trials
15   done on human beings; correct?
16       A. Generally, that's the case.
17       Q. Which is distinct from nonclinical research
18   which is done in either test tube or animal models;
19   correct?
20       A. That's correct.
21       Q. You've stated in your report in this case on
22   page 6 that "The regulatory requirements are much more
23   rigorous when crossing the boundary between making a
24   general health benefit claim, such as low-fat diets are
25   healthier than high fat diets, and taking a general

34 (Pages 2194 to 2197)

2198

1 statement to the next level and claiming efficacy in the
2 treatment of a specific type of cancer"; correct?
3    A. Again, that's correct, but it depends on what
4 the product is that we're talking about.
5    Q. I'm sorry.
6    A. I said --
7    Q. Oh, actually I'll just...
8       (Pause in the proceedings.)
9       So are you saying that if a dietary supplement
10 were claiming to treat prostate cancer, it would require
11 randomized, controlled clinical trials?
12    A. If -- are you talking about a food or are
13 you --
14    Q. I'm talking about -- I said a dietary
15 supplement.
16       MR. FIELDS: Objection. Ambiguity as to what
17 "a dietary supplement" is. Some have pure foods. Some
18 may be herbs. Some may be all kinds of things.
19       MS. VISWANATHAN: I'll withdraw the question.
20       BY MS. VISWANATHAN:
21    Q. If any product were claiming to treat prostate
22 cancer, it would require randomized, controlled clinical
23 trials; correct?
24    A. No, not correct. I don't believe that food
25 requires a randomized clinical trial, and I believe that

2199

1 the requirements and the stringency and the other things
2 that we look at can be relaxed because it is a food and
3 not a drug or a concoction of other herbs.
4    Q. Do you recall giving a deposition in this matter
5 on April 5, 2011?
6    A. Yes.
7    Q. Okay. And in that deposition on page 110, do
8 you recall giving the following testimony.
9       "QUESTION: Okay."
10       MR. FIELDS: Could we have just a moment to find
11 it?
12       MS. VISWANATHAN: Oh, sure. We have a copy.
13       BY MS. VISWANATHAN:
14    Q. "QUESTION: Would you agree that a product of
15 any type that purports to treat cancer should have its
16 efficacy and safety demonstrated through controlled
17 clinical studies?
18       "ANSWER: By treatment, a patient has to have a
19 disease, a certain stage of disease, a certain extent of
20 disease, and the treatment is going to have a beneficial
21 effect on either eradicating the disease, getting it
22 under control, prolonging someone's survival. If you're
23 trying to make claims like that, there should be
24 clinical trials to show that.
25       "QUESTION: And 'clinical trials' means trials

2200

1 on humans.
2       "ANSWER: Again, if you're making a treatment
3 claim, I've answered it already."
4       Do you recall giving that testimony?
5    A. Yes.
6    Q. Okay. So based on that testimony, if a fruit
7 juice were claiming to treat prostate cancer, it would
8 require clinical -- randomized clinical trials on
9 humans; correct?
10    A. Not correct.
11    Q. And if a fruit juice were claiming to prevent
12 prostate cancer, it would require clinical --
13 randomized, controlled clinical trials; correct?
14    A. No, not correct.
15    Q. And that's in contradiction to the testimony
16 you gave earlier in this -- in your deposition in this
17 case.
18    A. No, it's not.
19       In talking about a food, which is not being
20 offered as a substitute or a replacement for a
21 conventional therapy, that is known to be safe, for
22 which there are reliable data to support a claim that
23 it may be beneficial to patients with a number of
24 different disorders, one can relax the requirement for
25 a randomized clinical trial if the food has a high

2201

1 benefit-risk ratio, a low or zero toxicity or safety
2 profile, and has benefit to mankind.
3    Q. Sir, I'm asking you a question about a specific
4 claim. I understand you're saying that you're talking
5 about a claim that it may be beneficial to patients.
6       I'm asking you, if there's a specific claim that
7 a fruit juice is treating prostate cancer, wouldn't it
8 require randomized, controlled clinical trials?
9    A. Because it's a food, it would not require a
10 randomized clinical trial.
11    Q. Even if there were a claim that it treats
12 prostate cancer.
13    A. That's correct.
14    Q. And your answer is the same for if a fruit juice
15 were claiming to prevent prostate cancer, you say it
16 would not require randomized, controlled clinical
17 trials?
18    A. That's correct. If there were reliable
19 scientific data to support that.
20    Q. You defined "competent and reliable evidence" to
21 mean a scientific hypothesis has been established; is
22 that correct?
23    A. Yes.
24    Q. And you believe that nonclinical studies are
25 hypothesis-generating; correct?

35 (Pages 2198 to 2201)

2202

1    A.  They're more than that.  They -- you generate a
2  hypothesis to begin with, but then you test the
3  hypothesis in an animal model, in a test tube, in other
4  laboratory or even in animal studies, so it goes beyond
5  just hypothesis testing.
6    **Q.  Well, in fact you believe that if you see**
7  **evidence of anticancer activity in a test tube or an**
8  **animal test, then one goes to a clinical trial to see if**
9  **there's any activities in humans; correct?**
10    A.  Assuming that the agent you're testing is safe
11  and doesn't kill the animals, that's correct.
12    **Q.  And you believe that evidence from nonclinical**
13  **settings does not mean that the product is effective in**
14  **treating cancer patients; correct?**
15    A.  That may be the case, but also a lot of the
16  evidence that we get from nonclinical trials gives us a
17  direction to pursue that agent in potentially helping
18  mankind.
19    **Q.  So -- yes.**
20    **So I understand, so you're saying that the**
21  **nonclinical trials or the nonclinical evidence would**
22  **provide a hint that needs to be investigated further;**
23  **correct?**
24    A.  Yes.  Understanding there are differences
25  between the test tube or the mouse and man, but it gives

2203

1  us important information to do further studies.
2    **Q.  Okay.  You served as associate medical director**
3  **at Cancer Treatment Centers of America; is that right?**
4    A.  That's correct.
5    **Q.  And when you were in that position, 80 percent**
6  **of the patient population in your institution was using**
7  **alternative or complementary medicine; correct?**
8    A.  That's correct.
9    **Q.  And some examples of the kinds of things they**
10  **were using included fruit cocktails or fruit juice**
11  **cocktails, shark cartilage and megavitamins; correct?**
12    A.  That's correct.
13    **Q.  And in the Daniel Chapter One case you**
14  **testified in this court that if there is a claim that**
15  **the alternative or complementary product is designed to**
16  **prevent cancer, prevent the progression of cancer, cure**
17  **cancer or specifically treat cancer, then those would**
18  **have to go through the process of being tested in**
19  **randomized, controlled clinical trials; correct?**
20    A.  Yes, that's correct.  But again it depends upon
21  what the product is.
22    **Q.  Was that your testimony in Daniel Chapter One?**
23    A.  Yes, it was.
24    **Q.  And in Daniel Chapter One you further stated**
25  **that making claims that a particular product has**

2204

1  **specific anticancer activity is different from saying**
2  **it's just good nutrition like a vitamin; correct?**
3    A.  Run that one by me again.  The acoustics in here
4  are not very good.  I'm sorry.  I'm having trouble
5  hearing you.
6    **Q.  No problem.  I'll just reread it from the**
7  **screen.**
8    **In Daniel Chapter One you further stated that**
9  **making claims that a particular product has specific**
10  **anticancer activity is different from saying the**
11  **product is just good nutrition, as with a vitamin;**
12  **correct?**
13    A.  Well, again, that applies -- yes, that's correct
14  but again applied to a product that was being offered as
15  a substitute for and a replacement for a conventional
16  effective and safe anticancer therapy.
17    **Q.  So in Daniel Chapter One you said that claims**
18  **about specific anticancer activity for alternative or**
19  **complementary medicine products must go through the**
20  **randomized, controlled testing process.**
21    A.  Yes, I said that.  But then what is the
22  alternative therapy, which is very important.
23  "Alternative" means in place of or instead of
24  conventional treatment for cancer and other diseases.
25  And if that product is being offered in replacement for

2205

1  known and safe agents, there better be some proof for
2  that activity and safety.
3    **Q.  Okay.  You believe that there shouldn't be a**
4  **separate, different, less rigorous way of identifying**
5  **the safety and efficacy of complementary medicine;**
6  **correct?**
7    A.  I think we have to define "complementary
8  medicine."
9    **Q.  Okay.  Well, in Daniel Chapter One isn't it**
10  **fair to say that you defined it as something that is**
11  **being taken along with the patient's other cancer**
12  **treatments?**
13    A.  Yes.  If it's a food, I don't think you need a
14  randomized clinical trial for it.  If it's a drug
15  that's going to improve a patient's tolerance to
16  chemotherapy or lessen some of the toxic effects of
17  chemotherapy by improving their blood counts, and it is
18  a drug that is a complementary agent to cancer
19  treatment, then that agent has to go through the process
20  of clinical testing and randomized clinical trials.  If
21  it's a food, I don't believe it does have to go through
22  that process.
23    **Q.  Okay.  So previously when you testified in**
24  **Daniel Chapter One that there shouldn't be a separate,**
25  **different, less rigorous way of identifying the safety**

36 (Pages 2202 to 2205)

2206

1  and efficacy of so-called complementary medicine, you're
2  saying that's no longer your opinion?
3     A. I'm saying that the product in
4  Daniel Chapter One, again, had no reliable scientific
5  evidence supporting it or reliable or competent medical
6  oncologists supporting it. It was being offered as a
7  replacement for and instead of conventional treatment
8  for leukemia, for breast cancer. And thirdly, some of
9  the products had concerns about safety issues so that
10  they were not without safety concerns.
11     So for all of these reasons, my opinion was and
12  it's -- it would -- my opinion was that that product
13  required randomized clinical trials to support the
14  claims that were being made.
15     It is not a food. It's not been around for
16  thousands of years where there are no safety concerns,
17  and so for that reason there's a huge difference between
18  all of the different products that were being offered by
19  and sold by Daniel Chapter One compared to the fruit
20  juice we're discussing today.
21     Q. Well, in Daniel Chapter One you further stated
22  that complementary medicine must go through the same
23  rigorous process because, quote, we want to help cancer
24  patients and we want to make sure what they're getting
25  is safe and effective.

2207

1        Was that your testimony?
2     A. Yes. But again, as I said, there are
3  complementary medicines that diminish the severity of
4  nausea and vomiting. They're drugs that need to be
5  tested. There are other agents that improve the blood
6  counts in patients who are getting chemotherapy.
7  Because they're drugs or hormones, they also have to be
8  tested. If it's a food, it doesn't have to go through
9  the same stringency of a randomized clinical trial.
10     Q. Okay. In your report in this case, on page 11,
11  you state that there may be some category of patients
12  who do not have many or any alternatives, and for them a
13  clinician may recommend, among other things, the
14  consumption of pomegranate; correct?
15     A. That's correct.
16     Q. And that clinician's recommendation is for the
17  purpose of benefiting the general well-being of the
18  cancer patient; correct?
19     A. That's correct.
20     Q. The clinician is not recommending pomegranate as
21  a treatment for their cancer; correct?
22     MR. FIELDS: Objection to "treatment" ambiguity.
23  What does "treatment" mean?
24     MS. VISWANATHAN: Your Honor, I believe we have
25  a question where he defined "treatment" earlier, where

2208

1  he agreed to the definition of "treatment."
2     MR. FIELDS: I don't recall that, but if it
3  could be repeated and if we have this defined, then I
4  have no objection.
5     JUDGE CHAPPELL: Do you want to have her read
6  it?
7     MS. VISWANATHAN: Yeah, let me -- if I can just
8  go back and try and find it.
9     (Pause in the proceedings.)
10     I apologize, Your Honor. I'm just trying to
11  find the previous question, unless the court reporter
12  knows -- oh, here it is. Okay.
13     BY MS. VISWANATHAN:
14     Q. Earlier today I asked you, "You define treating
15  cancer as causing a regression of the disease, putting
16  somebody in remission, prolonging their disease-free
17  remission or prolonging their survival; is that
18  correct?"
19     And your answer was: "Yes."
20     A. Yes.
21     Q. So that is my -- that is the definition I'm
22  using when I use the word "treatment." Is that fair?
23     A. Yes.
24     Q. Great.
25     So back to my -- where we were. Okay.

2209

1     So my question was, where a clinician is
2  recommending pomegranate for the purpose of benefiting
3  the general well-being of a cancer patient, that's
4  different from recommending pomegranate as a treatment
5  for their cancer; correct?
6     A. When you started the question, you talked about
7  a patient who seemed to have no other treatment options,
8  where in the absence of any available therapy or
9  standard of therapy for that patient would or could
10  pomegranate juice be used to offer some benefit to the
11  patient. I believe that's the way you started it.
12     Q. Uh-huh.
13     A. The answer to that would be yes. If there are
14  no other standards, there is no available therapy, there
15  is no other approved therapy, are there data to suggest
16  that this agent would be safe and effective and not
17  harmful, and in this case the answer would be yes, that
18  could be used in that patient when there are no other
19  treatment options in the absence of a randomized
20  clinical trial to show that.
21     Q. And my understanding is -- my question is, the
22  use of pomegranate in that case is for the patient's
23  general well-being as opposed to a treatment for their
24  cancer; correct?
25     A. Well, it might be for both. It might improve

37 (Pages 2206 to 2209)

2210

1  the patient's well being, and it might provide some
2  benefit to the patient.
3      Q. So you're assuming that this patient is a
4  patient who's under the active care of an oncologist or
5  oncological surgeon; correct?
6      A. Yes.
7      Q. And that patient is getting a recommendation
8  from their physician; correct?
9      A. Yes.
10     Q. Okay. It's your opinion that you can't take the
11  physician out of the formula; correct?
12     A. That's correct.
13     Q. You didn't actually evaluate any of the
14  advertising claims made regarding the health benefits of
15  POM's products; correct?
16     A. No, I did not.
17     Q. And as we've been discussing, your opinion is
18  that the level of substantiation required for health
19  claims for food is different from that required for a
20  drug that is developed and marketed for the treatment,
21  cure or prevention of certain diseases; correct?
22     A. That's correct.
23     Q. So, hypothetically, you would agree that if a
24  food were marketed -- or were developed and marketed for
25  the treatment, cure or prevention of disease that the

2211

1  level of substantiation for a drug would apply?
2      A. I didn't understand the word "developed." I
3  would think that foods are out here and don't have to be
4  invented or developed today.
5      Q. Okay. Well, let's just say you agree that if a
6  food were -- well, let me clarify it.
7          You would agree that -- hypothetically, you
8  would agree that if a food were marketed for the
9  treatment, cure or prevention for certain diseases that
10  that level of substantiation for a drug would apply.
11     A. Again, there's a difference in my mind between a
12  drug and the confidence that you have to have, the
13  safety of the agent, the efficacy of the agent. The
14  risk-benefit ratio is different for a drug than it would
15  be for a food, and the stringency and requirement could
16  be relaxed and made less rigorous than it would be for a
17  drug.
18     Q. Okay. Well, in -- in Daniel Chapter One you
19  testified that the dietary -- that dietary supplements
20  marketed for the treatment, cure or prevention of cancer
21  should meet the same level of substantiation as drugs;
22  correct?
23     MR. FIELDS: Objection. Ambiguity to
24  "dietary supplement" again. It could be just pure fruit
25  or it could be a lot of herbs or it could be a drug.

2212

1  "Dietary supplement" is very ambiguous term.
2      JUDGE CHAPPELL: Did you understand the
3  question?
4      THE WITNESS: Yes, I did.
5      JUDGE CHAPPELL: Overruled.
6      THE WITNESS: I wasn't discussing in
7  Daniel Chapter One the difference between a -- various
8  concoctions of different herbs and other ingredients
9  that made up the various Daniel Chapter One products.
10  And by "a dietary supplement" I wasn't discussing or
11  didn't mean to say a pure food substance. I was
12  thinking about multivitamin substances. I was thinking
13  about other things that would improve a patient's
14  well-being, but I wasn't discussing a food.
15      Subsequently, since that Daniel Chapter One
16  testimony, I've learned more and understood more and
17  realize that there's a difference between a
18  Daniel One -- a Daniel Chapter One product and a pure
19  food substance, and thus my -- I don't think my opinion
20  today has anything to do with the situation in
21  Daniel Chapter One. They're totally different products;
22  one is not a food and one is a food.
23      BY MS. VISWANATHAN:
24     Q. Okay. So is it your opinion that the level of
25  substantiation required for health claims for a food is

2213

1  different from the level of substantiation required for
2  health claims for dietary supplements in some cases?
3      A. It depends on the dietary supplement. That's
4  correct. Is it pure food and the other is a mixture of
5  fifty different minerals and elements and vitamins and
6  other things? Then I think there is a difference.
7      Q. Okay. Well, you are -- okay.
8          So you're aware that POM Wonderful has several
9  products sold under the name POM Wonderful juice or POMx
10  diet -- pills and POMx liquid; correct?
11     A. Yes. I understand that, and I understand they
12  all come from the same, the same food substance.
13     Q. You have no independent knowledge of the
14  ingredients of any of the POM products; correct?
15     A. You mean each of the individual ingredients of
16  it?
17     Q. Yes.
18     A. I have some knowledge. I'm not here I don't
19  believe to testify to the different ingredients and the
20  milligrams or micrograms of each one of them.
21     Q. You have no specific knowledge of how those
22  products are manufactured; correct?
23     A. That's correct.
24     Q. Okay. So what -- and is your knowledge based on
25  what you were told by POM's representatives?

38 (Pages 2210 to 2213)

# In the Matter of:

# POM Wonderful, et al.

*September 1, 2011*
*Public Record*
*Trial Vol. 13*

**Condensed Transcript with Word Index**



**For The Record, Inc.**
**(301) 870-8025 - www.ftrinc.net - (800) 921-5555**

POM Wonderful, et al.                    Public Record                    9/1/2011

USCA Case #13-1060    Document #1483683    Filed: 03/12/2014    Page 321 of 367

2236

```
 1              FEDERAL TRADE COMMISSION
 2                   I N D E X
 3               POM WONDERFUL, LLC
 4               TRIAL VOLUME 13
 5             PART 1, PUBLIC RECORD
 6               SEPTEMBER 1, 2011
 7
 8   WITNESS:     DIRECT  CROSS   REDIRECT  RECROSS  VOIR
 9   BURNETT       2240   2256     2302      2312
10   ORNISH        2314   2355
11
12
13   EXHIBITS   FOR ID  IN EVID  IN CAMERA  STRICKEN/REJECTED
14   CX
15   None
16
17   PX
18   None
19
20   JX
21   None
22
23   DX
24   None
25
```

2238

1   APPEARANCES:

2

3   ON BEHALF OF THE FEDERAL TRADE COMMISSION:

4       HEATHER HIPPSLEY, ESQ.

5       MARY L. JOHNSON, ESQ.

6       SERENA VISWANATHAN, ESQ.

7       DEVIN WILLIS DOMOND, ESQ.

8       Federal Trade Commission

9       Bureau of Consumer Protection

10       601 New Jersey Avenue, N.W.

11       Washington, D.C. 20001

12       (202) 326-3285

13       hhippsley@ftc.gov

14

15   ON BEHALF OF THE RESPONDENTS:

16       JOHN D. GRAUBERT, ESQ.

17       Covington & Burling LLP

18       1201 Pennsylvania Avenue, N.W.

19       Washington, D.C. 20004-2401

20       (202) 662-5938

21       jgraubert@cov.com

22

23

24

25

2237

```
 1            UNITED STATES OF AMERICA
 2        BEFORE THE FEDERAL TRADE COMMISSION
 3
 4   In the Matter of            )
                                 )
 5   POM WONDERFUL LLC and       )
     ROLL GLOBAL LLC,            )
 6   as successor in interest to )
     Roll International Corporation, )
 7   companies, and           ) Docket No. 9344
     STEWART A. RESNICK,        )
 8   LYNDA RAE RESNICK, and      )
     MATTHEW TUPPER, individually )
 9   and as officers of the      )
     companies.                 )
10                               )
     -------------------------------)
11
12        THURSDAY, SEPTEMBER 1, 2011
13             9:30 a.m.
14          TRIAL VOLUME 13
15              PART 1
16           PUBLIC RECORD
17
18   BEFORE THE HONORABLE D. MICHAEL CHAPPELL
19       Administrative Law Judge
20       Federal Trade Commission
21       600 Pennsylvania Avenue, N.W.
22          Washington, D.C.
23
24
25   Reported by:  Susanne Bergling, RMR-CRR-CLR
```

2239

1   APPEARANCES:  (continued)

2

3   ON BEHALF OF THE RESPONDENTS:

4       BERTRAM FIELDS, ESQ.

5       Greenberg Glusker

6       1900 Avenue of the Stars

7       21st Floor

8       Los Angeles, California 90067

9       (310) 201-7454

10          -and-

11       KRISTINA M. DIAZ, ESQ.

12       BROOKE HAMMOND, ESQ.

13       JOHNNY TRABOULSI, ESQ.

14       Roll Law Group P.C.

15       11444 West Olympic Boulevard

16       10th Floor

17       Los Angeles, California 90064

18       (310) 966-8775

19       kdiaz@roll.com

20

21   ALSO PRESENT:

22       Hillary Sloane Gebler, Attorney Advisor

23

24

25

1 (Pages 2236 to 2239)

POM Wonderful, et al.      Public Record      9/1/2011

USCA Case #13-1060    Document #1483683    Filed: 03/12/2014    Page 322 of 367

2256

1   I'm not going to take your time to do that, but that --
2   that was a double-blind, placebo-controlled study?
3     A. That is correct.
4     Q. Okay. And does that study support your opinion
5   on the likelihood that pomegranate juice has a
6   beneficial effect on erectile function?
7     A. It does support it.
8     MR. FIELDS: That's all I have for this witness,
9   Your Honor.
10     JUDGE CHAPPELL: Cross?
11     MS. DOMOND: Yes, Your Honor. Thank you, Your
12   Honor.
13           CROSS-EXAMINATION
14     BY MS. DOMOND:
15     Q. Good morning again, Dr. Burnett.
16     A. Good morning.
17     Q. As an expert in the field of erectile
18   dysfunction, is it your opinion that if one uses the
19   words "erectile dysfunction," that person or entity is
20   talking about a clinical condition which is very
21   different from the concept of something that has a
22   potential beneficial effect on erectile tissue function
23   and health?
24     A. The words "erectile dysfunction" has had a
25   clinical connotation, yes.

2257

1     Q. And would you say it's very different from what
2   a potential beneficial effect on erectile tissue
3   function and health is?
4     A. Well, I think that it has that distinction when
5   we're talking about a true therapy for clinical use,
6   yes.
7     Q. Okay. And do the words "erectile dysfunction"
8   refer specifically to a clinical disorder or disease?
9     A. Again, we use this word "erectile dysfunction"
10   in a global sense to refer to the inability to attain
11   and maintain erections for sexual intercourse, and we do
12   use that, in a clinical sense, with a terminology that
13   refers specifically to that, yes.
14     Q. So, it is a clinical disorder?
15     A. Yes. That's why I want to be clear about my
16   definition of it.
17     Q. Okay. And you mentioned erectile dysfunction
18   therapy. Is that an intervention that would then
19   effectively treat, improve, or allow a man who has an
20   erectile dysfunction to function?
21     MR. FIELDS: Objection, Your Honor. Compound,
22   Your Honor. Treat and improve are different things.
23     MS. DOMOND: Treat and improve are two different
24   things? Okay.
25     BY MS. DOMOND:

2258

1     Q. That would effectively treat?
2     A. Well, again, I think we need to dissect this a
3   little bit so we make sure we're clear about what I'm
4   talking about and what you're trying to infer.
5     Treat, in a clinical sense, has various
6   different meanings. Treat can mean an approved
7   pharmaceutical therapy to treat a known clinical
8   condition. Treat can also mean, broadly, that it has a
9   role in -- directed towards the condition that may lead
10   to some improvement in that condition.
11     So, I think as a broad terminology, if you're
12   talking about something in a true clinical sense, as in
13   an FDA-approved pharmaceutical therapy or treatment,
14   that's a different understanding.
15     Q. I guess my question is, if you have something
16   that you said is an ED therapy, does that mean that that
17   intervention will effectively treat, improve, or allow
18   someone to function who has an erectile -- who has
19   erectile dysfunction?
20     A. Well, there are approved FDA treatments that we
21   use clinically and that have the role in improving the
22   erection response, if that's what you're saying.
23     Q. And in your opinion, if something's defined as a
24   treatment or therapy for erectile dysfunction, would you
25   hold it to a higher standard of proof than something

2259

1   that's been promoted as an intervention that could
2   possibly promote some level of improvement of one's
3   erectile health or tissues?
4     A. Well, again, I think that -- I don't want to
5   quibble about what we're trying to dissect your term of
6   treatment and mine is. A treatment can be any
7   intervention that can improve one's erectile function.
8   Yes, there are clinical therapies that are clinically
9   approved for the purpose of treating erectile
10   dysfunction, but, again, there may be a different
11   standard for that terminology. So, I just want to be
12   clear about what I'm describing.
13     Q. So, the different terminology goes to whether
14   you're saying erectile dysfunction or improvement in
15   erectile health? Is that the distinction?
16     A. I think there is still a -- there is a
17   distinction between those two, yes.
18     Q. Okay. And is this because erectile dysfunction,
19   as you stated earlier, refers to a clinical disorder,
20   and if one claims that something treats or alleviates
21   erectile dysfunction, then it needs to go through what
22   -- a regular clinical trial, like the FDA-approved thing
23   you were discussing?
24     A. Well, I think, taken in that context, okay --
25   so, making sure we all just understand what we're trying

6 (Pages 2256 to 2259)

2264

1    And, Dr. Burnett, is it also your opinion or is
2    it your opinion that one cannot rely on animal studies
3    even in combination with in vitro -- also known as test
4    tube studies -- to conclude that a product treats
5    erectile dysfunction in humans?
6        A.  In the context that we said in terms of the
7    finding of treating erectile dysfunction, for that level
8    of discussion, I do believe that we need more than just
9    animal studies.
10       Q.  And would you -- if it was animal in combination
11   with in vitro, would that be enough?
12       A.  I think you would still need to go further than
13   that, again, for the standard that we're speaking of.
14       Q.  Okay.  And, in fact, Dr. Burnett, is it correct
15   that experts require -- would require two to three human
16   randomized, controled trials to conclude that a product
17   treats erectile dysfunction?
18       A.  I won't quibble with that.  I think that makes
19   sense.
20       Q.  Okay.  In fact, you've testified to that.  Is
21   that correct?
22       A.  I have, and I would support that now.
23       Q.  And when you say human randomized,
24   controled trials, you mean -- randomization, does that
25   mean when study subjects are randomly assigned to either

2265

1    the experimental or control group without any of the
2    investigators knowing to which group that subject's
3    assigned?
4        A.  By definition of randomization, that's correct.
5        Q.  Okay.  And by a controlled trial, you mean a
6    study that has a placebo control arm to distinguish
7    positive effects resulting from the intervention from
8    false positives that even those who might not be
9    receiving the real intervention may experience, which is
10   also referred to sometimes as a placebo effect?
11       A.  So, by definition of placebo-controlled, I think
12   you've defined that well, and I will accept that.
13       Q.  Okay.  And, Dr. Burnett, an important part of
14   the human randomized, controlled trial would also be --
15   that -- that would show that a product treats erectile
16   dysfunction is the use of proper tools to assess the
17   outcomes.  Is that correct?
18       A.  It is customary now, for these sorts of trials
19   to be done, to use tools that would establish the role
20   of the therapy.
21       Q.  Okay.  And by proper tools, would -- that would
22   mean validated measures or instruments of erectile
23   dysfunction.  Is that correct?
24       A.  It has become the standard that those sort of
25   tools should be included when that sort of assessment is

2266

1    done.
2        Q.  And it's important to use a measure or
3    assessment tool that's been validated, because such tool
4    has been established as measuring erectile dysfunction
5    through rigorous assessments involving reliability
6    testing, validity testing, construct validity, and other
7    criteria.  Is that correct?
8        A.  I have said that before, and I would say that
9    now.
10       Q.  And one importance of using a validated
11   assessment tool for measuring erectile dysfunction is
12   that it's been established as reliable through testing a
13   large number of individuals.  Is that correct?
14       A.  That is correct.
15       Q.  And another importance to use such a tool, a
16   validated assessment tool, is because -- for measuring
17   erectile dysfunction is it means that the tool has
18   specificity; in other words, it's been established as a
19   valid test for measuring one's erectile dysfunction.  Is
20   that correct?
21       A.  That is true.
22       Q.  And, Dr. Burnett, can a scientist determine
23   whether a measurement or assessment tool has been
24   validated for measuring erectile dysfunction by
25   reviewing published studies that demonstrate that the

2267

1    tool has been tested and established for using -- for
2    use in the measure of erectile dysfunction?
3        A.  Could you restate that question?
4        Q.  If I'm a scientific expert and I want to see
5    whether a tool is validated or not, how would I go about
6    doing that?
7        A.  Well, there are -- there are, in clinical
8    trials, various instruments that have undergone rigorous
9    evaluation for their validity, and if those tools have
10   been used in the assessment of the particular
11   intervention being evaluated, then that would be
12   considered a way of determining whether the therapy
13   meets a certain efficacy level based on these tools that
14   have validation.
15       Q.  Okay.  And so I would search through different
16   scientific articles to see whether this specific -- this
17   tool has been validated or tested.  Is that correct?
18       A.  That is correct.  So, if that tool has been used
19   with a particular trial and has been reported on and
20   that's the one that you're looking at in the literature
21   and somebody's evaluating that, that report, then
22   looking for that kind of a tool would be helpful.
23       Q.  Okay.  And the value of using a validated
24   assessment tool over a nonvalidated assessment tool in a
25   study evaluating the effect of a product on erectile

8 (Pages 2264 to 2267)

2268

1   dysfunction is to help establish the credibility of the
2   work, because validated assessment tools are much
3   stronger than nonvalidated tools in both accuracy and
4   statistical validation.  Is that correct?
5      A.  I would support that.
6      Q.  So, Dr. Burnett, experts would not rely solely
7   on a nonvalidated measure to conclude that a product
8   treats erectile dysfunction.  Is that right?
9      A.  Again, in the standard that we're talking about,
10  treatment of erectile dysfunction, which I think I've
11  defined, we would -- we would rely on validated tools.
12     Q.  Okay.  And, Dr. Burnett, to analyze the outcome
13  from a human randomized, controlled trial that's testing
14  a product's effect on erectile dysfunction, that would
15  also require a statistical evaluation of data obtained
16  using the validated assessment measures that we've
17  discussed.  Is that correct?
18     A.  That is correct.  Statistical evaluation is part
19  of the analyses that occur now.
20     Q.  Okay.  And, in other words, for an expert to
21  conclude from such a study, a randomized, controlled
22  trial that's looking at a product's effect on erectile
23  dysfunction, they -- the controlled trial would have to
24  demonstrate results from those validated measures that
25  were statistically significant.  Is that correct?

2269

1     A.  That is correct.  Again, in the context that
2  I've described.
3     Q.  And, Dr. Burnett, evaluating data for
4  statistical significance is the standard of basic
5  scientific and clinical research to demonstrate that a
6  study's hypothesis has been proven.  Is that correct?
7     A.  Say that again.  I'm sorry.
8     Q.  Evaluating data for statistical significance is
9  the standard -- is the standard used in basic scientific
10  and clinical research to demonstrate that a study's
11  hypothesis has been proven.  Is that correct?
12     A.  Yes.
13     Q.  So, somewhat in layman's terms, to prove that a
14  product treats erectile dysfunction, a study's results
15  would have to show a statistically significant
16  difference between the placebo group's effect and the
17  treatment group's effect.  Is that correct?
18     A.  Again, in the context of a treatment for
19  erectile dysfunction, this has been a standard that has
20  been used with clinical trial studies.
21     Q.  Okay.  And, Dr. Burnett, if you don't have
22  statistical significance, can you conclude that -- that
23  the effect experienced by the test subjects was the
24  result of a product's effectiveness versus just a result
25  of chance?

2270

1     A.  Well, yes, you could make a conclusion that it
2  has some likely benefit in terms of efficacy, but both
3  in the standard of a true erectile dysfunction clinical
4  trial for treatment, as well as in other interventions
5  that we think may have some potential benefit for one's
6  erectile health.  So, in both of those contexts, I think
7  you could still make a conclusion, even without
8  necessarily achieving statistical significance.
9     Q.  So, you could conclude from a study, where
10  there's not statistical significance on a validated
11  measure, that that product has an effect of treating
12  erectile dysfunction?
13     A.  If you are going to that standard, the treatment
14  of erectile dysfunction, there may be a conclusion made
15  that a therapy has a potential benefit in that
16  treatment, even if it does not meet statistical
17  significance.
18     Q.  Right.  And I'm not talking about -- I think you
19  had mentioned potential benefit.  Is that a potential
20  benefit on erectile health?
21     A.  Exactly.
22     Q.  Okay.  I guess my specific question is, more so,
23  can you conclude, though -- and you discussed the
24  distinction between erectile health and erectile
25  dysfunction.  Would you be able to conclude from such a

2271

1   study that that product treats erectile dysfunction?
2     A.  So, in that standard of a therapy that we're
3  proposing here as being touted to treat erectile
4  dysfunction, yes, we can still make an assessment that
5  something has a potential benefit, although one might
6  conclude that more studies may need to be done.  You
7  know, we would not rely on just one trial that did not
8  meet statistical significance to discount a potential
9  therapy, even -- even in a setting now -- even in the
10  context now of a -- of a proposed treatment for ED.
11     Q.  Okay.  Just one moment.
12       And that would be a treatment in a clinical
13  setting.  Is that correct?
14     A.  That would even be in the setting -- in the
15  clinical setting that I'm talking about, even in that,
16  and the point being that many times, when you will
17  assess a trial -- and it may not even meet statistical
18  significance, but we have to be careful in understanding
19  whether we think it may still have some clinical
20  importance.  And just because one trial may not meet
21  that standard, we may not automatically dismiss that
22  therapy.  We might say, "Okay, this is interesting, it
23  might have a role here."  And we may want to carry out
24  an additional study, maybe reevaluate the criteria from
25  which we make the assessment, maybe the patient

9 (Pages 2268 to 2271)

USCA Case #13-1060    Document #1483689    Filed: 03/12/2014    Page 325 of 367

2272

1　population that's being studied.  So, I think that we
2　would not automatically dismiss the therapy just on that
3　basis.
4　　　Q.  Okay, I see.  And, Dr. Burnett, would you want
5　such a study to have a sufficient number of men that it
6　was powered to meet requirements of statistical
7　significance?  And, again, we're talking about the
8　randomized, controlled trials.
9　　　A.  Again, that would be an ideal, to really carry
10　it to the highest standard of promoting something as an
11　FDA pharmaceutical for the clinical management of
12　erectile dysfunction.
13　　　Q.  And, Dr. Burnett, in your opinion, for a product
14　to be promoted as preventing erectile dysfunction, would
15　experts also require the same type of human randomized,
16　controlled trials?
17　　　A.  Well, this term "prevention" I think requires
18　some discussion.  I don't think there's a therapy out
19　there in the world of sexual medicine that we've
20　established as of yet to be a true preventative
21　intervention for erectile dysfunction.  We do think
22　there are various sorts of interventions that we believe
23　likely have some potential benefit, anything from
24　dietary changes to weight loss and perhaps things that
25　we're still evaluating, but we're not sure really have a

2273

1　role, but because they seem to be potentially beneficial
2　and do not necessarily have harms and likely have
3　benefits, that we feel comfortable in promoting.
4　　　So, at this point in time, I think prevention is
5　a -- you know, kind of a little bit of a tough subject
6　to get into.  As clinicians, we may talk about therapies
7　that we think likely have benefit and will discuss
8　those, but at this point in time, I don't think there's
9　anything out there that has been established to be a
10　true prevention for erectile dysfunction.
11　　　Q.  Okay.  And when you said a likely potential
12　benefit, again, you're going -- you're referring to a
13　beneficial effect on erectile tissue and health.  Is
14　that right?
15　　　A.  Exactly.  So, we're talking about various things
16　that we think likely have healthful benefits in
17　preserving the physiology of one's erectile tissue, that
18　I think we're going to certainly support or I'm going to
19　tell my patients, "I think smoking should be
20　discontinued here, sir," or "Maybe you should be a
21　little bit more healthy" or "I think you should talk to
22　your primary doctor and consider trying to pursue some
23　more cardiovascular, healthful, kind of beneficial
24　things," that I think may help one's erectile function.
25　　　So, we are going to suggest these sorts of

2274

1　things, but I think the standard we're looking for -- we
2　haven't met yet anything in terms of clinical trials for
3　prevention, and that's just something we still need to
4　get to.  But even at this time, we are not going to
5　discount some of the discussions with our patients and
6　some suggestions that we think likely will be beneficial
7　to their health, including their erectile health.
8　　　Q.  And, Dr. Burnett, you see prevention as the same
9　thing as reducing risk.  Is that correct?
10　　　A.  I do think that's so.
11　　　Q.  So, you would have the same opinion with --
12　　　A.  The same opinion.
13　　　Q.  Okay.  And earlier this morning, Dr. Burnett,
14　you were testifying on direct about the very complex
15　process of erectile function.  Is that correct?
16　　　A.  That is correct.
17　　　Q.  And it's a very complex process because it
18　involves many different molecules and signaling
19　conduction pathways that lead to the er -- an erection.
20　Is that right?
21　　　A.  You are correct.
22　　　Q.  And you were discussing nitric oxide as an
23　important chemical in this process.  Is that right?
24　　　A.  Yes.  We think that's central to the process of
25　penile erection, but there still may be a number of

2275

1　different molecules signaling pathways, the word that
2　you're using, that may interact with this mechanism.
3　And studying all these and figuring out how these
4　interact, figuring out which ones promote it and try to
5　enhance those; figure out which ones inhibit it and then
6　suppress those, may all have dividends in terms of
7　improving nitric oxide physiology in the penis.
8　　　Q.  Okay.  And you said nitric oxide is an enzyme
9　that assists in the erectile process.  It's an enzyme
10　that actually begins the biochemical cascade of events
11　that lead to the production of another chemical called
12　cyclic GMP.  Is that correct?
13　　　A.  That's correct.
14　　　Q.  And cyclic GMP is the molecule that causes the
15　smooth muscle cells of the penis to relax.  Is that
16　right?
17　　　A.  Well, it's another intermediate, if you will.
18　　　Q.  Okay.
19　　　A.  So, it's -- it actually carries out some
20　additional downstream mechanisms, so we will call it an
21　effector for how the tissue responds.  Downstream, the
22　cyclic GMP are various ion channels.  There may be
23　various contractile proteins in the smooth muscle tissue
24　of the penis.  All of these can be changed by how cyclic
25　GMP signaling then brings about some of these other

10 (Pages 2272 to 2275)

2312

1     JUDGE CHAPPELL:  Recross?
2     MS. DOMOND:  Yes, Your Honor.
3       RECROSS-EXAMINATION
4     BY MS. DOMOND:
5     **Q. Hi again, Dr. Burnett.**
6     **When you were discussing treatment, you meant**
7 **treatment as a true agent for therapy, correct?**
8     A. Well, I think that what I was referring to --
9 and if there's just -- I need to restate that and be
10 absolutely clear.  I was saying that treatment can have
11 different meanings behind it, and treatment in the
12 context of a pharmaceutical drug that is approved by the
13 FDA as an intervention for a disease state, that may
14 have a different meaning for treatment than the broad
15 term of treatment, which is to intervene for a
16 condition.
17     And so -- which I'd just automatically say there
18 is a different synonym for what I'm trying to say.
19 Intervention, more broadly, for a condition I think is
20 fair enough.  That still separates it from the
21 treatment, but that's not to say that pomegranate juice
22 is not a treatment.  It could be a treatment in the
23 sense that it offers some potential health benefits.
24     **Q. Okay.  But when we were discussing treatment,**
25 **it's not limited only to just prescription drugs.  Is**

2313

1 **that correct?**
2     A. Sure.  A treatment could be more than just
3 prescription drugs.
4     **Q. Okay.**
5     A. Absolutely.
6     **Q. And you were asked and testified that RCT tests**
7 **are not necessary to deal with studies of drinking**
8 **pomegranate juice.  Now, this is okay if these are**
9 **studies and you're saying pomegranate juice is a**
10 **complementary therapy for erectile health and erectile**
11 **tissue.  Is that correct?**
12     A. Certainly, with the emphasis being that I am not
13 endorsing it as a primary intervention.  When somebody
14 comes in to see me as a patient with erectile
15 dysfunction, and I am going to otherwise proceed with my
16 clinical judgment, that there's interventions that I
17 think are primary interventions there.
18     **Q. Okay.**
19     **No further questions, Your Honor.**
20     MR. FIELDS:  No further questions, Your Honor.
21     JUDGE CHAPPELL:  Thank you, sir.  You're
22 excused.
23     THE WITNESS:  Thank you.
24     JUDGE CHAPPELL:  We will take a break now.  We
25 will reconvene at 11:30.

2314

1     (A brief recess was taken.)
2     JUDGE CHAPPELL:  Back on the record, Docket
3 9344.  Next witness.
4     MR. FIELDS:  Yes, Your Honor.  The next witness
5 is Dr. Dean Ornish, who is already up there in the
6 witness chair.
7     THE WITNESS:  Good morning, Your Honor.
8     JUDGE CHAPPELL:  Good morning.
9 Whereupon--
10       DEAN ORNISH
11 a witness, called for examination, having been first
12 duly sworn, was examined and testified as follows:
13       DIRECT EXAMINATION
14     BY MR. FIELDS:
15     **Q. Good morning, Dr. Ornish.**
16     A. Good morning, sir.
17     **Q. Would you spell your name for the reporter so**
18 **she gets it right?**
19     A. Yes.  It's Dean, D-E-A-N, last name is
20 O-R-N-I-S-H.
21     **Q. Is it correct, sir, that you're a medical doctor**
22 **and a clinical professor of medicine at the University**
23 **of California in San Francisco?**
24     A. Yes, sir.
25     **Q. Okay.  And you got your undergraduate degree**

2315

1 **suma cum laude at the University of Texas?**
2     A. Yes, sir.
3     **Q. You are originally from Texas?**
4     A. Yes, sir.  I was born and raised in Dallas.
5     **Q. Okay.**
6     A. Spent my first 26 years there.
7     **Q. All right.  And you actually gave the**
8 **baccalaureate address at the university.  Is that right?**
9     A. At the University of Texas in Austin, yes.
10     **Q. And you got your medical degree at Baylor**
11 **College in Houston?**
12     A. Baylor College of Medicine in Houston.
13     **Q. And is it correct that you studied bypass**
14 **surgery with Dr. Michael DeBakey at Baylor?**
15     A. Yes, sir, when I was a medical student.
16     **Q. And Dr. DeBakey is the fellow who developed open**
17 **heart surgery.  Is that right?**
18     A. He was one of the pioneers of open heart
19 surgery, yes, sir.
20     **Q. Okay.  And then, on leaving Texas, you became a**
21 **clinical fellow in medicine at Harvard Medical School.**
22 **Is that correct?**
23     A. Yes.
24     **Q. And did your residency at Mass General Hospital**
25 **in Boston?**

20 (Pages 2312 to 2315)

2316

1     A.  Yes.
2     Q.  Okay.  And is it correct that for over 34 years,
3  you've directed clinical research on the relationship
4  between diet and lifestyle and coronary heart disease?
5     A.  Yes, sir.  We were the first to prove that by --
6  in a series of studies, randomized, controlled trials,
7  that heart disease could not only be prevented but could
8  actually be reversed simply by making changes in diet
9  and lifestyle.  We went on to do studies showing that
10  the same lifestyle intervention that reversed heart
11  disease could reverse Type II diabetes, which would
12  affect half of the Americans with diabetes and
13  prediabetes over the next five to ten years.
14     We also showed that the same program could stop
15  swelling and reverse the progression of early stage
16  prostate cancer in a study we did in collaboration with
17  the Department of Urology at Memorial Sloan-Kettering in
18  New York, and that a change in lifestyle could change
19  your genes, turning on the genes that prevent disease,
20  turning off the genes that promote heart disease,
21  prostate cancer, and other illnesses.
22     And most recently, we did a study with
23  Dr. Elizabeth Blackburn, who was awarded the Nobel Prize
24  in medicine last year, showing that even your telomeres
25  can get involved in the chromosomes and control genes.

2317

1  So, when we tend to think of advances in medicine as a
2  new drug or a new laser, rather than simple choices in
3  diet and lifestyle, we use these very high-tech,
4  expensive, state-of-the-art scientific measures to prove
5  how powerful these very simple and low-tech and low-cost
6  interventions like diet can be.
7     Q.  Okay.  Is it fair to call that -- the studies
8  you've described landmark studies in the field of the
9  relationship between diet and lifestyle and heart
10  health?
11     A.  I'd like to think so.  Other people have called
12  them that.
13     Q.  Yes, okay.
14     A.  Dr. Sacks referred to the study of reversing
15  heart disease as a landmark study in his testimony.
16     Q.  Is it correct that even aside from the studies
17  you've talked about, you've been the principal
18  investigator or are the principal investigator in
19  several federally funded studies relating to nutrition
20  and coronary heart disease?
21     A.  Yes.
22     Q.  And that's including studies funded by the
23  Department of Defense?
24     A.  Yes, sir.
25     Q.  And the National Institutes of Health?

2318

1     A.  Yes.
2     Q.  Okay.  Now, you talked about prostate cancer.
3  Your research included the first randomized, controlled
4  trial on the effect of diet and lifestyle on early stage
5  prostate cancer, and you did that in collaboration with
6  the University of California and Memorial
7  Sloan-Kettering in New York?
8     A.  Yes, sir.  We did that study.  It was a
9  randomized, controlled trial.  We found that the same
10  lifestyle changes that could reverse heart disease could
11  beneficially affect the progression of prostate cancer
12  in men.  It was the first study to show that.
13     Q.  And is it correct you've written six published
14  books on the subject of the effect of diet and lifestyle
15  on heart disease and other diseases?
16     A.  Yes, sir.
17     Q.  Okay.  And you've written chapters in books by
18  other people as well?
19     A.  That's right, many standard medicine and
20  cardiology textbooks.
21     Q.  And is it correct that research by you and your
22  colleagues have been reported in such journals as the
23  Journal of the American Medical Association, Lancet,
24  Lancet Oncology, the American Journal of Cardiology, the
25  Proceedings of the National Academy of Sciences, and

2319

1  other peer-reviewed journals?
2     A.  Yes, sir.
3     Q.  Okay.  You have written numerous chapters --
4  pardon me, numerous articles for peer-reviewed journals,
5  as well as a chapter on the management of coronary heart
6  disease in Harrison's Principles of Internal Medicine.
7  Is that correct?
8     A.  That's right.  And also, the companion to the
9  Braunwald Cardiology textbooks as well.
10     Q.  Thank you.
11     And many of your studies and articles have been
12  on the subject of cardiovascular disease.  Is that
13  correct?
14     A.  Yes, sir.
15     Q.  Okay.  Now, has that been the principal area of
16  your research for over 35 years?
17     A.  Yes.
18     Q.  Okay.
19     A.  Not the only area, but a principal area.
20     Q.  That's been a principal area of your study?
21     A.  Yes.  In fact, just recently, as of January 1st
22  of this year, Medicare made a decision to cover
23  Dr. Ornish's Program for Reversing Heart Disease, our
24  program, for the American people.  That's the first time
25  Medicare has done anything like that.

21 (Pages 2316 to 2319)

POM Wonderful, et al.    Public Record    9/1/2011

USCA Case #13-1060    Document #1483683    Filed: 03/12/2014    Page 328 of 367

2320

1    Q. Thank you.
2        All right, I am not going to list all of your
3    awards. You got the Kellerman Award for Distinguished
4    Contribution to the Field of Cardiovascular Disease
5    Prevention. That was awarded by the International
6    Academy of Cardiology. Is that correct?
7    A. Yes, sir.
8    Q. Okay. And you were awarded by the University of
9    Texas as one of the most extraordinary alumni in the
10   past 125 years?
11   A. Yes, sir.
12   Q. Okay. And you are listed by Life Magazine as
13   one of the 50 most influential people in your
14   generation?
15   A. Yes, sir.
16   Q. Okay. And by Forbes as one of the most powerful
17   teachers -- one of the seven most powerful teachers in
18   the world?
19   A. Yes, sir.
20   Q. Okay. We're going to wind up with this pretty
21   soon.
22       And a panel of experts in U.S. News Report [sic]
23   rated your diet number one for heart health, among all
24   of such diets?
25   A. Yes, sir. Just a few months ago, the editors of

2321

1    U.S. News and World Report convened a panel of leading
2    diet experts that reviewed all of the different diets,
3    and they rated our diet as number one for heart health
4    and number two for diabetes.
5    Q. Okay. And you have given numerous lectures in
6    such institutions as the Mayo Clinic, the Cleveland
7    Clinic, the M.D. Anderson Center in Houston, and such --
8    and the like?
9    A. Yes.
10   Q. Okay. And is it -- you presently conduct a
11   nonprofit research institute in Marin County, across the
12   Bay from San Francisco?
13   A. Yes. In 1984, when I finished my medical
14   training in Boston, I moved to San Francisco and
15   established the nonprofit Preventive Medicine Research
16   Institute, which is a 501(C)(3) public foundation for
17   primarily research but also education and service.
18   Q. Okay.
19       We would offer Dr. Ornish as an expert and his
20   report and CV in evidence.
21       MS. EVANS: Could I ask you to specify, an
22   expert in what?
23       MR. FIELDS: Well, he's an expert in the
24   relationship between the heart and nutrition and in
25   cardiovascular disease and its relationship to

2322

1    nutrition, nutrients, and such things.
2        MS. EVANS: No objection.
3        JUDGE CHAPPELL: Any opinions that meet the
4    proper legal standards will be considered.
5        MR. FIELDS: Thank you, Your Honor.
6        BY MR. FIELDS:
7    Q. Dr. Ornish, as part of your research on diet and
8    its effect on cardiovascular disease, have you done
9    research on pomegranate juice sponsored by the Resnicks
10   or by Roll International?
11   A. Yes, sir.
12   Q. All right. At present, are you on friendly
13   terms with the Resnicks? You can speak frankly.
14   A. We're on reasonably good terms. I -- they
15   created a major challenge for me when they cut our
16   funding midway through one of the studies that actually
17   we will be talking about later, because we weren't
18   recruiting patients as fast as we thought we initially
19   would.
20       My prime directive in doing research is always
21   to do it right, even if it takes longer. Their attitude
22   was, well, you said you could do it in a certain amount
23   of time, and, you know, when you're doing research in a
24   new area, sometimes you -- it takes you longer than you
25   think, because in the case of this particular study, it

2323

1    was harder to get patients recruited because the
2    cardiologists were so aggressive about doing
3    angioplasties and stents, surgeries and bypass
4    surgeries, so it reduced much more than we had
5    originally planned the number of patients eligible.
6        So, by cutting our funding, it was often more
7    counterproductive to them, because as we'll talk about
8    later, if one of the studies had continued with the
9    number of patients that we initially projected we would
10   have needed, it would likely have shown a much stronger
11   outcome.
12       So, I respect the Resnicks. I appreciate them
13   as -- for what they're doing to advance the field.
14   We're on good -- reasonably good terms, but it -- it
15   created a major financial issue for our institution at
16   the time.
17   Q. They're not presently sponsoring anything that
18   you're doing, are they?
19   A. Not for many years. Not since then, actually.
20   Q. Pardon me?
21   A. Not since that time.
22   Q. Okay. Still, you've come here voluntarily, and
23   I gather your fee is a dollar an hour, or is it a dollar
24   a day?
25   A. It's a dollar an hour.

22 (Pages 2320 to 2323)

2324

1    Q. A dollar an hour, okay. Do you count nights as
2  well as days?
3    A. No. I think I have to get paid something,
4  right?
5    Q. Why have you come here essentially without pay
6  and voluntarily for people who have cut off your funding
7  or are no longer funding you at all?
8    A. Well, I am not doing this for the Resnicks. I
9  am doing this because I think this is an historic case.
10  I get asked to be an expert witness all the time. I've
11  never testified as an expert witness until now, and I'm
12  doing it because I believe in -- I think our liberties
13  are at stake here, and that concerns me greatly.
14       The -- I don't think that the Government -- I
15  think the Government is overstepping its role here. It
16  is playing the role of big brother, and ultimately, if
17  successful, will keep the American people from valuable
18  information that could make a difference in the quality
19  of their lives and possibly even be life-saving to them.
20       It's one thing when you're talking about the
21  standards of a new drug, because a new drug always has
22  toxicities and side effects, and anyone who has ever
23  seen a magazine ad for a drug can turn it over and there
24  are pages of side effects, known and unknown.
25       But we're talking about a beverage that's been

2325

1  around since the Bible, for thousands of years, that the
2  only side effects are good ones, and it concerns me that
3  if -- you know, if you're -- let me say that it concerns
4  me a bit, if the standard for a drug is held to a fruit
5  or a beverage, then, in fact, no one can meet that
6  standard, because the drug companies spend literally
7  billions of dollars to get a new drug approved.
8       Pfizer got four drugs approved in the last ten
9  years at an average cost of 1 to 4 billion dollars each.
10  No one is going to spend that kind of money to test a
11  fruit unless -- you know, if it's a drug and it's
12  successful, you could make billions of dollars a year.
13  Lipitor, Pfizer was making $10 billion a year, per year,
14  on one drug. So, it's worth it for them to put that
15  kind of money into it.
16       But when you're talking about -- and that's why
17  I admire the Resnicks for having put tens of millions of
18  dollars of their own money into studying pomegranate
19  juice. I remember meeting Stewart Resnick in the late
20  nineties, and he said, "You know, we have got some early
21  studies showing that pomegranate juice may be more
22  beneficial than anybody realized," and -- but rather
23  than going public and marketing, he said, "I'd like to
24  fund research with you and other people to see if that's
25  true or not." And I respect that. And he's put tens of

2326

1  millions of his own -- dollars of his own money into
2  doing that, and I respect that.
3       But if -- if -- with all the research that's
4  been done, if -- if simple health claims can't be made
5  for the potential benefits of pomegranate juice, then no
6  one will be able to make health claims except drug
7  companies, and I don't think that's right, and I think
8  that's to the detriment of the American people.
9       I'm about -- I believe in personal
10  responsibility, I believe in freedom of choice, and I
11  believe in empowering an individual with information so
12  that he or she can make their own judgments, not for big
13  brother to make that for us.
14       What we include in our diet is as important as
15  what we exclude. There are literally hundreds of
16  thousands of protective substances in predominantly
17  fruits and vegetables and whole grains and legumes and
18  soy products, and I think it's important for
19  manufacturers to be able to share science-based
20  information with the American people so that they can
21  decide whether or not they want to purchase these
22  products, not to overstate the claims, not to say that
23  this is a substitute for conventional approaches, but
24  there are things that people can do to empower
25  themselves. And I think it's important that the

2327

1  American people know about those so they can make their
2  own choices and not have the Government do it for them.
3    Q. While we're on that subject, is it your opinion
4  that when you're talking about fruit juice or vegetables
5  or other foods like that, that in testing whether they
6  are good for the health or whatever health claim they
7  might make, you have to have RCT tests?
8    A. I think that a randomized, controlled trial is
9  just one of many research designs. You know, when
10  you're doing a study, any study, whether you're looking
11  at a drug or a fruit or a device or a surgical
12  intervention, what you're really trying to do is say, is
13  this true or not? Is this helpful or not? That's
14  really the bottom line in any study. Is there a real
15  effect or is it just a chance effect?
16       And by convention, if that -- if the likelihood
17  that those findings due to chance is 5 percent or less,
18  then it's considered statistically significant, and
19  there are different research designs that are -- that
20  are intended to reduce the likelihood of bias or
21  something affecting the outcome other than the
22  intervention itself.
23       Now, a randomized, controlled trial is a
24  powerful tool to do that, but it's only one of many.
25  But it's a very simple-minded approach to say that only

23 (Pages 2324 to 2327)

POM Wonderful, et al.         Public Record         9/1/2011

USCA Case #13-1060    Document #1483683    Filed: 03/12/2014    Page 330 of 367

2328

1 randomized trials are good science and everything else
2 is really not, because randomized trials have their own
3 biases as well.
4      For example, if you're doing a study of a drug,
5 a randomized trial can be done because, number one, you
6 can have a placebo; if you're taking a pill, you don't
7 know if you're getting the drug or not. But if you're
8 studying a fruit or a food, it's very hard to do
9 especially double-blind, randomized, placebo-controlled
10 trials, because you know what you're getting.
11      In any randomized trial, what you normally do is
12 you ask the patient who may be eligible for the study,
13 would you be willing to volunteer for this study?
14 There's a 50/50 chance you are going to get the
15 intervention, but if you get the intervention, would you
16 be willing to follow it? Would you take the pill?
17 Would you eat the food? Would you drink the juice? Or
18 whatever it happens to be.
19      So, if they then subsequently get randomly
20 assigned to the control group, which is what happens
21 half the time, of course, they already know what the
22 intervention is. Now, if it's a drug, it doesn't
23 matter, because they can't get the drug if it's an
24 experimental drug, but if it's a food or a juice, they
25 can.

2329

1      And so you get what's called contamination,
2 where the control group members say, hey, if they think
3 it's good enough to do a study, maybe I'll just start
4 taking it myself. I'll start eating the food or I'll
5 start drinking the beverage. This is what happened with
6 the women's health initiative study, where the
7 Government spent a billion dollars to see whether diet
8 affected the likelihood of getting breast cancer or
9 heart disease in women.
10      And what they found is the control group
11 patients changed almost as much as the people in the
12 experimental group, so it didn't really show a
13 difference, and so it appeared as though diet didn't
14 really have an effect, but the real issue was that the
15 control group was changing as much as the experimental
16 group.
17      So, randomized trials can be beneficial, but
18 they are not perfect, and they have their own --
19 especially when you are dealing in nutrition, they have
20 their own set of limitations as well.
21   **Q. So, is it correct that, in your opinion, RCTs**
22 **would not be necessary to test and substantiate health**
23 **claims of something like pomegranate juice?**
24   A. It's important to look at the totality of the
25 evidence and to -- you know, to keep our common sense.

2330

1 In reviewing some of the transcripts -- you know, we can
2 get into the nitty-gritty and I am sure we will today
3 over P-values and this patient versus that patient and
4 so on, but I think it's important to examine the
5 totality of evidence.
6      In Dr. Sacks' testimony, for example, he said
7 that if it's not a double-blind, randomized, controlled
8 study, then it's not really -- you shouldn't be
9 considering it in a decision like this. Well, I think
10 that's -- that's silly. I mean, his own research, if
11 you applied that standard, the vast majority of his own
12 studies wouldn't meet that standard. So, clearly he
13 doesn't think that's true in his own work.
14      So, I think it's important to examine the
15 totality of evidence and to keep our common sense --
16   **Q. Okay.**
17   A. -- and if you're shown a series of studies that
18 include randomized trials but are not limited to them,
19 but there's a benefit for that, particularly if the only
20 side effects are good ones, then I think those studies
21 are worth considering.
22   **Q. Well, is it correct that they are not --**
23     JUDGE CHAPPELL: I don't think you got an answer
24 to your question.
25     MR. FIELDS: Yes, that's right. I was just

2331

1 going to put it to him again, Your Honor.
2     BY MR. FIELDS:
3   **Q. Are you -- is it -- is it correct that when you**
4 **look at the totality of the evidence, which you may**
5 **include RCTs, that RCTs are not necessary when you're**
6 **talking about fruit juice or broccoli or things like**
7 **that?**
8   A. Yes.
9   **Q. Okay. Let's talk about your studies, which is**
10 **what we're really here for today.**
11     **Is it correct you did a myocardial perfusion**
12 **study on pomegranate juice, known as Bev 1?**
13   A. Yes, sir.
14   **Q. And is it correct that myocardial perfusion is**
15 **blood flow to the heart?**
16   A. Yes, sir.
17   **Q. And I gather that blood flow to the heart is**
18 **essential to life. Is that correct?**
19   A. Well, it is, and the latest thinking about heart
20 disease is that the most important measure of heart
21 disease is blood flow to the heart, because that's
22 really the bottom line. I mean, heart disease is
23 simply -- coronary heart disease, which is the most
24 common form of heart disease, is when the heart doesn't
25 get enough blood to fuel itself, and blood carries the

24 (Pages 2328 to 2331)

2352

1    didn't have the funding to do it for one year. So, we
2    only did it for three months.
3        The Bev II study was cut in terms of the total
4    number of patients that we had -- we had projected --
5    well, let me back up a moment.
6        When you're doing a study, again, the question
7    you are trying to answer is, is this a real finding or
8    is this a chance finding? So, before you do a study,
9    you estimate the number of patients that you think
10    you'll need based on the expected change that you think
11    you'll observe in order to have significance. It's
12    called the power analysis.
13        Our power analysis, based on earlier studies in
14    the field, was that we would need at least 200 patients
15    to show a statistically significant difference, and
16    that's what we budgeted for. As it turned out, our
17    funding got cut, so we were only able to recruit 73
18    patients, of whom 56 we ended up having pre and post
19    data on.
20        Now, what's unfortunate and perhaps a little
21    ironic is that we did show in one of the measures in the
22    carotid artery that there was an improvement, and it was
23    significant to the 0.13 level as opposed to the 0.15
24    level. If that degree of change had occurred in the
25    larger number of patients that we had projected, it

2353

1    would have clearly been at the 0.05 or less, and it
2    would have been a very strong study showing that
3    pomegranate juice affected the progression of carotid
4    disease.
5        We also showed similar, almost statistically
6    significant improvements in the elasticity of the
7    arteries, and as the arteries get more clogged, they
8    become less elastic. So, when they become more elastic,
9    that's another measure of improvement.
10        So, it was unfortunate and short-sighted for the
11    Resnicks to cut the funding, because it prevented us
12    from being able to do the study that we had originally
13    planned to do that, that had it continued with the
14    remaining patients, and we have no reason to think that
15    it wouldn't as with the original 73, then it would have
16    shown a statistically significant difference.
17    **Q. Is that what underpowered means? In other**
18    **words, you don't have enough people to get to**
19    **statistical significance?**
20    A. Yes, sir. And it's important that you state, a
21    priori, in advance, what your number is so that you
22    can't just keep adding more patients to get the number
23    you want. These were all things that we clearly stated
24    in our protocol at the beginning of the study.
25    **Q. And are you confident that if you had had the**

2354

1    **number of patients that were in the protocol, that you**
2    **would have reached statistical significance?**
3    A. I am, because there's no reason to think that
4    the next 127 patients would have been different than the
5    first 73.
6    **Q. So, you -- and those 73 showed a definite**
7    **benefit but didn't reach statistical significance,**
8    **correct?**
9    A. That's correct.
10    **Q. Okay.**
11    A. There's always the possibility, but it would
12    have been unlikely, that those -- the next group of
13    patients would have been somehow different than the
14    first group.
15    **Q. Okay. In your opinion, Doctor, do your studies**
16    **constitute credible and reliable science showing that**
17    **pomegranate juice lessens the risk of cardiovascular**
18    **problems?**
19    A. Yes, and it goes beyond that. We've shown,
20    certainly in the Beverage I study, that pomegranate
21    juice actually improves the blood flow in people who
22    already had heart disease. So, we're not just talking
23    about risk of heart disease in terms of preventing it in
24    otherwise healthy people. We're talking about reversing
25    the progression of heart disease in people who already

2355

1    have severe heart disease. Clearly, if you can reverse
2    a disease that's -- or begin to reverse a disease, it
3    would only make sense that it would work even better to
4    help prevent it in the first place.
5    **Q. Thank you.**
6        That's all I have.
7        JUDGE CHAPPELL: Cross?
8        MS. EVANS: Good morning, Your Honor.
9            CROSS-EXAMINATION
10    BY MS. EVANS:
11    **Q. Good morning, Dr. Ornish. How are you?**
12    A. Good morning, Ms. Evans. Thank you for asking.
13    I'm fine.
14    **Q. I believe that you testified in research --**
15    A. Could I ask you a favor? Would you mind pulling
16    the microphone down closer?
17    **Q. Yes, because this only works for a regular-size**
18    **person.**
19        **I believe you testified that -- just a minute**
20    **ago that in research, you're trying to determine whether**
21    **an intervention is causing the effects or whether it's**
22    **coincidence.**
23    A. Yes.
24    **Q. Okay. And that's the case whether the**
25    **intervention is a drug or a juice or a lifestyle**

30 (Pages 2352 to 2355)

2380

1    Q. You were talking earlier about the level of
2  evidence needed for claims. Now -- and I'm just trying
3  to understand what you said in your report. Is it your
4  belief that because physicians use in their medical
5  practices procedures that have not been proven in
6  randomized clinical trials to work, that randomized
7  clinical trials cannot reasonably be required for
8  pomegranate juice?
9    A. That's a very strange question. I'm sorry.
10   Q. Okay. And if you could refer to your expert
11  report --
12   JUDGE CHAPPELL: Hold on a second. "That's a
13  very strange question," you said, "I'm sorry," you said.
14  Does that mean you cannot answer it?
15   THE WITNESS: Oh, I'm just trying to track what
16  she's asking. Are you saying --
17   JUDGE CHAPPELL: Because she seems to be taking
18  that as a no and she's launching into something else
19  here.
20   THE WITNESS: Well, Your Honor, I'd appreciate
21  the chance to clarify that. Thank you.
22   The fact that doctors use procedures not only
23  that haven't been subjected to randomized trials but
24  even ones that have been subjected to randomized trials,
25  and I think in the area of cardiology, angioplasties and

2381

1  stents have been extensively studied in randomized
2  trials, and we've found that they don't work very well.
3  Unless you're in the middle of having a heart attack,
4  they don't prolong life and they don't even prevent
5  heart attacks.
6    And you would think that if we're really
7  practicing evidence-based medicine, the number of
8  angioplasties and stents would have fallen precipitously
9  when those studies came out, but they are actually doing
10  more than ever because they are reimbursed at such a
11  high level. So, with all the talk about evidence-based
12  medicine, it turns out that reimbursement is in many
13  cases is a bigger driver than the practice of science.
14  That's the way it is.
15   That doesn't mean it's right. I'm certainly not
16  defending that. I'm not saying that I agree with that,
17  but I'm just reporting what it is.
18   But, again, I think it's important to point out
19  by your question that the level of evidence for a
20  beverage is not the same as a level of evidence for a
21  new drug with all kinds of potential known and unknown
22  side effects and toxicities that require a higher level
23  of evidence than a beverage that's been around for
24  thousands of years and has no toxicities and that the
25  only side effects appear to be good ones.

2382

1    MS. EVANS: Okay. Could we provide Dr. Ornish
2  with a copy of his expert report?
3    JUDGE CHAPPELL: Yes. Go ahead.
4    BY MS. EVANS:
5    Q. On -- because you wanted me to rephrase the
6  question, I'd like to -- I'd like to direct your
7  attention to a portion of your expert report, which
8  would be -- it's marked as PX 25 at page 7.
9    A. Okay.
10   Q. Okay. And if you go down to the second to the
11  last paragraph, starting with the sentence, "It seems
12  unreasonable." Could you read those three lines to me,
13  those three sentences to me?
14   A. I said, "Indeed, much of what physicians provide
15  patients in their clinical practices" --
16   Q. I'm sorry. I'm sorry. Oh, that's fine. The
17  whole thing is fine.
18   A. "Indeed, much of what physicians provide
19  patients in their clinical practices has not been proven
20  to be beneficial in randomized controlled trials.
21  Outside the ivory tower, there are other standards
22  beyond randomized controlled trials. It seems
23  unreasonable to require that pomegranate juice meet a
24  standard that is not met by many of the drugs and
25  surgical procedures -- surgical treatments used every

2383

1  day by physicians. For example, randomized controlled
2  trials have shown that angioplasties and stents do not
3  prevent heart attacks or prolong life, yet the number of
4  these procedures performed is greater than ever. There
5  are other considerations."
6    Q. Thank you.
7    Now -- so, when you say, "It seems unreasonable
8  to require that pomegranate juice meet a standard that
9  is not met by many of the drugs and surgical treatments
10  used every day by physicians," are you -- are you saying
11  that because physicians, in their medical practices,
12  procedures that have not been proven in RCTs to work,
13  that RCTs can't reasonably be required for pomegranate
14  juice?
15   A. That's a very twisted logic. That's not what
16  I'm saying at all.
17   Q. Well, you have the sentence that "It seems
18  unreasonable to require pomegranate juice to meet a
19  standard that is not used -- not met by many of the
20  drugs and surgical treatments used every day by
21  physicians."
22   A. It is unreasonable, but that's a big leap from
23  saying that randomized controlled trials, therefore,
24  shouldn't be used in considering the efficacy of
25  pomegranate juice.

37 (Pages 2380 to 2383)

2456

1    were promised the funding to do 200 patients. We didn't
2    get that funding. It got cut, in part because the
3    methodology that we were using to measure the carotid
4    arteries at the California Pacific Medical Center turned
5    out to not be as accurately reproducible as we wanted,
6    so we had to start over again. And we found a doctor at
7    the Jet Propulsion Laboratory, who is considered one of
8    the world leaders in this area, to do it, and that
9    further delayed us.
10       So, it was a classic example that no good deed
11   goes unpunished, because we weren't willing to cut
12   corners just for the speed of getting the results to the
13   Resnicks.
14       **Q. And I think my question was, there were no**
15   **significant changes in the experimental group relative**
16   **to the placebo for either thickness or elastic**
17   **properties, and that is set forth in Table 2, correct?**
18       A. If you define significance at the 0.5 level,
19   that's correct. If you say the 0.1 -- there was an 87
20   percent likelihood that this was not due to chance as
21   opposed to a 95 percent likelihood this was not due to
22   chance. It would have been wrong to publish this as a
23   null finding.
24       **Q. If you had had positive results, would you have**
25   **published it?**

2457

1        A. If we had positive results, would we have
2    published it? Yes, we would have published it.
3        **Q. Okay. And you just told me, as I understand it,**
4    **that if you had a sample size of 200 and if you had**
5    **these same data, it would be statistically significant?**
6        A. If these trends that we saw in this sample were
7    seen in a larger sample, it would clearly have been
8    statistically significant.
9        **Q. But that's merely a hypothesis, correct?**
10       A. We can't prove that, but there is no reason to
11   think that those patients who we followed would have
12   been fundamentally different.
13       **Q. But you don't know that.**
14       A. We don't know. That's why we didn't publish it.
15       **Q. Now, you sent the IMT results to the Respondents**
16   **on August 4, 2005, right, according to the first page of**
17   **this document?**
18       A. What was your question?
19       **Q. Now, you sent the IMT results to the Respondents**
20   **on October 4, 2005, right, according to the first page**
21   **of this document?**
22       A. That's correct.
23       **Q. Thank you.**
24       **And after that, did you have a telephone**
25   **conference with Dr. Liker and Mr. Tupper and**

2458

1    **Mr. Resnick?**
2        A. I don't remember, but it's entirely probable.
3        **Q. Okay. If you could bring up CX 754, please.**
4    **757.**
5        A. Thank you. Okay. I see that at least it was
6    scheduled. I presume we had it.
7        **Q. Okay. And this telephone conference was with**
8    **regard to the IMT study?**
9        A. Yes.
10       **Q. Okay. And had you previously told your**
11   **assistant, Michael Sumner, that you should publish the**
12   **results of this study even if they were nonsignificant?**
13       A. I don't recall ever telling him that, no.
14       **Q. Could I refresh your recollection?**
15       A. That I told him -- okay, sure.
16       **Q. Could you please bring up CX 717?**
17       **Now, this document is dated March 24, 2005?**
18       A. Okay.
19       **Q. And does it indicate that --**
20       A. Well, you know, if we had found results that
21   were clearly not significant --
22       **Q. Could you hold on one second? I don't have the**
23   **question, apparently.**
24       A. I thought you just asked me --
25       **Q. I can't find -- well, I can't find my copy.**

2459

1        A. Oh.
2        **Q. Does that -- is that an email from Dr. Sumner to**
3    **Dr. Gerdi Weidner?**
4        A. It is. It's not from me to her or from me to
5    him.
6        **Q. And in that document, does Dr. Sumner say that**
7    **he had briefly discussed the Bev I and Bev II results**
8    **with Dean today?**
9        A. Yes, it does. Excuse me.
10       **Q. And --**
11       A. You just asked me a question, and I'd like to
12   answer it. You asked me if I had told Michael Sumner
13   that he should publish it even if the results were
14   nonsignificant, and the answer to that question is if
15   they were clearly nonsignificant, if the P-value was
16   0.9, then I would say definitely we should publish it.
17   But in this case, once we actually analyzed the data,
18   and as you can see in that document you gave me a moment
19   ago, the one dated August 4th, 2005, you actually see in
20   the data, it was significant to the 0.13 level, which
21   means that it was thought that it would have been
22   grossly misleading and I think unethical to publish a
23   study saying that pomegranate juice had no effect when,
24   in fact, we knew from the very beginning that we needed
25   at least 200 patients, and that if this trend had

56 (Pages 2456 to 2459)

# In the Matter of:

# POM Wonderful, et al.

*September 2, 2011*
*Public Record*
*Trial Vol. 14*

**Condensed Transcript with Word Index**



**For The Record, Inc.**
**(301) 870-8025 - www.ftrinc.net - (800) 921-5555**

2472

```
                    FEDERAL TRADE COMMISSION
  1                      I N D E X
  2           IN RE POM WONDERFUL LLC, ET AL.
  3                   TRIAL VOLUME 14
  4                    PUBLIC RECORD
  5                  SEPTEMBER 2, 2011
  6
  7   WITNESS:      DIRECT  CROSS   REDIRECT  RECROSS  VOIR
  8   REIBSTEIN      2480   2526      2585
  9   GOLDSTEIN      2587   2607
 10
 11
 12   EXHIBITS   FOR ID  IN EVID  IN CAMERA  STRICKEN/REJECTED
 13   CX
 14   (none)
 15
 16   RX
 17   (none)
 18
 19   JX
 20   (none)
 21
 22   DX
 23   (none)
 24
 25
```

2473

```
  1            UNITED STATES OF AMERICA
  2         BEFORE THE FEDERAL TRADE COMMISSION
  3
  4   In the Matter of          )
  5   POM WONDERFUL LLC and      )
      ROLL GLOBAL LLC,           )
  6   as successor in interest to )
      Roll International Corporation, )
  7   companies, and          ) Docket No. 9344
      STEWART A. RESNICK,        )
  8   LYNDA RAE RESNICK, and     )
      MATTHEW TUPPER, individually )
  9   and as officers of the     )
      companies.                 )
 10                              )
      ------------------------------)
 11
 12         Friday, September 2, 2011
 13              9:34 a.m.
 14          TRIAL VOLUME 14
 15          PUBLIC RECORD
 16
 17
 18
 19   BEFORE THE HONORABLE D. MICHAEL CHAPPELL
 20         Administrative Law Judge
 21          Federal Trade Commission
 22         600 Pennsylvania Avenue, N.W.
 23              Washington, D.C.
 24
 25   Reported by: Josett F. Whalen, RMR-CRR
```

2474

```
  1  APPEARANCES:
  2
  3  ON BEHALF OF THE FEDERAL TRADE COMMISSION:
  4     HEATHER HIPPSLEY, ESQ.
  5     MARY L. JOHNSON, ESQ.
  6     SERENA VISWANATHAN, ESQ.
  7     DEVIN WILLIS DOMOND, ESQ.
  8     MICHAEL OSTHEIMER, ESQ.
  9     ANDREW D. WONE, ESQ.
 10     Federal Trade Commission
 11     Bureau of Consumer Protection
 12     601 New Jersey Avenue, N.W.
 13     Washington, D.C. 20001
 14     (202) 326-3285
 15     hhippsley@ftc.gov
 16
 17  ON BEHALF OF THE RESPONDENTS:
 18     JOHN D. GRAUBERT, ESQ.
 19     Covington & Burling LLP
 20     1201 Pennsylvania Avenue, N.W.
 21     Washington, D.C. 20004-2401
 22     (202) 662-5938
 23     jgraubert@cov.com
 24
 25
```

2475

```
  1  APPEARANCES:  (continued)
  2
  3  ON BEHALF OF THE RESPONDENTS:
  4     BERTRAM FIELDS, ESQ.
  5     Greenberg Glusker
  6     1900 Avenue of the Stars
  7     21st Floor
  8     Los Angeles, California 90067
  9     (310) 201-7454
 10        -and-
 11     KRISTINA M. DIAZ, ESQ.
 12     BROOKE HAMMOND, ESQ.
 13     JOHNNY TRABOULSI, ESQ.
 14     Roll Law Group P.C.
 15     11444 West Olympic Boulevard
 16     10th Floor
 17     Los Angeles, California 90064
 18     (310) 966-8775
 19     kdiaz@roll.com
 20
 21
 22  ALSO PRESENT:
 23     VICTORIA ARTHAUD, ESQ.
 24     HILLARY SLOANE GEBLER, ESQ.
 25
```

1 (Pages 2472 to 2475)

POM Wonderful, et al.      Public Record      9/2/2011

USCA Case #13-1060    Document #1483683    Filed: 03/12/2014    Page 336 of 367

2596

1 measuring oxidative stress, biochemical measures, were
2 completely reversed by the pomegranate juice
3 administration.
4    Q. And those are all things that cause erectile
5 dysfunction?
6    A. Yes.
7    Q. Okay. Now, are you familiar with the -- by the
8 way, are there any other studies, either in vitro or
9 animal studies, of pomegranate juice or POM products
10 that you know about that we haven't at least
11 summarized?
12    A. Sure.
13    So there are many. We'll speak of a few.
14    So Dr. De Negris has a series of manuscripts,
15 and he took human endothelial cells -- these are the
16 lining cells of arteries -- and he subjected them to
17 issues consistent with atherosclerotic changes and in
18 the administration of pomegranate juice and/or
19 pomegranate juice extract found that the tissue changes
20 lining these human cells were completely reversed. He
21 has a series of manuscripts.
22    Dr. Ignarro shows that the nitric oxide synthase
23 activity is enhanced.
24    Dr. Aviram has a wonderful study where he gave
25 human beings pomegranate juice and then took blood

2597

1 samples for them. Those blood samples were then shown
2 in control and after pomegranate juice to have far less
3 action in causing atherosclerosis. He looked in
4 particular at macrophages, which are healing cells. He
5 looked at atherosclerosis. He looked at LDL and HDL --
6 these are good and bad cholesterol -- actions.
7    Q. I particularly meant with reference to sexual
8 function and dysfunction.
9    A. Well, it's just that endothelial function is
10 particularly, as Dr. Burnett I'm sure brought up,
11 essential to erectile function.
12    There's just one on other study that's very
13 important, and that's Dr. Azadzoi's animal study. In
14 the animal study that we helped develop together, you
15 can identify the nerve to the penis and actually
16 electrically stimulate it and identify how rigid it gets
17 and how good an erection quality it is.
18    What he was able to do was to show that the
19 atherosclerotic state developed an erection problem.
20 Less hard erections were identified. Given pomegranate
21 juice, amazingly enough and with amazing science, he
22 found increased blood flow to the penis, he found much
23 better erection function, far less scarring in the
24 erection tissue. And this was really pretty, pretty
25 exciting animal data.

2598

1    Q. Are you familiar with the human study done by
2 Dr. Padma-Nathan on the effect of pomegranate juice on
3 erectile function?
4    A. Yes, I am.
5    Q. And would you -- by the way, that was a
6 placebo-controlled, double-blind, random study, what we
7 call an RCT study?
8    A. It's a single site, it's small numbers of
9 people, short duration of treatment, but it is a
10 double-blind and placebo-controlled trial.
11    I have to state that in fact as editor in chief
12 of the journal, that is the first and only nutraceutical
13 clinical trial that is randomized and double-blind that
14 I've ever come across in our field.
15    Q. Oh.
16    And is it correct that Dr. Padma-Nathan's study
17 using the GAQ questionnaire reached a p-factor of .058?
18    A. That is correct.
19    Q. And the line or I guess it's an imaginary line
20 of statistical significance is .05 p-value?
21    A. Yes.
22    So the p-value that traditional clinical --
23 excuse me -- statistical significance is derived is
24 from Fisher, described this in 1925 actually. And he
25 took essentially a bell-shaped curve, and he said what

2599

1 are two standard deviations from the center point and
2 comes to point -- P .05 as representing that.
3    I think if you read Fisher's data, which I did,
4 Fisher will be the first one to state that this is just
5 a choice, this is just a -- something that appears to be
6 an agreeable point, but in specific situations a
7 different value could be utilized.
8    Q. .058, which is a hair short of .05, is the
9 equivalent of a 94 percent probability of accuracy;
10 isn't that correct?
11    A. That's 100 percent correct, yes.
12    Q. And the statistical significance line would be
13 95 percent rather than 94 percent.
14    A. The traditional accepted clinical -- excuse
15 me -- the statistically significant point is P .05.
16    Q. Do you disqualify Dr. Padma-Nathan's study
17 because it got 94 percent instead of 95 percent?
18    A. I certainly would not disqualify that study.
19    Q. It still provides valuable information to the
20 clinician, does it not?
21    A. It provides very valuable information, yes.
22    Q. Now, Doctor -- well, let me back up a little
23 bit.
24    This was an RCT study, but in your opinion, when
25 we're studying pomegranate juice and its effect on

32 (Pages 2596 to 2599)

2600

1  erectile function, do we need RCT studies; that is, are
2  they necessary?
3      A. That's a great question.
4          Pharmaceutical agents, drugs, are synthetic,
5  unnatural and are developed in laboratories and have
6  specific pharmacological action on tissues. Since
7  they're new molecules to human beings, a Food and Drug
8  Administration strategy is to develop a series of
9  preclinical animal toxicity studies, phase I trials
10  just to see for safety, phase II to get dosing, and
11  phase III to get very, very large pivotal trials in
12  human beings to effect -- or to assess for safety and
13  efficacy.
14          In contrast, the fascinating story of
15  pomegranate juice goes back arguably to the
16  Garden of Eden I was just reading that -- I mean,
17  that's 5,700 years ago in history. The safety of this
18  product, this natural fruit juice, is not questionable.
19  It's been given for decades without issue.
20          Should something that works, therefore no
21  risk, have benefit as defined by in vitro and in vivo
22  studies of excellent quality published in
23  high-ranking -- in high-ranking, peer-reviewed
24  journals -- Proceedings of the National Academy of
25  Sciences is what Ignarro published in. That's an

2601

1  extremely high journal, and Ignarro is not anything but
2  a Nobel laureate, so we're looking here at genuine
3  preclinical science here. And given the fact that
4  nutraceuticals aren't really historically studied in our
5  field, I would argue the need for a randomized clinical
6  trial.
7          Placebo issues are extremely complicated. How
8  do you make a placebo pomegranate juice?
9      Q. Let me interrupt you for a minute because we may
10  have an ambiguity on the record.
11          You said you would argue the need for a
12  randomized clinical trial. Does that mean you would say
13  we don't need it or we do need it?
14      A. No, no, no. I would say you would need it in a
15  pharmaceutical product so that at best you'd find out
16  safety.
17          The concept of thalidomide is the reason why we
18  do randomized clinical trials (indicating). We want to
19  avoid that. But we don't need to do that when we have a
20  natural fruit juice that's been available for over
21  5,000 years showing us all the safety on earth.
22          And we have plenty of preclinical basic science
23  data showing benefit. We know erectile dysfunction is
24  highly, highly associated with oxidative stress
25  problems. We have an antioxidant that's a natural fruit

2602

1  juice.
2          So I'm saying to you, I don't know that we
3  actually do need to use the standards for pharmacologic
4  drug development with natural fruit juice
5  nutraceutical --
6      Q. Thank you.
7          Now, Dr. Padma-Nathan used the GAQ
8  questionnaire, and Dr. Melman, an expert for the FTC,
9  criticized the GAF questionnaire.
10          Is that questionnaire widely used?
11      A. In every Viagra, Levitra and Cialis study that I
12  was involved in and every publication in the Journal of
13  Sexual Medicine on these, GAQ is widely used. For
14  Dr. Melman to say that is a little embarrassing.
15      Q. All right. Now, are there disadvantages to the
16  other questionnaire, the longer IIEF questionnaire?
17      A. The International Index of Erectile Function
18  questionnaire is a PRO, which means a patient-reported
19  outcome. It has multiple domains. There's five
20  domains. There's 15 questions. It takes somewhere
21  around 15-20 minutes to complete. There are six
22  questions related to erectile function.
23          For example, one question deals with are you
24  confident with the ability to have a -- to obtain and
25  maintain an erection, nothing to do with hardness and

2603

1  certainly not what's on a patient's mind when he walks
2  in my office.
3          GAQ, on the other hand, is written for a
4  high school-educated person. It asks in the study
5  period did your erections improve. It's pretty basic.
6  It addresses the clinical important issue: I am here,
7  Mr. -- I am here, Dr. Goldstein. Can you help me
8  improve my erection.
9          I mean, that's directly assessed by the GAQ.
10  It's a yes/no question. It -- it's just part of every
11  pharmaceutical drug trial we've done and was in fact
12  94 percent accurate in the clinical nutraceutical
13  trial.
14      Q. Now, would it be fair to say some of the
15  questions in the IIEF questionnaire are ambiguous, like
16  the one you just gave us, are you confident in the
17  degree of your erection?
18      A. Well, I mean, there's six questions. Another
19  question asks how -- during sexual activity how often do
20  you get an erection, doesn't qualify -- does that mean a
21  mild erection, a moderate erection. It doesn't qualify.
22  It just says how often do you get an erection. That's
23  question one.
24          I think taken together it's been a very
25  successful PRO for the pharmaceutical industry. It has

33 (Pages 2600 to 2603)

2608

1    Q. And Dr. Goldstein, you've described this
2  mechanism of how pomegranate juice acts as a
3  prophylactic in promoting erectile health as
4  hypothetical; correct?
5    A. It's hypothetical to the extent that it does
6  have antioxidant properties. It has very potent
7  antioxidant properties. Antioxidant properties follow
8  this pathway of helping endothelial cells. But to the
9  extent that it is not hypothetical, there are basic
10  science and in vitro and in vivo studies and human
11  studies which support the hypothesis that pomegranate
12  juice promotes erectile health.
13    Q. Dr. Goldstein, you stated earlier today that
14  for people who have erectile dysfunction caused by
15  endothelial dysfunction that there's enough science to
16  show that pomegranate juice reduces the risk or
17  ameliorates that erectile dysfunction, but you stated
18  in your report that you would use pomegranate juice in
19  your practice for a specific subgroup of people who
20  have erectile dysfunction but for whom PDE5 inhibitors
21  do not work and they don't want to try more invasive
22  treatments; correct?
23    A. Again, your sentences are extremely long, and I
24  want to answer it correctly. I think what you said was
25  correct. This morning I did say the first part of your

2609

1  sentence, and I think I heard correctly what your --
2  second part of your sentence. In my deposition with
3  you, I said there are a certain group of patients for
4  whom I personally recommend pomegranate juice as
5  therapy, and those are men who have failed in more
6  traditional, standard pharmaceutical strategies for
7  erectile dysfunction.
8    Q. And you also would recommend pomegranate juice
9  in your practice for people who don't have erectile
10  dysfunction yet but drink pomegranate juice as a
11  prophylactic to maintain erectile health; correct?
12    A. For men who walk into my office and say they
13  are observing changes, lessening of their erectile
14  performance, but haven't yet a degree of erectile
15  dysfunction or have a degree of erectile function,
16  which is not consistent with the accepted terminology
17  of erectile dysfunction, these people do not qualify
18  for pharmacologic treatment. Pharmacologic treatment
19  is indicated for men who have erectile dysfunction, so
20  it's a logical and rational strategy for me as a
21  practitioner to recommend an agent where we have some
22  basic science to improve their erectile health.
23    Q. And Dr. Goldstein, erectile dysfunction can be
24  caused by psychological reasons?
25    A. Without a question, that's correct.

2610

1    Q. And there are also many physiological reasons
2  that can cause erectile dysfunction; correct?
3    A. True. Yes.
4    Q. And cardiovascular disease is one possible cause
5  of erectile dysfunction; correct?
6    A. Cardiovascular disease is one of the more common
7  causes of what we call vasculogenic form of erectile
8  dysfunction, yes.
9    Q. And neurologic diseases can cause erectile
10  dysfunction; correct?
11    A. Clearly, yes.
12    Q. And endocrine problems can cause erectile
13  dysfunction?
14    A. Without a question, yes.
15    Q. And treating a person's underlying disease, like
16  cardiovascular disease, doesn't necessarily treat their
17  erectile dysfunction; correct?
18    A. Sadly, most of the treatments for
19  cardiovascular disease worsen erectile dysfunction.
20  Taking, for example, medications to lower blood
21  pressure, which is a common treatment for a man with
22  cardiovascular disease, actually worsens the erectile
23  function.
24    Q. And Dr. Goldstein, in your expert report you
25  defined a nutraceutical as, quote, naturally occurring

2611

1  botanical product with health-promoting characteristics;
2  correct?
3    A. Yeah. An easier way would be a natural food
4  product with health benefits I guess, same thing.
5    Q. And pomegranate juice is a nutraceutical;
6  correct?
7    A. No doubt, in my mind, yes.
8    Q. And a dietary supplement such as a pomegranate
9  extract pill like POMx is also a nutraceutical?
10    A. Yes.
11    Q. And in order to conclude that pomegranate
12  products treat, prevent or reduce the risk of erectile
13  dysfunction in humans, you would not require a large,
14  randomized, placebo-controlled, double-blinded human
15  clinical study; correct?
16    A. You've phrased in this question pomegranate
17  juice as a treatment for erectile dysfunction, and I'm
18  never proposing that pomegranate juice is a treatment
19  for erectile dysfunction. We have pharmaceutical drugs
20  that treat erectile dysfunction. And I'm not suggesting
21  that pomegranate juice is going to replace Viagra or is
22  consistent with the pharmaceutical evidence for
23  treatment of erectile dysfunction. I've never once
24  implied that.
25    Q. Dr. Goldstein, you've previously been an author

35 (Pages 2608 to 2611)

2612

1  in articles evaluating the evidence concerning the
2  efficacy of nutraceuticals or alternative treatments in
3  preventing or treating erectile dysfunction; correct?
4      A.  If you could remind me of the article, that
5  would be helpful to me.
6      Q.  Sure.
7      I'd like to take a look at Exhibit CX 2002.
8      May we approach, Your Honor?
9      JUDGE CHAPPELL:  Go ahead.
10     BY MR. WONE:
11     Q.  CX 2002 is an article titled Prevention and
12  Treatment of Erectile Dysfunction Using Lifestyle
13  Changes and Dietary Supplements: What Works and What Is
14  Worthless, Part I and was published in the
15  Urologic Clinics of North America in 2004.
16     You were one of the six authors of this article;
17  correct, Dr. Goldstein?
18     A.  That is correct.
19     Q.  And the authors were from different
20  universities?
21     A.  The authors were part of a working committee for
22  the society called the Sexual Medicine Society of
23  North America to better understand the -- these types of
24  treatment.
25     Q.  And it was the nutraceutical committee?

2613

1      A.  It says on the title "nutraceutical committee."
2      Q.  And what is the purpose of the
3  Sexual Medicine Society, Dr. Goldstein?
4      A.  So all subspecialties of medicine that share
5  common interests and goals and want to foster ideas
6  seem to join into groups that allows exchange of ideas
7  and publications.  The Journal of Sexual Medicine, for
8  which I'm the editor, has different regions, and one of
9  the regions is the Sexual Medicine Society of
10  North America.
11     Q.  And if I could turn your attention to page 4 of
12  CX 2002, the section titled Placebo Effects in Erectile
13  Dysfunction Supplement Use, in the left column, the
14  first sentence reads, "Randomized, controlled clinical
15  trials are considered the criterion standard for
16  determining causality"; correct?
17     A.  That is what's written, yes.
18     Q.  So you distinguish the standard for evaluating
19  the efficacy of dietary supplements that was
20  articulated in the article from the standard you state
21  is needed in this case for POMx and pomegranate juice;
22  correct?
23     A.  You're going to have to repeat that.
24     Q.  Sure.
25     So you distinguish the standard for evaluating

2614

1  the efficacy of dietary supplements that was
2  articulated in this article from the standard you state
3  as needed in this case for pomegranate products;
4  correct?
5      A.  I think the context in which that was written
6  was the context of the pharmaceutical industry having
7  pharmaceutical drugs like Viagra, Levitra and Cialis
8  that have used the randomized clinical trial for their
9  determination of safety and efficacy.  I think that if
10  there could be randomized clinical control data for
11  nutraceuticals involving thousands of people, involving
12  multiple sites, involving an appropriate placebo, I
13  think that would be a real ideal.  I think in reality
14  that's not going to happen or it's not possible, and so
15  I would say that that sentence is an ideal and I think
16  the reality is not going to happen.
17     Q.  And if I could go to Exhibit CX 2003.
18     A.  What page is that, please?
19     Q.  It's a different exhibit, Dr. Goldstein.  One
20  more minute.
21     A.  Oh, okay.
22     MR. WONE:  May we approach, Your Honor?
23     JUDGE CHAPPELL:  Yes.
24     MR. WONE:
25     Q.  CX 2003 is an article titled Prevention and

2615

1  Treatment of Erectile Dysfunction Using Lifestyle
2  Changes and Dietary Supplements: What Works and What Is
3  Worthless, Part II, published in the Urologic Clinics of
4  North America in 2004; correct, Doctor?
5      A.  That is correct, yes.
6      Q.  And similar to CX 2002, you were one of the six
7  authors on this article; correct?
8      A.  It's the same subgroup.  We had a part I and a
9  part II.
10     Q.  And if I could turn your attention to page 10 of
11  CX 2003.
12     In the last paragraph, in discussing dietary
13  supplements and erectile dysfunction, the article
14  concluded that "Randomized clinical trials are the best
15  method of determining which dietary supplements will
16  become a part of conventional medicine"; correct?
17     A.  So I think -- that's what it states, and my
18  answer is it's -- the context and the dream and the hope
19  is that in fact that be the case.  I think more
20  experience and more knowledge -- this is now seven years
21  old -- this manuscript is -- would say that in the seven
22  years since writing this paper there hasn't been any
23  large-scale, randomized clinical control with a
24  nutraceutical.
25     The only nutraceutical publication in humans has

36 (Pages 2612 to 2615)

2616

1 been a paper of 43 people who completed the trial.  It's
2 just a -- one is the ideal dream, and one is the reality
3 that these are incredibly expensive and very complicated
4 to perform, and placebo issues get in the way,
5 et cetera.
6     Q.  And on page -- CX 2003 page 9, the first few
7 lines in the left column, even when a supplement has
8 "demonstrated initial promising results" for erectile
9 dysfunction, the article noted that, quote, larger
10 randomized trials are required to confirm efficacy and
11 determine --
12     MR. FIELDS:  I haven't objected to this point,
13 Your Honor, but I am going to register an objection now
14 to "dietary supplement" as to ambiguity because a
15 dietary supplement can be simply an herbal concoction,
16 and we don't know whether it's talking about a plain
17 food like fruit juice or not.  And if counsel will
18 clarify that and distinguish between dietary
19 supplements, the generic, and pure food, I have no
20 objection.
21     MR. WONE:  I'm using "dietary supplement" as
22 Dr. Goldstein intended in the title of his article,
23 which uses the word "dietary supplement."
24     MR. FIELDS:  But he hasn't defined it and you
25 haven't asked him.

2617

1     JUDGE CHAPPELL:  Right.  You can clarify that
2 with the witness.
3     BY MR. WONE:
4     Q.  Dr. Goldstein --
5     A.  It just disappeared, whatever was there.  Are we
6 done with this or --
7     Q.  No.
8     A.  Okay.  Could you -- I'd like to see it in the
9 context of this page.  That's page 9.  Where is this?  I
10 can't find it in the page.
11     Q.  Oh.  The -- well, I'm going to --
12     A.  There it is.  I now see it.  Thank you.
13     Q.  Dr. Goldstein, can you define "dietary
14 supplements" as you used it in CX 2003 and 2002?
15     A.  Seeing how it's seven years ago, I would have to
16 see specifically what we said, but in my best recall at
17 the moment is that it engages natural fruit juices, it
18 engages herbals, it engages -- it engages dietary
19 supplements.  The nonpharmaceuticals I guess would be
20 the issue.
21     But the point is, if you -- the reason why I
22 wanted to see it in context is, if you go in, the
23 sentence -- because you're just starting with the word
24 "minerals" -- the diagnosis of zinc-promoted copper
25 deficient -- no.  What am I doing -- other ED

2618

1 supplements, such as damiana, combined with herbals,
2 vitamins and minerals and other plants and extracts,
3 these are all separate and distinct from pomegranate
4 juice and I think need to be clarified that they're
5 distinguished from what we're talking about today.
6     You have an article that's a broad working of a
7 committee.  You're picking individual sentences here
8 that I think aren't -- are out of context.  I think we
9 have to clarify that.
10     Q.  But you stated, Dr. Goldstein, that despite
11 initial promising results for those supplements, quote,
12 larger randomized trials are required to confirm
13 efficacy and determine their safety profiles and
14 mechanisms of action; correct?
15     A.  But --
16     MR. FIELDS:  Same objection, Your Honor.  He
17 used the term "dietary supplements," and that's an
18 ambiguous term.  The witness has said you've got to
19 distinguish between these different dietary
20 supplements.
21     If counsel will say "are you saying RCTs are
22 necessary for pomegranate juice," he can answer that
23 squarely.  But if he says "are they necessary for
24 dietary supplements," that takes in herbal supplements,
25 concoctions of all kinds, as well as drugs.

2619

1     THE WITNESS:  Am I allowed to answer?
2     MR. WONE:  Your Honor, I asked Dr. Goldstein to
3 define "dietary supplements" as used in CX 2003 and
4 2002.  He said:
5     "ANSWER (as read):  Seeing how it's seven years,
6 I would have to see specifically what we said, but in my
7 best recall at the moment is that it engages natural
8 fruit juices, it engages herbals, it engages -- it
9 engages dietary supplements.  Nonpharmaceuticals I guess
10 would be the issue."
11     And then he continues on to --
12     JUDGE CHAPPELL:  That's fine.  But I think
13 you'll agree that the case we're here for is about
14 pomegranate juice, so can you at least keep us on point?
15     MR. WONE:  Sure.
16     JUDGE CHAPPELL:  Thank you.
17     THE WITNESS:  And am I allowed to answer or --
18     JUDGE CHAPPELL:  Nothing is pending right now.
19 No question is pending.
20     THE WITNESS:  No question.  Thank you.
21     BY MR. WONE:
22     Q.  So, Dr. Goldstein, as an author, you agree that
23 larger randomized trials were needed to confirm
24 efficacy, safety and mechanisms of action in the dietary
25 supplements in this article, but you don't require such

37 (Pages 2616 to 2619)

# In the Matter of:

# POM Wonderful, et al.

*October 12, 2011*
*Public Record*
*Trial Vol. 17*

**Condensed Transcript with Word Index**



**For The Record, Inc.**
**(301) 870-8025 - www.ftrinc.net - (800) 921-5555**

POM Wonderful, et al.        Record        10/12/2011

USCA Case #13-1060    Document #1483689    Filed: 03/12/2014    Page 342 of 367

2968

```
 1               FEDERAL TRADE COMMISSION
 2                    I N D E X
 3          IN RE POM WONDERFUL LLC, ET AL.
 4                  TRIAL VOLUME 17
 5                   PUBLIC RECORD
 6                 OCTOBER 12, 2011
 7
 8  WITNESS:      DIRECT  CROSS   REDIRECT  RECROSS  VOIR
 9  TUPPER         2972    3025     3036
10  DeKERNION      3039    3062     3119      3127
11
12
13  EXHIBITS   FOR ID  IN EVID  IN CAMERA  STRICKEN/REJECTED
14  CX
15  (none)
16
17  RX
18  (none)
19
20  JX
21  (none)
22
23  DX
24  (none)
25
```

2969

```
 1            UNITED STATES OF AMERICA
 2         BEFORE THE FEDERAL TRADE COMMISSION
 3
 4  In the Matter of          )
                              )
 5  POM WONDERFUL LLC and     )
    ROLL GLOBAL LLC,          )
 6  as successor in interest to  )
    Roll International Corporation, )
 7  companies, and            ) Docket No. 9344
    STEWART A. RESNICK,       )
 8  LYNDA RAE RESNICK, and    )
    MATTHEW TUPPER, individually  )
 9  and as officers of the    )
    companies.                )
10                            )
    ------------------------------)
11
12         Wednesday, October 12, 2011
13               9:33 a.m.
14            TRIAL VOLUME 17
15             PUBLIC RECORD
16
17
18    BEFORE THE HONORABLE D. MICHAEL CHAPPELL
19            Administrative Law Judge
20            Federal Trade Commission
21         600 Pennsylvania Avenue, N.W.
22              Washington, D.C.
23
24
25     Reported by:  Josett F. Whalen, RMR-CRR
```

2970

```
 1  APPEARANCES:
 2
 3  ON BEHALF OF THE FEDERAL TRADE COMMISSION:
 4      HEATHER HIPPSLEY, ESQ.
 5      MARY L. JOHNSON, ESQ.
 6      SERENA VISWANATHAN, ESQ.
 7      DEVIN WILLIS DOMOND, ESQ.
 8      TAWANA E. DAVIS, ESQ.
 9      Federal Trade Commission
10      Bureau of Consumer Protection
11      601 New Jersey Avenue, N.W.
12      Washington, D.C.  20001
13      (202) 326-3285
14      hhippsley@ftc.gov
15
16
17  ON BEHALF OF THE RESPONDENTS:
18      JOHN D. GRAUBERT, ESQ.
19      Covington & Burling LLP
20      1201 Pennsylvania Avenue, N.W.
21      Washington, D.C.  20004-2401
22      (202) 662-5938
23      jgraubert@cov.com
24
25
```

2971

```
 1  APPEARANCES:  (continued)
 2
 3  ON BEHALF OF THE RESPONDENTS:
 4      BERTRAM FIELDS, ESQ.
 5      Greenberg Glusker
 6      1900 Avenue of the Stars
 7      21st Floor
 8      Los Angeles, California  90067
 9      (310) 201-7454
10           -and-
11      KRISTINA M. DIAZ, ESQ.
12      BROOKE HAMMOND, ESQ.
13      JOHNNY TRABOULSI, ESQ.
14      Roll Law Group P.C.
15      11444 West Olympic Boulevard
16      10th Floor
17      Los Angeles, California  90064
18      (310) 966-8775
19      kdiaz@roll.com
20
21
22  ALSO PRESENT:
23      VICTORIA ARTHAUD, ESQ.
24      HILLARY SLOANE GEBLER, ESQ.
25
```

1 (Pages 2968 to 2971)

2972

1              P R O C E E D I N G S
2              -  -  -  -  -
3         JUDGE CHAPPELL:  Back on the record Docket 9344.
4         MS. DIAZ:  Thank you, Your Honor.  We're ready
5  when you are to call our next witness.
6         JUDGE CHAPPELL:  The voice is ready?
7         MS. DIAZ:  It's ready.  I have some lozenges
8  here just in case, but I'm trying to avoid using them.
9         JUDGE CHAPPELL:  All right.  Next witness.
10        MS. DIAZ:  Respondents call Matthew Tupper.
11             -  -  -  -  -
12  Whereupon --
13             MATTHEW TUPPER
14  a witness, called for examination, having been first
15  duly sworn, was examined and testified as follows:
16             DIRECT EXAMINATION
17        BY MS. DIAZ:
18        Q.  Mr. Tupper, you've already testified that you
19  are president of POM Wonderful; is that right?
20        A.  Yes, I did.
21        Q.  You've been employed by POM since 2003?
22        A.  That's correct.
23        Q.  Initially as chief operating officer?
24        A.  Correct.
25        Q.  And in 2005 you became president.

2973

1        A.  That's right.
2        Q.  Do you have any ownership interest in the
3  company?
4        A.  I do not.
5        Q.  Have you ever?
6        A.  I have never had an ownership interest.
7        Q.  Have you ever had an expectation of having an
8  interest?
9        A.  No expectation.  The company is the sole
10  property of Mr. and Mrs. Resnick.
11        Q.  And you are leaving the company soon; is that
12  right?
13        A.  That is correct.  I plan to leave POM by the
14  end of this year most probably, after our annual
15  harvest, which, as it turns out, is going to commence
16  tomorrow.  We're going to start picking our fruit
17  tomorrow.  That should be completed by the early part
18  of December, at which time I'm going to begin
19  transitioning my duties, and I will be leaving by the
20  end of the year.
21        Q.  Okay.  When you gave testimony in this case
22  previously -- I believe it was June -- you knew you
23  would be leaving; is that right?
24        A.  Yes, that's correct.
25            For actually a while now, my wife and I have

2974

1  been planning to pursue an early retirement, and that
2  plan has been in the works for a while, certainly was
3  in place in June when I testified, although at that
4  point I had not yet informed the Resnicks, the owners,
5  of what the plan was.  I think I told them in mid to
6  late June.
7        Q.  And you will not be joining any other -- any
8  Roll or Resnick company; is that right?
9        A.  That's correct.
10        Q.  You're not just shifting companies or --
11        A.  I'm not shifting companies.  I'd be leaving the
12  world of Roll altogether.
13        Q.  Okay.  Shifting gears a little bit, you
14  currently manage the day-to-day operations of the
15  company; is that right?
16        A.  I do.  I manage the day-to-day business on
17  behalf of the Resnicks.
18        Q.  And you have since -- since what time period?
19  Handled the day-to-day operations.
20        A.  Since 2003 when I first joined POM.
21        Q.  Okay.  Does that include POM's marketing
22  department?
23        A.  It does include the marketing team, yes.
24        Q.  Okay.  Do you manage POM's marketing exclusive
25  of the Resnicks?

2975

1        A.  If you mean do I develop the direction that
2  we're going to take in marketing independently and
3  decide how we want to market the products, no.  That,
4  that say, that final say, that direction, ultimately
5  lies with the Resnicks.  My job is to carry out and
6  implement the direction that has been decided upon.
7        Q.  Okay.  So who has ultimate decision-making
8  authority for advertising medical benefits or
9  medical -- you know -- yes.  Who has authority for
10  advertising the benefits of POM, the consumption of
11  pomegranate juice?
12        A.  Ultimately, any decisions made with respect to
13  what do we talk about, how do we talk about it, that
14  decision would lie with Stewart Resnick in consultation
15  with our legal advisers, our lawyers.
16        Q.  Okay.  But you handle the day-to-day in
17  connection with the health benefit advertising?
18        A.  That's correct.  Once a direction has been
19  decided upon, my job then is to work with all the
20  different parts of the team at POM to make sure that we
21  head in that direction and execute appropriately.
22        Q.  Okay.  What role do you play specifically in
23  connection with health benefit advertising?
24        A.  So when it comes to any of the ads or
25  communication that we would run or issue talking about

2 (Pages 2972 to 2975)

USCA Case #13-1060    Document #1483685    Filed: 03/12/2014    Page 344 of 367

2976

1  the medical research, I really view my job as to make
2  sure that all of the relevant pieces of the equation
3  come together, the science and the scientists, the
4  marketing team, the lawyers and legal advisers. My job
5  is ultimately to make sure that the science is correctly
6  portrayed in the ads and to make sure that's done the
7  right way.
8      Q. Okay. So are your -- you're the connecting
9  piece between the science and the marketing; is that
10 accurate?
11     A. Correct. My job is to connect the science, make
12 sure it's interpreted correctly through the lens of the
13 marketers and to make sure that it's done in
14 consultation and under the watch of our legal team.
15     Q. Okay. And so how do you go about doing that?
16 How do you go about ensuring that the science is, you
17 know, connected to the advertising?
18     A. It all starts with the scientists and in fact
19 the published papers that we would describe in an ad or,
20 again, in another sort of communication. I make sure
21 that the marketing team understands what was discovered
22 in a particular study and make sure that that
23 information gets, again, correctly, accurately, fairly
24 incorporated into the marketing materials.
25     Q. Okay. Now, have you always played that role in

2977

1  connection with health benefit advertising since you
2  first joined POM?
3      A. Well, since I first joined POM, I have always
4  been engaged in the dialogue around the science, in
5  other words, what are we studying, what did we learn,
6  what did the publication show, what did the study
7  conclude. But it was -- it's really been since 2007,
8  late 2006, early 2007, that I became more engaged in
9  this connecting role, and that occurred at a time when
10 we had a new head of marketing join POM.
11      The old head of marketing had actually been
12 around for a while and was quite up to speed on the
13 science, had a bit of a science background himself.
14 When we had a new marketing head come in, however, that
15 individual obviously didn't have the history of the
16 science program and didn't have quite as much of a
17 science background, and that's when I became more
18 directly involved myself.
19     Q. Okay. So since that 2007 time period, has the
20 process that you've used to connect the science with the
21 advertising and vet through legal, has that process
22 remained the same since 2007 to the present?
23     A. No. We've actually modified it, and we now have
24 a more formalized process involved where there is a
25 well-defined path, for lack of a better term, that an ad

2978

1  would travel before it ultimately gets published, and
2  you know, we literally have a checklist of the
3  individuals who need to review and sign off on those
4  ads, ultimately culminating in the legal review. And
5  that process ensures that nothing falls through the
6  cracks.
7      Q. Was there ever a time where the actual ads and
8  advertising themselves, the ads themselves, had to be
9  run by or approved by chief science officers, either
10 Mark Dreher or Brad Gillespie or their predecessors?
11     A. The -- always the final step of vetting and
12 approving an ad lies with our lawyers who perform the
13 legal review. The scientists, whether it's, you know,
14 Dr. Gillespie or Dr. Dreher or any of the outside
15 scientists we work with, they're actually engaged in the
16 process earlier on as we try to translate from
17 scientific language into layperson's language what it
18 was that we learned, what a study concluded, what the
19 results in a particular publication showed, so they get
20 involved at the outset of the process, and then the
21 final review is with legal.
22     Q. Okay. Mr. Tupper, what was Mr. Resnick's
23 stated policy on the relationship, on the required
24 relationship between the scientific studies and the
25 advertisements?

2979

1      A. Very simple I suppose, the policy is that the
2  ads had to accurately represent what the science
3  concluded. The -- you know, I think as has been
4  testified previously, we believe that throughout the
5  course of the science program there's been many
6  important learnings, which serve the public's interest
7  to learn about. The ads are one vehicle to disseminate
8  the information, but at all times the very clear policy
9  and direction is to make sure that what's portrayed in
10 the ads is consistent with what was learned in the
11 studies themselves.
12     Q. Are there any areas of science where POM saw
13 positive results in the science but where it didn't
14 advertise those?
15     A. Yes. There have been a number of different
16 areas where there's been some very encouraging research
17 and studies that have been completed and published but
18 where we've chosen not to discuss those in any of our
19 advertising because we wanted to see the science
20 progress further before we brought that information out
21 to the public.
22     Q. Okay. Can you identify some of those areas?
23     A. Sure. A few that come to mind would be:
24      We've done some actually quite interesting
25 research on immunity, cold and flu.

3 (Pages 2976 to 2979)

2996

1  this ad was used?
2      A. Again, this was --
3      Q. And I'm talking about the whole, you know, theme
4  with the copy.
5      A. This was an ad that again was very early on,
6  2004, just when we had launched the plastic bottle and
7  before we had developed the -- what became known as our
8  dressed bottle campaign, which was kicked off in late
9  2004, so this is another early ad in 2004.
10     Q. Okay. And is it your testimony that we haven't
11  used this ad since 2004?
12     A. I don't believe we have, no.
13     Q. Are you drawing a distinction between the --
14  just for sake of clarity here, are you drawing a
15  distinction between the headline and the copy, the body
16  copy?
17     A. I don't even believe that we've used the
18  headline and image subsequent to 2004.
19     Q. Okay. Can we put up the next ad, "Amaze your
20  cardiologist." It's CX 471 in my notes.
21         Mr. Tupper, can you put a time on this, on this
22  ad?
23     A. Same time frame, 2004, at the latest 2005. This
24  was an early-on iteration of our dressed bottle
25  campaign, which ultimately ended up having a white --

2997

1  stark white background. This was sort of a precursor to
2  that campaign, and we walked away from the use of the
3  color behind the bottle.
4      Q. Okay. Okay. I want to now review the
5  advertisements concerning the amount of money spent on
6  POM's research program. Do you know what ads I'm
7  referring to?
8      A. I do, yes.
9      Q. Okay. I'm referring to the "backed by"
10  advertisements. Is that what you have in mind?
11     A. Yes.
12         Did you say "backed by"?
13     Q. Backed by.
14     A. Yes.
15     Q. Okay. What does it mean to convey how much
16  money the company has invested?
17     A. Well, what it means is, very simply, and what
18  our intention has always been is to convey our
19  commitment to the science program, the seriousness, the
20  breadth, the depth of that science program, and to do so
21  by illustrating that concept with the amount of funding
22  that we've provided to the science.
23         And we've -- the goal was to really in many ways
24  distinguish ourselves from most of the other food and
25  supplement companies that do one or two simple studies

2998

1  and stop there. That's very different than how we've
2  approached our program, where, you know, over the past
3  decade-plus we've funded and provided support for dozens
4  upon dozens of studies with the intention of probing the
5  frontiers of knowledge about pomegranates.
6         And so in those ads, by citing the aggregate
7  amount of funding, we're trying to communicate that,
8  hey, this is a serious science program. We care about
9  science. We're committed to science. That's a core
10  part of what we do.
11     Q. Okay. So dollars referenced, were those
12  supposed to reference the total dollars or total
13  approximation of dollars on -- spent on POM's research
14  program?
15     A. Correct. That included the funding cumulatively
16  since the beginning that had gone to planning, executing
17  and analyzing and interpreting the results from the
18  studies, as well as setting the continued direction for
19  that program.
20     Q. Were you comfortable using the total dollars
21  spent on the research program regardless of the area of
22  health referenced in the advertisement?
23     A. So if you're asking do I think and do we think
24  it's appropriate to include the total amount at any
25  given time whether we're talking about cardiovascular or

2999

1  prostate or ED in an ad, the answer is yes. We feel
2  it's very appropriate.
3         Number one, again, the intention was to
4  communicate the expanse, the depth, the breadth of the
5  commitment to science. That's the primary objective.
6  But more fundamentally, the science all interrelates.
7  The learnings that we get from one study apply to other
8  studies in different areas because we're dealing with
9  some basic fundamentals of mechanistic action within the
10  human physiology that are really centered around
11  antioxidation, antimicrobial activity and
12  antiinflammation, and those span across all the areas as
13  these nutrients essentially have a systemic effect
14  throughout the body.
15     Q. Was overhead like salaries and rent included in
16  your total dollars?
17     A. No, it wasn't. We've always taken a very
18  conservative approach to calculating those dollars, so
19  it's just been, as I said, the dollars that have gone
20  out the door to external parties for planning and
21  conducting and then analyzing and interpreting studies,
22  so it doesn't include or it hasn't included the
23  salaries, the benefits associated with people
24  internally, Dr. Dreher, Dr. Gillespie, any of the
25  people who have worked on that team, the offices that

8 (Pages 2996 to 2999)

3060

1    Do you understand my question?
2    A. Yes, I do.
3    Yes. I think especially if you have a drug
4  with toxicities it's extremely important you have a
5  placebo because it frames the subjective effects of the
6  drug against a group who might express some of the
7  headache or nausea who didn't even get the drug, so it
8  gives you a real measure of the toxicity of the drug.
9    Q. In other words, is it correct that when you have
10  something subjective like pain or nausea, it's important
11  to have a placebo group because people may be reporting
12  something they don't really feel or -- but does that
13  apply to prostate? Is there anything subjective about
14  whether your prostate doubling time increases or
15  decreases?
16    A. No. No. You have no -- there's no symptoms,
17  no -- no knowledge or subjective feeling about it, no,
18  or objective feeling.
19    Q. Okay. Now, in the case of something like fruit
20  juice that has low or no toxicity at all, is it
21  necessary to have a -- what we call an RCT, that is, a
22  placebo-controlled kind of test?
23    A. Well, in my opinion, no. Well, no.
24    Q. Okay. It's your opinion we're looking for right
25  now.

3061

1    A. I think that -- there's a lot of reasons to that
2  obviously.
3    Q. In your opinion, based on all of the science
4  that you've talked about, is it likely that POM or POMx
5  will improve the chances of avoiding or deferring the
6  recurrence of prostate cancer in men who have had a
7  radical prostatectomy?
8    A. Yes.
9    Q. And is that a matter of high probability?
10    A. Yes.
11    Q. Now, a somewhat different question. I think the
12  court was alluding to this to some extent.
13    Based on all of these studies that you've told
14  us about, is it your opinion that the same mechanisms
15  that you've described would result in pomegranate juice
16  inhibiting the clinical development of prostate cancer
17  in men who have not been diagnosed with prostate
18  cancer?
19    A. Yes.
20    Q. Is that a matter of high probability in your
21  opinion?
22    A. Yes, it is.
23    MR. FIELDS: That's all I have.
24    JUDGE CHAPPELL: Will there be any cross?
25    MS. DAVIS: Yes.

3062

1    - - - - -
2    CROSS-EXAMINATION
3    BY MS. DAVIS:
4    Q. Good afternoon, Dr. DeKernion.
5    A. Good afternoon.
6    Q. Dr. DeKernion, would you agree that there is no
7  clinical study, research or trial proving that POM juice
8  prevents prostate cancer in humans?
9    A. Yes.
10    Q. And would you agree that there is no clinical
11  study, research or trial proving that POMx pills
12  prevents prostate cancer in humans?
13    A. Correct.
14    Q. Would you -- you would agree that there is no
15  clinical study, research or trial proving that POMx
16  liquid prevents prostate cancer in humans.
17    A. Correct.
18    Q. And you would agree that there is no clinical
19  study, research or trial proving that POM juice reduces
20  the risk of prostate cancer in humans.
21    A. Correct.
22    Q. And you would agree that there is no clinical
23  study, research or trial proving that POMx pills reduces
24  the risk of prostate cancer in humans.
25    A. Correct.

3063

1    Q. And you would agree that there is no clinical
2  study, research or trial proving that POMx liquid
3  reduces the risk of prostate cancer in humans.
4    A. Correct.
5    Q. And you would agree that the results of animal
6  and in vitro studies can't always be extrapolated to a
7  response in humans; is that correct?
8    A. I'm sorry. Did you say "can" or "can't"?
9    Q. Cannot.
10    A. Cannot.
11    Q. Cannot always be extrapolated to a response in
12  humans.
13    A. I would -- my answer to that is yes, but the --
14  not always but most of the time, if the mechanisms are
15  clearly defined as they are in here.
16    Q. And you would agree that even where the animal
17  and in vitro evidence is strong and shows that an
18  agent's mechanism of action works, this evidence does
19  not prove that an agent works in humans; is that
20  correct?
21    A. I'm sorry. Repeat that, will you? I'm sorry.
22    Q. Sure.
23    You would agree that even where the animal and
24  in vitro evidence is strong and shows that an agent's
25  mechanism of action works, this evidence does not prove

24 (Pages 3060 to 3063)

**STATEMENT OF COMMISSIONER MAUREEN K. OHLHAUSEN**
**DISSENTING IN PART AND CONCURRING IN PART**
*In the Matter of GeneLink, Inc. and foru International Corporation*
*Federal Trade Commission v. Sensa Products, LLC*
*Federal Trade Commission v. HCG Diet Direct, LLC*
*In the Matter of L'Occitane, Inc.*
*Federal Trade Commission and State of Connecticut v. LeanSpa, LLC*
January 7, 2014

I strongly support the Commission's enforcement efforts against false and misleading advertisements and therefore have voted in favor of the consent agreements with Sensa Products, LLC; HCG Diet Direct, LLC; L'Occitane, Inc.; and LeanSpa, LLC, despite having some concerns about the scope of the relief in several of these weight-loss related matters. I voted against the consent agreements in the matter of GeneLink, Inc. and foru International Corporation, however, because they impose an unduly high standard of at least two randomized controlled trials (or RCTs) to substantiate *any* disease-related claims, not just weight-loss claims. Adopting a one-size-fits-all approach to substantiation by imposing such rigorous and possibly costly requirements for such a broad category of health- and disease-related claims[1] may, in many instances, prevent useful information from reaching consumers in the marketplace and ultimately make consumers worse off.[2]

The Commission has traditionally applied the *Pfizer*[3] factors to determine the appropriate level of substantiation required for a specific advertising claim. These factors examine the nature of the claim and the type of product it covers, the consequences of a false claim, the benefits of a truthful claim, the cost of developing the required substantiation for the claim, and the amount of substantiation experts in the field believe is reasonable for such a claim.[4] One of the goals of the *Pfizer* analysis is to balance the value of greater certainty of information about a product's claimed attributes with the risks of both the product itself and the suppression of potentially useful information about it. Under such an analysis, the burden for substantiation for health- or disease-related claims about a safe product, such as a food, for example, should be lower than the burdens imposed on drugs and biologics because consumers face lower risks when consuming the safe product.[5]

---

[1] This provision may apply quite broadly in practice given the Commission majority's conclusion in our *POM Wonderful* decision that many of the claims involving the continued healthy functioning of the body also conveyed implied disease-related claims. *See POM Wonderful, LLC*, No. 9344, 2013 WL 268926 (F.T.C. Jan. 16, 2013).

[2] To be clear, however, I am not advocating in favor of permitting "unsubstantiated disease claims," as suggested in the statement of Chairwoman Ramirez and Commissioner Brill. Rather, I am suggesting that consumers would on balance be better off if we clarified that our requirements permit a variety of health- or disease-related claims about safe products, such as foods or vitamins, to be substantiated by competent and reliable scientific evidence that might not comprise two RCTs.

[3] *Pfizer, Inc.*, 81 F.T.C. 23 (1972).

[4] *Id.* at 91-93; *see also FTC Policy Statement Regarding Advertising Substantiation,* 104 F.T.C. 839 (1984) (appended to *Thompson Med. Co.*, 104 F.T.C. 648, 839 (1984)).

[5] The FDA designates most food ingredients as GRAS (generally recognized as safe). 21 C.F.R. § 170.30. Vitamins and minerals are treated as foods by the FDA and are also GRAS. *See* FDA Guidance for Industry: Frequently Asked Questions about GRAS (Dec. 2004), *available at* http://www.fda.gov/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/IngredientsAdditivesGRASPackaging/ucm061846.htm#Q1. As a result, food ingredients, vitamins, and minerals can be combined and sold

Recently, however, Commission orders, including the ones in the matter of GeneLink and foru International, seem to have adopted two RCTs as a standard requirement for health- and disease-related claims for a wide array of products.[6]  RCTs can be difficult to conduct and are often costly and time-consuming relative to other types of testing, particularly for diseases that develop over a long period of time or complex health conditions.  Requiring RCTs may be appropriate in some circumstances, such as where use of a product carries some significant risk, or where the costs of conducting RCTs may be relatively low, such as for conditions whose development or amelioration can be observed over a short time period.  Thus, I am willing to support the order requirement of two RCTs for short-term weight loss claims in the Sensa, HCG Diet Direct, L'Occitane, and LeanSpa matters because such studies can be conducted in a relatively short amount of time at a lower cost than for many other health claims.  My concern with GeneLink and foru International and the series of similar orders is that they might be read to imply that two RCTs are required to substantiate any health- or disease-related claims, even for relatively-safe products.  It seems likely that producers may forgo making such claims about these kinds of products, even if they may otherwise be adequately supported by evidence that does not comprise two RCTs.[7]

Although raising the requirement for both the number and the rigor of studies required for substantiation for all health- or disease-related claims may increase confidence in those claims, the correspondingly increased burdens in time and money in conducting such studies may suppress information that would, on balance, benefit consumers.  If we demand too high a level of substantiation in pursuit of certainty, we risk losing the benefits to consumers of having access to information about emerging areas of science and the corresponding pressure on firms to compete on the health features of their products.  In my view, the Commission should apply the *Pfizer* balancing test in a more finely calibrated manner than they have in the GeneLink and foru International orders to avoid imposing "unduly burdensome restrictions that might chill information useful to consumers in making purchasing decisions."[8]

In addition, based on the same concerns about imposing unnecessarily burdensome and costly obligations, I do not support a general requirement that all products be tested by different researchers working independently without an indication that the defendant fabricated or

---

to the public without direct evidence on the particular combination realized in the new product.  Many products are made up of several common generic ingredients, for which there is little financial incentive to test individually or to retest in each particular combination.

[6] The orders in this matter include as a Covered Product any food, drug, or cosmetic that is genetically customized or personalized for a consumer or that is promoted to modulate the effect of genes.  Other cases requiring two RCTs are *POM Wonderful LLC*, Docket No. 9344 (F.T.C. Jan. 10, 2013) (fruit juice); *Dannon Co., Inc.*, 151 F.T.C. 62 (2011) (yogurt); *Nestlé Healthcare Nutrition, Inc.*, 151 F.T.C. 1 (2011) (food); *FTC v. Iovate Health Sci. USA, Inc.*, No. 10-CV-587 (W.D.N.Y. July 29, 2010) (dietary supplement).

[7] Notably, the medical community does not always require RCTs to demonstrate the beneficial effects of medical and other health-related innovations.  For example, the recommendation that women of childbearing age take a folic acid supplement to reduce the risk of neural tube birth defects was made without RCT evidence on the relevant population. *See* Walter C. Willett, "Folic Acid and Neural Tube Defect: Can't We Come to Closure?" *American Journal of Public Health*, May 1992, Vol. 82, No. 5; Krista S. Crider, Lynn B. Bailey and Robert J. Berry, "Folic Acid Food Fortification—Its History, Effect, Concerns, and Future Directions," *Nutrients* 2011, Vol. 3, 370-384.

[8] FTC Staff Comment Before the Food and Drug Administration In the Matter of Assessing Consumer Perceptions of Health Claims, Docket No. 2005N-0413 (2006), *available at* http://www.ftc.gov/be/V060005.pdf.

otherwise interfered with a study or its results.[9]  Where defendants have fabricated results, as our complaint against Sensa alleges, a requirement of independent testing may be appropriate, but a simple failure to have adequate substantiation should not automatically trigger such an obligation.  In other cases, where there is some concern about a sponsor or researcher biasing a study, our orders may address this in a less burdensome way by requiring the producer making the disease-related claims to provide the underlying testing data to substantiate its claims, which we can examine for reliability.  Similarly, the requirement to test an "essentially equivalent product," which appears to be more rigorous than FDA requirements for food and supplement products, can significantly and unnecessarily increase the costs of substantiation, again potentially depriving consumers of useful information.  Instead, Commission orders should clearly allow claims regarding individual ingredients in combined products as long as claims for each ingredient are properly substantiated and there are no known relevant interactions.[10]

It is my hope and recommendation that as we consider future cases involving health- and disease-related claims, the Commission and its staff engage in a further dialogue about our substantiation requirements to discern how best to assess the potential costs and benefits of allowing different types of evidence that might provide a reasonable basis to substantiate such claims.  Although I am willing to support liability for failures to have adequate substantiation for health- and disease-related claims under certain circumstances, I am not willing to support a de facto two-RCT standard on health- and disease-related claims for food or other relatively-safe products.

---

[9] The FDA does not require independent testing for clinical investigational studies of medical products, including human drug and biological products or medical devices, and it permits sponsors to use a variety of approaches to fulfill their responsibilities for monitoring.  *See* FDA Guidance for Industry Oversight of Clinical Investigations—A Risk-Based Approach to Monitoring (Aug. 2013), *available at* http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM269919.pdf.

[10] Although the statement by Chairwoman Ramirez and Commissioner Brill asserts that the orders in GeneLink and foru International permit claims for individual ingredients in combined products as long as the claims for each ingredient are properly substantiated and there are no known interactions, the orders actually require that "reliable scientific evidence generally accepted by experts in the field demonstrate that the amount and *combination of additional ingredients* is unlikely to impede or inhibit the effectiveness of  the ingredients in the Essentially Equivalent Product."  Decision and Order at 2, *In the Matter of GeneLink, Inc.* FTC File No. 112 3095 (emphasis added).  My point is that the FDA does not require direct evidence regarding *combinations of individual ingredients deemed GRAS* but the order on its face requires scientific evidence demonstrating the effect of such combinations.



About Us    Locations    Events    Jobs    Giving    Videos    Pressroom    Blog    Stay Connected ▾    Patient Login ▶

**Memorial Sloan Kettering Cancer Center**

**Find a Doctor**



| HOME | CANCER CARE | RESEARCH | EDUCATION & TRAINING | | Making an Appointment » |

Cancer & Treatment ▾  |  For New Patients ▾  |  Counseling & Support ▾  |  Survivorship Center ▾  |  Hospital Information ▾  |  For Healthcare Professionals ▾

**Cancer Care**
- Adult Cancers
- Pediatric Cancers
- Patient Stories
- Our Physicians: At Work
- For Healthcare Professionals

**Clinical Trials**
- Learn About Clinical Trials
- Find a Clinical Trial

**Specialized Treatments & Services**
- Adult Blood & Marrow Stem Cell Transplantation
- Pediatric Blood & Marrow Transplantation
- Pathology Consultations

**Symptom Management**
- Integrative Medicine
- Palliative Care & Pain Management
- Rehabilitation
- Dermatologic Health
- Cognitive Testing

**Risk Assessment & Screening**
- Hereditary Cancer & Genetics
- Screening Guidelines
- Our Screening Services
- Prediction Tools

CLOSE ✕

INTEGRATIVE MEDICINE

# Pomegranate

About Herbs Newsletter

All  #  A  B  C  D  E  F  G  H  I  J  K  L  M  N  O  P  Q  R  S  T  U  V  W  X  Y  Z

## Pomegranate



- Scientific Name
- Common Name
- Clinical Summary
- Food Sources
- Purported Uses
- Constituents
- Mechanism of Action
- Pharmacokinetics
- Warnings
- Adverse Reactions
- Herb-Drug Interactions
- Literature Summary and Critique
- References

**INTEGRATIVE MEDICINE**
- Our Expertise
- Therapies, Classes & Workshops
- About Herbs, Botanicals & Other Products
  - Search About Herbs
  - Herbs, Botanicals & Other Products: FAQs
  - E-mail Us
- For Older Patients
- Our Research
- Additional Resources
- Multimedia

**JA-1298**

USCA Case #13-1060     Document #1483687     Filed: 03/12/2014     Page 351 of 367

## Scientific Name
Punica granatum L.

Top ▲

## Common Name
Chinese apple

Top ▲

## Clinical Summary

Pomegranate is a small fruit-bearing tree native to Asia but is cultivated in many parts of the world including the United States. The fruit juice extracted from the arils of the seeds is used in drinks and as a dietary supplement. Several studies have shown that pomegranate has antioxidant and antiatherosclerotic properties attributed to the presence of multiple polyphenols such as tannins, flavonols, anthocyanins and ellagic acid [1] [2].

Consumption of pomegranate juice was found to benefit patients with carotid artery stenosis [6], in those with hypertension [7], hyperlipidemia [21], mild to moderate erectile dysfunction [19], and in patients with coronary heart disease (CHD) [8], but had no effect in patients with chronic obstructive pulmonary disease (COPD) [9].
In a study of postmenopausal women, intake of pomegranate seed oil did not reduce hot flashes [22].

Pomegranate juice has been shown to suppress inflammatory cell signaling [1], inhibit prostate tumor growth and lower serum PSA levels [3] [4], and also inhibit aromatase activity, endogenous estrogen biosynthesis and breast cancer cell proliferation [5] in vitro.
A pomegranate seed extract alleviated ciplatin-induced hepatotoxicity in animal studies [23].
Pomegranate juice was reported to slow the rate of increase of PSA in men with high PSA levels, but data are conflicting [2] [24].

Top ▲

## Food Sources
Whole fruit, juice

Top ▲

## Purported Uses

- Cancer treatment and prevention
- Atherosclerosis
- Coronary heart Disease
- Hypercholesterolemia
- Hyperlipidemia
- Hypertension
- HIV

**JA-1299**

## Constituents

- Tannins
- Flavonols
- Anthocyanins
- Ellagic acid
  [14] [15] [16]

Top ▲

## Mechanism of Action

Several studies have indicated that pomegranate juice has antioxidant and antiatherosclerotic properties due to the presence of multiple polyphenols such as tannins, flavonols, anthocyanins and ellagic acid. Punicalagin, an ellagitannin, is the most abundant polyphenol that accounts for >50% of the antioxidant activity [1] [2]. Some commercial pomegranate juices are marketed with claims of higher antioxidant activity than green tea and red wine [13]. However such effects could be due to colonic microflora metabolites and not the polyphenols present in the juice [14]. Pomegranate extract can inhibit aromatase activity and decrease the endogenous synthesis of estrogen [5].

Top ▲

## Pharmacokinetics

Studies in rats suggest that most punicalagin is absorbed but only 3-6% is excreted in the feces and urine suggesting that the majority is converted to $CO_2$ or other undetectable metabolites [15]. The metabolites that are present in urine in both rats and humans, 6H-dibenzo[b,d]pyran-6-one derivatives, are the products of intestinal microflora metabolizing the pomegranate tannins. A recent human study has shown that ellagic acid is absorbed from pomegranate juice and detected in plasma samples. It is unclear whether free ellagic acid is due to hydrolysis of the pomegranate ellagitannins, physiological pH, or gut microflora activity [16].

Top ▲

## Warnings

Pomegranate juice may increase the risk of rhabdomyolysis for patients on statin therapy possibly due to the inhibition of CYP 450 enzymes [17].
Diabetic patients should be careful because of the sugar content of pomegranate.

Top ▲

## Adverse Reactions

No significant adverse effects were seen with daily consumption of 8 ounces of pomegranate juice in men for over two years [2].

Top ▲

## Herb-Drug Interactions

- **Cytochrome P4503A substrates:** Studies in rats indicate that pomegranate juice may inhibit cytochrome P450 3A (CYP3A) activity similar to grapefruit juice [10] [11]. But a study in humans demonstrated that pomegranate juice did not alter clearance of intravenous or oral midazolam, whereas grapefruit juice is known to have this effect [12].
- **CYP 2C9 substrates:** A study done in rats showed that pomegranate juice inhibited CYP2C9 activity and increased tolbutamide bioavailability [18].

JA-1300

When used in combination with warfarin, radiation therapy support, pomegranate juice may act with warfarin.[28]

Top ▲

### Literature Summary and Critique

Pantuck AJ, Leppert JT, Zomorodian N, et al. Phase II study of pomegranate juice for men with rising prostate-specific antigen following surgery or radiation for prostate cancer. *Clin Cancer Res.* 2006;12(13):4018-4026. 🗗

A phase II clinical trial was conducted with 46 men with rising PSA following surgery or radiotherapy. Subjects were given 240ml (8 ounces) of pomegranate juice daily until progression of disease. Researchers found a significant increase in the mean PSA doubling time following the study period. These results warrant further testing via a placebo-controlled study.

Sumner MD, Elliott-Eller M, Weidner G, et al. Effects of pomegranate juice consumption on myocardial perfusion in patients with coronary heart disease. *Am J Cardiol* 2005;96(6):810-814. 🗗

Forty-five patients with stable coronary heart disease (CHD) received 240mL/day of pomegranate juice or placebo for three months. After three months, stress-induced ischemia decreased in the pomegranate group (SDS -0.8 +/- 2.7), but an increase was observed in the placebo group. The authors conclude that pomegranate juice may be of benefit in improving stress-induced myocardial ischemia in CHD patients.

Top ▲

### References

1. Adams LS, Seeram NP, Aggarwal BB, Takada Y, Sand D, Heber D. Pomegranate juice, total pomegranate ellagitannins, and punicalagin suppress inflammatory cell signaling in colon cancer cells. 🗗 *J Agric Food Chem.* Feb 8 2006;54(3):980-985.

2. Pantuck AJ, Leppert JT, Zomorodian N, et al. Phase II study of pomegranate juice for men with rising prostate-specific antigen following surgery or radiation for prostate cancer. 🗗 *Clin Cancer Res.* Jul 1 2006;12(13):4018-4026.

3. Lansky EP, Jiang W, Mo H, et al. Possible synergistic prostate cancer suppression by anatomically discrete pomegranate fractions. 🗗 *Invest New Drugs.* Jan 2005;23(1):11-20.

4. Malik A, Afaq F, Sarfaraz S, Adhami VM, Syed DN, Mukhtar H. Pomegranate fruit juice for chemoprevention and chemotherapy of prostate cancer. 🗗 *Proc Natl Acad Sci* U S A. Oct 11 2005;102(41):14813-14818.

5. Kim ND, Mehta R, Yu W, et al. Chemopreventive and adjuvant therapeutic potential of pomegranate (Punica granatum) for human breast cancer. 🗗 *Breast Cancer Res Treat.* Feb 2002;71(3):203-217.

6. Aviram M, Rosenblat M, Gaitini D, et al. Pomegranate juice consumption for 3 years by patients with carotid artery stenosis reduces common carotid intima-media thickness, blood pressure and LDL oxidation. 🗗 *Clin Nutr.* Jun 2004;23(3):423-433.

7. Aviram M, Dornfeld L. Pomegranate juice consumption inhibits serum angiotensin converting enzyme activity and reduces systolic blood pressure. 🗗 *Atherosclerosis.* Sep 2001;158(1):195-198.

8. Sumner MD, Elliott-Eller M, Weidner G, et al. Effects of pomegranate juice consumption on myocardial perfusion in patients with coronary heart disease. 🗗 *Am J Cardiol.* Sep 15 2005;96(6):810-814.

9. Cerda B, Soto C, Albaladejo MD, et al. Pomegranate juice supplementation in chronic obstructive pulmonary disease: a 5-week randomized, double-blind, placebo-controlled trial. 🗗 *Eur J Clin Nutr.* Feb 2006;60(2):245-253.

### JA-1301

10. Summers KM. Potential drug-food interactions with pomegranate juice. *Ann Pharmacother.* Jul-Aug 2006;40(7-8):1472-1473.

11. Hidaka M, Okumura M, Fujita K, et al. Effects of pomegranate juice on human cytochrome p450 3A (CYP3A) and carbamazepine pharmacokinetics in rats. *Drug Metab Dispos.* May 2005;33(5):644-648.

12. Farkas D, Oleson LE, Zhao Y, et al. Pomegranate juice does not impair clearance of oral or intravenous midazolam, a probe for cytochrome P450-3A activity: comparison with grapefruit juice. *J Clin Pharmacol.* Mar 2007;47(3):286-294.

13. Gil MI, Tomas-Barberan FA, Hess-Pierce B, Holcroft DM, Kader AA. Antioxidant activity of pomegranate juice and its relationship with phenolic composition and processing. *J Agric Food Chem.* Oct 2000;48(10):4581-4589.

14. Cerda B, Espin JC, Parra S, Martinez P, Tomas-Barberan FA. The potent in vitro antioxidant ellagitannins from pomegranate juice are metabolised into bioavailable but poor antioxidant hydroxy-6H-dibenzopyran-6-one derivatives by the colonic microflora of healthy humans. *Eur J Nutr.* Aug 2004;43(4):205-220.

15. Cerda B, Llorach R, Ceron JJ, Espin JC, Tomas-Barberan FA. Evaluation of the bioavailability and metabolism in the rat of punicalagin, an antioxidant polyphenol from pomegranate juice. *Eur J Nutr.* Jan 2003;42(1):18-28.

16. Seeram NP, Lee R, Heber D. Bioavailability of ellagic acid in human plasma after consumption of ellagitannins from pomegranate (Punica granatum L.) juice. *Clin Chim Acta.* Oct 2004;348(1-2):63-68.

17. Sorokin AV, Duncan B, Panetta R, Thompson PD. Rhabdomyolysis associated with pomegranate juice consumption. *Am J Cardiol.* Sep 1 2006;98(5):705-706.

18. Nagata M, Hidaka M, Sekiya H, et al. Effects of pomegranate juice on human cytochrome P450 2C9 and tolbutamide pharmacokinetics in rats. *Drug Metab Dispos.* Feb 2007;35(2):302-305.

19. Forest CP, Padma-Nathan H, Liker HR. Efficacy and safety of pomegranate juice on improvement of erectile dysfunction in male patients with mild to moderate erectile dysfunction: a randomized, placebo-controlled, double-blind, crossover study. *Int J Impot Res.* 2007 Nov-Dec;19(6):564-7.

20. Komperda KE. Potential interaction between pomegranate juice and warfarin. *Pharmacotherapy.* 2009 Aug;29(8):1002-6.

21. Mirmiran P, Fazeli MR, Asghari G, Shafiee A, Azizi F. Effect of pomegranate seed oil on hyperlipidaemic subjects: a double-blind placebo-controlled clinical trial. *Br J Nutr.* 2010 Aug;104(3):402-6.

22. Auerbach L, Rakus J, Bauer C, et al. Pomegranate seed oil in women with menopausal symptoms: a prospective randomized, placebo-controlled, double-blinded trial. *Menopause.* 2012 Apr;19(4):426-32.

23. Yildirim NC, Kandemir FM, Ceribasi S, Ozkaraca M, Benzer F. Pomegranate seed extract attenuates chemotherapy-induced liver damage in an experimental model of rabbits. *Cell Mol Biol (Noisy-le-grand).* 2013 Feb 2;59 Suppl:OL1842-7.

24. Paller CJ, Ye X, Wozniak PJ, et al. A randomized phase II study of pomegranate extract for men

**JA-1302**

with rising PSA following radiotherapy for localized prostate cancer. *Prostate Cancer Prostatic Dis.* 2013 Mar;16(1):50-5.

Top ▲

*Last updated: August 14, 2013*

E-mail your questions and comments to aboutherbs@mskcc.org ✉.

🖶 Print    ✉ E-mail    ↗ Share    ⬇ Download this page as PDF    📖 Glossary On

| About Us | For Adult Patients | For Pediatric Patients | For Researchers | For Healthcare Professionals |
|---|---|---|---|---|
| Locations | Making an Appointment | Making an Appointment | About Our Research | Refer a Patient |
| Events | Cancers & Treatments | Cancers & Treatments | Sloan Kettering Institute | Clinical Updates |
| Jobs | Clinical Trials | Pediatric Clinical Trials | Memorial Hospital Research | Clinical Trials |
| Giving | Why MSKCC? | Why Choose Us | Clinical Research | Prediction Tools |
| Videos | For New Patients | Info for New Families | Collaborative Research Centers | Continuing Education |
| Pressroom | For International Patients | Life in Pediatrics | Extramural Collaborations | **Education & Training** |
| Blog | Counseling & Support | Pediatric Patient Stories | Research Support | Graduate Medical Education |
| President's Office | Survivorship Center | Survivorship Care | Postdoctoral Training | PhD & MD/PhD Education |
| Contact Us | Hospital Information | | | For High School & College Students |
| | Patient Stories | | | |
| | Patient Portal: MYMSKCC | | | |

**Like Us On**     **Follow Us On**     **Watch Us On** 

Memorial Sloan Kettering Cancer Center | Memorial Hospital for Cancer and Allied Diseases | Sloan Kettering Institute
Gerstner Sloan Kettering Graduate School of Biomedical Sciences | Memorial Sloan Kettering Cancer Center Library

Legal Disclaimer | Privacy Practices | Public Notices
©2014 Memorial Sloan Kettering Cancer Center

**JA-1303**

USCA Case #13-1060    Document #1483685    Filed: 03/12/2014    Page 356 of 367



## Antioxidants

Our bodies are battlegrounds against infection and diseases. Normal body functions such as breathing or physical activity and other lifestyle habits such as smoking produce substances called free radicals that attack healthy cells. When these healthy cells are weakened, they are more susceptible to cardiovascular disease and certain types of cancers. Antioxidants, such as vitamins C and E and carotenoids, which include beta-carotene, lycopene and lutein, help protect healthy cells from damage caused by free radicals.

### Carotenoids

Among the 600 or more carotenoids in foods, beta-carotene, lycopene and lutein are well-known leaders in the fight to reduce the damage from free radicals. Foods high in carotenoids may be effective allies against prostate cancer (beta-carotene); cancers of the mouth, pharynx, esophagus, stomach, colon and rectum (lycopene); and may help decrease your risk of macular degeneration (lutein).

Foods high in carotenoids include red, orange, deep-yellow and some dark-green leafy vegetables, like tomatoes, carrots, spinach, Brussels sprouts, sweet potatoes, winter squash and broccoli.

### Vitamin E

Research has demonstrated the broad role of vitamin E in promoting health. The main role of vitamin E is as an antioxidant. It helps protect your body from cell damage that can lead to cancer, heart disease and cataracts as we age. Vitamin E works with other antioxidants like vitamin C to offer protection from some chronic diseases. Vitamin E is found in vegetable oils, salad dressings, margarine, wheat germ, whole-grain products, seeds, nuts and peanut butter.

### Vitamin C

Perhaps the best-known antioxidant, vitamin C offers a wide-variety of health benefits, including protecting from infection and damage to body cells, helping produce collagen (the connective tissue that holds bones and muscles together); protecting your body from bruising by keeping capillary walls and blood vessels firm; and helping in the absorption of iron and folate.

To take advantage of these benefits, eat foods rich in vitamin C like citrus fruits (oranges, grapefruits and tangerines), strawberries, sweet peppers, tomatoes, broccoli and potatoes.

### Challenges to Healthful Eating

The best way to build a healthful eating plan is to eat well-balanced meals and snacks each day and to enjoy a wide variety of foods. Eating at least 2 cups of fruits and 2 ½ cups of vegetables daily is a good start for healthful living.

However, there may be circumstances that make healthful eating a challenge. If you are on a severely restricted low-calorie weight loss diet (less than 1,200 calories per day) or are of child-bearing age or just don't eat enough fruits and vegetables, a multivitamin or mineral supplement may be beneficial. Ask a registered dietitian or your doctor whether you need a supplement. A registered dietitian can evaluate your eating pattern and determine whether a supplement is right for you.



**JA-1304**

USCA Case #13-1060    Document #1483687    Filed: 03/12/2014    Page 357 of 367

KIDS eat right.

Public Policy Workshop
March 30 - April 1, 2014 • Washington, D.C.

**Stay Connected**

✉ E-Newsletter    📶 RSS Feeds    💬 Podcasts    📺 Videos

Quick Links

Join the Academy

shop

KidsEatRight

FNCE 2013

Food and Nutrition
Magazine

Journal

**Academy of Nutrition and Dietetics Foundation**

The Academy of Nutrition and Dietetics Foundation is the world's largest charitable organization (501c3) focused on food, nutrition and dietetics. Academy Foundation is dedicated to working with the Registered Dietitian to help kids and their families eat right.

**ANDPAC**
Academy of Nutrition and Dietetics Political Action Committee

Participate in the only political action committee broadly focused on food, nutrition and health. If dietetics is your profession, policy should be your passion!

Through accreditation and approval of more than 600 undergraduate and graduate didactic, dietetic technician and supervised practice programs, the Commission on Accreditation for Dietetics Education ensures entry-level education meets quality standards.

**Commission on Dietetic Registration**
the credentialing agency for the
Academy of Nutrition and Dietetics

The Commission on Dietetic Registration awards credentials to individuals at entry and specialty levels who have met CDR's standards for competency to practice in the dietetics profession.

Visit site    Make a donation    Visit site    Make a donation    Visit site    Visit site

Copyright © 1995-2014 | Academy of Nutrition and Dietetics, All Rights Reserved. | Privacy Statement | Terms and Conditions | Editorial Policy | Advertising & Sponsorship | Careers | Contact Us

**JA-1305**

Michael H. Davidson, MD - The University of Chicago Medicine



Home | About Us | Directions & Maps | Donate or Volunteer | Contact Us

Call UCM Connect to Make an Appointment: 1-888-824-0200

# THE UNIVERSITY OF CHICAGO MEDICINE

AT THE FOREFRONT OF MEDICINE®

- Specialties and Departments
- Find a Physician
  - » Michael H. Davidson, MD
- Request an Appointment
- Patient and Visitor Information
- Online Library
- Clinical Trials
- Classes and Events
- For Medical Professionals
- Jobs

Home > Find a Physician >

✉ EMAIL    SHARE    🖨 PRINT

## Michael H. Davidson, MD



### Clinical Professor of Medicine

### Director, Preventive Cardiology

Michael H. Davidson, MD, is a nationally recognized expert on statins, novel lipid-lowering drugs and the reduction of coronary artery disease risk through diet and exercise. He specializes in heart disease prevention--teaching patients to take a proactive approach in managing cardiac risk factors.

An active researcher, Dr. Davidson's clinical research background encompasses both pharmaceutical and nutritional clinical trials. His extensive research on statins, novel lipid-lowering drugs, and nonpharmacologic risk factor reduction has established him as a key opinion leader in this area.

A prolific author and lecturer on lipid disorders, nutrition, and atherosclerosis, Dr. Davidson has coordinated more than 1,000 clinical trials in areas of preventive cardiology. He has published more than 250 articles for leading medical journals and has written 3 books on Lipidology.

Dr. Davidson has been named one of "The Best Doctors in America" by Best Doctors Inc. for the past 10 years and was named Father of the Year by the American Diabetes Association, 2010. He currently serves as president of the National Lipid Association.

### Practice Locations

150 E. Huron Street
Suite 900
Chicago, IL 60611

### Year Started Practice

1986

### Board Certifications

Internal Medicine
Cardiology
Lipidology

### Medical School

Ohio State University College of Medicine

### Internship, Residency & Fellowship

Rush-Presbyterian-St. Luke's Medical Center, Chicago

### Memberships

American College of Cardiology
American College of Chest Physicians
American Medical Association
Midwest Lipid Association
National Lipid Association

### Language Spoken

English

### Clinical Interests

- Cardiology
- Preventive cardiology
- Cardiovascular lipid management
- Cardiovascular risk factor modification

### Request an Appointment

150 E. Huron Street
Request an appointment online
or call (773) 834-4150

Physicians, contact the
Referring Physician Access Line
at 1-877-DOM-2730

### Selected Publications

View a partial list of Dr. Davidson's publications through the National Library of Medicine's PubMed online database.

**JA-1306**

http://www.uchospitals.edu/physicians/michael-davidson.html[3/11/2014 8:07:30 AM]

Michael H. Davidson, MD - The University of Chicago Medicine

**Email**

mdavidso@bsd.uchicago.edu

**Office Phone**

(773) 702-1717

**Office Fax**

(773) 834-7300

**Office Postal Address**

Michael H. Davidson, MD
The University of Chicago Medicine
5841 S. Maryland Avenue, MC 6080
Chicago, IL 60637

**PATIENTS & VISITORS**

Request an Appointment
Find a Physician
Off-Site Clinic Locations
Directions & Maps
Visitation Guidelines
Medical Records Requests
Pay Your Bill
Financial Assistance
Patient Relations

**International Patients**
**Quality**
**JCAHO Public Notice**

**SPECIALTIES & DEPARTMENTS**

Cancer Care
Gastrointestinal Disorders
Heart Care
Neurosciences
Pediatrics
Surgery
More Specialties

**Online Health Library**
**Informacion en Espanol**

**MEDICAL PROFESSIONALS**

Refer a Patient
Contact a Department
Graduate Medical Education
Continuing Medical Education
Grand Rounds & Events Calendar
Nursing Careers

**RELATED SITES**

Pritzker School of Medicine
Biological Sciences Division
University of Chicago
Bucksbaum Institute for Clinical Excellence

**NEWS & COMMUNITY**

Newsroom
Science Life Blog
Patient Stories
Publications
Community Benefits
Make a Gift
Volunteer





© 2014 The University of Chicago Medical Center. All rights reserved.

Contact Us | Privacy Practices | Legal Disclaimer | Site Map | Employee Login

The University of Chicago Medicine
5841 S. Maryland Avenue
Chicago, IL 60637 | 773-702-1000

**Appointments:** Call UCM Connect at 1-888-824-0200

**JA-1307**

USCA Case #13-1060    Document #1483685    Filed: 03/12/2014    Page 360 of 367



STANFORD MEDICINE    Getting Care ▾    Research ▾    Education & Training ▾    Community ▾    About Us ▾    STANFORD UNIVERSITY



Ways to Give · Find a Physician · Find a Researcher

SEARCH ▸

| Patient Resources | Diseases & Treatments | Understanding Cancer | Clinical Trials | Research | Training | Outreach | About Us |

Stanford Medicine » School of Medicine » Stanford Cancer Center » About Cancer » What is Cancer? » Nutrition and Cancer » Nutrition to Reduce Cancer Risk



**DISEASES & TREATMENTS**

What is Cancer?
  Cancer Overview
  Cancer Diagnosis
  Cancer Treatment
  Genetics and Cancer
  Nutrition and Cancer
      General Nutrition Guidelines
      Nutrition Before Cancer Treatment
  → Nutrition to Reduce Cancer Risk
  Alternative Therapies
  Pain Management
  Coping With Diagnosis
  End of Life Care
  Online Resources
  Glossary
  Stanford Health Library
  NCI Cancer Information Service
Blood and Marrow Transplantation
Blood Diseases
Bone Cancer
Brain Cancer
Breast Cancer
Cancer Genetics
Childhood Cancers
Endocrine Cancers
Female and Gynecologic Cancers

# Nutrition to Reduce Cancer Risk

The scientific community is continually studying the role of diet in the development of cancer. Many results are preliminary and more is being learned every day. Research is discovering that intake of fruits, vegetables, and cereal grains may interfere with the process of developing cancer of the oral cavity, larynx, esophagus, stomach, colon, lung, prostate, and rectum. In addition to reducing the risk of developing cancer, the risk of developing heart disease, hypertension, obesity, diabetes, and other chronic diseases might also be prevented by eating more fruits and vegetables. There is also evidence that total fat intake of greater than 30 percent of total calories can increase the risk of developing some cancers. This is especially true when total fat intake includes saturated fat and possibly polyunsaturated fat. The Food Guide Pyramid, Dietary Guidelines for Americans, and 5 A Day for Better Health Campaign are good sources for nutritional information.

| ADDITIONAL INFORMATION |
| --- |
| ▪ "5 A Day For Better Health" |
| ▪ Dietary Guidelines For Americans |
| ▪ Exercise |
| ▪ Food Guide Pyramid |
| ▪ Phytochemicals, Antioxidants, and Omega-3 Fatty Acids |

## What foods help to prevent cancer?

Although research studies are inconclusive at this time, preliminary evidence suggests that some components of food may play a role in decreasing the risk of developing cancer, including phytochemicals, antioxidants, and omega-3 fatty acids.

## What are phytochemicals (or phytonutrients)?

Phytochemicals are chemicals found in plants that protect plants against bacteria, viruses, and fungi. Eating large amounts of brightly colored fruits and vegetables (yellow, orange, red, green, white, blue, purple), whole grains/cereals, and beans containing phytochemicals may decrease the risk of developing certain cancers as well as diabetes, hypertension, and heart disease. The action of phytochemicals varies by color and type of the food. They may act as antioxidants or nutrient protectors, or prevent carcinogens (cancer causing agents) from forming.

## What are specific sources of phytochemicals?

The list below is a partial list of phytochemicals found in foods:

- **Allicin** is found in onions and garlic. Allicin blocks or eliminates certain toxins from bacteria and viruses.
- **Anthocyanins** are found in red and blue fruits (such as raspberries and blueberries) and vegetables. They help to slow the aging process, protect against heart disease and tumors, prevent blood clots, and fight inflammation and allergies.
- **Biflavonoids** are found in citrus fruits.

JA-1308

Gastrointestinal and Colorectal Cancers

Head and Neck Cancers

Lung Cancer

Lymphoma

Male Cancers

Multiple Myeloma

Neuroendocrine Cancers

Skin Cancer

Soft Tissue Sarcomas

Urologic / Genitourinary Cancers

USCA Case #13-1060    Document #1483687    Filed: 03/12/2014    Page 361 of 367

- **Carotenoids** are found in dark yellow, orange, and deep green fruits and vegetables such as tomatoes, parsley, oranges, pink grapefruit, and spinach.

- **Flavonoids** are found in fruits, vegetables, wine, green tea, onions, apples, kale, and beans.

- **Indoles** are found in broccoli, bok choy, cabbage, kale, Brussel sprouts, and turnips (also known as "cruciferous" vegetables). They contain sulfur and activate agents that destroy cancer-causing chemicals.

- **Isoflavones** are found in soybeans and soybean products.

- **Lignins** are found in flaxseed and whole grain products.

- **Lutein** is found in leafy green vegetables. It may prevent macular degeneration and cataracts as well as reduce the risk of heart disease and breast cancer.

- **Lycopene** is found primarily in tomato products. When cooked, it appears to reduce the risk for cancer and heart attacks.

- **Phenolics** are found in citrus fruits, fruit juices, cereals, legumes, and oilseeds. It is thought to be extremely powerful, and is studied for a variety of health benefits including slowing the aging process, protecting against heart disease and tumors, and fighting inflammation, allergies, and blood clots.

Phytochemicals cannot be found in supplements and are only present in food. Foods high in phytochemicals include the following:

- broccoli
- berries
- soynuts
- pears
- turnips
- celery
- carrots
- spinach
- olives
- tomatoes
- lentils
- cantaloupe
- garlic
- apricots
- onions
- seeds
- soybeans
- green tea
- apples
- cabbage
- Brussels sprouts
- bok choy
- kale
- red wine

**JA-1309**

USCA Case #13-1060    Document #1483687    Filed: 03/12/2014    Page 362 of 367

There is no recommended dietary allowance for phytochemicals. Eat a variety of foods, including plenty of fruits and vegetables, to ensure you are getting adequate amounts in your diet.

## What are antioxidants?

Antioxidants are substances that inhibit the oxidation process and act as protective agents. They protect the body from the damaging effects of free radicals (by-products of the body's normal chemical processes). Free radicals attack healthy cells, which changes their DNA, allowing tumors to grow. Research is underway to investigate the role of antioxidants in decreasing the risk of developing cancer.

Antioxidants include:

- **vitamin C (ascorbic acid)**
  According to the National Cancer Institute (NCI), vitamin C may protect against cancer of the oral cavity, stomach, and esophagus and may also reduce the risk of developing cancers of the rectum, pancreas, and cervix. Also known as ascorbic acid, vitamin C may provide protection against breast and lung cancer.
  According to the American Dietetic Association and USDA Nutrient Database for Standard Reference, the following foods are good sources of vitamin C:
  - one medium orange - 69 mg
  - 1 cup orange juice - 124 mg
  - 1 medium raw green pepper - 106 mg
  - 1 cup raw strawberries - 81 mg
  - 1 cup cubed papaya - 86 mg
  - 1 medium raw red pepper - 226 mg
  - 1/2 cup cooked broccoli - 58 mg

  The recommended dietary allowance (RDA) for vitamin C has recently been increased to 75 milligrams per day for women and 90 milligrams per day for men. Safe upper limit = 2.000mg. If on high doses of chemo or nephrotoxins, upper limit = 500mg.

- **beta carotene**
  Beta carotene, also known as provitamin A, may help decrease the risk of developing cancer. According to the American Cancer Society, this nutrient may prevent certain cancers by enhancing the white blood cells in your immune system. White blood cells work to block cell-damaging free radicals.

  Good sources of beta carotene are dark green leafy and yellow-orange fruits and vegetables. In the body, beta carotene is converted to vitamin A. Eating foods rich in beta carotene is recommended to possibly decrease the risk of developing stomach, lung, prostate, breast, and head and neck cancer. However, more research is needed before a definite recommendation on beta carotene consumption can be made. Overdosing on beta carotene is not recommended. Large doses can cause the skin to turn a yellow-orange color, a condition called carotenosis. High intakes of beta carotene in supplement form may actually cause lung cancer in people at risk, such as smokers, and it is not recommended.

  While there is a recommended dietary allowance for vitamin A (safe upper limit = 25,000IU or 15mg), there is not one for beta carotene. Examples of some foods high in beta carotene include the following:
  - carrots

**JA-1310**

USCA Case #13-1060    Document #1483685    Filed: 03/12/2014    Page 363 of 367

- squash
- collards
- spinach
- sweet potatoes

- **vitamin E**

  Vitamin E is essential for our bodies to work properly. Vitamin E helps to build normal and red blood cells, as well as working as an antioxidant. Research is finding evidence that vitamin E may protect against prostate and colorectal cancer. The recommended dietary allowance for vitamin E is 15 milligrams per day. The adult upper limit for vitamin E is 1,000 milligrams per day. Good sources of vitamin E (and the amount each serving contains) include the following:

  - 1 tablespoon sunflower oil - 6.9 mg
  - 1 ounce sunflower seeds - 14 mg
  - 1 ounce almonds - 7.4 mg
  - 1 ounce hazelnuts - 4.3 mg
  - 1 ounce peanuts - 2.1 mg
  - 3/4 cup bran cereal - 5.1 mg
  - 1 slice whole wheat bread - .23 mg
  - 1 ounce wheat germ - 5.1 mg

  Since some sources of vitamin E are high in fat. A synthetic form of a vitamin E is available as a supplement. Vitamin E supplementation is probably not needed for most individuals because vitamin E is a fat-soluble vitamin and is stored in our bodies. Very high doses of vitamin E can also interfere with the way other fat-soluble vitamins work. Also, large doses of vitamin E from supplements are not recommended for people taking blood thinners and some other medications, as the vitamin can interfere with the action of the medication. To make sure you are meeting your needs, eat a varied diet that includes whole-wheat breads and cereals.

There is no recommended dietary allowance for antioxidants. Eat a variety of foods, including plenty of fruits and vegetables, to ensure you are getting adequate amounts in your diet.

## What are omega-3 fatty acids?

Researchers are studying the effects omega-3 fatty acids have on delaying or reducing tumor development in breast and prostate cancer. Since our bodies cannot make omega-3 fatty acids, we must get them from food or supplements. The omega-3 fatty acids include:

- alpha-linolenic acid
- eicosapentaenoic acid
- docosahexaenoic acid

Sources and recommended servings of foods high in omega-3 fatty acids include:

- seafood, especially cold-water fish like salmon, mackerel, sardines, herring, halibut, stripped bass, tuna, and lake trout (aim for three to four servings of these fish every week)
- flaxseed oil and beans such as kidney, great northern, navy, and soybeans

The American Cancer Society recommends avoiding omega-3 fatty acid supplements in the following situations:

**JA-1311**

USCA Case #13-1060     Document #1483685     Filed: 03/12/2014     Page 364 of 367

- if you take anticoagulant medications or aspirin, as omega-3 fatty acid supplements may increase the risk of excessive bleeding

- if you have elevated cholesterol levels, as omega-3 fatty acid supplements may continue to increase your cholesterol levels

- if you are pregnant or breastfeeding (Women should talk to their physicians before taking omega-3 supplements or any dietary supplements.)

- if you are menstruating, as omega-3 fatty acid supplements may increase the tendency of developing anemia

**JA-1312**

Prostate cancer screenings | Medicare.gov

View ▾

Sites ▾     🔒 MyMedicare.gov Login

**Medicare**.gov

🔍

type search term here                    Menu ▾

✚ Share

Home  ➔  Your Medicare coverage

# Your Medicare Coverage

## Is my test, item, or service covered?

type your test, item, or service here

## Prostate cancer screenings

### How often is it covered?

Medicare Part B (Medical Insurance) covers:

- **Digital rectal exam:** Once every 12 months
- **Prostate Specific Antigen (PSA) test:** Once every 12 months

### Who's eligible?

All men over 50 (beginning the day after your 50th birthday) with Medicare are covered.

### Your costs in Original Medicare

- **Digital rectal exam:** You pay 20% of the Medicare-approved amount for the digital rectal exam and for the doctor's services related to the exam. The Part B deductible applies. In a hospital outpatient setting, you pay a copayment.
- **Prostate Specific Antigen (PSA) Test:** You pay nothing for PSA the blood test. If you get the test from a doctor that doesn't accept assignment, you may have to pay an additional fee for the doctor's services, but not for the test itself.

| Note |
| --- |
| Your doctor or other health care provider may recommend you get services more often than Medicare covers. Or, they may recommend services that Medicare doesn't cover. If this happens, you may have to pay some or all of the costs. It's important to ask questions so you understand why your doctor is recommending certain services and whether Medicare will pay for them. |

**JA-1313**

**Related resources**

- ◆ Medicare & You: Prostate Cancer Awareness Month (video)
- ◆ CDC: prostate cancer information
- ◆ National Cancer Institute: prostate cancer information
- ◆ U.S. Preventive Services Task Force: screening for prostate cancer recommendations
- ◆ American Cancer Society:prostate cancer information

Return to search results

## Find someone to talk to

Select your state...

---

## Share the news. Share the health!



Tell your friends and family with Medicare about the difference these benefits can make.

---

Home    **Medicare**.gov

A federal government website managed by the Centers for Medicare & Medicaid Services
7500 Security Boulevard, Baltimore, MD 21244



**Sign Up / Change Plans**

**Your Medicare Costs**

**What Medicare Covers**

**Drug Coverage (Part D)**

**Supplements & Other Insurance**

**Claims & Appeals**

**Manage Your Health**

**Forms, Help & Resources**

**Take Action**

Find health & drug plans

Find doctors, providers, hospitals & plans

Where can I get covered medical items?

Get Medicare forms

Publications

Information in other languages

Phone numbers & websites

**Get Email Updates**

**JA-1314**

USCA Case #13-1060    Document #1483687    Filed: 03/12/2014    Page 367 of 367

## Helpful Links

Site policies & important links

Privacy policy

FOIA

No Fear Act

HHS.gov

USA.gov

Inspector General

Plain language

Archive

Downloadable databases

"Medicare & You" Handbook

Help with file formats & plug-ins

## CMS & HHS Websites

HealthCare.gov

STOPMedicareFraud.gov

InsureKidsNow.gov

MyMedicare.gov

Medicaid.gov

CMS.gov

## Get Involved with Us

  

**JA-1315**